UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RICARDO SALOM, CATHERINE PALAZZO as assignee for Ruben Palazzo, and PETER HACKINEN, *on their own behalf and on behalf of other similarly situated persons,* | Case No. 2:24-cv-00444- BJR |
| Plaintiffs, | **<u>CORRECTED</u> PLAINTIFFS' COMBINED APPENDIX OF EXHIBITS FOR JUDICIAL NOTICE** |
| vs. | |
| NATIONSTAR MORTGAGE LLC, | |
| Defendant. | |

## TABLE OF CONTENTS

(Exhibits are bookmarked in Adobe as well)

| Exhibit No. | Description | Appendix Pages |
|---|---|---|
| 1 | Final Order for Class Approval: *Baxter v. Lakeview & Nationstar,* Circuit Court for Anne Arundel County, MD (Case No. C-02-cv-22-000654). | 1-2 |
| 2 | Transcript of Hearing for Final Approval: *Baxter v. Lakeview & Nationstar,* Circuit Court for Anne Arundel County, MD (Case No. C-02-cv-22-000654). | 3-10 |
| 3 | Transcript of Hearing for Class Certification: *Baxter v. Lakeview & Nationstar,* Circuit Court for Anne Arundel County, MD (Case No. C-02-cv-22-000654). | 11-31 |
| 4 | Declaration of Nationstar's Senior Vice President Courtney Ehinger: *Baxter v. Lakeview & Nationstar,* Circuit Court for Anne Arundel County, MD (Case No. C-02-cv-22-000654). | 32-38 |
| 5 | Nationstar's Assurance of Discontinuance with Consumer Protection Division of the Office of the Maryland Attorney General | 39-49 |
| 6 | Nationstar's Stipulation and Settlement Agreement: *Garcia v. Nationstar,U.S. District Court for the Western District of Washington* (Case No. 2:15-cv-01808-TSZ at ECF. 92-1) | 49-57 |
| 7 | Declaration OF Benjamin H. Richman: *Garcia v. Nationstar,U.S. District Court for the Western District of Washington* (Case No. 2:15-cv-01808-TSZ at ECF. 92-1) | 58-61 |
| 8 | Declaration of Ian Mensher: *Garcia v. Nationstar,U.S. District Court for the Western District of Washington* (Case No. 2:15-cv-01808-TSZ at ECF. 118) | 62-66 |
| 9 | Mr. Cooper Group Inc.'s Fourth Quarter of 2023 Earnings Review (February 9, 2024) Related to Its SEC Reporting | 67-80 |
| 10 | Mr. Cooper Group Inc.'s February 9, 2024 Press Release Related to its Fourth Quarter of 2023 Earnings Review Related to Its SEC Reporting | 81-90 |

# TABLE OF CONTENTS

(Exhibits are bookmarked in Adobe as well)

| Exhibit No. | Description | Appendix Pages |
|---|---|---|
| 11 | Mr. Cooper Group Inc.'s 2023 Annual Report on Form 10-K to the SEC (less exhibits) | 91-124 |
| 12 | Br. of *Amici Curiae* Consumer Financial Protection Bureau's in the matter of *Thomas-Lawson v. Carington Mortgage Services LLC* before the United States Court of Appeals for the Ninth Circuit (Case No. 21-55459)(dated Oct. 21, 2021) | 125-162 |

| | | |
|---|---|---|
| **TONDA BAXTER, on behalf of herself and others similarly situated,** | * | **IN THE** |
| | * | **CIRCUIT COURT** |
| **Plaintiff,** | * | **FOR** |
| *v.* | * | **ANNE ARUNDEL COUNTY** |
| **LAKEVIEW LOAN SERVICING, LLC,** *et al.* | * | Civil No.: C-02-CV-22-000654 |
| | * | |
| **Defendants.** | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## FINAL APPROVAL ORDER

Upon consideration of the Unopposed Motion for Final Approval of Class Action Settlement, (the "Settlement Agreement"), to which there have been no objections and only one opt out request, and after a Settlement Hearing on March 15, 2024, at 1:30 P.M., it is, by the Circuit Court for Anne Arundel City, HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

1.    The Court finds that the proposed settlement as set forth in the Settlement Agreement, is fair, reasonable, adequate, and in the best interests of the Class.

2.    The Court finds that due and sufficient notice was given to the Class of the proposed settlement, and that the form and content of the Class Notice, and the mailing, and distribution of the Class Notice, satisfy the requirements of Maryland Rule 2-231(f) and due process, and constitute the best notice practicable under the circumstances.

3.    The Settling Parties are authorized and directed to consummate the settlement in accordance with the terms and provisions of the Settlement Agreement and the Clerk of the Circuit Court for Anne Arundel County is directed to enter and docket this Order.

1

APX. 1

03/18/2024/NS

4.      The Court finds that Stephanie Maria McHenry, 1240L Gemini Drive, Annapolis, MD 21403, timely exercised her right to exclude herself from the above-captioned action. Stephanie Maria McHenry is not included in or bound by this Final Approval Order.

5.      The Class Representative and Class Members are barred from asserting any Released Claims as defined in the Settlement Agreement, and they shall be deemed to have forever released, dismissed with prejudice, relinquished, and discharged the Defendants of all Released Claims as provided in the Settlement Agreement.

6.      Neither the Settlement Agreement nor any act performed or document executed pursuant to the Settlement Agreement may be deemed or used as an admission of wrongdoing in any civil, criminal, or administrative proceeding.

7.      Without affecting the finality of the Final Approval Order, this Court reserves jurisdiction over all matters relating to the administration and consummation of the settlement.

_____ 3/15/2024

The Honorable *Cathleen M. Vitale*
Judge, Circuit Court for Anne Arundel County

2

Apx. 2

1          IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

2    TONDA BAXTER,

3              Plaintiff

4      vs.                                          Civil Docket

5    LAKEVIEW LOAN SERVICING, LLC, ET AL.,      No. C-02-CV-22-000654

6              Defendants

7              OFFICIAL TRANSCRIPT OF PROCEEDINGS

8            SETTLEMENT AGREEMENT FINAL APPROVAL ORDER,

9                  MOTION FOR ATTORNEY'S FEES

10                    VOLUME III OF III

11                                          Annapolis, Maryland

12                                          Friday, March 15, 2024

13   BEFORE:

14       THE HONORABLE CATHLEEN M. VITALE, JUDGE

15   APPEARANCES:

16       For the Plaintiff:

17            PHILLIP ROBINSON, ESQUIRE

18            E. DAVID HOSKINS, ESQUIRE

19       For the Defendants:

20            THAILER BUARI, ESQUIRE

21   Transcribed from electronic recording by:

22       Patricia Kobylski, Transcriber

23       CRC Salomon

24       2201 Old Court Rd, Baltimore, MD 21208

25       410-821-4888

Office (410) 821-4888                2201 Old Court Road, Baltimore, MD 21208                Facsimile (410) 821-4889
CRC Salomon, Inc.                    www.crcsalomon.com - info@crcsalomon.com                                    Page:

Apx 3

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

```
 1              T A B L E   O F   C O N T E N T S

 2                                                    Page

 3   Motion for Attorney's Fees                        12

 4   Settlement Agreement Final Approval Order          20

 5   WITNESSES:              DIRECT:  CROSS:  REDIRECT:  RECROSS:

 6        None

 7   EXHIBITS:              IDENTIFICATION:   EVIDENCE:

 8        None

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Apx 4

```
1          P R O C E E D I N G S
2          THE COURT:  This is Baxter versus Lakeview, C-02-CV-
3   22-000654.  If Counsel would identify themselves for the record,
4   please.
5          MR. ROBINSON:  Good afternoon, Your Honor, Phillip
6   Robinson on behalf of Ms. Baxter and the Class.
7          MR. HOSKINS:  David Hoskins on behalf of the Plaintiff
8   and the Class.
9          MR. BUARI:  Good afternoon, Your Honor, Thailer Buari
10  on behalf of Lakeview Loan Servicing, LLC, and Nationstar
11  Mortgage, LLC.
12         THE COURT:  All right.  So, gentlemen, I am walking
13  into this so you all will have to educate the Court.
14         THE CLERK:  Can you have them spell their names?
15         THE COURT:  What's that?
16         THE CLERK:  Can you have them spell their names?
17         THE COURT:  The Clerk's Office would like you to spell
18  all of your names for us, please.
19         MR. ROBINSON:  Phillip Robinson, Your Honor, P-H-I-L-
20  L-I-P R-O-B-I-N-S-O-N.
21         MR. HOSKINS:  First initial, E. David, D-A-V-I-D,
22  Hoskins, H-O-S-K-I-N-S.
23         MR. BUARI:  Thailer, T-H-A-I-L-E-R, last name is
24  Buari, B-U-A-R-I.
25         THE COURT:  Okay.  You all can have a seat.
```

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page: 3

```
1          MR. BUARI:  Thank you, Your Honor.
2          THE COURT:  All right.  So, as I understand this, we
3   are at the tail end having had -- and let me just put something
4   on the record.  The Court communicated with Mr. Lynch (phonetic)
5   this morning.  He filed a request to be present by remote
6   appearance, and as we made it clear to Mr. Lynch, if he wishes
7   to practice in Anne Arundel County, his presence is required.
8   If he wants to live in Virginia Beach and be a Virginia lawyer,
9   then he's free to do that as well, but in Anne Arundel County we
10  require your presence.  And the Court issued, the last time he
11  asked to be remote, he was notified in December that his
12  appearance would be required here.  He has not been here; he was
13  denied the request to appear by phone, so, or remotely.  All
14  right, go ahead, Counsel.
15         MR. ROBINSON:  Good afternoon again, Your Honor,
16  Phillip Robinson.  I'll provide Your Honor with a general
17  overview and sort of where we're at.  And you're correct, we are
18  the tail end of this case, I hope.  The case was filed in April
19  of 2022, with class and individual claims asserted by Ms. Baxter
20  against the Defendants related to charging fees for accepting
21  payments by telephone or -- and/or the internet.
22         And there had been a Fourth Circuit case that was
23  published addressing Maryland law a couple months before that.
24  The Defendants appeared; the Defendants filed an answer.  The
25  Plaintiffs served discovery.  We served an initial demand in
```

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page: 4

```
1   August of 2022, asking for all the money back consistent with
2   Alexander (phonetic).
3          THE COURT:  Right, that's the Carrington case, right?
4          MR. ROBINSON:  Yeah.  And the Defendants answered
5   discovery but didn't tell us at the time -- we learned
6   subsequently in the fall of 2022 -- that they had actually
7   unilaterally refunded.  So, it's a little different, Your Honor.
8   I've never encountered this before without Court approval,
9   without Court supervision, the Defendants refunded and they
10  provided sworn testimony and numerous papers before the Court
11  that they've done that.
12         That being said, they did not refund prejudgment
13  interest that the Class Members would be entitled to and they
14  didn't make any payment for attorney fees that Mr. Hoskins and I
15  would be entitled to in almost any other case.  But for the case
16  being filed, that recovery may never had happened.
17         The parties went with first in early 2023, a little
18  over a year ago, we had mediation with Judge Green (phonetic).
19  We subsequently had a settlement conference with Judge
20  Platt.  There were cross-motions for summary judgment, a motion
21  for -- contested motion for class certification.  Judge Crooks,
22  in May, I believe, Your Honor, certified the Class.  So, the
23  normal thing --
24         THE COURT:  Judge Crooks or Judge McCormack?
25         MR. ROBINSON:  I think Judge Crooks --
```

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page: 5

```
1          THE COURT:  Okay.
2          MR. ROBINSON:  -- certified the Class.  Normally, Your
3   Honor, at a class settlement, we would go through all the class
4   factors.  We don't have to do that here because Judge Crooks has
5   already -- unless Your Honor wants me to -- Judge Crooks has
6   already determined that there is a class.  He encouraged the
7   parties --
8          THE COURT:  Right, no, I knew that.
9          MR. ROBINSON:  -- he encouraged the parties to
10  continue the settlement communications.  That did happen
11  throughout all of last summer.  A settlement agreement was
12  reached, presented to the Court in early September.  Judge
13  McCormack gave preliminary approval to that --
14         THE COURT:  That's what I was saying.
15         MR. ROBINSON:  -- in December.  And then pursuant to
16  that order, notice was sent out to the Class Members by email
17  and by mail to those who didn't have an email address.
18         THE COURT:  Mm-hmm.
19         MR. ROBINSON:  For settlement, a third-party
20  settlement administrator, American Legal, was picked and
21  distributed all that.  We provided the Court with copies; their
22  affidavit of what they did, and their calculations as to who got
23  the notice.
24         I believe we have -- we had one Class Member here a
25  moment ago.  She didn't want to talk.  Mr. Hoskins and I can
```

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page: 6

Apx. 5

**Page 7**

1  both represent as Officers of the Court, that at least in my
2  experience, I think he would agree, I have never gotten as many
3  phone calls as I did with this Class notice, because most of the
4  calls are like, what do you mean, we got a check?  I don't
5  remember getting a check.  So, there were hundreds of phone
6  calls that we had to ask Defense Counsel did these people get a
7  check or not?
8       But what's a little different with this settlement
9  too, in addition, is if they didn't get a check, the Defendants
10  have already said they're going to pass that money on to
11  Comptroller's Fund, Lost Payment Fund.  So here, the Class
12  Members will have opportunity if they even -- we've since solved
13  the notice period most of them getting their checks if they
14  hadn't gotten them.  But if anybody else who didn't get the --
15  didn't read the notice, they will be able to get on the
16  Comptroller's list at some point when Nationstar and Lakeview
17  turn over the rest of the money.
18       THE COURT:  If they know to look at it.
19       MR. ROBINSON:  If they look at it, you're right.  And
20  you know from your time in the state legislature what will --
21  it'll achieve at some point to the State.  But be that as it
22  may, we don't normally have that in a class case.
23       THE COURT:  Yeah, that is a little unusual, I agree.
24       MR. ROBINSON:  A extra, extra opportunity.  We also
25  don't have a class case that gets more than 100 percent recovery

**Page 8**

1  of the fees that were taken.  And so, you know, and I'll get to
2  the attorney fee issue last.  But basically, we're -- Mr.
3  Hoskins and I are able to leverage this case to try to get final
4  resolution.
5       The most important thing is that Class Members got
6  notice.  So, they knew -- because when they got the checks,
7  there was no notice -- no court-approved notice.  There was no
8  notice of any kind explaining why they were getting the check
9  So, and that's really the most important thing in these cases is
10  that folks have some notice so they know where to go to get help
11  if they need help.
12       We only had one opt-out.  American Legal says by their
13  calculation, 99 -- over 99 percent of the people got notice,
14  either by mail or email, which is extraordinary.  In most cases,
15  Your Honor --
16       THE COURT:  Yeah, it is.
17       MR. ROBINSON:  -- I can represent to you it's about 90
18  percent is what have been most of my cases more recently.  And
19  that goes to the Defendants had a good list to work from.
20  American Legal scrubbed it and updated it to the, you know,
21  using the zip code update feature.  And so, that's a pretty good
22  outcome there.  We'd had no objections.  That's another
23  indication that the settlements from the Class is perfected fair
24  and reasonable and I've been able to Mr. Hoskins and I, you
25  know, as I said, it's hundreds of phone calls.

**Page 9**

1       THE COURT:  What did most people receive back, just
2  curious?
3       MR. ROBINSON:  They received back 100 percent of
4  whatever their fees were that they paid.
5       THE COURT:  Whatever their fees were.
6       MR. ROBINSON:  So, not everybody paid the same amount
7  of fees, Your Honor.
8       THE COURT:  No, no, I understand that.
9       MR. ROBINSON:  So, now, if they've cashed their check,
10  Your Honor -- so, that gets back to if they didn't cash their
11  check, we've been able with Defense Counsel to get checks
12  reissued, for people who've contacted us, to them.  And then
13  secondly, if they didn't either contact us, they'll also have
14  the opportunity to get it later from the Comptroller's Office.
15       THE COURT:  Right.
16       MR. ROBINSON:  So, we've laid out in the motions --
17       THE COURT:  It's quite the journey.
18       MR. ROBINSON:  Yeah, this is -- it's -- I can say this
19  is not the normal course, but it is what it is.  And I think the
20  parties worked hard to get a settlement, you know, reached.  And
21  there is an extraordinary benefit to the class.  Now, we've
22  calculated in our papers for the Court what we think that
23  benefit is.  The Defendants have represented, from the Class
24  Members, the Class period being three years from when we filed
25  the lawsuit --

**Page 10**

1       THE COURT:  Right.
2       MR. ROBINSON:  -- there was $982,000 that was
3  refunded.  But the additional benefit, Your Honor --
4       THE COURT:  That's a nice number.
5       MR. ROBINSON:  -- that, honestly, is the most
6  important in my experience with most of these Class Members in
7  talking to them, is they still can pay by phone; they don't have
8  to pay a fee.
9       THE COURT:  Right.
10       MR. ROBINSON:  So, we calculate that as -- and based
11  on the data that --
12       THE COURT:  Or at least the old ones don't.  The new
13  ones will probably find it in their documents.
14       MR. ROBINSON:  Right.  Well, maybe, but that'll have
15  to be a new loan and Fannie and Freddie Mac won't buy those.
16  So, that's a whole other thing.  So, I don't think the fees will
17  be added in.  But we've calculated based on the data that
18  they've given us, Your Honor, that that's probably the annual
19  savings conservatively of $287,000 to Maryland residents.
20  Probably when people find out it's free, that number --
21       THE COURT:  Will start using that service.
22       MR. ROBINSON:  -- that number will probably go up.
23  And, honestly, it makes sense for the Defendants.  It's a whole
24  lot easier to take that money by phone and get it electronically
25  than process a check.  So, it's -- and --

Apx. 6

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

**Page 11**

1  THE COURT:  Oh, no, I know.  I'm -- I think my entire
2  loan was paid by ACH, you know, but not with them.
3  MR. ROBINSON:  So, we think the result here is
4  extraordinary.  There's no -- one opt-out; there's no
5  objections; at least going forward until the loans or terms
6  maybe are changed or the law is changed.  The Commissioner of
7  Financial Regulation did try to get the law changed after the
8  Carrington case came out and the legislature, you know, didn't
9  do that.
10  So, there is no express authority in Maryland law to
11  charge these fees.  There's no contract that I have ever seen in
12  a mortgage contract --
13  THE COURT:  Not if you get, you know, work your way
14  through all the other groups where they are doing that, that'd
15  be really, you know, like the counties and the municipalities.
16  MR. ROBINSON:  Government's always off the hook, Your
17  Honor.
18  THE COURT:  I know.  I'm just being funny.
19  MR. ROBINSON:  You were very adept at that when you
20  had your former role of making sure the government was usually
21  exempt from such things.
22  THE COURT:  You got it.
23  MR. ROBINSON:  And then there's other reasons why
24  those issues can't be pursued, but you're right, you might see
25  it in HOAs and other contexts.

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page : 11

**Page 12**

1  THE COURT:  Well, that's actually where I was thinking
2  of it.  Being a smart aleck about the city, I just happen to
3  have another matter I was going over.  It involved a utility and
4  I thought, yeah, I'm seeing what they're paying, but it's all
5  right, it's the government; we're here to help.
6  MR. ROBINSON:  So, we reached in the settlement
7  agreement an extra fund of $151,440 and of that, we are -- have
8  agreed that that would pay for the administration, American
9  Legal's costs.  And it would -- whatever their -- whatever is
10  left over, and their costs are minimal compared to other
11  entities that do this type of work, would go to a SCRA recipient
12  and the parties recommended Habitat for Humanity and Housing
13  Initiative Partnership, which is a statewide housing --
14  THE COURT:  No, I know who they are.
15  MR. ROBINSON:  -- entity.
16  THE COURT:  Yeah.
17  MR. ROBINSON:  And then also would pay for whatever
18  reasonable attorney fees the Court would have.  So, unless the
19  Court has any questions about the settlement, I think the papers
20  pretty much lay out, you know, why we think it's fair and
21  reasonable and should be given final approval under the
22  circumstances.  So, I could go next to the attorney fees.
23  THE COURT:  You know, I did have an opportunity to
24  review the file.  If I remember correctly, your fees were about
25  six percent, 6.7.  Is that right?

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page : 12

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

**Page 13**

1  MR. ROBINSON:  Typically, in these cases, Your Honor,
2  I'm asking for 40 percent.  In the Alexander case, we asked for
3  40 percent of the cash fund that was created.  And that is the
4  going rate on most of these cases.  But here, because of the
5  circumstances created by the refunds that were separate and
6  apart, Mr. Hoskins and I are asking for $114,240, which on our
7  math is about six percent of the common fund, the total benefit
8  to the Class.
9  Our hours in the case are pretty much in line with
10  that.  We did go through multiple mediation and settlement
11  conferences.  Mr. Hoskins and I produced the discovery.  We did
12  not -- candid candor to the Court, we did not need to do
13  depositions because they admitted to all the facts.
14  THE COURT:  Yeah.
15  MR. ROBINSON:  We did have to go through contested
16  motions and multiple motions to reconsider by the Defense.  We
17  had a contested class certification hearing on a very obscure
18  issues that I have never seen in any other case I've ever done.
19  You know, mostly presented by the Defendants' election to do the
20  refunds without notifying anybody in advance, the Court or us.
21  We think that the fee that we're asking for is
22  justified.  We've demonstrated the skill and the legal services.
23  THE COURT:  Tell me again just so that I have -- so I
24  know that it was a contingency and your contingency fee
25  represented what percent?

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page : 13

**Page 14**

1  MR. ROBINSON:  Well, in our agreement it's 40 percent,
2  Your Honor, but what we're asking for here is six percent --
3  THE COURT:  Okay.
4  MR. ROBINSON:  -- of the 114,000 -- or of the 150,000,
5  sorry.
6  THE COURT:  Oh, I'll give you six percent of the 114,
7  but I didn't think that's what you're asking for.
8  MR. ROBINSON:  No, no, no.
9  THE COURT:  It's actually 6.7, isn't that what the
10  document said?
11  MR. ROBINSON:  Yes.
12  THE COURT:  Okay.
13  MR. ROBINSON:  But and that's of the total benefit to
14  the Class, Your Honor.  Of the second settlement fund that we
15  created, the 151,440, we're asking for $114,240 of that.  The
16  rest will pay for the administration and then go to the SCRA.
17  And how we came up with that calculation, Your Honor,
18  was primarily based on using the leverage of the prejudgment
19  interest and that the Class was entitled to but had never been
20  paid.  And it doesn't make economic sense, frankly, to send them
21  additional checks for the amount of prejudgment interest.  Did
22  someone have a $7 fee or a $21 fee?
23  THE COURT:  I don't know, I think I just got a .32
24  check on one of those goofy Verizon settlements, class action
25  settlement, so.

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page : 14

Apx. 7

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

**Page 15**

```
1          MR. ROBINSON:  Right, and goofy may be the apt
2   adjective, Your Honor, but generally to send out that check it
3   cost $1, so --
4          THE COURT:  I know, that's why I thought it was pretty
5   funny.
6          MR. ROBINSON:  -- and it may cost more sometimes.
7   American Legal's very good at what they do and they tend to
8   be -- they don't overcharge.  That's why I recommend them.
9          THE COURT:  So, you all put in how many hours in this
10  case?
11         MR. ROBINSON:  We gave this to Judge -- when we were
12  in front of Judge Klavans for that settlement conference, we
13  gave him the number.  We don't have the number with us, Your
14  Honor, but it was -- it basically, on an hourly rate, we pulled
15  out about 114,000.
16         THE COURT:  What was your hourly?
17         MR. ROBINSON:  Mine is, in the District Court, is 650
18  and --
19         MR. HOSKINS:  Four seventy-five.
20         MR. ROBINSON:  -- 475 for Mr. Hoskins.  So, you can
21  cross-check.  It's not required under the -- Your Honor has the
22  discretion to do a cross-check to the extent you're asking these
23  questions.  You know, we have, you know, I think 80-plus hours
24  in this case or over 100 hours at this point with all those
25  phone calls.
```

**Page 16**

```
1          And then when we did the calculations, it came out as
2   sort of a wash.  But under the common fund theory in which we
3   petition for fees, that's typically most courts have not looked
4   at the cross-check in recent years.  We laid out the Bowen case,
5   Bontempo, and the Hess case from the Maryland State Courts about
6   the common fund settlement.  It's not -- common fund
7   settlement's also not specifically addressed in the 2-700 Rules.
8          THE COURT:  Right.
9          MR. ROBINSON:  We did go through the Jiffy Lube
10  factors and the 2-700 factors, which would look at the skill,
11  legal services --
12         THE COURT:  Right.
13         MR. ROBINSON:  -- customary fees, contingent fee.
14  This was completely contingent.  We wouldn't get paid unless the
15  Class got paid.
16         THE COURT:  Right.
17         MR. ROBINSON:  The amounts involved and the results,
18  the experience of counsel, the undesirability.  I don't
19  particularly find these cases undesirable, but I know other
20  attorneys do, and I know the Court sometimes does.  It doesn't
21  like me when --
22         THE COURT:  Yeah.
23         MR. ROBINSON:  -- I come in with these wonky statutes,
24  so.
25         THE COURT:  Okay.
```

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

**Page 17**

```
1          MR. ROBINSON:  The change here in the law was in 2018
2   when the legislature changed the Maryland Consumer Debt
3   Collection Act to incorporate the Fair Debt Collection Practices
4   Act.  So, that's what this sort of emerged from --
5          THE COURT:  Okay.
6          MR. ROBINSON:  -- in this sort of new era.
7          THE COURT:  Okay.
8          MR. ROBINSON:  Unless the Court has any other
9   questions, we --
10         THE COURT:  I do not.  Do I have --
11         MR. ROBINSON:  -- we had presented in with our ECS --
12  or, I'm sorry, with our MDEC filings, a proposed order with --
13         THE COURT:  I have it.
14         MR. ROBINSON:  -- the assumption, Your Honor, that we
15  might have had a ruling by now on the individual claim that we
16  argued with Judge Silbrett (phonetic) last month.  He's not
17  issued that ruling.  It hasn't appeared on MDEC, so we've
18  modified the final orders because this isn't really going to be
19  -- until he does the declaration on the individual claim, there
20  won't be a final order.
21         THE COURT:  Right.
22         MR. HOSKINS:  Final judgment.
23         MR. ROBINSON:  Judgment.
24         MR. HOSKINS:  It's this one.
25         MR. ROBINSON:  This one.  So, Your Honor, we've
```

**Page 18**

```
1   provided this to opposing counsel ahead of time so we just
2   modified that a little.  But if I may approach, I can bring you
3   these.
4          THE COURT:  Is it the one that you sent in the file?
5          MR. ROBINSON:  No, because we had to take out the
6   final judgment language.
7          THE COURT:  All right, then go ahead and let me have
8   what you're proposing since it isn't what was proposed.
9          MR. ROBINSON:  A separate order for attorney fees --
10         THE COURT:  Right, and --
11         MR. ROBINSON:  -- and then --
12         THE COURT:  -- there's no change to that one, correct?
13         MR. ROBINSON:  No.  Well, you can change it, Your
14  Honor.
15         THE COURT:  Well, I can change it.  I was
16  contemplating changing it.  No, I'm just kidding.
17         MR. ROBINSON:  And then I think what we took out is
18  the final judgment.  So, whenever his order then that would
19  become the final judgment.
20         THE COURT:  Yeah, I just wanted to pull it up and take
21  a look and see if --
22         MR. ROBINSON:  And we discussed with them at that
23  hearing last month in the matter, he didn't rule from the bench,
24  you know, and the way the declaratory judgment is the
25  declaratory judgment has to be entered separately from a
```

Apx. 8

1  judgment.  And if he's going to do a negative declaratory
2  judgement, I think it would just be a negative.  And he seemed
3  to understand all that and know that from his experience.
4        THE COURT:  You are absolutely right.  I don't see
5  anything.
6        MR. ROBINSON:  Mr. Hoskins looked up our hours, Your
7  Honor, just so we have that for you.  We had 137 hours --
8        THE COURT:  Okay.
9        MR. ROBINSON:  -- as of June of '23.  I know I have at
10 least 30 hours answering Class Member phone calls, plus the
11 other papers we filed, so.
12       THE COURT:  All right.  All right, thank you.
13 Counsel, do you have anything you want to add to any of the
14 discussion?
15       MR. BUARI:  Nothing to add, Your Honor.  We did have
16 an opportunity to review the revised final order and we are okay
17 with that.  So, but other than that, nothing more to add.
18       THE COURT:  All right.  I did have an opportunity when
19 I learned the matter was coming before me to review the file so
20 that I could familiarize myself, not only with the claim itself,
21 but the various stages of the process.  I am aware, and you all
22 have confirmed, of course, that Ms. McHenry (phonetic) has opted
23 out.  She is a resident of Anne Arundel County using her right
24 to exercise her right to exclude.  And presuming that matter
25 will get resolved, that would pretty much satisfy -- pretty much

---

1  satisfy the litigation itself, so.
2        With regard to the attorney's fees, I did look.
3  That's how I knew the 6.7 before you came out to make sure that
4  the Court was clear on what the request was for attorney's fees.
5  So, I have before me -- and I have certainly listened to Counsel
6  just now with regard to the Final Approval Order, which you
7  filed -- well, which you've handed me today, which is slightly
8  different than the document and judgment that was forwarded with
9  the file.
10       I am satisfied the information is together.  And I'm
11 certainly satisfied that it is in order.  I do believe that the
12 settlement that has been reached based on the contents of the
13 file not being as familiar as prior court members with this
14 case, but looking through it, I am familiar with it.  I do
15 believe that it is a fair and adequate settlement based on all
16 that you've told me.
17       Those that have opted in; she who has opted out; those
18 that have been notified; and those that were given an
19 opportunity for notification.  So, I signed the Final Approval
20 Order.
21       Now, with regard to the attorney's fees, I often
22 wonder the mathematical calculations and machinations that get
23 you to where you all get for your fees.  So, I did take some
24 time to look through the Motion for Attorney's Fees.  And I will
25 candidly tell you, Counsel, that I had some thought processes

---

1  when I came out here that was a little different than what I
2  did.  But just listening to the unique dynamic of this class
3  action suit, in particular, what I would say the confirmation
4  and reconfirmation of those that had been prepaid; those that
5  had received a benefit already; those that had, but didn't
6  remember, I don't even want to imagine what that spreadsheet
7  looks like about who you called; who you contacted; what you had
8  to do; when you called him; who you had to backwards.  I don't
9  even want to think about it.
10       But it certainly -- your estimated hours is a fair
11 representation of the hours.  The Court has no problem with
12 regard to the fees.  The fees, even based on your hourly rate,
13 would get you pretty close to 114,000 anyway.  So, I will sign
14 that order as well and I have that your fees are fair and
15 reasonable.  I believe they were aptly earned.  I'm sure the
16 citizens of the State of Maryland thank you very much, those
17 that are paying and those that no longer have to pay as a result
18 of your efforts, so.  Ms. Baxter was wise to seek you out.  All
19 right.
20       MR. ROBINSON:  Thank you, Your Honor.
21       THE COURT:  With that I think we are concluded and you
22 all can have a great weekend.
23       MR. ROBINSON:  Thank you, Your Honor.
24       MR. HOSKINS:  Thank you, Your Honor.
25       MR. BUARI:  Thank you, Your Honor, you as well.

---

1        THE COURT:  All right.
2        MR. ROBINSON:  Have a good weekend, Your Honor.
3        THE COURT:  You too.
4        (At 2:03 p.m., proceedings concluded.)

Apx. 9

CERTIFICATE OF TRANSCRIBER

1       I hereby certify that the proceedings in the matter of

2   Tonda Baxter vs. Lakeview Loan Servicing, LLC, et al., case no.

3   C-02-CV-22-000654, heard in the Circuit Court for Anne Arundel

4   County, Maryland, on March 15, 2024, were recorded by means of

5   digital audio.

6       I further certify that, to the best of my knowledge and

7   belief, page numbers 1 through 22 constitute a complete and

8   accurate transcript of the proceedings as transcribed by me.

9       I further certify that I am neither a relative to nor an

10  employee of any attorney or party herein, and that I have no

11  interest in the outcome of this case.

12      In witness whereof, I have affixed my signature this 9th

13  day of April, 2024.

14

15

16  *Patricia A. Kobylski*

17      Patricia A. Kobylski

18      Transcriber

Apx. 10

Case 2:24-cv-00444-BJR   Document 40-1   Filed 07/17/24   Page 14 of 165

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

```
 1            IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

 2    TONDA BAXTER,

 3            Plaintiff

 4       vs.                                      Civil Docket

 5    LAKEVIEW LOAN SERVICING LLC, et al.,      No. C-02-CV-22-000654

 6            Defendants.

 7                  OFFICIAL TRANSCRIPT OF PROCEEDINGS

 8                          MOTIONS HEARING

 9                          VOLUME I OF II

10                                            Annapolis, Maryland

11                                            Monday, April 24, 2023

12    BEFORE:

13       THE HONORABLE MARK W. CROOKS, JUDGE

14    APPEARANCES:

15       For the Plaintiff:

16            PHILLIP ROBINSON, ESQUIRE

17            EDWIN DAVID HOSKINS, ESQUIRE

18       For the Defendants:

19            JOHN LYNCH, ESQUIRE

20    Transcribed from electronic recording by:

21       Susan Evans-Melvin

22       Transcriber

23       CRC Salomon

24       2201 Old Court Rd, Baltimore, MD 21208

25       410-821-4888
```

Apx. 11

1                    T A B L E   O F   C O N T E N T S

2                                                              Page

3    Motion for Certification of Class                         6

4    Motion for Partial Summary Judgment                       49

5    Court's Ruling                                            69

6    WITNESSES:                  DIRECT:  CROSS:  REDIRECT:  RECROSS:

7          None

8    EXHIBITS:                   IDENTIFICATION:   EVIDENCE:

9          None

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Apx. 12

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE COURT:  This is Tonda Baxter versus Lakeview Loan |
| 3 | Servicing, LLC, and Nationstar Mortgage, LLC.  It's C-02-CV-22- |
| 4 | 000654.  Would the parties please identify themselves for the |
| 5 | record? |
| 6 | MR. ROBINSON:  Phillip Robinson on behalf of the |
| 7 | plaintiff, Your Honor. |
| 8 | THE COURT:  All right.  Welcome. |
| 9 | MR. HOSKINS:  David Hoskins, also on behalf of the |
| 10 | plaintiff. |
| 11 | THE COURT:  Welcome. |
| 12 | MR. LYNCH:  And Judge, John Lynch for the defendants. |
| 13 | THE COURT:  All right.  Nice to see everyone.  So, |
| 14 | you're welcome to have a seat, if you like.  The Court |
| 15 | recognizes we're here under, sort of, two separate motions, if |
| 16 | you will, I guess colloquially refer to as 2-231 hearing, |
| 17 | basically to assess the issues, whether the foundations of a |
| 18 | class have been established; and then, secondly, the Motion for |
| 19 | Partial Summary Judgment.  I think we have ample time to address |
| 20 | these matters, so I don't want either side to feel constrained. |
| 21 | If you hear something that the other side said and you feel that |
| 22 | you want to have a chance to respond, instead of, sort of, the, |
| 23 | what I call the sweat hog method from Welcome Back, Kotter. |
| 24 | Just trust that you, if you ask at the end, you'll certainly not |
| 25 | be left with an opportunity to not respond to something that you |

| | |
|---|---|
| 1 | feel is compelling. |
| 2 | The only disclaimer I will give both sides is at 3:00, |
| 3 | I have another hearing, very succinct, where it's really I've |
| 4 | demanded the parties come in to sort of admonish the parties, |
| 5 | for lack of a better phrase.  I think that's a euphemism.  But |
| 6 | along with saying, if we're not done by three -- I think we can |
| 7 | be, but if we're not, certainly, I'll ask for your patience |
| 8 | while I kick you -- well, I'm not kicking you out of here, but |
| 9 | kick you from the well of the courtroom while I bring those |
| 10 | parties forward. |
| 11 | Not trying to sound haughty, but I've read everything |
| 12 | that's been filed regarding these two motions, at least that I |
| 13 | can glean.  And I say that because I really am taking an |
| 14 | opportunity for both sides to sort of amplify their arguments, |
| 15 | their responses to those arguments, and certainly encourage you |
| 16 | to focus on the parts that you think are most salient or germane |
| 17 | to your motions.  For example, if you think -- just pulling this |
| 18 | out of a hat, but if you think numerosity is clearly met, then I |
| 19 | don't want to waste any time talking about numerosity.  I'd |
| 20 | rather talk about commonality, if that's where the fault lines |
| 21 | exist, so to speak. |
| 22 | Again, I'm not -- I'm just pulling that out of the |
| 23 | ether.  I see a lot of times -- not a lot of times, but every |
| 24 | now and then, I'll come out here for these hearings, and I feel |
| 25 | that both sides are essentially just paraphrasing exactly what |

Office (410) 821-4888                    2201 Old Court Road, Baltimore, MD 21208              Facsimile (410) 821-4889
CRC Salomon, Inc.              www.crcsalomon.com • info@crcsalomon.com                              Page : 3

Office (410) 821-4888                    2201 Old Court Road, Baltimore, MD 21208              Facsimile (410) 821-4889
CRC Salomon, Inc.              www.crcsalomon.com • info@crcsalomon.com                              Page : 4

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

| | |
|---|---|
| 1 | was in their motion, and I just don't think that's the best use |
| 2 | of everyone's time, including the Court's.  So, I really hope |
| 3 | you'll sort of amplify what you've already put to paper knowing |
| 4 | that I've read and thought about what you've already had to say, |
| 5 | so to speak.  All right.  But I will turn it over to you, Mr. |
| 6 | Robinson, and you may begin. |
| 7 | Well, let me ask you.  Would you rather bifurcate -- I |
| 8 | don't have strong preference -- bifurcate first the 2-231 |
| 9 | hearing and then pivot to the Partial Summary Judgment?  Or how |
| 10 | would you like to proceed? |
| 11 | MR. ROBINSON:  I would do whatever Your Honor wants. |
| 12 | My intention was to try to -- I think the issues overlap when we |
| 13 | get to some of the core -- the legal issues in the case, |
| 14 | basically, are presented in the Summary Judgment Motion which |
| 15 | can be addressed within my argument, I think, in the class cert |
| 16 | when we get to the commonality, typicality, and the C3 prong. |
| 17 | So, I don't, I don't think the legal issues are the same from |
| 18 | one to the next.  And as Your Honor pointed out from the papers, |
| 19 | there's really no dispute about much of particular issues. |
| 20 | So, I'll generally describe those and answer any |
| 21 | inquiries from the Court.  But I was going to focus in on what I |
| 22 | thought was most succinct. |
| 23 | THE COURT:  Okay.  I appreciate that. |
| 24 | MR. ROBINSON:  Not going to repeat what I wrote. |
| 25 | THE COURT:  So, why don't we then agree that you'll -- |

| | |
|---|---|
| 1 | even though the Venn diagrams overlap, you'll focus first on the |
| 2 | issues regarding the class itself, and then you'll have a chance |
| 3 | to respond to that, then we'll pivot back to the Summary |
| 4 | Judgment Motion. |
| 5 | MR. ROBINSON:  Sure. |
| 6 | THE COURT:  And then sort of treat it almost as a |
| 7 | bifurcated hearing, even though we're not drawing any rigid |
| 8 | fault lines.  All right.  So, you may proceed. |
| 9 | MR. ROBINSON:  All right.  Your Honor, I had a, I |
| 10 | guess maybe preliminarily, I did make three paper copies, just |
| 11 | because sometimes paper is a little easier, of three things. |
| 12 | One, the class rule, and two cases that are cited in the papers. |
| 13 | May I approach? |
| 14 | THE COURT:  Sure. |
| 15 | MR. ROBINSON:  I provided counsel copies, and I |
| 16 | provided both of you, but not marked-up copies. |
| 17 | THE COURT:  I appreciate it.  Thank you. |
| 18 | MR. ROBINSON:  So, Your Honor, just what's in what I |
| 19 | provided you, just for a brief summary, is the rule itself as it |
| 20 | is today, 2-231, for class actions, the Frazier versus Crystal |
| 21 | Ford case which is -- relates to both the motions that are |
| 22 | before the Court, and it's pretty dispositive from your point of |
| 23 | view, and I'll probably reference things in that case.  And |
| 24 | then, mostly for background purposes, the Andrews and Lawrence |
| 25 | Professional Services versus Mills case from the Supreme Court |

Office (410) 821-4888                    2201 Old Court Road, Baltimore, MD 21208              Facsimile (410) 821-4889
CRC Salomon, Inc.              www.crcsalomon.com • info@crcsalomon.com                              Page : 5

Office (410) 821-4888                    2201 Old Court Road, Baltimore, MD 21208              Facsimile (410) 821-4889
CRC Salomon, Inc.              www.crcsalomon.com • info@crcsalomon.com                              Page : 6

Apx. 13

```
 1  is probably a seminal, sort of background case, I believe, for
 2  Your Honor and the Court's consideration of the legal issues
 3  under the MCDCA and the MCPA.  And so that's why I just focused
 4  on those.  There's other cases I brought depending on what
 5  inquiries are from the Court, but I thought these were really
 6  sort of the primary things.
 7          So, in a class action, under -- it's covered under the
 8  Maryland Rule 2-231, and we pointed out in our paper, since
 9  you've read through some of the cases and the briefing, we have
10  in Maryland a little different numbering system because we had
11  an amendment to the rule.  And so, sometimes when you're reading
12  a case, the numbers can get off.  But the big -- the prongs are
13  --
14          THE COURT:  You mean from Federal Rule 23, you mean?
15          MR. ROBINSON:  Yeah.  And when you're reading cases
16  from other jurisdictions.  Basically, we got rid of defendants'
17  class actions which aren't in this case.  And by doing that, we
18  re-numbered the rule, and so, just when you're reading some of
19  the older Maryland cases, including Crystal Ford, you might see
20  a paragraph reference, but it's -- you have to be careful when
21  you're looking at that to make sure it's from the current
22  Maryland rule which applies to this case.  That's my only reason
23  for bringing it out.  It gets a little confusing when you're
24  trying to look.  And the case law teaches us to look to some of
25  the federal cases, but you have to look at --
```

```
 1          THE COURT:  Got it.
 2          MR. ROBINSON:  -- C3 in Maryland to B3 under the
 3  federal rule, or B3 under the old Maryland rule.
 4          THE COURT:  Got it.
 5          MR. ROBINSON:  It's just a numbering thing.
 6          THE COURT:  Sure.
 7          MR. ROBINSON:  So, we have proposed two plaintiff's
 8  classes.  That's subject to the Maryland 2-231.  And there's two
 9  general prerequisites in order to go forward.  As the Court
10  pointed out earlier, 2-231(b) has all four prongs.  A
11  plaintiff has to meet all four prongs: numerosity is one,
12  commonality is the second, typicality is the third, and
13  represented parties will fairly and adequately protect the
14  class.
15          We've provided in our papers that we think that we
16  meet all those prongs, and I don't think there's much dispute,
17  based on the sworn testimony from the defendants, that
18  numerosity is met.  There's a couple hundred Lakeview class
19  members and I think over a thousand Nationstar class members.
20  So, that's not really an issue.
21          The commonality and typicality prongs are normally, as
22  we outlined in our papers, viewed sort of together.  Is there a
23  common legal or factual predicate to the case?  And is the
24  plaintiff's claims typical of the putative class members?  Here,
25  the issue is, did the defendants have the right to charge a
```

```
 1  convenience fee?  And that's generally described in the case law
 2  in the papers before you, as a fee for accepting a payment over
 3  the phone.
 4          The defendants did not charge a fee for taking
 5  payments over the internet.  So, we're really in this case only
 6  focused, and what's before you in the papers, to taking payments
 7  over the phone.  Mortgage companies, servicers are allowed to
 8  charge fees, generally, under Maryland law, if those fees are
 9  enumerated in the loan documents or they're authorized by law.
10  And here, in both cases, they're not enumerated in any loan
11  documents in this case that I've ever seen in Maryland, and
12  there's no Maryland law that expressly authorizes it.
13          And since October 1st -- this is where I'm morphing
14  into the Summary Judgment argument a little bit, for background
15  purposes.  Since October 1st, 2018, the Maryland Consumer Debt
16  Collection statute was amended at 14-202(11) to prohibit
17  collectors from undertaking conduct which violated the Federal
18  Fair Debt Collection Practices Act.
19          Now, when the General Assembly amended that provision,
20  it did not incorporate the opposing side's arguments, it did
21  not incorporate the definitions.  It did not incorporate the
22  defenses that are in the federal statute.  All it incorporated
23  was the conduct.  So, the Alexander versus Carrington case has
24  all sorts of background.  I'm sure Your Honor has read that, on
25  the Court claims.  And that's from the Fourth Circuit, last
```

```
 1  year.
 2          But what was incorporated was the conduct.  And here,
 3  there's really no dispute that Lakeview and Nationstar both
 4  qualify as collectors.  In this instance, what appears to have
 5  happened, based on the discovery record, is that Lakeview as a
 6  master servicer hired Nationstar as a sub-servicer.  So,
 7  Lakeview is collecting through -- I don't know how many mortgage
 8  cases you've done, Your Honor, but maybe from your background in
 9  the U.S. Attorney's Office, but Lakeview has basically hired a
10  vendor to do collection on its behalf.
11          So, under the MCDCA, they're both collectors.  They
12  both qualify as collectors.  We don't get duplicative damages
13  for that, just to be candid with the Court, but they both
14  qualify under the statute as collectors.  And so, since October
15  1st, 2018, they're prohibited from conduct which is barred by
16  the FDCPA, the federal compound.  And so, here, the specific
17  provision, it's under the one statute, it's section 808, or the
18  codified version, which is 15 USC 1692F(1).  That bars the
19  collection, the unfair or unconscionable means of collection of
20  any debt, specifically the collection of any amount,
21  parentheses, including any interest fee charged, and so on,
22  unless that amount is expressly authorized by agreement creating
23  the debt, or permitted by law.  The same argument I provided to
24  you earlier.
25          So, that's been in Maryland law since October 1st,
```

Apx. 14

Case 2:24-cv-00444-BJR   Document 40-1   Filed 07/17/24   Page 18 of 165

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

**Page 11**

```
 1   2018.  Nationstar and Lakeview, though, were charging fees to
 2   accept fees.  Sometimes they're called pay-to-pay fees, for
 3   taking payments over the phone.  And the discovery shows they
 4   were -- I think it was fourteen to eighteen or so dollars.  The
 5   costs for that are much less, but that's not relevant for our
 6   claims, but just, you know, it's not even the actual cost.
 7        So, the claim that we brought in April of last year,
 8   and served on the defendants, as any normal case would be, was
 9   under that sort of claim.  And that legal claim is the same for
10   Ms. Baxter as it is for every class member.
11        Are they allowed to charge a fee?  Now, we have a
12   class action.  This gets us under the purpose point of a class
13   action.  In this case, we have a class action because it doesn't
14   make any sense to have hundreds of people take the same legal
15   claim, the same legal arguments, the same theoretical defenses.
16   So, we filed the case in April of 2022.  Looking back three
17   years, within the statute of limitations, and of course they
18   have acknowledged in their papers they were collecting even
19   beyond the limitations period.  And we served discovery.  They
20   answered in June and then we sent discovery to them.  And you
21   can see from the record, plaintiff served discovery.
22        The defendants -- this is where it gets a little
23   unusual.  The defendants took no discovery in the case.  I've
24   never had a case, in candor to the Court, where the defendants
25   took no discovery.  We sent a demand to them in August, and then
```

**Page 12**

```
 1   we know now, with the affidavits they've presented to the Court
 2   in various forms, what they did is they sought to compromise not
 3   only the class members' claims, but Ms. Baxter's claims, by
 4   sending out checks.
 5        Now, under 2-231(I) under the current rule, the
 6   defendants were barred from trying to compromise the class
 7   members' claims.  They're also ethically not permitted to
 8   communicate with Ms. Baxter, but they did, under their sworn
 9   testimony.  And I think it's a little fuzzy, Your Honor, but I
10   think that -- my position is, it's too close to the gray line
11   for them to communicate about the claims before the Court, these
12   convenience fees, with the class members, the putative class
13   members, without leave of the Court.
14        They didn't come to Your Honor, and say, "Your Honor,
15   we'd like to do this," and get a Court order.  What we know from
16   the papers is they did it on their own.  And there is no order
17   authorizing them to do this, and the rule says they shall.
18        So, this case diverges at that point in September.
19   But we go back to that same claim.  They've admitted nine
20   hundred and so thousand dollars was collected from the putative
21   class members.  And they -- according to their testimony, they
22   issued checks and sent it back.  We don't know from their
23   testimony, Your Honor, if they paid any prejudgement interest.
24   We don't know from their testimony who actually got the checks
25   and cashed them, or whether they thought they were junk checks
```

**Page 13**

```
 1   and just threw them away, because there is no court order
 2   explaining what they were.
 3        And the -- and so, the case sort of muddles along.  We
 4   went -- we were supposed to have a mediation and that got
 5   canceled unilaterally by the defendants.  And then we moved for
 6   summary judgment and class cert.  So, the Court-- the
 7   commonality, the common legal issue is, did the defendants
 8   violate 14-202(11) and the answer to that by their own admission
 9   is yes, they collected fees.  They provided no evidence to the
10   Court that those fees were authorized in any mortgage contact,
11   and as an officer of the Court, and the Court knows that I do a
12   fair amount of mortgage stuff, I've never seen a deed of trust
13   or a note that authorizes these fees.
14        They do authorize late fees, in some cases.  And they
15   authorize other fees, but there is no note or deed of trust that
16   I've ever seen in the State of Maryland.  They haven't
17   identified any that authorizes convenience fees for taking
18   payments over the phone.
19        THE COURT:  How does that not lend itself to their
20   argument, however, that these don't flow from a debt?  That
21   these are additional quid pro quo, oral contract to avoid a four
22   percent penalty?  The fact that, you know, as you've said you've
23   never seen it.  But doesn't that, sort of, in some way, support
24   their own argument that this really doesn't flow from the debt,
25   per se?
```

**Page 14**

```
 1        MR. ROBINSON:  Well, so, the -- yeah.  That's not
 2   exactly how they phrase it, Your Honor.  Their argument is it's
 3   not incidental to the debt.  That's addressed in the Alexander
 4   case pretty directly.  Of course, it's incidental because people
 5   were making their payment on the debt.  That's the only reason
 6   they're on the phone with them.  And that's their burden to
 7   show some document.  And I'm just talking about the prong that
 8   there has to be a document expressly authorizing.  That's the
 9   claim.
10        There's no -- the claim does not arise if there's some
11   implied right.  The claim arises if there is no document
12   expressly authorizing and there's no law.  And we know,
13   secondly, there's no law, Your Honor, because the Office of the
14   Commissioner on Financial Regulation, which regulates and
15   licenses both Nationstar and Lakeview -- we provided this in our
16   papers -- introduced not this last session, but the year before,
17   legislation to expressly authorize these fees.  And that
18   legislation was defeated.  So, there would have been no point to
19   having that legislation introduced if the law authorized the
20   fees expressly.  Because that's what the bill was all about.
21   And that bill did not pass.
22        Now, the -- so, since there is no contract expressly
23   authorizing the fees, like a late fee.  The contracts clearly
24   say you can charge a late fee.  They don't say you can charge a
25   convenience fee for taking a payment over the phone.  There's no
```

Office (410) 821-4888    2201 Old Court Road, Baltimore, MD 21208    Facsimile (410) 821-4889
CRC Salomon, Inc.    www.crcsalomon.com • info@crcsalomon.com

Apx. 15

law that expressly authorizes it.  Then, on the 1692F(1),
they're in violation of that conduct, which is bootstrapped into
the MCDCA.

          The MCDCA claim, now to go back to commonality, is a
per se violation of the Consumer Protection Act.  So, when we
get to the Summary Judgment motion, Your Honor, basically, we're
trying to just condense.  We could have a stand-alone Consumer
Protection Act claim, but we haven't presented that claim.  We
just presented the per se violation claim, because it's just
simpler and we don't get anything extra by doing the alternative
really.  So, we sort of just streamline things.

          Typicality prong is the same.  Are all the claims
typical?  Is the plaintiff typical of the defendants?  It's all,
it's all sort of subsumed in the commonality.

          Then we look at adequacy, and they're two prongs to
that.  Is Ms. Baxter adequate?  She's been ready, willing, and
able to answer discovery which they never served.  She has
participated and communicated with me regularly throughout the
litigation, and if necessary, she's ready, willing, and able to
come to trial, and she's hired counsel, Mr. Hoskins and I, who
have both been appointed by this Court and other courts in the
state as class counsel, and we have some experience in this
space.

          So, that's really all you look for in terms of a
plaintiff.  Had they taken her deposition, theoretically, they

could have some other arguments if they had inquired, but
Your Honor, again, they made no inquiries.  So, I think that's
like a per se concession that she's adequate.

          THE COURT:  Was that Ms. Baxter that was just here in
the courtroom?

          MR. ROBINSON:  No.  She's not here today.

          THE COURT:  All right.  There was someone here.  I
didn't know if she was here for -- I know she was to your backs,
but she was here for about thirty minutes and left.  Okay.

          MR. ROBINSON:  She's not here today.

          THE COURT:  Okay.

          MR. ROBINSON:  So, then, Mr. Hoskins and I, we have
both been appointed by this Court.  Well, I have been appointed
by this Court.  I believe Mr. Hoskins has by this Court.  And in
the state courts and federal courts as class counsel and been
found adequate and there's nothing protected there.  So, I think
that sort of subsumes.

          Assuming all of those factors are met, then we go to
C3 under 2-231.  And C3.  And there's three types of classes
that could be maintainable.  What we propose to the Court is C3.
So, there, we look -- the Court looks, is there a common
question of law and fact?  I've already gone over that, that
it's common to the members of the class that predominate.
There's one predominate issue in this case, Your Honor.  Are
they allowed to charge those fees or not?  They've created a

second one.  Are they allowed to refund the fees and compromise
a class members claims without leave of the Court?  I suppose
you could look at that as sort of a predominate issue.  It makes
no sense to have, you know, hundreds, if not thousands of
individual cases.  And is this the superior method of dealing
with small fee cases?  We're talking fees of less than twenty
dollars for taking these.  It makes no sense to flood the
District Court of Maryland with these sorts of claims.

          And so, yeah, we think we meet the C3 requirements
there.  And are the interests of the members of the class
individually controlling?  They've answered in discovery there
are no other cases affecting these class members.  No one has
ever brought one.  So, you sort of look to see if there's other
cases.  That might be a reason not to certify.  There are no
other cases affecting this class members, according to their
discovery responses under penalties of perjury.

          And does -- and so, then, you also look at the
desirability of concentrating this on one particular forum.
There.  Here.  It's best to have this on one forum.  It doesn't
make sense to have it in a different forum.  And the last thing
you look at is management.  Typically, that's where these cases
come down.  And what's interesting in this case is here,
Nationstar has admitted under oath there is no management
difficulties whatsoever in this case, about this fee.  And the
reason they say that is -- and I can say that, I think, in

candor to the Court and based on their affidavits -- they've
identified every class member.  They say that they refunded to
every class member.  Now, we don't know if the class members got
the money.  That's a different issue.  But they know who the
class members are.  They know how much money they paid.  And
they say they refunded it.  Those are the management issues,
usually.

          Now, we also know, and we provided testimony to the
Court, that -- regulations, they're required by regulations, the
defendants are -- both of them -- to track all of this
information electronically and to be able to produce the
information.  But of course, they've produced that here already.

          Now, the -- so, we think that there is no management
issue in this case because they've easily identified all the
class members.  It is the superior way to address these sort of
classable claims.

          Now, their primary defense, Your Honor, to get to
their responses.  And this is again where the case gets a little
unusual, is, their theory they've mooted out the plaintiff's
claims and the class members' claims.  That's -- one is to
accept that argument, the Court would have to say that they were
allowed to compromise the class members' claims in violation of
2-231(I).  And we don't think that that is permissible.

          The Court would also then have to also recognize that
they were permitted to communicate with representative parties.

| | |
|---|---|
| 1 Clearly Ms. Baxter is represented. So, there's no excuse, but | 1 mortgage companies as it were. Did they, did they have a choice |
| 2 under their sworn penalties of perjury, they've testified that | 2 whether to receive the check or not? Or was it sent |
| 3 they communicated directly with Ms. Baxter about the claims in | 3 unilaterally? In other words, just a -- |
| 4 this case. | 4 MR. ROBINSON: They were sent, they were sent -- |
| 5 Now, I think it's too close to the gray line to | 5 according to the testimony and my understanding, Your Honor -- |
| 6 communicate with the class members about the claims in this case | 6 and Mr. Lynch can explain otherwise -- is it was sent |
| 7 and send a check. But arguably, Your Honor, that's a different | 7 unilaterally. You didn't know anything about it. The Court |
| 8 -- we don't, we don't in civil cases use the rules of | 8 didn't know anything about it. |
| 9 professional responsibility to enforce a legal claim, but I | 9 THE COURT: What do you base your representations on |
| 10 realize that here because there's serious problems, and it's | 10 that the individuals weren't given a description of what the |
| 11 totally consistent with 2-231(I). | 11 checks were for? What is that based upon? |
| 12 THE COURT: Is there an agreement whether the checks | 12 MR. ROBINSON: Based on their testimony in their |
| 13 were sent unilaterally, or whether individuals were given a | 13 affidavits. They haven't provided copies of the checks. They |
| 14 choice to receive their check or not? | 14 haven't provided any class notice that's required under 2-231 to |
| 15 MR. ROBINSON: There was no -- I can say there was no | 15 go in a class case. There's none of that evidence. So, I |
| 16 communication to Mr. Hoskins and I, no agreement from Mr. | 16 think, and based on my experience, and I think Ms. Baxter's own |
| 17 Hoskins and I, there's no court order agreeing that the checks | 17 situation is there was no explanation in what she received. |
| 18 could be sent. So, I think the testimony from the defendants is | 18 THE COURT: Let's just say their actions do -- I'm not |
| 19 they sent the checks. There's no, there's no testimony from the | 19 conceding the point on behalf of Mr. Lynch or anybody else, but |
| 20 defendants or discovery showing that any class member asked for | 20 let's just say it does fly in the face of subsection I, and say |
| 21 the checks. So, there's not invitation to them, if that's what | 21 that were proven, how does that cut against the grain of the |
| 22 Your Honor is asking. | 22 mootness doctrine? Wouldn't the corrective action be a sanction |
| 23 THE COURT: Well, no, I didn't mean -- vis-à-vis the | 23 versus it basically offsets what they're essentially raising as |
| 24 Court or counsel in respect to each other. I just meant with | 24 an affirmative defense to the formation of the class? |
| 25 the individual persons who received a check, the clients of the | 25 MR. ROBINSON: Well, I don't -- well, that's a good |

| | |
|---|---|
| 1 question, Your Honor. So, I don't think we're asking for a | 1 sounds like an incredibly granular and labor-intensive process, |
| 2 sanction here. But I'm -- I'm -- | 2 vis-à-vis the Court trial. Essentially, now going through and |
| 3 THE COURT: I know you're not, but I'm just saying -- | 3 saying let's just assume that liability attached, but the |
| 4 MR. ROBINSON: If I can rephrase, Your Honor. | 4 question of scope. How do you, how do you as a practical matter |
| 5 THE COURT: Sure. | 5 go through and figure out who got a check and who didn't get a |
| 6 MR. ROBINSON: The way I'm thinking about this is, | 6 check to enter a judgment? |
| 7 because this is the most unusual case I've ever had. This has | 7 MR. ROBINSON: The Court can order them to produce the |
| 8 never happened before. Is what we're essentially asking for is | 8 spreadsheet. They already produced a spreadsheet. It's in the |
| 9 the Court to certify the class, enter judgment, and allow them | 9 Court records. It's 1600 pages. All they have to do is add a |
| 10 to present to the Court evidence that shows people actually got | 10 couple columns. What was the name of the person, what was their |
| 11 the money. And then they can satisfy the judgment. I think | 11 address, what was the check number, when did the check cash? I |
| 12 that's the only reasonable remedy when you read the class rule, | 12 mean, their testimony is that they can do all this and that |
| 13 the point of the class rule. The Crystal Ford case says the | 13 they've already done this work. They just didn't provide to the |
| 14 Court has to strictly supervise the class, the putative class. | 14 Court or us with the information. And their theory is that they |
| 15 And here, we don't have any evidence, because they haven't | 15 can give the leftover funds to the comptroller for the lost |
| 16 presented it either in response to discovery or supplemental | 16 money thing. |
| 17 discovery, or in their own affidavits of who actually received | 17 So, to the extent the Court has any concerns, they've |
| 18 the money and cashed it. Because my assumption is because there | 18 admitted that they have all the data pieces. So, what typically |
| 19 was no explanation, it's probably most likely people threw it | 19 happens in the normal class case, Your Honor, when we're at the |
| 20 out because they thought it was junk, thought it was a fake | 20 final approval on a settlement is I would hand Your Honor the |
| 21 check. | 21 class list that you would accept under seal in case there was |
| 22 THE COURT: So, and my concern is, you know, when you | 22 any question that came up later. The defendants have a legal |
| 23 get to the C3 factors, obviously, you appropriately argued | 23 duty -- that's why I went through all those regulations -- to be |
| 24 judicial economy. You know, it's one of the primary and | 24 able to track all of this information down to the granular. We |
| 25 principle reasons to form a class. But what you're proposing | 25 provided the deposition transcript excerpts and affidavit from |

Apx. 17

```
 1   Mr. Charlin at the Officer of the Commissioner on Financial
 2   Regulation.  He's the supervisor in charge of mortgage
 3   servicers.  And that deposition was taken by Nationstar in
 4   another case.  And in response to Nationstar's inquiries, he
 5   said we require them to track all this.  That's what his
 6   affidavit testimony says.
 7           The officer required Nationstar and Lakeview to comply
 8   with all laws.  And I think in this case, Maryland 2-231(I)
 9   that's their legal duty.  So, I think because of the unique
10   circumstances that weren't authorized by any Court, and
11   certainly weren't authorized by plaintiff's counsel because we
12   didn't know anything about it, that I think under the
13   circumstances, the roadmap here is because there is no dispute
14   that the class factors are met.  The dispute is, well, we've
15   paid some money back.  But they haven't told the Court or us
16   what happened.  So, usually, it's class counsel, one of my
17   duties as class counsel is to double-check the list, make sure
18   people get their money, and re-issue the checks when someone has
19   passed.  We get, you know, the right, appropriate paperwork from
20   the estate.  So, that's all the kind of stuff that we normally
21   do.  And the Court usually entrusts us, when they certifies us,
22   to do that as class counsel.  And sometimes the Court asks us to
23   submit post-judgment reports as to what happened.
24           So, that's how these things are administered.  There
25   is no management issue in this case because they have all the
```

```
 1   granular data.  The relief that they've provided is not even the
 2   whole relief.  So, based on their sworn testimony, all they sent
 3   was the amounts that were taken, the total convenience fees.
 4   So, they didn't include prejudgment interest.  So, that's one
 5   aspect why we think the case isn't moot.  They didn't include
 6   attorney fees which under the Crystal Ford case and the other
 7   cases that we cite in our papers, we're entitled to.  So, the
 8   case is not moot for the -- I don't think mootness is a defense
 9   to the class cert.  I think is my ultimate position.  I think
10   it's their defense to the whole action.
11           But it's not-- there is no complete relief.  Now, in
12   the Crystal Ford case, that dealt with the mootness doctrine ad
13   nauseum.  And the three questions, the first page of that
14   decision I provided to Your Honor in answer, are right before
15   the Court in this case.  So, the questions presented are on the
16   right side of the first page.  Does the tender require the Court
17   to deny class certification?  The answer below.  No.  The third
18   question:  Is an award of attorney fees to the plaintiff under
19   fee shifting provision of the Consumer Protection Act limited to
20   fees incurred before the tender?  Answer is no.
21           So, I think, and then the other issue in that case
22   also sort of relates.  We're not seeking punitives here.  But
23   the plaintiff was seeking punitive damages in the Crystal Ford
24   case.  Here, we're seeking prejudgment interest.  And the answer
25   to that question is the aware of punitive damage foreclosed for
```

```
 1   the tender of individual compensatory damages?  And the answer
 2   there was no.  In our case, it would be, is the tender without
 3   prejudgment interest that's allowed as a matter of right because
 4   we know the exact sums that were charged and collected and the
 5   dates collected.  We don't know yet because they haven't
 6   provided it, when they died the refunds, when people actually got
 7   the money and cashed the money.  Once we have that data, either
 8   the parties, just like parties do in District Court every day,
 9   can come up with a mathematical formula to provide the Court as
10   to what the prejudgment interest is and enter it, or we can have
11   a trial on that if we really need to.  But they have the
12   granular data and it's just a math exercise.
13           THE COURT:  What would their mootness argument be --
14           How, I guess, would your response to their mootness
15   argument be impacted if it could be shown unequivocally that the
16   motivation to send out the checks was the opinion letter that
17   happened four days before and not the specter of a class action
18   lawsuit?
19           MR. ROBINSON:  Well, that would be a dispute of fact
20   that's in the record.  So one, to rephrase what Your Honor said
21   so I can be clear.
22           THE COURT:  Sure.
23           MR. ROBINSON:  Their argument is that an advisory
24   notice from the Office of Commissioner on Financial Regulation
25   from May of 2022 put them on notice and that four months after
```

```
 1   the fact they decided to make refunds.  So that, first of all --
 2           THE COURT:  I thought it was four days after.  Was it
 3   four months or four days?
 4           MR. ROBINSON:  I don't -- I don't believe it was until
 5   September.
 6           MR. LYNCH:  What we did is we stopped the practice of
 7   charging convenience fees right after the --
 8           THE COURT:  I see.
 9           MR. LYNCH:  -- and then it took some time to gather
10   the information to send the checks.
11           THE COURT:  Okay.
12           MR. ROBINSON:  So, all of that admission, now, Your
13   Honor, is not in their discovery responses.  It took several
14   months to gather the facts.  You have in the record before you
15   their interrogatory responses.  None of those facts are there.
16   So, that creates all sorts of problems, I think, for the
17   defendants.  But remember, we filed the case and served the case
18   in April.  The notice came out in May.  The notice said these
19   fees might be -- and they quote that in one of their papers,
20   "might."  They took a deposition of Mr. Charlin.  Mr. Charlin
21   said that the Office of the Commissioner for Financial
22   Regulations does not provide legal advice.  It's a different
23   case, Your Honor.  But different fee.  Different junk fee.  But
24   Nationstar inquired, and Mr. Charlin testified on behalf of the
25   office, under oath, that they don't provide legal advice to
```

**Page 27 (left column)**

1    their licensees.

2          So, I think it's a clever argument that they're

3    raising before Your Honor here.  But it doesn't bear out with

4    the facts.  It's not in their discovery responses that were

5    never supplemented.  They were never supplemented.  And

6    discovery is closed.  So, I don't really think they can make

7    that argument.  And then, and then the other thing, just to --

8    we've also put in the record in the other case, the Kemp case

9    out of Montgomery County, they've provided an expert report

10   which isn't confidential and we've provided it as an exhibit in

11   the papers here.  Their expert opines that Nationstar and other

12   servicers have every right to disregard an Office from the

13   Commissioner for Financial Regulation.

14         So, I share that, and we shared it with the Court

15   because it's sort of like they're talking out of two sides of

16   their mouth.  You're not adjudicating the other case.  I'm not

17   asking you to.  But I do think it goes to whether or not using

18   your discretion, whether the case should be certified.  In

19   looking at the undisputed material facts before you for summary

20   judgment, I do think it's relevant for those aspects that

21   they're really acting inconsistently in two different courts at

22   the same time and compounding all the issues in this case.  No

23   discovery served, no supplementals, no leave of the Court to

24   compromise the claims.

25         That's what their mootness argument comes down to, is

**Page 28 (right column)**

1    they're trying to compromise the class members claims.  Not

2    following the Crystal Ford case and the precepts that are there.

3    All they had to do is come to the Court and say we'd like to do

4    this and get a court order, but they chose not to do that.  And

5    the rule tells them how to do it, but they didn't follow that.

6          THE COURT:  All right.  Understandably, we're creeping

7    towards the next motion because they do overlap.  So, let me

8    give Mr. Lynch a chance to respond to the certification issue

9    and then we'll pivot back to you for the partial summary

10   judgment.

11         MR. LYNCH:  Yeah.  Thank you, Judge.  Mr. Robinson, we

12   obviously know each other and have other cases.  Is it okay to

13   stand from here?

14         THE COURT:  Of course.

15         MR. LYNCH:  Is that okay?  I didn't know if you wanted

16   me to --

17         THE COURT:  No.  Wherever you're most comfortable, and

18   if you even wanted to remain seated, that's fine, too.

19         MR. LYNCH:  Okay.  So, Judge, first of all, John Lynch

20   for Nationstar and Lakeview.  And I'll try to be as succinct,

21   but I do have a number of points to raise.

22         THE COURT:  Sure.

23         MR. LYNCH:  They filed their class case and they're

24   seeking, you know, return of the amount we collected in

25   convenience fees, and injunctive ruling.  And then the May -- I

**Page 29 (left column)**

1    think it was May 12th, the Commissioner's ruling came out, or

2    the notice.  And Mr. Robinson is right.  It does say "might."

3    The convenience fees might be a violation.  And Your Honor, there

4    are cases in certain parts of the country where convenience fees

5    have been determined not to be a violation.  And we make the

6    argument, just like you said, Judge, that it's a separate oral

7    contract and it's not incidental to the debt in question.

8          There are certainly plenty of cases, too, that have

9    declared the convenience fees are, you know, violations.  So,

10   then, after that May 12th came out, and one thing I will

11   disagree with Mr. Robinson about, as far as not supplementing

12   our discovery and the evidence in the record, we have two

13   declarations from a vice president at Nationstar, and she said

14   the refunds were given because of the ruling from the

15   Commissioner.  And they never took a deposition of Nationstar.

16   You've heard them kind of cast, you know, bad remarks on our

17   side for not sending discovery out or not taking a deposition of

18   the plaintiff.

19         We did answer written discovery, but they didn't take

20   a deposition, and we have two declarations.  They tried to

21   strike those declarations and that was denied.  So, the two

22   declarations on summary judgment and class certification can be

23   considered.  In the declaration, it said Nationstar made these

24   refunds and stopped the practice in May.  And Judge, the reason

25   the refunds didn't start till September and October is they had

**Page 30 (right column)**

1    to gather the names of the people in Maryland, and they also had

2    to gather the amounts, because certain people had more than one

3    convenience fee.

4          And Judge, one thing, not only the evidence,

5    undisputed evidence in the declarations that it was the

6    Commissioner's ruling, another just practical reason that it was

7    in response to the Commissioner's ruling was Mr. Robinson is

8    suing under class for about $980,000.00.  Nationstar refunded

9    1.16.  So, they went back another year and even refunded an

10   additional year that's not even the subject of this case.  So,

11   approximately another $200,000.00 Nationstar refunded.  And they

12   did it because they have a history in Maryland and they made the

13   decision.

14         And I think Mr. Robinson is right.  In other

15   litigation, I don't think the Commissioner's statements are

16   binding.  And here it say "might."  But they made the business

17   decision that they were going to make that refund.

18         THE COURT:  Well, let's just say Nationstar had

19   applied it as a credit going forward so then you know

20   unequivocally the class of persons under your mootness response

21   to their motion would be satisfied.  So, what about Mr.

22   Robinson's point that right now they're operating in a vacuum or

23   in the dark.  They just don't know and perhaps people threw --

24         MR. LYNCH:  Yes.  I'll get to that, Judge.  So, one

25   thing which is kind of on that point is the argument about the I

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

1  argument, about dismissal or compromise.  That applies to a
2  class action that's been certified.  That is a class action, not
3  a case -- it's not a class action until a Court certifies it.
4  You can send refund checks.  And we cited the Tennessee case
5  which was exactly on point.  That -- once a class is certified
6  by a Court, then you can't dismiss it, then you can't compromise
7  it without coming to the Court.  Before it's certified, you can
8  take whatever steps you want.  And that is what the rules says.
9  It has to be a certified class action.  Not a class action
10 allegations.  It's not a class action until it's certified.
11       And then, Judge, going to the issue you raised about,
12 you know, sending the checks out versus a credit, we determined
13 -- my clients did -- first of all, Lakeview is a master service,
14 so they don't charge.  They hired Nationstar who handles the
15 interaction with the customer.  So, Lakeview shouldn't even be
16 in the case anyway because they don't charge convenience fees.
17 But Nationstar decided to send the checks.
18       And if you look at the case that Mr. Robinson and
19 plaintiff -- it's the Frazier versus Castle Ford, that is the
20 case they rely on.  And let me tell you two things about that
21 case, Judge.  One, it's the tender that matters.  Even when a
22 class action is certified, Judge, and Mr. Robinson is on class
23 actions.  It's what I do for a living, too.  You only have to
24 tender the check.  The reason what we did is even better than a
25 class action if we tendered the check later on in the case after

1  it's certified is usually there's what's called a Cy Pres fund
2  and the money that's not cashed within six months or a year
3  depending on what the attorneys agree on, that goes to the
4  United Way or that goes to consumer reports.  The people don't
5  even get it.
6        In this particular case, after we would send them a
7  second check and we outlined everything that we're doing, then
8  it would go to the state and they would have the opportunity to
9  go to the state to get their money.  So, the way we did it
10 actually is a bigger benefit to these people.  And under the
11 law, Judge, this process that Mr. Robinson is talking to you
12 about is not the way this situation worked and is not the way
13 class actions work because you only have to tender the money.
14 It's not our responsibility in a class action or even before a
15 class action to make sure the person -- we have to use best
16 known addresses, but whether they cash it, whether they tear it
17 up, whatever they decide to do with it is their own business.
18 You don't have an obligation.  You have to send it to the best
19 known address and you have to tender it.  It's not an actual
20 receipt standard.  And that's what the case they rely on, Judge,
21 the Castle Ford, they said tender is enough in that case.
22       The other thing that's the most important thing about
23 the Castle Ford case and they rely on it, is, and we agree with
24 the holding of the Castle Ford case.  The Castle Ford case says
25 in a purported class action, you can't pick off the named

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

1  plaintiffs.  So, if we were to come into court and we only would
2  have paid Ms. Baxter, and we came to court and said, "Judge, we
3  want out of this class action.  We paid her.  It's moot now."
4  We did not do that.  We agree with that ruling.  We didn't come
5  in and do that.  We paid everybody for an additional year, even
6  farther out.  So, we paid 1.155 million dollars and paid it.
7  Just to say that again.  Paid 1.15 million.  Told them after we
8  did it with declarations, and we did have a mediation.
9        And I think it was kind of alluded to that we didn't.
10 We did have a mediation.  And we wanted to give them some money
11 for attorneys' fees and move on.  And they would not do that.
12 And Judge --
13       THE COURT:  Are you talking about court-ordered
14 mediation?  Or separate mediation?
15       MR. LYNCH:  It was a court-ordered mediation, Judge.
16 The name of the --
17       THE COURT:  Was it Judge Platt, I believe?
18       MR. LYNCH:  I think it was.
19       MR. ROBINSON:  Judge Platt was the settlement judge.
20       MR. LYNCH:  Right.  I meant settlement judge.
21       MR. ROBINSON:  It was Judge Leo Green.  And the one,
22 just for the record, that I was referencing was the one
23 scheduled in November that's in the papers.  That was canceled
24 by the defendants.
25       THE COURT:  Got it.  Okay.

1        MR. LYNCH:  So, Judge, the case we believe is on point
2  is from the -- two cases.  One from the Maryland Court of
3  Special Appeals which is the -- and I'm not going to pronounce
4  it correctly, Judge.  It's the Trattino versus Wallschlaegger
5  (phonetic) case.  And in that case, that was an individual
6  plaintiff.  It wasn't a class action.  Individual plaintiff.
7  Wasn't a class action.  Wells Fargo refunded all of the money.
8  Summary judgment was granted and the case was over because it
9  was just one plaintiff.  So, in this case, all of the
10 plaintiffs, if it was certified, everybody who would be a
11 potential class member, we've already paid.
12       The next case, Judge, is, that we cited, Carson versus
13 Daimler Chrysler Corp from 2003 in Tennessee which we cited
14 which is on all fours.  And I know that's Tennessee, but it is
15 identical where a purported class action was mooted because you
16 paid for all the relief that was sought.
17       I want to talk about one of the potential relief, two
18 potential relief that is being sought by the plaintiffs in this
19 case, prejudgment interest.  In the Chrysler case, they said you
20 don't get prejudgment interest if your case was mooted.  In this
21 case, Judge, in the complaint, no request for prejudgment
22 interest.  In their Motion for Summary Judgment, no request for
23 prejudgment interest.  The only time prejudgment interest comes
24 up is when we brought up the mootness doctrine.  And they want
25 to keep the prejudgment interest in play somehow so they can

Apx. 20

keep working.  And we believe this case is about attorneys'
fees, Judge.  They just want to keep the case going so they can
get some sort of -- we would pay a lodestar figure.  They could
submit the bills to the Court right now and we would -- and have
a fight about reasonableness in the case.  They don't want that.
They want to say that the money we paid almost a year ago now, I
think it's last September or October that they get some part of
that, or if they get some part of some multiplier.

        And Judge, the prejudgment interest doesn't count now
because all the claims have been mooted.  Second, on attorneys'
fees, if the claims have been mooted, they don't get attorneys'
fees either.  And we've -- not only that, we offered it.  So,
Judge, we believe we have mooted the case properly.

        Judge, one of the factors of class actions that you
noted in the rules is judicial economy.  What in the world would
courts want defendants to do?  A regulation comes out and they
have a class action, and we paid 1.15 million dollars and refund
all the money, and as soon as we do it, we tell them in
declarations.  That's what courts and the system is designed to
do.  What it's not designed to do is to keep the litigation
going, come to the Court, ask for a class action, say there
wasn't enough, and ask the Court to monitor things that have
already been paid.

        And we don't believe it's improper.  We think it's
being done for an improper purpose.  And Mr. Robinson is right.

---

I think I've only had one other case -- I've gotten old, Judge.
I've been practicing close to thirty years.  As far as mooting
a class action, we have not done that very often.  We did even
really -- we wanted to make sure we weren't -- we're in good
situations with the regulators, and we put all of that in the
declarations, and that's the reason we did it.  But there is no
class.  We believe this is what mootness is designed to do.
Everything they're suing for is gone.  It is complete relief.

        They are seeking an injunction, Judge.  And we stopped
the practice in May.  We put in our declaration that we don't
have any intent to start again.  And there is nothing to enjoin.
So all the money has been returned.  And we have said we've
stopped the practice.  And we said we don't -- we've stopped the
practice and not going to continue.  We've got the statements in
there.  So, the relief they're seeking from this Court through
the class action model has already been satisfied.  And we
believe that's what mootness if or.  We did it properly, Judge,
and we did it, which I think the Courts of Maryland -- a lot of
times, Judge, in these cases and I can show you cases that have
been settled all over the country.  Let's say there was 1.15
million of convenience fees over a three- or four-year period.
You know, those cases settle because the law is not certain
sometimes.  They settle at a two-thirds or one-third.  We paid
it all.  We paid all the convenience fees we could find of any
borrower in Maryland.  Did it voluntarily.

---

        And Mr. Robinson is right.  We said "might" in the
regulation.  And it wasn't mandatory, but we made the business
decision that in Maryland.  And actually, Judge, we're not
charging convenience fees, and we put in our declaration.  In
May, we stopped in Maryland.  In July, we stopped nationally.
So, we believe this is an all fours case for the mootness
doctrine.

        I can't think of another situation where mootness
would apply, that when you do everything they have sued for and
it's already all been done.  And Judge, we shouldn't be here.

        THE COURT:  Let me just ask.  I know that you're --
obviously, you've argued that the prejudgment interest is sort
of rhetoric, if you will, was to keep this case going on life
support so to speak.  Let's just say that is the motivation,
what would you say, though to the -- take that -- you know, when
that came and merged as a specter in this case.  What would you
say, notwithstanding that, the time of that, to sort of the
viability of the formation of a class?  In other words, the idea
that prejudgment interest really has not been addressed.

        MR. LYNCH:  So, and you heard my arguments on why it
doesn't have a legal basis.  It doesn't have a legal basis under
the statute or the claims.  But Judge, you wouldn't certify a
class of a thousand or twelve hundred people just on prejudgment
interest.  The amounts of that, the cost of the attorneys
dealing with that would be more than any prejudgment interest.

---

I think we calculated it, arguably it's somewhere maybe between
thirty and sixty thousand would be the total fund of the class
for prejudgment interest.  Again, we believe it's very
disingenuous when it's not in the complaint and not in the
summary judgment and now it's being put as an issue to try to
defeat mootness.

        Again, when you look at the factors for a class
action, one of them is judicial economy, and requiring us to
certify a class and come back and say the status of every check
and then issue a separate check and do some calculation on
prejudgment interest, that flies in the face of judicial
economy.  The class members wouldn't get any benefit.  The only
benefit would be for attorneys.  And that isn't something that
we believe is appropriate at all.

        THE COURT:  All right.  Well, thank you, Mr. Lynch.  I
appreciate it.  Any rebuttal on the formation issue and then
we'll pivot to the partial summary judgment.

        MR. ROBINSON:  Certainly, Your Honor, Paragraph 47 of
the complaint put the defendant on notice for prejudgment
interest, a common question to the class numbers.  That was
incorporated in Count 1 in Paragraph 55, and under the case law,
Your Honor, we fit -- there are three types of prejudgment
interest, we're the automatic type so we don't have to ask for
it expressly even though it's in the complaint, it was plead,
they were on notice of the claim from the beginning of the case,

```
 1   and to Mr. Lynch's final point a moment ago, we can't be
 2   burdened to calculate the amounts of prejudgment interest
 3   because they're so de minimis, that flies in the face of the
 4   purpose of a class action is, small dollars, Your Honor.
 5          So we don't have any evidence before the Court of
 6   which class members got checks, no names.  We have a conclusory
 7   affidavit.  Now, there's three affidavits, Your Honor, just to
 8   be clear, one of which was given to us in November that did not
 9   specify the details.  It did not give us that 1,600-page chart
10   that's in the record that's now unsealed.
11          After discovery closed, they provided a second and
12   then the third affidavit from the same witness, so we still
13   don't know from all three of those who actually received the
14   money, we don't -- there's no way for a class number to know if
15   it was legitimate.  There's no evidence before the Court that
16   they were told what this was about and if they just ripped it up
17   or threw it out because they thought it was junk mail or a fake
18   check.
19          THE COURT:  But let's just say that it does the sheet
20   because the State has to put it in a fund whereby later, persons
21   that they later learned that that $52 check I got was actually
22   legit, how does that not create a remedy that's acceptable in
23   the alternative?
24          MR. ROBINSON:  I think it's -- well, I'll agree with
25   Your Honor's premise of the question that it is an alternative
```

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page: 39

```
 1   remedy, it's not a remedy authorized under 2-231 once a case is
 2   commenced.
 3          If they had realized after the Alexander case was
 4   published that what they were doing was wrong and stopped before
 5   we even sued, I think this -- that would be the right remedy for
 6   them to do.  Once this case was filed, Your Honor, they were
 7   under the supervision of this Court and the Crystal Ford case
 8   makes real clear on the third page of the outline of the
 9   decision I provided you, Your Honor, page 3, there's a -- on the
10   second to last paragraph on the right side, the last sentence
11   that says, "and the prosecution of the action is subject to
12   significant oversight of the court," footnote 8 which is
13   referenced on that sentence.  Goes on and says, "the rules
14   required judicial diligence to avoid such abuses," see Maryland
15   rule 2-213(h) --" I think that's probably a typo.
16          THE COURT:  It's got to be, yes.
17          MR. ROBINSON:  I think the current rule would be (i)
18   because this is -- predates, Your Honor, but to my friend's
19   argument that they could bypass judicial scrutiny, that can't be
20   reconciled with the Crystal Ford case in just basic norms that
21   parties are there before the Court should come to the Court and
22   seek relief and --
23          THE COURT:  What about Mr. Lynch's argument that the
24   class itself has not been certified therefore (i) is not
25   implicated?
```

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page: 40

```
 1          MR. ROBINSON:  Right, that's not in the rule if you
 2   read the actual rule, Your Honor, it doesn't say this doesn't
 3   apply unless the case is certified and the -- I think the
 4   explanation of that rule in Crystal Ford talks about judicial
 5   scrutiny and the rest of that footnote 8 is talking about what
 6   is normal in a class action and part of the judicial scrutiny is
 7   if there's a settlement to make sure it's not a sham settlement,
 8   you know, some kind of -- like it's not a coupon settlement,
 9   there's been a lot of litigation, you know, from your prior
10   federal -- there's all these -- I won't say the majority but all
11   of these terrible settlements with, you know, worthless coupons
12   but it's a windfall for certain participants.  That's not this
13   case.
14          The dissent -- we quoted the dissent in our reply,
15   Your Honor, but we didn't know the Court -- I apologize that I
16   didn't know it was the dissent that we were quoting but this is
17   the tell.  The dissent in Crystal Ford says, "Cases are
18   allegiant that post the tender of all the relief a party is
19   entitled to in complaint is sufficient to move the case."  All
20   of the relief.
21          The plaintiffs here and the class members were
22   entitled to prejudgment interest, no matter how de minimis Mr.
23   Lynch thinks it might have been, we don't know that because they
24   haven't given us the data points to make the easy calculation --
25   when they collected it, when it was received, then we run the 18
```

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page: 41

```
 1   percent or whatever mathematical formula, and we can just -- we
 2   can run a calculation so they say on the low end, it may be 30,
 3   it could be.
 4          I don't know the answer to that but we know that's
 5   part of the relief that we asked for in the complaint and that
 6   it doesn't even matter if it was in the complaint and there was
 7   case law to this effect -- is it's automatic in this case
 8   because it's a precise liquidated amount and there's no payment
 9   of attorney fees which are -- the plaintiffs and the class
10   members are entitled to as well and so that's also relief to
11   even from the dissent from Crystal Ford and the citation to long
12   cases about mootness most of which he's embracing from Tennessee
13   and other jurisdictions.  That law, there is no complete relief
14   and that's why certification is and can be required here.
15          Administratively, he -- the argument that you just
16   heard was this isn't really that hard to manage.  Well, we did
17   it once so what's the hard part about telling the Court the
18   names of the people and they all be under seal if it's
19   appropriate to seal individuals' names and addresses but we
20   should know who they are to verify that they actually received
21   the benefit of what they were supposed to get and it's --
22          THE COURT:  Talking of the benefit -- what if they --
23   I don't know, was that 50 or 60 thousand dollars, what you told
24   us is the outer limit of the amount of prejudgment, is that with
25   interest, or a person's affected, or what is the 50, 60?
```

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com
Facsimile (410) 821-4889
Page: 42

Apx. 22

1  MR. ROBINSON:  Judge, I mean, we have not done the
2  calculation, but I know it's a de minimis number.  We think it's
3  somewhere between 30 and 60 but again, I'm not -- we have not
4  done -- I want to state for the record we have not done that
5  calculation.
6  UNIDENTIFIED SPEAKER:  30 to 60 percent per year which
7  is up to three years, could be 18 percent --
8  THE COURT:  Mr. Robinson, let's just say --
9  UNIDENTIFIED SPEAKER:  So the math --
10  MR. LYNCH:  It could be calculated based on -- so I'll
11  say that will be determined whether it's a -- when the notice
12  was given that it would, you know, be something that was
13  improper too.
14  MR. ROBINSON:  Their argument, Your Honor, to that
15  last point is they think that they didn't have notice -- they
16  didn't know it was illegal to the commissioner who issued the
17  notice.  The law was in effect since October 1, 2018, there's a
18  difference of opinion about that.  That's why we did not move
19  for summary judgment on prejudgment interest because we don't
20  have enough data points and there's a dispute about this issue
21  so there was no way for us to present that to the Court.
22  THE COURT:  What is the amount, I guess this is just
23  going down a rabbit hole but what is the amount that individuals
24  saved to avoid the late fee payment through this pay to pay, so
25  to speak, even if it is now deemed at least in Maryland illegal

1  or inappropriate but what of the amount saved is enforced by
2  that number?  If you were to say, well, there was a 4 percent
3  fee, let's say half the patrons would have paid, what
4  relevance if any would that have on this litigation?
5  MR. ROBINSON:  It has none to the clients because it's
6  not a defend.  That's why I gave you the Anders case, that would
7  be an exception to the provisions in Anders that allow for
8  actual damages to be recovered, the actual damages is the
9  payment of the fee that's not allowed.  There's no exception for
10  set off.  First of all, if it was a set off, Your Honor, they
11  would have to plead that as a counterclaim and they didn't.
12  So they're not entitled to that and it's also my main
13  argument why you have the Anders case is because they're asking
14  for an exception to the statute that the general assembly didn't
15  enact itself, a judicial exception, and the Court -- the Court
16  of Appeals now, Supreme Court said the remedy for that is for
17  them to go down the street to the general assembly.
18  The remedy for them if they want to change the ruling
19  to that 2-231(i) is to go to the rules committee, make a
20  recommendation, and then ask the Court, the Supreme Court, to
21  adopt those changes to allow them to do a bypass and a cheat to
22  the controller's office on the lost fund.  That's not in any
23  rule, that's not in any statute, it's clever but it really
24  doesn't.
25  So the roadmap here for class certification is fairly

1  simple, we think.  There's no dispute that there's a class that
2  can be certified under the factors.  The mootness argument
3  doesn't apply because not all relief has been reached.  What
4  practically would happen next, which I think is important for
5  Your Honor to understand and consider, is if the Court would've
6  certified the class -- classes as we proposed within 30 days as
7  we put in our proposed order, we would present an administrative
8  order for sending notice to the class.  The class would have the
9  opportunity to opt out.  Some class members may have individual
10  declaratory claims like Ms. Baxter does, then they may want to
11  opt out to pursue those individually.
12  Or they may have other claims, or they just don't want
13  to be in class actions, and they want to opt out for that
14  reason, those are all various reasons.  There wouldn't be a
15  settlement, they don't have an opportunity to reject out once
16  that opt out period is over, then we would -- in the interim we
17  could present the -- what's left of the affirmative claims and
18  we think that if the Court orders them to provide the right data
19  points, we can easily do a mathematical calculation of the
20  prejudgment interest.  The Court -- and then of course, as part
21  of our summary judgment which we haven't gotten to is we ask for
22  attorney fees, all of that can be done in the interim.  So --
23  and the practical speak is this is really what would wrap things
24  up.  We don't think there's much still left for trial; the terms
25  of relief would be tried before a judge anyway so that wouldn't

1  go before the jury -- or the declaratory relief for Ms. Baxter
2  and that's likely to be done on papers based on the ruling.
3  So I think -- I wish I wasn't here under these
4  circumstances because I've never encountered this before but
5  under the circumstances, that's what's fair and reasonable
6  because there's really no dispute that there's a class here.
7  There's a dispute that they tried to bypass the effort and avoid
8  court supervision.  I don't think we need to condone indirectly
9  by denying the certification of the class because none of these
10  people who allegedly -- we don't know who they are, of those who
11  received a check, know what their rights are.  That's what the
12  whole point of the class is, we will present a notice with those
13  actions to explain.  They might have other claims that they need
14  to pursue or could -- should pursue but they have no notice of
15  that, so where's the due process in that?
16  THE COURT:  Let me just -- because I'll forget to
17  circle back.  Whatever the Court does today, unlikely to issue a
18  summary opinion but I want to be clear for the record.  It
19  wasn't an inappropriate argument for you to make or suggest but
20  I'm not speaking normatively through my ruling one way or the
21  other.  In other words, I'm not making public policy whether it
22  was appropriate response under (i) or not.  I just want that to
23  be clear.  I think there was a suggestion that, you know, I'd be
24  sending some signal.  I'm not doing that by my ruling, I think
25  most of us would agree with that, but I certainly want to make

Apx. 23

```
1    that clear, but anyways --
2           MR. LYNCH:  Can I make just a few comments, Judge?
3    You said in the beginning --
4           THE COURT:  Sure, go ahead, Mr. Lynch.
5           MR. LYNCH:  As far as certifying the class on
6    injunction -- injunctive relief, the only evidence in front of
7    the Court is we stopped the practice in Maryland last May.
8    Theres no evidence -- they didn't take the deposition, they
9    didn't get any evidence during discovery.  This Court could not
10   -- it's our position give an advisory opinion about the practice
11   going forward.  Injunctive relief is to stop a current threat
12   that we believe it would be entirely inappropriate to have a
13   class action on injunctive relief.  The only evidence in front
14   of the Court is we don't do it anymore.
15          Then the class action has to be certified on issues
16   and topics.  We -- the only evidence in front of the Court is
17   we've reimbursed all of the convenience fees.  We would submit
18   to the Court you can't certify a case on reimbursement of
19   attorney's fees if it's already been done.  That's what mootness
20   is.  I am mindful in all candor about the prejudgment interest
21   issue but if any class -- and we think it should be mooted
22   because once you moot the underlying claim, there is no
23   prejudgment interest and we've decided cases to that account but
24   if the Court isn't inclined to accept those cases, the only
25   class that arguably could be certified would be a class action
```

**[Page 48 / right column]**

```
1    on only prejudgment interest because all of the evidence in
2    front of the Court is all the Maryland borrowers had gotten
3    their convenience fees paid, reimbursed before the class was
4    certified.
5           Then the other issue, Mr. Robison said, is you've got
6    to give notice so they can think about some other claims they
7    had against Nationstar and Lakeview.  That isn't the point of a
8    class action notice.  A class action notice is when a court
9    determines whether a claim is viable and whether they want to
10   give someone notice about the issue in the case.  The purpose of
11   a class action notice where they opt in or out has nothing to do
12   with other types of claims they may have against a party, that's
13   not what class actions are for.  They're on the issue that is
14   still in a case, that's what a class action notice is for.
15          So this notion that well, maybe Ms. Baxter and a bunch
16   of other Maryland people may have some other issues against
17   Nationstar, we should send them all notices.  That is not the
18   purpose, and we believe, Judge, if you look at the Tennessee
19   case and when you look at the Frasier (phonetic) case and the
20   Chrysler case, where the Chrysler case is a case that just came
21   out in the Maryland Court of Special Appeals.  You can't moot a
22   claim by giving the money back, that's what mootness is, and we
23   did that here.  A class cannot be certified on that issue.
24          MR. ROBINSON:  Your Honor, if I may just for the
25   record, there is no class claim for declaratory injunctive
```

```
1    relief before the Court.  I don't know why it keeps being raised
2    as an argument.  It's not plead.  Ms. Baxter has an individual
3    claim under CLEK (phonetic), the (unintelligible) loan, under
4    the Liles case and Moling case so.
5           Now, class members would have a ratio problem which is
6    why one of the benefits why there's no finality here and why we
7    think a class is justified in the summary judgment motion is
8    class members would receive notice of the claims that are
9    certified by the Court and we think there's enough about the
10   claims under 14-202(11) on convenience fees, and they would have
11   the right to opt out.
12          And to cater to the Court, one of the considerations
13   the class has when it opts out is do I have other claims because
14   I can't split my claims?  So we don't want to be -- have anybody
15   prejudiced but the whole point is they get a notice telling them
16   they have claims in this Court, that this Court is certified so
17   they can make an informed educated decision.
18          THE COURT:  All right, thank you.  Referring to the
19   partial summary judgment motion, are you arguing that one as
20   well, Mr. Robinson?
21          MR. ROBINSON:  Yes, sir.
22          THE COURT:  I know that you've touched upon it
23   multiple times but I'm sure there's more that you want to say.
24          MR. ROBINSON:  So again, this is an unusual case, Your
25   Honor, but we've hit on four legal claims.  Count 1 is under the
```

**[Page 50 / right column]**

```
1    MCDCA and MCPA.  We only moved for partial summary of judgment
2    on the primary basis for the motion under the MCDCA is 14-
3    202(11) and I've already been through that statutory framework
4    to which there's really no dispute.
5           They're not allowed to charge a fee related to the
6    mortgage here which has to be in writing.  You can't have an
7    oral agreement related to real property contracts and if you're
8    making a payment on your mortgage that's related to real
9    property because it's secured by the real property, the
10   regulations we cited in our papers require any agreement between
11   Lakeview, Nationstar, a borrower to be in writing.  There's no
12   writings.
13          So their practice of charging convenience fees for
14   payments was relative of 14-202(11), that's a per se violation
15   of the consumer protection act of 13-301(14)(3)(I) -- three Is,
16   and so we did not move for a scandal on MCPA summary judgment so
17   I'm not going to argue that but, you know, it would be moved --
18   that would be moved if the Court granted our summary judgment on
19   this claim.  We don't get anything extra.  The -- we've outlined
20   in our motion in pages 3 to 7 the undisputed material facts.
21   They're discovery responses which are unamended.  Those
22   affidavits we heard about, the second and the third ones that
23   came in February after the close of discovery, that's not how
24   you supplement your prior discovery responses and these are --
25   and the Court here is pretty vigilant on its DCM guidelines,
```

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

**Page 51**

```
 1   have supplements timely by the discovery deadline.  You don't
 2   wait to sandbag someone after the fact.
 3         The Alexander case and then we cited dozens of others
 4   on pages 11 and 12 of our motion are on point and that this is a
 5   viable claim and in this instance there's no dispute of fact,
 6   we're in trial for the judgement of liability.  In this Court
 7   they're -- they rely on this one unreported case from the Court
 8   of Special Appeals, which really the court isn't supposed to
 9   consider.  There's a potential rule change, I mean, from the
10   Supreme Court about whether -- but that doesn't apply yet, Your
11   Honor, and I don't remember exactly how that got left at last
12   month's hearing of the Court's -- the Supreme Court's rules --
13   order, but you know, our response to that is that's not reliable
14   for persuasive or even any other kind of basis but if the Court
15   is inclined to do that, I've been in this Court and settled in
16   another one these convenience fee cases before Your Honor's
17   colleagues in another case so this isn't -- you know, this is --
18   these are sort of normal.
19         The attorney fees here and I -- we think there's no
20   dispute about the amount of money that was collected,
21   $982,907.22, down to the penny they told us, Your Honor, so
22   what's unusual is I can move for summary judgment as to the
23   damage and so we are asking for a judgment for damages of that
24   amount for the punitive classes, the Nationstar class and I
25   would assume the Lakeview class, the -- and we know to the
```

**Page 52**

```
 1   penny.
 2         Normally, I can't do that, Your Honor, I'm moving for
 3   summary judgement as to liability and relief for damages for
 4   trial at some later stage.  We -- so but we know that here.
 5   What we don't know is the data points to calculate the
 6   prejudgment interest that's automatic and as a matter of right
 7   owed to the class members as we've outlined in our prejudgment
 8   interest cases.
 9         There's really no discretion because we know the
10   dates.  They know the dates they collected the money, the know
11   the dates that people got the money, and then you just run the
12   math.  It's 6 percent per year which is the maximum for a fee
13   that was paid three plus years ago, it could be 18 percent or
14   more.  Somebody paid the fee a year ago before we stopped the
15   practice, Your Honor, would get less under prejudgment interest
16   for that fee and if as Mr. Lynch pointed out, they paid multiple
17   fees there would be sort of a calculation there in addition.
18         We've asked for an award of attorney fees as part of
19   our motion for partial summary judgment which again is a little
20   unusual at this stage, but we can do that because we know to a
21   penny how much they collected from the class members.  We also
22   know from the admission that we just heard, the benefit to the
23   class members here just like the benefit in Crystal Ford is that
24   they stopped the practice.
25         THE COURT:  How would that not be (unintelligible)?
```

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

**Page 53**

```
 1   It states the obvious but under a 40 percent model, you're
 2   pulling that from recovery in this case, how would you not be
 3   then unfairly tacking the attorney fees on top of the amount of
 4   the damages that you indicated?
 5         MR. ROBINSON:  Well, first of all, there's no case on
 6   point so it's a fair question, Your Honor, because this is very
 7   confusing but normally what happens in a class case is we would
 8   petition for a percentage of the common fund that's created.
 9         THE COURT:  Right.
10         MR. ROBINSON:  Now -- but when you have a common fund
11   plus prospective relief, here we have by their own admission
12   prospective relief to the class, they now get the same service
13   for free and we know just based on simple math, one year of
14   those free fees is a value to Maryland consumers of $393,162.88
15   and so the case law, Crystal Ford says this, that remember I
16   went through those questions with you earlier?  Well, part of
17   the benefit in Crystal Ford was the defendant stopped using the
18   defective warranty form and they made corrections and the Court
19   reversed on the awarded attorney fees based on Lonestar
20   (phonetic) which is all they're offering, saying that no, the
21   attorneys work, also without benefit to the class members in
22   correcting those defective warranties.
23         Here, we have, you know, a different issue where we've
24   got prospective free relief for Maryland residents who now can
25   pay on the phone for free by their own admission without having
```

**Page 54**

```
 1   to pay that fee so $14 or $18, depending on the scale.  So for
 2   each Maryland resident, they're more than likely in my
 3   experience to probably use that service if it's for free and the
 4   benefit is great, the only prospective.
 5         So we've asked for an attorney fee award that
 6   calculates in that we've also obtained future benefit.  We think
 7   we're entitled to that judgement -- the last point I want to
 8   make in favor of the class as we've proposed because there's
 9   nothing preventing them from starting again.  They've admitted
10   that notices are.  They might change their business practice.
11         They have an expert in the cases that they can
12   disregard those notice is a might but they will not change their
13   business practice.  I'm not an expert in the cases but they
14   argue they can disregard those notices but a judgement from this
15   Court would act as collateral stock hold.
16         Unless the law's changed to expressly allow these as
17   the commissioner attempted to do in 2022 but -- and that
18   legislation failed or unless their contracts are changed, they
19   get someone to actually sign a written contract not an oral
20   contract related to real estate, but we think we've achieved
21   results.
22         So that's why what's left for this case is we think
23   it's certified as summary judgment -- partial summary judgment
24   as we've asked for, the two moot sentences to work out, the
25   three moot sentences to work out or the amount of prejudgment
```

**Page 55 (left column)**

```
 1   interest and that's a mathematical calculation that we can do
 2   between counsel and present to the Court to add on to the
 3   judgement, and then Ms. Baxter has her individual declaratory
 4   relief that she's entitled to which under the Higgins case comes
 5   after law so we didn't move for that because we have to wait
 6   under the case law for the equitable relief after the legal
 7   issues are taken care of.
 8            And so we've asked for an award of attorney fees
 9   that's equal to the percentage of the benefit to the class and
10   then the Court, the 2-700 rules don't squarely apply to
11   contingency cases like this one.
12            THE COURT:  But how's that, recognizing the, you know,
13   form in which we sit today, how's that not a genuine issue of
14   material fact?  I know we've already addressed it in the
15   certification part of the hearing but they're saying it was the
16   commissioner's advice that motivated their prompt action, and
17   you were saying it was the benefit of the class generated by
18   this lawsuit and that's what gives rise to a of an non Lonestar
19   attorney fee award so to speak.  So how's that not a genuine
20   issue of material fact, what motivated their actions?
21            MR. ROBINSON:  Wel, because we've provided the
22   testimony from the commissioner's office and they sort of took,
23   Your Honor, that the commissioner does not provide legal advice.
24            THE COURT:  Doesn't provide legal -- well, I mean,
25   that's the disclaimers from the attorney general all the time,
```

**Page 56 (right column)**

```
 1   it's legal advice for sure by saying, you know, this is not a
 2   court opinion, you have to rely on it but it certainly motivates
 3   actions when you see the opinion from the letter AG, how is this
 4   not similar?  In other words, it doesn't have to be legal advice
 5   to be the thing that motivated them to change their actions in a
 6   regulatory environment.
 7            MR. ROBINSON:  All I have is my opinion, Your Honor.
 8   You get to call the balls and strikes.
 9            THE COURT:  Again, I'm not really (unintelligible).
10   I'm just saying but you -- do you not agree that that's a
11   genuine issue of material fact vis a vis the attorney fee issue?
12            MR. ROBINSON:  I don't think that the key to that is
13   what's material.  I don't think -- and advice from agency to
14   them, if that's viewed that way, can be relied upon.  They can't
15   because we have the agencies on sworn testimony, it says, one
16   they have to follow the law and the law's been the same since
17   October 1, 2018.  Two, the agency's sworn testimony that
18   Nationstar took an attempt case I provided Your Honor with that
19   says they're required to follow the law and then had their
20   own expert report, so I just think it's not material, that's the
21   key.  It's a fact, I'm not disagreeing with it's a fact, but I
22   don't think it's a material fact for the question of whether or
23   not what the attorney fee is that can be awarded.
24            Now, the Court has some discretion to determine that
25   amount under the case law.  I can't run the math, Your Honor.
```

**Page 57 (left column)**

```
 1   The question then is under the circumstances based on the highly
 2   unusual case that's never been in any court that I know of, in
 3   this kind of circumstance, what would be the appropriate thing?
 4   We know what we provided and there's no dispute about this is
 5   that the common bond mechanism and we know from Crystal Ford
 6   it's not just looking at the Lonestar, that's what Crystal Ford
 7   holds, it's also looking at the benefit for the class.
 8            And so there's no dispute here because they've argued
 9   in front of the Court today and (unintelligible) in the Court
10   that they're not charging the fees, they're providing the same
11   service for free, and so I think for Maryland residents, that's
12   $14 a month or so that they can buy gas, that otherwise
13   were paying a fee that was never authorized.  That's a benefit
14   that we should get credit for as counsel who took the risk of
15   bringing the case.
16            I mean, the fact that's interesting is we filed the
17   case before the advisory notice came out from the commissioner's
18   office, and they answered or they received the complaint before
19   the advisory notice came out, and in their discovery responses
20   that are in the record, none of them addressed the advisory
21   notice at all.  It's only until these later affidavits that they
22   provided the advisory notice.
23            So that's why I think it's not really material under
24   how they pursued the case.  Had they brought that up in their
25   answer, had they brought that up in their original discovery
```

**Page 58 (right column)**

```
 1   responses in August and September, I think there'd be a harder
 2   argument for me, Your Honor, but they didn't bring it up until
 3   later.  So I don't really think it's material, they forfeited it
 4   because they didn't bring it up timely.
 5            THE COURT:  Okay, Mr. Lynch?
 6            MR. LYNCH:  So Judge, I'm going to start with the
 7   procedural issue and then go into several substantive.
 8            First of all, summary judgment motion on behalf of a
 9   class that hasn't been certified is improper.  The only motion
10   for summary judgment that the Court can hear today is for
11   Baxter.  You don't even have -- I guess we're getting back to
12   some kind of basics.
13            Until a class action is certified and you know that
14   the issue is certified, that class can't move for summary
15   judgment.  So they filed summary judgment and class
16   certification at the same time.  Until a class is certified, a
17   class can't move for summary judgment so it should be dismissed
18   without prejudice unless they're just doing this for Baxter.
19            We don't even know if the class is being certified.
20   Until you have a class and until you send notices out to the
21   class, you can't move because you don't even know who's opted in
22   and opted out.  So the Court can't make a ruling on summary
23   judgment for a class that hasn't even been certified.
24            Procedurally, the summary judgment's wrong,
25   substantively.  They're seeking a judgment against Nationstar
```

Apx. 26

1  for close to a million dollars.  The only evidence -- when

2  you're talking about evidence there has to be either undisputed

3  evidence or a genuine issue of material fact.  The only evidence

4  in this case is from Nationstar that we've repaid $980,000,

5  actually repaid 1.1 million.  You cannot get summary judgment on

6  a commons fund that's been repaid, that is mootness.  The money

7  has been repaid.

8        They're asking to get a judgment in this Court for

9  $980,000 when the only evidence in front of the Court is that

10  that money has been repaid.  They didn't take any depositions of

11  Nationstar.  They tried to strike the declarations, the Court

12  said they're denied, and they can be considered on summary

13  judgement and class certification, trying to strike those

14  declarations and then denied.

15        They're asking the Court for a judgment when the

16  money's been repaid by undisputed evidence.  Then on attorney's

17  fees, the only way they would ever get any more than just

18  whatever they get for Baxter in attorney's fees would be having

19  the establishment, first of all of some sort of benefit to the

20  class.  The class -- you don't hear attorney's fees, motions for

21  a class until a class has been certified, until it's been given

22  notice, and then if there's a summary judgment or a trial.

23  They're trying to skip all of those steps and get attorney's

24  fees when a class hasn't even been certified for the entire

25  class.  The whole way they're doing it on summary judgment for a

1  class is completely improper.

2        There is no common fund.  The Court hasn't made any

3  rulings.  All the evidence in the Court is we've repaid the

4  money.  I mean, mootness applies to the summary judgment and the

5  class certification but even if it didn't, they are skipping

6  steps A through E on the basics of class actions.  You've got to

7  have a class action certified, you've got to have notice, then

8  you file for summary judgment, then you file the motion for

9  attorney's fees and the Court approves it.

10        The Court doesn't know what type of benefit a class

11  would get because they -- the class hasn't even been certified

12  yet so it's procedurally improper and they don't have the

13  merits, Judge -- the only evidence this Court has, you weigh the

14  evidence.  Everybody had time for discovery, the evidence says

15  $980,000 has been repaid.  How in the world, given that evidence

16  in the record, can a judgment be entered for $980,000?

17        And then they're saying they're not seeking injunctive

18  relief?  Well, they -- I just heard Mr. Robinson say, well, how

19  about if Nationstar changes the policy?  They want to get paid

20  on money that's already been paid, they want a percentage of

21  that when the only evidence in the record -- and they had the

22  opportunity to depose Nationstar, is that we stop the practice

23  right after we go the ruling which is simple, and that's a

24  business call, and some of these we did based on that but we

25  stopped in May.  That's not because of some class being

1  certified or some lawsuit.  The lawsuit was a month old, right,

2  and that's when we were served with it.  And so again, the only

3  evidence is we stopped based on regulatory, not because of Mr.

4  Robinson's lawsuit and certainly not some benefit to the class

5  because it happened.

6        It will be a year that we stopped the practice of

7  four.  Any class ever would have been certified.  When you're

8  about a benefit to the classes, if the Court ordered an

9  injunction, if the Court ordered an injunction and saw that the

10  practice was still continuing, maybe that would be a benefit to

11  the class but not something that happened a year ago that

12  happened undisputedly based on the record, based on the

13  regulatory memorandum that was sent out.

14        And again, Judge, I think one thing I would ask the

15  Court when the Court's thinking about this case and I agree with

16  Mr. Robinson that it's a little unusual, but courts should look

17  favorably upon companies like Nationstar when something's in

18  dispute or something that they believe is the (unintelligible)

19  and they reimburse all the money early on.  That should be

20  something that trial court judges and appellate judges in

21  Maryland should promote, and if this Court somehow gives him

22  some sort of judgment and certifies a case on fees that have

23  already been reimbursed, that is -- you know what that's doing?

24  That's not promoting what courts are here for and it's also

25  giving plaintiff's attorneys in the class action space I think

1  really, really things that aren't merited by the law and things

2  that aren't favorable to courts in cases.  I mean, again, we --

3  we've reimbursed 1.5 million dollars.  We -- companies don't do

4  that unless they believe and they're sincere in doing it and

5  it's not in response to Mr. Robinson's lawsuit.

6        THE COURT:  All right, thank you.  Mr. Robinson, you

7  get the last word.

8        MR. ROBINSON:  Thank you, Your Honor.  My friend says

9  he doesn't know if they were served.  My friend filed on May 25,

10  2022, a consent motion and in Paragraph 3 admitted in a judicial

11  notice to the Court that they were served on April 25, 2022.

12        MR. LYNCH:  We may have been served before that.

13  Certainly wasn't far into the case.

14        MR. ROBINSON:  So they were timely served, Your Honor.

15  They knew about the case and that the case was pending.  The

16  Crystal Ford case talks about this whole theory they have that

17  we're only entitled to attorney fees for Lonestar.  That's what

18  the trial judge in Crystal Ford had held, that he did not

19  certify the case.  Same facts as this case.  In Crystal Ford at

20  the trial level, they moved to pick off the plaintiff and trial

21  judge did not certify the class but the Court of Appeals then --

22  now Supreme Court held in the Crystal Ford case that that

23  plaintiff's attorney was entitled to attorney fees for the

24  benefit of paying on behalf of the punitive potential class

25  members and that's in the decision and here, what we know

Apx. 27

| | |
|---|---|
| 1 because there's no dispute is that after following this case, | 1 it and there's no prejudgment interest and there's no attorney |
| 2 after answering, after serving them with discovery, after their | 2 fees that are paid. |
| 3 answers in discovery in which they did not disclose that they | 3 We went -- we were scheduled to go to a meeting on |
| 4 were making funds, after never supplementing in their discovery | 4 this issue, you can see from the court papers in November, that |
| 5 that they were making any refunds, then they disclosed in a | 5 was canceled by the defendants the week before.  Then we did go |
| 6 series of affidavits, one given to us in November 2022 and two | 6 with communication with Judge Leo Green that didn't resolve.  We |
| 7 after the discovery had closed. | 7 had our conference with Judge Platt, there's another one |
| 8 We don't have the names of the class numbers, we don't | 8 scheduled for a week or two from now. |
| 9 have the class projects, we don't -- all we have is sort of the | 9 THE COURT:  Okay. |
| 10 self-serving affidavits with no supplementation to the discovery | 10 MR. ROBINSON:  So -- |
| 11 responses. | 11 MR. LYNCH:  (Unintelligible.) |
| 12 So we've achieved benefit by their own admission, | 12 MR. ROBINSON:  I don't believe so.  There's a trial |
| 13 $900,000 and change returned to theoretically the class members | 13 date -- a trial by date in the fall but I don't think, Your |
| 14 but we don't know if they got it, all without court supervision | 14 Honor, this is -- I mean, if -- Your Honor, I tried to map out |
| 15 and all they had to do if they read the rule, 2-235 the class | 15 for Your Honor in my argument and in the papers before you what |
| 16 action rule Paragraph 5, all they had to do if they read it is | 16 to do with this unusual case, okay?  I think that what to do is |
| 17 to file a motion with the Court to do what they were doing, then | 17 what we've asked for which is the judgment be entered as -- to |
| 18 we could have addressed all these issues last summer, Your | 18 certify the class -- judgment on behalf of the class be entered |
| 19 Honor.  They chose not to do that. | 19 and that the parties be ordered to be present an administrative |
| 20 They chose not to supplement and I think we've asked | 20 order so a notice can go to the class members who can then opt |
| 21 for partial summary judgment and they have to right to satisfy | 21 out and then a final judgment is entered along with papers for |
| 22 the judgment by presenting admissible evidence that shows they | 22 what the calculations are for prejudgment interest. |
| 23 paid actual people and that those people got the money.  There's | 23 In district court, the attorneys presented like a |
| 24 nothing before the Court to show that anybody -- who got the | 24 worksheet to determine what the prejudgment interest is on a |
| 25 money.  All there is is a spreadsheet with a bunch of numbers on | 25 contact claim.  It's the same thing here except going to have a |

| | |
|---|---|
| 1 spreadsheet attached to it.  It's just a math exercise, and then | 1 the classes, and the -- including the damage amount which the |
| 2 my friend makes -- the last argument that I'd like to sort of | 2 defendant can put forward evidence to satisfy that said |
| 3 say in response and rebuttal. | 3 admissible evidence, and it can be under seal and also the Court |
| 4 My friend argues that procedurally what we've done is | 4 award attorney fees that it feels that are just and right under |
| 5 improper.  He's -- | 5 the circumstances and we provided all the case law that says |
| 6 MR. LYNCH:  Because that's what I said.  I didn't hear | 6 it's under a common fund theory, we would have been entitled to |
| 7 that. | 7 40 percent of the benefit to the class up to -- and we only |
| 8 MR. ROBINSON:  Procedurally, he said what we've done | 8 asked for 20 something percent of the total benefit of the |
| 9 by moving simultaneously for class cert and summary of judgment | 9 class, the money they got plus the future benefit which as we |
| 10 isn't proper.  You cited no rule for that and in fact the | 10 know now is about a year worth of free fees.  Thank you. |
| 11 Supreme Court affirmed class certification and summary judgment | 11 THE COURT:  All right, thank you, Mr. Robinson. |
| 12 in LVNV v. Finch, which counsel decided on papers and I can | 12 MR. LYNCH:  Your Honor, if I may, there is no law |
| 13 provide you -- the Court with that.  They did not move for | 13 saying you get a certain percentage of a common fund, that's |
| 14 summary judgment as to damages, we just moved as to liability | 14 just a request from a plaintiff's class action attorney, there's |
| 15 but that was affirmed on appeal. | 15 just no law on that. |
| 16 So I just think there's no -- nothing preventing us | 16 Second, Judge, and I know I'm repeating myself but you |
| 17 from doing exactly what we did under the circumstances of this | 17 cannot get a judgment against a class that is not certified, you |
| 18 case.  There's no rule cited and more importantly, Your Honor, | 18 just can't and I don't know what cases he's talking about but |
| 19 they forfeited and waived that because that argument is not in | 19 the proper procedure is to get a class certified and they say as |
| 20 their opposition or summary judgment. | 20 early as practical in the rules, then you give notice, you find |
| 21 THE COURT:  Okay. | 21 out who's opting out, then the class moves for summary judgment. |
| 22 MR. ROBINSON:  So for all the reasons we would ask the | 22 This is improper to do that and whether he's saying it was a -- |
| 23 Court to certify the classes as proposed, require the parties to | 23 and there is no common fund, and we believe, Judge, the cases |
| 24 present an administrative order to fulfill the class | 24 we've cited on mootness are directly applicable here. |
| 25 requirements, and enter partial summary judgment on behalf of | 25 THE COURT:  All right, thank you.  Well, the parties |

Apx. 28

1  have done an excellent job bringing their arguments.  I think
2  the one thing that all sides agree upon is that this is sort of
3  a highly unorthodox posture in which we collectively find
4  ourselves and that's one of the reasons why the Court feels
5  compelled not to hide the ball but give both sides
6  (unintelligible).
7          I think it's a benefit to let the parties know what he
8  Court intends to do with the two instant motions notwithstanding
9  the fact that rule 2-231 regards the -- requires the Court in
10  its order essentially to really to be an opinion in the order
11  indicating why the Court decided to certify or refused to
12  certify the class, and the reason I plan to not hide the ball
13  from both sides with regard to both motions right now is number
14  one, they have another conference in front of Judge Platt in the
15  very near future and I, as sort of an independent arbiter who's
16  heard these limited two motions here today, I feel that this is
17  a cases that cries out for the parties to continue to have a
18  collegial dialogue to see if they can resolve this entire case
19  as well before the case goes too far down the road because I
20  think this case runs the risk of being one of those inverse
21  paradoxes where the amount of time and money and effort spent
22  ultimately starts to dwarf the amount of controversy and not
23  that there's anything wrong with that or that's an unheard of
24  paradigm, in fact that unfortunately, is asked all too often,
25  and I'm finding that in the wake of COVID it manifests even more

1  often because a lot of times, two and three years have elapsed,
2  further than ordinarily what would have happened before these
3  cases are reaching the Court, and just because parties remain
4  invested in their respective cases, a lot more blood and
5  treasure is spent to get to the Court they might have otherwise
6  ordinarily be and that sort of creates (unintelligible) to keep
7  on driving.
8          But in this case, I want to be clear I think there's
9  been a couple suggestions made from the plaintiff's counsel and
10  again, Mr. Robinson, I'm not saying -- and actually, Mr. Lynch
11  made the same comment that this Court should almost normatively
12  send signals and you, know, essentially make a ruling that's in
13  part at least influenced by what would be typically a public
14  policy consideration, and I just want to be clear that this
15  Court is reminding itself all throughout the hearing and in my
16  decision that I'm only wearing the judicial hat which is looking
17  at this case from the four corners of the issue before it and
18  not weighing in whether I think it sends a signal to plaintiff's
19  attorneys or whether it sends a signal to what remedies
20  corporations should take when there's a possibility of pending
21  litigation, that sort of thing.
22          That being said, I don't find that today's decision on
23  both motions, which I spent a lot of time thinking about and
24  reading before today's hearing, is that difficult, and I hope
25  the parties will take me at my word and sometimes I think as the

1  Court that you worry that when you make quick decisions on the
2  back end of a lot of reading and thinking, it looks like the
3  Court didn't spend time thinking about it, but I have.
4          And I find first, with regard to the motion for
5  partial summary judgment, that it's a very clear decision on
6  this Court's part that the motion should be denied at this
7  juncture.  I do find that there's genuine issues of material
8  fact that are replete and that have been raised in response to
9  the motion for partial summary judgment that would be a gross
10 example of putting the cart before the horse for this Court to
11 grant the motion either for partial summary judgment and the
12 reasons for that are -- include the fact that indeed the class
13 has not been certified and this Court therefore to enter any
14 judgment, the Court would have to enter judgment predicated on
15 the scope of the class itself.
16          I'm reminded of a case I once had, it was a
17 (unintelligible) case where we thought we were going to have a
18 huge class of persons that would be the victims of this wayward
19 cardiologist who was telling his hapless farmers that they had
20 coronary artery disease when they had none, and we thought --
21          MR. ROBINSON:  I apologize.
22          THE COURT:  That's okay.  It sounded like it was
23 coming from over here, I thought maybe the sheriff --
24          MR. ROBINSON:  It's the only number that goes through
25 my do not disturb.

1          THE COURT:  That's okay but in that case, we're were
2  going to have a huge class of persons, patients of this doctor
3  but when they were individually interviewed or received notices,
4  many of them I think were under the placebo effect where they
5  even -- they were showed on angiography that they had no
6  stenosis or almost limited stenosis, they still felt that their
7  doctor had done them a good turn and that certainly grossly
8  affected the size of the class, and I'm only saying that as
9  probably a terrible analogy because one of the genuine issues of
10 material fact would be the size of the class and I think both
11 parties have alluded to the fact that the Court has certified
12 the class that statutory notices have to go out and certain
13 decisions have to be made at an individual basis by I think the
14 punitive class members themselves.
15          But in addition to that, I find that the other genuine
16 issues of material fact include the -- especially as it pertains
17 to the attorney fees argument would be what if anything
18 motivated -- not if anything, things that motivated but what
19 motivated Nationstar to refund the monies and certainly what the
20 benefits are, those are all issues of material fact with
21 prospective benefits to persons and that should be weighed
22 against the benefits that the -- Mr. Lynch on behalf of his
23 client's basis that the person's received even when they're
24 engaging in the pay over the phone option so to speak.
25          In addition to that, I think genuine issues, what

**Page 71**

```
 1   would be the date of the judgment itself and I don't know how
 2   you calculate the prejudgment interest if you don't have a date
 3   of a judgment and certainly this Court can't enter that
 4   judgement today so that obviously in and of itself keeps the
 5   prejudgment issue interest a judiciable controversy that has to
 6   be resolved by a factfinder.  I assume that could be me, who
 7   knows?
 8        But ultimately, this Court finds that the motion for
 9   partial summary judgment is premature at best but at worst it's
10   -- even when you look more at the more granular level, the
11   genuine issues that have been raised by Mr. Lynch on behalf of
12   his clients do constitute material that have to be resolved
13   before this Court could begin to fashion a judgment and it would
14   be an extremely, highly unorthodox matter for this Court to pass
15   the judgment in the context of the summary judgment.
16        The motion involves a monetary figure that is nebulous
17   and requires a lot more granular assessment and that goes to
18   actually Mr. Robinson's argument which is it strikes this Court
19   that Nationstar in particular is the one that holds the specific
20   information that has to be collected and collated in some
21   fashion that would allow more exact and granular computation of
22   how much monies have been retuned to the individual clients and
23   how much ahs been not only tendered but in terms of forming a
24   judgment but how much has been actually received by individuals
25   in the form of cashing checks and that sort of thing.
```

**Page 72**

```
 1        So I don't find the motion for partial summary
 2   judgment was a default decision.  I find that it was actually
 3   very simple when it comes down to it.  Similarly, I find that
 4   the certification of the class issue is not overcome by the
 5   mootness sort of response that has been raised by Nationstar.  I
 6   really have not had significant exposure to class action suits
 7   admittedly but I'm somewhat forcing myself on behalf of the
 8   courts to really look at the four corners of the rule itself and
 9   -- in the first instance because I think both sides would
10   benefit here by having a fewer number of unknown variables,
11   meaning this Court looks at the prerequisites of the class
12   including numerosity and also all the other subparts of 2-231(b)
13   and I find first off that certainly there's a significant number
14   of individuals who are in a similar situation and therefore, I
15   find that the number of potential individuals is an appropriate
16   size by which they could be collated and congealed if you will
17   into a singular class and I'm talking about both classes now at
18   this time but the presence of all factors absolutely common to
19   the classes.  I haven't heard anything to suggest that each
20   individual would have a disparate sort of claim or cause of
21   action different from the 14-202 claims and the consumer
22   protection act claims that have been raised on Ms. Baxter.
23        And then I find that that leads me to my next part
24   that the claims of Ms. Baxter is absolutely typical of the class
25   from what I understand.  I think one of the key differences is
```

**Page 73**

```
 1   not germane to the legal issues, it would be a question more
 2   implicating the scope of the judgment, that is how many
 3   times an individual may have availed themselves of this service
 4   but not the nature of the claim itself be it one or five times
 5   or what have you.
 6        And last, I find that the representation of these two
 7   of the Court, it's appropriate that they would zealously
 8   advocate for Ms. Baxter and by extension to the -- for the
 9   entire class and therefore they fairly and adequately protect
10   the interest of the class which is really an important
11   consideration when on an individual basis, I don't even think
12   many of these individuals even if they are sophisticated, I'm
13   guessing some of them are not sophisticated but even if they
14   were not, perhaps (unintelligible) would not motivate an
15   individual to even begin to deal with the filing fees involved
16   in district court were done on an one off, ad hoc basis.
17        And that's a good segway, of course, to one of the
18   additional prongs that this Court has to consider under 2-231
19   which is -- I'll just characterize, paraphrase and of course,
20   this judicial economy and that is that the extended nature of
21   the litigation commits by the memory of the class, certainly
22   motivates the Court to concentrate the litigation such that the
23   courts will not be clogged with numerous individual claims, and
24   the Court finds that the management of the class is achieved and
25   sounds like is has been achieved in some ways and I agree with
```

**Page 74**

```
 1   Mr. Robinson on that front that merely the fact that Nationstar
 2   has ostensibly by their own representations paid back these fees
 3   means they've identified the known members but the known
 4   members, again -- and we still call it a punitive class is
 5   because notices have to be sent out in terms of who wants in and
 6   who wants out and that's a big process that will now commence in
 7   the next couple weeks ostensibly because the Court will issue
 8   its written opinion that will summarize per the rule the reasons
 9   that I'm planning on certifying the class.
10        And again, in certifying the class, I'll just go ahead
11   and say perhaps it's (unintelligible) at this point.  I'm not
12   saying the mootness arguments didn't resonate in part with the
13   Court.  I mean, I hope all the attorneys here will take stock of
14   the fact this Court and most courts, I can't speak for
15   Montgomery County, but we are deluged with civil litigations
16   because of what took primacy in the wake of COVID I mean during
17   COVID were the Constitutional claims and criminal defense.
18        So what we have is an enormous amount of civil
19   backlog.  It's no one's fault, not the litigants, not the
20   Courts'.  It's one in a hundred years, god willing, the pandemic
21   and the reason I'm saying this is I hope both sides will
22   continue to take stock of where this case is in your dialogue
23   with each other because I -- what I would be -- notice for all
24   sides if this case got to trial and the trial court, and again,
25   it could be me, it could be one of my colleagues but I had some
```

Apx. 30

1  epiphany about what we're talking about, the attorney fees and
2  prejudgment interest because all the other issues have been
3  largely resolved, either actually speaking or practically
4  speaking.
5      I've seen cases where they talked about consequences
6  when that happens and that's why I think this case is unorthodox
7  because the minute these monies have been from what I understand
8  paid back and that's why my order may actually have conditional
9  language in it that -- I don't know, I haven't tracked too many
10  of these 2-231 issues in the courts, I don't know how often that
11  occurs but what I'm envisioning is my order will have
12  conditional language that says that this Court may alter or
13  amend the certification before the judgment on merits because
14  that might be required when I receive additional feedback from
15  the parties, and when I say feedback, that might come in the
16  form a motion and I'm saying that because I think that now that
17  the class is certified, the Court has not really weighed in
18  fully on the mootness doctrine and it certainly -- I've denied
19  their motion for partial summary judgment on the initial grounds
20  without prejudice and I'm denying the sort of the response of
21  the defense if you will to mootness without prejudice because I
22  think that as the parties learn more and go forward especially
23  the scope and size of the class, some of what's been raised
24  today could be renewed when many of these variables are known
25  including the mootness doctrine.

1      But right now, I think hopefully what I've done is a
2  service to all sides because now that we're not speculating as
3  to whether there's a certified class, there is and there will be
4  one in when my order's published in a week or two, then both
5  sides can move concretely to say whether or not the class has
6  been certified, certain motions are more proper and for the
7  Court and right as it were if that makes sense.
8      So I really have made in some ways a very limited
9  holding based on immediately what's in front of the Court so
10  it's sort of one tile in a mosaic but certainly many of the
11  arguments that were raised today could be raised in a later
12  context and I think it would be an appropriate thing for the
13  parties to do.  In good faith I think that with more known
14  variables the motion to be presented again in a separate form.
15      All right, so thank you.
16      MR. ROBINSON:  Thank you, Judge.
17      MR. LYNCH:  Thank you, Your Honor.
18      THE COURT:  The motion -- denial of motion for summary
19  judgment will be reflected as the hearing sheet is in order of
20  the Court, but again I'll issue the opinion on certification
21  here in a week or two.
22      I hope everyone has a good day, thank you.
23      MR. ROBINSON:  Thank you, Judge.
24      MR. LYNCH:  Thank you, Your Honor.
25      (At 3:17 p.m., proceedings concluded.)

Tonda Baxter vs. Lakeview Loan Servicing LLC, et al. (C-02-CV-22-000654)

                    CERTIFICATE OF TRANSCRIBER
1
2      I hereby certify that the proceedings in the matter of
3  Tonda Baxter vs. Lakeview Loan Servicing, LLC, et al., case no.
4  C-02-CV-22-000654, heard in the Circuit Court for Anne Arundel
5  County, Maryland, on April 24, 2023, were recorded by means of
6  digital audio.
7      I further certify that, to the best of my knowledge and
8  belief, page numbers 1 through 76 constitute a complete and
9  accurate transcript of the proceedings as transcribed by me.
10      I further certify that I am neither a relative to nor an
11  employee of any attorney or party herein, and that I have no
12  interest in the outcome of this case.
13      In witness whereof, I have affixed my signature this 9th
14  day of April, 2024.
15
16
17              Susan Evans-Melvin
18                 Transcriber
19
20
21
22
23
24
25

Apx. 31

**E-FILED; Anne Arundel Circuit Court**
**Docket: 2/15/2023 6:36 PM; Submission: 2/15/2023 6:36 PM**

# EXHIBIT 4

IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY

**TONDA M. BAXTER,**
*On behalf of herself individually and
similarly situated persons,*

              Plaintiff,

v.

**LAKEVIEW LOAN SERVICING LLC,**
et al.

         Defendants.

Civil Case: C-02-CV-22-000654

### DECLARATION OF COURTNEY EHINGER

I, Courtney Ehinger, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury on this

_10_ day of November, 2022, that the following facts are true and correct:

      1.    I am a resident of Texas, over eighteen years of age, and by my own free will state the following true facts.

      2.    I am employed by Nationstar Mortgage LLC d/b/a Mr. Cooper ("Mr. Cooper") as a Senior Vice President, Performing Servicing. In that capacity, I am familiar with Mr. Cooper's policies and procedures for servicing loans, including various payment methods at Mr. Cooper offers and the fees that were associated with making payment by telephone, and the extent to which information available in Mr. Cooper's electronic databases can be searched systematically. I am authorized to make this Declaration on behalf of Mr. Cooper.

      3.    In my capacity as Senior Vice President, I have access to Mr. Cooper's business records regarding its customers. I am familiar with the manner and procedures by which the records contained in Mr. Cooper's files were prepared and maintained. These records were prepared and maintained by employees of Mr. Cooper in the performance of their regular business duties and were made by persons with knowledge of the matters they record or from information supplied by

Apx. 33

persons with such knowledge.  It is Mr. Cooper's regular practice to create and maintain such records in the course of its business.

4.      The facts set forth in this Declaration are based on my review of Mr. Cooper's business records or my personal knowledge. If called as a witness, I could and would be competent to testify to these facts.

5.      I am familiar with the Class Action Complaint filed by Plaintiff in this case, on behalf of herself and similarly situated persons. I understand that Plaintiff asserts claims on behalf of a class of individuals in Maryland who, starting three years before the filing of the Complaint, paid a convenience fee collected in whole or in part by Mr. Cooper to make a payment on a residential mortgage debt ("Mr. Cooper Class").

6.      I also understand that Plaintiff asserts claims on behalf of a class of individuals in Maryland who, starting three years before the filing of the Complaint, paid a convenience fee collected in whole or in part by Lakeview to make a payment on a residential mortgage debt ("Lakeview Class").

7.      Mr. Cooper's records show that, from the period beginning April 15, 2019 through April 15, 2022, there were 65,894 instances in which Maryland borrowers paid convenience fees collected by Mr. Cooper to make a mortgage payment on their residential mortgage loans.  The total amount of convenience fees collected by Mr. Cooper during this time period is $982,907.22.

8.      The spreadsheet attached hereto as **Exhibit A** includes the information set forth in Paragraph 6 above, as well as identifying the loan numbers, the amount of convenience fees charged and collected, and the dates on which said fees were paid.

9.      The Lakeview Class is a subset of, and included within, the Mr. Cooper Class. Mr. Cooper serviced the loans in the Lakeview Class on behalf of Lakeview.  However, Nationstar did

-2-

Apx. 34

not charge or collect convenience fees on behalf of Lakeview or remit any such fees to Lakeview.

10.     On May 16, 2022, Mr. Cooper stopped charging a fee to Maryland borrowers for the convenience of making payment over the telephone, either by live representative or via the interactive voice recognition system. Thus, Mr. Cooper has not charged any Maryland customer a convenience fee after May 16, 2022.

11.     By July 2, 2022, Mr. Cooper had stopped charging a fee for the convenience of making payment over the telephone, either by live representative or via the interactive voice recognition system, nationwide – in all states in which Mr. Cooper services mortgage loans.

12.     Beginning in September 2022, Mr. Cooper began implementing its decision to refund all convenience fees charged to Maryland customers from October 1, 2018 through May 16, 2022, the date on which Mr. Cooper ceased charging such fees to Maryland customers.

13.     All refunds of convenience fees paid by Maryland borrowers from October 1, 2018 through May 16, 2019 were completed on or about October 2, 2022. The spreadsheet attached as Exhibit B identifies the loan numbers and amounts refunded to Mr. Cooper's Maryland customers. The total amount refunded is $1,155,277.60 (the "Final Remediation Amount").

14.     Exhibit B identifies refunds of the fees that appear on Exhibit A ("Maryland Class Spreadsheet Refunds").

15.     However, some of the fees identified on Exhibit A do not appear on or are shown in a lesser amount on Exhibit B because between the time of assessment and remediation, Mr. Cooper had already waived such fees in whole or in part.

16.     Exhibit B also includes refunds of convenience fees associated with the loan numbers shown on Exhibit A, but such convenience fees were collected outside the period from April 15, 2019 through April 15, 2022 ("Outside Class Period Refunds"), including refunds of

-3-

Apx. 35

convenience fees collected from October 1, 2018 through April 14, 2019 or from April 16, 2022 through May 16, 2022.

17.     Exhibit B also identifies refunds of convenience fees associated with loans not included in the Mr. Cooper Class ("Non-Class Member Refunds") because the refund period began more than six months prior to the beginning of the class period (*i.e.*, from October 1, 2018 through April 14, 2019).

18.     In sum, all members of the Mr. Cooper Class who paid convenience fees from April 15, 2022 through May 16, 2022 (when Mr. Cooper stopped charging such fees), have received refunds of those fees.

19.     Mr. Cooper has refunded all convenience fees paid by Maryland customers who paid a convenience fee between October 1, 2018 and May 16, 2018, for a total amount refunded of $1,155,277.60.

20.     The following chart identifies the amounts refunded by Mr. Cooper to Maryland customers for convenience fees collected from October 1, 2018 through May 16, 2022:

| | |
|---|---|
| Maryland Class Spreadsheet Refunds | $982,907.22 |
| Non-Class Member Refunds | $27,276.24 |
| Outside Class Period Refunds | $145,094.14 |
| Total Refund Amount to Maryland Customers | $1,155,277.60 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __10_ day of November, 2022.

Courtney Ehinger
Senior Vice President

132231249

-4-

Apx. 36

# EXHIBIT A

# **FILED UNDER SEAL**

# EXHIBIT B

# **FILED UNDER SEAL**

| | |
|---|---|
| CONSUMER PROTECTION DIVISION, OFFICE OF THE ATTORNEY GENERAL, 200 St. Paul Place, 16th Floor Baltimore, Maryland 21202, | IN THE CONSUMER PROTECTION DIVISION OF THE OFFICE OF THE ATTORNEY GENERAL |
| Proponent, | |
| v. | |
| NATIONSTAR MORTGAGE LLC, t/a Champion Mortgage Company, | |
| Respondent. | |

## ASSURANCE OF DISCONTINUANCE

This Assurance of Discontinuance ("Assurance") is being entered into between the Consumer Protection Division of the Office of the Attorney General of the State of Maryland (the "Division") and Nationstar Mortgage LLC.  The Division and Respondent agree as follows:

### PARTIES

1.      The Consumer Protection Division is responsible for enforcement of Maryland consumer protection laws, including the Maryland Consumer Protection Act, Md. Code Ann., Com. Law ("CL") §§ 13-101 through 13-501 (2013 Repl. Vol. and 2017 Supp.) ("CPA").

2.      Respondent Nationstar Mortgage LLC ("Nationstar") is in the financial services business.  Its predecessor company was formed in 1994.  Nationstar is a Delaware limited liability company with its principal place of business at 8950 Cypress Waters Boulevard, Coppell, Texas  75019.

3.      Nationstar uses Champion Mortgage Company and other similar names, including, but not limited to, Champion Mortgage Company of Texas, (collectively "Champion") as a trade name for Nationstar in its reverse mortgage loan servicing business.

### THE DIVISION'S ALLEGATIONS

Apx. 39

4.      Nationstar provides residential mortgage loan services, including the servicing of loans in Maryland. It services forward mortgages – that is, conventional mortgages – under the name Nationstar.  It services reverse mortgages under the name Champion.

5.      In connection with its mortgage servicing business, Nationstar has charged inspection fees for residential real properties located in Maryland.

6.      An inspection fee is defined by Md. Code Ann., CL §§ 12-121 and 12-1027 as a fee imposed by a lender or credit grantor to pay for a visual inspection of real property.  A lender or credit grantor may not, subject to a few specific exceptions, impose an inspection fee in connection with a loan secured by residential property in Maryland.

7.      Nationstar violated CL §§ 12-121 and 12-1027 by assessing consumers prohibited inspection fees on its forward mortgages before January 1, 2014, for residential real properties located in Maryland.  Respondent assessed inspection fees on its reverse mortgages until at least February 4, 2016.  For both the forward and reverse mortgages, Nationstar represents that it has implemented procedures designed to prevent the future assessment of prohibited inspection fees to Maryland consumers.

8.      From on or about January 1, 2006 through on or about November 1, 2010, Nationstar estimates that it has assessed inspection fees about 27,543 times on 3,077 delinquent loans. Nationstar assumes the assessment of an inspection charge each month a loan was 45 days or more past due, at a charge of $9 per inspection, thus assessing an estimated $247,887 in prohibited inspection fees. Between November 5, 2010 and January 1, 2014, Nationstar charged at least $780,430 in prohibited inspection fees on 13,737 delinquent loans.   All instances in this section relate to forward, i.e. conventional mortgage loans in Maryland.

-2-

Apx. 40

9.      Between May 4, 2009 and at least February 4, 2016, Champion assessed at least $59,868 in prohibited inspection fees on at least 1,047 reverse mortgage loans.

10.      Respondent committed unfair and deceptive trade practices that violated the CPA by:

a.      misrepresenting implicitly or explicitly its right to assess and collect inspection fees; and

b.      failing to disclose that it assessed and collected prohibited inspection fees.

11.      Respondent represents that it has refunded, credited or reversed $780,430 in inspection fees that it assessed and collected or assessed but did not collect on its forward mortgages for all inspection fees charged between November 5, 2010 and January 1, 2014.   It also represents that it has successfully refunded, reversed or otherwise credited fees assessed on its reverse mortgages, totaling approximately $47,329, but has been unable to locate consumers entitled to refunds for 58 inactive files for which checks totaling approximately $12,539 were returned as undeliverable.

12.      Respondent will refund, credit or otherwise reverse, prohibited inspection fees in at least 27,543 transactions on forward loans between January 2006 and November 1, 2010, for an estimated $247,887 in fees that it has not refunded, credited or otherwise reversed.

13.      Altogether, Nationstar assessed an estimated $1,088,168 in prohibited inspection fees.

14.      Nationstar neither admits nor denies any allegations contained herein but desires to resolve the dispute concerning the above allegations. Respondent agrees to the relief set forth in this Assurance.

-3-

Apx. 41

15.     The parties agree that there is no private cause of action, explicit or implicit, created by this Assurance; however, nothing in this Assurance shall be construed as a waiver of any consumer's claims under applicable law.

## CEASE AND DESIST PROVISIONS

16.     The provisions of this Assurance shall apply to Nationstar and the company's members, officers, employees, agents, successors, assignees, affiliates, merged or acquired entities, parents or controlling entities, wholly-owned subsidiaries and all other persons acting in concert or participating with any such company.

17.     Respondent shall cease and desist from engaging in any unfair or deceptive trade practices in violation of the CPA.

18.     Respondent shall cease and desist, either directly or indirectly, from assessing or collecting inspection fees against consumers on any residential real property located in Maryland in violation of CL §§ 12-121 and 12-1027.

19.     Within seventy-five (75) days after the date of this Assurance, Respondent shall provide the Division with a report of the inspection fees referenced above in Paragraph 12 and assessed on residential real properties located in Maryland ("Report"), including the amount of fees refunded, reversed or otherwise credited.   The Report shall be in an editable Excel spreadsheet, with each item below contained in a separate field:

a.      consumer's first name;

b.      consumer's last name;

c.      consumer's last known address;

d.      whether the loan is a forward loan or a reverse mortgage;

-4-

Apx. 42

e.   the number of delinquent months for which the consumer was charged - or reasonably estimated to have been charged - an inspection fee;

f.   the amount of inspection fees actually or estimated to have been assessed against the consumer;

g.   if the inspection fees have been remediated (i.e. refunded, reversed, credited, or in any other way reimbursed to the consumer);

h.   the amount of the fees that were refunded, reversed, credited, or in any other way reimbursed to the consumer for the assessed and/or collected inspection fees;

i.   the date(s) the fees were refunded, reversed, credited, or in any other way reimbursed to the consumer;

j.   the date the loan was service transferred, if applicable; and

k.   the name of the entity to which the loan was service transferred.

20.    Within seventy-five (75) days after the date of this Assurance, Respondent shall send a notice to each servicer to which Respondent sold and/or transferred the servicing rights for any loan secured by residential real property located in Maryland on which Respondent improperly assessed, but did not refund, credit or reverse the full - or estimated - amount of inspection fees assessed in violation of CL §§ 12-121 and 12-1027. The notice shall inform the new servicer that all such inspection fees were assessed in violation of CL §§ 12-121 and 12-1027 and that the assessment should be reversed, refunded or credited to the consumer, and include:

a.  the consumer's first name;

-5-

Apx. 43

    b.   the consumer's last name;

    c.   the consumer's last known address at the time the servicing rights were sold and/or transferred;

    d.   the consumer's loan number at the time the servicing rights were sold and/or transferred; and

    e.   the loan's total sum – or estimated sum - of the assessed inspection fees that were not remediated.

Respondent shall send the Division a copy of each such notice.

## RESTITUTION, COSTS AND OTHER PAYMENTS

21.    Consumers are eligible for restitution if Respondent assessed any inspection fees in violation of CL §§ 12-121 and 12-1027 but did not refund, reverse or otherwise credit the consumers for such fees charged in connection with loans secured by residential real property located in Maryland for its forward mortgages and its reverse mortgages.  To the extent that Nationstar has not already refunded, reversed or otherwise credited consumers for such fees charged in connection with loans secured by residential real property located in Maryland, it shall do so within 60 days of the date of this Assurance.

22.    If, for any reason, Respondent is unable to refund, reverse or otherwise credit within 60 days of this Assurance any inspection fees assessed or collected, it shall provide the Division within 85 days of this Assurance a list ("Restitution List") of those consumers for whom it has not refunded, reversed or otherwise credited any inspection fees that includes:

    a.   the consumer's first name;

    b.   the consumer's last name;

Apx. 44

      c.     the last known address of the consumer;

      d.     the consumer's social security number;

      e.     the total amount of actual or estimated fess assessed; and

      f.     the amount of restitution due.

23.    Respondent shall, upon request, provide to the Division access to its business records related to its imposition of inspection fees, including documentation of any of the information contained in the Restitution List.

24.    The Division shall attempt to locate all consumers on the Restitution List who are entitled to a refund of inspection fees, but whom Respondent has been unable to locate, and to pay such consumers the restitution amounts they are owed.   If the Division is unable to locate the consumer, the funds owed that consumer will escheat to the State.

25.    Respondent shall pay to the Division the sum of Ten Thousand Dollars ($10,000.00) for costs the Division has incurred investigating this matter or that may be incurred by the Division in conducting the claims process ("Costs").

26.    Respondent agrees to a $750,000 settlement amount ("Settlement Amount") to be calculated as follows: Respondent shall (i) refund, credit or reverse inspection fees in the amount of $ 260,426 (the "Restitution Amount") within sixty (60) days of this Assurance; and within twenty (20) days of this Assurance (ii) pay a Civil Monetary Penalty ("CMP") in the amount of $489,574 to the Office of the Attorney General, State of Maryland in accordance with the instructions of the Maryland Office of the Attorney General, Consumer Protection Division, 16th Floor, 200 St. Paul Place, Baltimore, MD 21202.

Apx. 45

27.     To the extent any portion of the Restitution Amount cannot be made directly to Consumers, the remaining Restitution Amount shall be deposited into an account (the "Restitution Account") maintained by the Division.  The Division shall make disbursements from this Restitution Account to pay restitution to consumers on the Restitution List.

28.     If there are insufficient funds collected to provide full restitution to all consumers on the Restitution List, benefits will be distributed on a *pro rata* basis or as determined by the Division.

29.     The Restitution Amount received by the Division from Respondent shall be credited by the Division first toward the payment of restitution to consumers on the Restitution List and Costs. All remaining, undistributed funds in the Restitution Account owed to consumers whom neither Nationstar nor the Division is able to locate shall be deemed funds of the State and be made additional part of the Civil Monetary Penalty as referenced above.

### DEFAULT

30.     No delay or failure by a party in exercising any right, power or privilege under this Assurance shall affect such right, power or privilege; nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such right, power or privilege preclude any further exercise thereof, of any other right, power or privilege.

31.     Respondent hereby waives demand, diligence, presentment, protest and notice of every kind, except as expressly provided herein.  Any notice to Respondent that the Division is required to make shall be made by mailing such notice, first class mail, to the person(s) designated by Respondent for the purpose of receiving notice pursuant to paragraph 32 of this Assurance.

-8-

Apx. 46

## NOTICE

32.     Whenever notice is required under this Assurance, notice shall be provided in writing sent via overnight delivery.

Notice to the Division shall be directed to:

> William D. Gruhn
> Consumer Protection Division
> 200 Saint Paul Place, 16th Floor
> Baltimore, Maryland 21202
> 410-576-6558
> (410) 576-6566 (facsimile)
> bgruhn@oag.state.md.us

Notice to Respondent shall be directed to:

> Nationstar Mortgage LLC
> 8950 Cypress Waters Blvd.
> Coppell, TX 75019
> Attention: General Counsel
> with copy to
> Chief Compliance Officer
>
> _____

Any party may change its designated notice recipients by written notice to the other party.

## DISPUTES

33.     The Chief of the Division or his designee shall resolve any disputes that arise in compliance with applicable law concerning this Assurance and may enter any supplemental orders reasonably needed to effectuate its purpose. Provided however, the Division shall give the Respondent written notice of such dispute or any default and Respondent has 10 business days to respond to such allegations.

## ENFORCEMENT

-9-

Apx. 47

34.     Respondent understands that this Assurance is enforceable by the Division pursuant to the CPA and that any future violation of this Assurance shall constitute a subsequent violation of the CPA for purposes of § 13-410(b).

35.     Respondent agrees that the allegations set forth in paragraphs 4 – 13 of this Assurance shall be taken as true without further proof in any case under Title 11 of the United States Code or subsequent civil litigation pursued by the Division to enforce its rights to any payment or money judgment owed pursuant to this Assurance, including but not limited to a non-dischargeability complaint pursuant to Title 11, §523 of the United States Code and any related or similar sections.

36.     If any portion of this Assurance is held invalid by operation of law, the remaining terms thereof shall not be affected and shall remain in full force and effect.

## THE PARTIES' SIGNATURES

37.     This Assurance may be signed by the parties electronically and in counterparts.

AGREED TO this _14th_ day of _May_, 2018,

Brian E. Frosh
Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202

By:

William D. Gruhn, Chief
Consumer Protection Division


Lucy A. Cardwell
Special Assistant Attorney General

NATIONSTAR MORTGAGE LLC doing business as MR. COOPER

By:

Jay Bray
Chief Executive Officer
Nationstar Mortgage LLC doing business as Mr. Cooper

-10-

Apx. 48

The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JUANITA GARCIA, individually and on behalf of all others similar situated,<br><br>          Plaintiff,<br><br>     vs.<br><br>NATIONSTAR MORTGAGE LLC, a Delaware limited liability company,<br><br>          Defendant. | No. C15-1808 TSZ<br><br>**STIPULATION AND SETTLEMENT AGREEMENT** |

IT IS HEREBY STIPULATED AND AGREED, by, between, and among plaintiff

Juanita Garcia ("Plaintiff"), on behalf of herself and all Settlement Class Members as defined

herein, and defendant Nationstar Mortgage LLC ("Defendant") that the lawsuit originally

captioned *Juanita Garcia  v. Nationstar Mortgage LLC*, Case No. C15-1808 TSZ, in the

United States District Court for the Western District of Washington (the "Litigation") and the

matters raised by, or which could have been raised by, the Litigation related to the collection of

"convenience fees" are settled, compromised, and dismissed on the merits and with prejudice

on the terms and conditions set forth in this Settlement Agreement and the Release set forth

herein, subject to the approval of the Court.

**1.     RECITALS**

     1.1.     On November 17, 2015, Plaintiff Juanita Garcia filed a putative nationwide

class action complaint in the Litigation.

1.2.    In the complaint, Plaintiff asserts claims for Violations of RCW Ch. 19.86 and Violations of 15 U.S.C. § 1692 *et seq.*, alleging that Defendant collected "convenience fees" from borrowers in order to make payments on residential mortgage debts that were not specifically enumerated in the original agreements creating such debts.

1.3.    Based upon the complaint, the substantial discovery completed, and the completed briefing on Plaintiff's motion for class certification, the parties agreed to engage in mediation.

1.4.    The parties exchanged discovery consisting of written discovery, document productions, and depositions.

1.5    On July 10, 2017, the parties attended a mediation at JAMS in San Francisco, CA before John Bates, Esq.

1.6    In advance of and during the mediation, the parties exchanged detailed mediation briefs that outlined their respective positions.

1.7    The mediation involved an in-person mediation session, numerous conference calls, and subsequent negotiations concerning the claims raised in the Litigation.

1.8    Following the mediation, the Parties received, considered, and accepted a mediator's proposal.

1.9    Based on Class Counsel's experience representing plaintiffs in other putative class actions, Class Counsel believes that the Litigation has significant merit and that the evidence developed supports Plaintiff's claims. Class Counsel recognizes and acknowledges, however, that prosecuting the Litigation through the conclusion of fact and expert discovery, a ruling on class certification, dispositive motions, trial, and appeals will involve considerable uncertainty, time, and expense.

1.10    Class Counsel has concluded that it is in the best interests of the Settlement Class that the claims asserted in the Litigation be resolved on the terms and conditions set forth in this Agreement. After extensive consideration and analysis of the factual and legal issues presented in the Litigation, extensive settlement discussions, and mediation, Class Counsel

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT- 2
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

concluded that the substantial benefits the Settlement Class Members will receive as a result of this settlement are a very good result in light of the expense, risk, and uncertainty of continued litigation, including the motion for class certification, the expense that would be necessary to prosecute the Litigation through trial, the likelihood of success at trial, and any appeals that might be taken.

1.11    Defendant has denied, and continues to deny, each and every allegation of liability, wrongdoing, and damages, as it has substantial factual and legal defenses to all claims and class allegations in the Litigation. Defendant has always maintained, and continues to maintain, that it has acted in accordance with all applicable agreements and governing law. Nonetheless, after extensive consideration and analysis of the factual and legal issues presented in the Litigation, extensive settlement discussions, and mediation, Defendant concluded that the Litigation should be fully and finally settled on a class-wide basis in light of the expense, risk, and uncertainty of continued litigation, including the motion for class certification, the expense that would be necessary to prosecute the Litigation through trial, the likelihood of success at trial, and any appeals that might be taken. Without admitting any liability or wrongdoing whatsoever, Defendant agrees to the terms of this Agreement, in order to resolve all issues relating to the subject matter of the Litigation.

**2.    DEFINITIONS**

As used herein, the following terms have the meanings set forth below.

2.1.    "Administrator" or "Settlement Administrator" means, subject to approval of the Court, Heffler Claims Group, LLC ("Heffler"), a third-party administrator selected by Class Counsel, which will oversee the Notice and the processing of Claim Forms and payment of Claim Settlement Relief to Settlement Class Members. The Administrator has represented that it has sufficient security protocols in place to ensure the confidential information Defendant provides is in the course of the administration is protected.

2.2.    "Agreement" or "Settlement Agreement" means this Stipulation and Settlement Agreement, including all exhibits thereto.

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT- 3
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

2.3.    "Attorneys' Fees and Expenses" means the amount of attorneys' fees and reimbursement of costs and expenses awarded by the Court to Class Counsel from the Settlement Fund.

2.4.    "Case Contribution Award" means compensation to Plaintiff for her time and effort in the Litigation, if any, as awarded by the Court.

2.5.    "Claim" means a written request for Claim Settlement Relief submitted by a Settlement Class Member to the Settlement Administrator using a Claim Form in substantially the form of Exhibit A to this Agreement or as ultimately approved by the Court.

2.6.    "Claim Deadline" means the last date by which a Claim submitted to the Settlement Administrator by a Settlement Class Member for Claim Settlement Relief must be postmarked or submitted on the Settlement Website, which shall be fourteen (14) days before the Final Approval Hearing.

2.7.    "Claim Settlement Relief" means the monetary payment to be made to Settlement Class Members who submit properly completed and timely Claim Forms to the Settlement Administrator, and who qualify for such relief under this Settlement Agreement.

2.8.    "Claim Form" means the document in the form attached as Exhibit A to this Agreement and/or as ultimately approved by the Court .

2.9.    "Claimant" means any Settlement Class Member who submits a Claim pursuant to this Settlement Agreement.

2.10.    "Class Counsel" means Rafey S. Balabanian of Edelson PC and D. Frank Davis of Davis & Norris, LLP.

2.11.    "Class Notice" or "Notice" means the program of notice described in Section 6 of this Agreement to be provided to Settlement Class Members by the Settlement Administrator, including the Direct Notice and Settlement Website, which will notify Settlement Class Members, among other things, about their rights to opt out and object to the Settlement, the preliminary approval of the Settlement, the manner by which to submit a Claim, and the scheduling of the Final Approval Hearing.

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT- 4
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

2.12.    "Convenience Fees" means the monetary fees charged by Defendant to borrowers to make payments over the phone or internet that are at issue in the Litigation.

2.13.    "Court" means the United States District Court for the Western District of Washington.

2.14.    "Days" means calendar days, except that, when computing any period of time prescribed or allowed by this Agreement, the day of the act, event, or default from which the designated period of time begins to run shall not be included. Further, when computing any period of time prescribed or allowed by this Agreement, the last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, Sunday, or legal holiday. All calculations of days and times shall be adjusted to permit compliance by Defendant with the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711-1715, including the notifications of appropriate regulators under 28 U.S.C. § 1715(b) and expiration of the 90-day review period in 28 U.S.C. § 1715 before the Final Approval Hearing is held in the Litigation to review and approve the Settlement.

2.15.    "Defendant" means Nationstar Mortgage LLC.

2.16.    "Defense Counsel" means Defendant's counsel of record in the Litigation.

2.17    "Direct Notice" means the "Notice" that is emailed or mailed by the Settlement Administrator to Settlement Class Members, in substantially the form attached as Exhibits E–F to this Agreement and/or as ultimately approved by the Court. Direct Notice shall be sent not less than forty-five (45) days after the entry of the Preliminary Approval Order.

2.18.    "Final" means one business day following the latest of the following events: (i) the date upon which the time expires for filing or noticing any appeal of the Court's Judgment approving this Agreement; (ii) if there is an appeal or appeals, other than an appeal or appeals solely with respect to the award of Attorneys' Fees and Expenses and/or Case Contribution Award, the date of completion, in a manner that finally affirms and leaves in place the Judgment without any material modification, of all proceedings arising out of the appeal or

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT- 5
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

appeals (including, but not limited to, the expiration of all deadlines for motions for reconsideration or petitions for review and/or *certiorari*, all proceedings ordered on remand, and all proceedings arising out of any subsequent appeal or appeals following decisions on remand); or (iii) the date of final dismissal of any appeal or the final dismissal of any proceeding on *certiorari*.

2.19.   "Final Approval" means the entry of the Judgment approving the Settlement after the Final Approval Hearing is conducted.

2.20.   "Final Approval Hearing" means the hearing held by the Court to determine whether the terms of this Agreement are fair, reasonable, and adequate for the Settlement Class as a whole, whether the Settlement should be granted final approval, and whether the Judgment should be entered.

2.21.   "Final Settlement Date" means the date on which the Judgment in this case becomes Final (as defined in Paragraph 2.18).

2.22.   "Judgment" means the final order and judgment to be entered by the Court in substantially similar form as Exhibit B approving the settlement of the Litigation in accordance with this Agreement after the Final Approval Hearing.

2.23.   "Litigation" means the action captioned *Juanita Garcia v. Nationstar Mortgage LLC*, Case No. C15-1808 TSZ, pending in the United States District Court for the Western District of Washington.

2.24.   "Named Plaintiff" or "Plaintiff" means Juanita Garcia.

2.25.   "Notice and Administrative Costs" means the reasonable and authorized costs and expenses of disseminating and publishing the Class Notice in accordance with the Preliminary Approval Order, and all reasonable and authorized costs and expenses incurred by the Settlement Administrator in administering the Settlement, including but not limited to costs and expenses associated with assisting Settlement Class Members, processing claims, escrowing funds and issuing and mailing Claim Settlement Relief.

2.26.   "Objection Deadline" means the date identified in the Preliminary Approval

---

Order and Class Notice by which a Settlement Class Member must serve written objections, if any, to the Settlement in accordance with Section 12 of this Agreement to be able to object to the Settlement. The Objection Deadline shall be no earlier than fourteen (14) days after Class Counsel submits their application for Attorneys' Fees and Expenses and forty-five (45) days after Notice is sent to the Settlement Class or as the Court may otherwise direct.

2.27.   "Opt-Out Deadline" means the date identified in the Preliminary Approval Order and Class Notice by which a Request for Exclusion must be filed in writing with the Settlement Administrator in accordance with Section 11 of this Agreement in order for a Settlement Class Member to be excluded from the Settlement Class. The Opt-Out Deadline shall be forty-five (45) days after Notice is sent to the Settlement Class or as the Court may otherwise direct.

2.28.   "Parties" means Plaintiff and Defendant in the Litigation.

2.29.   "Preliminary Approval Application" means Plaintiff's motion for the Court to preliminarily approve the Settlement and to enter the Preliminary Approval Order, including all exhibits and documents attached thereto. Plaintiff's Preliminary Approval Application shall be filed within twenty-one (21) days after this Agreement is signed.

2.30.   "Preliminary Approval Order" means the order in substantially similar form as Exhibit C and providing for, among other things, preliminary approval of the Settlement as fair, reasonable, and adequate; certification of the Settlement Class for settlement purposes only; dissemination of the Class Notice to the Settlement Class; and finding that the proposed Class Notice is reasonably calculated to apprise the Settlement Class of the pendency of the Litigation, the material terms of the proposed Settlement, and the Settlement Class Members' options and rights with respect thereto.

2.31.   "Release" or "Releases" means the releases of all Released Claims by the Releasing Persons against the Released Persons, as provided for in Section 10 of this Agreement.

2.32.   "Released Claims" means all claims, actions, causes of action, law suits, debts,

---

sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, demands, and any other forms of liability released pursuant to Section 10 of this Agreement.

2.33.   "Released Persons" means Defendant and each of its past or present divisions, subsidiaries, predecessors, investors, parent companies, acquired companies, and affiliated companies (which shall include any person or entity which controls, is controlled by, or is under common control with any such party), any direct or indirect subsidiary of Defendant and each of its past or present divisions, subsidiaries, predecessors, investors, parent companies, acquired companies, and affiliated companies, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities.

2.34.   "Releasing Persons" means Plaintiff, all Settlement Class Members who do not properly and timely opt out of the Settlement, and their respective family members, heirs, administrators, successors, and assigns.

2.35.   "Request for Exclusion" means a written request from a Settlement Class Member that seeks to exclude the Settlement Class Member from the Settlement Class and that complies with all requirements in Section 11 of this Agreement.

2.36.   "Settlement Class" means all members of the class of borrowers in the Litigation that will be certified by the Court for settlement purposes as more fully described in Section 3.1 of this Agreement.

2.37.   "Settlement Class Member" means any member of the Settlement Class.

2.38.   "Settlement Fund" means the three million eight hundred seventy-five thousand dollar ($3,875,000.00) non-reversionary settlement fund, from which all costs of (i) Settlement Class Member claims, (ii) Notice and Administrative Costs, (iii) any Case Contribution Award to Plaintiff as class representative, and (iv) any award of attorneys' fees and costs to proposed Class Counsel shall be paid. The costs of establishing the escrow account shall be deducted from the Settlement Fund. Any interest earned on the escrow account shall be considered part of the Settlement Fund.

---

2.39.   "Settlement Website" means the website to be created, launched, and maintained by the Settlement Administrator, and which allows for the electronic submission of Claim Forms and provides access to relevant case documents including Notice in substantially similar form as Exhibit D, information about the submission of Claim Forms and other relevant documents, including downloadable Claim Forms, which shall have the Uniform Resource Locator of [TBD].

2.40.   "Settling Parties" means, collectively, Defendant, Plaintiff, and all Releasing Persons.

**3.   CLASS DEFINITION, CLASS PERIOD AND CONDITIONS AND OBLIGATIONS RELATING TO THE SETTLEMENT EFFECTIVENESS**

3.1.   The "Settlement Class" shall include: (1) all individuals in the United States who, from November 17, 2014 to the date of preliminary approval of the settlement, made a payment to Nationstar on a residential mortgage debt over the phone or online that included a fee charged by Nationstar for using the phone or internet, and whose debt had not been current for 30 or more consecutive days at the time Nationstar began servicing it ("FDCPA Settlement Class"); and (2) all individuals in Washington state who, from November 17, 2011 to the date of preliminary approval of the settlement made a payment to Nationstar on a residential mortgage debt over the phone or online that included a fee charged by Nationstar for using the phone or internet, and whose debt had not been current for 30 or more consecutive days at the time Nationstar began servicing it ("CPA Settlement Class"). Excluded from the Settlement Class are: (i) individuals who are or were officers or directors of the Defendant or any of their respective affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; and, (iii) all individuals who file a timely and proper request to be excluded from the Settlement Class.

3.2.   This Settlement Agreement is expressly contingent upon the satisfaction, in full, of the material conditions set forth below.

3.3.    Condition No. 1:  District Court Approval.  The Settlement must be approved by the Court in accordance with the following steps:

3.3.1.    Application for Preliminary Approval of Proposed Settlement, Class Certification, and Class Notice.  After good faith consultation with Defense Counsel, Class Counsel will present a Preliminary Approval Application to the Court within 21 days of the execution of this Agreement.  The Preliminary Approval Application shall include a Class Notice and Claim Form, in substantially similar form as Exhibits A and D-F, and a proposed Preliminary Approval Order, in substantially similar form as Exhibit C.  The Settling Parties shall, in good faith, take reasonable steps to secure expeditious entry by the Court of the Preliminary Approval Order and shall request that the Court schedule a Final Approval Hearing no earlier than ninety (90) days after the service of the required Notices under 28 U.S.C. § 1715.

3.4.2.    Settlement Class Certification.  In connection with the proceedings on Preliminary and Final Approval of the proposed Settlement, Plaintiff shall seek as part of the Preliminary Approval Application an order certifying the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure for purposes of this Settlement only.

3.4.3.    Entry of Preliminary Approval Order.  The Court shall enter a Preliminary Approval Order in substantially similar form as Exhibit C, which shall, among other things:

a.    Certify for purposes of settlement a Settlement Class, approving Plaintiff as class representative and appointing Class Counsel, pursuant to Fed. R. Civ. P. 23;

b.    Preliminarily approve the Settlement as fair, reasonable and adequate;

c.    Order the issuance of Class Notice to the Settlement Class, and determine that such Notice complies with all legal requirements, including, but not limited to, the Class Action Fairness Act and Due Process Clause of the United States Constitution;

d.    Schedule a date and time for a Final Approval Hearing to

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT- 10
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

determine whether the Settlement should be finally approved by the Court, the amount of Attorneys' Fees and Expenses that should be awarded to Class Counsel, and any Case Contribution Award to Plaintiff;

e.    Require Settlement Class Members who wish to exclude themselves to submit an appropriate and timely written request for exclusion by the Opt-Out Deadline, as directed in the Settlement Agreement and Class Notice, and advise that a failure to do so shall bind those Settlement Class Members who remain in the Settlement Class;

f.    Require Settlement Class Members who wish to object to the Settlement Agreement to submit an appropriate and timely written statement by the Objection Deadline, as directed in the Settlement Agreement, Class Notice, and Preliminary Approval Order, and advise that a failure to do so shall prevent those Settlement Class Members from objecting to the Settlement;

g.    Require attorneys representing any objecting Settlement Class Member, at the Settlement Class Member's expense, to file a notice of appearance;

h.    Authorize the Settling Parties to take all necessary and appropriate steps to establish the means necessary to implement the Settlement Agreement; and

i.    Issue related orders to effectuate the preliminary approval of the Settlement Agreement.

3.4.4.    Issuance of Class Notice.  Pursuant to the Preliminary Approval Order to be entered by the Court, the Settlement Administrator shall cause the Class Notice to be issued in accordance with Section 6 below.

3.4.5.    Final Approval Hearing.  In connection with the Preliminary Approval Application, Plaintiff shall request that the Court schedule and conduct a hearing after dissemination of Settlement Class Notice, at which it will consider whether the Settlement is fair, reasonable, and adequate pursuant to Rule 23 of the Federal Rules of Civil Procedure. Specifically, after good faith consultation with Defendant, Plaintiff shall request that, on

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT- 11
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

after the Final Approval Hearing, the Court:  (i) enter the final Judgment, granting Final Approval of the Agreement and dismissing with prejudice this Litigation; (ii) determine the amount of Attorneys' Fees and Expenses that should be awarded to Class Counsel as contemplated in the Settlement Agreement; and (iii) determine the Case Contribution Award, if any, that should be awarded as contemplated by the Settlement Agreement. Any application for Attorneys' Fees and Expenses shall be made at least fourteen days prior to the Objection Deadline. The Settling Parties will reasonably cooperate with one another in seeking entry of the final Judgment.

3.5.    Condition No. 2:  Finality of Judgment.  The Court shall enter a final Order and Judgment in substantially similar form as Exhibit B that must be Final in accordance with Paragraph 2.18 above, and shall, among other things:

a.    Find that (1) the Court has personal jurisdiction over all Settlement Class Members and subject matter jurisdiction over the claims asserted in this Litigation; and (2) venue is proper;

b.    Finally approve the Settlement Agreement, pursuant to Fed. R. Civ. P. 23, as fair, reasonable, and adequate;

c.    Find that the form and means of disseminating the Class Notice complied with all legal requirements, including, but not limited to, Rule 23 and the Due Process Clause of the United States Constitution;

d.    Enter final Judgment with respect to the claims of all Settlement Class Members and dismiss the claims of all Settlement Class Members and the Litigation with prejudice;

e.    Make the Releases in Section 10 of the Settlement Agreement effective as of the Final Settlement Date;

f.    Permanently bar and enjoin Plaintiff and all Settlement Class Members who have not opted out of the Agreement, from filing, commencing, prosecuting, intervening in, or participating in (as class members or otherwise) any action in any jurisdiction

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT- 12
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

based on or relating to any of the Released Claims or the facts and circumstances relating thereto;

g.    Permanently bar and enjoin Plaintiff and all Settlement Class Members who have not opted out of the settlement from organizing Settlement Class Members, or soliciting the participation of Settlement Class Members, in a separate class for purposes of pursuing any action (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action in any jurisdiction) based on or relating to any of the Released Claims or the facts and circumstances relating thereto;

h.    Find that, by operation of the entry of the Judgment, Plaintiff and all Settlement Class Members who have not opted out of the Agreement shall be deemed to have forever released, relinquished, and discharged the Released Persons from any and all Released Claims;

i.    Authorize the Settling Parties to implement the terms of the Settlement Agreement;

j.    Without affecting the finality of the Judgment for purposes of appeal, retain jurisdiction relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement, the Final Judgment, and for any other necessary purpose; and

k.    Issue related orders to effectuate the Final Approval of the Agreement and its implementation.

4.    SETTLEMENT CONSIDERATION, BENEFITS, AND OTHER RELIEF

4.1.    Settlement Fund.  In consideration for the Releases set forth in Section 10, and within five business days of entry of the Final Approval Order, Defendant shall establish the Settlement Fund. Any amounts Defendant has already paid to the Administrator for Notice and Administrative Costs shall be deducted from the total amount of funds Defendant contributes to the Settlement Fund.  Defendant shall not have any obligation to contribute additional amounts to the settlement contemplated by this Agreement.

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT- 13
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

Apx. 52

4.2. <u>Settlement Monetary Consideration.</u> Those Settlement Class Members who submit a timely, valid, and verified Claim Form, substantially in the form of Exhibit A, by the Claim Deadline in the manner required by this Agreement, shall receive Claim Settlement Relief under the following terms and conditions.

4.2.1. <u>Overview.</u> Settlement Class Members will be eligible for relief if they fall within Settlement Class. As reflected in the Claim Form (Exhibit A), Claimants making Claims must execute the Claim Form representing and affirming that they qualify for relief as a Settlement Class Member.

4.2.2. <u>Payments to Settlement Class Members.</u> For any Settlement Class Member who submits a timely, valid, and verified Claim Form, the Settlement Administrator shall issue Claim Settlement Relief that is a pro rata portion of the Settlement Fund, based on the number of times a Settlement Class Member paid Convenience Fees as determined by Defendant's records, after accounting for Notice and Administrative Costs, any Case Contribution Award to Plaintiff as class representative, and any award of attorneys' fees and costs to proposed Class Counsel. For example, if Defendant's records indicate that Claimant A made three times as many Convenience Fees payments as Claimant B (number—not amount—of payments), then Claimant A's pro rata share will be three times Claimant B's.

4.2.3. <u>Representation Regarding Convenience Fees.</u> Defendant represents that it will provide prior express notice to consumers prior to charging any Convenience Fees and that it is not currently charging any such fees for on-line payments.

5. **SETTLEMENT ADMINISTRATION AND COSTS**

5.1. All Notice and Administrative Costs shall be paid to the Settlement Administrator from the Settlement Fund. If the Settlement Administrator requires payment of any Notice and Administrative Costs before the Settlement Fund is established, Defendant shall pay those amounts directly to the Settlement Administrator upon request, and the amount Defendant pays to the Settlement Fund shall include an offset for any Notice and Administrative Costs already so paid.

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT–14
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

5.2. The Settlement Administrator shall administer the Settlement in a cost-effective and timely manner. The Settlement Administrator shall maintain reasonably detailed records of its activities under this Agreement. The Settlement Administrator shall maintain all such records as are required by applicable law in accordance with its normal business practices and such records will be made available to Class Counsel and Defense Counsel upon request. The Settlement Administrator shall also provide reports and other information to the Court as the Court may require. The Settlement Administrator shall provide Class Counsel and Defense Counsel with information concerning Notice, administration and implementation of the Settlement Agreement. Should the Court request, the Parties, in conjunction with the Settlement Administrator, shall submit a timely report to the Court summarizing the work performed by the Settlement Administrator, including a report of all amounts paid to the Settlement Class Members on account of Claim Settlement Relief. Without limiting the foregoing, the Settlement Administrator shall:

5.2.1. Forward to Defense Counsel, with copies to Class Counsel, all documents and other materials received in connection with the administration of the Settlement Agreement within thirty (30) days after the date on which all Claim Forms have been finally approved or disallowed per the terms of the Agreement;

5.2.2. Receive exclusion forms and other requests from the Settlement Class and promptly provide a copy of such requests to Class Counsel and Defense Counsel upon receipt (the "Opt-Out List"). If the Settlement Administrator receives an exclusion form or other requests from the Settlement Class after the Opt-Out Deadline, the Settlement Administrator shall promptly provide copies thereof to Class Counsel and Defense Counsel;

5.2.3. Provide weekly reports to Class Counsel and Defense Counsel, including without limitation, reports regarding the number of Claim Forms received, the total number of approved Claims for Claim Settlement Relief and the monetary amount of such Claims, and the number of opt-outs and objections received; and

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT–15
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

5.2.4. Make available for inspection by Class Counsel or Defense Counsel the Claim Forms, any documentation submitted in support thereof, and any correspondence received by the Settlement Administrator at any time upon reasonable notice.

5.2.5. Provide Class Counsel and Defendant's counsel with an affidavit or declaration by a competent affiant or declarant, attesting that the Class Notice has been disseminated in accordance with the Preliminary Approval Order and identifying the number of Requests for Exclusion to the Settlement.

5.3. Defendant will coordinate with the Settlement Administrator to provide Mail Notice to the Settlement Class, as provided in this Agreement. Within seven (7) days of the grant of Preliminary Approval, Defendant shall produce to the Settlement Administrator the list of all names, addresses, email addresses, and number of Convenience Fees paid for each Settlement Class Member (the "Class List").

5.4. Because the information about Settlement Class Members in the Class List that will be provided to the Settlement Administrator will consist of confidential information, non-public personal information, and other information protected by privacy laws, the Settlement Administrator will execute a non-disclosure agreement and will take all reasonable steps to ensure that any information provided to it by Defendant will be used solely for the purpose of effecting this Settlement. Any such information provided to the Settlement Administrator will not be provided to Plaintiff or Class Counsel, except as permitted by Paragraph 7.4. The Settlement Administrator shall administer the Settlement in accordance with the terms of this Settlement Agreement and, without limiting the foregoing, shall treat any and all documents, communications, and other information and materials received in connection with the administration of the Settlement as confidential and shall not disclose any or all such documents, communications, or other information to any person or entity except as provided for in this Agreement or by court order.

5.5. Forms. The Settlement Administrator shall complete and provide to Defendant any forms necessary for Defendant to pay the Settlement Fund and otherwise implement this

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT–16
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

Settlement.

6. **NOTICE TO THE SETTLEMENT CLASS**

6.1. <u>Direct Notice.</u> Subject to the requirements of the Preliminary Approval Order, no later than forty-five (45) days after the entry of the Preliminary Approval Order, the Settlement Administrator shall send Notice via email substantially in the form attached as Exhibit E, along with an electronic link to the Claim Form, to all Settlement Class Members for whom a valid email address is available in the Class List. If no valid email address exists for a person in the Settlement Class, or in the event that the transmission of any email notice results in a hard "bounce-back," the Settlement Administrator shall, no later than the Notice Date, send Notice via First Class U.S. Mail through a postcard notice with attached Claim Form substantially in the form attached as Exhibit F, to each physical address in the Class List.

6.2. <u>Settlement Website.</u> No later than the mailing of the Direct Notice, the Settlement Administrator shall establish the Settlement Website, which shall contain copies of this Settlement Agreement, Exhibits, and Notice substantially in the form attached as Exhibit D. The Settlement Website shall also allow for the submission of Claim Forms on-line, as well as provide for Claim Forms that can be downloaded from the site for mailing. The Settlement Website shall remain open and accessible through the payment of all Claim Settlement Relief to the Settlement Class.

7. **CLAIM FILING, REVIEW, AND APPROVAL PROCESS**

7.1. <u>Claim Filing Process.</u> Settlement Class Members can make a Claim for Claim Settlement Relief by either submitting a Claim Form on-line through the Settlement Website or by mailing (either through posting with the United States Postal Service or through a private mail carrier, such as UPS or Federal Express, provided that proof of the mail date is reflected on the label of the mailing) a physical Claim Form providing the information and affirmations to the Settlement Administrator by the Claim Deadline. Any Settlement Class Member who does not submit on-line or mail a completed Claim Form by the Claim Deadline shall be deemed to have waived any claim to Claim Settlement Relief and any such Claim Settlement

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT–17
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

Form may be rejected.

7.2.  Claim Review Process. The Settlement Administrator may reject a Claim Form, or any part of a claim for a payment reflected therein, where the Claimant submitting the Claim Form does not appear on the Class List. In addition, the Settlement Administrator shall be obliged to employ reasonable procedures to screen claims for abuse or fraud and deny Claim Forms where there is evidence of abuse or fraud. The Settlement Administrator shall determine whether a Claim Form submitted by a Settlement Class Member is an approved Settlement Relief and shall reject Claim Forms that fail to comply with the instructions thereon or the terms of this Agreement, after giving the claimant a reasonable opportunity to provide any requested missing information. In no event shall any Settlement Class Member have more than fourteen (14) days after being noticed by the Settlement Administrator of any question or deficiency in the submitted Claim Form to answer such question or cure such deficiency.

7.3.  Claim Payment. Upon confirmation by the Settlement Administrator that the Claim Form is valid, the Settlement Administrator shall make a determination as to the amount of the Claim in accordance with this Settlement Agreement, including Section 4.2.2, and information contained in Defendant's electronic records.

7.3.1.  Notification. Within forty-five (45) days after the Final Settlement Date, the Settlement Administrator shall provide the Parties with a list of all Settlement Class Members who filed a Claim, whether the Claim was rejected or accepted, and if rejected, the reason it was rejected, and if accepted, the amount to be paid. Both Defense Counsel and Class Counsel shall have the right to challenge the acceptance or rejection of a Claim Form submitted by Settlement Class Members. The Settlement Administrator shall follow any agreed-to decisions of Defense Counsel and Class Counsel. To the extent Defense Counsel and Class Counsel are not able to agree on the disposition of a challenge, John Bates of JAMS shall decide such a challenge.

7.3.2.  Processing Claims. The Settlement Administrator shall have ninety (90) days after the Final Settlement Date within which to process the Claims and remit the

8000140391097631062

STIPULATION AND SETTLEMENT
AGREEMENT- 18
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

appropriate amounts by check to the Claimants. Any check that is remitted to a Claimant and that is not negotiated within ninety (90) days after issuance shall be cancelled (the checks shall state "void after 90 days"), and the Settlement Administrator shall not have any further obligation to continue efforts to distribute Claim Settlement Relief to such Claimant.

7.3.3.  Funding. The Settlement Administrator shall use only the Settlement Fund to fund the distribution of Claim Settlement Relief to Claimants.

7.4.  Information Available to Class Counsel. Except as provided herein, upon the reasonable request of Class Counsel, the Settlement Administrator shall inform Class Counsel, among other things and with the exception of confidential information, non-public personal information, and other information protected by privacy laws, of the amount of any Settlement Class Member's Convenience Fees reflected in the electronic information provided to the Settlement Administrator by Defendant. Nothing in this Paragraph or this Settlement Agreement shall authorize the Settlement Administrator to disclose to Class Counsel any confidential information, non-public personal information, and other information protected by privacy laws.

8.  COVENANTS

The Settling Parties covenant and agree as follows:

8.1.  Covenants Not to Sue. Plaintiff, as representative of the Settlement Class, covenants and agrees on behalf of the Settlement Class: (i) not to file, commence, prosecute, intervene in, or participate in (as class members or otherwise) any action in any jurisdiction based on or relating to any of the Released Claims, or the facts and circumstances relating thereto, against any of the Released Persons; (b) not to organize or solicit the participation of Settlement Class Members in a separate class for purposes of pursuing any action (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action in any jurisdiction) based on or relating to any of the Released Claims or the facts and circumstances relating thereto; and (c) that the foregoing covenants and this Agreement shall be a complete defense to any of the Released Claims against any of the

8000140391097631062

STIPULATION AND SETTLEMENT
AGREEMENT- 19
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

Released Persons.

8.2.  Cooperation. The Parties agree to cooperate reasonably and in good faith with the goal of obtaining entry of a final Judgment as quickly as is reasonably practicable and expeditiously reaching agreement on the matters requiring mutual agreement as set forth in this Agreement, including, but not limited to, the expeditious agreement to the terms of all settlement administration protocols, and the preparation and execution of all other reasonable documents necessary to achieve Final Approval of the Settlement by the Court. Further, the Settling Parties shall consult with mediator John Bates of JAMS as necessary in effectuating this Paragraph.

9.  REPRESENTATIONS AND WARRANTIES

9.1.  Plaintiff's Representations and Warranties.

9.1.1.  Plaintiff represents and warrants that she is the sole and exclusive owner of all Released Claims and that she has not assigned or otherwise transferred any interest in any of the Released Claims against any of the Released Persons, and further covenants that she will not assign or otherwise transfer any interest in any of Plaintiff's Released Claims.

9.1.2.  Plaintiff represents and warrants that she has no surviving claim or cause of action against any of the Released Persons with respect to any of the Released Claims.

9.2.  The Parties' Representations and Warranties. The Parties, and each of them on his, her, or its own behalf only, represent and warrant:

9.2.1.  That they are voluntarily entering into the Settlement Agreement as a result of arm's-length negotiations about their counsel, that in executing the Settlement Agreement, they are relying solely upon their own judgment, belief, and knowledge, and the advice and recommendations of their own independently selected counsel, concerning the nature, extent and duration of their rights and claims hereunder and regarding all matters which relate in any way to the subject matter hereof; and that, except as provided herein, they have not been influenced to any extent whatsoever in executing the Settlement Agreement by representations, statements, or omissions pertaining to any of the foregoing matters by any

8000140391097631062

STIPULATION AND SETTLEMENT
AGREEMENT-20
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

Party or by any person representing any party to the Settlement Agreement. Each of the Settling Parties assumes the risk of mistake as to facts or law.

10.  RELEASES

10.1.  Released Claims of Settlement Class. Upon the Final Settlement Date, each member of the Settlement Class, other than Plaintiff and those Settlement Class Members who have validly opted out, shall, by operation of the final Judgment, be deemed to have fully, conclusively, irrevocably, forever, and finally released, relinquished, and discharged the Released Persons from any and all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, promises, damages, penalties, attorneys' fees and costs, liens, judgments, and demands of any kind whatsoever that each member of the Settlement Class may have on or before the Final Settlement Date or may have had in the past, whether in arbitration, administrative, or judicial proceedings, whether as individual claims or as claims asserted on a class basis, whether past or present, mature or not yet mature, known or unknown, suspected or unsuspected, whether based on federal, state, or local law, statute, ordinance, regulations, contract, common law, or any other source, that were or could have been sought or alleged in the Litigation that relate, concern, arise from, or pertain in any way to the Released Persons' conduct, policies, or practices concerning Convenience Fees charged by Defendant to the Settlement Class, including but not limited to claims related to charges for making payments to Defendant over the phone or internet and claims or causes of action under the federal Fair Debt Collection Practices Act and Washington Consumer Protection Act.

10.1.1.  This Settlement Agreement shall not release Defendant from any existing obligation to any Settlement Class Member, other than Plaintiff, under any loan, note, mortgage, or deed of trust. This provision is not meant to and does not limit the Release in Paragraph 10.1.

10.2.  Released Claims of Plaintiff. Upon the Final Settlement Date, Plaintiff, on behalf of herself, her family members, heirs, guardians, assigns, executors, administrators, predecessors, and successors, hereby releases and discharges the Released Persons from any

8000140391097631062

STIPULATION AND SETTLEMENT
AGREEMENT-21
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

and all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorneys' fees and costs, liens, judgments, and demands of any kind whatsoever that Plaintiff may have on or before the Final Settlement Date or may have had in the past, whether in arbitration, administrative, or judicial proceedings, whether as individual claims or as claims asserted on a class basis, whether past or present, mature or not yet mature, known or unknown, suspected or unsuspected, whether based on federal, state, or local law, statute, ordinance, regulations, contract, common law, or any other source. In agreeing to this Release, Plaintiff explicitly acknowledges that unknown losses or claims could possibly exist and that any present losses may have been underestimated in amount or severity.

10.3. Without in any way limiting their scope, these Releases cover by example and without limitation, any and all claims for attorneys' fees, costs, expert fees, or consultant fees, interest, or litigation fees, or any other fees, costs, and/or disbursements incurred by Class Counsel, Plaintiff, or any Settlement Class Members in connection with or related in any manner to the Litigation, the settlement of the Litigation, the administration of such Settlement, and/or the Released Claims, except to the extent otherwise specified in the Settlement Agreement.

10.4. In connection with the foregoing Releases, Plaintiff and each Settlement Class Member who has not validly opted out shall be deemed, as of the entry of the Final Judgment, to have waived any and all provisions, rights, benefits conferred by any statute, rule and legal doctrine which provides that a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor. To the extent that anyone might argue that these principles of law are applicable—notwithstanding that the Settling Parties have chosen Washington law to govern this Settlement Agreement—Plaintiff hereby agrees, and each Settlement Class Member will be deemed to agree, that the provisions of all such principles of law or similar federal or state laws, rights, rules, or legal

80001.0039/10976310.2
STIPULATION AND SETTLEMENT AGREEMENT-22 (C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

principles, to the extent they are found to be applicable herein, are hereby knowingly and voluntarily waived, relinquished, and released. Plaintiff recognizes, and each Settlement Class Member will be deemed to recognize, that, even if they may later discover facts in addition to or different from those which they now know or believe to be true, they nevertheless agree that, upon the Final Settlement Date, they fully, finally, and forever settle and release any and all claims covered by these Releases. The Settling Parties acknowledge that the foregoing Releases were bargained for and are a material element of the Agreement.

10.5. Upon the Final Settlement Date: (i) the Settlement Agreement shall be the exclusive remedy for any and all Settlement Class Members, except those who have validly opted out in accordance with the terms and provisions hereof; (ii) the Released Persons shall not be subject to liability or expense for any of the Released Claims to any such Settlement Class Member(s); (iii) Settlement Class Members who have not opted out shall be permanently barred and enjoined from filing, commencing, prosecuting, intervening in, or participating in (as class members or otherwise) any action in any jurisdiction based on or relating to any of the Released Claims or the facts and circumstances relating thereto; and (iv) Settlement Class Members who have not opted out shall be permanently barred and precluded from challenging Settlement Class Members, or soliciting the participation of Settlement Class Members, for purposes of pursuing any action (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action in any jurisdiction) based on or relating to any of the Released Claims or the facts and circumstances relating thereto.

10.6. Nothing in the Settlement Agreement and Releases shall preclude any action to enforce the terms of the Settlement Agreement, including participation in any of the processes detailed therein. The Releases set forth herein are not intended to include the release of any rights or duties of the Settling Parties arising out of the Settlement Agreement, including the express warranties and covenants contained herein.

11.   OPT-OUT RIGHTS

11.1. A Settlement Class Member who wishes to opt out of the Settlement Class must

80001.0039/10976310.2
STIPULATION AND SETTLEMENT AGREEMENT-23 (C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

do so in writing. In order to opt out, a Settlement Class Member must complete and send to the Settlement Administrator, at the address listed in the Class Notice and on the Settlement Website for this Settlement, a Request for Exclusion that is postmarked or otherwise delivered no later than the Opt Out Deadline, as specified in the Class Notice (or as the Court otherwise requires). The Request for Exclusion must: (a) identify the case name; (b) identify the name and address of the Settlement Class Member; (c) be personally signed by the Settlement Class Member requesting exclusion; and (d) contain a statement that indicates a desire to be excluded from the Settlement Class in the Litigation, such as "I hereby request that I be excluded from the proposed Settlement Class in the Class Action." Mass or class opt outs shall not be allowed.

11.2. Any Settlement Class Member who properly opts out of the Settlement Class shall not: (a) be bound by any orders or judgments relating to the Settlement; (b) be entitled to relief under, or be affected by, the Agreement; (c) gain any rights by virtue of the Agreement; or (d) be entitled to object to any aspect of the Agreement.

11.3. If the number of Settlement Class Members who properly and timely exercise their right to opt out of the Settlement Class exceeds five percent (5%) of the total number of Settlement Class Members, Defendant shall have the right, at its sole discretion, to terminate this Agreement without penalty or sanction by providing written notice of the election to do so to all other Parties hereto within ten (10) days after learning from the Settlement Administrator that the number of valid opt outs exceeds 5% of the Settlement Class Members. If Defendant elects this option, the Settlement Class shall be decertified without prejudice to Defendant's right to oppose any later attempt to certify a class.

11.4   Except for those Settlement Class Members who timely and properly file a Request for Exclusion in accordance with Section 11, all other Settlement Class Members will be deemed to be Settlement Class Members for all purposes under the Agreement, and upon the Final Settlement Date, will be bound by its terms, regardless of whether they receive any monetary relief or any other relief.

80001.0039/10976310.2
STIPULATION AND SETTLEMENT AGREEMENT-24 (C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

12.   OBJECTIONS

12.1. Overview. Any potential Settlement Class Member who does not opt out of the Settlement may comment upon or object to the Settlement or any of its terms.

12.2. Process. Any potential Settlement Class Member who wishes to object to the Settlement must do so in writing and any papers submitted in support of said objection, shall be received by the Court at the Final Approval Hearing, only if the Person making an objection shall, on or before the Objection Deadline approved by the Court and specified in the Notice, file notice of his or her intention to do so and at the Final Approval Hearing, (a) file copies of such papers through the Court's CM/ECF system if the objection is from a Settlement Class Member represented by counsel, who must also file an appearance, and (c) send copies of such papers via mail, hand, or overnight delivery service to both Class Counsel and Defense Counsel.

12.3. Any member of the Settlement Class who intends to object to this Settlement Agreement must include his or her name and address, include all arguments, citations, and evidence supporting the objection (including copies of any documents relied on), state that he or she is a Settlement Class Member, state that he or she paid Convenience Fees to Defendant, the name and contact information of any and all attorneys representing, advising, or in any way assisting the objector in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection; and a statement indicating whether the objector intends to appear at the Final Approval Hearing either personally or through counsel, who must file an appearance or seek pro hac vice admission, accompanied by the signature of the objecting Settlement Class Member. Any Settlement Class Member who fails to timely file a written objection with the Court and notice of his or her intent to appear at the Final Approval Hearing in accordance with the terms of this Paragraph and as detailed in the Notice, and at the same time provide copies to designated counsel for the Parties, shall not be permitted to appear to this Settlement Agreement at the Final Approval Hearing, and shall be foreclosed from

80001.0039/10976310.2
STIPULATION AND SETTLEMENT AGREEMENT-25 (C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

seeking any review of this Settlement Agreement by appeal or other means and shall be deemed to have waived his or her objections and be forever barred from making any such objections in the Action or any other action or proceeding.

**13.   SETTLEMENT APPROVAL**

13.1.   Within twenty-one (21) days of this Agreement's date, Plaintiff shall apply to the Court for entry of the proposed Preliminary Approval Order and setting of a Final Approval Hearing.

13.2.   Plaintiff shall move for and brief the issue of Final Approval of the Settlement in accordance with the Preliminary Approval Order or such other order of the Court.

13.3.   At the Final Approval Hearing, Plaintiff shall move for entry of the proposed Judgment and present arguments in support thereof.

13.4.   Promptly after the Final Settlement Date, Settlement Class Members shall dismiss with prejudice all claims, actions, or proceedings that have been brought by or involve any Settlement Class Member in any other jurisdiction and that are released pursuant to this Settlement Agreement.

**14.   CERTIFICATION OF SETTLEMENT CLASS FOR SETTLEMENT PURPOSES**

14.1.   After the Preliminary Approval Order is entered, Plaintiff shall move for Final Approval of the Settlement and entry of final Judgment.

14.2.   If the Settlement is not granted final approval, or this Agreement is otherwise terminated or rendered null and void, the certification of the Settlement Class shall be automatically vacated and shall not constitute evidence or a binding determination that the requirements for certification of a class for trial purposes in this or any other action can be or have been satisfied; in such circumstances, Defendant reserves and shall have all rights to challenge certification of the Settlement Class or any other class for trial purposes in the Litigation, or in any other action, on all available grounds as if no Settlement Class had been certified.

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT-26
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

**15.   ATTORNEYS' FEES, EXPENSES, AND PLAINTIFF'S CASE CONTRIBUTION AWARD**

15.1.   Defendant has agreed that Class Counsel shall be entitled to an award of reasonable attorneys' fees and costs in an amount to be determined by the Court and paid from the Settlement Fund. Class Counsel has agreed to limit their request for attorneys' fees and costs to no more than twenty-five (25%) of the Settlement Fund. Should the Court award less than the amount sought by Class Counsel, the difference in the amount sought and the amount ultimately awarded pursuant to this Paragraph shall remain in the Settlement Fund to be distributed to Settlement Class Members.

15.2.   Class Counsel agrees that the amount of such costs and fees awarded shall compensate them for all legal work in the Litigation up to and including the date of the Final Judgment, including any appeal of the Judgment, as well as for all legal work and costs that may be incurred in the Action after the date of the Final Judgment. In the event the Court awards Class Counsel less than the amount of Attorneys' Fees and Expenses requested by Class Counsel, this Settlement Agreement shall nonetheless remain in full force and effect.

15.3.   Class Counsel shall be paid the Attorneys' Fees and Expenses awarded by the Court from the Settlement Fund within seven (7) days after the Final Settlement Date. Payment of the Attorneys' Fees and Expenses shall be made via wire transfer to an account designated by Class Counsel after providing necessary information for electronic transfer. If for any reason the final Judgment does not become Final within the meaning of Paragraph 2.18 (i.e., the Final Settlement Date does not occur), the Settlement Administrator shall not disburse the Attorneys' Fees and Expenses to Class Counsel.

15.4.   In addition to the Claim Settlement Relief otherwise due to a Settlement Class Member of the Settlement Class, Defendant agrees Plaintiff is entitled to reasonable Case Contribution Award in an amount determined by the Court that shall be paid from the Settlement Fund. Should the Court award less than the amount sought, the difference in the amount sought and the amount ultimately awarded pursuant to this Paragraph shall remain in

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT-27
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

the Settlement Fund to be distributed to Settlement Class Members.

15.5.   Plaintiff shall be paid the Case Contribution Award, as determined by the Court, from the Settlement Fund within seven (7) days after the Final Settlement Date. Payment of the Case Contribution Award shall be made via check to the Plaintiff, such check to be sent care of Class Counsel.

15.6.   The procedure for and the grant or denial or allowance or disallowance by the Court of the Attorneys' Fees and Expenses and Case Contribution Award are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement, and any order or proceedings relating to the applications for Attorneys' Fees and Expenses and Case Contribution Award, or any appeal from any order relating thereto or reversal or modification thereof, will not operate to terminate or cancel this Agreement, or affect or delay the finality of Judgment approving the Agreement.

**16.   CONFIDENTIALITY; COMMUNICATIONS TO MEDIA AND PUBLIC**

16.1   The Settling Parties agree that the terms of this Settlement shall remain confidential and not be disclosed by any party until the Settlement Agreement is filed in connection with Plaintiff's Preliminary Approval Application.

16.2   The Settling Parties agree further that both before and after Preliminary Approval of the Settlement, they shall not publish a press release or a release on the internet concerning the Settlement without the prior written review and approval of all other Settling Parties, which approval shall not be unreasonably withheld or delayed.

16.3   The Settling Parties agree that both before and after Preliminary Approval, if any print or electronic media outlet contacts any party or its counsel seeking information or a statement regarding the Settlement, in the absence of a response agreed upon by all Settling Parties, no information will be provided in response to such inquiries except to the extent such information appears as part of the public record.

**17.   TERMINATION AND EFFECT THEREOF**

17.1.   This Agreement shall be terminable by any Party if any of the conditions of

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT-28
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

---

Section 3 are not fully satisfied, or if the conditions of Section 11.4 occur regarding the number of opt-outs, unless they are waived in writing signed by authorized representatives of the Settling Parties.

17.2.   This Agreement shall also terminate at the discretion of any Settling Party if: (1) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of this Agreement that is material, including without limitation, the terms or relief, the findings or conclusions of the Court, the provisions relating to Class Notice, the definition of the Settlement Class, and/or the terms of the Releases; (2) the Court, or any appellate court(s), does not enter or completely affirm, or alters, or restricts, or expands, any portion of the final Judgment, or any of the district court's findings of fact or conclusions of law that is material; or (3) if all of the conditions required to be met before the Final Settlement Date do not occur.

17.3.   If this Agreement is terminated as provided herein, the Settlement shall be null and void from its inception and the Settling Parties will be restored to their respective positions in the Litigation as of the date of Preliminary Approval. In such event, the terms and provisions of this Agreement will have no further force and effect with respect to the Settling Parties and will not be used in the Litigation, or in any other proceeding for any purpose, and any Judgment or order entered by the Court in accordance with the terms of this Agreement will be treated as vacated, *nunc pro tunc*.

**18.   MISCELLANEOUS PROVISIONS**

18.1   The Settling Parties acknowledge that it is their intent to consummate this Agreement, and they agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Agreement and to exercise their best efforts to accomplish the foregoing terms and conditions of this Agreement.

18.2.   The Settling Parties intend the Settlement to be a final and complete resolution of all disputes between them with respect to the Litigation. The Settlement compromises claims that are contested and will not be deemed an admission by any Settling Party as to the merits of any claim or defense. The Settling Parties agree that the consideration provided to the

80001.0039/10976310.2
STIPULATION AND SETTLEMENT
AGREEMENT-29
(C15-1808 TSZ)

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

Case 2:15-cv-01808-TSZ   Document 92-1   Filed 12/11/17   Page 31 of 73
Case 2:24-cv-00444-BJR   Document 40-1   Filed 07/17/24   Page 60 of 165
Case 2:15-cv-01808-TSZ   Document 92-1   Filed 12/11/17   Page 32 of 73

Settlement Class and the other terms of the Settlement were negotiated in good faith and at arm's length by the Settling Parties, and reflect a Settlement that was reached voluntarily after consultation with competent legal counsel. The amounts paid are to compromise the claimants' claims for damages and the amounts paid represent the claimants' compensation for such alleged damages.

18.3.    Neither this Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Agreement or the Settlement is or may be deemed to be or may be used as an admission or evidence of the validity of any Released Claims, or of any wrongdoing or liability of any Released Persons; or is or may be deemed to be or may be used as an admission of, or evidence of, any fault, omission, wrongdoing, or liability of any Released Persons in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. Defendant may file this Agreement and/or the Judgment in any action that may be brought against it in order to support any defense or counterclaim, including, without limitation, those based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion, issue preclusion, or similar defense or counterclaim.

18.4.    All agreements made and orders entered during the course of the Litigation relating to the confidentiality of information will survive this Agreement.

18.5.    All of the Exhibits to this Agreement are material and integral parts hereof and are fully incorporated herein by this reference.

18.6.    This Agreement may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

18.7.    This Agreement and the Exhibits attached hereto constitute the entire agreement among the Settling Parties, and no representations, warranties, or inducements have been made to any Party concerning this Agreement or its Exhibits other than the representations, warranties, and covenants covered and memorialized herein. Except as otherwise provided herein, the Settling Parties will bear their own respective costs.

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

18.8.    Class Counsel, on behalf of the Settlement Class, are expressly authorized by Plaintiff to take all appropriate action required or permitted to be taken by the Settlement Class pursuant to this Agreement to effectuate its terms, and are expressly authorized to enter into any modifications or amendments to this Agreement on behalf of the Settlement Class that Class Counsel deem appropriate.

18.9.    This Agreement may be executed in one or more counterparts. All executed counterparts and each of them will be deemed to be one and the same instrument. Facsimile signatures, electronic signatures, or signatures sent via e-mail will be treated as original signatures and shall be binding. A complete set of counterparts will be submitted to the Court.

18.10.   This Agreement will be binding upon, and inure to the benefit of, the successors and assigns of the Settling Parties.

18.11.   The Court will retain jurisdiction with respect to implementation and enforcement of the terms of this Agreement, and all Settling Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement.

18.12.   None of the Settling Parties, or their respective counsel, will be deemed the drafter of this Agreement or its Exhibits for purposes of construing the provisions thereof. The language in all parts of this Agreement and its Exhibits will be interpreted according to its fair meaning, and will not be interpreted for or against any Settling Party as the drafter thereof.

18.13.   The Settling Parties stipulate to stay all proceedings in the Litigation until the approval of this Agreement has been finally determined, except the stay of proceedings shall not prevent the filing of any motions, affidavits, and other matters necessary to obtain and preserve final judicial approval of this Agreement.

18.14.   Except as agreed by the Parties in writing, within thirty (30) days after the Final Settlement Date, the Parties shall destroy all electronically stored information, testimony, or other information produced in the Litigation, including the mediation for the Litigation.

18.15.   The Settlement shall be governed by the laws of the State of Washington, applied without regard to laws applicable to choice of law, except to the extent that the law of

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

Apx. 57

The Honorable Thomas S. Zilly

1

2

3

4

5

6                               UNITED STATES DISTRICT COURT

7                             WESTERN DISTRICT OF WASHINGTON

8                                          AT SEATTLE

9    JUANITA GARCIA, individually and on behalf          NO. C15-1808 TSZ
     of all others similarly situated,
10                                                       **DECLARATION OF BENJAMIN H.**
11                             Plaintiff,                 **RICHMAN IN SUPPORT OF**
                                                         **PLAINTIFF'S MOTION FOR**
12         v.                                            **PRELIMINARY APPROVAL OF CLASS**
                                                         **CERTIFICATION AND CLASS ACTION**
13   NATIONSTAR MORTGAGE LLC, a Delaware                 **SETTLEMENT**
     limited liability company,
14                                                       NOTE ON MOTION CALENDAR:
15                                                       Friday, December 29, 2017.
                               Defendant.
16

17

18         Pursuant to 18 U.S.C. § 1746, I, Benjamin H. Richman, hereby declare as follows:

19         1.      I am an attorney admitted to practice before the Supreme Court of the State of

20   Illinois, and have been admitted to practice *pro hac vice* before this Court for purposes of this

21   action. I am entering this declaration in support of Plaintiff Juanita Garcia's Motion for

22   Preliminary Approval of Class Certification and Class Action Settlement. This declaration is

23   based upon my personal knowledge, except where expressly noted otherwise. If called upon to

24   testify to the matters stated herein, I could and would competently do so.

25         2.      I am the Managing Partner of the Chicago office of Edelson PC, which has been

26   retained to act as co-counsel for Plaintiff Juanita Garcia and the putative class in this action.

27

DECL. OF BENJAMIN H. RICHMAN ISO PRELIM. APP.                    LAW OFFICES OF
No. C15-1808 TSZ                              - 1 -        **CLIFFORD A. CANTOR, P.C.**
                                                                627 208th Ave. SE
                                                               Sammamish, WA 98074
                                                        Tel (425) 868-7813 • Fax (425) 732-3752

3.      The proposed settlement now before the Court is the result of years' worth of contentious litigation, including extensive written and oral discovery, and motion practice. On the discovery front, over the course of the litigation the parties engaged in substantial formal and informal discovery, including the exchange of written interrogatories and document requests, the production of thousands of pages of documents, as well as depositions of Plaintiff Garcia and key personnel at Defendant Nationstar. From that discovery, the parties gathered and analyzed information material not only to their substantive legal positions in the litigation, but to the ultimate resolution of this case. Among other things, discovery revealed that approximately 188,400 individuals were subject to the debt-collection practices at issue, the nature and form of the convenience fees charged by Nationstar, Nationstar's disclosure of those fees (or alleged lack thereof), and the like. It was this information that the parties used to brief numerous substantive issues in the case, not the least of which were Plaintiff's request for adversarial class certification and their respective positions heading into a private mediation (described further below). Ultimately, it was this discovery and the parties extensive vetting of the issues in the case (through briefing and other litigation) that allowed them to sufficiently evaluate the strengths and weaknesses of their respective positions and led them to the belief that they possessed the information necessary to reach a fair and reasonable compromise of the claims at issue.

4.      That said, the parties were not able to reach a resolution all on their own. Instead, in July 2017, the parties engaged mediator John Bates, Jr. of JAMS (San Francisco) to assist them in their settlement discussions. After making extensive written submissions to Mr. Bates (which they shared with each other), the parties participated in a full-day mediation in San Francisco. Despite their good faith efforts and making significant progress, the parties did not ultimately reach a resolution that day.

5.      Rather, at the close of the mediation session, Mr. Bates submitted a mediator's proposal as to certain material terms of the proposed settlement. After careful consideration and analysis, both sides ultimately accepted the mediator's proposal and got to work on negotiating

DECL. OF BENJAMIN H. RICHMAN ISO PRELIM. APP.                - 2 -
No. C15-1808 TSZ

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074
Tel  (425) 868-7813 • Fax  (425) 732-3752

the remaining terms of a fulsome written settlement agreement. Through arm's-length negotiations over the course of the next several months, the parties were able to come to a complete agreement as to the resolution of this matter, consistent with Mr. Bates's mediator's proposal, and in the form now before the Court.

6.     It's also important to note that Plaintiff Juanita Garcia has at all times demonstrated her willingness to vigorously prosecute this case on her own behalf and on behalf of her follow settlement class members. Indeed, Ms. Garcia has been actively engaged in the matter from inception through the present: assisting with the review of documents filed with the Court, reviewing and responding to extensive written discovery, preparing and sitting for her own deposition, and weighing in with her views of the proposed settlement and its documentation.  All of her efforts have required significant time commitments, which included time away from her family and personal obligations, as well as tailoring her work schedule to the needs of the case. Without Ms. Garcia's involvement, the settlement now before the Court would not have been achieved.

7.     For their part, proposed class counsel has extensive experience litigating complex class actions, and have at all times devoted the time and other resources necessary to advance the interests of the proposed settlement class. They are well-qualified and experienced members of the plaintiffs' bar who regularly engage in consumer class actions involving similar issues and of similar size, scope, and complexity as the present case. (See Firm Resume of Edelson PC, attached as Exhibit A.) Further, they have frequently been appointed class counsel by courts throughout the country, and as evidenced by their pursuit of the litigation thus far, have the resources necessary to conduct litigation of this nature.

8.     To that end, proposed class counsel has already spent significant time, effort and other resources investigating the case, identifying the claims asserted, prosecuting the case through all phases of litigation, and ultimately negotiating a settlement that provides substantial benefits to the proposed settlement class. And they will continue to devote the resources

DECL. OF BENJAMIN H. RICHMAN ISO PRELIM. APP.          - 3 -
No. C15-1808 TSZ

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074
Tel (425) 868-7813 • Fax (425) 732-3752

1   necessary to see this case through approval of the proposed settlement or its final disposition

2   otherwise.

3         9.     Finally, while Plaintiff and proposed class counsel are confident the class would

4   be able to obtain adversarial class certification and ultimately prevail at trial, they are mindful

5   that the expense, duration, and complexity of protracted litigation is nevertheless substantial and

6   the outcome at trial can never be guaranteed. Moreover, even if Plaintiff and the class were

7   successful on all fronts—certifying a class and maintaining certification through trial, and

8   obtaining a judgment against Nationstar—Nationstar would inevitably appeal some or all the

9   rulings against, thus further delaying (or altogether preventing) the class from obtaining any

10   relief.

11         10.    Thus, comparing the benefits secured under the proposed settlement—which

12   provides both significant injunctive and monetary relief for the class—with the risks inherent in

13   ongoing litigation of this nature, Plaintiff and proposed class counsel are of the belief that the

14   proposed settlement can be appropriately approved as a fair, reasonable, and adequate

15   compromise of the claims at issue.

16        I declare under penalty of perjury that the foregoing is true and correct.

17   Executed on December 11, 2017 at Chicago, Illinois.

18                              /s/ *Benjamin H. Richman*

19                              Benjamin H. Richman

20

21

22                              Certificate of Service

23        I certify that, on the date stamped above, I caused this declaration and exhibit to be filed
with the Clerk of the Court via the CM/ECF system, which will cause notification of filing to be
emailed to counsel of record for all parties.

24

25                       s/ *Cliff Cantor*, WSBA # 17893

26

27

DECL. OF BENJAMIN H. RICHMAN ISO PRELIM. APP.
No. C15-1808 TSZ       - 4 -                        LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074
Tel (425) 868-7813 • Fax (425) 732-3752

THE HONORABLE THOMAS S. ZILLY

1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
8                                    AT SEATTLE

9    JUANITA GARCIA, individually and on behalf of
     all others similarly situated,
10                                                    Case No. 2:15-cv-01808-TSZ
                                      Plaintiff,
11                                                    DECLARATION OF IAN MENSHER
           v.                                         IN SUPPORT OF CLASS MEMBER
12                                                    SHERLIE CHARLOT'S JOINDER IN
     NATIONSTAR MORTGAGE LLC, a Delaware              PLAINTIFF'S STATEMENT REGARDING
13   Limited Liability Company,                       SCOPE OF RELEASE IN PROPOSED CLASS
                                                      ACTION SETTLEMENT
14                                    Defendants.

15

16

17

18         I, Ian Mensher, hereby declare as follows:

19         1.     I am an attorney with Keller Rohrback L.L.P., and I represent Sherlie Charlot. I am a

20   member of the bar of Washington State and admitted to practice in this District. I have personal

21   knowledge of the matters set forth in this declaration and I am competent to testify to the matters stated

22   herein.

23         2.     Ms. Charlot is a named plaintiff in a proposed class action case filed in the United States

24   District Court for the Eastern District of California. *See Contreras v. Nationstar Mortg. LLC*, No. 2:16-

25   cv-00302-MCE-EFB (E.D. Cal.). The case was filed on February 12, 2016.

26

27
     DECLARATION OF IAN MENSHER                          KELLER ROHRBACK L.L.P.
28   (Case No. 2:15-CV-01808-TSZ) - 1                      1201 Third Avenue, Suite 3200
                                                             Seattle, WA 98101-3052
                                                           Tel.: (206) 623-1900
                                                             Fax: (206) 623-3384

3.      Keller Rohrback L.L.P. ("KR") and Hagens Berman Sobol Shapiro LLP ("HBSS") are co-counsel for Ms. Charlot and the proposed classes in the *Contreras* case. I am counsel of record in the *Contreras* action. Along with Ms. Charlot, KR and HBSS represent several other named plaintiffs in the *Contreras* matter. These plaintiffs collectively seek to represent several classes of mortgagors who have paid allegedly improper fees, including "convenience fees" (also known as "pay-to-pay fees"), as well as other fees related to property inspections and other mortgage servicing activities.

4.      As part of the Rule 26(f) conference that the parties held in the *Contreras* matter in November 2017, counsel for Nationstar, Erik Kemp, represented that no cases related to the *Contreras* matter existed. The parties filed a joint status report confirming the same. From that point forward, I and my colleagues relied on Mr. Kemp's misrepresentation that no such case existed. I and my colleagues were unaware that this case—*Garcia v. Nationstar Mortg. LLC*, No. 2:15-cv-01808-TSZ (W.D. Wash.)—had been filed.

5.      On October 9, 2018, I became aware of the *Garcia* case and that there was a settlement pending final approval. I reviewed the Settlement Agreement entered into between the *Garcia* parties, including the release.

6.      On October 10, 2018, I held a telephone conference with Mr. Kemp and his colleague, Kalama Lui-Kwan. I was joined on the call by Gretchen Obrist of KR, and Tom Loeser of HBSS. On the call, Mr. Kemp disclosed that he had been counsel for Defendant Nationstar from the outset of the *Garcia* case and that the *Garcia* and *Contreras* cases involve the same "convenience fee." He conceded the cases are related and that there is overlap between the *Garcia* and *Contreras* classes and that the class settlement in *Garcia* would impact the classes Ms. Charlot and her co-plaintiffs seek to represent in the *Contreras* matter.

DECLARATION OF IAN MENSHER
(Case No. 2:15-CV-01808-TSZ) - 2

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

7.      On the October 10, 2018 call, we also asked Mr. Kemp why he did not inform us about the *Garcia* case when we had our Rule 26(f) conference in November 2017. He stated that he did not believe he was required to disclose the *Garcia* case under the Local Rules of Practice for the United States District Court, Eastern District of California.

8.      On the October 10, 2018 call, we also asked Mr. Kemp whether he had intended to inform us at any time that the *Garcia* matter existed. He told us that he did, but only *after* this Court entered final approval of the class settlement in *Garcia*.

9.      On the October 10, 2018 call, we also asked Mr. Kemp, among other things, whether his client would stipulate to a carve-out for our clients and class case (with a potential offset for any persons who filed a claim in the *Garcia* settlement). Mr. Kemp stated that he did not believe his client would agree to a carve-out of the *Garcia* release to allow overlapping class members to participate in both the *Garcia* and *Contreras* cases. Mr. Kemp stated that he didn't believe his client would agree because Nationstar wants the release read and applied as broadly as possible.

10.      On October 11, 2018, I, Tom Loeser and Gretchen Obrist spoke with counsel for Ms. Garcia by phone about the scope of the Release in the Settlement Agreement and a potential solution for its overbreadth in light of Nationstar counsel's representations and position. Showing great cooperation, counsel for Ms. Garcia agreed to work with counsel for Nationstar to provide clarity on the scope of the Release and to ensure that my clients and potential class members in the *Contreras* matter were not releasing any uncompensated claims through the *Garcia* settlement.

11.      On October 15, 2018, counsel for Ms. Garcia provided us with a copy of their draft Statement Regarding Scope of Release in Proposed Class Action Settlement ("Statement") which was styled as a joint statement with Nationstar. We provided edits to the document with the hope that Nationstar would join in it. But later that same day counsel for Ms. Garcia informed us that Nationstar

DECLARATION OF IAN MENSHER
(Case No. 2:15-CV-01808-TSZ) - 3

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

1

2

would not join in the Statement. We thanked counsel for preparing the Statement and for their efforts in

seeking Nationstar's joinder. We made clear our position that Nationstar's non-opposition was

3

4

inadequate because the Statement needed to have Nationstar's full joinder and signature for it to be

5

binding.

6

      12.     On the evening of October 15, 2018, Gretchen Obrist and I left a voicemail with Mr.

7

Kemp to discuss Nationstar's position. Mr. Kemp has not returned the call.

8

      13.     Prior to filing Ms. Charlot's Joinder, I provided Ms. Garcia's counsel with a draft of the

9

Joinder, my declaration, and the proposed order.

10

11

      I declare under the penalty of perjury under the laws of the United States that for foregoing is

12

true and correct.

13

      DATED this 16th day of October, 2018 at Seattle, Washington.

14

15

16

                               *s/Ian Mensher*
                               Ian Mensher

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF IAN MENSHER
(Case No. 2:15-CV-01808-TSZ) - 4

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

Apx. 65

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on October 16, 2018, I electronically filed the foregoing with the Clerk of

3

the Court using the CM/ECF system, which in turn sent notice to the following counsel of record:

4

5   Benjamin H. Richman                          Erik Kemp
    EDELSON PC                                   Kalama M. Lui Kwan
6   350 N. LaSalle Street, 14th Floor            SEVERSON & WERSON
    Chicago, IL  60654                           One Embarcadero Center, Suite 2600
7   Tel.: (312) 589-6377                         San Francisco, CA  94111
    Email: brichman@edelson.com                  Tel.: (415) 398-3344
8                                                Email: ek@severson.com
                                                        kml@severson.com
9   D. Frank Davis
    Wesley W. Barnett
10  DAVIS & NORRIS LLP
    2154 Highland Avenue South
11  Birmingham, AL  35205
    Tel.: (205) 930-9900
12  Email: fdavis@davisnorris.com               John Alan Knox
           wbarnett@davisnorris.com             WILLIAMS KASTNER
13                                               Two Union Square
    Rafey S. Balabanian                          601 Union Street, Suite 4100
14  EDELSON PC (SF)                              Seattle, WA  98101
    123 Townsend Street, Suite 100               Tel.: (206) 628-6600
15  San Francisco, CA  94107                     Email: jknox@williamskastner.com
    Tel.: (415) 212-9300
16  Email: rbalabanian@edelson.com              *Attorneys for Defendants*

17

18  Clifford A. Cantor
    627 208th Avenue SE
19  Sammamish, WA  98074-7033
    Tel.: (425) 868-7813
20  Email: cliff.cantor@outlook.com

21  *Attorneys for Plaintiffs*

22

23                                               s/ Ian Mensher
24                                               Ian Mensher

25

26  4834-6962-1624, v. 1

27

28  DECLARATION OF IAN MENSHER              KELLER ROHRBACK L.L.P.
    (Case No. 2:15-CV-01808-TSZ) - 5         1201 Third Avenue, Suite 3200
                                             Seattle, WA 98101-3052
                                             Tel.: (206) 623-1900
                                             Fax: (206) 623-3384



## IMPORTANT INFORMATION

This presentation contains summarized information concerning Mr. Cooper Group Inc. ("Mr. Cooper" or the "Company") and the Company's business, operations, financial performance and trends. No representation is made that the information in this presentation is complete. For additional financial, statistical and business related information, as well as information regarding business and segment trends, see the Company's most recent Annual Report on Form 10-K ("Form 10-K") and Quarterly Reports on Form 10-Q filed with the U.S. Securities and Exchange Commission (the "SEC"), as well other reports filed with the SEC from time to time. Such reports are or will be available in the Investors section of the Company's website (www.mrcoopergroup.com) and the SEC's website (www.sec.gov).

Forward Looking Statements. This presentation contains forward-looking statements within the meaning of the U.S. federal securities laws, including statements regarding (i) implementing strategic initiatives and (ii) operating returns hypotheticals. All statements other than statements of historical or current fact included in this presentation that address activities, events, conditions or developments that we expect, believe or anticipate will or may occur in the future are forward-looking statements. Forward-looking statements give our current expectations and projections relating to our financial condition, results of operations, plans, objectives, future performance and business and these statements are not guarantees of future performance.

Forward-looking statements may include the words "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," "strategy," "future," "opportunity," "may," "should," "will," "would," "will be," "will continue," "will likely result," and similar expressions. Such forward-looking statements involve risks and uncertainties that may cause actual events, results or performance to differ materially from those indicated by such statements. Certain of these risks are identified and discussed in documents Mr. Cooper has filed or will file from time to time with the SEC. These risk factors will be important to consider in determining future results and should be reviewed in their entirety. These forward-looking statements are expressed in good faith, and Mr. Cooper believes there is a reasonable basis for them. However, the events, results or trends identified in these forward-looking statements may not occur or be achieved. Forward-looking statements speak only as of the date they are made, and Mr. Cooper is not under any obligation, and expressly disclaims any obligation, to update, alter or otherwise revise any forward-looking statement, except as required by law. Readers should carefully review the statements set forth in the reports that Mr. Cooper has filed or will file from time to time with the SEC.

Non-GAAP Measures. This presentation contains certain references to non-GAAP measures. Please refer to the Appendix for more information on non-GAAP measures.

Apx. 67

## 2023 FULL-YEAR HIGHLIGHTS

**Financial**
- Reported $500 million net income and $660 million pretax operating income[1]
- Generated ROTCE of 12.5% and operating ROTCE[1] of 12.5%
- TBV[1] increased to $63.67 per share, up 12% y/y
- TNW/assets[1] was 29%, with available liquidity of $2.4 billion

**Operational**
- Servicing generated $869 million pretax operating income[1]
- Servicing portfolio grew to $992 billion, up 14% y/y
- Originations generated $100 million pretax operating income[1] on funded volume of $12.6 billion

**Other**
- Repurchased 5.6 million shares for $276 million at an average price of $49.53
- Attained BB credit rating from 
- Completed strategic acquisitions: 

Mr. Cooper Group

## FOURTH QUARTER HIGHLIGHTS

**Financial**
- Reported $46 million net income and $151 million pretax operating income[1]
- Generated ROTCE of 4.5% and operating ROTCE[1] of 11.1%
- TBV[1] increased to $63.67 per share, 15th consecutive quarter of growth

**Operational**
- Servicing generated $229 million pretax operating income[1]
- Servicing portfolio grew to $992 billion, up 6% q/q and 14% y/y
- Originations generated $10 million pretax operating income[1] on funded volume of $2.7 billion

**Other**
- Repurchased 1.3 million shares for $72 million
- Attained BB Fitch credit rating and subsequent to quarter-end, upgraded to Ba3 by Moody's
- Subsequent to quarter-end, issued $1 billion senior notes at 7.125%

Mr. Cooper Group

Apx. 68

## MR. COOPER IS THE MARKET LEADER



**Since becoming a fully-independent public company, we've delivered consistent execution on strategic goals**

- ✅ Strengthened balance sheet through deleveraging and focus on asset quality
- ✅ Bolstered liquidity and delivered over 500,000 customer solutions during Pandemic
- ✅ Divested Xome Title, Field Services & Valuations, and Reverse
- ✅ Drove down servicing costs by 30%, now down 38% below industry peer average
- ✅ Achieved record customer retention, exceeding 60% refinance recapture target
- ✅ Implemented 75% MSR hedge ratio
- ✅ Utilized deferred tax assets, down 63% since WMIH merger
- ✅ Achieved $1 trillion strategic target[1]

5 |   [1] Pro forma for 1Q'24 pending transactions

Mr.CooperGroup

## OUR STRATEGIC GOAL = SUSTAINED HIGHER RETURNS



6 |   [1] Please see appendix for reconciliations of non-GAAP items
[2] 3Q'23 ROTCE of 13.8% excludes $67 mm SASCO trust collapse gain

Mr.CooperGroup

Apx. 69

**SURPASSING STRATEGIC GROWTH TARGET WITH STRONG MOMENTUM**



Servicing Portfolio Grew 14% Y/Y (UPB in $ bn's)



**4Q'23 Servicing Portfolio Breakdown**
(UPB in $ bn's)

Mr.CooperGroup

**SERVICING INCOME MOMENTUM FROM GROWTH, OPERATING LEVERAGE, RATES**



Pretax Operating Income[1] Benefitting from
Portfolio Growth and Efficiency
($ mm's)



[1] Please see appendix for reconciliations of non-GAAP items
[2] Excludes $67 mm SASCO trust collapse and non-recurring fees of $13 mm consisting of deboarding fees and incentive fees

Mr.CooperGroup

Apx. 70

## ORIGINATIONS REMAINS SOLIDLY PROFITABLE DESPITE CHALLENGING ENVIRONMENT



**Origination Pretax Operating Income[1] Outperforms Guidance**
($ mm's)



**Project Flash Driving Significant Originations Cost Efficiency**

**Seasonality Impacts 4Q'23 Funded Volume**
($ bn's)



**4Q'23 DTC Funding Mix**

9 |  *[1] Please see appendix for reconciliations of non-GAAP items*

Mr.CooperGroup

## STRONG XOME SALES AND INVENTORY GROWTH Y/Y, WELL POSITIONED FOR ADVERSE ENVIRONMENT



Sales +75% y/y

Inventories +22% y/y
(Thousands)



FHA Market Foreclosure Metrics Still Below Normal

10 |  *Source: FHA Single Family Loan Performance Trends (% loans in foreclosure based on October data for each year)*

Mr.CooperGroup

Apx. 71

## SUMMARY 4Q'23 FINANCIAL RESULTS

| $ mm's, except per share data | 4Q'23 | 3Q'23 | 4Q'22 |
|---|---|---|---|
| Servicing | $229 | $301 | $159 |
| Originations | 10 | 29 | (2) |
| Corporate debt interest expense | (48) | (45) | (39) |
| Corporate expense/other | (40) | (36) | (36) |
| **Pretax operating income[1]** | **$151** | **$249** | **$82** |
| MSR MTM, net of hedge[1] | (41) | 61 | (58) |
| Adjustments | (39) | 44 | (33) |
| Intangible amortization | (2) | (2) | (1) |
| Pretax income | $69 | $352 | ($10) |
| Income tax (expense) | (23) | (77) | 11 |
| **Net income** | **$46** | **$275** | **$1** |
| Weighted average diluted sharecount | 66.7 | 67.7 | 71.6 |
| Diluted EPS[2] | $0.69 | $4.06 | $0.01 |
| ROTCE[1] | 4.5% | 27.3% | 0.1% |
| **Operating ROTCE[1][3]** | **11.1%** | **18.7%** | **6.3%** |

- Adjustments included $27 mm costs related to the cyber event, $8 mm deal costs associated with Roosevelt and Home Point, $2 mm severance charge, and $2 mm equity loss in Sagent

- Other MTM of $41 mm included $217 mm MSR MTM, net of excess spread[4], and $176 mm hedge gain, equivalent to **81% hedge ratio**

- MSR ended the quarter valued at 1.55% of UPB or 5.2x the base servicing fee



**TBV/Share[1] +12% y/y**

| 4Q'22 | 1Q'23 | 2Q'23 | 3Q'23 | 4Q'23 |
|---|---|---|---|---|
| $56.72 | $56.72 | $58.81 | $62.78 | $63.67 |

[1] Please see appendix for reconciliations of non-GAAP items. [2] Per share data calculated based on net income (loss) attributable to common shareholders. [3] Assumes GAAP tax rate of 24.2%   [4] Includes MSR fair value MTM of $183 mm less $20 mm excess spread /financing MTM, $13 mm other MTM adjustments, and $1 mm fair value excess spread accretion     Mr.CooperGroup

## WELL POSITIONED TO PERFORM IN ADVERSE ENVIRONMENTS

**High Quality MSR Portfolio with Record Low Delinquencies[1]**





Our special servicing business and digital real estate auction marketplace positions us to generate counter-cyclical revenues during adverse credit cycles

[1] Based on 60+ day delinquencies (% of loans). FHA, VA/USDA, and Conventional based on MSR portfolio.     Mr.CooperGroup

Apx. 72

## HIGH YIELD OFFERING BRINGS ADDITIONAL LIQUIDITY

Liquidity[1] ($ mm's)





Senior Note Maturities ($ mm's)

13 |  [1] Liquidity includes unrestricted cash and collateralized, but undrawn, availability on MSR, advance and warehouse lines.
      [2] Assumes the new issuance of $1 bn senior notes, net of discount and underwriting fees, of $985 mm will be used to pay down MSR lines

Mr.CooperGroup

## MR. COOPER BALANCE SHEET MANAGEMENT REFLECTED IN TIGHTER SPREADS



Senior Note Spread (Basis Points)
($600 mm, 6.0%, 2027)



Capital Ratio above 20-25% Target
Range at 12/31/2023[1]



29.3%
TNW/Assets

14 |  [1] Please see appendix for reconciliations of non-GAAP items
      Note: Senior notes spreads from 12/30/22 through 1/29/24. Source: Bloomberg

Mr.CooperGroup

Apx. 73

# *Appendix*

## BALANCE SHEET

| $ mm's | 4Q'22 | 1Q'23 | 2Q'23 | 3Q'23 | 4Q'23 |
|---|---|---|---|---|---|
| Cash and cash equivalents | $527 | $534 | $517 | $553 | $571 |
| Restricted cash | 175 | 133 | 170 | 151 | 169 |
| Mortgage servicing rights at fair value | 6,654 | 6,566 | 7,149 | 8,504 | 9,090 |
| Advances and other receivables, net of reserves | 1,019 | 933 | 802 | 758 | 996 |
| Mortgage loans held for sale at fair value | 893 | 937 | 1,187 | 893 | 927 |
| Property and equipment, net | 65 | 64 | 61 | 59 | 53 |
| Deferred tax asset, net | 703 | 707 | 657 | 499 | 472 |
| Other assets | 2,740 | 2,783 | 2,601 | 2,010 | 1,918 |
| Total assets | $12,776 | $12,657 | $13,144 | $13,427 | $14,196 |
| | | | | | |
| Unsecured senior notes, net | $2,673 | $2,675 | $2,676 | $3,147 | $3,151 |
| Advance, warehouse and MSR facilities, net | 2,885 | 2,934 | 3,512 | 3,545 | 4,302 |
| Payables and other liabilities | 2,633 | 2,550 | 2,395 | 1,964 | 1,995 |
| MSR related liabilities - nonrecourse at fair value | 528 | 512 | 482 | 467 | 466 |
| Total liabilities | 8,719 | 8,671 | 9,065 | 9,123 | 9,914 |
| Total stockholders' equity | 4,057 | 3,986 | 4,079 | 4,304 | 4,282 |
| Total liabilities and stockholders' equity | $12,776 | $12,657 | $13,144 | $13,427 | $14,196 |

Mr.CooperGroup

Apx. 74

## SEGMENT OPERATING INCOME AND NON-GAAP RECONCILIATION

| $ mm's | Servicing | Originations | Corporate / Other | Consolidated |
|---|---|---|---|---|
| Service related, net, excluding MTM | $347 | $16 | $22 | $385 |
| Net gain on mortgage loans held for sale | 9 | 51 | (1) | 59 |
| Operating revenue excluding MTM | 356 | 67 | 21 | 444 |
| Salaries, wages, and benefits | 88 | 36 | 40 | 164 |
| General and administrative | 92 | 23 | 53 | 168 |
| Total expenses | 180 | 59 | 93 | 332 |
| Interest income | 148 | 10 | 1 | 159 |
| Interest expense | (100) | (9) | (50) | (159) |
| Other expense, net | - | - | (3) | (3) |
| Total other income (expenses), net | 48 | 1 | (52) | (3) |
| Pretax income (loss) before MTM | 224 | 9 | (124) | 109 |
| Fair value of excess spread accretion | 1 | - | - | 1 |
| Other MTM | (41) | - | - | (41) |
| MTM | (40) | - | - | (40) |
| Pretax income (loss) from operations | 184 | 9 | (124) | 69 |
| Other MTM | 41 | - | - | 41 |
| Adjustments | 2 | 1 | 36 | 39 |
| Intangible amortization | 2 | - | - | 2 |
| Pretax operating income (loss) from operations | $229 | $10 | ($88) | $151 |

## ROTCE RECONCILIATION

| $ mm's | 4Q'22 | 1Q'23 | 2Q'23 | 3Q'23 | 4Q'23 |
|---|---|---|---|---|---|
| Pretax income (loss) | ($10) | $35 | $198 | $352 | $69 |
| Income tax (expense) benefit | 11 | 2 | (56) | (77) | (23) |
| Net income | $1 | $37 | $142 | $275 | $46 |
| ROCE[1] | 0.1% | 3.7% | 14.1% | 26.2% | 4.3% |
| ROTCE | 0.1% | 3.8% | 14.6% | 27.3% | 4.5% |
| Pretax income (loss) | ($10) | $35 | $198 | $352 | $69 |
| Other mark-to-market | 58 | 63 | (61) | (61) | 41 |
| Adjustments | 33 | 11 | 11 | (44) | 39 |
| Intangible amortization | 1 | 1 | 2 | 2 | 2 |
| Pretax operating income | $82 | $110 | $150 | $249 | $151 |
| Income tax expense[2] | (20) | (27) | (36) | (60) | (37) |
| Fully-taxed operating income | $62 | $83 | $114 | $189 | $114 |
| Operating ROTCE | 6.3% | 8.6% | 11.7% | 18.7% | 11.1% |
| Average book value | $4,081 | $4,022 | $4,033 | $4,192 | $4,293 |
| Average tangible book value | $3,953 | $3,895 | $3,896 | $4,032 | $4,123 |

ROTCE is a non-GAAP financial measure that is computed by dividing annualized earnings by average tangible common equity (tangible book value). Operating ROTCE is a non-GAAP financial measure that is computed by dividing annualized fully-taxed operating earnings by average tangible common equity. Tangible common equity equals total stockholders' equity less goodwill and intangible assets. The methodology of determining tangible common equity may differ among companies. Management believes that ROTCE and operational ROTCE are useful financial measures because they measure the performance of a business consistently and enables investors and others to assess the Company's use of equity.

Apx. 75

## TANGIBLE BOOK VALUE (TBV) AND TNW/ASSETS

| $ mm's except for per share data | 4Q'22 | 1Q'23 | 2Q'23 | 3Q'23 | 4Q'23 |
|---|---|---|---|---|---|
| **Stockholders' equity** | **$4,057** | **$3,986** | **$4,079** | **$4,304** | **$4,282** |
| Goodwill | (120) | (120) | (120) | (141) | (141) |
| Intangible assets | (8) | (6) | (28) | (30) | (28) |
| **Tangible book value (TBV)** | **$3,929** | **$3,860** | **$3,931** | **$4,133** | **$4,113** |
| Ending outstanding sharecount (mm's) | 69.3 | 68.1 | 66.8 | 65.8 | 64.6 |
| TBV/share | $56.72 | $56.72 | $58.81 | $62.78 | $63.67 |
| | | | | | |
| Assets | $12,776 | $12,657 | $13,144 | $13,427 | $14,196 |
| Loans subject to repurchase from GNMA | $1,865 | $1,889 | $1,650 | $1,027 | $966 |
| Tangible assets[1] | $12,648 | $12,531 | $12,996 | $13,256 | $14,027 |
| Deferred tax assets, net | $703 | $707 | $657 | $499 | $472 |
| TNW/Assets[2] | 31.1% | 30.8% | 30.2% | 31.2% | 29.3% |
| TNW/Assets[2] excluding DTA and loans subject to repurchase from GNMA | 32.0% | 31.7% | 30.6% | 31.0% | 28.9% |
| | | | | | |
| Operating lease liabilities | $111 | $106 | $91 | $99 | $91 |
| MSR line draws | 1,410 | 1,440 | 1,809 | 2,195 | 2,814 |
| Unsecured senior notes principal | 2,700 | 2,700 | 2,700 | 3,200 | 3,200 |
| Debt | $4,221 | $4,246 | $4,600 | $5,494 | $6,105 |
| MSR line draws/Debt | 33% | 34% | 39% | 40% | 46% |

[1] Tangible assets excludes goodwill and intangible assets
[2] Based on TBV divided by tangible assets

Mr.CooperGroup

## SERVICING NON-GAAP RECONCILIATION

| $ mm's | 4Q'22 | | 1Q'23 | | 2Q'23 | | 3Q'23 | | 4Q'23 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | $ | Bps | $ | Bps | $ | Bps | $ | Bps | $ | Bps |
| **Pretax income from operations** | **$98** | **4.5** | **$94** | **4.4** | **$243** | **11.5** | **$361** | **16.1** | **$184** | **7.6** |
| Other mark-to-market (MTM) | 56 | 2.6 | 61 | 2.9 | (63) | (3.0) | (63) | (2.8) | 40 | 1.7 |
| Fair value of excess spread accretion | 2 | 0.1 | 2 | 0.1 | 2 | 0.1 | 2 | 0.1 | 1 | 0.0 |
| Accounting items | 3 | 0.1 | - | - | - | - | - | - | 2 | 0.1 |
| Intangible amortization | - | - | - | - | - | - | 1 | 0.0 | 2 | 0.1 |
| **Pretax income excluding MTM and other notable items** | **$159** | **7.3** | **$157** | **7.4** | **$182** | **8.6** | **$301** | **13.4** | **$229** | **9.5** |
| Average UPB ($bn) | $668 | | $661 | | $848 | | $897 | | $963 | |
| | | | | | | | | | | |
| **Amortization Reconciliation** | | | | | | | | | | |
| MSR amortization | ($135) | (6.2) | ($125) | (5.8) | ($148) | (7.0) | ($171) | (7.6) | ($160) | (6.7) |
| Excess spread accretion | 12 | 0.5 | 10 | 0.5 | 11 | 0.5 | 11 | 0.5 | 9 | 0.4 |
| Total amortization | (123) | (5.7) | (115) | (5.3) | (137) | (6.5) | (160) | (7.1) | (151) | (6.3) |
| Fair value of excess spread accretion | 2 | 0.1 | 2 | 0.1 | 2 | 0.1 | 2 | 0.1 | 1 | 0.0 |
| **Total amortization including fair value of excess spread accretion** | **($121)** | **(5.6)** | **($113)** | **(5.2)** | **($135)** | **(6.4)** | **($158)** | **(7.0)** | **($150)** | **(6.3)** |

Mr.CooperGroup

Apx. 76

## SERVICING PROFITABILITY

| $ mm's | 4Q'22 $ | 4Q'22 Bps | 1Q'23 $ | 1Q'23 Bps | 2Q'23 $ | 2Q'23 Bps | 3Q'23 $ | 3Q'23 Bps | 4Q'23 $ | 4Q'23 Bps |
|---|---|---|---|---|---|---|---|---|---|---|
| **Operational Revenue** | | | | | | | | | | |
| Base servicing fees | $320 | 14.8 | $327 | 15.2 | $345 | 16.3 | $382 | 17.0 | $412 | 17.1 |
| Modification fees | 2 | 0.1 | 3 | 0.1 | 5 | 0.2 | 6 | 0.3 | 5 | 0.2 |
| Late payment fees | 14 | 0.6 | 16 | 0.7 | 16 | 0.8 | 17 | 0.7 | 14 | 0.6 |
| Other ancillary revenues | – | – | 10 | 0.5 | 15 | 0.7 | 82 | 3.7 | 16 | 0.7 |
| Total MSR operational revenue | 336 | 15.5 | 356 | 16.5 | 381 | 18.0 | 487 | 21.7 | 447 | 18.6 |
| Base subservicing fee and other subservicing revenue | 75 | 3.4 | 69 | 3.3 | 79 | 3.7 | 92 | 4.1 | 77 | 3.2 |
| Total servicing fee revenue | 411 | 18.9 | 425 | 19.8 | 460 | 21.7 | 579 | 25.8 | 524 | 21.8 |
| MSR financing liability costs | (5) | (0.2) | (8) | (0.4) | (7) | (0.3) | (7) | (0.3) | (8) | (0.3) |
| Excess spread payments and portfolio runoff | (12) | (0.5) | (10) | (0.5) | (11) | (0.5) | (11) | (0.5) | (9) | (0.4) |
| Total operational revenue | 394 | 18.2 | 407 | 18.9 | 442 | 20.9 | 561 | 25.0 | 507 | 21.1 |
| **Amortization** | | | | | | | | | | |
| MSR amortization | (135) | (6.2) | (125) | (5.8) | (148) | (7.0) | (171) | (7.6) | (160) | (6.7) |
| Excess spread accretion | 12 | 0.5 | 10 | 0.5 | 11 | 0.5 | 11 | 0.5 | 9 | 0.4 |
| Total amortization | (123) | (5.7) | (115) | (5.3) | (137) | (6.5) | (160) | (7.1) | (151) | (6.3) |
| **Mark-to-Market Adjustments** | | | | | | | | | | |
| MSR fair value MTM | (35) | (1.6) | (105) | (4.9) | 139 | 6.6 | 270 | 12.0 | (183) | (7.6) |
| MTM adjustment[1] | (13) | (0.6) | 50 | 2.3 | (88) | (4.2) | (203) | (9.0) | 163 | 6.7 |
| Excess spread / financing MTM | (8) | (0.4) | (6) | (0.3) | 12 | 0.6 | (4) | (0.2) | (20) | (0.8) |
| Total MTM adjustments | (56) | (2.6) | (61) | (2.9) | 63 | 3.0 | 63 | 2.9 | (40) | (1.7) |
| **Total revenues** | **$215** | **9.9** | **$231** | **10.7** | **$368** | **17.4** | **$464** | **20.7** | **$316** | **13.1** |
| Average UPB ($bn) | $868 | | $861 | | $848 | | $897 | | $963 | |

[1] Mark-to-market adjustment represents MSR hedging activity, gain (loss) on MSR sales, and amounts transferred out of mark-to-market to reserves on advances and other receivables   Mr.CooperGroup

## SERVICING PROFITABILITY [CONT.]

| $ mm's | 4Q'22 $ | 4Q'22 Bps | 1Q'23 $ | 1Q'23 Bps | 2Q'23 $ | 2Q'23 Bps | 3Q'23 $ | 3Q'23 Bps | 4Q'23 $ | 4Q'23 Bps |
|---|---|---|---|---|---|---|---|---|---|---|
| Salaries, wages and benefits | $83 | 3.8 | $82 | 3.8 | $83 | 3.9 | $87 | 3.8 | $88 | 3.7 |
| Servicing support fees | 20 | 1.0 | 16 | 0.7 | 21 | 1.0 | 29 | 1.3 | 25 | 1.0 |
| Corporate and other general and administrative expenses | 39 | 1.8 | 42 | 2.0 | 44 | 2.1 | 52 | 2.3 | 56 | 2.3 |
| Foreclosure and other liquidation related expenses | 3 | 0.1 | 11 | 0.5 | 8 | 0.4 | – | – | 8 | 0.3 |
| Depreciation and amortization | 2 | 0.1 | 2 | 0.1 | 3 | 0.1 | 4 | 0.2 | 3 | 0.1 |
| Total general and administrative expenses | 64 | 3.0 | 71 | 3.3 | 76 | 3.6 | 85 | 3.8 | 92 | 3.7 |
| **Total expenses** | **$147** | **6.8** | **$153** | **7.1** | **$159** | **7.5** | **$172** | **7.6** | **$180** | **7.4** |
| Interest income | $83 | 3.8 | $79 | 3.7 | $107 | 5.1 | $157 | 6.9 | $148 | 6.1 |
| Advance interest expense | (9) | (0.4) | (14) | (0.6) | (14) | (0.7) | (13) | (0.6) | (14) | (0.6) |
| Other interest expense | (44) | (2.0) | (49) | (2.3) | (59) | (2.8) | (75) | (3.3) | (86) | (3.6) |
| Interest expense | (53) | (2.4) | (63) | (2.9) | (73) | (3.5) | (88) | (3.9) | (100) | (4.2) |
| **Total other (expenses) income, net** | **$30** | **1.4** | **$16** | **0.8** | **$34** | **1.6** | **$69** | **3.0** | **$48** | **1.9** |
| **Pretax income from continuing operations** | **$98** | **4.5** | **$94** | **4.4** | **$243** | **11.5** | **$361** | **16.1** | **$184** | **7.6** |
| Average UPB ($bn) | $868 | | $861 | | $848 | | $897 | | $963 | |

Mr.CooperGroup

Apx. 77

## SERVICING PORTFOLIO

| $ mm's | 4Q'22 | 1Q'23 | 2Q'23 | 3Q'23 | 4Q'23 |
|---|---|---|---|---|---|
| **Unpaid Principal Balance (UPB) Rollforward** | | | | | |
| Originations | $3,250 | $2,731 | $3,796 | $3,419 | $2,678 |
| Acquisitions | 23,057 | 8,316 | 53,878 | 98,563 | 69,154 |
| Dispositions | (179) | (1,256) | (350) | (22,184) | (1,450) |
| Runoff | (10,152) | (8,735) | (10,286) | (10,950) | (10,764) |
| **Total MSRs[1]** | **$411,382** | **$412,438** | **$459,476** | **$528,324** | **$587,942** |
| Subservicing | 459,053 | 440,111 | 422,522 | 408,930 | 403,778 |
| **Total Servicing** | **$870,435** | **$852,549** | **$881,998** | **$937,254** | **$991,720** |
| **Valuation Data** | | | | | |
| MSR carrying value | 162 bps | 159 bps | 156 bps | 161 bps | 155 bps |
| **Runoff Rates** | | | | | |
| CPR | 5.3% | 4.4% | 5.8% | 5.6% | 4.2% |
| Principal payments | 3.9% | 4.0% | 4.0% | 3.8% | 3.8% |
| MSR runoff rate | 9.2% | 8.4% | 9.8% | 9.4% | 8.0% |
| **Total Servicing CPR** | **4.9%** | **4.1%** | **5.5%** | **5.3%** | **4.0%** |
| **Portfolio Composition** | | | | | |
| GSE | 29% | 30% | 35% | 40% | 44% |
| GNMA | 15% | 15% | 14% | 13% | 12% |
| PLS | 3% | 3% | 3% | 3% | 3% |
| Total MSRs | 47% | 48% | 52% | 56% | 59% |
| Subservicing | 53% | 52% | 48% | 44% | 41% |
| Total | 100% | 100% | 100% | 100% | 100% |

Mr.CooperGroup

## ORIGINATIONS NON-GAAP RECONCILIATION

| | 4Q'22 | | 1Q'23 | | 2Q'23 | | 3Q'23 | | 4Q'23 | |
|---|---|---|---|---|---|---|---|---|---|---|
| $ mm's | $ | Margin | $ | Margin | $ | Margin | $ | Margin | $ | Margin |
| **Pretax (loss) income** | ($14) | -0.15% | $23 | 0.55% | $38 | 1.00% | $29 | 0.93% | $9 | 0.40% |
| Accounting items | 12 | 0.38% | - | 0.00% | - | 0.00% | - | 0.00% | 1 | 0.04% |
| **Pretax (loss) income excluding accounting items** | ($2) | 0.23% | $23 | 0.55% | $38 | 1.00% | $29 | 0.93% | $10 | 0.44% |
| Pull through adjusted lock volume ($bn) | $2.8 | | $3.0 | | $3.8 | | $3.3 | | $2.6 | |
| Funded volume ($bn) | $3.2 | | $2.7 | | $3.8 | | $3.4 | | $2.7 | |

Mr.CooperGroup

Apx. 78

## ORIGINATIONS PROFITABILITY

| $ mm's | 4Q'22 | 1Q'23 | 2Q'23 | 3Q'23 | 4Q'23 |
|---|---|---|---|---|---|
| Service related, net - Originations | $12 | $11 | $16 | $18 | $16 |
| **Net gain on mortgage loans held for sale** | | | | | |
| Net gain on loans originated and sold | (12) | 18 | 6 | (8) | - |
| Capitalized servicing rights | 68 | 51 | 75 | 78 | 51 |
| Total net gain on mortgage loans held for sale | 56 | 69 | 81 | 70 | $1 |
| **Total revenues** | **$68** | **$80** | **$97** | **$88** | **$67** |
| | | | | | |
| **Supplemental Data** | | | | | |
| Pull through adjusted lock volume | $2,797 | $3,045 | $3,819 | $3,308 | $2,592 |
| Funded volume | $3,169 | $2,739 | $3,822 | $3,412 | $2,661 |
| Loans sold, servicing retained | $3,169 | $2,372 | $3,320 | $3,472 | $2,484 |
| GOS margin[1] | 2.00% | 2.27% | 2.12% | 2.12% | 1.97% |
| Revenue margin[1] | 2.43% | 2.63% | 2.54% | 2.66% | 2.58% |
| Value of capitalized servicing retained | 212 bps | 214 bps | 225 bps | 225 bps | 206 bps |
| Value of capitalized servicing at lock[2] | 152 bps | 160 bps | 166 bps | 168 bps | 172 bps |

Mr.CooperGroup

## ORIGINATIONS PROFITABILITY [CONT.]

| $ mm's | 4Q'22 | 1Q'23 | 2Q'23 | 3Q'23 | 4Q'23 |
|---|---|---|---|---|---|
| Salaries, wages and benefits | $54 | $34 | $36 | $37 | $36 |
| Loan originations expenses | 9 | 7 | 9 | 7 | 7 |
| Corporate and other general and administrative expenses | 11 | 9 | 8 | 7 | 9 |
| Marketing and professional service fee | 5 | 4 | 4 | 5 | 5 |
| Depreciation and amortization | 2 | 2 | 2 | 2 | 2 |
| **Total expenses** | **$81** | **$56** | **$59** | **$58** | **$59** |
| Funded volume | $3,169 | $2,739 | $3,822 | $3,412 | $2,661 |
| Expenses margin[1] | 2.56% | 2.04% | 1.54% | 1.70% | 2.22% |
| | | | | | |
| Interest income | $9 | $6 | $10 | $10 | $10 |
| Interest expense | (10) | (7) | (10) | (11) | (9) |
| **Total other income (expenses), net** | **($1)** | **($1)** | **$0** | **($1)** | **$1** |
| Funded volume | $3,169 | $2,739 | $3,822 | $3,412 | $2,661 |
| Other income, net margin[1] | -0.02% | -0.04% | 0.00% | -0.03% | 0.04% |
| **Pretax (loss) income from continuing operations** | **($14)** | **$23** | **$38** | **$29** | **$9** |
| Pretax (loss) income margin[2] | -0.15% | 0.55% | 1.00% | 0.93% | 0.40% |

Mr.CooperGroup

Apx. 79

## ADJUSTED EBITDA

| $ mm's | 4Q'22 | 1Q'23 | 2Q'23 | 3Q'23 | 4Q'23 |
|---|---|---|---|---|---|
| Consolidated GAAP pretax (loss) income | ($10) | $35 | $198 | $352 | $69 |
| Other mark-to-market | 58 | 63 | (61) | (61) | 41 |
| Adjustments[1] | 33 | 11 | 11 | (44) | 39 |
| MSR amortization, net[2] | 121 | 113 | 135 | 158 | 150 |
| Capitalized servicing rights | (71) | (54) | (78) | (85) | (54) |
| Depreciation and amortization | 8 | 9 | 9 | 10 | 10 |
| Corporate debt interest expense | 39 | 39 | 39 | 45 | 48 |
| Other | 5 | 5 | 8 | 8 | 7 |
| **Adjusted EBITDA** | **$183** | **$221** | **$261** | **$383** | **$310** |

*[1] Adjusted EBITDA calculated consistent with the definition in the corporate indentures for senior unsecured notes maturing in 2026, 2027, 2028, and 2031. 4Q'23 adjustments include $27 mm related to cyber event, $8 mm in deal costs, $2 mm severance charge, and $2 mm loss associated with equity investments     [2] Includes fair value of excess spread accretion*     Mr.CooperGroup

## 4Q'23 SOURCES AND USES CASH FLOW

| $mm's | Servicing | Originations | Corporate / Other | Consolidated | Illustrative Steady State Discretionary Cashflow |
|---|---|---|---|---|---|
| GAAP pretax income (loss) | $184 | $9 | ($124) | $69 | |
| Depreciation and amortization | 3 | 2 | 5 | 10 | |
| Share-based compensation | 1 | 1 | 5 | 7 | |
| Amortization of deferred financing costs | 1 | - | 7 | 8 | |
| Settlement of excess spread financing | (17) | - | - | (17) | |
| MSR amortization | 160 | - | - | 160 | |
| Other mark-to-market | 41 | - | - | 41 | |
| **Business segment cash flow from operations** | **$373** | **$12** | **($107)** | **$278** | **$278** |
| State/local taxes[1] | | | | - | (2) |
| Total working capital change[2] | | | | 620 | - |
| **Total sources, net** | | | | **$898** | **$276** |
| Capex | | | | (2) | (2) |
| Capitalized servicing rights – Originations/EBO | | | | (54) | (54) |
| MSR purchases, MSR sales, and excess spread financing | | | | (734) | (96) |
| Net investment in MSR | | | | (788) | (150) [3] |
| Repurchase of common stock | | | | (72) | - |
| **Total uses, net** | | | | **($862)** | **($152)** |
| **Change in cash** | | | | **$36** | **$124** |
| **Change in unrestricted cash** | | | | **$18** | |

*[1] Based on marginal tax rate of 3.2%, net of federal benefit. Actual tax payments/refunds included in total working capital changes*
*[2] Includes mortgage loans originated, sold or repurchased, net gains on mortgage loans held for sale excluding capitalized servicing rights, repayment of nonrecourse debt – legacy assets, and changes in warehouse facilities, advance facilities, advances and other receivables, other assets, payables and other liabilities, taxes, and other activities*
*[3] Required investment to sustain the net MSR is based on sum of ($160) mm MSR amortization, $9 mm excess spread accretion, and $1 mm in fair value of excess spread accretion*

Mr.CooperGroup

Apx. 80



FOR IMMEDIATE RELEASE

## MR. COOPER GROUP REPORTS FOURTH QUARTER 2023 RESULTS

- Reported net income of $46 million including other mark-to-market loss of $41 million, equivalent to ROCE of 4.3% and operating ROTCE of 11.1%
- Book value per share and tangible book value per share increased to $66.29 and $63.67
- Servicing portfolio grew 14% y/y to $992 billion
- Repurchased 1.3 million shares of common stock for $72 million
- Subsequent to quarter end, issued $1 billion senior notes maturing 2032 with coupon of 7.125%

**Dallas, TX (February 9, 2024)** - Mr. Cooper Group Inc. (NASDAQ: COOP) (the "Company"), reported fourth quarter income before income tax expense of $69 and net income of $46 million. Excluding other mark-to-market and other adjustments, the Company reported pretax operating income of $151 million.  Adjustments included other mark-to-market net of hedges of $41 million, $27 million related to the previously disclosed cyber event, and other items shown below in the reconciliation of GAAP and non-GAAP results.

Chairman and CEO Jay Bray commented, "The fourth quarter closed out an exceptionally productive year for Mr. Cooper, with steadily rising return on equity throughout the year and very substantial growth which puts us on the cusp of achieving our $1 trillion portfolio strategic target.  We enter 2024 with robust capital and liquidity, an extremely talented and dedicated team, and enormous energy to serve customers, clients and all our other stakeholders."

Chris Marshall, Vice Chairman added, "Operational performance this year has benefited from strong focus and vigorous execution.  Accomplishments include record servicing profits and very agile performance by our originations unit despite headwinds from rising interest rates. Over the last fifteen years, we have grown in a steady, consistent, and prudent fashion, to the point that today we have earned the title of market leader.  I believe we are in strong shape to excel in 2024 and beyond."

Apx. 81

## Servicing

The Servicing segment provides a best-in-class home loan experience for our 4.6 million customers while simultaneously strengthening asset performance for investors. In the fourth quarter, Servicing recorded pretax income of $184 million, including other mark-to-market of $41 million. The servicing portfolio ended the quarter at $992 billion. Servicing generated pretax operating income, excluding other mark-to-market, of $229 million. At quarter end, the carrying value of the MSR was $9,090 million equivalent to 155 bps of MSR UPB.

| | Quarter Ended | | | |
|---|---|---|---|---|
| | Q4'23 | | Q3'23 | |
| ($ in millions) | $ | BPS | $ | BPS |
| Operational revenue | $ 507 | 21.1 | $ 561 | 25.0 |
| Amortization, net of accretion | (151) | (6.3) | (160) | (7.1) |
| Mark-to-market | (40) | (1.7) | 63 | 2.8 |
| Total revenues | 316 | 13.1 | 464 | 20.7 |
| Total expenses | (180) | (7.4) | (172) | (7.6) |
| Total other expenses, net | 48 | 1.9 | 69 | 3.0 |
| Income before taxes | 184 | 7.6 | 361 | 16.1 |
| Other mark-to-market | 41 | 1.7 | (61) | (2.7) |
| Accounting items | 2 | 0.1 | — | — |
| Intangible amortization | 2 | 0.1 | 1 | — |
| Pretax operating income excluding other mark-to-market and accounting items | $ 229 | 9.5 | $ 301 | 13.4 |

| | Quarter Ended | |
|---|---|---|
| | Q4'23 | Q3'23 |
| MSRs UPB ($B) | $ 588 | $ 528 |
| Subservicing and Other UPB ($B) | 404 | 409 |
| Ending UPB ($B) | $ 992 | $ 937 |
| Average UPB ($B) | $ 963 | $ 897 |
| 60+ day delinquency rate at period end | 1.9 % | 1.9 % |
| Annualized CPR | 4.0 % | 5.3 % |
| Modifications and workouts | 16,953 | 21,459 |

## Originations

The Originations segment creates servicing assets at attractive margins by acquiring loans through the correspondent channel and refinancing existing loans through the direct-to-consumer channel. Originations earned pretax income of $9 million and pretax operating income of $10 million.

The Company funded 10,699 loans in the fourth quarter, totaling approximately $2.7 billion UPB, which was comprised of $1.2 billion in direct-to-consumer and $1.5 billion in correspondent. Funded volume decreased 22% quarter-over-quarter, while pull through adjusted volume decreased 22% quarter-over-quarter to $2.6 billion.

Apx. 82

|  | Quarter Ended | |
|---|---|---|
| ($ in millions) | Q4'23 | Q3'23 |
| Income before taxes | $           9 | $          29 |
| Accounting items | 1 | — |
| Pretax operating income excluding accounting items and other | $          10 | $          29 |

|  | Quarter Ended | |
|---|---|---|
| ($ in millions) | Q4'23 | Q3'23 |
| Total pull through adjusted volume | $       2,592 | $        3,308 |
| Funded volume | $       2,661 | $        3,412 |
| Refinance recapture percentage | 76 % | 83 % |
| Recapture percentage | 22 % | 24 % |
| Purchase volume as a percentage of funded volume | 59 % | 54 % |

**Conference Call Webcast and Investor Presentation**

The Company will host a conference call on February 9, 2024 at 10:00 A.M. Eastern Time. Preregistration for the call is now available in the Investor section of www.mrcoopergroup.com. Participants will receive a toll-free dial-in number and a unique registrant ID to be used for immediate call access. A simultaneous audio webcast of the conference call will be available under the investors section on www.mrcoopergroup.com.

**Non-GAAP Financial Measures**

The Company utilizes non-GAAP financial measures as the measures provide additional information to assist investors in understanding and assessing the Company's and our business segments' ongoing performance and financial results, as well as assessing our prospects for future performance. The adjusted operating financial measures facilitate a meaningful analysis and allow more accurate comparisons of our ongoing business operations because they exclude items that may not be indicative of or are unrelated to the Company's and our business segments' core operating performance, and are better measures for assessing trends in our underlying businesses. These notable items are consistent with how management views our businesses. Management uses these non-GAAP financial measures in making financial, operational and planning decisions and evaluating the Company's and our business segment's ongoing performance. Pretax operating income (loss) in the servicing segment eliminates the effects of mark-to-market adjustments which primarily reflects unrealized gains or losses based on the changes in fair value measurements of MSRs and their related financing liabilities for which a fair value accounting election was made. These adjustments, which can be highly volatile and material due to changes in credit markets, are not necessarily reflective of the gains and losses that will ultimately be realized by the Company. Pretax operating income (loss) in each segment also eliminates, as applicable, transition and integration costs, gains (losses) on sales of fixed assets, certain settlement costs that are not considered normal operational matters, intangible amortization, change in equity method investments, fair value change in equity investments and other adjustments based on the facts and circumstances that would provide investors a supplemental means for evaluating

3

Apx. 83

the Company's core operating performance. Return on tangible common equity (ROTCE) is computed by dividing net income by average tangible common equity (also known as tangible book value). Tangible common equity equals total stockholders' equity less goodwill and intangible assets. Management believes that ROTCE is a useful financial measure because it measures the performance of a business consistently and enables investors and others to assess the Company's use of equity. Tangible book value is defined as stockholders' equity less goodwill and intangible assets. Our management believes tangible book value is useful to investors because it provides a more accurate measure of the realizable value of shareholder returns, excluding the impact of goodwill and intangible assets.

**<u>Forward Looking Statements</u>**

Any statements in this release that are not historical or current facts are forward looking statements. Forward looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance, or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. Results for any specified quarter are not necessarily indicative of the results that may be expected for the full year or any future period. Certain of these risks and uncertainties are described in the "Risk Factors" section of Mr. Cooper Group's most recent annual reports and other required documents as filed with the SEC which are available at the SEC's website at http://www.sec.gov. Mr. Cooper undertakes no obligation to publicly update or revise any forward-looking statement or any other financial information contained herein, and the statements made in this press release are current as of the date of this release only.

Investor Contact:

Kenneth Posner, SVP Strategic Planning and Investor Relations
(469) 426-3633
Shareholders@mrcooper.com

Media Contact:

Christen Reyenga, VP Corporate Communications
MediaRelations@mrcooper.com

Apx. 84

**Financial Tables**

<div align="center">

**MR. COOPER GROUP INC. AND SUBSIDIARIES**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(millions of dollars, except for earnings per share data)

</div>

|  | Three Months Ended December 31, 2023 | Three Months Ended September 30, 2023 |
|---|---|---|
| **Revenues:** | | |
| Service related, net | $ 345 | $ 432 |
| Net gain on mortgage loans held for sale | 59 | 142 |
| Total revenues | 404 | 574 |
| **Total expenses:** | 332 | 301 |
| **Other (expense) income, net:** | | |
| Interest income | 159 | 167 |
| Interest expense | (159) | (146) |
| Other (expense) income, net | (3) | 58 |
| Total other (expense) income, net | (3) | 79 |
| Income before income tax expense | 69 | 352 |
| Income tax expense | 23 | 77 |
| Net income | $ 46 | $ 275 |
|  | | |
| Earnings per share: | | |
| Basic | $ 0.71 | $ 4.14 |
| Diluted | $ 0.69 | $ 4.06 |
| Weighted average shares of common stock outstanding (in millions): | | |
| Basic | 65.1 | 66.4 |
| Diluted | 66.7 | 67.7 |

<div align="center">

5

</div>

**MR. COOPER GROUP INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(millions of dollars)

| | | | Unaudited | |
| --- | --- | ---: | --- | ---: |
| | | December 31, 2023 | | September 30, 2023 |
| **Assets** | | | | |
| Cash and cash equivalents | $ | 571 | $ | 553 |
| Restricted cash | | 169 | | 151 |
| Mortgage servicing rights at fair value | | 9,090 | | 8,504 |
| Advances and other receivables, net | | 996 | | 758 |
| Mortgage loans held for sale at fair value | | 927 | | 893 |
| Property and equipment, net | | 53 | | 59 |
| Deferred tax assets, net | | 472 | | 499 |
| Other assets | | 1,918 | | 2,010 |
| Total assets | $ | 14,196 | $ | 13,427 |
| | | | | |
| **Liabilities and Stockholders' Equity** | | | | |
| Unsecured senior notes, net | $ | 3,151 | $ | 3,147 |
| Advance and warehouse facilities, net | | 4,302 | | 3,545 |
| Payables and other liabilities | | 1,995 | | 1,964 |
| MSR related liabilities - nonrecourse at fair value | | 466 | | 467 |
| Total liabilities | | 9,914 | | 9,123 |
| Total stockholders' equity | | 4,282 | | 4,304 |
| Total liabilities and stockholders' equity | $ | 14,196 | $ | 13,427 |

6

Apx. 86

## UNAUDITED SEGMENT STATEMENT OF
## OPERATIONS & EARNINGS RECONCILIATION
(millions of dollars, except for earnings per share data)

| | Three Months Ended December 31, 2023 | | | |
| --- | --- | --- | --- | --- |
| | Servicing | Originations | Corporate/ Other | Consolidated |
| Service related, net | $ 307 | $ 16 | $ 22 | $ 345 |
| Net gain on mortgage loans held for sale | 9 | 51 | (1) | 59 |
| **Total revenues** | 316 | 67 | 21 | 404 |
| **Total expenses** | 180 | 59 | 93 | 332 |
| Other income (expense), net: | | | | |
| Interest income | 148 | 10 | 1 | 159 |
| Interest expense | (100) | (9) | (50) | (159) |
| Other income, net | — | — | (3) | (3) |
| Total other income (expense), net | 48 | 1 | (52) | (3) |
| **Pretax income (loss)** | $ 184 | $ 9 | $ (124) | $ 69 |
| Income tax expense | | | | 23 |
| Net income | | | | $ 46 |
| Earnings per share | | | | |
| Basic | | | | $ 0.71 |
| Diluted | | | | $ 0.69 |
| **Non-GAAP Reconciliation:** | | | | |
| **Pretax income (loss)** | $ 184 | $ 9 | $ (124) | $ 69 |
| Other mark-to-market | 41 | — | — | 41 |
| Accounting items / other | 2 | 1 | 36 | 39 |
| Intangible amortization | 2 | — | — | 2 |
| Pretax operating income (loss) | $ 229 | $ 10 | $ (88) | $ 151 |
| Income tax expense[1] | | | | (37) |
| Operating income | | | | $ 114 |
| Operating ROTCE[2] | | | | 11.1 % |
| Average tangible book value (TBV)[3] | | | | $ 4,123 |

[1]   Assumes tax-rate of 24.2%.

[2]   Computed by dividing annualized earnings by average TBV.

[3]   Average of beginning TBV of $4,133 and ending TBV of $4,113.

Apx. 87

**UNAUDITED SEGMENT STATEMENT OF**
**OPERATIONS & EARNINGS RECONCILIATION**
(millions of dollars, except for earnings per share data)

| | Three Months Ended September 30, 2023 | | | |
| --- | --- | --- | --- | --- |
| | Servicing | Originations | Corporate/ Other | Consolidated |
| Service related, net | $ 392 | $ 18 | $ 22 | $ 432 |
| Net gain on mortgage loans held for sale | 72 | 70 | — | 142 |
| **Total revenues** | 464 | 88 | 22 | 574 |
| **Total expenses** | 172 | 58 | 71 | 301 |
| Other income (expense), net: | | | | |
|   Interest income | 157 | 10 | — | 167 |
|   Interest expense | (88) | (11) | (47) | (146) |
|   Other expense, net | — | — | 58 | 58 |
| Total other income (expense), net | 69 | (1) | 11 | 79 |
| **Pretax income (loss)** | $ 361 | $ 29 | $ (38) | $ 352 |
| Income tax expense | | | | 77 |
| Net income | | | | $ 275 |
| Earnings per share | | | | |
|   Basic | | | | $ 4.14 |
|   Diluted | | | | $ 4.06 |
| **Non-GAAP Reconciliation:** | | | | |
| **Pretax income (loss)** | $ 361 | $ 29 | $ (38) | $ 352 |
| Other mark-to-market | (61) | — | — | (61) |
| Accounting items / other | — | — | (44) | (44) |
| Intangible amortization | 1 | — | 1 | 2 |
| Pretax operating income (loss) | $ 301 | $ 29 | $ (81) | $ 249 |
| Income tax expense | | | | (60) |
| Operating income[1] | | | | $ 189 |
| Operating ROTCE[2] | | | | 18.7 % |
| Average tangible book value (TBV)[3] | | | | $ 4,032 |

[1]   Assumes tax-rate of 24.2%.

[2]   Computed by dividing annualized earnings by average TBV.

[3]   Average of beginning TBV of $3,931 and ending TBV of $4,133.

Apx. 88

**UNAUDITED SEGMENT STATEMENT OF**
**OPERATIONS & EARNINGS RECONCILIATION**
(millions of dollars, except for earnings per share data)

| | Servicing | Originations | Corporate/Other | Consolidated |
|---|---|---|---|---|
| | Year Ended December 31, 2023 | | | |
| Service related, net | $ 1,295 | $ 61 | $ 84 | $ 1,440 |
| Net gain on mortgage loans held for sale | 84 | 271 | (1) | 354 |
| **Total revenues** | 1,379 | 332 | 83 | 1,794 |
| **Total expenses** | 664 | 232 | 276 | 1172 |
| Other income (expense), net: | | | | |
|   Interest income | 491 | 36 | 1 | 528 |
|   Interest expense | (324) | (37) | (176) | (537) |
|   Other expense, net | — | — | 41 | 41 |
| Total other income (expense), net | 167 | (1) | (134) | 32 |
| **Pretax income (loss)** | $ 882 | $ 99 | $ (327) | $ 654 |
| Income tax expense | | | | 154 |
| Net income | | | | $ 500 |
| Earnings per share | | | | |
|   Basic | | | | $ 7.46 |
|   Diluted | | | | $ 7.30 |
| **Non-GAAP Reconciliation:** | | | | |
| **Pretax income (loss)** | $ 882 | $ 99 | $ (327) | $ 654 |
| Other mark-to-market | (18) | — | — | (18) |
| Accounting items / other | 2 | 1 | 14 | 17 |
| Intangible amortization | 3 | — | 4 | 7 |
| Pretax operating income (loss) | $ 869 | $ 100 | $ (309) | $ 660 |
| Income tax expense | | | | (160) |
| Operating income[1] | | | | $ 500 |
| Operating ROTCE[2] | | | | 12.5 % |
| Average tangible book value (TBV)[3] | | | | $ 3,987 |

[1]   Assumes tax-rate of 24.2%.
[2]   Computed by dividing annualized earnings by average TBV.
[3]   Average of quarterly TBV averages of $3,895 for 1Q'23, $3,896 for 2Q'23, $4,032 for 3Q'23, and $4,123 for 4Q'23.

9

Apx. 89

**Non-GAAP Reconciliation:**

| ($ in millions except value per share data) | Quarter Ended | | | |
|---|---|---|---|---|
| | Q4'23 | | Q3'23 | |
| **Stockholders' equity (BV)** | $ | 4,282 | $ | 4,304 |
| Goodwill | | (141) | | (141) |
| Intangible assets | | (28) | | (30) |
| **Tangible book value (TBV)** | $ | 4,113 | $ | 4,133 |
| Ending shares of common stock outstanding (*in millions*) | | 64.6 | | 65.8 |
| | | | | |
| BV/share | $ | 66.29 | $ | 65.38 |
| TBV/share | $ | 63.67 | $ | 62.78 |
| | | | | |
| Net income | $ | 46 | $ | 275 |
| ROCE[1] | | 4.3 % | | 26.2 % |
| | | | | |
| Beginning stockholders' equity | $ | 4,304 | $ | 4,079 |
| Ending stockholders' equity | $ | 4,282 | $ | 4,304 |
| Average stockholders' equity (BV) | $ | 4,293 | $ | 4,192 |

[1]   Return on Common Equity (ROCE) is computed by dividing annualized earnings by average BV.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

---

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2023**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____
Commission file number: 001-35449

---



### Mr. Cooper Group Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **91-1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **8950 Cypress Waters Blvd, Coppell, TX** | **75019** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (469) 549-2000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $0.01 par value per share** | **COOP** | **The Nasdaq Stock Market** |

Securities registered pursuant to Section 12(g) of the Act: None

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12(b)-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large Accelerated Filer | ☒ | Accelerated Filer | | ☐ |
| Non-Accelerated Filer | ☐ | Smaller reporting company | | ☐ |
| | | Emerging growth company | | ☐ |

If an emerging growth company, indicate by check mark if registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of the error corrections are restatements that required recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐ No ☒

Number of shares of common stock, $0.01 par value, outstanding as of February 22, 2024 was 64,602,234.

As of June 30, 2023 (the last business day of the registrant's most recently completed second fiscal quarter), the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was $3,275,695,445 based on the closing sales price of $50.64 as reported on the Nasdaq Stock Market.

---

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of our definitive Proxy Statement, to be filed with the Securities and Exchange Commission pursuant to Regulation 14A within 120 days of the Company's fiscal year-end, are incorporated by reference into Part III, Items 10-14 of this Annual Report on Form 10-K.

MR. COOPER GROUP INC.
ANNUAL REPORT ON FORM 10-K
TABLE OF CONTENTS

**PART I** | **Page**

Item 1. | Business | 4
Item 1A. | Risk Factors | 9
Item 1B. | Unresolved Staff Comments | 31
Item 1C. | Cybersecurity | 31
Item 2. | Properties | 32
Item 3. | Legal Proceedings | 32
Item 4. | Mine Safety Disclosures | 32

**PART II**

Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 33
Item 6. | [RESERVED] | 34
Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35
Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 50
Item 8. | Financial Statements and Supplementary Data | 52
Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 113
Item 9A. | Controls and Procedures | 113
Item 9B. | Other Information | 115
Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 115

**PART III**

Item 10. | Directors, Executive Officers and Corporate Governance | 115
Item 11. | Executive Compensation | 115
Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 115
Item 13. | Certain Relationships and Related Transactions, and Director Independence | 115
Item 14. | Principal Accountant Fees and Services | 115
Item 15. | Exhibits and Financial Statement Schedules | 126
Item 16. | Form 10-K Summary | 127
Signatures | | 127

**PART I.**

**Item 1. Business**

*The disclosures set forth in this item are qualified by Item 1A. Risk Factors and the section within Item 1, captioned "Caution Regarding Forward-Looking Statements." Management's Discussion and Analysis of Financial Condition and Results of Operations of this report and other cautionary statements are set forth elsewhere in this report.*

**OVERVIEW**

Mr. Cooper Group Inc., including our consolidated subsidiaries (collectively, "Mr. Cooper," the "Company," "we," "us" or "our"), is the largest non-bank servicer of residential mortgage loans in the U.S. according to the latest publications from Inside Mortgage Finance as of the third quarter of 2023, and a major mortgage originator. We also provide Real Estate disposition services through our Xome subsidiary.

Our success depends on working with residential mortgage borrowers (our customers), government sponsored and private investors, and business partners, to help customers achieve home ownership and manage what is typically their largest and most important financial asset. Investors primarily include government sponsored enterprises ("GSE") such as the Federal National Mortgage Association ("Fannie Mae" or "FNMA") and the Federal Home Loan Mortgage Corp ("Freddie Mac" or "FHLMC"), investors in private-label securitizations, the Government National Mortgage Association ("Ginnie Mae" or "GNMA"), as well as organizations owning mortgage servicing rights ("MSR"), which engage us to subservice. We are regulated both at the Federal and individual state levels.

We have provided a glossary of terms, which defines certain industry-specific and other terms that are used herein, in Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"),* of this Form 10-K.

In 2023, we continued to grow our servicing portfolio with the acquisition of Home Point Capital Inc. ("Home Point") and expanded our special servicing product offering with the acquisition of Rushmore Loan Management Services, LLC ("Rushmore"). We also broadened our business offerings with the acquisition of investment advisor Roosevelt Management Company, LLC ("Roosevelt"). For further discussion regarding these transactions, refer to *Note 3, Acquisitions* in the Notes to Consolidated Financial Statements within Item 8.

**BUSINESS SEGMENTS**

We conduct our operations through two operating segments: Servicing and Originations.

See Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations,* and *Note 21, Segment Information* in the Notes to Consolidated Financial Statements within Item 8, for additional financial information about these segments.

**Servicing**

As of December 31, 2023, we served 4.6 million customers with an aggregate unpaid principal balance ("UPB") of $992 billion, consisting of $588 billion in owned servicing and $404 billion in subservicing and other. During 2023, we acquired $340 billion UPB of loans, with $97 billion of UPB related to subservicing.

We service loans on behalf of investors or owners of the underlying mortgages. Servicing consists of collecting loan payments, remitting principal and interest payments to investors, managing escrow funds for the payment of mortgage-related expenses, such as taxes and insurance, performing loss mitigation activities on behalf of investors and otherwise administering our mortgage loan servicing portfolio.

*Servicing*

Where we own the right to service loans, we recognize MSR assets in our consolidated financial statements and have elected to mark this portfolio to fair value each quarter. We primarily generate recurring revenue through contractual servicing fees, which include late payment, modification, and other ancillary fees and interest income on custodial deposits. As the MSR owner, we are obligated to make servicing advances to fund scheduled principal, interest, tax and insurance payments when the mortgage loan borrower has failed to make the scheduled payments and to cover foreclosure costs and various other items that are required to preserve the assets being serviced. As the MSR owner, we generally have the right to solicit our customers for refinance opportunities, which are processed through our direct-to-consumer channel in our Originations segment. Additionally, we may be able to modify or refinance loans pursuant to government programs and earn incentive fees or gain-on-sale revenues from redelivering modified loans to new securitizations.

---

Table of Contents

*Subservicing*

We service loans on behalf of clients who own the underlying servicing rights. Since we do not own the right to service the loan, we do not recognize an MSR asset in our consolidated financial statements. We primarily generate revenue based upon a stated fee per loan per month that varies based on the loan's delinquency status. As a subservicer, we may be obligated to make servicing advances; however, advances are generally limited, with recoveries typically following within 30 days. Additionally, our exposure to foreclosure-related costs and losses is generally limited in our subservicing relationships as those risks are retained by the owner of the MSR. Capital requirements for subservicing arrangements are substantially lower than for owned MSRs. We also offer high-touch, special servicing through our brand Rushmore Servicing in connection with the acquisition of Rushmore Loan Management Services, LLC. The acquisition of the Rushmore Servicing special servicing business brings us additional capacity and positions us for revenue growth opportunities across a wide range of adverse environments.

As of December 31, 2023, our subservicing portfolio had a total UPB of $404 billion, which accounted for 41% of the total servicing portfolio. We believe the subservicing operations allow us to leverage the scale of our technology and labor capital to provide cost effective servicing to customers while limiting the use of cash resources, thereby producing a higher return on equity.

*Focus on the Customer*

We are focused on providing quality service to our customers and building strong, lasting relationships. We have developed a culture of customer advocacy and celebrate and reward our team members for providing excellent service that helps our customers achieve their goal of homeownership and manage what is for many of them their largest financial asset. Additionally, we have invested significantly in technology solutions to improve the customer experience.

For each loan we service or subservice, we utilize a customer-centric model designed to increase borrower performance and to decrease borrower delinquencies. Keys to this model include frequent borrower interactions and utilization of multiple loss mitigation strategies, particularly in the early stages of default. We train our customer service representatives to find solutions that work for homeowners when circumstances allow. We believe this commitment to continued home ownership helps preserve neighborhoods and home values and improves asset performance for our investors.

**Originations**

Our Originations segment originates residential mortgage loans, providing both purchase and refinance opportunities to our existing servicing customers through our direct-to-consumer channel and purchases loans from other originators through our correspondent channel. According to the latest publication by Inside Mortgage Finance, as of the third quarter of 2023, we were the 26th largest overall mortgage loan originator in the United States. During the year ended December 31, 2023, we funded $12.6 billion mortgage loans. We generate revenue through gains related to the selling of mortgage loans sourced through our direct-to-consumer and correspondent channels and fees associated with originating loans. We originate and purchase conventional mortgage loans conforming to the underwriting standards of the GSEs. We also originate and purchase government-insured mortgage loans, which are insured by the Federal Housing Administration ("FHA"), Department of Veterans Affairs ("VA") and U.S. Department of Agriculture ("USDA"). Additionally, we offer non-agency "Jumbo" purchase loans and closed-end second lien refinance loans in our direct-to-consumer channel, originating to the standards of our investors.

We utilize warehouse facilities to fund originated loans. When we sell originated mortgage loans to secondary market investors, we generally retain the servicing rights on mortgage loans sold. The mortgage loans are typically sold within 30 days of origination in order to both mitigate credit risk and minimize the capital required. The majority of our mortgage loans were sold to, or were sold pursuant to, programs sponsored by Fannie Mae, Freddie Mac or Ginnie Mae.

*Direct-to-Consumer Channel*

We originate loans directly with borrowers through our direct-to-consumer channel. This channel utilizes our call centers, website and mobile apps, specially-trained teams of licensed mortgage originators, predictive analytics and modeling utilizing proprietary data from our servicing portfolio to reach those of our existing 4.6 million servicing customers who may benefit from a new mortgage. Depending on borrower eligibility, we will refinance existing loans into conventional, government or non-agency products. Through loan campaigns and direct marketing, the direct-to-consumer channel seeks to convert leads into loans in a cost-efficient manner. We earn gain-on-sale revenues from securitizing newly-originated loans.

Our direct-to-consumer channel represented 47% and 63% of our mortgage originations for the years ended December 31, 2023 and 2022, respectively, based on funded volume. Pull through adjusted lock volume for this channel was $5.7 billion and $14.8 billion in 2023 and 2022, respectively.

---

Table of Contents

*Correspondent Channel*

We purchase closed mortgage loans from community banks, credit unions, mortgage brokers and independent mortgage bankers. We primarily generate revenue from the receipt of underwriting fees from correspondents earned on a per loan basis, as well as the gain on sale of loans sold into the secondary market. The correspondent channel serves as a cost-effective means of acquiring new customer relationships for our servicing portfolio.

Our correspondent channel represented 53% and 37% of our mortgage originations for the years ended December 31, 2023 and 2022, respectively, based on funded volume. Pull through adjusted lock volume for this channel was $7.1 billion and $10.1 billion in 2023 and 2022, respectively.

**Competition**

Our Servicing segment primarily competes against large financial institutions and non-bank servicers. The subservicing market in which we operate is also highly competitive and we face competition related to subservicing pricing and service delivery. Our competitive position is also dependent on our ability to provide excellent customer service, manage delinquent loans and mitigate investor losses, demonstrate compliance with local, state, federal and investor regulations, and improve technology and processes while controlling our costs.

Our Originations segment competes based on product offerings, rates, fees and customer service. Many of our competitors consist of large banks or other financial institutions with greater financial resources, more diverse funding sources with lower funding costs, and less reliant on the sale of mortgage loans into the secondary markets to maintain their liquidity. Additionally, newer competitors are reinventing aspects of the mortgage loan industry and capturing profit pools historically collected by existing market participants.

Our primary competitive strength flows from our ability to market our products to our servicing portfolio customers. We believe our origination capabilities provide a significant advantage compared to other servicers and subservicers. Our Originations segment is highly dependent on our customer relationships. Many smaller and mid-sized financial institutions may find it difficult to compete in the mortgage industry due to the significant market share of the largest competitors, along with the continual need to invest in technology in order to reduce operating costs while maintaining compliance with underwriting standards and regulatory requirements. Our ability to win new clients and maintain existing customers is largely driven by the level of customer service we provide and our ability to comply and adapt to an increasingly complex regulatory environment.

**Government Regulation**

The residential mortgage industry is highly regulated. We are required to comply with a wide array of federal, state and local laws and regulations that regulate, among other things, the manner in which we conduct our servicing, originations and ancillary business and the fees we may charge. These regulations directly impact our business and require constant compliance.

**Cyclicality and Seasonality**

The U.S. residential real estate industry is seasonal, cyclical and affected by changes in general economic conditions. Industry demand is affected by consumer demand for home loans and the market for buying, selling, financing and/or refinancing residential real estate, which in turn, is affected by the national and global economy, regional trends, property valuations, interest rates, and socio-economic trends by state and federal populations that may accelerate or slow certain real estate trends.

**Human Capital Resources**

Over the last few years, we have cultivated a people-first culture, utilizing team member feedback to drive new initiatives. Mr. Cooper had approximately 6,800 employees as of December 31, 2023 across the U.S. and India.

As a company, Mr. Cooper is grounded in a set of intangible values - being challengers of convention, champions for our customers and cheerleaders for our team. Our most recent engagement survey, which led to our fifth Great Place to Work® certification and inclusion on the 2023 Great Place to Work® and Fortune Best in Financial Services and Best Workplaces in Texas lists, shows how these intentional efforts are making a difference, with 88% of survey participants having said that Mr. Cooper is a great place to work.

These efforts are governed by the Company's policy, which outlines Mr. Cooper Group's dedication to supporting human rights through a robust diversity, equity, and inclusion (DE&I) Team Member programs and competitive compensation.

Table of Contents

**Diversity and Inclusion Initiatives:** Our success as a business is directly tied to our ongoing efforts to attract and retain diverse talent, promote fairness and equity, and maintain an inclusive and progressive environment where each team member can thrive. We established our internal Office of Diversity, Equity, and Inclusion to serve as a driver and a resource for our team members and the community. The Office of Diversity, Equity, and Inclusion has spearheaded numerous programs and oversees 11 Employee Resource Teams as of December 31, 2023. The Office of DE&I facilitated events honoring Heritage Months, while our Employee Resource Teams sponsored events, comprised of speaking engagements, career development workshops, and community service. With our expanded educational offerings, in 2023, our team members across numerous topics across a variety of DE&I topics.

In addition to creating an inclusive environment for our team members, we understand the importance of supporting the communities where we live and work. In 2023, we continued our efforts in the community by providing housing education and outreach, resulting in $360 million in homeownership funding secured to support homeowners in need. As part of our community support, in 2023, we also created a supplier diversity program, including launching a supplier diversity web portal to ensure we maintain a robust and diverse vendor pipeline as part of our procurement efforts. We recognize supplier diversity as a business strategy that strengthens the local, national and broader global community while generating economic opportunity for disadvantaged communities. We appreciate the strategic benefits and value derived from robust supplier diversity initiatives and commit to their continuous improvement.

**Talent Management:** We invest in attracting, developing and retaining the best talent, and we know that focusing on a holistic experience will continue to be key in our journey from better to best. We operate an overarching Talent Management function, which combines our Training, Leadership Development and Talent Acquisition teams into one group. Over the past year, we offered our employees training across a broad range of categories, including leadership, inclusion, professional skills, and performance management.

**Performance Management and Compensation:** We abide by a pay for performance philosophy that links rewards to a team member's performance. Rewards are differentiated, which results in top performers receiving higher rewards, showing team members they are being compensated based on their individual contributions. To ensure our compensation practices are fair and market competitive, we evaluate our pay ranges every year using data from several industry surveys.

**Additional Information**

To learn more about Mr. Cooper Group Inc., please visit our website at www.mrcoopergroup.com. From time to time, we use our website as a channel of distribution of material Company information. We make our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 ("Exchange Act") available free of charge under the Investors section of our website as soon as reasonably practicable after we electronically file the reports with, or furnish them to, the Securities and Exchange Commission ("SEC"). Our reports, proxy and information statements and other information filed electronically with the SEC can also be accessed at www.sec.gov.

Our website also provides access to reports filed by our directors, executive officers and certain significant stockholders pursuant to Section 16 of the Exchange Act. In addition, our Corporate Governance Guidelines, Code of Business Conduct and Ethics, Code of Ethics, and charters for the standing committees of our Board of Directors are available on our website. Any information on our website is not incorporated by reference into this Annual Report on Form 10-K.

7 Mr. Cooper Group Inc. - 2023 Annual Report on Form 10-K

**CAUTIONS REGARDING FORWARD-LOOKING STATEMENTS**

This report contains forward-looking statements within the meaning of the U.S. federal securities laws. These forward-looking statements include, without limitation, statements concerning plans, objectives, goals, projections, strategies, core initiatives, future events or performance, and underlying assumptions and other statements, which are not statements of historical or current facts. When used in this discussion, the words "anticipate," "appears," "believe," "foresee," "intend," "should," "expect," "estimate," "project," "plan," "may," "could," "will," "are likely" and similar expressions are intended to identify forward-looking statements. These statements involve predictions of our future financial condition, performance, plans and strategies, and are thus dependent on a number of factors including, without limitation, assumptions and data that may be imprecise or incorrect. Specific factors that may impact performance or other predictions of future actions have, in many but not all cases, been identified in connection with specific forward-looking statements. As with any projection or forecast, forward-looking statements are inherently susceptible to uncertainty and changes in circumstances, and we are under no obligation to, and expressly disclaim any obligation to, update or alter our forward-looking statements, whether as a result of new information, future events or otherwise.

A number of important factors exist that could cause future results to differ materially from historical performance and these forward-looking statements. Factors that might cause such a difference include, but are not limited to:

- macroeconomic and U.S. residential real estate market conditions;
- changes in prevailing interest rates and or changes in home prices;
- our ability to maintain or grow the size of our servicing portfolio;
- our ability to maintain or grow our originations volume and profitability;
- our ability to recapture voluntary prepayments related to our existing servicing portfolio;
- our shift in the mix of our servicing portfolio to subservicing, which is highly concentrated;
- our ability to prevent cyber intrusions and mitigate cyber risks;
- delays in our ability to collect or be reimbursed for servicing advances;
- our ability to obtain sufficient liquidity and capital to operate our business;
- disruptions in the secondary home loans market;
- our ability to successfully implement our strategic initiatives and hedging strategies;
- our ability to realize anticipated benefits of our previous acquisitions;
- our ability to use our net operating loss, other tax carry forwards and certain built-in losses or deductions;
- changes in our business relationships or changes in servicing guidelines with Fannie Mae, Freddie Mac and Ginnie Mae;
- third-party credit, servicer and correspondent risks;
- our ability to pay down debt;
- our ability to manage legal and regulatory examinations and enforcement investigations and proceedings, compliance requirements and related costs;
- issues related to the development and use of artificial intelligence;
- health pandemics, hurricanes, earthquakes, fires, floods and other natural catastrophic events; and
- our ability to maintain our licenses and other regulatory approvals.

All of these factors are difficult to predict, contain uncertainties that may materially affect actual results and may be beyond our control. New factors emerge from time to time, and it is not possible for our management to predict all such factors or to assess the effect of each such factor on our business. Although we believe that the assumptions underlying the forward-looking statements contained herein are reasonable, any of the assumptions could be inaccurate, and any of these statements included herein may prove to be inaccurate. Given the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by us or any other person that the results or conditions described in such statements or our objectives and plans will be achieved. Please refer to Item 1A, *Risk Factors,* and Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations,* sections of this report for further information on these and other factors affecting our business.

Mr. Cooper Group Inc. - 2023 Annual Report on Form 10-K 8

Table of Contents

**Item 1A.** *Risk Factors*

You should carefully consider the following risk factors together with all of the other information included in this report, including the financial statements and related notes, when deciding to invest in us. The risks and uncertainties described below could materially adversely affect our business, financial condition and results of operations in future periods and are not the only risks facing our Company. Additional risks not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition and results of operations in future periods.

**Risk Factor Summary**

**Market, Financial Reporting, Credit and Liquidity Risks**

- Our revenues in Originations and Servicing are highly dependent on macroeconomic and U.S. residential real estate market conditions.
- Our earnings may decrease because of changes in prevailing interest rates and or declines in home prices.
- We may be unable to obtain sufficient capital to operate our business, and our substantial indebtedness may limit our financial and operating activities and our ability to incur additional debt to fund operations.
- A disruption in the secondary home loan market, including the MBS market, could have a detrimental effect on our business.
- If our estimates or assumptions in our financial models of loans prove to be incorrect, it may affect our earnings.
- We may not realize all of the anticipated benefits of previous or potential acquisitions and dispositions.
- Our hedging strategies may not be successful in mitigating our risks associated with interest rates.
- We have third-party credit, servicer and correspondent risks.
- Changes in tax legislation and challenges from tax authorities may have an adverse impact on our financial condition.
- We may not be able to fully utilize our net operating loss ("NOL"), other tax carry forwards and certain built-in losses or deductions.

**Business & Operational Risks**

Servicing
- A significant increase in delinquencies for the loans that we own and service could have a material impact on our revenues, expenses and liquidity and on the valuation of our MSRs.
- We may not maintain or grow our business if we don't acquire MSRs or enter into favorable subservicing agreements.
- We service higher risk loans which are more expensive to service than conventional mortgage loans.
- We are required to make servicing advances that can be subject to delays in recovery or may not be recoverable.
- Our counterparties may terminate our servicing rights and subservicing contracts.
- We could have a downgrade in our servicer ratings.

Originations
- We may not be able to maintain the volumes in our loan originations business.
- We may be required to indemnify or repurchase loans we sold, or will sell, if these loans fail to meet certain criteria.
- We are highly dependent upon loan programs administered by the Agencies to generate revenues.

Corporate/Other
- Our Real Estate exchange business could be further impacted by delays in foreclosure sales, as well as economic slowdowns and recessions.

9 Mr. Cooper Group Inc. - 2023 Annual Report on Form 10-K

**General Business & Operational Risks**

- We may not be successful in implementing certain strategic initiatives.
- Technology failures or cyber-attacks against us or our vendors could damage our business operations, and new laws and regulations could increase our costs.
- Our capital investments in technology may not achieve anticipated returns.
- We and our vendors have operations in India that could be adversely affected by changes in political or economic stability or by government policies.
- Our vendor relationships subject us to a variety of risks.
- Our risk management policies and procedures may not be effective.
- We could have, appear to have or be alleged to have conflicts of interest with Xome.
- Our business could suffer if we fail to attract, or retain, highly skilled employees and changes in our executive management team may be disruptive to our business.
- Negative public opinion could damage our reputation and adversely affect our business.
- Issues related to the development and use of artificial intelligence could give rise to legal and/or regulatory action, damage our reputation or otherwise materially harm our business.
- We may have lapses in disclosure controls and procedures or internal control over financial reporting.
- Our business is subject to the risks of natural catastrophic events and health pandemics.

**Regulatory, Compliance and Legal Risks**

- We operate within a highly regulated industry on federal, state and local levels.
- We are subject to numerous legal proceedings, federal, state or local governmental examinations and enforcement investigations.
- We are subject to state licensing and operational requirements that result in substantial compliance costs.
- Our business would be adversely affected if we lose our licenses.
- We may incur increased litigation costs and related losses if a court overturns a foreclosure or if a loan we are servicing becomes subordinate to a Home Owners Association lien.
- Delays in residential mortgage foreclosure proceedings could have a negative effect on our ability to liquidate loans timely and slow the recovery of advances and thus impact our earnings or liquidity.

**Risks Related to Owning our Stock**

- Our common stock is subject to transfer restrictions.
- Anti-takeover provisions in our charter and under Delaware law could limit certain stockholder actions.
- The market price of our common stock may decrease, resulting in a loss for investors.

Mr. Cooper Group Inc. - 2023 Annual Report on Form 10-K 10

Table of Contents

**Risk Factors**

Market, Financial Reporting, Credit and Liquidity Risks

*Our revenues in Originations and Servicing are highly dependent on macroeconomic and U.S. residential real estate market conditions.*

Our success depends largely on the health of the U.S. residential real estate industry, which is seasonal, cyclical and affected by changes in general economic conditions beyond our control. Economic factors such as increased interest rates, inflation, slow economic growth or recessionary conditions, the pace of home price appreciation or the lack of it, changes in household debt levels, and increased unemployment or stagnant or declining wages affect our customers' income and thus their ability and willingness to make loan payments. Although inflation has slowed during 2023, it remains above the Federal Reserve's 2% target, and it is expected that interest rates will remain elevated for some time. Additionally, global events affect all such macroeconomic conditions. Instability in the global credit markets, the impact of uncertainty regarding global central bank monetary policy, the instability in the geopolitical environment in many parts of the world (including as a result of the ongoing Ukraine-Russia conflict, China-Taiwan relations, and the recent eruption of hostilities in Israel and Gaza), global economic ramifications of the current economic challenges in China, and other disruptions may continue to put pressure on global economic conditions. Weak, or a significant deterioration in economic conditions, reduces the amount of disposable income consumers have, which in turn reduces consumer spending and the willingness of qualified potential customers to take out loans. As a result, such economic factors affect loan origination volume. Additional macroeconomic factors including, but not limited to, rising government debt levels, the withdrawal or augmentation of government interventions into the financial markets, changing U.S. consumer spending patterns, changing expectations for inflation and deflation, and actual and credit markets may create low consumer confidence in the U.S. economy or the U.S. residential real estate industry. Excessive home building or high foreclosure rates resulting in an oversupply of housing in a particular area may also increase the amount of losses incurred on defaulted mortgage loans. Any or all of the circumstances described above may lead to further volatility in or disruption of the credit markets at any time and adversely affect our financial condition.

Any uncertainty or deterioration in market conditions that leads to a decrease in loan originations will result in lower revenue on loans sold into the secondary market. Lower loan origination volumes generally place downward pressure on margins, thus compounding the effect of the deteriorating market conditions. Companies focusing on mortgage originations may experience severe financial distress and this may result in numerous companies exiting the mortgage business or filing bankruptcy. This could cause a contagion effect resulting in the banks which provide us financing lines to reduce the lines or increase financing costs. Such events could be detrimental to our business. Moreover, any deterioration in market conditions that leads to an increase in loan delinquencies will result in lower revenue for loans we service for the GSEs and Ginnie Mae as servicing fees are collected only for current performing loans. While increased delinquencies generate higher ancillary revenues, including late fees, these fees are sometimes unrecoverable if the related loan is liquidated. Increased delinquencies may also increase the cost of servicing the loans for all market participants. The decreased cash flow from lower servicing fees or higher cost to service could decrease the estimated value of our MSRs, resulting in recognition of losses when we write down those values. In addition, an increase in delinquencies lowers the interest income we receive on cash held in collection and increases our obligation to advance certain principal, interest, tax and insurance obligations owed by the delinquent mortgage loan borrower. An increase in delinquencies could therefore be detrimental to our business.

*Our earnings may decrease because of changes in prevailing interest rates or declines in home prices.*

Our profitability is directly impacted by changes in prevailing interest rates. Interest rates have risen further and faster than any time in modern history. The following are certain material risks we face related to changes in interest rates:

Servicing:

• a decrease in interest rates may increase prepayment speeds which lead to (i) increased amortization expense; (ii) decreased servicing fees; and (iii) decreased fair value of our MSRs;

• an increase in interest rates, together with an increase in monthly payments when an adjustable mortgage loan's interest rate adjusts upward from an initial fixed rate or a low introductory rate, may cause increased delinquency, default and foreclosure. Increased mortgage defaults and foreclosures may adversely affect our business as they increase our expenses and reduce the number of mortgages service fees that are collected. Additionally, payment savings on modifications are directly tied to market interest rates, and increasing interest rates may reduce the number of customers eligible to receive modifications or increase the likelihood of re-default for those who receive a modification. Loan modifications for government insured mortgages are more difficult in a high-rate environment, which may result in higher delinquency levels for loans in Ginnie Mae securities. An increase in interest rates also slows drawdown unhedged early buyout ("EBO") revenues;

Originations:

• an increase in interest rates could adversely affect our loan origination volume because refinancing an existing loan would be less attractive for homeowners and qualifying for a purchase money loan may be more difficult for consumers;

• an increase in interest rates could also adversely affect our production margins due to increased competition among originators;

Other:

• an increase in interest rates could adversely affect Xome's Real Estate exchange property sales, particularly non-distressed sales, as financing may become less attractive to borrowers;

• an increase in interest rates could increase the cost of servicing our outstanding debt, including our ability to finance servicing advances and loan originations and for borrowing for acquisitions; and

• a decrease in interest rates could reduce our earnings from our custodial deposit accounts.

Home prices in many areas of the country have risen dramatically. Home values may deflate significantly, especially in those areas with the highest rates of increase. Falling home prices may result in higher defaults, greater loss severity, increased foreclosures and losses to investors and others. A decrease in housing values may greatly affect mortgage loan originations for years, with dramatic decreases in volume due in part from borrowers' inability to sell or refinance their properties as a result of the lower values. In addition, as investors take losses and liquidity in capital markets evaporates, investors and originators may tighten underwriting criteria and availability of loan production. These events could decrease our revenue from loan originations or loan purchases, and increase our expenses for the repurchases, the resources needed to validate claims, and servicing costs to manage higher defaults and foreclosures.

Any of the foregoing could adversely affect our business, financial condition and results of operations.

*A disruption in the secondary home loan market, including the MBS market, could have a detrimental effect on our business.*

Demand in the secondary market and our ability to complete the sale or securitization of our mortgage loans depends on a number of factors, many of which are beyond our control. This includes general economic conditions, general conditions in the banking system, the willingness of lenders to provide funding for mortgage loans, the willingness of investors to purchase mortgage loans and MBS, and changes in regulatory requirements. In September 2022, the U.S. Federal Reserve withdrew from the mortgage securities market and ceased purchasing MBS. Additionally, the yield on U.S. Treasury bonds, often referred to as one of the primary market indicator rates, remains high and the spread between mortgage rates and 10-year Treasury yield continues to remain at 2008 financial crisis levels. Customers have little to no rate incentive to refinance and there is minimal demand from buyers of MBS. Any continued significant disruption or period of illiquidity in the general MBS market could directly affect our liquidity because no existing alternative secondary market would likely be able to accommodate on a timely basis the volume of loans that we typically sell in any given period. Accordingly, if the MBS market experiences a period of illiquidity, we may be prevented from selling the loans that we produce into the secondary market in a timely manner or at favorable prices, which could be detrimental to our business.

*We may be unable to obtain sufficient capital to operate our business.*

Our financing strategy includes the use of significant leverage because, to make servicing advances and fund originations, we require liquidity in excess of the capital generated by our operations. Accordingly, our ability to finance our operations depends on our ability to secure financing on acceptable terms and to renew and/or replace existing financings as they expire. These financings may not be available on acceptable terms or at all. If we are unable to obtain these financings, we may need to raise the funds we require in the capital markets or through other means, any of which may increase our cost of funds.

We are generally required to renew a significant portion of our debt financing arrangements each year, which exposes us to refinancing and interest rate risks. Our ability to refinance existing debt and borrow additional funds is affected by a variety of factors including:

• the available liquidity in the credit markets;

• prevailing interest rates;

• an event of default, a negative ratings action by a rating agency and limitations imposed on us under the indentures governing our current debt that contain restrictive covenants and borrowing conditions that may limit our ability to raise additional debt;

• the strength of the lenders from which we borrow; and

• limitations on borrowings or advance facilities imposed by the amount of eligible collateral pledged, which may be less than the borrowing capacity of the advance facility.

Additionally, the Basel III "endgame" regulations released in response to recent regional bank failures are expected to discourage banks from investing in MSRs and other mortgage assets, which may make it more difficult to secure or to obtain acceptable terms for our various debt facilities.

If we are unable to obtain sufficient capital on acceptable terms for any of the foregoing reasons, this could adversely affect our business, financial condition and results of operations.

*Our substantial indebtedness may limit our financial and operating activities and our ability to incur additional debt to fund future needs.*

As of December 31, 2023, the aggregate principal amount of our unsecured senior notes was $3,200 million. Although we and our subsidiaries have substantial indebtedness, we believe we have the ability to incur additional indebtedness in the future, subject to the limitations contained in the agreements governing our indebtedness. These agreements generally restrict us and our restricted subsidiaries from incurring additional indebtedness; however, these restrictions are subject to important exceptions and qualifications. If we incur additional debt, the related risks could be magnified and could limit our financial and operating activities.

Our current and any future indebtedness could:

• require us to dedicate a substantial portion of cash flow from operations to the payment of principal and interest on our current indebtedness and any indebtedness we may incur in the future, thereby reducing the funds available for other purposes;

• make it more difficult for us to satisfy and comply with our obligations with respect to the unsecured senior notes;

• subject us to increased sensitivity to increases in prevailing interest rates;

• place us at a competitive disadvantage to competitors with relatively less debt in economic downturns, adverse industry conditions or catastrophic external events; or

• reduce our flexibility in planning for or responding to changing business, industry and economic conditions.

In addition, our substantial level of indebtedness could limit our ability to obtain financing or additional financing on acceptable terms to fund future working capital, capital expenditures, debt service requirements and/or general corporate and other purposes, which could have a material adverse effect on our business and financial condition. Our liquidity needs could vary significantly and may be affected by general economic conditions, industry trends, performance and many other factors outside of our control. Our substantial obligations could have other important consequences. For example, our failure to comply with the restrictive covenants in the agreements governing our indebtedness, which limit our ability to incur liens, to incur debt and to sell assets, could result in an event of default that, if not cured or waived, could harm our business or prospects and could result in our bankruptcy.

We use financial models that rely heavily on estimates in determining the fair value of certain assets and liabilities, such as MSRs and MSR financing liabilities, and if our estimates or assumptions prove to be incorrect, it may affect our earnings.

We use internal financial models that utilize, wherever possible, market participant data to value certain of our assets, including our MSRs and MSR financing liabilities and for purposes of financial reporting. These models are complex and use asset-specific collateral data and market inputs for interest and discount rates. In addition, the modeling requirements of MSRs are complex because of the high number of variables that drive cash flows associated with MSRs. Even if the general accuracy of our valuation models is validated, valuations are highly dependent upon the reasonableness of our assumptions and the predictability of the relationships that drive the results of the models. In determining value for MSRs, we make certain assumptions, many of which are beyond our control, including, among other things:

• the rates of prepayment and repayment within the underlying pools of mortgage loans and our ability to recapture mortgage prepayments through the origination platform;

• projected rates of delinquencies, defaults and liquidations;

• future interest rates;

• cost to service the loans;

• ancillary revenues; and

• amounts of future servicing advances.

If these assumptions or relationships prove to be inaccurate, if market conditions change or if errors are found in our models, the value of certain assets and liabilities could materially vary, which could impact our ability to satisfy minimum net worth covenants and borrowing conditions in our debt agreements and adversely affect our business, financial condition and results of operations.

We may not realize all of the anticipated benefits of previous or potential acquisitions and dispositions.

Our ability to realize the anticipated benefits of previous or potential acquisitions, including the acquisition of assets, will depend, in part, on our ability to scale-up to appropriately service these assets and integrate the businesses of the acquired companies with our business.

The risks associated with acquisitions include, among others:

• unknown or contingent liabilities;

• unanticipated issues in integrating information, management style, controls and procedures, servicing practices, communications and other systems including information technology systems;

• the value of non-cash consideration received and its potential change in value;

• unanticipated incompatibility of purchasing, logistics, marketing and administration methods;

• not retaining key employees or clients; and

• inaccuracy of valuation and/or operating assumptions supporting our purchase price.

When we acquire a platform, we may elect to operate this platform in addition to our current platform for a period of time or indefinitely. Individually or collectively, these transactions could substantially increase the UPB, or alter the composition of our portfolio of mortgage loans that we service or have an otherwise significant impact on our business. Additionally, we may make potentially significant acquisitions which could expose us to greater risks than we currently experience in servicing our current portfolio and adversely affect our business, financial condition and results of operations.

11 Mr. Cooper Group Inc. · 2023 Annual Report on Form 10-K

13 Mr. Cooper Group Inc. · 2023 Annual Report on Form 10-K

Mr. Cooper Group Inc. · 2023 Annual Report on Form 10-K 12

Mr. Cooper Group Inc. · 2023 Annual Report on Form 10-K 14

The risks associated with disposition include, among other things:

- difficulty in finding buyers or alternative exit strategies on acceptable terms in a timely manner;
- destabilization of the applicable operations;
- loss of key personnel;
- ability to obtain necessary governmental or regulatory approvals;
- post-disposal disputes and indemnification obligations;
- access by purchasers to certain of our systems and tools during transition periods;
- the migration of data and separation of systems; and
- data privacy matters.

We can provide no assurances that we will enter into any such agreements or as to the timing of any potential strategic transactions. The strategic transaction process may disrupt our business including diverting management's attention from ongoing business concerns. We also may not realize all of the anticipated benefits of potential future strategic transactions, which could adversely affect our business, financial condition and results of operations.

*Our hedging strategies may not be successful in mitigating our risks associated with interest rates.*

We use various derivative financial instruments to provide a level of protection against interest rate risks related to our both our pipeline (LHFS and IRLCs spanning our Originations and Servicing segments) and our MSR portfolio (in our Servicing segment), but no hedging strategy can protect us completely. The nature and timing of hedging transactions influence the effectiveness of these strategies. Poorly designed strategies, improperly executed and documented transactions or inaccurate assumptions could increase our risks and losses. In addition, hedging strategies involve transaction and other costs. Our hedging strategies and the derivatives that we use may not be able to adequately offset the risks of interest rate volatility, and our hedging transactions may result in or magnify losses. Furthermore, interest rate derivatives may not be available on favorable terms or at all, particularly during periods of heightened volatility or economic downturns. Any of the foregoing risks could adversely affect our business, financial condition and results of operations.

*We have third-party credit, servicer and correspondent risks which could have a material adverse effect on our business, liquidity, financial condition and results of operation.*

*Consumer Credit Risk:* We provide representations and warranties to purchasers and insurers of the loans that we sell that range between three years and the life of the loan. In the event of a breach of these representations and warranties, we may be required to repurchase a mortgage loan or indemnify the purchaser, and any subsequent loss on the mortgage loan may be borne by us. Our loss estimates are affected by factors both internal and external in nature, including, level of loan sales, as well as to whom the loans are sold, the expectation of credit loss on repurchases and indemnifications, our success rate at appealing repurchase demands, our ability to recover any losses from third parties, the overall economic condition in the housing market, the economic condition of borrowers, the political environment at investor agencies and the overall U.S. and world economies. Many of the factors are beyond our control and may lead to judgments that are susceptible to change. In adverse market conditions, loans may decrease in value due to an increase in delinquencies, borrower defaults and nonpayments. In addition, property values may experience losses at liquidation due to extensions in foreclosure and real estate owned ("REO") sales timelines, as well as home price depreciation.

*Counterparty Credit Risk:* We are exposed to counterparty credit risk in the event of non-performance by counterparties to various agreements. Although certain credit facilities and warehouse lines are committed, we may experience a disruption in operations due to a lender withholding funds of a borrowing request on the respective credit facility.

*Prior Servicer Risk:* We service mortgage loans under guidelines set forth by regulatory agencies and GSEs. Failure to meet stipulations of the servicing guidelines can result in assessment of fines and loss of reimbursement of loan related advances, expenses, interest and servicing fees. When the servicing of a portfolio is assumed either through purchase of servicing rights or through a subservicing arrangement, various loans in the acquired portfolio may have been previously serviced in a manner that will contribute towards our not meeting certain servicing guidelines. If not recovered from a prior servicer, such events frequently lead to the eventual realization of a loss to us. The recovery process against a prior servicer can be prolonged based upon the time required by us to meet minimum loss deductibles under the indemnification provisions in our agreements with the prior servicer and for the time requirements by the prior servicer to review underlying loss events and our request for indemnification. The amounts recovered from prior servicers may differ from our estimated recoveries recorded based on the prior servicer's interpretation of responsibility for loss, which could lead to our realization of additional losses.

*Correspondent Risk:* We purchase closed loans from correspondent lenders. The failure of these correspondent lenders to comply with any applicable laws, regulations and rules may subject us to monetary penalties or other losses. Although we have controls and procedures designed to assess areas of risk with respect to these acquired loans, including, without limitation, diligence regarding compliance with underwriting guidelines and applicable laws or regulations, we may not detect every violation of law by these correspondent lenders. In an economic downturn, a number of these correspondent lenders may not be financially viable, and any issues with respect to loans purchased from them and sold to Fannie Mae and Freddie Mac would transfer any manufacturing defect risk of origination to us. Additionally, we expect occupancy fraud and income fraud in the correspondent channel to increase. As housing prices and interest rates increase, loan terms become less favorable, and affordability becomes more challenging. As a result, borrowers may be more inclined to either inflate their income or misrepresent their occupancy intentions.

Any of the above could adversely affect our business, liquidity, financial condition and results of operations.

*Changes in tax legislation and challenges from tax authorities may have an adverse impact on our financial condition.*

U.S. federal and state tax authorities may periodically revise legislation that may result in changes to the interpretation of established tax concepts. Future revisions in tax legislation and interpretations thereof could adversely impact our provision for income taxes, cash flow and financial condition. In addition, challenges arising from taxing authorities, including the Internal Revenue Service (IRS) and state and local jurisdictions, on the interpretation of tax laws and regulations could result in adjustments to our effective tax rate, the amount of taxes due or otherwise have an adverse impact on our financial condition.

*We may not be able to fully utilize our NOLs, other tax carry forwards and certain built-in losses or deductions.*

As of December 31, 2023, we had U.S. federal NOLs of $354 million, of which $186 million were not subject to limitation under Section 382 of the United States Internal Revenue Code of 1986, as amended (the "Code"). Our ability to utilize NOLs, other tax carry forwards and certain built-in losses or deductions to reduce taxable income in future years could be limited for various reasons, including if projected future taxable income is insufficient to recognize the full benefit of such NOL carry forwards prior to their expiration. Although we have certain transfer restrictions in place under our Certificate of Incorporation, our Board could issue additional shares of stock or permit or effect future conversions, amendments or redemptions of our stock, which, depending on their magnitude, could result in ownership changes that would trigger the imposition of additional limitations on the utilization of our NOLs under Sections 382 and 383 of the Code. Similar provisions of state tax law may also apply. In an attempt to minimize the likelihood of an additional ownership change occurring, our Certificate of Incorporation contains transfer restrictions limiting the acquisition (and disposition) of our stock or any other ownership interest in stock for purposes of Section 382 by persons or group of persons treated as a single entity under Treasury Regulation Section 1.382-3 owning (actually or constructively), or who would own as a result of the transaction, 4.75% of the total value of our stock (including any other interests treated as stock for purposes of Section 382). Nevertheless, it is possible that we could undergo an ownership change, either by events within or outside of the control of our Board, e.g., indirect changes in the ownership of persons owning 5% of our stock. In the event of a subsequent ownership change, all or part of the NOLs or built-in losses that were not previously subject to limitations under Section 382 could also become subject to an annual limitation. Section 384 may also apply in the event of an ownership change resulting from an acquisition, which would limit the utilization of our NOLs to only certain income or gains generated from assets owned subsequent to the acquisition. In addition, at the state level, there may be periods during which the use of NOLs is suspended or otherwise limited, which could accelerate or permanently increase state taxes owed.

**Business & Operational Risks**

*Servicing*

*A significant increase in delinquencies for the loans that we own and service could have a material impact on our revenues, expenses and liquidity and the valuation of our MSRs.*

- *Revenue.* An increase in delinquencies will result in lower revenue for loans we service for GSEs and Ginnie Mae as servicing fees are collected only for current performing loans. Additionally, while increased delinquencies generate higher ancillary revenues, including late fees, these fees do not offset the higher cost to service a delinquent loan and are sometimes unrecoverable if the loan is liquidated. In addition, an increase in delinquencies reduces cash held in collections and other accounts and lowers the interest income we receive.

- *Expenses.* An increase in delinquencies will result in a higher cost to service due to the increased time and effort required to collect payments from delinquent borrowers and an increase in interest expense as a result of an increase in our advancing obligations.

- *Liquidity.* An increase in delinquencies could also negatively impact our liquidity because of an increase in servicing advances resulting in an increase in borrowings under advance facilities and/or insufficient financing capacity to fund increases in advances.

- *Valuation of MSRs.* We base the price we pay for MSRs on, among other things, our projections of the cash flows from the related pool of mortgage loans based on market participant assumptions. Expectation of delinquencies is a significant assumption underlying these cash flow projections. If delinquencies were significantly greater than expected, the estimated fair value of our MSRs could be diminished. If the estimated fair value of MSRs is reduced, we would record a loss which would adversely impact our ability to satisfy borrowing conditions in our debt agreements which could have a negative impact on our financial results.

An increase in delinquency rates could therefore adversely affect our business, financial condition and results of operations.

*We may not be able to maintain or grow our business if we do not acquire MSRs or enter into additional subservicing agreements on favorable terms.*

Our servicing portfolio is subject to "run off," meaning that mortgage loans serviced by us may be prepaid prior to maturity or repaid through standard amortization of principal. As a result, our ability to maintain the size of our servicing portfolio depends on our ability to acquire the right to service additional pools of residential mortgages, enter into additional subservicing agreements or to retain the servicing rights on newly originated mortgages. We have also shifted the mix of our servicing portfolio to a greater mix of subserviced loans. While we expect this strategy to have longer-term benefits, in the short-term, since subservicing revenues are earned on a fee per loan basis, this shift in our servicing portfolio to subservicing could reduce our revenue and earnings. In addition, we may not be able to maintain our pipeline of subservicing opportunities, and do not have control of whether a subservicing client sells off its portfolio or the volume and timing of such sales.

The Federal Housing Finance Agency ("FHFA") could enact more stringent requirements on the GSEs, or other federal or state agencies may enact additional requirements that are more stringent regarding the acquisition of MSRs. Additionally, if we do not comply with our seller/servicer obligations, the investors may not consent to approve future transfers of MSRs.

If we do not acquire MSRs or enter into additional subservicing agreements on terms favorable to us, our business, financial condition and results of operations could be adversely affected.

*Some of the loans we service are higher risk loans, which are more expensive to service than conventional mortgage loans and may lead to liquidity challenges.*

Some of the mortgage loans we service are higher risk loans, meaning that the loans are to less credit worthy borrowers, delinquent or for properties the value of which has decreased. These loans are more expensive to service because they require more frequent interaction with customers and greater monitoring and oversight. Additionally, in connection with the ongoing mortgage market reform and regulatory developments, servicers of higher risk loans are subject to increased scrutiny by state and federal regulators and will experience higher compliance and regulatory costs, which could result in a further increase in servicing costs. We may not be able to pass along any of the additional expenses we incur in servicing higher risk loans to our servicing clients. The greater cost of servicing higher risk loans, which may be further increased through regulatory reform, constant decrees or enforcement, could adversely affect our business, financial condition and results of operations. We have a portfolio of higher risk loans guaranteed by Ginnie Mae. In an adverse economic scenario or a pandemic similar to COVID-19, where defaults rise rapidly and unexpectedly, we may have funding challenges since Ginnie Mae does not allow the separate utilization of advances as a form of collateral, and we may not be able to secure financing for advances on acceptable terms or at all. If we are unable to obtain these financings, we may need to raise the funds we require in the capital markets or through other means, any of which may increase our cost of funds. Additionally, Ginnie Mae issued new guidelines on early buyouts of reperforming loans which could affect our liquidity.

As a result of the COVID pandemic, most investors have changed their loss mitigation program procedures and requirements. New program interpretation, implementation, and testing are time intensive and are subject to operational risk. While we have extensive validation in place to ensure timeliness and accuracy of these updated loss mitigation programs, the multitude of changes and differences in programs announced by each investor creates risk of error. The risk subjects us to loss indemnification requirements.

*We are required to make servicing advances that can be subject to delays in recovery or may not be recoverable in certain circumstances.*

During any period in which a borrower is not making payments, we are required under most of our servicing agreements to advance our own funds to meet contractual principal and interest remittance requirements for investors, pay property taxes and insurance premiums, legal expenses and other protective advances. We also advance funds to maintain, repair and market real estate properties on behalf of investors. As home values change, we may have to reconsider certain of the assumptions underlying our decisions to make advances, and in certain situations our contractual obligations may require us to make certain advances for which we may not be reimbursed. In addition, when a mortgage loan serviced by us defaults or becomes delinquent, the repayment to us of the advance may be delayed until the mortgage loan is repaid or refinanced or the liquidation occurs. Market disruptions where a temporary period of forbearance may be offered for customers unable to pay on certain mortgage loans may also increase the number of defaults, delinquencies or forbearances related to the loans we service, increasing the advances we make for such loans.

We have sold to a joint venture capitalized by certain entities formed and managed by Rithm Capital Corp. ("Rithm") and certain third-party investors the rights to mortgage servicing rights and servicer advances related to certain loan pools. In connection with these transactions, Rithm purchased the equity of wholly owned special purpose subsidiaries of Mr. Cooper Group that issued limited recourse funding to finance the advances. We continue to service these loans. In the event that Rithm receives requests for advances in excess of amounts that they or their co-investors are willing or able to fund, we are obligated to fund these advance requests. Since we have transferred the related advance facilities to Rithm, we may have to obtain other sources of financing which may not be available. Our inability to fund these advances could result in a termination event under the applicable servicing agreement, an event of default under the advance facilities and a breach of our purchase agreement with Rithm. Our inability to fund these advance requests could adversely affect our business, financial condition and results of operations.

*Our counterparties may terminate our servicing rights and subservicing contracts.*

The owners of the loans we service and the primary servicers of the loans we subservice may, under certain circumstances, terminate our MSRs or subservicing contracts, respectively.

*Agency Servicing:* We are party to seller/servicer agreements and/or subject to guidelines and regulations (collectively, seller/servicer obligations) with both of the GSEs, FHA and Ginnie Mae. As is standard in the industry, under the terms of these seller/servicer agreements, the agencies have the right to terminate us as servicer of the loans serviced on their behalf at any time and also have the right to cause us to sell the MSRs to a third party.

Apx. 96

We are subject to minimum financial eligibility requirements established by the Agencies. These minimum financial requirements, include net worth, capital ratio and/or liquidity criteria in order to set a minimum level of capital needed to adequately absorb potential losses and a minimum amount of liquidity needed to service Agency mortgage loans and MBS and cover the associated financial obligations and risks. To meet these minimum financial requirements, we are required to maintain cash and cash equivalents in amounts that could impede us from growing our business and place us at a competitive disadvantage in relation to federally chartered banks and certain other financial institutions. These seller/servicer obligations include financial covenants that include capital requirements related to tangible net worth. The FHFA and Ginnie Mae have updated their minimum financial eligibility requirements for GSE seller/servicers and Ginnie Mae issuers, the majority of which became effective on September 30, 2023. The updated minimum financial eligibility requirements modify the definitions of tangible net worth and eligible liquidity, modify their minimum standard measurement and include a new risk-based capital ratio, among other changes. On October 21, 2022, Ginnie Mae extended the compliance date for its risk-based capital requirements to December 31, 2024. Although we believe that we will be in compliance with these updated requirements, to the extent that these capital and liquidity requirements are not met, the applicable agency may suspend or terminate these agreements, which would prohibit us from further servicing these specific types of mortgage loans or being an approved servicer. If we are unable to meet these capital and liquidity requirements, this could adversely affect our business, financial condition and results of operations.

*Subservicing:* Our subservicing portfolio is highly concentrated with a small number of parties who may elect to transfer their subservicing relationship to other counterparties or may go out of business. As of December 31, 2023, 93% of our subservicing portfolio is with 6 counterparties. Under our subservicing contracts, the primary servicers for which we conduct subservicing activities have the right to terminate our subservicing contracts with or without cause, with limited notice and with no termination fee upon a change of control. Entering into additional subservicing contracts will expose us to similar risks with new counterparties.

*We could have a downgrade in our servicer ratings.*

Standard & Poor's and Fitch rate us as a residential loan servicer. Favorable ratings from these agencies are important to the conduct of our loan servicing business. Downgrades in servicer ratings could:

- adversely affect our ability to finance servicing advances and maintain our status as an approved servicer by Fannie Mae, Freddie Mac, Ginnie Mae, and other investors;

- lead to the early termination of existing advance facilities and affect the terms and availability of advance facilities that we may seek in the future;

- cause our termination as servicer in our servicing agreements that require that we maintain specified servicer ratings; and

- further impair our ability to consummate future servicing transactions.

Any of the above could adversely affect our business, financial condition and results of operations.

19 Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K

*Originations*

*We may not be able to maintain the volumes in our loan originations business, which would adversely affect our ability to replenish our servicing business.*

The volume of loans funded within our loan originations business is subject to multiple factors, including changes in interest rates and availability of government programs. Volume in our originations business is based on the refinancing of existing mortgage loans that we service, which is highly dependent on interest rates and other macroeconomic factors, and originations through our Correspondent channel. Our loan origination volume may decline if interest rates increase, if government programs terminate and are not replaced with similar programs or if we cannot replace this volume with other loan origination channels such as Correspondent, new customer acquisitions or purchase money loans. Any such slowdown may materially decrease the number and volume of mortgages we originate. As interest rates have rapidly risen, our refinancing volumes have significantly decreased as fewer consumers are incentivized to refinance their mortgages. As a result, our Originations revenues have decreased substantially. In addition, consumers are increasingly completing the mortgage process using online and/or digital tools. The proliferation of these tools and their ease of use may present challenges in retaining and attracting new loan applicants if we are unable to effectively implement new technology-driven products and services as quickly as competitors or be successful in marketing these products and services to consumers. Additionally, newer market participants, often called "disruptors," are reinventing aspects of the mortgage loan industry and capturing profit pools historically collected by existing market participants. As a result, the lending industry could become even more competitive if new market participants are successful in capturing market share from existing market participants such as ourselves. If we are unable to maintain our loan originations volume, our business, financial condition and results of operations could be adversely affected.

*We may be required to indemnify or repurchase loans we sell, will sell, if these loans fail to meet certain criteria or characteristics or under other circumstances.*

The indentures governing our securitized pools of loans and our contracts with purchasers of our whole loans contain provisions that require us to indemnify or repurchase the related loans under certain circumstances. While our contracts vary, they contain provisions that require us to repurchase loans if:

- our representations and warranties concerning loan quality and loan circumstances are inaccurate, including representations concerning the licensing of a mortgage broker;

- we fail to secure adequate mortgage insurance within a certain period after closing;

- a mortgage insurance provider denies coverage;

- we fail to comply, at the individual loan level or otherwise, with regulatory requirements in the current dynamic regulatory environment; or

- the borrower fails to make certain initial loan payments due to the purchaser, or terminates employment between the time validation is performed and the time the loan funds.

We are subject to repurchase claims and may continue to receive claims in the future. If we are required to indemnify or repurchase loans that we originate or have previously originated and sell or securitize that result in losses that exceed our reserve, this could adversely affect our business, financial condition and results of operations.

*We are highly dependent upon loan programs administered by Fannie Mae, Freddie Mac, the Federal Housing Administration, the Department of Veterans Affairs, the US Department of Agriculture and Ginnie Mae (collectively, the "Agencies") to generate revenues through mortgage loan sales to institutional investors.*

There are various proposals which deal with GSE reform, including winding down the GSEs and reducing or eliminating over time the role of the GSEs in guaranteeing mortgages and providing funding for mortgage loans, as well as proposals to implement reforms relating to borrowers, lenders and investors in the mortgage market, including reducing the maximum size of loans that the GSEs can guarantee, phasing in a minimum down payment requirement for borrowers, improving underwriting standards and increasing accountability and transparency in the securitization process. Uncertainty remains regarding the future of the GSE's, including with respect to the duration of conservatorship, the extent of their roles in the market and what forms they will have, and whether they will be government agencies, government-sponsored agencies or private for-profit entities. The extent and timing of any regulatory reform regarding the GSEs and the U.S. housing finance market, as well as any effect on our business operations and financial results, are uncertain. It is not yet possible to determine whether such proposals will be enacted and, if so, when, what form any final legislation or policies might take or how proposals, legislation or policies may impact our business.

Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K 20

---

Our ability to generate revenues through mortgage loan sales to institutional investors depends to a significant degree on programs administered by the Agencies that facilitate the issuance of mortgage-backed securities in the secondary market. These Agencies play a critical role in the residential mortgage industry, and we have significant business relationships with many of them. Almost all of the conforming loans we originate qualify under existing standards for inclusion in guaranteed mortgage securities backed by one of these Agencies. We also derive other material financial benefits from these relationships, including the assumption of credit risk on loans included in such mortgage securities in exchange for our payment of guarantee fees and the ability to avoid certain loan inventory finance costs through streamlined loan funding and sale procedures. If it is not possible for us to complete the sale or securitization of certain of our mortgage loans due to changes in Agency programs, we may lack liquidity under our mortgage financing facilities to continue to fund mortgage loans, and our revenues and margins on new loan originations would be materially and negatively impacted.

Our GNMA loan portfolio may experience higher default risk as these loans typically have high Loan to Value Ratios (LTV). In case of default, we may not recover all servicing expenses and experience losses due to limited collateral value. The loss can be higher if there is any structural damage to the property due to natural disasters such as floods, fire, hurricanes and other environmental factors from climate change. A requirement of FHA is to convey property in habitable condition, and damage from natural hazards may require us to repair properties to conveyable condition. Our loan originations business may not be able to sell these loans, and we may not recover all our capital which leads to higher losses. Additionally, we may not be able to recover all expenses related to damage caused by water and wind. Inflationary pressures may limit a borrower's disposable income which may lead to additional incumbrances on title, impeding our foreclosure efforts. Our REO portfolio from foreclosed government loans, may experience higher losses due to declines in market value and extended sale timelines. This may occur due to multiple factors beyond our control, such as higher interest rates, which would limit a potential buyer's capacity to purchase, inflationary pressure limiting surplus cash or economic deterioration of local neighborhoods where properties are located. Our servicing business may experience higher advance requirements, increasing our interest expense cost from credit lines.

We are largely reliant on Agency MBS issuances to sell the loans that we originate. In recent years, the Agencies have instituted periodic limits on products such as investor properties, second homes, and products with multiple risk characteristics such as borrowers with below average credit scores and high LTV. If these periodic limits for purchasing these loans become permanent, we must find other investors for loans within our pipeline, which may be at a material discount to the expected pricing.

Any discontinuation of, or significant reduction in, the operation of these Agencies or any significant adverse change in the level of activity in the secondary mortgage market or the underwriting criteria of these Agencies could materially and adversely affect our business, liquidity, financial position and results of operations.

*Corporate/Other*

*Our Real Estate exchange business could be further impacted by delays in foreclosure sales, as well as economic slowdowns and recessions.*

The foreclosure moratoriums instituted during the COVID-19 pandemic have impacted and are continuing to impact our REO exchange business. The Exchange business consists of the Xome.com auction platform that provides efficient execution for sales of foreclosed properties. States, agencies and regulators have previously issued forbearance programs and placed a moratorium on foreclosures and evictions. Many of the measures have been lifted; however, there has been a delay in the sailing of FHA foreclosed properties, which adversely impacts our REO exchange revenues. A continued economic slowdown, recession, or declining consumer confidence in the economy could have a material adverse effect on values of residential real estate properties. The volume of residential real estate transactions is highly variable which is primarily affected by the average price of real estate sales, the availability of funds to finance purchases, mortgage interest rates, consumer confidence in the economy and general economic factors affecting the real estate markets. A decline in real estate transactions could materially and adversely affect our REO exchange business.

*General Business & Operational Risks*

*We may not be successful in implementing certain strategic initiatives.*

Certain strategic initiatives, which we discuss in our MD&A, are designed to improve our results of operations and drive long-term stockholder value.

There is no assurance that we will be able to successfully implement these strategic initiatives, that we will be able to realize all of the projected benefits of our plans or that we will be able to compete successfully in new markets and our efforts may be more expensive and time consuming than we expect, which could adversely affect our business, financial condition and results of operations.

21 Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K

*Technology failures or cyber-attacks against us or our vendors could damage our business operations, and new laws and regulations could increase our costs.*

The business industry as a whole is characterized by rapidly changing technologies, system disruptions and failures caused by fire, power loss, telecommunications failures, system misuse, unauthorized intrusion (cyber-attack), computer viruses and disabling devices, natural disasters, health pandemics and other similar events that may interrupt or delay our ability to provide services to our borrowers. As a part of conducting business, we receive, transmit and store a large volume of personally identifiable information and other user data. Additionally, Xome, which utilizes a real estate auction website, is reliant on information technology networks and systems to securely process, transmit and store sensitive electronic information. Cybersecurity risks for the financial services industry have increased significantly in recent years due to new technologies, the reliance on technology to conduct financial transactions and the increased sophistication of organized crime and hackers. Those parties also may attempt to misrepresent personal or financial information to obtain loans or other financial products from us or attempt to fraudulently induce employees, customers, or other users of our systems to disclose confidential information in order to gain access to our data or that of our customers. Additionally, cyberattacks on financial institutions are increasingly becoming a tactical risk of modern warfare. Cyberattacks performed as an act of war are typically excluded from insurance coverage and could result in material financial loss to the organization with limited recourse from insurance providers. We and others in our industry are regularly the subject of attempts by attackers to gain unauthorized access to our networks, systems, and data, or to obtain, change, or destroy confidential data (including personal identifying information of individuals) through a variety of means, including computer viruses, malware, phishing, ransomware and other attack vectors. These attacks may result in unauthorized individuals obtaining access to our confidential information or that of our customers, or otherwise accessing, damaging, or disrupting our systems or infrastructure. In particular, as initially disclosed on November 2, 2023, and supplemented in our disclosures on November 9, 2023, and December 15, 2023, on October 31, 2023, we experienced a cybersecurity incident in which an unauthorized third party gained access to certain of our technology systems and obtained personal information relating to substantially all of our current and former customers.

In addition, we access our products and services, including our Home Intelligence app, our customers may use personal smartphones, tablet PCs, and other mobile devices that are beyond our control systems. Third parties with which we do business or that facilitate our business activities or vendors that provide services or security solutions for our operations could also be sources of operational risk and information security risk to us, including from cyberattacks, information breaches or loss, breakdowns, disruptions or failures of their own systems or infrastructure, or any deficiencies in the performance of their responsibilities. Additional security breaches, acts of vandalism and developments in computer intrusion capabilities could cause our financial, accounting, data processing or other operating systems and facilities to fail to operate properly or become disabled and could result in a compromise or breach of the technology that we or our vendors use to protect our borrowers' personal information and transaction data.

Despite our efforts to ensure the integrity of our systems, it is possible that we may not be able to anticipate or implement effective preventive measures against additional internal and external security breaches, especially because the techniques used change frequently, are becoming more sophisticated and are not recognized until launched, and because security attacks can originate from a wide variety of sources. This is especially applicable in the shift to having most of our team members work in a home-centric environment, as our team members access our secure networks through their mobile devices. These risks may increase in the future as we continue to increase our reliance on telecommunication technologies (including mobile devices), the internet and use of web-based product offerings.

Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K 22

Apx. 97

While we have implemented policies and procedures designed to help mitigate cybersecurity risks and cyber intrusions, there can be no assurance that cyber intrusions, whether external or internal, will not occur. An additional successful penetration or circumvention of the security of our or our vendors' systems or a defect in the integrity of our or our vendors' systems or cybersecurity could cause serious negative consequences for our business, including significant disruption of our operations, misappropriation of our confidential information or that of our customers, or damage to our computers or operating systems and to those of our customers and counterparties. Any of the foregoing events could result in violations of applicable privacy and other laws, financial loss to us or to our customers, loss of confidence in our security measures, customer dissatisfaction, significant litigation exposure and harm to our reputation, all of which could adversely affect our business, financial condition and results of operations. This risk is enhanced in certain jurisdictions with stringent data privacy laws. For example, the California Consumer Privacy Act of 2018 which went into effect in January 2020, as amended by the California Privacy Rights Act, which went into effect in January 2023 (collectively, the "Privacy Acts"), provides data privacy rights for consumers and operational requirements for us. The Privacy Acts include a statutory damages framework and private rights of action against businesses that fail to comply with certain Privacy Acts terms or implement reasonable security procedures and practices to prevent data breaches. Several other states have enacted similar legislation, and many other states are currently considering similar legislation, and there remains increased interest at the federal level as well. Additionally, while we have obtained insurance to cover us against certain cybersecurity risks and information theft, there can be no guarantee that all losses will be covered or that the insurance limits will be sufficient to cover such losses.

In addition, increasing attention is being paid by the media, regulators and legislators to matters relating to cybersecurity, and regulators and legislators may enact laws or regulations regarding cybersecurity. For example, the New York Department of Financial Services has adopted regulations that are far-ranging in scope, including not only specific technical safeguards but also requirements regarding governance, incident planning, data management and system testing, and the FTC promulgated a revised Safeguards Rule. New laws and regulations could result in significant compliance costs, which may adversely affect our cash flows and net income.

***Our capital investments in technology may not achieve anticipated returns.***

Our business is becoming increasingly reliant on technology investments, and the returns on these investments are less predictable. We are currently making, and will continue to make, significant technology investments to support our organizations and servicing offerings by implementing improvements to our customer-facing technology and evolving our information processes and computer systems to run our business more efficiently and remain competitive and relevant to our customers. Additionally, we have sold certain intellectual property rights related to our proprietary, cloud-based technology platform for mortgage servicing and received an equity stake in the buyer. These technology initiatives might not provide the anticipated benefits or may provide them on a delayed schedule or at a higher cost. We must monitor and choose the right investments and implement them at the right pace. Failing to make the best investments or making an investment commitment significantly above or below our needs could result in the loss of our competitive position and adversely impact our financial condition and results of operations.

***We and our vendors have operations in India that could be adversely affected by changes in political or economic stability or by government conduct.***

We currently have operations located in India, which is subject to relatively higher degrees of political and social instability and may lack the infrastructure to withstand political unrest or natural disasters. The political or regulatory climate in the United States, or elsewhere, also could change so that it would not be lawful or practical for us to use international operations in the manner in which we currently use them. If we or our vendors had to curtail or cease operations in these countries and transfer some or all of these operations to another geographic area, we would incur significant transition costs as well as higher future overhead costs that could materially and adversely affect our results of operations. In many foreign countries, particularly in those with developing economies, it may be common to engage in business practices that are prohibited by laws and regulations applicable to us, such as The Foreign Corrupt Practices Act of 1977, as amended ("FCPA"). Any violations of the FCPA or local anti-corruption laws by us, our subsidiaries or our local agents could have an adverse effect on our business and reputation and result in substantial financial penalties or other sanctions.

23 Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K

***Our vendor relationships subject us to a variety of risks.***

We have significant vendors that, among other things, provide us with financial, technology and other services to support our businesses. With respect to vendors engaged to perform activities required by the applicable servicing criteria, we assess compliance with the applicable servicing criteria for the applicable vendor (or in certain cases require vendors to provide their own assessments and attestations) and are required to have procedures in place to provide reasonable assurance that the vendor's activities comply in all material respects with servicing criteria applicable to the vendor. In the event that a vendor's activities do not comply with the servicing criteria, it could negatively impact our servicing agreements. Additionally, key vendors may misuse our data which could expose our customers to unauthorized transactions or other potential adverse events, which may adversely affect our business and reputation. In addition, if our current vendors were to stop providing services to us on acceptable terms, including as a result of one or more vendor bankruptcies, we may be unable to procure alternatives from other vendors in a timely and efficient manner and on acceptable terms, or at all. Further, we may incur significant costs to resolve any such disruptions in service and this could adversely affect our business, financial condition and results of operations.

***We could have, appear to have or be alleged to have conflicts of interest with Xome.***

Xome provides services to us which could create, appear to create or be alleged to create conflicts of interest. By obtaining services from a subsidiary, there is risk of possible claims of collusion or claims that such services are not provided by Xome upon market terms. We have adopted policies, procedures and practices that are designed to identify and address conflicts of interest. In addition, we undertake practices to identify and deal with potential conflicts. Further, we have engaged an independent third party to conduct a pricing study in an attempt to ensure that the fees charged are customary and reasonable. However, there can be no assurance that such measures will be effective in eliminating all conflicts of interest or that third parties will refrain from making such allegations. Appropriately identifying and dealing with conflicts of interest is complex and difficult, and our reputation, which is one of our most important assets, could be damaged and the willingness of counterparties to enter into transactions with us may be affected if we fail, or appear to fail, to identify, disclose and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or regulatory enforcement actions.

***Our risk management policies and procedures may not be effective.***

Our risk management framework seeks to mitigate risk and appropriately balance risk and return. We have established policies and procedures intended to identify, monitor and manage the types of risk to which we are subject, including credit risk, market and interest rate risk, liquidity risk, cyber risk, regulatory, legal and reputational risk. Although we have devoted significant resources to develop our risk management policies and procedures and expect to continue to do so in the future, these policies and procedures, as well as our risk management techniques such as our hedging strategies, may not be fully effective. There may also be risks that exist, or that develop in the future, that we have not appropriately anticipated, identified or mitigated. As regulations and markets in which we operate continue to evolve, our risk management framework may not always keep sufficient pace with those changes. If our risk management framework does not effectively identify or mitigate our risks, we could suffer unexpected losses and could be materially adversely affected.

***Our business could suffer if we fail to attract, or retain, highly skilled employees and changes in our executive management team may be disruptive to our business.***

Our future success will depend on our ability to identify, hire, develop, motivate and retain highly qualified personnel for all areas of our organization. Many of the companies with which we compete for experienced employees are large banks who have greater resources than we have and may be able to offer more attractive terms of employment. In addition, we invest significant time and expense in training our employees, which increases their value to competitors who may seek to recruit them. We may not be able to attract, develop and maintain an adequate skilled workforce necessary to operate our businesses and labor expenses may increase as a result of a shortage in the supply of qualified personnel. If we are unable to attract and retain such personnel, we may not be able to take advantage of acquisitions and other growth opportunities that may be presented to us and this could materially affect our business, financial condition and results of operations. From time to time, we may have staffing reductions and may be exposed to unanticipated consequences of our staffing reductions, including attrition beyond the planned reductions, increased difficulties in our day-to-day operations, increasing levels of continuity, loss of accumulated knowledge and/or efficiency, reduced employee morale and reduced ability to attract and retain qualified personnel. Employees who were not affected by our planned staffing reductions may seek alternate employment, which may harm our productivity.

Additionally, the experience of our executive management team is a valuable asset to us. Our executive management team has significant experience in the residential loan origination and servicing industry and would be difficult to replace. Disruptions in management continuity could result in operational or administrative inefficiencies and added costs, which could adversely impact our results of operations and stock price, and may make recruiting for future management positions more difficult or costly.

Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K 24

Table of Contents

***Negative public opinion could damage our reputation and adversely affect our business.***

Reputational risk, or the risk to our business, earnings and capital from negative public opinion, is inherent in our business. Negative public opinion can result from our actual or alleged conduct in any number of activities, including lending and debt collection practices, technology failures, cyber attacks, corporate governance, and actions taken by government regulators and community organizations in response to those activities. Negative public opinion can also result from media coverage, whether accurate or not. Additionally, the proliferation of social media websites as well as the personal use of social media by our employees and others, including personal blogs and social network profiles, also may increase the risk that negative, inappropriate or unauthorized information may be posted or released publicly that could harm our reputation or have other negative consequences, including as a result of our employees interacting with our customers in an unauthorized manner in various social media outlets.

Our reputation may also be negatively impacted by our environmental, social and governance ("ESG") practices and disclosures, including climate change practices and disclosures. In addition, various private third-party organizations have developed ratings processes for evaluating companies on their approach to ESG matters. These third party ESG ratings may be used by some investors to assist with their investment and voting decisions. Any unfavorable ESG ratings may lead to reputational damage and negative sentiment among our investors and other stakeholders.

These factors could impair our working relationships with government agencies and investors, expose us to litigation and regulatory action, negatively affect our ability to attract and retain customers and employees, and adversely affect our results of operations.

***Issues related to the development and use of artificial intelligence (AI) could give rise to legal and/or regulatory actions, damage our reputation or otherwise materially harm our business.***

We currently incorporate generative AI driven automation in our call centers. We also developed a mortgage-centric AI platform to onboard loan portfolios that we use internally and market to third parties. Our research and development of such technology remains ongoing, and we may begin to use AI in other areas in our business operations. AI presents risks, challenges, and unintended consequences that could affect our and our customers' adoption and use of this technology. AI algorithms and training methodologies may be flawed. Additionally, AI technologies are complex and rapidly evolving. While we aim to develop and use AI responsibly and attempt to identify and mitigate ethical and legal issues presented by its use, we may be unsuccessful in identifying or resolving issues before they arise. AI-related issues, deficiencies and/or failures could (i) give rise to legal and/or regulatory action, including as a result of new applications of existing data protection, privacy, intellectual property, and other laws; (ii) damage our reputation; or (iii) otherwise materially harm our business.

***Lapses in disclosure controls and procedures or internal control over financial reporting could materially and adversely affect our operations, profitability or reputation.***

Our disclosure controls and procedures may not be effective in every circumstance. Similarly, we may experience a material weakness or significant deficiency in internal control over financial reporting. Any lapses or deficiencies may materially and adversely affect our business and results of operations or financial condition, restrict our ability to access the capital markets, require us to spend significant resources to correct the lapses or deficiencies, expose us to regulatory or legal proceedings, subject us to fines, penalties or judgments, harm our reputation, or otherwise cause a decline in investor confidence.

***Our business is subject to the risks of earthquakes, hurricanes, fires, floods, health pandemics and other natural catastrophic events.***

Earthquakes, hurricanes, fires, floods, health pandemics, and similar events could have a material adverse effect on the macro economy and affect our loan servicing costs, increase our servicing advances, increase servicing defaults and negatively affect the value of our MSRs and loans in our pipeline.

**Regulatory, Compliance and Legal Risks**

***We operate within a highly regulated industry on federal, state and local levels and our business results are significantly impacted by the laws and regulations to which we are subject, as well as scrutiny from governmental or regulatory agencies.***

Our businesses are subject to extensive, complex and comprehensive regulation under federal, state and local laws in the United States, as well as governmental scrutiny from regulators and law enforcement agencies. These laws, regulations and governmental inquiries can significantly affect the way that we do business, can restrict the scope of our existing businesses, limit our ability to expand our product offerings or to pursue acquisitions, or can make our costs to service or originate loans higher, which could impact our financial results.

25 Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K

Federal, state and local governments have proposed or enacted numerous laws, regulations and rules related to mortgage loans and registered investment advisors. Due to the highly regulated nature of the residential mortgage industry, we are required to comply with a wide array of federal, state and local laws and regulations that regulate, among other things, the manner in which we conduct our servicing, originations and ancillary business, including Xome and Roosevelt Management Company, and the fees we may charge. These regulations directly impact our business and require constant compliance, which includes enhancing our compliance program, procedures and controls, monitoring and internal and external audits. A failure in maintaining an effective compliance program or a material failure to comply with any of these laws or regulations could subject us to lawsuits or governmental actions, which could materially adversely affect our business, financial condition and results of operations. In addition, there continue to be changes in legislation and licensing, which require technology changes and additional implementation costs for loan originators and new state and federal privacy legislation could impact mortgage operations, marketing, and data governance. We expect legislative changes will continue in the foreseeable future, which may increase our operating expenses. For example, on December 30, 2022 the state of New York signed into law a new measure which strictly enforces the state statue of limitations period to foreclose on a mortgage lien before losing the ability to enforce the security instrument. The law has not yet had sufficient time to be tested or challenged, but could subject the company to substantial losses for investors in properties in New York which could increase the potential of losses to the company. Furthermore, there continue to be changes in state laws that are adverse to mortgage servicers that increase costs and operational complexity of our business and impose significant penalties for violators. Any of these changes in law could adversely affect our business, financial condition and results of operations.

Regulatory requirements or changes to existing requirements that the CFPB or other federal or state agencies, including HUD and the FCC, related to our business may result in increased compliance and operational costs and impair the profitability of such business. For example, Regulation C of the Home Mortgage Disclosure Act ("HMDA") requires us to collect and report certain mortgage data for every loan application. These requirements for gathering and submitting large amounts of data regarding loan applications to regulators and the public are complex. Thus, any inadvertent error in gathering or reporting the data could result in fines or penalties being levied by the CFPB or other regulators against us. In addition, the authority of state attorneys general to bring actions to enforce federal consumer protection legislation, as a result of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), could be expanded and we could be subject to additional state lawsuits and enforcement actions, thereby further increasing our legal and compliance costs. The cumulative effect of these changes could result in a material impact on our earnings. The implementation of the originations and servicing rules by the CFPB and the CFPB's continuing examinations of our business, could increase our regulatory compliance burden and associated costs and place restrictions on our operations, which could in turn adversely affect our business, financial condition and results of operations. Additionally, our sub-servicing of loans for federally regulated depositories creates indirect regulatory risk with the OCC, FDIC, and the U.S. Federal Reserve. Recent enforcement actions by these regulators over competitors in the mortgage servicing business increases our risks with both the CFPB and indirectly through our subservicing business partners.

We could be subject to additional regulatory requirements or changes under the Dodd-Frank Act beyond those currently proposed, adopted or contemplated. There also continues to be discussion of potential GSE reform which would likely affect markets for mortgages and mortgage securities in ways that cannot be predicted. In addition, FHFA initiatives may be implemented by the GSEs that could materially affect the market for conventional and/or government insured loans. Further, on November 3, 2023, the Financial Stability Oversight Council (the "FSOC") unanimously voted to issue final versions of a new analytic framework for financial stability risks and updated guidance on the FSOC's nonbank financial company determinations process. The updated guidance for Nonbank Financial Company Determinations sets forth the FSOC's procedures for considering whether to designate a nonbank financial company for Federal Reserve supervision and prudential standards under section 113 of the Dodd-Frank Act.

Individual states have also been active in regulatory enforcement, as have other regulatory organizations such as the Multi-State Mortgage Committee, as well as various state Attorneys General. We also believe there has been a shift among certain regulators towards a broader view of the scope of regulatory oversight responsibilities with respect to mortgage originators and servicers. In addition to their traditional focus on consumer protection laws, licensing and examination matters, certain regulators have begun to make observations, recommendations or demands with respect to such areas as corporate governance, loss-to-moderate income lending requirements, safety and soundness, and risk and compliance management.

Certain regulators took steps to block the acquisition of MSRs by one of our competitors. It is possible that we could become subject to similar actions with respect to our acquisition of MSRs or other key business operations such as entering into subservicing contracts, which could adversely affect our business, financial condition and results of operations.

Apx. 98

Table of Contents

The influx of new laws, regulations, and other directives adopted in response to the COVID-19 pandemic exemplifies the ever-changing and increasingly complex regulatory landscape we operate in. While some regulatory reactions to COVID-19 may have relaxed certain compliance obligations (e.g., relaxing work location requirements for loan personnel working remotely during COVID-19 emergency declarations) other updates related to servicing delinquent mortgages and providing new mortgage assistance programs have substantially increased mortgage servicers responsibilities and risks. While some regulators have granted permanent ability to work away from a licensed location, those that have not may determine that prior leniency surrounding work locations may no longer apply. We have received, and may continue to receive, inquiries from various federal and state lawmakers, attorneys general and regulators seeking information on our COVID-19 response and its impact on our business, team members, and clients. Future regulatory scrutiny and enforcement resulting from COVID-19 is unknown.

Additionally, the CFPB iteratively adopted rules over the course of several years regarding mortgage servicing practices that required us to make modifications and enhancements to our mortgage servicing processes and systems. While the CFPB announced its flexible supervisory and enforcement approach during the COVID-19 pandemic on certain consumer communications required by the mortgage servicing rules, managing to the CFPB's loss mitigation rules is challenging. If we are unable to comply with, or face allegations that we are in breach of, applicable laws, regulations or other requirements, we may face regulatory action, including fines, penalties, and restrictions on our business. In addition, we could face increased litigation, including class action lawsuits, and reputational damage.

*We are subject to numerous legal proceedings, federal, state or local governmental examinations and enforcement investigations. Some of these matters are highly complex and slow to develop, and results are difficult to predict or estimate.*

*Legal Proceedings:* We are routinely and currently involved in a significant number of legal proceedings concerning matters that arise in the ordinary course of our business. There is no assurance that the number of legal proceedings will not increase in the future, including certified class or mass actions. These legal proceedings range from actions involving a single plaintiff to putative class action lawsuits. These actions and proceedings are generally based on alleged violations of consumer protection, securities, employment, contract, tort, common law fraud and numerous other laws, including, but not limited to, the Equal Credit Opportunity Act, Fair Debt Collection Practices Act, Fair Credit Reporting Act, Real Estate Settlement Procedures Act, National Housing Act, Homeowners Protection Act, Servicemember's Civil Relief Act, Telephone Consumer Protection Act, Truth in Lending Act, Financial Institutions Reform, Recovery, and Enforcement Act of 1989, unfair, deceptive or abusive acts or practices in violation of the Dodd-Frank Act, the Securities Act of 1933, the Securities Exchange Act of 1934, the Home Mortgage Disclosure Act, the Bankruptcy Code, False Claims Act, the CARES Act and Making Home Affordable loan modification programs (while MHA programs have ended, claims may continue to arise). Additionally, along with others in our industry, we are subject to repurchase and indemnification claims and may continue to receive claims in the future, regarding alleged breaches of representations and warranties relating to the sale of mortgage loans, the placement of mortgage loans into securitization trusts or the servicing of mortgage loan securitizations. We are also subject to legal actions or proceedings related to loss sharing and indemnification provisions of our various acquisitions. Additionally, third parties may assert claims against us that our content, website processes or software applications infringe their intellectual property rights. Certain of the pending or threatened legal proceedings include claims for substantial compensatory, punitive and/or, statutory damages or claims for an indeterminate amount of damages.

Litigation and other proceedings may require that we pay settlement costs, legal fees, damages, including punitive damages, penalties or other charges, or be subject to injunctive relief affecting our business practices, any or all of which could adversely affect our financial results. In particular, ongoing and other legal proceedings brought under federal or state consumer protection statutes may result in a separate fine for each violation of the statute, which, particularly in the case of class action lawsuits, could result in damages substantially in excess of the amounts we earned from the underlying activities and that could have a material adverse effect on our liquidity, financial position and results of operations. The costs of responding to the investigations can be substantial.

*Regulatory Matters:* We operate within highly regulated industries on a federal, state and local level. In the normal and ordinary course of our business, we are routinely subject to extensive examinations, investigations, subpoenas, inquiries and reviews by various federal, state and local governmental, regulatory and enforcement agencies, including CFPB, the Securities and Exchange Commission, the Department of Justice, the Office of the Special Inspector General for the Troubled Asset Relief Program, the U.S. Department of Housing and Urban Development, various State mortgage banking regulators and various State Attorneys General, related to our residential loan servicing and origination practices, our financial reporting and other aspects of our businesses. For example, in 2020, we resolved certain legacy regulatory matters with the CFPB, the multi-state committee of mortgage banking regulators and various State Attorneys General, and the Executive Office of the United States Trustee, all of which involved findings from examinations and discussions that were completed in 2014 and 2015, and related to certain loan servicing practices which occurred during 2010 through 2015. Several large mortgage origination or servicers have been subject to similar matters, which have resulted in the payment of fines and penalties, changes to business practices and the entry of consent decrees or settlements. The trend of large settlements with governmental entities may adversely affect the outcomes for other financial institutions, including us. We continue to manage our response to each matter, but it is not possible for us to reliably predict the outcome of any of them, including predicting any possible losses resulting from any judgments or fines, which can lead to substantial disparities between legal reserves and subsequent settlements or penalties.

Responding to these matters requires us to devote substantial legal and regulatory resources, resulting in higher costs and lower net cash flows. Adverse results in any of these matters could further increase our operating expenses and reduce our revenues, require us to change business practices, limit our ability to grow and otherwise materially and adversely affect our business, reputation, financial condition and results of operation. To the extent that an examination or other regulatory engagement reveals a failure by us to comply with applicable law, regulation or licensing requirement this could lead to (i) loss of our licenses and approvals to engage in our businesses, (ii) damage to our reputation in the industry and loss of client relationships, (iii) governmental investigations and enforcement actions, (iv) administrative fines and penalties and litigation, (v) civil and criminal liability, including class action lawsuits, and actions to recover incentive and other payments made by governmental entities, (vi) enhanced compliance requirements, (vii) breaches of covenants and representations under our servicing, debt or other agreements, (viii) inability to raise capital and (ix) inability to execute on our business strategy. Any of these occurrences could further increase our operating expenses and reduce our revenues, require us to change business practices and procedures and limit our ability to grow or otherwise materially and adversely affect our business, reputation, financial condition and results of operations.

Moreover, depository changes established under the Dodd-Frank Act, which continue to be expanded, other regulatory changes such as the CFPB having its own examination and enforcement authority and the "whistleblower" provisions of the Dodd-Frank Act and guidance on whistleblowing programs issued by the NYDFS could further increase the number of legal and regulatory enforcement proceedings against us. In addition, while we take numerous steps to prevent and detect employee misconduct, such as fraud, employee misconduct cannot always be deterred or prevented and could subject us to additional liability.

We establish reserves for pending or threatened legal proceedings when it is probable that a liability has been incurred and the amount of such loss can be reasonably estimated. Legal proceedings are inherently uncertain, and our estimates of loss are based on information available at that time. Our estimates may change from time to time for various reasons, including factual or legal developments in these matters. There cannot be any assurance that the ultimate resolution of our litigation and regulatory matters will not involve losses, which may be material, in excess of our recorded accruals or estimates of reasonably possible losses.

*Unlike competitors that are national banks, we are subject to state licensing and operational requirements that result in substantial compliance costs.*

Because we are not a depository institution, we do not benefit from a federal exemption to state mortgage banking, loan servicing or debt collection licensing and regulatory requirements. We must comply with state licensing requirements and varying compliance requirements in all 50 states, the District of Columbia and other U.S. territories, and we are sensitive to regulatory changes that may increase our costs through stricter licensing laws, disclosure laws or increased fees or that may impose conditions to licensing that we or our personnel are unable to meet. In addition, we are subject to periodic examinations by state regulators, which can result in refusals to renew licenses or increased fees as well as fines and/or be required to pay substantial penalties imposed by state regulators due to compliance errors, or failure to maintain appropriate state licensing. Future state legislation and changes in existing regulation may significantly increase our compliance costs or reduce the amount of ancillary revenues, including late fees that we may charge to borrowers. This could make our business cost-prohibitive in the affected state or states and could materially affect our business.

---

Table of Contents

*Our business would be adversely affected if we lose our licenses.*

Our operations are subject to regulation, supervision and licensing under numerous federal, state and local statutes, ordinances and regulations. In most states in which we operate, a regulatory agency regulates and enforces laws relating to mortgage servicing companies, mortgage originations companies and real estate brokers and auctioneers. These rules and regulations generally provide for licensing as a mortgage servicing Company, mortgage originations Company or third-party debt default specialist, licensed auctioneer, and other similar types of requirements as to the form and content of contracts and other documentation, licensing of our employees and employee hiring background checks, licensing of independent contractors with which we contract, restrictions on certain practices, disclosure and record-keeping requirements and enforcement of borrowers' rights. We are subject to periodic examination by state regulatory authorities.

We believe that we maintain all material licenses and permits required for our current operations and are in substantial compliance with all applicable federal, state and local laws, rules, regulations and ordinances. We may not be able to maintain all requisite licenses and permits, and the failure to satisfy those and other regulatory requirements could result in a default under our servicing or other agreements and have a material adverse effect on our operations. The states that currently do not provide extensive regulation of our businesses may later choose to do so, and if such states so act, we may not be able to obtain or maintain all requisite licenses and permits. The failure to satisfy those and other regulatory requirements could result in a default under our servicing agreements and have a material adverse effect on our operations. Furthermore, the adoption of additional, or the revision of existing, rules and regulations could adversely affect our business, financial condition and results of operations.

*We may incur increased litigation costs and related losses if a court overturns a foreclosure or if a loan we are servicing becomes subordinate to a Home Owners Association lien.*

We may incur costs if we are required to, or if we elect to, execute or re-file documents or take other action in our capacity as a servicer in connection with pending or completed foreclosures. In addition, if a court rules that the lien of a Home Owners Association takes priority over the lien we service, we may incur legal liabilities and costs to defend such actions. If a court dismisses or overturns a foreclosure because of errors or deficiencies in the foreclosure process, we may have liability to the loan owner, a borrower, title insurer or the purchaser of the property sold in foreclosure. These costs and liabilities may not be legally or otherwise reimbursable to us, particularly to the extent they relate to securitized mortgage loans. A significant increase in litigation costs could adversely affect our liquidity, and our inability to be reimbursed for an advance could adversely affect our business, financial condition and results of operations.

*Residential mortgage foreclosure proceedings in certain states have been delayed due to lack of judicial resources and legislation, all of which could have a negative effect on our ability to liquidate loans timely and slow the recovery of advances and thus impact our earnings or liquidity.*

In some states, such as New York, our industry has faced, and may continue to face, increased delays and costs caused by state law and local court rules and processes. In addition, California and Nevada have enacted Homeowner's Bill of Rights legislation to establish complex mandatory loss mitigation practices for homeowners which cause delays in foreclosure proceedings. Delays in foreclosure proceedings could also require us to make additional servicing advances by drawing on our servicing advance facilities, or delay the recovery of advances, all or any of which could materially affect our earnings and liquidity and increase our need for capital.

*Risks Related to Owning our Stock*

*Our common stock, and any other instruments treated as stock for purposes of Section 382, is subject to transfer restrictions under our Certificate of Incorporation which, if not complied with, could result in the forfeiture of such stock and related distributions.*

Our Certificate of Incorporation contains significant transfer restrictions in relation to the transfer of our common stock and any other instruments treated as stock for purposes of Section 382. These transfer restrictions have been adopted in order to minimize the likelihood that we will be deemed to have an "ownership change" within the meaning of Section 382 that could limit our ability to utilize our NOLs under and in accordance with regulations promulgated by the IRS.

In particular, without the approval of our Board, (i) no person or group of persons treated as a single entity under Treasury Regulation Section 1.382-3 will be permitted to acquire, whether directly or indirectly, and whether in one transaction or a series of related transactions, any of our common stock or any other instrument treated as stock for purposes of Section 382, to the extent that after giving effect to such purported acquisition (a) the purported acquirer or any other person by reason of the purported acquirer's acquisition would become a Substantial Holder (as defined below), or (b) the percentage stock ownership of a person that, prior to giving effect to the purported acquisition, is already a Substantial Holder would be increased; and (ii) no Substantial Holder may dispose, directly or indirectly, of any class of stock or any other instrument treated as stock for purposes of Section 382. A "Substantial Holder" is a person that owns (as determined for purposes of Section 382) at least 4.75% of the total value of our stock, including any instrument treated as stock for purposes of Section 382.

Because of the complexity of applying Section 382, and because the determination of ownership for purposes of Section 382 does not correspond to SEC beneficial ownership reporting on Schedules 13D and 13G, holders and potential acquirers of our securities should consult with their legal and tax advisors prior to making any acquisition or disposition of our securities. Pursuant to Article VIII of our Certificate of Incorporation, the Board has the sole power to determine compliance with the transfer restrictions, and we cannot assure you that the Board will concur with any conclusions reached by any holder of our securities or their respective advisors, and/or approve or ratify any proposed acquisitions or dispositions of our securities. Under Article VIII, Section 5(b), of our Certificate of Incorporation, if the Board determines that a Prohibited Transfer (as defined in our Certificate of Incorporation) has occurred, such Prohibited Transfer shall, to the extent not already approved in writing by the Board, be void ab initio and have no legal effect, and upon written demand by us, the Purported Transferee (as defined in our Certificate of Incorporation) shall disgorge or cause to be disgorged our securities, together with any dividends or distributions received, with respect to such securities.

*Anti-takeover provisions in our Certificate of Incorporation and Amended and Restated Bylaws ("Bylaws") and under Delaware law, as well as certain existing contractual arrangements, make a third-party acquisition of us difficult.*

Our Certificate of Incorporation, including Article VIII thereof, and Bylaws contain provisions that make it difficult for a third party to acquire us, even if doing so might be deemed beneficial by our stockholders. These provisions could limit the price that investors might be willing to pay in the future for shares of our common stock.

*The market price of our common stock may decrease, and you may lose all or part of your investment.*

The market price of our common stock could decrease, and you may not be able to resell your shares at or above the price at which you purchase them. These fluctuations could be based on various factors, including:

- our operating performance and the performance of our competitors and fluctuations in our operating results;
- macro-economic trends, including changes in interest rates and economic growth and unemployment;
- the public's reaction to our press releases, our other public announcements and our filings with the SEC;
- changes in earnings estimates or recommendations by research analysts who follow us or other companies in our industry;
- global, national or local economic, legal and regulatory factors unrelated to our performance;
- announcements of negative news by us or our competitors, such as announcements of poorer than expected results of operations, data breaches or significant litigation;
- actual or anticipated variations in our or our competitors' operating results, and our or our competitors' growth rates;
- failure by us or our competitors to meet analysts' projections or guidance we or our competitors may give the market;
- changes in laws or regulations, or new interpretations or applications of laws and regulations, that are applicable to our business;
- changes in accounting standards, policies, guidance, interpretations or principles;
- the departure of key personnel;
- the number of shares publicly traded; and

Apx. 99

- other developments affecting us, our industry or our competitors.

In addition, in recent years the stock market has experienced significant price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies. These broad market fluctuations have often been unrelated or disproportionate to the operating performance of those companies. These broad market fluctuations, as well as general economic, political and market conditions such as recessions or interest rate changes, may cause declines in the market price of our common stock, and you may not realize any return on your investment in us and may lose some or all of your investment.

### Item 1B. *Unresolved Staff Comments*

None.

### Item 1C. *Cybersecurity*

*Cyber Risk Management and Strategy*

Our cyber risk management and strategy has been incorporated into our compliance and risk management program across a number of verticals. For example, information security risk assessments are performed across our business processes, including, but not limited to, third-party services, vendors and systems that process sensitive data. We undergo external annual penetration assessments to evaluate susceptibility to attack, for example, through social engineering, application websites and system/network vulnerabilities. We aim to continuously evolve our information security program in response to the ever-changing landscape of best practices, industry-specific risks, company-specific risks, and potential threats. This evolution is also driven by validation tests in an effort to ensure our program remains robust and effective. In the wake of the October 2023 cybersecurity incident, we prioritized implementation of enhanced safeguards consistent with our incident response process and further fortifying our commitment to information security.

We also have a process to evaluate third-party providers, which is designed to understand the potential risks and impact of threats to our supply chains as well as potential privacy risks associated with external data management. This process has multiple components and is designed to assess our providers performance across several domains, including data security, asset management, communications and operations management, access control, business continuity management, financial, and legal compliance.

Considering the complexity and evolving nature of cybersecurity threats, we engage with a range of external experts, including cybersecurity assessors, consultants, and auditors, in evaluating and testing our risk management systems. These engagements allow us to leverage specialized knowledge and insights, including leading industry practices, to better inform our cybersecurity strategies and processes. Our collaboration with these third parties includes audits, threat assessments, and consultations to enhance our security measures.

In addition, we undergo several compliance audits annually, which include a SOX compliance audit, and a SOC1 audit. Our approach to managing compliance-related risks includes maintaining a data loss prevention program, centralized compliance management, an identity management platform, ongoing Managed Security monitoring, threat and vulnerability monitoring, and information security risk insurance.

*Governance Related to Cybersecurity Risks*

The full Board of Directors conducts several reviews throughout the year in an effort to ensure that our cyber strategy and risk management is appropriate and prudent. It is the responsibility of the Board of Directors to understand and oversee our strategic plans, the associated risks, and the steps that our senior management team is taking to manage and mitigate those risks. Principle responsibility in this domain is shared by our Chief Risk and Compliance Officer, who has approximately 20 years of leadership experience in the financial services sector with an extensive background in the mortgage industry, and our Chief Information Officer who has approximately 20 years of experience leading technology and product engineering functions.

Our Enterprise Risk Committee reviews and discusses cybersecurity, information security and data privacy risks at regular intervals. A quarterly Enterprise Risk Committee meeting is chaired by our Chief Risk and Compliance Officer and includes information security briefings led by the Chief Information Security Officer.

We also hold quarterly Audit and Risk Committee meetings, during which our Board of Directors receives briefings on information security matters. Risks that are identified during these processes are reviewed by executive leadership and corrective action plans are established to address and manage the issues, as applicable and appropriate.

We believe in a proactive approach to enterprise risk management. A major tenet of our cybersecurity program includes training to educate and inform team members on cyber hygiene and threat management as well as regular testing to check for understanding. We have invested in technology and dedicated internal resources to facilitate training for application developers, conduct tabletop exercises, run anti-phishing campaigns, and train on privacy regulations. These training activities, along with other key risk indicators, are tracked and reported to our Enterprise Risk Committee on a quarterly basis.

*Recent Cybersecurity Activity*

As previously disclosed on a Form 8-K dated November 2, 2023, as amended by the Form 8-K/As dated, November 9, 2023, and December 15, 2023, on October 31, 2023, we experienced a cybersecurity incident in which an unauthorized third party gained access to certain of our technology systems and obtained personal information relating to substantially all of our current and former customers. Following detection of this incident, we initiated response protocols that included deploying containment measures involving shutting down certain systems as a precautionary measure. We notified law enforcement, regulatory authorities, and other stakeholders. We worked with our existing cybersecurity firms and retained additional cybersecurity experts to support our actions.

Our engagement with law enforcement and regulators, and defense of litigation is ongoing. To assist our customers, we have offered identity protection services, including credit monitoring, to all of our current and former customers for two years.

The cybersecurity incident did not result in a misstatement to the interim consolidated financial statements previously filed or included in this Annual Report on Form 10-K. In addition, while we cannot presently quantify the full extent of remediation and legal expenses associated with this cyberattack, we do not believe the incident has materially affected or is reasonably likely to materially affect, our business strategy, results of operations, or financial condition.

### Item 2. *Properties*

We lease and maintain our principal executive office in one building totaling approximately 176,000 square feet in Coppell, Texas. Our business operations and support offices are in leased facilities in various other locations in the United States, as well as locations in India. Our locations in the United States include (i) Texas and California, which houses our Servicing and Originations segments, and (ii) Arizona, Michigan, Florida, and Colorado, which house the remainder of our Servicing segment. Our India locations include Chennai, which supports our Servicing and Originations segments, and Bengaluru, which supports our Servicing segment. We believe that our facilities are adequate for our current requirements and are being appropriately utilized. We periodically review our space requirements, and we believe we will be able to acquire new space and facilities as and when needed on reasonable terms. We also look to consolidate and dispose of facilities we no longer need, as and when appropriate.

### Item 3. *Legal Proceedings*

We are routinely and currently involved in a number of legal proceedings, including, but not limited to, judicial, arbitration, regulatory and governmental proceedings related to matters that arise in connection with the conduct of our business. While it is not possible to predict the outcome of any of these matters, based on our assessment of the facts and circumstances, we do not believe any of these matters, individually or in the aggregate, will have a material adverse effect on our financial position, results of operations or cash flows. For a description of our material legal proceedings, see *Note 20, Commitments and Contingencies* in the Notes to Consolidated Financial Statements under Item 8. *Financial Statements and Supplementary Data*, of this Form 10-K.

### Item 4. *Mine Safety Disclosures*

Not applicable.

---

## PART II.

### Item 5. *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

*Market Information and Stockholders*

Our common stock has been traded on the Nasdaq Stock Market under the ticker symbol "COOP."

As of February 22, 2024, there were 1,629 stockholders of record of our common stock. A substantially greater number of holders of our common stock are "street name" or beneficial holders, whose shares are held by banks, brokers and other financial institutions.

*Dividends*

We have not declared or paid cash dividends on our common stock, and we currently do not expect to declare or pay any cash dividends in the foreseeable future. The timing and amount of any future dividends, if any, will be determined by the Board of Directors and will depend, among other factors, upon our earnings, financial condition, cash requirements, the capital requirements of subsidiaries and investment opportunities at the time any such transaction is considered.

*Issuer Purchases of Equity Securities*

In October 2022, our Board of Directors authorized a new repurchase plan of $200 million of our outstanding common stock. In July 2023, our Board of Directors authorized an additional $200 million of our outstanding common stock. This stock repurchase program may be suspended, modified or discontinued at any time at our discretion. As of December 31, 2023, $137 million of common stock remain available for repurchase. During the three months ended December 31, 2023, we repurchased shares of our common stock at a total cost of $72 million under our share repurchase program. The number and average price of shares purchased are set forth in the table below:

| Period | (a) Total Number of Shares Purchased (in thousands) | (b) Average Price Paid per Share[1] | (c) Total Number of Shares Purchased as Part of Publicly Announced Plan or Program (in thousands) | (d) Maximum Dollar Value of Shares that May Yet Be Purchased Under the Plan or Program (in millions)[1] |
|---|---|---|---|---|
| October 2023 | 419 | $ 54.82 | 419 | $ 186 |
| November 2023 | 547 | $ 57.59 | 547 | $ 155 |
| December 2023 | 277 | $ 63.56 | 277 | $ 137 |
| Total | 1,243 | | 1,243 | |

(1) Excludes excise tax.

*Stockholder Return Performance*

The following graph shows a comparison of the cumulative total stockholder return for our common stock, the S&P 500 Index and the S&P Composite 1500 Financials Index from December 31, 2018 through December 31, 2023. This data assumes an investment of $100 on December 31, 2018.



**Comparison of Cumulative Total Return (December 31, 2018 to December 31, 2023)**

Comparative results for our common stock, the S&P 500 Index and the S&P Composite 1500 Financials Index are presented below:

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Mr. Cooper | 100 | 107 | 266 | 357 | 344 | 558 |
| S&P 500 Index | 100 | 129 | 150 | 190 | 153 | 190 |
| S&P Composite 1500 Financials Index | 100 | 128 | 123 | 162 | 142 | 156 |

### Item 6. [RESERVED]

Apx. 100

*Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following discussion should be read in conjunction with the information contained in our consolidated financial statements, including the notes thereto. The following discussion contains, in addition to the historical information, forward-looking statements that include risks and uncertainties (see discussion of "Forward-Looking Statements" included elsewhere in this Annual Report on Form 10-K). Our actual results may differ materially from those anticipated in these forward-looking statements as a result of certain factors, including those factors set forth under Item 1A, *Risk Factors*, and elsewhere in this Annual Report on Form 10-K.

All dollar amounts presented herein are in millions, except per share data and other key metrics, unless otherwise noted.

We have provided a glossary of terms, which defines certain industry-specific and other terms that are used herein, at the end of the MD&A section.

**Basis of Presentation**

The below presentation discusses the results of the operations for the year ended December 31, 2023 compared to the year ended December 31, 2022. For a discussion of results of operations for the year ended December 31, 2022 compared to the year ended December 31, 2021, please refer to Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations*, in our Annual Report on Form 10-K for the year ended December 31, 2022.

## Overview

We are a leading servicer and a major originator of residential mortgage loans. Our purpose is to keep the dream of homeownership alive, and we do this by helping mortgage borrowers (our customers) manage what is typically their largest financial asset, and by helping our investors maximize the returns from their portfolios of residential mortgages. We have a track record of significant growth, having expanded our servicing portfolio UPB from $10 billion in 2006 to $992 billion as of December 31, 2023. We believe this track record reflects our strong operating capabilities, strong loss mitigation skills, a commitment to compliance, a customer-centric culture, a demonstrated ability to retain customers, growing origination capabilities, and significant investment in technology.

Our strategy to position the Company for continued, sustainable long-term growth includes initiatives to improve profitability and generate a return on tangible equity of 12% or higher. Key strategic initiatives include the following:

- Strengthen our balance sheet by building capital and liquidity, and managing interest rate and other forms of risk;
- Improve efficiencies by driving continuous improvement in unit costs for Servicing and Originations segments, as well as by taking corporate actions to eliminate costs throughout the organization;
- Grow our servicing portfolio to $1 trillion in UPB by acquiring new customers and retaining existing customers;
- Achieve and sustain a refinance recapture rate of 60%;
- Delight our customers and keep Mr. Cooper a great place for our team members to work;
- Reinvent the customer experience by acting as the customer's advocate and by harnessing technology to deliver digital solutions that are personalized and friction-less;
- Sustain the talent of our people and the culture of our organization; and
- Maintain strong relationships with agencies, investors, regulators, and other counterparties and a strong reputation for compliance and customer service.

**Anticipated Trends**

In the fourth quarter of 2023, our Servicing segment generated income before income tax expense of $184, and our servicing portfolio grew to $992 billion, bringing us very close to our $1 trillion UPB target. We anticipate achieving this target during the first quarter of 2024, once boarding of a $90 billion subservicing portfolio for a new client is complete. We expect growth conditions to remain favorable, especially for MSR bulk purchases, which are coming to market with attractive margins. Overall, we expect our Servicing segment income to lag our servicing portfolio growth, as we anticipate lower interest rates in 2024, which increase prepayment speeds and amortization expense and lower net interest income.

In the fourth quarter of 2023, our Originations segment generated income before income tax expense of $9 on funded volume of $2,661. We expect the Originations segment to operate at higher levels of profitability during the first quarter of 2024 compared to the fourth quarter of 2023 due to business interruptions caused by the cybersecurity incident in 2023. Refer to Item 1C. *Cybersecurity*, for more information on the cybersecurity incident.

On February 1, 2024, we completed an offering of $1,000 unsecured senior notes due 2032 at 7.125%, and used the proceeds from the offering to repay a portion of the MSR facilities, which have a higher run rate than the new unsecured senior notes. The offering will result in incremental corporate interest expense going forward, partially offset by a decrease in interest expense for our Servicing segment.

While the recent inflation rate increase appears to have subsided, the inflation rate remains relatively high. Inflationary pressures may limit a borrower's disposable income, which can decrease a borrowers' ability to enter into mortgage transactions. Inflationary pressures may also increase our operating costs. However, historically changes in interest rates have a greater impact on our financial results than changes in inflation. While interest rates are greatly influenced by changes in the inflation rate, they do not necessarily change at the same rate or extent as the inflation rate.

**Results of Operations**

Table 1. Consolidated Operations

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | Change |
| Revenues - operational[1] | $ 1,769 | $ 1,643 | $ 126 |
| Revenues - mark-to-market | 25 | 821 | (796) |
| Total revenues | 1,794 | 2,464 | (670) |
| Total expenses | 1,172 | 1,274 | (102) |
| Total other income, net | 32 | 24 | 8 |
| Income before income tax expense | 654 | 1,214 | (560) |
| Less: Income tax expense | 154 | 291 | (137) |
| Net income from continuing operations | $ 500 | $ 923 | $ (423) |

[1] Operational consists of total revenues, excluding mark-to-market.

Income before income tax expense decreased during the year ended December 31, 2023 compared to 2022 primarily due to a decrease in total revenues, partially offset by lower total expenses. The decrease in total revenues was primarily attributable to lower favorable MTM adjustment as the increase in mortgage rates was greater in 2022 compared to 2023. The MTM adjustment was partially offset by the increase in operational revenues in our Servicing segment driven by a larger servicing UPB portfolio in 2023, partially offset by decreased origination revenues due to lower origination volumes. The decrease in total expenses was primarily driven by lower salaries, wages and benefits in our Originations segment due to lower headcount in both the direct-to-consumer and correspondent channels as a result of reducing headcount commensurate with lower origination volumes in 2022. Partially offsetting the decrease in total expenses was cybersecurity incident related costs of $27 in 2023. Refer to Item 1C. *Cybersecurity*, for more information on the cybersecurity incident.

Income tax expense was $154 with an effective tax rate of 23.5% in the year ended December 31, 2023 compared with $291 with an effective tax rate of 24.0% in 2022. For further information on income taxes, please refer to *Note 17, Income Taxes*, in the Notes to Consolidated Financial Statements.

---

Table of Contents

## Segment Results

Our operations are conducted through two segments: Servicing and Originations.

- The Servicing segment performs operational activities on behalf of investors or owners of the underlying mortgages and mortgage servicing rights, including collecting and disbursing borrower payments, investor reporting, customer service, modifying loans where appropriate to help borrowers stay current, and, when necessary, performing collections, foreclosures, and the sale of REO. In 2023, we expanded our special servicing product offering with the acquisition of Rushmore Loan Management Services.
- The Originations segment originates residential mortgage loans through our direct-to-consumer channel, which provides refinance options for our existing customers, and through our correspondent channel, which purchases or originates loans from mortgage bankers.

Refer to *Note 21, Segment Information*, in the Notes to Consolidated Financial Statements for a summary of segment results.

## Servicing Segment

The Servicing segment's strategy is to generate income by growing the portfolio and maximizing servicing margin. We believe several competitive strengths have been critical to our long-term growth as a servicer and subservicer, including our low-cost platform that creates operating leverage, our skill in mitigating losses for investors and clients, our commitment to strong customer service, industry leading compliance management, our history of successfully boarding new loans, and the ability to retain existing customers by offering attractive purchase and refinance options. We believe that our operational capabilities are reflected in our strong servicer ratings and recent agency recognition.

Table 2. Servicer Ratings

| | Fitch[1] | Moody's[2] | S&P[3] |
| --- | --- | --- | --- |
| Rating date | January/February 2024 | May 2023 | January 2024 |
| Residential | RPS2 | SQ2- | Above Average |
| Master Servicer | RMS2+ | SQ1- | Above Average |
| Special Servicer | RSS2 | SQ2- | Above Average |
| Subprime Servicer | RPS2 | SQ2- | Above Average |
| Rushmore Special Servicer[4] | RSS2 | SQ3+ | Above Average |

[1] Fitch Rating Scale of 1 (Highest Performance) to 5 (Low/No Proficiency)
[2] Moody's Rating Scale of SQ1 (Strong Ability/Stability) to SQ5 (Weak Ability/Stability)
[3] S&P Rating Scale of Strong to Weak
[4] In connection with the acquisition of Roosevelt in 2023, the Company acquired Rushmore Loan Management Services, LLC, which is a residential mortgage servicer with services that focuses on special servicing.

---

Table of Contents

The following table sets forth the results of operations for the Servicing segment:

Table 3. Servicing Segment Results of Operations

| | Year Ended December 31, | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2023 | | | 2022 | | | Change | |
| | Amt | bps[1] | | Amt | bps[1] | | Amt | bps |
| **Revenues** | | | | | | | | |
| Operational | $ 1,917 | 22 | $ | 1,530 | 19 | $ | 387 | 3 |
| Amortization, net of accretion | (563) | (6) | | (693) | (9) | | 130 | 3 |
| Mark-to-market adjustments - Servicing | 25 | — | | 821 | 10 | | (796) | (10) |
| Total revenues | 1,379 | 16 | | 1,658 | 20 | | (279) | (4) |
| **Expenses** | | | | | | | | |
| Salaries, wages and benefits | 348 | 4 | | 324 | 4 | | 24 | — |
| General and administrative expenses | | | | | | | | |
| Servicing support fees | 91 | 1 | | 76 | 1 | | 15 | — |
| Corporate and other general and administrative expenses | 194 | 2 | | 125 | 2 | | 69 | — |
| Foreclosure and other liquidation related expenses, net | 27 | 1 | | 16 | — | | 11 | 1 |
| Depreciation and amortization | 12 | — | | 18 | — | | (6) | — |
| Total general and administrative expenses | 324 | 4 | | 235 | 3 | | 89 | 1 |
| Total expenses | 664 | 8 | | 559 | 7 | | 105 | 1 |
| **Other income (expense)** | | | | | | | | |
| Other interest income | 491 | 6 | | 208 | 3 | | 283 | 3 |
| Advance interest expense | (55) | (1) | | (31) | (1) | | (24) | — |
| Other interest expense | (269) | (3) | | (190) | (2) | | (79) | (1) |
| Interest expense | (326) | (4) | | (221) | (3) | | (103) | (1) |
| Total other income (expenses), net | 167 | 2 | | (13) | — | | 180 | 2 |
| Income from continuing operations before income tax expense | $ 882 | 10 | $ | 1,086 | 13 | $ | (204) | (3) |
| Weighted average cost - advance and MSR facilities | 7.9 % | | | 4.6 % | | | 3.3 % | |
| Weighted average cost - excess spread financing | 8.7 % | | | 8.8 % | | | (0.1)% | |

[1] Calculated basis points ("bps") are as follows: Annual dollar amount/Total average UPB X 10000.

Apx. 101

#### Table 4. Servicing • Revenues

| | Year Ended December 31, | | | | | |
| | 2023 | | 2022 | | Change | |
| | Amt | bps[1] | Amt | bps[1] | Amt | bps |
|---|---|---|---|---|---|---|
| **MSR Operational Revenue** | | | | | | |
| Base servicing fees | $ 1,466 | 16 | $ 1,227 | 15 | $ 239 | 1 |
| Modification fees | 19 | — | 13 | — | 6 | — |
| Late payment fees | 63 | 1 | 59 | 1 | 4 | — |
| Other ancillary revenues | 117 | 2 | 53 | 1 | 64 | 1 |
| Total MSR operational revenue | 1,665 | 19 | 1,352 | 17 | 313 | 2 |
| Subservicing/other revenue | 323 | 3 | 283 | 3 | 40 | — |
| Total servicing fee revenue | 1,988 | 22 | 1,635 | 20 | 353 | 2 |
| MSR financing liability costs | (30) | 1 | (19) | — | (11) | 1 |
| Excess spread payments and portfolio runoff | (41) | (1) | (86) | (1) | 45 | — |
| Total operational revenue | 1,917 | 22 | 1,530 | 19 | 387 | 3 |
| **Amortization, Net of Accretion** | | | | | | |
| MSR accretion | (604) | (7) | (779) | (10) | 175 | 3 |
| Excess spread accretion | 41 | 1 | 86 | 1 | (45) | — |
| Total amortization, net of accretion | (563) | (6) | (693) | (9) | 130 | 3 |
| **Mark-to-Market Adjustments • Servicing** | | | | | | |
| MSR MTM | 121 | 2 | 1,328 | 17 | (1,207) | (15) |
| Gain (loss) on MSR sales | 23 | — | (1) | — | 26 | — |
| Reclassifications[2] | (5) | (1) | (30) | (1) | (3) | — |
| Excess spread / financing MTM | (18) | — | (142) | (2) | 124 | 2 |
| Total MTM adjustments - Servicing | 25 | — | 821 | 10 | (796) | (10) |
| Total revenues - Servicing | $ 1,379 | 16 | $ 1,658 | 20 | $ (279) | (4) |

[1] Calculated basis points ("bps") are as follows: Annual dollar amount/Total average UPB X 10000.
[2] Reclassifications include the impact of negative modeled cash flows which have been transferred to reserves on advances and other receivables. The negative modeled cash flows relate to advances and other receivables associated with inactive and liquidated loans that are no longer part of the MSR portfolio.

**Servicing Segment Revenues**
The following provides the changes in revenues for the Servicing segment:

*Servicing* - Operational revenue increased during the year ended December 31, 2023 compared to 2022, primarily due to an increase in base servicing fees as a result of a higher average MSR UPB portfolio in 2023 and an increase in other ancillary revenues due to a $67 gain from the sale of mortgage loans that were acquired in connection with the collapse of a securitization trust due to over-collateralization.

MSR amortization decreased for the year ended December 31, 2023 compared to 2022, primarily due to lower prepayments driven by higher mortgage rates in 2023, partially offset by a higher average MSR UPB portfolio and higher average MSR fair value.

MSR MTM, excess spread/financing MTM and loss on MSR hedging activities decreased during the year ended December 31, 2023 compared to 2022, as the increase in mortgage rates was greater in 2022 compared to 2023.

*Subservicing* - Subservicing fees increased during the year ended December 31, 2023 as compared to 2022, primarily due to subservicing UPB portfolio acquisitions, including the specialty UPB portfolio acquired from Rushmore during the second quarter of 2023, which was fully operational beginning in the third quarter of 2023, partially offset by the deboarding of a few subservicing clients.

**Servicing Segment Expenses**
Total expenses increased during the year ended December 31, 2023 as compared to 2022, primarily driven by an increase in corporate and other general and administrative expenses and salaries, wages, and benefits. The increase in corporate and other general administrative expenses was primarily driven by the growth in our MSR UPB portfolio and an increase in allocated cost in 2023 due to a higher percentage of total headcount in the Servicing segment following the workforce reduction in the Originations segment in 2022. Salaries, wages and benefits increased primarily due to a higher headcount driven by the growth in our MSR UPB portfolio.

**Servicing Segment Other Income (Expenses), net**
Total other income (expenses), net changed during the year ended December 31, 2023 as compared to 2022, primarily due to higher interest income attributable to higher interest rates, partially offset by higher interest expenses from MSR and advance financing.

#### Table 5. Servicing Portfolio • Unpaid Principal Balances

| | Year Ended December 31, | |
| | 2023 | 2022 |
|---|---|---|
| **Average UPB** | | |
| MSRs | $ 476,442 | $ 383,809 |
| Subservicing and other[1] | 416,153 | 425,235 |
| Total average UPB | $ 892,595 | $ 809,064 |

| | December 31, 2023 | | | December 31, 2022 | | |
| | UPB | Fair Value | bps | UPB | Fair Value | bps |
|---|---|---|---|---|---|---|
| **MSRs** | | | | | | |
| Agency | $ 561,656 | $ 8,774 | 156 | $ 380,502 | $ 6,322 | 166 |
| Non-agency | 26,286 | 316 | 120 | 30,880 | 332 | 108 |
| Total MSRs | 587,942 | 9,090 | 155 | 411,382 | 6,654 | 162 |
| **Subservicing and other[1]** | | | | | | |
| Agency | 355,915 | N/A | | 437,491 | N/A | |
| Non-agency | 47,863 | N/A | | 21,562 | N/A | |
| Total subservicing and other | 403,778 | N/A | | 459,053 | N/A | |
| Total ending balance | $ 991,720 | $ 9,090 | | $ 870,435 | $ 6,654 | |

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| **MSR UPB Encumbrance** | | |
| MSRs - unencumbered | $ 513,672 | $ 327,598 |
| MSRs - encumbered[2] | 74,270 | 83,784 |
| Total MSRs UPB | $ 587,942 | $ 411,382 |

[1] Subservicing and other includes (i) loans we service for others, (ii) residential mortgage loans originated but have yet to be sold, and (iii) agency REO balances for which we own the mortgage servicing rights.
[2] Encumbered MSRs consist of residential mortgage loans included within our excess spread financing transactions and MSR financing liability.

The following table provides a rollforward of our MSR and subservicing and other portfolio UPB:

#### Table 6. Servicing and Subservicing and Other Portfolio UPB Rollforward

| | Year Ended December 31, | | | | | |
| | 2023 | | | 2022 | | |
| | MSR | Subservicing and Other | Total | MSR | Subservicing and Other | Total |
|---|---|---|---|---|---|---|
| Balance - beginning of year | $ 411,382 | $ 459,053 | $ 870,435 | $ 339,208 | $ 370,520 | 709,728 |
| **Additions:** | | | | | | |
| Originations[1] | 12,624 | — | 12,624 | 27,381 | — | 27,381 |
| Acquisitions / Increase in subservicing[1] | 229,910 | 97,372 | 327,282 | 121,471 | 196,759 | 318,230 |
| **Deductions:** | | | | | | |
| Dispositions/ Decrease in subservicing[2] | (25,239) | (124,621) | (149,860) | (20,902) | (57,127) | (78,029) |
| Principal reductions and other | (18,279) | (11,849) | (30,128) | (16,525) | (13,132) | (29,657) |
| Voluntary reductions[3] | (20,936) | (15,400) | (36,336) | (33,444) | (37,754) | (76,198) |
| Involuntary reductions[4] | (1,392) | (777) | (2,169) | (608) | (213) | (821) |
| Net changes in loans serviced by others | (128) | — | (128) | (199) | — | (199) |
| Balance - end of year | $ 587,942 | $ 403,778 | $ 991,720 | $ 411,382 | $ 459,053 | $ 870,435 |

[1] Amount for Subservicing and Other UPB includes transfers from MSR for MSRs sold with subservicing rights retained.
[2] Amount for MSR UPB includes transfers to Subservicing and Other for MSRs sold with subservicing rights retained.
[3] Voluntary reductions are related to loan payoffs by customers.
[4] Involuntary reductions refer to loan chargeoffs.

The table below summarizes the overall performance of the servicing and subservicing portfolio:

#### Table 7. Key Performance Metrics • Servicing and Subservicing Portfolio

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Loan count | 4,559,578 | 4,149,116 |
| Average loan amount[1] | $ 217,269 | $ 209,284 |
| Average coupon - agency | 3.9 % | 3.6 % |
| Average coupon - non-agency | 4.9 % | 4.5 % |
| 60+ delinquency (% of loans)[2] | 1.9 % | 2.6 % |
| 90+ delinquent (% of loans)[2] | 1.6 % | 2.2 % |
| 120+ delinquent (% of loans)[2] | 1.4 % | 2.0 % |

| | Year Ended December 31, | |
| | 2023 | 2022 |
|---|---|---|
| Total prepayment speed (12-month constant prepayment rate) | 4.7 % | 9.6 % |

[1] Average loan amount is presented in whole dollar amounts.
[2] Loan delinquency is based on the current contractual due date of the loan. In the case of a completed loan modification, delinquency is based on the modified due date of the loan. Loan delinquency includes loans in forbearance.

Delinquency is an assumption in determining the mark-to-market adjustment and is a key indicator of MSR portfolio performance. Delinquent loans contribute to lower MSR values due to higher costs to service and increased carrying costs of advances.

#### Table 8. Subservicing Loan Modifications and Workout Units

| | Year Ended December 31, | | Change |
| | 2023 | 2022 | |
|---|---|---|---|
| Modifications[1] | 22,850 | 42,131 | (19,281) |
| Workouts[2] | 48,766 | 47,559 | 1,207 |
| Total modification and workout units | 71,616 | 89,690 | (18,074) |

[1] Modifications consist of agency programs designed to adjust the terms of the loan (e.g., reduced interest rates).
[2] Workouts consist of other loss mitigation options designed to assist borrowers and keep them in their homes, but do not adjust the terms of the loan.

Total modifications consist of agency programs designed to adjust the terms of the loan (e.g., reduced interest rates). Total modifications decreased during the year ended December 31, 2023 decreased compared to 2022 primarily due to a decrease in modifications related to loans impacted by the COVID-19 pandemic and related regulatory relief options. Total workouts during the year ended December 31, 2023 increased compared to 2022 primarily due to the extension of the COVID-19 Recovery Loss Mitigation Options, which expanded the options to include additional eligible borrowers and resulted in an increase in workouts in 2023.

**Servicing Portfolio and Liabilities**
The following table sets forth the activities of MSRs:

#### Table 9. MSRs • Fair Value Rollforward

| | Year Ended December 31, | |
| | 2023 | 2022 |
|---|---|---|
| Fair value - beginning of year | $ 6,654 | $ 4,223 |
| **Additions:** | | |
| Servicing retained from mortgage loans sold | 273 | 554 |
| Purchases and acquisitions of servicing rights | 3,189 | 1,595 |
| **Dispositions:** | | |
| Sales of servicing assets and excess yield | (573) | (294) |
| **Changes in fair value:** | | |
| Due to changes in valuation inputs or assumptions used in the valuation model (MSR MTM): | | |
| Agency | 118 | 1,316 |
| Non-agency | 3 | 12 |
| Changes in valuation due to amortization: | | |
| Scheduled principal payments | (248) | (176) |
| Prepayments | | |
| Voluntary prepayments | | |
| Agency | (325) | (556) |
| Non-agency | (11) | (38) |
| Involuntary prepayments | | |
| Agency | (20) | (9) |
| Non-agency | 30 | 27 |
| Other changes[1] | — | — |
| Fair value - end of year | $ 9,090 | $ 6,654 |

[1] Amounts primarily represent negative fair values reclassified from the MSR asset to reserves as underlying loans are removed from the MSR and other reclassification adjustments.

See *Note 5, Mortgage Servicing Rights and Related Liabilities* and *Note 18, Fair Value Measurements*, in the Notes to Consolidated Financial Statements, for additional information regarding the range of assumptions and sensitivities related to the fair value measurement of MSRs as of December 31, 2023.

Apx. 102

Table of Contents

**Excess Spread Financing**

As further disclosed in Note 5, Mortgage Servicing Rights and Related Liabilities, in the Notes to Consolidated Financial Statements, we have entered into sale and assignment agreements treated as financing arrangements whereby the acquirer has the right to receive a specified percentage of the excess cash flow generated from an MSR.

The servicing fees associated with an MSR can be segregated into (i) a base servicing fee and (ii) an excess servicing fee. The base servicing fee, along with ancillary income and other revenues, is designed to cover costs incurred to service the specified pool plus a reasonable margin. The remaining servicing fee is considered excess. We sell a percentage of the excess fee, as a method for efficiently financing acquired MSRs and the purchase of loans, however we have not done so in recent years due to the availability of lower cost sources of funding.

Excess spread financings are recorded at fair value, and the impact of fair value adjustments on future revenues and capital resources varies primarily due to prepayment speeds and option-adjusted spread levels. See Note 5, Mortgage Servicing Rights and Related Liabilities and Note 18, Fair Value Measurements, in the Notes to Consolidated Financial Statements, for additional information regarding the range of assumptions and sensitivities related to the fair value measurement of the excess spread financing liability as of December 31, 2023 and 2022.

During 2022, the Company entered into an assignment agreement to repurchase excess spread liabilities for a total purchase price of $277.

The following table sets forth the results in the excess spread financing:

**Table 10. Excess Spread Financing - Rollforward**

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | | 2023 | | 2022 |
| Fair value - beginning of year | $ | 509 | $ | 768 |
| Additions: | | | | |
| New financings | | — | | — |
| Deductions: | | | | |
| Repayments | | (9) | | (293) |
| Settlements | | (71) | | (99) |
| Changes in fair value: | | | | |
| Agency | | 5 | | 113 |
| Non-Agency | | 3 | | 20 |
| Fair value - end of year | $ | 437 | $ | 509 |

**Originations Segment**

The strategy of our Originations segment is to originate or acquire new MSRs for the servicing portfolio at a more attractive cost than purchasing MSRs with transactions and to retain or recapture our existing customers by providing them with attractive refinance and purchase options. The Originations segment plays a strategically important role because its profitability is typically counter cyclical to that of the Servicing segment. Furthermore, by originating or acquiring MSRs at a more attractive cost than bulk MSR acquisitions, the Originations segment improves our overall profitability and cash flow. Our Originations segment is one way that we help underserved consumers access the financial markets. In 2023, our total originations included loans for 9,561 customers with low FICOs (<660), 10,242 customers with income below the U.S. median household income, 12,139 first-time homebuyers, and 2,928 veterans. The originations during this period included 14,534 Ginnie Mae loans, which are designed for first-time homebuyers, low- and moderate-income borrowers, and veterans, comprising $4 billion in total proceeds. Once these loans are originated, the underserved borrowers become our servicing customers.

The Originations segment includes two channels:

- Our direct-to-consumer ("DTC") lending channel relies on our call centers, website and mobile apps, specially trained teams of licensed mortgage originators, predictive analytics and modeling utilizing proprietary data from our servicing portfolio to reach our existing customers who may benefit from a new mortgage. Depending on borrower eligibility, we will refinance existing loans into conventional, government or non-agency products. Through loan campaigns and direct marketing, the direct-to-consumer channel seeks to convert leads into loans and ultimately MSRs in a cost-efficient manner.

- Our correspondent lending channel facilitates the acquisition of MSRs through purchasing newly originated residential mortgage loans that have been underwritten to investor guidelines. This includes both conventional and government-insured loans that qualify for inclusion in securitizations that are guaranteed by the GSEs. Our correspondent lending channel enables us to replenish servicing portfolio runoff typically at a better rate of return than traditional bulk or flow acquisitions.

Table of Contents

The following table sets forth the results of operations for the Originations segment:

**Table 11. Originations Segment Results of Operations**

| | Year Ended December 31, | | | Change |
|---|---|---|---|---|
| | 2023 | | 2022 | |
| **Revenues** | | | | |
| Service related, net - Originations[1] | $ | 61 | $ 98 | $ (37) |
| Net gain on mortgage loans held for sale | | | | |
| Net gain on loans originated and sold[2] | | 16 | 139 | (123) |
| Capitalized servicing rights[3] | | 255 | 493 | (238) |
| Total net gain on mortgage loans held for sale | | 271 | 632 | (361) |
| Total revenues | | 332 | 730 | (398) |
| **Expenses** | | | | |
| Salaries, wages and benefits | | 143 | 329 | (186) |
| General and administrative | | | | |
| Loan origination expenses | | 30 | 59 | (29) |
| Corporate and other general and administrative expenses | | 33 | 54 | (21) |
| Marketing and professional service fees | | 18 | 33 | (15) |
| Depreciation and amortization | | 8 | 16 | (8) |
| Total general and administrative | | 89 | 162 | (73) |
| Total expenses | | 232 | 491 | (259) |
| Other income (expenses) | | | | |
| Interest income | | 36 | 53 | (17) |
| Interest expense | | (37) | (43) | 6 |
| Total other (expenses) income, net | | (1) | 10 | (11) |
| Income from continuing operations before income tax expense | $ | 99 | $ 249 | $ (150) |
| Weighted average note rate - mortgage loans held for sale | | 6.8 % | 4.2 % | 2.6 % |
| Weighted average cost of funds - warehouse facilities (excluding facility fees) | | 6.7 % | 3.6 % | 3.1 % |

[1]  Service related, net - Originations refers to fees collected from customers for originated loans and from other lenders for loans purchased through the correspondent channel, and includes loan application, underwriting, and other similar fees.
[2]  Net gain on loans originated and sold (excluding capitalized servicing rights) represents the unrealized and realized gains and losses from the origination, purchase, and sale of loans as well as the unrealized and realized gains and losses from related derivative instruments. Gains from the origination and sale of loans are affected by the volume and margin of our originations activity which can vary based upon mortgage interest rates.
[3]  Capitalized servicing rights represent the fair value attributed to mortgage servicing rights at the time in which they are retained in connection with the sale of loans during the period.

**Table 12. Originations - Key Metrics**

| | Year Ended December 31, | | | Change |
|---|---|---|---|---|
| | 2023 | | 2022 | |
| **Key Metrics** | | | | |
| DTC locked PTA volume[1] | $ | 5,704 | $ 14,823 | $ (9,119) |
| Correspondent locked PTA volume[1] | | 7,060 | 10,067 | (3,007) |
| Total PTA lock volume | $ | 12,764 | $ 24,890 | $ (12,126) |
| DTC funded volume | $ | 5,940 | $ 17,857 | $ (11,917) |
| Correspondent funded volume | | 6,694 | 10,393 | (3,699) |
| Total funded volume[2] | $ | 12,634 | $ 28,250 | $ (15,616) |
| DTC volume of loans sold | $ | 5,850 | $ 19,200 | $ (13,350) |
| Correspondent volume of loans sold | | 6,657 | 10,863 | (4,206) |
| Total volume of Originations loans sold | $ | 12,507 | $ 30,063 | $ (17,556) |
| Recapture percentage[3] | | 24.0 % | 31.8 % | (7.8) % |
| Refinance recapture percentage[4] | | 77.1 % | 58.7 % | 18.4 % |
| Purchase as a percentage of funded volume | | 57.2 % | 33.0 % | 24.2 % |
| Value of capitalized servicing on retained settlements | | 219 bps | 191 bps | 28 bps |
| **Originations Margin** | | | | |
| Revenue | $ | 332 | $ 730 | $ (398) |
| PTA lock volume | $ | 12,764 | $ 24,890 | $ (12,126) |
| Revenue as a percentage of PTA lock volume[5] | | 2.60 % | 2.93 % | (0.33) % |
| Expenses[6] | $ | 233 | $ 483 | $ (244) |
| Funded volume | $ | 12,634 | $ 28,250 | $ (15,616) |
| Expenses as a percentage of funded volume[7] | | 1.84 % | 1.70 % | 0.14 % |
| Originations Margin | | 0.76 % | 1.23 % | (0.47) % |

[1]  Pull through adjusted ("PTA") volume represents the expected funding from locks taken during the period.
[2]  Funded volume for the period could include pull through adjusted lock volume from prior periods.
[3]  Recapture percentage includes new loan originations from both purchase and refinance transactions where borrower retention and/or property retention occurs as a result of a loan payoff from our servicing portfolio. Excludes loans we are contractually unable to solicit.
[4]  Refinance recapture percentage includes new loan originations from refinance transactions where borrower retention and property retention occurs as a result of a loan payoff from our servicing portfolio. Excludes loans we are contractually unable to solicit.
[5]  Calculated on pull-through adjusted lock volume as revenue is recognized at the time of loan lock.
[6]  Expenses include total expense and total other income (expenses), net.
[7]  Calculated on funded volume as expenses are incurred based on closing of the loan.

**Originations Segment Revenues**

Total revenues decreased for the year ended December 31, 2023 compared to 2022 primarily driven by lower originations volume in 2023 that resulted in a decrease in capitalized servicing rights and a decline in net gain on loans originated and sold.

Apx. 103

**Table of Contents**

**Originations Segment Expenses**

Total expenses for the year ended December 31, 2023 decreased when compared to 2022 primarily due to a decline in salaries, wages and benefits expense, and lower origination expenses. Salaries, wages and benefits expense declined due to decreased headcount and lower origination volumes in both DTC and correspondent channels. Loan origination expenses declined in 2023 primarily due to cost reduction initiatives in connection with decreased origination volumes.

**Originations Segment Other (Expenses) Income, Net**

Interest income relates primarily to mortgage loans held for sale. Interest expense is associated with the warehouse facilities utilized to finance newly originated loans. Due to lower originations volume, both interest income and interest expense declined, partially offset by higher interest rates, resulting in immaterial changes for total other (expenses) income, net, during the year ended December 31, 2023 as compared to 2022.

**Originations Margin**

The Originations Margin for the year ended December 31, 2023 decreased as compared to 2022 primarily due to lower revenue as a percentage of pull through adjusted lock volume driven by lower margins from a shift in channel mix from higher margin direct-to-consumer to lower margin correspondent and decline in total revenues as a result of lower originations volume from both the direct-to-consumer and correspondent channels. Direct-to-consumer channel mix was 45% and 60% for the years ended December 31, 2023, and 2022, respectively.

## Corporate/Other

Corporate/Other includes the results of Xome's and Roosevelt Management Company's operations, the Company's unallocated overhead expenses (which include the costs of executive management and other corporate functions that are not directly attributable to our operating segments), changes in equity investments and interest expense on our unsecured senior notes. In addition, Corporate/Other includes eliminations related to intersegment hedge fair value changes.

The following tables set forth the selected financial results for Corporate/Other:

**Table 13. Corporate/Other Selected Financial Results**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | Change |
| **Corporate/Other – Operations** | | | |
| Total revenues | $ 83 | $ 76 | $ 7 |
| Total expenses | 276 | 224 | 52 |
| Interest income | 1 | — | 1 |
| Interest expense | 176 | 160 | 16 |
| Other income, net | 41 | 187 | (146) |
| **Key Metrics** | | | |
| Average exchange inventory under management | 27,120 | 19,663 | 7,457 |

Total revenues increased during the year ended December 31, 2023 as compared to 2022 due to increased revenue from Xome driven by greater sales volume in connection with exchange inventory growth.

Total expenses increased during the year ended December 31, 2023 as compared to 2022 due to cybersecurity incident related expenses of $26 and an increase in allocated costs in 2023, driven by higher percentage of total headcount in Corporate/Other following the workforce reduction in the Originations segment in 2022. Refer to Item 1C. *Cybersecurity*, for more information on the cybersecurity incident.

Interest expense increased during the year ended December 31, 2023 as compared to 2022 primarily due to the senior note assumed from the acquisition of Home Point Capital Inc.

The change in other income, net during the year ended December 31, 2023 as compared to 2022 was primarily due to a gain of $223 recorded in 2022 upon completion of the mortgage servicing platform sale to Sagent M&C, LLC, partially offset by a preliminary bargain purchase gain of $96 recorded in 2023 in connection with the acquisition of Home Point Capital Inc.

---

## Liquidity and Capital Resources

We measure liquidity by unrestricted cash and availability of borrowings on our MSR and other facilities. We held cash and cash equivalents on hand of $571 as of December 31, 2023 compared to $527 as of December 31, 2022. During the year ended December 31, 2023, we generated net cash of $896 from operating activities and bought $5.6 million shares of our outstanding common stock for a total cost of $276, excluding excise tax, as part of our stock repurchase program. We have sufficient borrowing capacity to support our operations. As of December 31, 2023, total borrowing capacity for advance, warehouse, and MSR facilities was $11,301 of which $1,848 was collateralized and immediately available to draw. During the year ended December 31, 2023, we increased capacity on our MSR facilities by $2,550. Additionally, on February 1, 2024, we completed an offering of $1,000 7.125% unsecured senior notes due 2032. We repaid a portion of the amounts outstanding on our MSR facilities with the net proceeds of the offering. For more information on our advance, warehouse, and MSR facilities, see *Note 13, Indebtedness*, in the Notes to Consolidated Financial Statements.

**Sources and Uses of Cash**

Our primary sources of funds for liquidity include: (i) servicing fees and ancillary revenues; (ii) advance, warehouse and MSR facilities, other secured borrowings and unsecured senior notes; (iii) payments received in connection with the sale of excess spread.

Our primary uses of funds for liquidity include: (i) funding of servicing advances; (ii) originations of loans; (iii) payment of interest expenses; (iv) payment of operating expenses; (v) repayment of borrowings and repurchases or redemptions of outstanding indebtedness; (vi) payments for acquisitions of MSRs; (vii) payment of our technology expenses.

We believe that our cash flows from operating activities, as well as cash capacity through existing facilities, provide adequate resources to fund our anticipated ongoing cash requirements. We rely on these facilities to fund operating activities. As the facilities mature, we anticipate renewal of these facilities will be achieved. Future debt maturities will be funded with cash and cash equivalents, cash flow from operating activities and, if necessary, future access to capital markets. We continue to optimize the use of deposit match and avoid unnecessary interest carrying costs.

In addition, derivative instruments are used as part of the overall strategy to manage exposure to market risks primarily associated with fluctuations in interest rates related to originations and servicing. As part of the Company's economic hedging strategy, the Company hedges interest rate risk related to the pipeline in Originations (comprised of IRLCs and newly originated mortgage loans held for sale) and MSR portfolio in Servicing primarily using third-party derivative instruments. See *Note 12, Derivative Financial Instruments*, in the Notes to Consolidated Financial Statements within Item 8, *Financial Statements and Supplementary Data*, which is incorporated herein for a summary of our derivative transactions.

In the normal course of business, we enter into various types of on- and off-balance sheet transactions with special purpose entities ("SPEs") determined to be variable interest entities ("VIEs"), which primarily consist of securitization trusts established for a limited purpose. Generally, these SPEs are formed for the purpose of securitization transactions in which we transfer assets to an SPE, which then issues to investors various forms of debt obligations supported by those assets. In these securitization transactions, we typically receive cash and/or other interests in the SPE as proceeds for the transferred assets. See *Note 14, Securitizations and Financings*, in the Notes to Consolidated Financial Statements within Item 8, *Financial Statements and Supplementary Data*, which is incorporated herein for a summary of our transactions with VIEs and unconsolidated balances, and details of their impact on our consolidated financial statements.

---

**Table of Contents**

**Cash Flows**
The table below presents cash flows information:

**Table 14. Cash Flows**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | Change |
| **Net cash attributable to:** | | | |
| Operating activities | $ 896 | $ 3,767 | $ (2,871) |
| Investing activities | (1,836) | (1,322) | (514) |
| Financing activities | 978 | (2,784) | 3,762 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | $ 38 | $ (339) | $ 377 |

*Operating activities*
Cash generated from operating activities decreased to $896 during the year ended December 31, 2023 from $3,767 in 2022. The decrease was primarily due to a decline of $4,827 in cash generated from originations net sales activities driven by higher mortgage rates, partially offset by an increase of $1,833 in cash used for the repurchase of loan assets out of Ginnie Mae securitizations.

*Investing activities*
Cash used in investing activities increased to $1,836 during the year ended December 31, 2023 from $1,322 in 2022. The increase was primarily due to cash used of $522 for the acquisitions of Roosevelt and Home Point in 2023, and an increase of $255 in cash used for the purchase of mortgage servicing rights in 2023, partially offset by an increase of $313 in cash generated from the proceeds on sale of mortgage servicing rights in 2023.

*Financing activities*
Our financing activities generated cash of $978 during the year ended December 31, 2023 compared to cash used of $2,784 in 2022. The change was primarily due to a net borrowing of $1,375 in 2023 compared to net repayment of $2,113 in 2022 on our advance, warehouse and MSR facilities.

---

**Table of Contents**

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

**Market Risk**
Our principal market exposure is to interest rate risk due to the impact on our mortgage-related assets and commitments.

*Interest Rate Risk*
Changes in interest rates negatively affect our operations primarily as follows:

*Servicing Segment*

- a decrease in mortgage rates may increase prepayment speeds which may impact earnings through (i) increased amortization expense; (ii) decrease in servicing fees; and (iii) decrease in the fair value of our MSRs;

- a decrease in interest rates could reduce our earnings from our custodial deposit accounts;

- an increase in interest rates would increase the cost of servicing our outstanding debt, including our ability to finance servicing advances and for borrowing for acquisitions;

- an increase in interest rates, together with an increase in monthly payments when an adjustable mortgage loan's interest rate adjusts upward from an initial fixed rate or a low introductory rate, may cause increased delinquency, default and foreclosure. Increased mortgage defaults and foreclosures may adversely affect our business as they increase our expenses and reduce the number of performing loans; and

- an increase in interest rates also adversely affect our redelivery margins on EBO loans and consequently reduce the volume of EBO repurchases.

*Originations Segment*

- an increase in interest rates could adversely affect our loan originations volume because refinancing an existing loan would be less attractive for homeowners and qualifying for a purchase money loan may be more difficult for consumers;

- an increase in interest rates also adversely affect our production margins due to increased competition among originators;

Our Investment Committee establishes and maintains policies and procedures to govern our risk appetite and associated hedging programs. Factors considered include such factors as market volatility, duration and interest rate sensitivity measures, limits, targeted hedge ratios, the type of hedge instruments used in our hedging activities and our liquidity risk profile. Management actively manages interest rate exposure associated with the MSR portfolio and the pipeline through the usage of hedge instruments in accordance with the Investment Committee policies, which specify that the MSR portfolio and the pipeline should be hedged separately. Hedge instruments permitted by our aggregate hedge strategy include highly liquid market instruments such as Forward MBS trades, Swap futures, and Treasury futures. See *Note 12, Derivative Financial Instruments* to the Consolidated Financial Statements for additional information regarding our use of derivatives.

**MSR Hedging Strategy**
MSRs are measured at fair value with changes in fair value being recorded in earnings in the period in which the changes occur. The MSR hedge strategy is focused on mitigating interest-rate risk associated with the MSR portfolio excluding PLS MSRs (referred to herein as "MSR portfolio exposure").

Our MSR hedge strategy's objective is to provide partial hedge coverage of our MSR portfolio exposure, considering current market and liquidity conditions. The hedge coverage ratio defined as the ratio of hedge and asset rate sensitivity (referred to as DV01) is targeted at 75% of the MSR portfolio modeled interest rate risk, subject to change at the discretion of the Investment Committee. Accordingly, the changes in fair value of our hedging instruments may not fully offset the changes in fair value of our MSR portfolio exposure attributable to interest rate changes. We periodically evaluate the coverage ratio to determine if it warrants adjustment based on market conditions and the symmetry of interest rate risk exposure and liquidity impacts of the hedge and asset profile under stock scenarios. In addition, while DV01 measures remain within the range of our hedging strategy's objective, actual changes in fair value of the derivatives and MSR portfolio may not offset to the same extent, due to non-parallel changes in the interest rate curve and the basis risk inherent in the MSR profile and hedging instruments. We continuously evaluate the use of hedging instruments to strive to enhance the effectiveness of our interest rate hedging strategy.

Apx. 104

Table of Contents

The changes in value on the derivative instruments associated with the MSR hedging strategy are recorded in earnings as a component of "revenues - service related, net" in the consolidated statements of operations within the Servicing segment and in "loss (gain) on MSR hedging activities" on the consolidated statements of cash flows.

*Pipeline Hedging Strategy - Loans Held For Sale and IRLCs*

We are exposed to interest rate risk and related price risk during the period from the date of the interest rate lock commitment through (i) the lock commitment cancellation or expiration date or (ii) through the date of sale of the resulting loan into the secondary mortgage market for both the Originations segment for newly originated mortgage loans and the Servicing segment related to repurchased EBO mortgage loans held for sale. IRLCs generally range to 90 days and mortgage loans held for sale are generally funded and sold within 30 days. The objective of the pipeline hedging strategy is to economically hedge the entire pipeline interest rate exposure of both IRLCs and mortgage loans held for sale within certain hedge coverage tolerance levels. The net daily market risk position of net pull-through adjusted IRLCs and mortgage loans held for sale is monitored daily and its tolerance is +/- 10% of the estimated base value risk.

The changes in value on the derivative instruments associated with the pipeline hedging strategy are recorded in earnings as a component of "revenues - net gain on mortgage loans held for sale" on the consolidated statements of operations and consolidated statements of cash flows within the Originations and Servicing segments.

*Sensitivity Analysis*

We assess our market risk based on changes in interest rates utilizing a sensitivity analysis. The sensitivity analysis measures the potential impact on fair values based on hypothetical changes (increases and decreases) in interest rates.

We use a duration-based model in determining the impact of interest rate shifts on our loan portfolio, certain other interest-bearing liabilities measured at fair value and interest rate derivatives portfolios. The primary assumption used in these models is that an increase or decrease in the benchmark interest rate produces a parallel shift in the yield curve across all maturities.

We utilize a discounted cash flow analysis to determine the fair value of MSRs and the impact of parallel interest rate shifts on MSRs. The discounted cash flow model incorporates prepayment speeds, OAS, costs to service, delinquencies, ancillary revenues, recapture rates and other assumptions that management believes are consistent with the assumptions that other similar market participants use in valuing the MSRs. The key assumptions to determine fair value include prepayment speed, OAS and cost to service. However, this analysis ignores the impact of interest rate changes on certain material variables, such as the benefit or detriment on the value of future loan originations, non-parallel shifts in the spread relationships between MBS, swaps and U.S. Treasury rates and changes in primary and secondary mortgage market spreads. For mortgage loans, IRLCs, forward delivery commitments on MBS and treasury futures, we rely on a model in determining the impact of interest rate shifts. In addition, the primary assumption used for IRLCs, is the borrower's propensity to close their mortgage loans under the commitment.

Our total market risk is influenced by a wide variety of factors including market volatility and the liquidity of the markets. There are certain limitations inherent in the sensitivity analysis presented, including the necessity to conduct the analysis based on a single point in time and the inability to include the complex market reactions that normally would arise from the market shifts modeled.

We used December 31, 2023 market rates on our instruments to perform the sensitivity analysis. The estimates are based on the market risk sensitive portfolios described in the preceding paragraphs and assume instantaneous, parallel shifts in interest rate yield curves. These sensitivities are hypothetical and presented for illustrative purposes only. Changes in fair value based on variations in assumptions generally cannot be extrapolated because the relationship of the change in fair value may not be linear.

**51** Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K

The following table summarizes the estimated change in the fair value of our assets and liabilities sensitive to interest rates as of December 31, 2023 given hypothetical instantaneous parallel shifts in the yield curve. Actual results could differ materially.

**Table 17. Change in Fair Value**

| | December 31, 2023 | |
| --- | --- | --- |
| | Down 25 bps | Up 25 bps |
| Increase (decrease) in assets | | |
| Mortgage servicing rights at fair value | $ (130) | $ 116 |
| Mortgage loans held for sale at fair value | 2 | (2) |
| Derivative financial instruments: | | |
| Interest rate lock commitments | 4 | (4) |
| Forward MBS trades | 76 | (72) |
| Treasury futures | — | — |
| Total change in assets | (48) | 38 |
| Increase (decrease) in liabilities | | |
| Mortgage servicing rights liabilities at fair value | (2) | 2 |
| Excess spread financing at fair value | (3) | 3 |
| Derivative financial instruments: | | |
| Interest rate lock commitments | — | — |
| Forward MBS trades | 6 | (4) |
| Treasury futures | — | — |
| Total change in liabilities | 1 | 1 |
| Total net change | $ (49) | $ 37 |

**Capital Resources**

*Capital Structure and Debt*

We require access to external financing resources from time to time depending on our cash requirements, assessments of current and anticipated market conditions and after-tax cost of capital. If needed, we believe additional capital could be raised through a combination of issuances of equity, corporate indebtedness, asset-backed acquisition financing and/or cash from operations. Our access to capital markets can be impacted by factors outside our control, including economic conditions.

*Financial Covenants*

Our credit facilities contain various financial covenants which primarily relate to required tangible net worth amounts, liquidity reserves, leverage requirements, and profitability requirements, which are measured at our operating subsidiary, Nationstar Mortgage, LLC, as well as Rushmore Loan Management Services, LLC, which was acquired during the third quarter of 2023 in connection with the acquisition of Roosevelt. As of December 31, 2023, we were in compliance with our required financial covenants.

*Seller/Servicer Financial Requirements*

We are also subject to net worth, liquidity and capital ratio requirements established by the Federal Housing Finance Agency ("FHFA") for Fannie Mae and Freddie Mac ("Enterprises") Seller/Servicers, and Ginnie Mae for single-family issuers, as summarized below. These requirements apply to our operating subsidiary, Nationstar Mortgage, LLC, and Rushmore Loan Management Services, LLC.

*Minimum Net Worth*

• FHFA - a net worth base of $2.5 plus a dollar amount equal to or exceeding the sum of (i) 25 basis points of the seller/servicer's residential first lien mortgage servicing UPB, serviced for the Enterprises, plus (ii) 25 basis points of non-agency serviced UPB, plus (iii) 35 basis points of the seller/servicer's residential first lien mortgage servicing UPB serviced for Ginnie Mae.

Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K **52**

Table of Contents

• Ginnie Mae - a net worth equal to the sum of $2.5, plus (i) 35 basis points of the issuer's total effective Ginnie Mae single-family outstanding obligations, plus (ii) 25 basis points of the issuer's total Enterprises single family outstanding servicing portfolio balance, plus (iii) 25 basis points of the issuer's total non-agency single family servicing portfolio.

*Minimum Liquidity*

• FHFA - a base Liquidity of eligible assets equal to or exceeding:
  • 7 basis points of the seller/servicer's residential first lien mortgage servicing UPB serviced for the Enterprises, if the seller/servicer remits (on an Enterprise draws) interest or principal, or both, as scheduled, regardless of whether principal or interest has been collected from the borrower, plus
  • 3.5 basis points of the seller/servicer's residential first lien mortgage servicing UPB serviced for the Enterprises, if the seller/servicer remits (or an Enterprise draws) the interest and principal only as actually collected from the borrower, plus
  • 3.5 basis points of the seller/servicer's non-agency servicing UPB, plus
  • 10 basis points of the seller/servicer's residential first lien mortgage servicing UPB serviced for Ginnie Mae.
  • In addition, an origination liquidity equal to or exceeding the sum of the following:
    i. Residential first lien mortgages held for sale, at lower of cost or market
    ii. Residential first lien mortgages held for sale, at fair value, plus
    iii. UPB of interest rate lock commitments after fallout adjustments
  • Supplemental liquidity at all time equal to or exceeding the sum of:
    i. 5 basis points of the seller/servicer's residential mortgage servicing UPB serviced for the Enterprises, plus
    ii. 5 basis points of the seller/servicer's residential mortgage servicing UPB serviced for Ginnie Mae
• Ginnie Mae - the greater of $5 or the sum of:
  • 10 basis points of the issuer's outstanding Ginnie Mae single-family servicing UPB, plus
  • 3.5 basis points of the issuer's outstanding Enterprises single family servicing UPB, if the issuer remits (on the Enterprise draws) the principal and interest only as actually collected from the borrower, plus
  • 7 basis points of the issuer's outstanding Enterprises single-family servicing UPB, if the issuer remits (or the Enterprise draws) the principal or interest, or both, as scheduled, regardless of whether principal or interest has been collected from the borrower, plus
  • 3.5 basis points of the issuer's outstanding non-agency single-family servicing UPB.
• Ginnie Mae - issuers that originated more than $1 billion in UPB of any residential first mortgage in the recent four-quarter period must have liquid assets equal to the greater of at least $1 or the sum of the points listed immediately above, plus:
  • 50 basis points of loans held for sale, plus
  • 50 basis points of the issuer's UPB of IRLCs after fallout adjustments

*Financial Reporting Requirements*

• FHFA – must obtain an assessment of the seller/servicer's performance and creditworthiness by a qualified, independent third party on an annual basis and meet the following criteria:
  • One primary servicer rating or master servicer rating, as applicable for large non-depository institutions that have greater than or equal to $50 billion in servicing UPB, and
  • One primary servicer rating or master servicer rating, as applicable, and one third party long-term senior unsecured debt rating or long-term corporate family rating, for large non-depository institutions that have greater than $100 billion in servicing UPB, and
  • One primary servicer rating or master servicer rating, as applicable, and issued by two rating agencies, each of which must issue either a third party long-term unsecured debt rating or long-term corporate family rating for large non-depository institutions that have greater than or equal to $150 billion in servicing UPB.

*Minimum Capital Ratio*
• FHFA and Ginnie Mae - a ratio of Tangible Net Worth to Total Assets greater than 6%.

*Secured Debt to Gross Tangible Asset Ratio*
• Ginnie Mae - a secured debt to gross tangible asset ratio no greater than 60%.

As of December 31, 2023, Nationstar Mortgage, LLC and Rushmore Loan Management Services, LLC were in compliance with our seller/servicer financial requirements for FHFA and Ginnie Mae.

**53** Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K

In 2022, the FHFA and Ginnie Mae revised its Seller/Servicers and single-family issuers minimum financial eligibility requirements. All revisions are effective in 2024, as summarized below. The Company is currently evaluating the impact of the revised requirements.

*Capital and Liquidity Plan (effective March 31, 2024)*
• FHFA - Require annual capital and liquidity plan that includes MSR stress tests as part of the plan.

*Capital Requirements (effective December 31, 2024)*
• Ginnie Mae - a Risk-Based Capital Ratio ("RBCR") of at least 6%. RBCR is adjusted net worth less excess MSRs divided by total risked-based assets.

Since our Ginnie Mae single-family servicing portfolio exceeds $75 billion in UPB, we are also required to obtain an external primary servicer rating and issuer credit ratings from two different rating agencies and receive a minimum rating of a B or its equivalent. We met this requirement for all financial periods presented.

In addition, Fannie Mae or Freddie Mac may require capital ratios in excess of stated requirements. Refer to *Note 19, Capital Requirements*, in the Notes to Consolidated Financial Statements for additional information.

**Table 15. Debt**

| | December 31, 2023 | December 31, 2022 |
| --- | --- | --- |
| Advance facilities principal amount | $ 682 | $ 669 |
| Warehouse facilities principal amount | 822 | 817 |
| MSR facilities principal amount | 2,814 | 1,410 |
| Unsecured senior notes principal amount | 3,200 | 2,700 |

*Advance Facilities*

As part of our normal course of business, we borrow money to fund servicing advances. Our servicing agreements require that we advance our own funds to meet contractual principal and interest payments for certain investors, and to pay taxes, insurance, foreclosure costs and various other items that are required to preserve the assets being serviced. Delinquency rates and prepayment speeds affect the size of servicing advance balances, and we exercise our ability to stop advancing principal and interest where the pooling and servicing agreements permit, where the advance is deemed to be non-recoverable from future proceeds. These servicing requirements affect our liquidity. We rely upon several counterparties to provide us with financing facilities to fund a portion of our servicing advances. As of December 31, 2023, we had a total borrowing capacity of $950, of which we had borrowings on additional $268. The maturity dates of our advance facilities range from October 2024 to September 2025. As of December 31, 2023, we had $432 of borrowings outstanding under facilities maturing within less than one year and $250 of borrowings outstanding under facilities maturing within the next two years.

*Warehouse and MSR Facilities*

Loan origination activities generally require short-term liquidity in excess of amounts generated by our operations. The loans we originate are financed through several warehouse lines on a short-term basis. We typically hold the loans for approximately 30 days and then sell or place the loans in government securitizations in order to repay the borrowings under the warehouse lines. Our ability to fund current operations depends upon our ability to secure these types of short-term financings on acceptable terms and to renew or replace the financings as they expire. As of December 31, 2023, we had a total borrowing capacity of $5,101 and $5,250 for warehouse and MSR facilities, of which we could borrow an additional $4,279 and $2,456, respectively. The maturity dates for our warehouse facilities range from February 2024 to September 2025. As of December 31, 2023, we had $664 of borrowings outstanding under warehouse facilities maturing within less than one year and $158 of borrowings outstanding under warehouse facilities maturing within the next two years. Our MSR facilities provide financing for our servicing rights and investments. The maturity dates for our MSR facilities range from November 2024 to September 2025. As of December 31, 2023, we had $329 of borrowings under MSR facilities maturing within less than one year and $2,485 of borrowings outstanding under MSR facilities maturing within the next two years.

Mr. Cooper Group Inc. • 2023 Annual Report on Form 10-K **54**

Apx. 105

Table of Contents

*Unsecured Senior Notes*

In 2021 and 2022, we completed offerings of unsecured senior notes with maturity dates ranging from 2027 to 2031. In connection with the completion of Home Point in the third quarter of 2023, we assumed an unsecured senior note with a maturity date in 2026. We pay interest semi-annually to the holders of these notes at interest rates ranging from 5.000% to 6.000%. We are scheduled to pay a total of $940 of interest payments from these notes over the next eight years, of which $176 is due within less than one year.

As of December 31, 2023, the expected maturities of our unsecured senior notes based on contractual maturities are presented below:

**Table 16. Contractual Maturities - Unsecured Senior Notes**

| Year Ending December 31, | Amount |
|---|---|
| 2024 through 2025 | $ — |
| 2026 | 500 |
| 2027 | 600 |
| 2028 | 850 |
| Thereafter | 1,250 |
| Unsecured senior notes principal amount | 3,200 |
| Purchase discount and unamortized debt issuance costs | (49) |
| Unsecured senior notes, net | $ 3,151 |

*Other contractual obligations*

Our operating lease obligations were primarily incurred for office space and equipment. The average lease terms are generally for 1 to 8 years. As of December 31, 2023, total future minimum lease payments for our operating lease obligations was $102, of which $23 is due within less than a year. For more information regarding lease obligations, see *Note 9, Leases,* in the Notes to Consolidated Financial Statements.

## Critical Accounting Policies and Estimates

Various elements of our accounting policies, by their nature, are inherently subject to estimation techniques, valuation assumptions and other subjective assessments. In particular, we have identified the following policies that, due to the judgment, estimates and assumptions inherent in those policies, are critical to an understanding of our consolidated financial statements. These policies relate to fair value measurements, particularly those determined to be Level 3 as discussed in *Note 18, Fair Value Measurements,* in Notes to Consolidated Financial Statements and valuation and realization of deferred tax assets. We believe that the judgment, estimates and assumptions used in the preparation of our consolidated financial statements are appropriate given the factual circumstances at the time. However, given the sensitivity of our consolidated financial statements to these critical accounting policies, the use of other judgments, estimates and assumptions could result in material differences in our results of operations or financial condition. Fair value measurements considered to be Level 3 representing estimated values based on significant unobservable inputs include (i) the valuation of MSRs and (ii) the valuation of excess spread financing.

*MSRs at Fair Value*

We generally retain the servicing rights for existing residential mortgage loans transferred to a third party. We recognize MSRs recorded on the balance sheet in such transfers that meet the accounting requirements for sale treatment at fair value. Additionally, we may acquire the rights to service residential mortgage loans from third parties. We have elected to measure all MSRs at fair value subsequent to capitalization or acquisition, with all changes in fair value recorded within "revenues - service related, net" in the consolidated statements of operations. We estimate the fair value of MSRs using a discounted cash flow model, which incorporates prepayment speeds, option adjusted spread, costs to service, delinquencies, ancillary revenues, recapture rates and other assumptions that management believes are consistent with the assumptions that other similar market participants use in valuing the MSRs. The key assumptions to determine fair value include prepayment speeds, option adjusted spread ("OAS"), and cost to service. However, the discounted cash flow model is complex and uses asset-specific collateral data and market inputs for interest and discount rates. In addition, the modeling requirements of MSRs are complex because of the high number of variables that drive cash flows associated with MSRs. We obtain third-party valuations, industry surveys and other available market data quarterly to assess the reasonableness of the fair value calculated by the cash flow model. For the impact of changes in estimates on MSRs at fair value, see Item 7A, *Quantitative and Qualitative Disclosures about Market Risk* and *Note 5, Mortgage Servicing Rights and Related Liabilities,* in the Notes to Consolidated Financial Statements.

*Excess Spread Financing*

In conjunction with the acquisition of certain MSRs on various pools of residential mortgage loans (the "Portfolios"), we have entered into sale and assignment agreements related to its right to servicing fees, under which we sell to third parties the right to receive a portion of the excess cash flow generated from the Portfolios after receipt of a fixed base servicing fee per loan. We measure these financing arrangements at fair value to accurately represent the future performance of the acquired MSRs and related excess servicing financing, with all changes in fair value recorded as a charge or credit to "revenues - service related, net" in the consolidated statements of operations. The fair value on excess spread financing is based on the present value of future expected discounted cash flows. The cash flow assumptions used in the model are based on various factors, with the key assumptions being mortgage prepayment speeds and option adjusted spread. However, the discounted cash flow model is complex and uses asset-specific collateral data and market inputs. In addition, our total market risk is influenced by a wide variety of factors including market volatility and liquidity of the markets. We obtain a third-party valuation, industry surveys and other available market data quarterly to assess the reasonableness of the fair value calculated by the cash flow model. For the impact of changes in estimates on excess spread financing, see Item 7A, *Quantitative and Qualitative Disclosures about Market Risk* and *Note 5, Mortgage Servicing Rights and Related Liabilities,* in the Notes to Consolidated Financial Statements.

---

Table of Contents

*Realization of Deferred Tax Assets*

Our provision for income taxes is calculated using the balance sheet method, which requires the recognition of deferred income taxes. Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes and certain changes in the valuation allowance. We provide a valuation allowance against deferred tax assets if, based on available evidence, it is more likely that not some portion or all of the deferred tax assets will not be realized. In determining the adequacy of the valuation allowance, we consider all forms of evidence, including: (1) historic earnings or losses; (2) anticipated taxable income resulting from the reversal of taxable temporary differences; (3) tax planning strategies; and (4) anticipated future earnings exclusive of the reversal of taxable temporary differences. Of all of the sources of taxable income, we generally rely upon reversals of existing deferred tax liabilities, tax planning strategies, and future taxable income excluding reversing differences. In determining the appropriate amount of valuation allowance required, we consider (1) internal forecasts of our future pre-tax income exclusive of reversing temporary differences and carryforwards, (2) the nature and timing of future reversals of existing deferred tax assets and liabilities, (3) future originating temporary and permanent differences, and (4) NOL carryforward expiration dates, among others.

## Other Matters

**Recent Accounting Developments**

Below provides recently issued accounting pronouncements applicable to us but not yet effective.

Accounting Standards Update 2023-07, *Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures* ("ASU 2023-07"), provides updates to qualitative and quantitative reportable segment disclosure requirements, including enhanced disclosures about significant segment expenses that are regularly provided to the chief operating decision maker included within each reported measure of segment profit or loss and increased interim disclosure requirements, among others. The amendments in ASU 2023-07 are effective for fiscal years beginning after December 15, 2023, and interim periods within fiscal years beginning after December 15, 2024. Early adoption is permitted, and the amendments should be applied retrospectively. We are currently evaluating the impact this ASU may have on our financial statement disclosures. The Company does not expect ASU 2023-07 to have a material impact on our consolidated financial statements.

Accounting Standards Update 2023-09, *Income Taxes (Topic 740): Improvements to Income Tax Disclosures* ("ASU 2023-09"), provides qualitative and quantitative updates to the rate reconciliation and income taxes paid disclosures, among others, in order to enhance the transparency of income tax disclosures, including consistent categories and greater disaggregation of information for income taxes paid by jurisdiction. The amendments in ASU 2023-09 are effective for fiscal years beginning after December 15, 2024, with early adoption permitted. The amendments should be applied prospectively; however, retrospective application is also permitted. We are currently evaluating the impact this ASU may have on our financial statement disclosures. The Company does not expect ASU 2023-09 to have a material impact on our consolidated financial statements.

See *Note 1, Nature of Business and Basis of Presentation,* in the Notes to Consolidated Financial Statements within Item 8 for information on recent accounting guidance adopted in 2023.

## GLOSSARY OF TERMS

This Glossary of Terms defines some of the terms that are used throughout this report and does not represent a complete list of all defined terms used.

*Advance Facility.* A secured financing facility to fund advance receivables which is backed by a pool of mortgage servicing advance receivables made by a servicer to a certain pool of mortgage loans.

*Agency.* Government entities guaranteeing the mortgage investors that the principal amount of the loan will be repaid; the Federal Housing Administration, the Department of Veterans Affairs, the US Department of Agriculture and Ginnie Mae (and collectively, the "Agencies").

*Agency Conforming Loan.* A mortgage loan that meets all requirements (loan type, maximum amount, LTV ratio and credit quality) for purchase by Fannie Mae, Freddie Mac, or insured by the FHA, USDA or guaranteed by the VA or sold into Ginnie Mae.

*Asset-Backed Securities ("ABS").* A financial security whose income payments and value is derived from and collateralized (or "backed") by a specified pool of underlying receivables or other financial assets.

*Bulk acquisitions or purchases.* MSR portfolio acquired on non-contract basis through an open market bidding process.

*Base Servicing Fee.* The servicing fee retained by the servicer, expressed in basis points, in an excess MSR arrangement in exchange for the provision of servicing functions on a portfolio of mortgage loans, after which the servicer and the co-investment partner share the excess fees on a pro rata basis.

*Client.* Owner of the underlying mortgage servicing rights on behalf of whom we service loans.

*Conventional Mortgage Loans.* A mortgage loan that is not guaranteed or insured by the FHA, the VA or any other government agency. Although a conventional loan is not insured or guaranteed by the government, it can still follow the guidelines of GSEs and be sold to the GSEs.

*Correspondent lender, lending channel or relationship.* A correspondent lender is a lender that funds loans in their own name and then sells them off to larger mortgage lenders. A correspondent lender underwrites the loans to the standards of an investor and provides the funds at close.

*Customer.* Residential mortgage borrower.

*Delinquent Loan.* A mortgage loan that is 30 or more days past due from its contractual due date.

*Department of Veterans Affairs ("VA").* The VA is a cabinet-level department of the U.S. federal government, which guarantees certain home loans for qualified borrowers eligible for securitization with GNMA.

*Direct-to-consumer originations ("DTC").* A type of mortgage loan origination pursuant to which a lender markets refinancing and purchase money mortgage loans directly to selected consumers through telephone call centers, the Internet or other means.

*Excess Servicing Fees.* In an excess MSR arrangement, the servicing fee cash flows on a portfolio of mortgage loans after payment of the base servicing fee.

*Excess Spread.* MSRs with a co-investment partner where the servicer receives a base servicing fee and the servicer and co-investment partner share the excess servicing fees. This co-investment strategy reduces the required upfront capital from the servicer when purchasing or investing in MSRs.

*Excess Yield.* The remaining servicing fees above the minimum servicing fee ("GSE Base Servicing Fee"), as defined by the agencies, whereby the rights to the excess fees are separated, securitized by the GSE's and sold, while we retain the obligation to service the loan and therefore continue to receive the GSE Base Servicing Fee.

*Exchange inventory.* Consists of Xome's real estate inventory ranging from pre-foreclosure to bank-owned properties.

Apx. 106

*Federal National Mortgage Association ("Fannie Mae" or "FNMA").* FNMA was federally chartered by the U.S. Congress in 1938 to support liquidity, stability, and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold. Fannie Mae buys mortgage loans from lenders and resells them as mortgage-backed securities in the secondary mortgage market.

*Federal Housing Administration ("FHA").* The FHA is a U.S. federal government agency within the Department of Housing and Urban Development (HUD). It provides mortgage insurance on loans made by FHA-approved lenders in compliance with FHA guidelines throughout the United States.

*Federal Housing Finance Agency ("FHFA").* A U.S. federal government agency that is the regulator and conservator of Fannie Mae and Freddie Mac and the regulator of the 12 Federal Home Loan Banks.

*Federal Home Loan Mortgage Corporation ("Freddie Mac" or "FHLMC").* Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage markets and expand opportunities for homeownership and affordable rental housing. Freddie Mac participates in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities.

*Forbearance.* An agreement between the mortgage servicer or lender and borrower for a temporary postponement of mortgage payments. It is a form of repayment relief granted by the lender or creditor in lieu of forcing a property into foreclosure.

*Government National Mortgage Association ("Ginnie Mae" or "GNMA").* GNMA is a self-financing, wholly owned U.S. Government corporation within HUD. Ginnie Mae guarantees the timely payment of principal and interest on MBS backed by federally insured or guaranteed loans - mainly loans insured by the FHA or guaranteed by the VA. Ginnie Mae securities are the only MBS to carry the full faith and credit guarantee of the U.S. federal government.

*Government-Sponsored Enterprise ("GSE").* Certain entities established by the U.S. Congress to provide liquidity, stability and affordability in residential housing. These agencies are Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks.

*Interest Rate Lock Commitments ("IRLC").* Agreements under which the interest rate and the maximum amount of the mortgage loan are set prior to funding the mortgage loan.

*Investors.* Our investors include agency investors and non-agency investors. Agency investors primarily consist of Government National Mortgage Association ("Ginnie Mae" or "GNMA") and the GSEs, Federal National Mortgage Association ("Fannie Mae" or "FNMA") and Federal Home Loan Mortgage Corp ("Freddie Mac" or "FHLMC"). Non-agency investors consist of investors in private-label securitizations.

*Loan Modification.* Permanent or temporary modifications to loan terms with the borrower, including the interest rate, amortization period and term of the borrower's original mortgage loan. Loan modifications are usually made to loans that are in default, or in imminent danger of defaulting.

*Loan-to-Value Ratio ("LTV").* The unpaid principal balance of a mortgage loan as a percentage of the total appraised or market value of the property that secures the loan. An LTV over 100% indicates that the UPB of the mortgage loan exceeds the value of the property.

*Lock period.* A set of periods of time that a lender will guarantee a specific rate is set prior to funding the mortgage loan.

*Loss Mitigation.* The range of servicing activities provided by a servicer in an attempt to minimize the losses suffered by the owner of a defaulted mortgage loan. Loss mitigation techniques include short-sales, deed-in-lieu of foreclosures and loan modifications, among other options.

*Mortgage-Backed Securities ("MBS").* A type of asset-backed security that is secured by a group of mortgage loans.

*Mortgage Servicing Right ("MSRs").* The right and obligation to service a loan or pool of loans and to receive a servicing fee as well as certain ancillary income. MSRs may be bought and sold, resulting in the transfer of loan servicing obligations. MSRs are designated as such when the benefits of servicing the loans are expected to more than adequately compensate the servicer for performing the servicing.

*MSR Facility.* A line of credit backed by mortgage servicing rights that is used for financing purposes. In certain cases, these lines may be a sub-limit of another warehouse facility or alternatively exist on a stand-alone basis. These facilities allow for same or next day draws at the request of the borrower.

*Non-Conforming Loan.* A mortgage loan that does not meet the standards of eligibility for purchase or securitization by Fannie Mae, Freddie Mac or Ginnie Mae.

*Option adjusted spread ("OAS").* The incremental spread added to the risk-free rate to reflect embedded (prepayment) optionality and other risk inherent in the MSRs or excess spread financing used to discount future cash flows for fair value purposes.

*Originations.* The process through which a lender provides a mortgage loan to a borrower.

*Pull through adjusted lock volume.* Represents the expected funding from locks taken during the period.

*Prepayment Speed.* The rate at which voluntary mortgage prepayments occur or are projected to occur. The statistic is calculated on an annualized basis and expressed as a percentage of the outstanding principal balance.

*Primary Servicer.* The servicer that owns the right to service a mortgage loan or pool of mortgage loans. This differs from a subservicer, which has a contractual agreement with the primary servicer to service a mortgage loan or pool of mortgage loans in exchange for a subservicing fee based upon portfolio volume and characteristics.

*Prime Mortgage Loan.* Generally, a high-quality mortgage loan that meets the underwriting standards set by Fannie Mae or Freddie Mac and is eligible for purchase or securitization in the secondary mortgage market. Prime Mortgage loans generally have lower default risk and are made to borrowers with excellent credit records and a monthly income at least three to four times greater than their monthly housing expenses (mortgage payments plus taxes and other debt payments) as well as significant other assets. Mortgages not classified as prime mortgage loans are generally called either sub-prime or Alt-A.

*Private Label Securitizations ("PLS").* Securitizations that do not meet the criteria set by Fannie Mae, Freddie Mac or Ginnie Mae.

*Real Estate Owned ("REO").* Property acquired by the servicer on behalf of the owner of a mortgage loan or pool of mortgage loans, usually through foreclosure or a deed-in-lieu of foreclosure on a defaulted loan. The servicer or a third-party real estate management firm is responsible for selling the REO. Net proceeds of the sale are returned to the owner of the related loan or loans. In most cases, the sale of REO does not generate enough to pay off the balance of the loan underlying the REO, causing a loss to the owner of the related mortgage loan.

*Recapture.* Voluntarily prepaid loans that are expected to be refinanced by the related servicer.

*Refinancing.* The process of working with existing borrowers to refinance their mortgage loans. By refinancing loans for borrowers we currently service, we retain the servicing rights, thereby extending the longevity of the servicing cash flows.

*Servicing.* The performance of contractually specified administrative functions with respect to a mortgage loan or pool of mortgage loans. Duties of a servicer typically include, among other things, collecting monthly payments, maintaining escrow accounts, providing periodic monthly statements to the borrower and monthly reports to the loan owners or their agents, managing insurance, monitoring delinquencies, executing foreclosures (as necessary), and remitting fees to guarantors, trustees and service providers. A servicer is generally compensated with a specific fee outlined in the contract established prior to the commencement of the servicing activities.

---

*Servicing Advances.* In the course of servicing loans, servicers are required to make advances that are reimbursable from collections on the related mortgage loan or pool of loans. There are typically three types of servicing advances: P&I Advances, T&I Advances and Corporate Advances.

    (i) P&I Advances cover scheduled payments of principal and interest that have not been timely paid by borrowers. P&I Advances serve to facilitate the cash flows paid to holders of securities issued by the residential MBS trust. The servicer is not the insurer or guarantor of the MBS and thus has the right to cease the advancing of P&I, when the servicer deems the next advance nonrecoverable.

    (ii) T&I Advances pay specified expenses associated with the preservation of a mortgaged property or the liquidation of defaulted mortgage loans, including but not limited to property taxes, insurance premiums or other property-related expenses that have not been timely paid by borrowers in order for the lien holder to maintain its interest.

    (iii) Corporate Advances pay costs, fees and expenses incurred in foreclosing upon, preserving defaulted loans and selling REO, including attorneys' and other professional fees and expenses incurred in connection with foreclosure and liquidation or other legal proceedings arising in the course of servicing the defaulted mortgage loans.

    Servicing Advances are reimbursed to the servicer if and when the borrower makes a payment on the underlying mortgage loan at the time the loan is modified or upon liquidation of the underlying mortgage loan but are primarily the responsibility of the investor/owner of the loan. The types of servicing advances that a servicer must make are set forth in its servicing agreement with the owner of the mortgage loan or pool of mortgage loans. In some instances, a servicer is allowed to cease Servicing Advances, if those advances will not be recoverable from the property securing the loan.

*Servicing Fee.* A servicing fee is the percentage of each mortgage payment made by a borrower to a mortgage servicer as compensation for keeping a record of payments, collecting, and making escrow payments, passing principal and interest payments along to the note holder.

*Subservicing.* Subservicing is the process of outsourcing the duties of the primary servicer to a third-party servicer. The third-party servicer performs the servicing responsibilities for a fee and is typically not responsible for making servicing advances, which are subsequently reimbursed by the primary servicer. The primary servicer is contractually liable to the owner of the loans for the activities of the subservicer.

*U.S. Department of Agriculture ("USDA").* The USDA is a cabinet-level department of the U.S. federal government, which guarantees certain home loans for qualified borrowers.

*Warehouse Facility.* A type of line of credit facility used to temporarily finance mortgage loan originations to be sold in the secondary market. Pursuant to a warehouse facility, a loan originator typically agrees to transfer to a counterparty certain mortgage loans against the transfer of funds by the counterpart, with a simultaneous agreement by the counterpart to transfer the loans back to the originator at a date certain, or on demand, against the transfer of funds from the originator.

*Unpaid Principal Balance ("UPB").* The principal of outstanding on a mortgage loan or a pool of loans that have not yet been repaid. UPB is used together with the servicing fees and ancillary incomes as a means of estimating the future revenue stream for a servicer.

**Item 8. *Financial Statements and Supplementary Data***

Index to Consolidated Financial Statements:

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 42) | 63 |
| Consolidated Balance Sheets as of December 31, 2023 and 2022 | 66 |
| Consolidated Statements of Operations for the Years Ended December 31, 2023, 2022 and 2021 | 67 |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2023, 2022 and 2021 | 68 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2023, 2022 and 2021 | 69 |
| Notes to Consolidated Financial Statements | 71 |
|   1. Nature of Business and Basis of Presentation | 71 |
|   2. Significant Accounting Policies | 72 |
|   3. Acquisitions | 82 |
|   4. Revenues | 83 |
|   5. Mortgage Servicing Rights and Related Liabilities | 83 |
|   6. Advances and Other Receivables | 87 |
|   7. Mortgage Loans Held for Sale | 88 |
|   8. Property and Equipment | 90 |
|   9. Leases | 90 |
|   10. Loans Subject to Repurchase from Ginnie Mae | 91 |
|   11. Goodwill and Intangible Assets | 91 |
|   12. Derivative Financial Instruments | 92 |
|   13. Indebtedness | 94 |
|   14. Securitizations and Financing | 96 |
|   15. Stockholders' Equity and Employee Benefit Plans | 97 |
|   16. Earnings per Share | 98 |
|   17. Income Taxes | 99 |
|   18. Fair Value Measurements | 101 |
|   19. Capital Requirements | 107 |
|   20. Commitments and Contingencies | 108 |
|   21. Segment Information | 110 |
|   22. Subsequent Events | 112 |

Apx. 107

Index to Consolidated Financial Statements

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Mr. Cooper Group Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Mr. Cooper Group Inc. (the Company) as of December 31, 2023 and 2022, the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2023, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2023, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 28, 2024 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating critical audit matters below, providing a separate opinion on the critical audit matters or on the accounts or disclosures to which they relates.

*63* Mr. Cooper Group Inc. - 2023 Annual Report on Form 10-K

---

**Valuation of Forward Mortgage Servicing Rights and the Excess Spread Financing Liability**

*Description of the Matter* — The estimated fair values of mortgage servicing rights (MSRs) and the excess spread financing liability were $9.1 billion and $437 million, respectively, as of December 31, 2023. The excess spread financing liability is accounted for as a secured borrowing whereby the Company sold to third parties the right to receive a portion of excess cash flow generated from various pools of MSRs. As described in Note 2 and 3 to the consolidated financial statements, the Company measures MSRs and the excess spread financing liability at fair value on a recurring basis with changes in fair value recorded in the statement of operations. Such fair values are based on the present value of future cash flows from servicing the underlying loans. The significant unobservable assumptions used to estimate the fair value of MSRs are prepayment speeds, option adjusted spread, and cost to service. The significant unobservable assumptions used to estimate the fair value of the excess spread financing liability are prepayment speeds and option adjusted spread.

Auditing management's estimate of the fair value of MSRs and the excess spread financing liability is complex and required judgment due to the subjectivity of the significant unobservable assumptions utilized in the calculation of the fair value. Changes to any of these assumptions could have a material impact on the fair value of the MSRs and the excess spread financing liability.

*How We Addressed the Matter in Our Audit* — We obtained an understanding, evaluated the design, and tested the operating effectiveness of the Company's process for estimating the fair value of MSRs and the excess spread financing liability, including management's internal controls over the development of the significant unobservable assumptions and determination of the fair value of MSRs and the excess spread financing liability. This included, among others, testing internal controls over management's review of: 1) historical results and market-based information considered in developing these assumptions; 2) comparing independent fair value ranges and assumptions obtained from third-party valuation firms to the internally developed fair value estimate and assumptions; 3) the completeness and accuracy of data used in determining the assumptions and the fair value estimate.

To test the fair value of the MSRs and the excess spread financing liability, our audit procedures included, among others, testing the reasonableness of the significant unobservable assumptions and the fair value estimate. We tested the reasonableness of the assumptions by comparing to historical Company results and independent, market-based information. We tested the completeness and accuracy of the data underlying the assumptions and historical results. We also performed a sensitivity analysis of the significant unobservable assumptions to evaluate the changes in fair value of the MSRs as well as changes in the valuation specialist to assist in testing management's assumptions and the fair value estimate by developing and comparing to independent expectations. We identified potential sources of corroborating and contrary information. We also compared the significant unobservable assumptions and the fair value estimate developed by management to those from the third-party valuation firms utilized by management and evaluated the competence and objectivity of these firms.

Mr. Cooper Group Inc. - 2023 Annual Report on Form 10-K *64*

---

Index to Consolidated Financial Statements

**Accounting for the Acquisition of Home Point Capital, Inc.**

*Description of the Matter* — The Company completed its acquisition of Home Point Capital, Inc. (Home Point) in the third quarter of 2023, for total consideration of approximately $658 million, including $335 million for a bulk purchase of a portion of Home Point's mortgage servicing rights (MSRs) portfolio and $323 million for the tender offer to acquire the outstanding shares of common stock of Home Point. As described in Note 2 and Note 3 to the consolidated financial statements, the acquisition was accounted for as a business combination under ASC 805 which resulted in recording a $96 million preliminary bargain purchase gain.

Auditing the Company's accounting for the Home Point acquisition was complex due to the subjectivity required in determining the fair value of the acquired MSRs related to Home Point's total servicing portfolio and the assumed repurchase reserve liability related to Home Point's historical mortgage loan sales. The subjectivity was primarily due to determining the significant assumptions used in determining the fair value. Selecting and applying audit procedures to address the subjectivity involves auditor judgment and industry-specific knowledge including the current market conditions considered by a market participant.

The acquisition date fair value of the MSR assets were determined using market participant assumptions to estimate the present value of future cash flows from servicing the underlying loans. The significant unobservable assumptions used to estimate the fair value of the MSRs were prepayment speeds, option adjusted spread, and cost to service. The acquisition date fair value of the repurchase reserve liability was estimated using: i) historical loss rates; ii) secondary market pricing of loans; iii) the quality of underwriting procedures; and iv) borrower delinquency and default patterns.

*How We Addressed the Matter in Our Audit* — We obtained an understanding, evaluated the design, and tested the operating effectiveness of the Company's internal controls over its accounting for Home Point acquisition, including development of the significant assumptions and determination of the fair value of acquired MSRs and assumed repurchase reserves. This included, among others, testing internal controls over management's review of: 1) historical results and market-based information considered in developing these assumptions; 2) comparing independent fair value ranges and assumptions to third-party sources, where available, to the internally developed fair value estimates and assumptions; 3) the completeness and accuracy of data used in determining the assumptions and the fair value estimates.

To test the acquisition date fair value of the MSRs and repurchase reserves, our audit procedures included, among others, testing the reasonableness of the significant assumptions and the fair value estimate. We tested the reasonableness of the assumptions by comparing to historical Company results and independent, market-based information. We tested the completeness and accuracy of the data underlying the assumptions and historical results. We also performed a sensitivity analysis of the significant unobservable assumptions to evaluate the changes in fair value of the MSRs as well changes in the repurchase reserve liability resulting from changes in the significant assumptions. We utilized internal valuation specialists to assist in testing management's assumptions and the fair value estimates and to identify potential sources of corroborating and contrary information.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2002.

Dallas, Texas
February 28, 2024

*65* Mr. Cooper Group Inc. - 2023 Annual Report on Form 10-K

---

**Consolidated Financial Statements**

**MR. COOPER GROUP INC.**
**CONSOLIDATED BALANCE SHEETS**
(millions of dollars, except share data)

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 571 | $ 527 |
| Restricted cash | 169 | 175 |
| Mortgage servicing rights at fair value | 9,090 | 6,654 |
| Advances and other receivables, net of reserves of $170 and $137, respectively | 996 | 1,019 |
| Mortgage loans held for sale at fair value | 927 | 893 |
| Property and equipment, net of accumulated depreciation of $141 and $122, respectively | 53 | 65 |
| Deferred tax assets, net | 472 | 703 |
| Other assets | 1,918 | 2,740 |
| Total assets | $ 14,196 | $ 12,776 |
| | | |
| **Liabilities and Stockholders' Equity** | | |
| Unsecured senior notes, net | $ 3,151 | $ 2,673 |
| Advance, warehouse and MSR facilities, net | 4,302 | 2,855 |
| Payables and other liabilities | 1,995 | 2,633 |
| MSR related liabilities - nonrecourse at fair value | 466 | 528 |
| Total liabilities | 9,914 | 8,719 |
| Commitments and contingencies (Note 20) | | |
| Common stock at $0.01 par value - 300 million shares authorized, 93.2 million shares issued | 1 | 1 |
| Additional paid-in-capital | 1,087 | 1,104 |
| Retained earnings | 4,302 | 3,802 |
| Treasury shares at cost - 28.6 million and 24.0 million shares, respectively | (1,108) | (850) |
| Total stockholders' equity | 4,282 | 4,057 |
| Total liabilities and stockholders' equity | $ 14,196 | $ 12,776 |

*See accompanying Notes to Consolidated Financial Statements.*

Mr. Cooper Group Inc. - 2023 Annual Report on Form 10-K *66*

Index to Consolidated Financial Statements

**MR. COOPER GROUP INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(millions of dollars, except for earnings per share data)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| **Revenues:** | | | |
| Service related, net | $ 1,440 | $ 1,865 | $ 1,067 |
| Net gain on mortgage loans held for sale | 354 | 599 | 2,251 |
| Total revenues | 1,794 | 2,464 | 3,318 |
| **Expenses:** | | | |
| Salaries, wages and benefits | 634 | 789 | 1,036 |
| General and administrative | 538 | 485 | 626 |
| Total expenses | 1,172 | 1,274 | 1,662 |
| Total other income (expense), net | 32 | 24 | 281 |
| Income from continuing operations before income tax expense | 654 | 1,214 | 1,937 |
| Less: Income tax expense | 154 | 291 | 471 |
| Net income from continuing operations | 500 | 923 | 1,466 |
| Net loss from discontinued operations | — | — | (12) |
| Net income | 500 | 923 | 1,454 |
| Less: Undistributed earnings attributable to participating stockholders | — | — | 8 |
| Less: Premium on retirement of preferred stock | — | — | 28 |
| Net income attributable to common stockholders | $ 500 | $ 923 | $ 1,418 |
| **Earnings from continuing operations per common share attributable to Mr. Cooper:** | | | |
| Basic | $ 7.46 | $ 12.84 | $ 17.39 |
| Diluted | 7.30 | 12.50 | 16.67 |
| **Earnings from discontinuing operations per common share attributable to Mr. Cooper:** | | | |
| Basic | $ — | $ — | $ (0.15) |
| Diluted | — | — | (0.14) |
| **Earnings per common share attributable to Mr. Cooper:** | | | |
| Basic | $ 7.46 | $ 12.84 | $ 17.24 |
| Diluted | 7.30 | 12.50 | 16.53 |

*See accompanying Notes to Consolidated Financial Statements.*

**MR. COOPER GROUP INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
(millions of dollars, except share data)

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Retained Earnings | Treasury Shares Amount | Total Mr. Cooper Stockholders' Equity | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares (in thousands) | Amount | Shares (in thousands) | Amount | | | | | | |
| Balance at January 1, 2021 | 1,000 | $ — | 69,457 | $ 1 | $ 1,326 | $ 1,434 | $ (58) | $ 2,703 | $ 1 | $ 2,704 |
| Shares issued / (surrendered) under incentive compensation plan | — | | 1,244 | — | (20) | — | — | (20) | — | (20) |
| Share-based compensation | — | | — | — | 29 | — | — | 29 | — | 29 |
| Repurchase of common stock | — | | (16,924) | — | — | — | (572) | (572) | — | (572) |
| Retirement of preferred stock | (1,000) | | — | — | (19) | (9) | — | (28) | — | (28) |
| Net income | — | | — | — | — | 1,454 | — | 1,454 | — | 1,454 |
| **Balance at December 31, 2021** | — | $ — | 73,777 | $ 1 | 1,116 | 2,879 | (630) | 3,366 | 1 | 3,367 |
| Shares issued / (surrendered) under incentive compensation plan | — | | 906 | — | (41) | — | 19 | (22) | — | (22) |
| Share-based compensation | — | | — | — | 29 | — | — | 29 | — | 29 |
| Dividends paid to noncontrolling interests | — | | — | — | — | — | — | — | (1) | (1) |
| Repurchase of common stock | — | | (5,417) | — | — | — | (239) | (239) | — | (239) |
| Net income | — | | — | — | — | 923 | — | 923 | — | 923 |
| **Balance at December 31, 2022** | — | $ — | 69,266 | $ 1 | 1,104 | 3,802 | (850) | 4,057 | — | 4,057 |
| Shares issued / (surrendered) under incentive compensation plan | — | | 910 | — | (45) | — | 28 | (25) | — | (25) |
| Share-based compensation | — | | — | — | 28 | — | — | 28 | — | 28 |
| Repurchase of common stock, including excise tax | — | | (5,577) | — | — | — | (278) | (278) | — | (278) |
| Net income | — | | — | — | — | 500 | — | 500 | — | 500 |
| **Balance at December 31, 2023** | — | $ — | 64,599 | $ 1 | $ 1,087 | $ 4,302 | $ (1,108) | $ 4,282 | $ — | $ 4,282 |

*See accompanying Notes to Consolidated Financial Statements.*

Index to Consolidated Financial Statements

**MR. COOPER GROUP INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(millions of dollars)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| **Operating Activities** | | | |
| Net income | $ 500 | $ 923 | $ 1,454 |
| Less: Net loss from discontinued operations | — | — | (12) |
| Net income from continuing operations | 500 | 923 | 1,466 |
| Adjustments to reconcile net income to net cash attributable to operating activities: | | | |
| Deferred tax expense | 135 | 289 | 351 |
| Net gain on mortgage loans held for sale | (354) | (599) | (2,251) |
| Provision for servicing and non-servicing reserves | 40 | 30 | 34 |
| Fair value changes in mortgage servicing rights | 483 | (549) | 506 |
| Fair value changes in MSR related liabilities | 18 | 142 | (33) |
| Depreciation and amortization for property and equipment and intangible assets | 38 | 37 | 57 |
| Bargain purchase gain | (96) | — | — |
| Loss on MSR hedging activities | 68 | 332 | 86 |
| (Gain) loss on MSR sales | (23) | 3 | (7) |
| Gain on disposition of assets | — | (223) | — |
| Gain on sale of business | — | — | (528) |
| Other operating activities | 105 | 96 | 58 |
| Repurchases of loan assets out of Ginnie Mae securitizations | (1,234) | (3,067) | (10,156) |
| Mortgage loans originated and purchased for sale, net of fees | (12,805) | (28,309) | (84,684) |
| Sales proceeds and loan payment proceeds for mortgage loans held for sale | 14,330 | 34,461 | 97,461 |
| Changes in assets and liabilities: | | | |
| Advances and other receivables | 28 | 153 | (380) |
| Other assets | (6) | 278 | 586 |
| Payables and other liabilities | (131) | (230) | (259) |
| Net cash attributable to operating activities - continuing operations | 896 | 3,767 | 2,607 |
| Net cash attributable to operating activities - discontinued operations | — | — | 625 |
| Net cash attributable to operating activities | 896 | 3,767 | 2,632 |
| **Investing Activities** | | | |
| Acquisitions of business, net of cash acquired | (522) | — | — |
| Acquisition of assets | (34) | — | — |
| Purchase of mortgage servicing rights | (1,850) | (1,595) | (922) |
| Proceeds on sale of mortgage servicing rights and excess yield | 603 | 290 | 61 |
| Property and equipment additions, net of disposals | (18) | (17) | (41) |
| Sale of business, net of cash divested | — | — | 465 |
| Other investing activities | (15) | — | 2 |
| Net cash attributable to investing activities - continuing operations | (1,836) | (1,322) | (435) |
| Net cash attributable to investing activities - discontinued operations | — | — | 1,627 |
| Net cash attributable to investing activities | (1,836) | (1,322) | 1,192 |
| **Financing Activities** | | | |
| Increase (decrease) in advance, warehouse and MSR facilities | 1,375 | (2,113) | (1,272) |
| Settlements and repayment of excess spread financing | (80) | (392) | (186) |
| Repurchase of common stock | (276) | (239) | (572) |
| Issuance of unsecured senior debt | — | — | 600 |
| Retirement of preferred stock | — | — | (28) |
| Other financing activities | (41) | (40) | (42) |

Index to Consolidated Financial Statements

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Net cash attributable to financing activities - continuing operations | 978 | (2,784) | (1,470) |
| Net cash attributable to financing activities - discontinued operations | — | — | (2,226) |
| Net cash attributable to financing activities | 978 | (2,784) | (3,696) |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 38 | (339) | 128 |
| Cash, cash equivalents and restricted cash - beginning of year | 702 | 1,041 | 913 |
| Cash, cash equivalents and restricted cash - end of year[1] | $ 740 | $ 702 | $ 1,041 |
| **Supplemental Disclosures of Cash Activities** | | | |
| Cash paid for interest expense from unsecured senior notes, excess spread financing, and advance, warehouse and MSR facilities | $ 441 | $ 303 | $ 347 |
| Cash paid for income taxes | 26 | 17 | 159 |
| **Supplemental Disclosures of Non-cash Investing and Financing Activities** | | | |
| Purchase of mortgage servicing rights holdback | $ 149 | $ 11 | $ 6 |
| Sale of mortgage servicing rights holdback | 16 | 15 | 2 |
| Excise tax from repurchase of common stock | 2 | — | — |
| Equity consideration received from disposition of assets | — | 250 | — |
| Equity consideration received from sale of business | — | — | 58 |

[1] The following table provides a reconciliation of cash, cash equivalents and restricted cash to amounts reported within the consolidated balance sheets.

| | December 31, 2023 | December 31, 2022 | December 31, 2021 |
|---|---|---|---|
| Cash and cash equivalents | $ 571 | $ 527 | $ 895 |
| Restricted cash | 169 | 175 | 146 |
| Total cash, cash equivalents and restricted cash | $ 740 | $ 702 | $ 1,041 |

*See accompanying Notes to Consolidated Financial Statements.*

**MR. COOPER GROUP INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(millions of dollars, unless otherwise stated)

## 1. Nature of Business and Basis of Presentation

*Nature of Business*

Mr. Cooper Group Inc. collectively with its consolidated subsidiaries, ("Mr. Cooper," the "Company," "we," "us" or "our") provides servicing, origination and transaction-based services related to single family residences throughout the United States with operations under its primary brands: Mr. Cooper® and Xome®. Mr. Cooper is one of the largest home loan servicers and originators in the country focused on delivering a variety of servicing and lending products, services and technologies. The Company has provided a glossary of terms, which defines certain industry-specific and other terms that are used herein, in Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations*, of this Form 10-K.

*Basis of Presentation*

The consolidated financial statements of the Company have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). The significant accounting policies described below, together with the other notes that follow, are an integral part of the consolidated financial statements.

*Basis of Consolidation*

The consolidated financial statements include the accounts of the Company, its wholly owned subsidiaries, other entities in which the Company has a controlling financial interest, and those variable interest entities ("VIE") where the Company's wholly owned subsidiaries are the primary beneficiaries. Assets and liabilities of VIEs and their respective results of operations are consolidated from the date that the Company became the primary beneficiary through the date the Company ceases to be the primary beneficiary. The Company applies the equity method of accounting to investments where it is able to exercise significant influence, but not control, over the policies and procedures of the entity and owns less than 50% of the voting interests. Investments in certain companies over which the Company does not exert significant influence are recorded at fair value, or at cost upon election of measurement alternative, at the end of each reporting period. Intercompany balances and transactions on consolidated entities have been eliminated.

*Use of Estimates*

The preparation of the consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from these estimates, and such differences could be material, due to factors such as adverse changes in the economy, changes in interest rates, secondary market pricing for loans held for sale and derivatives, strength of underwriting and servicing practices, changes in prepayment assumptions, declines in home prices or discrete events adversely affecting specific borrowers.

*Reclassifications*

Certain reclassifications have been made in the 2022 and 2021 consolidated statements of cash flows to conform to 2023 presentation. Such reclassifications were not material and did not affect total revenues, net income or cash attributable to operating activities.

*Recent Accounting Guidance Adopted*

Accounting Standards Update ("ASU") 2020-04, 2021-01 and 2022-06, collectively implemented as Accounting Standards Codification Topic 848 ("ASC 848"), Reference Rate Reform provides temporary optional expedients and exceptions for applying generally accepted accounting principles to contract modifications, hedge accounting and other transactions affected by the transitioning away from reference rates that are expected to be discontinued, such as interbank offered rates and the London Inter-Bank Offered Rate ("LIBOR"). This guidance became effective on March 12, 2020, and can be adopted no later than December 31, 2024, with early adoption permitted. All of the Company's facilities have transitioned away from LIBOR to alternative reference rates in 2023. In addition, the Company's derivative financial instruments are not tied to LIBOR rates. The Company adopted ASU 2020-04, as amended by ASU 2021-01 and ASU 2022-06, in the fourth quarter of 2023. The adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

## 2. Significant Accounting Policies

*Cash and Cash Equivalents*

Cash and cash equivalents include unrestricted cash on hand and other interest-bearing investments with original maturity dates of 90 days or less.

*Restricted Cash*

Restricted cash includes collected funds pledged to certain advance and warehouse facilities, collected fees payable to third parties, and certain contractual escrow funds.

*Mortgage Servicing Rights ("MSR")*

The Company recognizes the rights to service mortgage loans for others, or MSRs, whether acquired or as a result of the sale of loans the Company originates with servicing retained, as assets. The Company initially records all MSRs at fair value. The Company has elected to subsequently measure MSRs at fair value.

The fair value of the MSRs is based upon the present value of the expected future net cash flows related to servicing the underlying loans. The Company determines the fair value of the MSRs using a discounted cash flow model which incorporates prepayment speeds, option adjusted spread, costs to service, delinquencies, ancillary revenues, recapture rates and other assumptions that management believes are consistent with the assumptions that other similar market participants use in valuing the MSRs. Beginning in the second quarter of 2023, the Company valued MSRs using a stochastic option adjusted spread instead of a static discount rate.

The key assumptions to determine fair value include prepayment speeds, option adjusted spread and cost to service. The credit quality and stated interest rates of the loans underlying the MSRs affect the assumptions used in the cash flow models. The Company obtains third-party valuations quarterly to assess the reasonableness of the fair value calculated by the cash flow model. Fair value adjustments are recorded within "revenues - service related, net" in the consolidated statements of operations.

*Advances and Other Receivables, Net*

The Company advances funds to or on behalf of the investors when the borrower fails to meet contractual payments (e.g., loan principal and interest, property taxes, insurance) in accordance with terms of its servicing agreements. Other receivables consist of advances funded to maintain and market underlying loan collateral through foreclosure and ultimate liquidation on behalf of the investors. Advances are recovered from borrowers for performing loans and from the investors and loan proceeds for non-performing loans.

The Company may also acquire servicer advances in connection with the acquisition of MSRs through asset acquisitions or business combinations. These advances are recorded at their relative fair value amounts upon acquisition, which may result in a purchase discount or premium. The Company records receivables upon determining that collection of amounts due from loan proceeds, investors, mortgage insurers, or prior servicers is probable. Reserves related to recoverability of advances and other receivables are discussed below in Reserves for Servicing Activities.

*Mortgage Loans Held for Sale*

The Company originates prime residential mortgage loans with the intention of selling such loans on a servicing-retained basis in the secondary market. As these loans are originated with intent to sell, the loans are classified as held for sale and the Company has elected to measure these loans held for sale at fair value. The Company estimates fair value of mortgage loans held for sale using a market approach by utilizing either: (i) the fair value of securities backed by similar mortgage loans, adjusted for certain factors to approximate the fair value of a whole mortgage loan, including the value attributable to mortgage servicing and credit risk, (ii) current commitments to purchase loans or (iii) recent observable market trades for similar loans, adjusted for credit risk and other individual loan characteristics. In connection with the Company's election to measure originated mortgage loans held for sale at fair value, the Company records the loan origination fees when earned, net of direct loan originations costs associated with these loans. Loan origination fees and underwriting fees are recorded in "revenues - service related, net" in the consolidated statements of operations. Gains or losses recognized upon sale of loans and fair value adjustments are recorded in "revenues - net gain on mortgage loans held for sale" in the consolidated statements of operations.

*Repurchased Loans*

From time to time the Company is required to repurchase loans from various investors related to originations or servicing defects. Such defects include, but are not limited to, breaches in seller representations and warranties made upon sale or demands for servicing repurchase due certain situations (such as modification). Such loans are repurchased by the Company as required with the intent of resale in the secondary market. If the defect is something that can be cured, the Company may seek to cure the issue and resell the loan to the investor and retain servicing. However, the nature of the defect may preclude the Company from curing in which case the Company may elect to sell such loans, servicing retained, through a whole loan (or "scratch and dent sale"). Due to the Company's intent to sell these loans, these repurchases are appropriately classified as mortgage loans held for sale, with any gains or losses recorded in "revenues - net gain on mortgage loans held for sale" in the consolidated statements of operations.

*Loans Subject to Repurchase from Ginnie Mae*

For certain loans originated and sold into GNMA mortgage-backed securities, the Company, as servicer/transferor, has the unilateral right to repurchase, without GNMA's prior authorization, any individual loan in a GNMA securitization pool if that loan meets certain criteria, including payment not being received from the borrower for greater than 90 days ("delinquent status"). For loans in delinquent status, the Company must recognize in its consolidated balance sheets the right to repurchase the loan and a corresponding repurchase liability, regardless of whether the Company intends to repurchase the loan. The Company records these rights to repurchase in "other assets" at the unpaid principal balance and a corresponding liability in "payables and other liabilities" in its consolidated balance sheets.

From time to time, the Company exercises this right to repurchase individual delinquent loans in GNMA securitization pools to minimize interest spread losses, re-pool into new GNMA securitizations or otherwise sell to third-party investors. The majority of GNMA repurchased loans are repurchased in connection with loan modifications and loan resolution activity with the intent to re-pool into new GNMA securitizations upon re-performance of the loan or otherwise sell to third-party investors. Therefore, the Company classifies such loans as loans held for sale and has elected to measure these repurchased loans at fair value.

*MSR Related Liabilities - Nonrecourse*
*Excess Spread Financing*

In conjunction with the acquisition of certain MSRs on various pools of residential mortgage loans (the "Portfolios"), the Company entered into sale and assignment agreements related to its right to servicing fees, under which the Company sells to third parties the right to receive a portion of the excess cash flow generated from the Portfolios after receipt of a fixed base servicing fee per loan. The excess cash flow payments to third parties are considered counterparty payments, which are recorded as an adjustment to "revenues - service related, net" in the consolidated statements of operations. The agreements consist of two components - current excess spread, or remittance of a percentage of excess spread on currently serviced loans, and future excess spread, or the obligation to transfer currently serviced loans that have been refinanced into current excess spread or a replacement loan of similar economic characteristics into the Portfolios. The new or replacement loan will be governed by the same terms set forth in the sale and assignment agreement described above. The sale of these rights is accounted for as a secured borrowing under Accounting Standards Codification ("ASC") 860, with the total proceeds received being recorded as a component of "MSR related liabilities - nonrecourse at fair value" in the consolidated balance sheets. The Company determines the effective interest rate on these liabilities and allocates total repayments between interest expense and the outstanding liability.

The Company has elected to measure the outstanding financings related to the excess spread financing agreements at fair value with all changes in fair value recorded to "revenues - service related, net" in the consolidated statements of operations. The fair value on excess spread financing is based on the discounted cash flows of projected positive and negative cash flows. The cash flow assumptions used in the model are based on various factors, with the key assumptions being mortgage prepayment speeds and option adjusted spread.

Changes to excess spread financing other than payments and fair value measurements include accretion, which results from changes in the portfolio. Changes related to accretion are recorded to "revenues - service related, net" with an offset to excess spread financing liability on the consolidated balance sheet.

*Mortgage Servicing Rights Financing*

The Company has historically entered into transactions with third parties to sell a contractually specified base fee component of certain MSRs and servicer advances under specified terms. The Company evaluates these transactions to determine if they were sales or secured borrowings. When a transaction qualifies for sale treatment, the Company derecognizes the transferred assets in its consolidated balance sheets. If the Company determines that the related MSRs sales are contingent on the receipt of consents from various third parties, for accounting purposes, legal ownership of the MSRs continues to reside with the Company. The Company continues to account for the MSRs in its consolidated balance sheets. In addition, the Company records an MSR financing liability associated with this financing transaction. The Company continues to account for the sold specified base fee cash flows within MSRs in its consolidated balance sheets. Counterparty payments related to this financing arrangement are recorded as an adjustment to the Company's "revenues - service related, net" in the consolidated statements of operations.

The Company has elected to measure the mortgage servicing rights financing liabilities at fair value with all changes in fair value recorded to "revenues - service related, net" in the consolidated statements of operations. The fair value on mortgage servicing right financings is based on the present value of future expected discounted cash flows. The cash flow assumptions and prepayment assumptions used in the model are based on various factors, with the key assumptions being refinance financing rates and advance recovery rates.

*Property and Equipment, Net*

Property and equipment is comprised of furniture, fixtures, leasehold improvements, computer software, and computer hardware. These assets are stated at cost less accumulated depreciation. Repairs and maintenance are expensed as incurred which is included in "expenses - general and administrative" in the consolidated statements of operations. Depreciation, which includes depreciation and amortization on finance leases, is recorded using the straight-line method over the estimated useful lives of the related assets. Cost and accumulated depreciation applicable to assets retired or sold are eliminated from the accounts, and any resulting gains or losses are recognized at such time through a charge or credit to "expenses - general and administrative." Costs to internally developed computer software are capitalized during the development stage and include internal and external costs incurred to develop software.

Long-lived assets shall be tested for recoverability whenever events or changes in circumstances indicate that the carrying amount might not be recoverable. The Company performs a quarterly evaluation to determine whether such events have occurred. If events and circumstances indicate the carrying values exceed the fair value of the fixed assets, the Company will proceed with impairment testing. Impairment loss shall be recognized only if the carrying amount of a long-lived asset is not recoverable and exceeds its fair value. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of undiscounted cash flows expected to result from the use and eventual disposition of the asset. The impairment loss is measured as the amount by which the carrying amount of a long-lived asset exceeds its fair value.

*Leases*

If the Company determines an arrangement contains a lease or lease components, then the lease will be accounted for under ASC 842 and classified as either a finance or operating lease. At the lease commencement date, the Company recognizes a leased right-of-use ("ROU") asset and corresponding lease liability based on the present value of the lease payments over the lease term. Leased ROU assets are tested for impairment in accordance with ASC 360, *Property, Plant, and Equipment*. The Company did not have material finance leases for the periods presented.

ASC 842 provides for two policy elections. The first refers to leases with a term of 12 months or less and the second relates to separating lease components from non-lease components. The Company elected not to recognize lease assets and lease liabilities for leases with a term of 12 months or less and not to separate lease components from non-lease components.

Leases primarily consist of various corporate and office facilities. Operating leases in which the Company is the lessee are recorded as operating lease ROU assets and operating lease liabilities, which are included in "other assets" and "payables and other liabilities," respectively, on the consolidated balance sheets. Operating lease ROU assets represent the Company's right to use an underlying asset during the lease term and operating lease liabilities represent the Company's obligation to make lease payments arising from the lease. ROU assets and operating lease liabilities are recognized at lease commencement based on the present value of remaining lease payments using a discount rate that represents the Company's incremental borrowing rate at the lease commencement date, as most of the Company's leases do not provide an implicit rate. ROU assets are further adjusted for lease incentives. Operating lease expense, which is comprised of amortization of the ROU asset and the implicit interest accreted on the operating lease liability, is recognized on a straight-line basis over the lease term and is recorded in "expenses - general and administrative" in the consolidated statements of operations. Operating lease activity is included in operating activities within the consolidated statements of cash flows.

Index to Consolidated Financial Statements

**Derivative Financial Instruments**

Derivative instruments are used as part of the overall strategy to manage exposure to market risks primarily associated with fluctuations in interest rate risks related to Pipeline (including mortgage loans held for sale and interest rate lock commitments ("IRLCs")) and the MSR portfolio. The Company recognizes all derivatives at fair value on a recurring basis in "other assets" and "payables and other liabilities" on its consolidated balance sheets. The Company treats all of its derivative instruments as economic hedges, therefore none of its derivative instruments are designated as accounting hedges.

Derivative instruments utilized by the Company primarily include IRLCs, loan purchase commitments ("LPCs"), forward Mortgage Backed Securities ("MBS"), Treasury futures, interest rate swap agreements and interest rate caps. IRLCs and LPCs represent an agreement to extend credit to a mortgage loan applicant, or an agreement to purchase a loan from a third-party originator, respectively, whereby the interest rate and loan amount is set prior to funding. The Company has the ability and intent to fund the loan for purpose of selling in the secondary market, accordingly, upon funding these IRLCs or LPCs will be mortgage loans held for sale for which the Company has selected the fair value option. Similar to the fair values of mortgage loans held for sale; held in inventory awaiting sale into the secondary market. IRLCs and LPCs are subject to changes in mortgage interest rates from the date of the commitment through the date of funding and ultimately through sale of the loan into the secondary market. As a result, the Company is exposed to interest rate risk during the period from the date of the lock commitment through (i) the lock commitment cancellation or expiration date; or (ii) the date of sale into the secondary mortgage market. IRLCs are considered freestanding derivatives and are recorded at fair value at inception inclusive of the inherent value of servicing. Loan commitments generally range between 30 days and 90 days and the Company typically sells mortgage loans within 30 days of origination. Changes in fair value subsequent to inception are based on changes in the fair value of the underlying loan, inherent value of servicing of the loan (future MSR value), and adjustments for the estimated pull-through rate. Any changes in fair value are recorded in earnings as a component of "revenues - net gain on mortgage loans held for sale" on the consolidated statements of operations and comprehensive statements of cash flows.

The Company uses other derivative financial instruments (mentioned above), primarily forward MBS purchase and sales commitments (also referred to as TBA securities), to manage exposure to interest rate risk and changes in the fair value of IRLCs and mortgage loans held for sale (both in Originations and Servicing) and MSRs. These commitments are recorded at fair value based on pricing of similar instruments in the secondary market based upon the investor/Agency, coupon, and estimated sale or delivery month. The forward MBS commitments fix the forward price that will be realized in the secondary market and thereby reduce the interest rate price risk to the Company. The Company's expectation of the amount of its IRLCs that will ultimately close is a key factor in determining the notional amount of derivatives used in economically hedging the position. The changes in value of all derivative instruments related to the Pipeline are recorded as "revenues - net gain on mortgage loans held for sale." The changes to the value of Forward MBS for the MSR portfolio are recorded in "revenues - service related, net."

The Company may elect to purchase other derivative instruments, such as interest rate swaps and Treasury futures to mitigate exposure to interest rate risk related to cash flows on securitized mortgage borrowings.

**Business Combinations and Asset Acquisitions**

The Company evaluates whether a transaction meets the definition of a business. The Company first applies a screen test to determine if substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset. If the screen test is met, the transaction is accounted for as an asset acquisition. If the screen test is not met, the Company further considers whether the set of assets or acquired entities have at a minimum, inputs and processes that have the ability to create outputs in the form of revenue. If the assets or acquired entities meet this criteria, the transaction is accounted for as a business combination.

Acquisitions that qualify as a business combination are accounted for using the acquisition method of accounting. The fair value of consideration transferred for an acquisition is allocated to the assets acquired and liabilities assumed based on their fair value as of the acquisition date. The excess of the consideration transferred over the fair value of assets acquired and liabilities assumed is recorded as goodwill. Conversely, in the event the fair value of assets acquired and liabilities assumed is greater than the consideration transferred, a bargain purchase gain is recognized.

Determining the fair value of assets acquired and liabilities assumed requires judgment and often involves the use of significant estimates and assumptions. The Company estimates the fair value of the intangible assets acquired generally by using a discounted cash flow analysis (the income approach). For the income approach, the Company uses inputs and assumptions to develop these estimates on a market participant perspective which include estimates of projected revenues, discount rates, economic lives and income tax rates, among others, all of which require significant management judgment. The Company engages third-party valuation firms when appropriate to assist in the fair value determination of assets acquired and liabilities assumed. Acquisition-related expenses and transaction costs associated with business combinations are expensed as incurred.

**Goodwill**

Goodwill is not amortized but is instead subject to impairment testing. The Company evaluates its goodwill for impairment annually as of October 1 of each year or more frequently if impairment indicators arise in accordance with ASC 350, Intangibles - Goodwill and Other. When testing goodwill for impairment, the Company may elect to perform either a qualitative test or a quantitative test to determine if it is more likely than not that the carrying value of a reporting unit exceeds its estimated fair value.

During a qualitative analysis, the Company considers the impact of any changes to the following factors: macroeconomic, industry and market factors, cost factors, and changes in overall financial performance, as well as any other relevant events and uncertainties impacting a reporting unit. If the qualitative assessment does not conclude that it is more likely than not that the estimated fair value of the reporting unit is greater than the carrying value, the Company performs a quantitative analysis. In a quantitative test, the carrying value of the reporting unit is compared to its estimated fair value.

In a quantitative test, the fair value of a reporting unit is determined based on a discounted cash flow analysis and further analyzed using other methods of valuation. A discounted cash flow analysis requires the Company to make various assumptions, including assumptions about future cash flows, growth rates and discount rates. The assumptions about future cash flows and growth rates are based on the Company's long-term projections by reporting unit. In addition, an assumed terminal value is used to project future cash flows beyond base years. Assumptions used in the Company's impairment testing are consistent with its internal forecasts and operating plans. The discount rate is based on the Company's debt and equity balances, adjusted for current market conditions and investor expectations of return on the Company's equity. If the fair value of a reporting unit exceeds its carrying amount, there is no impairment. If not, the Company compares the fair value of the reporting unit with its carrying amount. To the extent the carrying amount of the reporting unit exceeds its fair value, a write-down of the reporting unit's goodwill would be necessary.

**Intangible Assets**

Intangible assets primarily consist of customer relationships and technology acquired through business combinations. Those intangible assets are deemed to have finite useful lives and are amortized either on a straight-line basis over their estimated useful lives (trade name, technology and internally developed software), or on a basis more representative of the time pattern over which the benefit is derived (customer relationships). Intangible assets are recorded at their estimated fair value at the date of acquisition.

Intangible assets with finite useful lives are tested for impairment whenever events or circumstances indicate that their carrying amount may not be recoverable by comparing the carrying value of the assets to the estimated future undiscounted cash flows to be generated by the asset. If an impairment is determined to exist for intangible assets, the carrying value of the asset is reduced to the estimated fair value.

**Investment in Unconsolidated Entities**

The Company accounts for investments in unconsolidated entities using the equity method when the Company holds a significant, but less than controlling, ownership interest and has the ability to exercise significant influence over operating and financial decisions of the investee. These investments include our investment in Sagent M&C, LLC ("Sagent"). Under the equity method of accounting, investments are initially recorded at cost and thereafter adjusted for additional investments, distributions and the proportionate share of earnings or losses of the investee. The Company evaluates the equity method investments for impairment when events or changes in circumstances indicate that an other-than-temporary decline in value may have occurred. See Note 4, Dispositions, for more information on our investment in Sagent.

**Revenue Recognition**

ASC 606, Revenue from Contracts with Customers, establishes principles for reporting information about the nature, amount, timing and uncertainty of revenue and cash flows arising from the entity's contracts to provide goods or services to customers. The core principle requires an entity to recognize revenue to depict the transfer of goods or services to customers as performance obligations are satisfied in an amount that reflects the consideration that the entity expects to be entitled to receive in exchange for those goods or services. The majority of the Company's revenue-generating transactions in the Servicing and Originations segments, including revenue generated from financial instruments, such as the Company's loans and derivatives, as well as revenue related to the Company's mortgage servicing activities, are not within the scope of ASC 606 as these activities are subject to other GAAP discussed elsewhere within the Company's disclosures. Generally, revenues from Xome fall within the scope of ASC 606.

---

Index to Consolidated Financial Statements

The core principle requires an entity to recognize revenue to depict the transfer of goods or services to customers as performance obligations are satisfied in an amount that reflects the consideration that the entity expects to be entitled to receive in exchange for those goods or services.

**Revenues from Servicing Activities**

- "Revenues, service related, net" primarily include contractually specified servicing fees, late charges, prepayment penalties, fair value adjustments, and other ancillary revenues. The servicing fees are based on a contractual percentage of the outstanding principal balance and recognized as revenue as earned during the life of the loan. Corresponding loan servicing costs are charged to expense as incurred. The Company recognizes ancillary revenues and earnings on float as they are earned.

In addition, the Company receives various fees in the course of providing servicing on its various portfolios. These fees include modification fees for modifications performed outside of government programs, modification fees for modifications pursuant to various government programs, co-issue transaction fees charged to sellers from boarding MSRs, deboarding fees for transferring MSRs off the servicing platform, and incentive fees for servicing performance on specific government-sponsored entities ("GSE") portfolios. Fees recorded on modifications of mortgage loans serviced by the Company for others are recognized on collection and are recorded as a component of "revenues - service related, net." Fees recorded on modifications pursuant to various government programs are recognized based upon completion of all necessary steps by the Company and the minimum loan performance time frame to establish eligibility for the fee. Revenue earned on modifications pursuant to various government programs is included as a component of "revenues - service related, net." Incentive fees for servicing performance on specific GSE portfolios are recognized as various incentive standards are achieved and are recorded as a component of "revenues - service related, net."

Fair value adjustments related to MSRs, excess spread financing and MSRs financing are recorded as component of "revenues - service related, net."

The Company also acts as a subservicer for certain parties that own the underlying servicing rights and receives subservicing fees, which are typically a stated monthly fee per loan that varies based on types of loans. Fees related to the subserviced portfolio are accrued in the period the services are performed.

- "Revenues - net gain on mortgage loans held for sale" within the Servicing segment is comprised of the realized and unrealized gains and losses on sales of mortgage loans held for sale, including loans that are repurchased out of GNMA securities and subsequently modified and re-securitized, and any other repurchased loans.

- Derivative instruments are used as part of the overall strategy to manage exposure to market risks primarily associated with fluctuations in interest rates within the servicing segment. The Company recognizes all derivatives on its consolidated balance sheets at fair value on a recurring basis. The Company treats all derivative instruments as economic hedges, therefore none of its derivative instruments are designated as accounting hedges. The changes in value on obligations derivative instruments are recorded within revenue in the as "revenues - net gain on mortgage loans held for sale." See accounting policy "Derivative Financial Instruments" for more details.

**Revenues from Origination Activities**

- "Revenues - servicing related, net" within the Originations segment is comprised of loan origination and other loan fees which generally represent flat, per-loan fee amounts and are recognized as revenue at the time the loans are funded.

- "Revenues - net gain on mortgage loans held for sale" includes the realized and unrealized gains and losses on sales of newly originated mortgage loans, as well as the changes in fair value of all pipeline-related derivatives, including IRLCs.

---

Index to Consolidated Financial Statements

Transfers of financial assets are accounted for as sales when control over the assets has been surrendered. Control over transferred assets is deemed to be surrendered when (i) the assets have been legally isolated from the Company, (ii) the transferee has the right (free of conditions that constrain it from taking advantage of that right) to pledge or exchange the transferred assets, and (iii) the Company does not maintain effective control over the transferred assets through either (a) an agreement that entitles and obligates the Company to repurchase or redeem them before their maturity or (b) the ability to unilaterally cause the holder to return specific assets. Loan securitizations structured as sales, as well as whole loan sales and the resulting gains on such sales, net of any accrual for recourse obligations, are reported in earnings during the period in which the securitization closes or the sale occurs.

- Derivative instruments are used as part of the overall strategy to manage exposure to market risks primarily associated with fluctuations in interest rates related to originations. The Company recognizes all derivatives on its consolidated balance sheets at fair value on a recurring basis. The Company treats all derivative instruments as economic hedges, therefore none of its derivative instruments are designated as accounting hedges. The changes in value on originations derivative instruments are recorded within revenue in the as "revenues - net gain on mortgage loans held for sale." See accounting policy "Derivative Financial Instruments" for more details.

**Revenue from Xome Activities**

- Xome revenues primarily consists of real estate exchange, which is a proprietary digital exchange for selling foreclosed, REO, and seller-owned property. Xome also has revenues from the sale of data and data-related services. Revenue is recognized upon transfer of control of promised goods or services to customers in an amount that reflects the consideration expected to be received in exchange for those products. Xome's business is included in Corporate/Other.

**Repurchase Reserves for Origination Activity**

The Company accrues reserves for the repurchase of loans from GSEs, GNMA, and third-party investors primarily due to origination defect and are initially recorded upon sale of the loan to a third party with subsequent reserves recorded based on repurchase demands. The repurchase reserves are included in "payables and accrued liabilities" in the consolidated balance sheets and the provision for repurchase reserves is a component of "revenues - net gain on mortgage loans held for sale" in the consolidated statements of operations.

During each reporting period, the Company utilizes an internal model to estimate repurchase reserves for loan origination activities based upon its expectation of future defects and historical loss rates. The estimate of the repurchase reserve is based on judgments and historical inputs which can be influenced by many factors and may change over the life of the underlying loans, including: (i) historical loss rate, (ii) secondary market pricing of loans; (iii) the quality of Company's underwriting procedures; (iv) borrower delinquency and default patterns; and (v) other Company-specific and macro-economic factors. On a quarterly basis, management corroborates these assumptions using third-party data, where applicable.

**Reserves for Servicing Activity**

In connection with loan servicing activities, the Company records reserves primarily for the recoverability of advances, interest claims, and mortgage insurance claims. Reserves for advances and other receivables associated with loans in the MSR portfolio are considered within the MSR valuation, and the provision expense for such advances is recorded in the mark-to-market adjustment in "revenues - service related, net" in the consolidated statements of operations. Such valuation considers the expected cash outflows and inflows for advances and other receivables in accordance with the fair value framework. Reserves for advances and other receivables on loans transferred out of the MSR portfolio are established within "advances and other receivables, net." As loans serviced transfer out of the MSR portfolio, any negative MSR value or any GNMA loan fallout value associated with the loans transferred is reclassified from the MSR to the reserve within "advances and other receivables, net" to the extent such reserves continue to be required for balances remaining on the consolidated balance sheets. Management evaluates reserves for sufficiency each reporting period and any additional reserve requirements are recorded as a provision in "expenses - general and administrative" as needed.

The Company records reserves for advances and other receivables and evaluates the sufficiency of such reserves through internal models considering expected recovery rates on claims filed with government agencies, government sponsored enterprises, vendors, prior servicer and other counterparties. Key assumptions used in the models include but are not limited to expected recovery rates by loan type, which are derived from historical recovery rates, and aging of the receivable. Recovery of advances and other receivables is subject to judgment and estimates based on the Company's assessment of its compliance with servicing guidelines, its ability to produce the necessary documentation to support claims, its ability to support amounts from prior servicers and to effectively negotiate settlements, as needed. Management reviews recorded advances and other receivables, and upon determination that no further recourse for recovery is available from all means known to management, the recorded balances associated with these receivables are written off against the reserve.

Index to Consolidated Financial Statements

**Credit Loss Reserves**

ASC 326, *Financial Instruments — Credit Losses* requires expected credit losses for financial instruments held at the reporting date to be measured based on historical experience, current conditions and reasonable and supportable forecasts, which is referred to as the current expected credit loss, or CECL, methodology. The new standard reflects management's best estimate of all expected credit losses for the Company's financial assets that are recognized at amortized cost. The CECL methodology considers expected lifetime loss rates calculated from historical data using a weighted average life to determine the current expected credit loss reserve.

The Company determined that "advances and other receivables, net" and certain financial instruments included in "other assets" are within the scope of ASC 326.

For "advances and other receivables, net," the Company determined that the majority of estimated losses are due to servicing operational errors, and credit-related losses are not significant because of the contractual relationships with the government and government sponsored agencies. The Company determined that the credit-related risk associated with certain applicable financial instruments can increase with the passage of time. The CECL reserve methodology considers these financial instruments collectible to a point in time of 39 months. Any projected remaining balance at the end of the collection period is considered a loss and factors into the overall CECL loss rate required.

For "other assets," primarily trade receivables and service fees earned but not received, the Company determined that these are short-term in nature (less than one year), and the estimated credit-related losses over the life of these receivables are similar to those resulting from the Company's existing loss reserve process. The Company monitors the financial status of customers to determine if any specific loss considerations are required.

**Variable Interest Entities**

In the normal course of business, the Company enters into various types of on- and off-balance sheet transactions with special purpose entities ("SPEs"), which primarily consist of securitization trusts established for a limited purpose. Generally, these SPEs are formed for the purpose of securitization transactions in which the Company transfers assets to an SPE, which then issues to investors various forms of debt obligations supported by those assets. In these securitization transactions, the Company typically receives cash and/or other interests in the SPE as proceeds for the transferred assets. The Company will typically retain the right to service the transferred receivables and to repurchase the transferred receivables from the SPE if the outstanding balance of the receivables falls to a level where the cost exceeds the benefits of servicing the transferred receivables.

The Company evaluates its interests in each SPE for classification as a Variable Interest Entity ("VIE"). When an SPE meets the definition of a VIE and the Company determines that the Company is the primary beneficiary, the Company includes the SPE in its consolidated financial statements.

The Company consolidates certain SPEs connected with mortgage activities. See *Note 14, Securitizations and Financings*, for more information on Company SPEs, and *Note 13, Indebtedness*, for certain debt activity connected with SPEs.

**Securitizations and Asset-Backed Financing Arrangements**

The Company and its subsidiaries have been a transferor in connection with a number of securitizations and asset-backed financing arrangements. The Company has continuing involvement with the financial assets of the securitizations and the asset-backed financing arrangements. The Company has aggregated these transactions into two groups: (1) securitizations of residential mortgage loans accounted for as sales and (2) financings of advances on loans serviced for others accounted for as secured borrowings.

---

**Securitizations Treated as Sales**

The Company's continuing involvement typically includes acting as servicer for the mortgage loans held by the trust and holding beneficial interests in the trust. The Company's responsibilities as servicer include, among other things, collecting monthly payments, maintaining escrow accounts, providing periodic reports and managing insurance in exchange for a contractually specified servicing fee. The beneficial interests held consist of both subordinate and residual securities that were retained at the time of securitization. These securitizations generally do not result in consolidation of the VIE as the beneficial interests that are held in the unconsolidated securitization trusts have no value and no potential for significant cash flows in the future. In addition, as of December 31, 2023, the Company had no other significant assets in its consolidated financial statements related to these trusts. The Company has no obligation to provide financial support to unconsolidated securitization trusts and has provided no such support. The creditors of the trusts can look only to the assets of the trusts themselves for satisfaction of the debt issued by the trusts and have no recourse against the assets of the Company. The general creditors of the Company have no claim on the assets of the trusts. The Company's exposure to loss as a result of its continuing involvement with the trusts is limited to the carrying values, if any, of its investments in the residual and subordinate securities of the trusts, the MSRs that are related to the trusts and the advances to the trusts. The Company considers the probability of loss arising from its advances to be remote because of their position ahead of most of the other liabilities of the trusts. See *Note 5, Mortgage Servicing Rights and Related Liabilities*, and *Note 6, Advances and Other Receivables*, for additional information regarding MSRs and advances.

**Financings Accounted as Secured Borrowing**

The Company transfers advances on loans serviced for others to SPEs in exchange for cash. The Company consolidates these SPEs because the Company is the primary beneficiary of the VIE.

These VIEs issue debt supported by collections on the transferred advances. The Company made these transfers under the terms of its advance facility agreements. The Company classifies the transferred advances on its consolidated balance sheets as advances and classifies the related liabilities as advance facilities and other nonrecourse debt. The SPEs use collections of the pledged advances to repay principal and interest and to pay the expenses of the entity. Holders of the debt issued by these entities can look only to the assets of the entities themselves for satisfaction of the debt and have no recourse against the Company.

**Interest Income**

Interest income primarily includes interest earned on custodial cash deposits associated with the servicing portfolio. Interest income is also recognized on mortgage loans held for sale for the period from loan funding to sale, which is typically within 30 days. Loans are placed on non-accrual status when any portion of the principal or interest is greater than 90 days past due. Loans return to accrual status when the principal and interest become current and it is probable that the amounts are fully collectible. For individual loans that have been modified, a period of six timely payments is required before the loan is returned to an accrual basis.

**Interest Expense**

Interest expense primarily includes interest incurred on advance, warehouse and MSR facilities, unsecured senior notes, excess spread financing and compensating bank balances, as well as bank fees. The Company incurred interest expense related to advance, warehouse and MSR facilities, unsecured senior notes and excess spread financing of $485, $361 and $370 for the years ended December 31, 2023, 2022 and 2021, respectively.

**Share-Based Compensation**

Equity based awards include restricted stock units ("RSUs") granted to employees of the Company and non-employee directors and performance-based stock awards ("PSUs") granted to certain executive officers. The RSUs are valued at the fair market value of the Company's common stock on the grant date and recognized as an expense over the requisite employee service period on a straight-line basis using an accelerated attribution model. The PSUs feature a combination of service, market and/or performance conditions. Market conditions are valued using a model that incorporates the market condition of the grants while performance conditions are assessed for the probability of achievement. The PSUs are expensed on a straight-line basis over their requisite employee service period. The Company applies a dynamic forfeiture rate and records share-based compensation in "expenses - salaries, wages and benefits" within the consolidated statements of operations.

**Advertising Costs**

Advertising costs are expensed as incurred and are part of "expenses - general and administrative" within the consolidated statements of operations. The Company incurred advertising costs of $23, $37 and $40 for the years ended December 31, 2023, 2022 and 2021, respectively.

---

Index to Consolidated Financial Statements

**Income Taxes**

The Company is subject to the income tax laws of the U.S. and its states and municipalities. These tax laws are complex and subject to different interpretations by the taxpayer and the relevant governmental taxing authorities.

Deferred income taxes are determined using the balance sheet method. Deferred taxes are recognized for the future tax consequences attributable to differences between the consolidated financial statements carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates that will apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect of a change in tax rates on deferred tax assets and liabilities is recognized as income or expense in the period that includes the enactment date.

The Company regularly reviews the carrying amount of its deferred tax assets to determine if the establishment of a valuation allowance is necessary. If based on the available evidence, it is more likely than not that all or a portion of the Company's deferred tax assets will not be realized in future periods, a deferred tax valuation allowance is established. Consideration is given to various positive and negative evidence that could affect the realization of the deferred tax assets. In evaluating this available evidence, management considers, among other things, historical financial performance, expectation of future earnings, length of statutory carryforward periods, experience with operating tax loss and tax credit carryforwards which may expire unused, the use of tax planning strategies and the timing of reversals of temporary differences. The Company's evaluation is based on current tax laws as well as management's expectations of future performance.

The Company initially recognizes tax positions in the consolidated financial statements when it is more likely than not that the position will be sustained upon examination by the tax authorities. Such tax positions are initially and subsequently measured as the largest amount of tax benefit that is greater than 50% likely of being realized upon ultimate settlement with the tax authority, assuming the tax authority has full knowledge of the position and all relevant facts. In establishing a provision for income tax expense, the Company makes judgments and interpretations about the application of these inherently complex tax laws. The Company recognizes interest and penalties related to uncertain tax positions as a component of provisions for income taxes in accordance with ASC 740.

**Earnings Per Share**

The Company computes earnings per share using the two-class method, which is an earnings allocation formula that determines earnings per share for common stock and any participating securities according to dividends declared (whether paid or unpaid) and participation rights in undistributed earnings. The Series A Preferred Stock is considered participating securities because it has dividend rights determined on an as-converted basis in the event of Company's declaration of a dividend or distribution for common shares. In 2021, the Company retired its preferred shares. As of December 31, 2023 and 2022, the Company had 10 million preferred shares authorized at $0.00001, with zero shares issued and outstanding and aggregate liquidation preference of zero dollars.

Basic net income per common share is computed by dividing net income available to common stockholders by the weighted average number of common shares outstanding for the period. Diluted net income per common share is computed by dividing net income available to common stockholders by the sum of the weighted average number of common shares outstanding and any dilutive securities for the period.

**Share Repurchases**

The Company has a stock repurchase program which allows the Company to repurchase its common stock using open market stock purchases or privately negotiated transactions. Repurchased common stock is stated at cost and presented as a separate component of stockholders' equity in treasury stock. The share repurchase cost will be determined based on the total dollar amount paid for share repurchases for a single day divided by the total volume of shares repurchased. The Inflation Reduction Act of 2022 imposed a nondeductible 1% excise tax on the net value of certain stock repurchases made after December 31, 2022. As a result, the Company recorded the applicable excise tax of $2 during the year ended December 31, 2023 as an incremental cost of the shares repurchased in "treasury shares at cost" within the consolidated balance sheets.

---

Index to Consolidated Financial Statements

## 3. Acquisitions

*Acquisition of Assets*

During the second quarter of 2023, the Company acquired certain assets and liabilities of Rushmore Loan Management Services, LLC ("Rushmore") for a total purchase price of $34 (the "Rushmore Transaction"). Assets acquired were recorded in the Servicing segment and primarily included subservicing contracts and related servicing advances and receivables. The Company accounted for the transaction as an asset acquisition in accordance with Accounting Standard Codification Topic 805, *Business Combinations ("ASC 805")*, whereby the purchase price represents relative fair values of assets and liabilities acquired.

*Acquisition of Roosevelt Management Company and Affiliated Companies*

In July 2023, the Company acquired all the equity interests of Roosevelt Management Company, LLC ("Roosevelt"), an investment management firm, and its affiliated subsidiaries including Rushmore Loan Management Services, LLC and other entities, for a total purchase price of $28 ("Roosevelt Transaction"). The Company accounted for the transaction as a business combination in accordance with ASC 805 using the acquisition method of accounting. Under the acquisition method of accounting, the Company allocated the purchase price of the acquisition to identifiable assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date, with the excess of the purchase price over those fair values allocated to goodwill. The Company recorded $4 of intangible assets and $21 of goodwill based on the purchase price allocation. $5 and $16 of the goodwill is assigned to Servicing segment and Corporate/Other segment, respectively. The goodwill will be deductible for tax purposes. During the year ended December 31, 2023, the Company incurred $13 of acquisition costs related to the Roosevelt Transaction. The financial results of Rushmore and Roosevelt were included in Servicing segment and Corporate/Other segment, respectively. The Company finalized its allocation of fair value of consideration transferred during the three months ended December 31, 2023.

*Acquisition of Home Point Capital Inc.*

In May 2023, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") and a mortgage servicing rights purchase and sale agreement ("Purchase Agreement") with Home Point Capital Inc.("Home Point"), a Delaware corporation. Per the Merger Agreement, the Company agreed to commence a tender offer to acquire all of the outstanding shares of common stock of Home Point, other than certain excluded shares. The Home Point transactions closed in the third quarter of 2023 for total consideration of approximately $658. The Purchase Agreement was a bulk purchase of a portion of Home Point's mortgage servicing rights ("MSR") portfolio for $335. The Merger Agreement was the tender offer to acquire outstanding shares of common stock of Home Point, which included the benefit of the cash paid in the bulk purchase of Home Point's MSR portfolio. The net consideration paid for the two transactions was $323, or $2.33 per share.

The Company accounted for the two transactions as one business combination ("Home Point Acquisition") in accordance with ASC 805 using the acquisition method of accounting. Under the acquisition method of accounting, the Company allocated the purchase price of the acquisition to identifiable assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. The Company acquired $1.2 billion MSR and assumed a senior note with a principal balance of $500, among other acquired net assets. The Company recorded a preliminary bargain purchase gain of $96 in "other income (expense), net" within the consolidated statements of operations and reported under Corporate/Other segment, which represents the excess of the estimated fair value of net assets acquired over the consideration transferred. The purchase price allocation is subject to change as the Company obtains additional information and finalizes its review during the measurement period (up to one year from the acquisition date). The primary area of the preliminary allocation of fair value of consideration transferred that is not yet finalized is related to potential tax adjustments. The Company believes it was able to negotiate a bargain purchase price due to seller's operational challenges from significant market volatility, as well as the seller's desire to exit the business in an expedited manner. During the year ended December 31, 2023, the Company incurred $7 of acquisition costs related to the Home Point Acquisition.

Apx. 112

Index to Consolidated Financial Statements

## 4. Dispositions

### Sale of Mortgage Servicing Platform

On March 31, 2022, the Company completed the sale of certain assets and liabilities of its servicing and subservicing technology platform for performing and non-performing mortgage loans (the "Mortgage Servicing Platform") to Sagent, in exchange for Class A-1 Common Units equal to 19.9% ownership of Sagent, and the sale of certain tangible personal property of the Company used in the conduct of the Mortgage Servicing Platform in exchange for $9.9 in cash, for total consideration of $260 (the "Sagent Transaction"). In connection with the Sagent Transaction, the Company recorded a gain of $223, which was included in "other income, net" within the consolidated statements of operations under Corporate/Other, and recorded $4 transaction costs during the year ended December 31, 2022. The net carrying amount of assets and liabilities transferred in connection with the Sagent Transaction was $31 and reported under Corporate/Other.

The Company accounts for the equity interest under the equity method of accounting, as the Company has the ability to exercise significant influence over Sagent's operating and financial decisions but does not own a majority equity interest or otherwise control the respective entity. Under the equity method of accounting, the investment is initially stated at cost and subsequently adjusted for additional investments, distributions, and the Company's proportionate share of Sagent's earnings or losses. The initial cost of the equity interest recorded was $250, which represented the fair value as of March 31, 2022. During the fourth quarter of 2023, the Company recognized additional Class A-1 Common Units for $12. The Company recorded a $17 and $13 loss related to the Company's proportionate share of net loss of Sagent during the years ended December 31, 2023 and 2022, respectively. The Company's investment in Sagent was $232 as of December 31, 2023.

## 5. Mortgage Servicing Rights and Related Liabilities

The following table sets forth the carrying value of the Company's MSRs and the related liabilities. In estimating the fair value of all mortgage servicing rights and related liabilities, the impact of the current environment was considered in the determination of key assumptions.

| MSRs and Related Liabilities | December 31, 2023 | December 31, 2022 |
|---|---|---|
| MSRs at fair value | $ 9,090 | $ 6,654 |
| | | |
| Excess spread financing at fair value | $ 437 | $ 509 |
| Mortgage servicing rights financing at fair value | 29 | 19 |
| MSR related liabilities - nonrecourse at fair value | $ 466 | $ 528 |

### Mortgage Servicing Rights

The Company owns and records at fair value the rights to service traditional residential mortgage loans for others either as a result of purchase transactions or from the retained servicing associated with the sales and securitizations of loans originated. MSRs are comprised of servicing rights of both agency and non-agency loans.

The following table sets forth the activities of MSRs:

| MSRs at Fair Value | Year Ended December 31, 2023 | 2022 |
|---|---|---|
| Fair value - beginning of year | $ 6,654 | 4,223 |
| Additions: | | |
| Servicing retained from mortgage loans sold | 273 | 554 |
| Purchases and acquisitions of servicing rights | 3,189 | 1,595 |
| Dispositions: | | |
| Sales of servicing assets and excess yield | (573) | (294) |
| Changes in fair value: | | |
| Changes in valuation inputs or assumptions used in the valuation model (MSR MTM) | 121 | 1,328 |
| Changes in valuation due to amortization | (604) | (779) |
| Other changes[1] | 30 | 27 |
| Fair value - end of year | $ 9,090 | $ 6,654 |

[1] Amounts primarily represent negative fair values reclassified from the MSR asset to reserves as underlying loans are removed from the MSR and other reclassification adjustments.

From time to time, the Company sells its ownership interest in certain MSRs and is retained as the subservicer for the sold assets. The Company has evaluated the sale accounting requirements related to these transactions, including the Company's continued involvement as the subservicer, and concluded that these transactions qualify for sale accounting treatment. During the years ended December 31, 2023 and 2022, the Company sold $25,239 and $20,902 in unpaid principal balance of MSRs, of which $23,218 and $19,817 was retained for subservicing, respectively.

During the year ended December 31, 2023, certain agencies entered into agreements with the Company to purchase excess servicing cash flows ("excess yield") on certain agency loans with a total UPB of $41,958 for total proceeds of $294. The Company recorded a gain of $33 through the mark-to-market adjustments within "revenues - service related, net" in the consolidated statements of operations.

MSRs are segregated between investor type into agency and non-agency pools (referred to herein as "investor pools") based upon contractual servicing agreements with investors in the respective balance sheet date to evaluate the MSR portfolio and fair value of the portfolio. Agency investors consist of Government National Mortgage Association ("Ginnie Mae" or "GNMA") and the GSEs, Federal National Mortgage Association ("Fannie Mae" or "FNMA") and Federal Home Loan Mortgage Corp ("Freddie Mac" or "FHLMC"). Non-agency investors consist of investors in private-label securitizations.

The following table provides a breakdown of UPB and fair value for the Company's MSRs:

| MSRs - UPB and Fair Value Breakdown by Investor Pools | December 31, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| | UPB | Fair Value | UPB | Fair Value |
| Agency | $ 561,656 | $ 8,774 | $ 380,502 | $ 6,322 |
| Non-agency | 26,286 | 316 | 30,880 | 332 |
| Total | $ 587,942 | $ 9,090 | $ 411,382 | $ 6,654 |

Refer to Note 14, Fair Value Measurements, for further discussion on key weighted-average inputs and assumptions used in estimating the fair value of MSRs.

---

Index to Consolidated Financial Statements

The following table shows the hypothetical effect on the fair value of the Company's MSRs when applying certain unfavorable variations of key assumptions to these assets for the dates indicated:

| MSRs - Hypothetical Sensitivities | Option Adjusted Spread[1] | | Total Prepayment Speeds | | Cost to Service per Loan | |
|---|---|---|---|---|---|---|
| | 100 bps Adverse Change | 200 bps Adverse Change | 10% Adverse Change | 20% Adverse Change | 10% Adverse Change | 20% Adverse Change |
| December 31, 2023 | | | | | | |
| Mortgage servicing rights | $ (368) | $ (706) | $ (219) | $ (425) | $ (89) | $ (178) |

| | Discount Rate | | Total Prepayment Speeds | | Cost to Service per Loan | |
|---|---|---|---|---|---|---|
| | 100 bps Adverse Change | 200 bps Adverse Change | 10% Adverse Change | 20% Adverse Change | 10% Adverse Change | 20% Adverse Change |
| December 31, 2022 | | | | | | |
| Mortgage servicing rights | $ (266) | $ (511) | $ (136) | $ (264) | $ (61) | $ (122) |

[1] Beginning in the second quarter of 2023, the Company valued MSRs using a stochastic option adjusted spread ("OAS") instead of a static discount rate. Refer to Note 14, Fair Value Measurements, for further discussion.

These hypothetical sensitivities should be evaluated with care. The effect on fair value of an adverse change in assumptions generally cannot be determined because the relationship of the change in assumptions to the fair value may not be linear. Additionally, the impact of a variation in a particular assumption on the fair value is calculated while holding other assumptions constant. In reality, changes in one factor may lead to changes in other factors, which could impact the above hypothetical effects.

### Excess Spread Financing

In order to finance the acquisition of certain MSRs on various portfolio, the Company previously entered into sale and assignment agreements with third parties and sold to these entities the right to receive a specified percentage of the excess cash flow generated from the portfolios in excess of a fixed base servicing fee per loan. The Company retains all the base servicing fees, ancillary income and interest float earnings on principal along with interest payments and escrow, and also incurs costs to service the specified pool. The Company is the legal owner and the servicer of the portfolios and provides all servicing and advancing functions.

In connection with the above transactions, the Company entered into refinanced loan obligations with third parties that require the Company to transfer the new loan or a replacement loan of similar economic characteristics into the respective portfolio if the Company refinances any loan in the portfolio. The new or replacement loan will be governed by the same terms set forth in the sale and assignment agreement described above.

The Company had excess spread financing liability of $437 and $509, with UPB of $74,219 and $83,706 as of December 31, 2023 and 2022, respectively. Refer to Note 14, Fair Value Measurements, for further discussion on the valuation of excess spread financing liability.

The following table shows the hypothetical effect on the Company's excess spread financing fair value when applying certain unfavorable variations of key assumptions to those liabilities for the dates indicated:

| Excess Spread Financing - Hypothetical Sensitivities | Option Adjusted Spread[1] | | Prepayment Speeds | |
|---|---|---|---|---|
| | 100 bps Adverse Change | 200 bps Adverse Change | 10% Adverse Change | 20% Adverse Change |
| December 31, 2023 | | | | |
| Excess spread financing | $ 16 | $ 32 | $ 10 | $ 20 |

| | Discount Rate | | Prepayment Speeds | |
|---|---|---|---|---|
| | 100 bps Adverse Change | 200 bps Adverse Change | 10% Adverse Change | 20% Adverse Change |
| December 31, 2022 | | | | |
| Excess spread financing | $ 19 | $ 40 | $ 11 | $ 22 |

[1] Beginning in the second quarter of 2023, the Company valued excess spread financing using a stochastic OAS instead of a static discount rate. Refer to Note 14, Fair Value Measurements, for further discussion.

These hypothetical sensitivities should be evaluated with care. The effect on fair value of an adverse change in assumptions generally cannot be determined because the relationship of the change in assumptions to the fair value may not be linear. Additionally, the impact of a variation in a particular assumption on the fair value is calculated while holding other assumptions constant. In reality, changes in one factor may lead to changes in other factors, which could impact the above hypothetical effects. Also, a positive change in the above assumptions would not necessarily correlate with the corresponding decrease in the net carrying amount of the excess spread financing. Excess spread financing's cash flow assumptions that are utilized in determining fair value are based on the related cash flow assumptions used in the financed MSRs. Any fair value change recognized in the financed MSRs attributable to related cash flows assumptions would inherently have an inverse impact on the carrying amount of the related excess spread financing.

### Mortgage Servicing Rights Financing

The Company had MSR financing liability of $29 and $19 as of December 31, 2023 and 2022, respectively. Refer to Note 2, Significant Accounting Policies, for further discussion on MSR financing, and Note 14, Fair Value Measurements, for further discussion on key weighted-average inputs and assumptions used in the valuation of the MSR financing liability.

Apx. 113

**Revenues - Service Related, net**

The following table sets forth the items comprising total "revenues - service related, net":

| Revenues - Service Related, net | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Contractually specified servicing fees[1] | $ 1,700 | $ 1,458 | $ 1,122 |
| Other service-related income[1] | 72 | 105 | 72 |
| Incentive and modification income[1] | 43 | 29 | 51 |
| Servicing late fees[1] | 89 | 76 | 71 |
| Mark-to-market adjustments - Servicing | | | |
| MSR MTM | 121 | 1,328 | 502 |
| Loss on MSR hedging activities | (68) | (332) | (86) |
| Gain (loss) on MSR sales | 23 | (3) | 7 |
| Reclassifications[2] | (33) | (30) | (35) |
| Excess spread / MSR financing MTM | (18) | (142) | 33 |
| Total mark-to-market adjustments - Servicing | 25 | 821 | 421 |
| Amortization, net of accretion | | | |
| MSR amortization | (604) | (779) | (1,008) |
| Excess spread accretion | 41 | 86 | 255 |
| Total amortization, net of accretion | (563) | (693) | (753) |
| Originations service fees[3] | 61 | 98 | 176 |
| Corporate/Xome related service fees | 84 | 76 | 186 |
| Other[4] | (71) | (105) | (279) |
| Total revenues - Service Related, net | $ 1,440 | $ 1,865 | $ 1,067 |

[1] The Company recognizes revenue on an earned basis for services performed. Amounts include subservicing related revenues. Amounts also include servicing fees from loans sold with servicing retained of $708, $661 and $495 for the years ended December 31, 2023, 2022 and 2021, respectively.

[2] Reclassifications include the impact of negative modeled cash flows which have been transferred to reserves on advances and other receivables. The negative modeled cash flows relate to advances and other receivables associated with inactive and liquidated loans that are no longer part of the MSR portfolio.

[3] Amounts include fees collected from customers for originating residential mortgage loans and from other lenders for loans purchased through the correspondent channel, and includes loan application, underwriting, and other similar fees.

[4] Other represents the excess servicing fee that the Company pays to the counterparties under the excess spread financing arrangements, portfolio runoff and the payments made associated with MSR financing revenue.

## 6. Advances and Other Receivables

Advances and other receivables, net consists of the following:

| Advances and Other Receivables, Net | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Servicing advances, net of $13 and $12 purchase discount, respectively | $ 1,065 | $ 1,053 |
| Receivables from agencies, investors and prior servicers, net of $6 and $7 purchase discount | 101 | 103 |
| Reserves | (170) | (137) |
| Total advances and other receivables, net | $ 996 | $ 1,019 |

Index to Consolidated Financial Statements

Mortgage loans held for sale are recorded at fair value as set forth below:

| Mortgage Loans Held for Sale | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Mortgage loans held for sale - UPB | $ 924 | $ 921 |
| Mark-to-market adjustment[1] | 3 | (28) |
| Total mortgage loans held for sale | $ 927 | $ 893 |

[1] The mark-to-market adjustment includes net change in unrealized gain/loss, premium on correspondent loans and fees on direct-to-consumer loans. The mark-to-market adjustment is recorded in "revenues - net gain on mortgage loans held for sale" in the consolidated statements of operations.

The following table sets forth the activities of mortgage loans held for sale:

| Mortgage Loans Held for Sale | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Balance - beginning of year | $ 893 | $ 4,381 |
| Loans sold and loan payments received | (14,097) | (34,731) |
| Mortgage loans originated and purchased, net of fees | 12,856 | 28,309 |
| Repurchase of loans out of Ginnie Mae securitizations[1] | 1,234 | 3,067 |
| Net change in unrealized gain (loss) on retained loans held for sale | 44 | (132) |
| Net transfers of mortgage loans held for sale[2] | (3) | (1) |
| Balance - end of year | $ 927 | $ 893 |

[1] The Company has the option right to repurchase any individual loan in a Ginnie Mae securitization pool if that loan meets certain criteria, including being delinquent greater than 90 days. The majority of Ginnie Mae repurchased loans are repurchased in connection with loan modifications and loan resolution activity, with the intent to repool into new Ginnie Mae securitizations upon re-performance of the loan or to otherwise sell to third-party investors. Therefore, these loans are classified as held for sale.

[2] Amount reflects transfers to other assets for loans transitioning into REO status and transfers to advances and other receivables, net, for claims made on certain government insurance mortgage loans. Transfers out are net of transfers to advances and other receivables, net, for claims made on certain government insurance mortgage loans. Transfers out are net of transfers in upon receipt of proceeds from an REO sale or claim filing.

For the years ended December 31, 2023 and 2022, the Company recorded a total realized gain of $33 and a loss of $267 from total sales proceeds of $13,877 and $34,464, respectively, on the sale of mortgage loans held for sale.

The Company accrues interest income as earned and places loans on non-accrual status after any portion of principal or interest has been delinquent for more than 90 days. Accrued interest is recorded as "interest income" in the consolidated statements of operations.

The total UPB of mortgage loans held for sale on non-accrual status was as follows:

| Mortgage Loans Held for Sale | December 31, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| | UPB | Fair Value | UPB | Fair Value |
| Non-accrual[1] | $ 42 | $ 36 | $ 102 | $ 87 |

[1] Non-accrual UPB includes $35 and $90 of UPB related to Ginnie Mae repurchased loans as of December 31, 2023 and 2022, respectively.

The total UPB of mortgage loans held for sale for which the Company has begun formal foreclosure proceedings was $30 and $65 as of December 31, 2023 and 2022, respectively.

---

The following table sets forth the activities of the servicing reserves for advances and other receivables:

| Reserves for Advances and Other Receivables | 2023 | 2022 |
|---|---|---|
| Balance - beginning of year | $ 137 | $ 167 |
| Provision | 40 | 30 |
| Reclassification[1] | 27 | 36 |
| Write-offs | (34) | (96) |
| Balance - end of year | $ 170 | $ 137 |

[1] Reclassifications represent reserves provisioned within other balance sheet accounts as associated serviced loans become inactive or liquidate.

**Purchase Discount for Advances and Other Receivables**

The following table sets forth the activities of the purchase discount for advances and other receivables:

| Purchase Discount for Advances and Other Receivables | Year Ended December 31, 2023 | | Year Ended December 31, 2022 | |
|---|---|---|---|---|
| | Servicing Advances | Receivables from Agencies, Investors and Prior Servicers | Servicing Advances | Receivables from Agencies, Investors and Prior Servicers |
| Balance - beginning of year | $ 12 | $ 7 | $ 19 | $ 12 |
| Addition from acquisition[1] | 5 | — | — | — |
| Utilization of purchase discounts | (4) | (1) | (7) | (5) |
| Balance - end of year | $ 13 | $ 6 | $ 12 | $ 7 |

[1] In connection with the acquisition of Home Point in 2023, the Company recorded the acquired advances and other receivables at fair value as of the acquisition date, which resulted in a purchase discount of $5. Refer to *Note 3, Acquisitions*, for discussion of the Home Point acquisition.

**Credit Loss for Advances and Other Receivables**

The following table sets forth the activities of the CECL allowance for advances and other receivables:

| CECL Allowance for Advances and Other Receivables | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Balance - beginning of year | $ 36 | $ 31 |
| Provision | 1 | 10 |
| Write-offs | (2) | (5) |
| Balance - end of year[1] | $ 35 | $ 36 |

[1] As of December 31, 2023, $29 and $6 were included in reserves and purchase discount, respectively. As of December 31, 2022, $29 and $7 were included in reserves and purchase discount, respectively.

The Company determined that the credit-related risk associated with applicable financial instruments typically increases with the passage of time. The CECL reserve methodology considers these financial instruments collectible to a point in time of 39 months. Any projected remaining balance at the end of the collection period is considered a loss and factors into the overall CECL loss rate required.

## 7. Mortgage Loans Held for Sale

*Mortgage Loans Held for Sale*

The Company maintains a strategy of originating and purchasing residential mortgage loan products primarily for the purpose of selling to GSEs or other third-party investors in the secondary market as a servicing-retained basis. The Company primarily originates loans through its correspondent channel and assists customers currently in the Company's servicing portfolio with refinancing of loans or new home purchases through its direct-to-consumer channel. Generally, all newly originated mortgage loans held for sale are securitized and transferred to GSEs or delivered to third-party purchasers shortly after origination on a servicing-retained basis.

Index to Consolidated Financial Statements

## 8. Property and Equipment

The composition of property and equipment, net, and the corresponding ranges of estimated useful lives were as follows:

| Property and Equipment, Net | December 31, 2023 | December 31, 2022 | Estimated Useful Life |
|---|---|---|---|
| Furniture, fixtures, and equipment | $ 57 | $ 55 | 5 years |
| Capitalized software costs | 94 | 87 | 3 - 5 years |
| Software in development and other | 8 | 12 | |
| Leasehold improvements | 30 | 27 | Lesser of 10 years or remaining lease term |
| Long-term finance lease - computer equipment | 5 | 6 | 3 - 5 years |
| Property and equipment, gross | 194 | 187 | |
| Less: Accumulated depreciation | (141) | (122) | |
| Property and equipment, net | $ 53 | $ 65 | |

The Company recorded depreciation expense on property and equipment of $31 for the years ended December 31, 2023 and 2022, respectively. The Company has entered into various lease agreements for computer equipment, which are classified as finance leases. See *Note 9, Leases*, for more information.

The Company recorded no impairment charges during the years ended December 31, 2023 and 2022.

## 9. Leases

The Company's leases primarily relate to office space and equipment, with remaining lease terms of generally less than 1 year to 7 years. Certain lease arrangements contain extension options, which typically range from 1 to 7 years, at the then fair market rental rates. As of December 31, 2023 and 2022, operating lease ROU assets were $72 and $96, respectively, and corresponding lease liabilities were $91 and $111, respectively, which were included in "other assets," and "payables and other liabilities," respectively, on the consolidated balance sheets. The Company does not currently have any significant finance leases in which it is the lessor.

The table below summarizes the Company's net lease cost:

| Net Lease Cost | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Operating lease cost | $ 21 | $ 26 |
| Sublease income | (3) | (3) |
| Total net lease cost | $ 18 | $ 23 |

The table below summarizes other information related to the Company's operating leases:

| Operating Leases - Other Information | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows from operating leases | $ 19 | $ 23 |
| Leased assets obtained in exchange for new operating lease liabilities | $ 8 | $ 15 |
| Weighted average remaining lease term - operating leases, in years | 5.0 | 6.0 |
| Weighted average discount rate - operating leases | 4.6 % | 3.8 % |

Apx. 114

Index to Consolidated Financial Statements

Maturities of operating lease liabilities as of December 31, 2023 are as follows:

| Year Ending December 31, | Operating Leases |
|---|---|
| 2024 | $ 23 |
| 2025 | 20 |
| 2026 | 18 |
| 2027 | 16 |
| 2028 | 13 |
| Thereafter | 12 |
| Total future minimum lease payments | 102 |
| Less: imputed interest | 11 |
| Total operating lease liabilities | $ 91 |

### 10. Loans Subject to Repurchase from Ginnie Mae

Loans are sold to Ginnie Mae in conjunction with the issuance of mortgage-backed securities. The Company, as the issuer of the mortgage-backed securities, has the unilateral right to repurchase any individual loan in a Ginnie Mae securitization pool if that loan meets certain criteria, including payments not being received from borrowers for greater than 90 days. Once the Company has the unilateral right to repurchase a delinquent loan, it has effectively regained control over the loan and recognizes these rights to the loan on its consolidated balance sheets and establishes a corresponding repurchase liability regardless of the Company's intention to repurchase the loan. The Company had loans subject to repurchase from Ginnie Mae of $966 and $1,865 as of December 31, 2023 and 2022, respectively, which are included in both "other assets" and "payables and other liabilities" in the consolidated balance sheets.

### 11. Goodwill and Intangible Assets

**Goodwill**

The following table presents changes in the carrying amount of goodwill by reportable segment for the year ended December 31, 2023. There were no changes in goodwill in 2022:

| | Year Ended December 31, 2023 | | | |
|---|---|---|---|---|
| | Servicing | Originations | Corporate/Other[2] | Total |
| Balance - beginning of year | $ 80 $ | 28 $ | 12 $ | 120 |
| Addition from acquisitions[1] | 5 | — | 16 | 21 |
| Balance - end of year | $ 85 $ | 28 $ | 28 $ | 141 |

[1] As discussed in *Note 3, Acquisitions*, the Company recorded goodwill in connection with the Roosevelt Transaction.
[2] The goodwill associated with Xome and Roosevelt is included in Corporate/Other.

During the years ended December 31, 2023 and 2022, the Company performed a quantitative assessment of its reporting units and determined that no impairment of goodwill existed. Goodwill is recorded in "other assets" in the consolidated balance sheets.

*Intangible Assets*

The following tables present the composition of intangible assets:

| | December 31, 2023 | | | |
|---|---|---|---|---|
| Intangible Assets | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Weighted Average Remaining Life in Years |
| Customer relationships | $ 96 $ | (73) $ | 23 | 4.7 |
| Trade name | 9 | (7) | 2 | 4.5 |
| Other[1] | 3 | — | 3 | 2.8 |
| Total intangible assets | $ 108 $ | (80) $ | 28 | 4.5 |

[1] Other intangible assets primarily include licenses.

| | December 31, 2022 | | | |
|---|---|---|---|---|
| Intangible Assets | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Weighted Average Remaining Life in Years |
| Customer relationships | $ 74 $ | (67) $ | 7 | 5.6 |
| Technology | 25 | (25) | — | 0.0 |
| Trade name | 7 | (6) | 1 | 0.6 |
| Total intangible assets | $ 106 $ | (98) $ | 8 | 4.9 |

Intangible assets are recorded in "other assets" within the consolidated balance sheets. In 2023, the Company recorded intangible assets of $23 and $4 in connection with the Rushmore Transaction and Roosevelt Transaction, respectively. See further discussion in *Note 3, Acquisitions*. The Company recognized $7 and $6 of amortization expense related to intangible assets during the years ended December 31, 2023 and 2022, respectively. The Company expects to record amortization expense for existing amortizable intangible assets of $7, $7, $6, $5, and $3 for each of the years ending December 31, 2024 to 2028. No impairment on intangible assets was recorded during the years ended December 31, 2023 and December 31, 2022.

### 12. Derivative Financial Instruments

Derivative instruments are used as part of the overall strategy to manage exposure to interest rate risks related to mortgage loans held for sale and IRLCs ("the pipeline") and the MSR portfolio. The Company economically hedges the pipeline separately from the MSR portfolio primarily using third-party derivative instruments. Such derivative instruments utilized by the Company include IRLCs, LPCs, forward MBS and Treasury futures. The changes in value on the derivative instruments associated with pipeline hedging are recorded in earnings as a component of "revenues - net gain on mortgage loans held for sale" on the consolidated statements of operations and consolidated statements of cash flows, while changes in the value of derivative instruments associated with the MSR portfolio fair value are recorded in "revenues - service related, net" on the consolidated statements of operations and in "loss (gain) on MSR hedging activities" on the consolidated statements of cash flows.

Index to Consolidated Financial Statements

The following tables provide the outstanding notional balances, fair values of outstanding positions and recorded gains/(losses) for the derivative financial instruments. Gains/(losses) include both realized and unrealized gains/(losses) of each derivative financial instrument.

| | | December 31, 2023 | | Year Ended December 31, 2023 |
|---|---|---|---|---|
| Derivative Financial Instruments | Expiration Dates | Outstanding Notional | Fair Value | Gains/(Losses) |
| **Assets** | | | | |
| Mortgage loans held for sale | | | | |
| Loan sale commitments | 2024 | $ 337 $ | 11 $ | 1 |
| Derivative financial instruments | | | | |
| Treasury futures | 2024 | 2,634 | 113 | 113 |
| Forward MBS trades | 2024 | 2,365 | 22 | 155 |
| IRLCs | 2024 | 584 | 21 | (1) |
| LPCs | 2024 | 361 | 3 | 2 |
| Total derivative financial instruments - assets | | $ 5,944 $ | 159 $ | 269 |
| **Liabilities** | | | | |
| Derivative financial instruments | | | | |
| Forward MBS trades | 2024 | 1,049 | 9 | (126) |
| Treasury futures | 2024 | 80 | — | (196) |
| LPCs | 2024 | 41 | — | 1 |
| IRLCs | 2024 | 1 | — | — |
| Total derivative financial instruments - liabilities | | $ 1,171 $ | 9 $ | (321) |

| | | December 31, 2022 | | Year Ended December 31, 2022 |
|---|---|---|---|---|
| Derivative Financial Instruments | Expiration Dates | Outstanding Notional | Fair Value | Gains/(Losses) |
| **Assets** | | | | |
| Mortgage loans held for sale | | | | |
| Loan sale commitments | 2023 | $ 354 $ | 10 $ | (15) |
| Derivative financial instruments | | | | |
| Treasury futures | 2023 | — | 8 | 569 |
| Forward MBS trades | 2023 | 1,143 | 8 | 569 |
| IRLCs | 2023 | 755 | 22 | (112) |
| LPCs | 2023 | 145 | 1 | (2) |
| Total derivative financial instruments - assets | | $ 2,043 $ | 31 $ | 459 |
| **Liabilities** | | | | |
| Derivative financial instruments | | | | |
| Forward MBS trades | 2023 | 681 | 9 | (56) |
| LPCs | 2023 | 892 | 14 | (277) |
| IRLCs | 2023 | 209 | 1 | — |
| | 2023 | 15 | — | — |
| Total derivative financial instruments - liabilities | | $ 1,797 $ | 24 $ | (332) |

As of December 31, 2023 the Company held $8 and $56 in collateral deposits and collateral obligations on derivative instruments, respectively. As of December 31, 2022, the Company held $49 and $1 in collateral deposits and collateral obligations on derivative instruments, respectively. Collateral deposits and collateral obligations are recorded in "other assets" and "payables and other liabilities," respectively, on the Company's consolidated balance sheets, and are included in "net cash attributable to operating activities" within the consolidated statements of cash flows. The Company does not offset fair value amounts recognized for derivative instruments against amounts collected or deposited on derivative instruments in the consolidated balance sheets.

### 13. Indebtedness

*Advance, Warehouse and MSR Facilities*

| | | | | December 31, 2023 | | December 31, 2022 | |
|---|---|---|---|---|---|---|---|
| | Maturity Date | Collateral | Capacity Amount | Outstanding | Collateral Pledged | Outstanding | Collateral Pledged |
| **Advance Facilities** | | | | | | | |
| $350 advance facility | October 2024 | Servicing advance receivables | $ 350 $ | 132 $ | 169 $ | 150 $ | 189 |
| $300 advance facility[1] | November 2024 | Servicing advance receivables | 300 | 273 | 364 | 308 | 410 |
| $250 advance facility | September 2027 | Servicing advance receivables | 250 | 250 | 326 | 171 | 209 |
| $50 advance facility | December 2024 | Servicing advance receivables | 50 | 27 | 49 | 40 | 45 |
| Advance facilities principal amount | | | | 682 | 908 | 669 | 853 |
| **Warehouse Facilities** | | | | | | | |
| $1,500 Warehouse Facility | June 2024 | Mortgage loans or MBS | 1,500 | 107 | 104 | 206 | 212 |
| $750 Warehouse Facility | June 2024 | Mortgage loans or MBS | 750 | 177 | 176 | 135 | 133 |
| $750 Warehouse Facility | October 2024 | Mortgage loans or MBS | 750 | 155 | 166 | 202 | 209 |
| $500 Warehouse Facility | June 2024 | Mortgage loans or MBS | 500 | 72 | 78 | 76 | 80 |
| $350 Warehouse Facility | August 2024 | Mortgage loans or MBS | 350 | 73 | 75 | 11 | 12 |
| $250 Warehouse Facility[2] | February 2024 | Mortgage loans or MBS | 250 | — | — | 115 | 117 |
| $250 Warehouse Facility[3] | September 2025 | Mortgage loans or MBS | 250 | 158 | 177 | 14 | 15 |
| $200 Warehouse Facility | June 2024 | Mortgage loans or MBS | 200 | 82 | 84 | 18 | 21 |
| $200 Warehouse Facility | January 2025 | Mortgage loans or MBS | 200 | 12 | 21 | — | — |
| $100 Warehouse Facility | April 2024 | Mortgage loans or MBS | 100 | 25 | 33 | 19 | 26 |
| $100 Warehouse Facility | April 2024 | Mortgage loans or MBS | 100 | — | — | — | — |
| $1 Warehouse Facility | December 2024 | Mortgage loans or MBS | 1 | — | — | — | — |
| Warehouse facilities principal amount | | | | 822 | 915 | 617 | 910 |
| **MSR Facilities** | | | | | | | |
| $1,500 Warehouse Facility[3] | April 2025 | MSR | 1,500 | 980 | 1,455 | 380 | 2,384 |
| $1,450 Warehouse Facility[1] | November 2024 | MSR | 1,450 | 300 | 2,164 | 380 | 927 |
| $750 Warehouse Facility[1] | September 2025 | MSR | 750 | 545 | 1,306 | 380 | 1,482 |
| $500 Warehouse Facility | June 2025 | MSR | 500 | 485 | 693 | 365 | 512 |
| $500 Warehouse Facility | April 2025 | MSR | 500 | 385 | 634 | — | — |
| $300 Warehouse Facility | June 2025 | MSR | 300 | 236 | 677 | — | — |
| $50 Warehouse Facility | November 2024 | MSR | 50 | 29 | 67 | 25 | 74 |
| MSR facilities principal amount | | | | 2,814 | 6,958 | 1,410 | 5,499 |
| Advance, warehouse and MSR facilities principal amount | | | | 4,318 $ | 8,781 | 2,696 $ | 7,262 |
| Unamortized debt issuance costs | | | | (16) | | (11) | |
| Total advance, warehouse and MSR facilities, net | | | | $ 4,302 | | $ 2,685 | |

Apx. 115

(2)  Total capacity for this facility is $1,750, of which $300 and $1,450 are internally allocated for advance financing and MSR financing, respectively; capacity is fully fungible and is not restricted by these allocations.

(3)  This facility was terminated in February 2024.

(4)  The capacity amount for this facility is $1,000, of which $750 is a sublimit for MSR financing.

The weighted average interest rate for advance facilities was 7.6% and 4.1% for the years ended December 31, 2023 and 2022, respectively. The weighted average interest rate for warehouse and MSR facilities was 7.6% and 4.0% for the years ended December 31, 2023 and 2022, respectively.

*Unsecured Senior Notes*

Unsecured senior notes consist of the following:

| Unsecured Senior Notes | December 31, 2023 | December 31, 2022 |
|---|---|---|
| $850 face value, 5.500% interest rate payable semi-annually, due August 2028 | $ 850 | $ 850 |
| $650 face value, 5.125% interest rate payable semi-annually, due December 2030 | 650 | 650 |
| $600 face value, 6.000% interest rate payable semi-annually, due January 2027 | 600 | 600 |
| $600 face value, 5.750% interest rate payable semi-annually, due November 2031 | 600 | 600 |
| $550 face value, 5.000% interest rate payable semi-annually, due January 2026[(5)] | 500 | — |
| Unsecured senior notes principal amount | 3,200 | 2,700 |
| Purchase discount[(5)] and unamortized debt issuance costs | (49) | (27) |
| Unsecured senior notes, net | $ 3,151 | $ 2,673 |

(5)  In connection with the Home Point Acquisition in 2023, the Company assumed an unsecured senior note with a principal balance of $500 and recorded a purchase discount of $32 on the acquisition date, of which $5 has been accreted in the year ended December 31, 2023. See *Note 2, Acquisitions,* for further details.

The ratios included in the indentures for the unsecured senior notes are incurrence-based compared to the customary rate covenants that are often found in credit agreements that require a company to maintain a certain ratio. The incurrence-based covenants limit the issuer(s) and restricted subsidiaries ability to incur additional indebtedness, pay dividends, make certain investments, create liens, consolidate, merge or sell substantially all of their assets or enter into certain transactions with affiliates. The indentures contain certain events of default, including (subject, in some cases, to customary cure periods and materiality thresholds) defaults based on (i) the failure to make payments under the applicable indenture when due, (ii) breach of covenants, (iii) cross-defaults to certain other indebtedness, (iv) certain bankruptcy or insolvency events, (v) material judgments and (vi) invalidity of material guarantees.

The indentures provide that on or before certain fixed dates, the Company may redeem up to 40% of the aggregate principal amount of the unsecured senior notes with the net proceeds of certain equity offerings at fixed redemption prices, plus accrued and unpaid interest, to the redemption dates, subject to compliance with certain conditions. In addition, the Company may redeem all or a portion of the unsecured senior notes at any time on or after certain fixed dates at the applicable redemption prices set forth in the indentures plus accrued and unpaid interest, to the redemption dates. No notes were repurchased or redeemed during the years ended December 31, 2023 and 2022.

As of December 31, 2023, the expected maturities of the Company's unsecured senior notes based on contractual maturities are as follows:

| Year Ending December 31, | Amount |
|---|---|
| 2024 through 2025 | $ — |
| 2026 | 500 |
| 2027 | 600 |
| 2028 | 850 |
| Thereafter | 1,250 |
| Total unsecured senior notes principal amount | $ 3,200 |

*Financial Covenants*

The Company's credit facilities contain various financial covenants, which primarily relate to required tangible net worth amounts, liquidity reserves, leverage requirements, and profitability requirements, which are measured at the Company's operating subsidiary, Nationstar Mortgage LLC. The Company was in compliance with its required financial covenants as of December 31, 2023.

## 14. Securitizations and Financings

*Variable Interest Entities*

In the normal course of business, the Company enters into various types of on- and off-balance sheet transactions with SPEs determined to be VIEs, which primarily consist of securitization trusts established for a limited purpose. Generally, these SPEs are formed for the purpose of securitization transactions in which the Company transfers assets to an SPE, which then issues to investors various forms of debt obligations supported by those assets.

The Company has determined that the SPEs created in connection with certain advance facilities trusts should be consolidated as the Company is the primary beneficiary of each of these entities.

A summary of the assets and liabilities of the Company's transactions with VIEs included in the Company's consolidated financial statements is presented below:

| Consolidated Transactions with VIEs | December 31, 2023 Transfers Accounted for as Secured Borrowings | December 31, 2022 Transfers Accounted for as Secured Borrowings |
|---|---|---|
| **Assets** | | |
| Restricted cash | $ 111 | $ 78 |
| Advances and other receivables, net | 495 | 398 |
| Total assets | $ 606 | $ 476 |
| **Liabilities** | | |
| Advance facilities[(1)] | $ 382 | $ 321 |
| Payables and other liabilities | 1 | 1 |
| Total liabilities | $ 383 | $ 322 |

(1)  Refer to advance facilities in *Note 13, Indebtedness,* for additional information.

The following table shows a summary of the outstanding collateral and certificate balances for securitization trusts for which the Company was the transferor, including any retained beneficial interests and MSRs, that were not consolidated by the Company:

| Unconsolidated Securitization Trusts | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Total collateral balances - UPB | $ 881 | $ 976 |
| Total certificate balances | $ 849 | $ 949 |

The Company has not retained any variable interests in the unconsolidated securitization trusts that were outstanding as of December 31, 2023, and 2022, and therefore does not have a significant maximum exposure to loss related to these unconsolidated VIEs.

A summary of mortgage loans transferred by the Company to unconsolidated securitization trusts that are 60 days or more past due are presented below:

| Principal Amount of Transferred Loans 60 Days or More Past Due | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Unconsolidated securitization trusts | $ 91 | $ 119 |

## 15. Stockholders' Equity and Employee Benefit Plans

Share-based awards under the 2019 Omnibus Incentive Plan (the "2019 Plan") include (i) restricted stock units ("RSUs") granted to employees of the Company, consultants, and non-employee directors and (ii) performance stock units ("PSUs") granted to certain executive officers.

*Restricted Stock Units*

The RSUs are valued at the fair market value of the Company's common stock on the grant date as defined in the 2019 Plan. The stock awards for employees generally vest in equal installments on each of the first three anniversaries of the awards, provided that the participant remains continuously employed with the Company during that time. If the participant's employment has terminated by reason of retirement, or upon death or disability, the unvested shares of an award will vest. The stock awards for non-employee directors generally vest the earlier of (a) the first anniversary of the grant date or (b) the date of the next annual stockholders meeting following the grant date. Any forfeiture of restricted stock awards before vesting has been achieved, results in a reduction in the balance of outstanding common shares.

*Performance Stock Units*

The PSUs are valued at the fair market value of the Company's common stock on the grant date as defined in the 2019 Plan. In March 2023 and November 2023, certain executives of the Company were granted 0.1 million and 0.2 million PSUs (the "2023 PSUs"), respectively. 50% of the 2023 PSUs are eligible to vest in an amount between 0% to 200% of a target award based on achievement of relative total shareholder return and the remaining 50% are eligible to vest in an amount between 0% to 200% of a target award based on achievement of annualized tangible book value growth. The 2023 PSUs vest over a period of three to five years and are settled into shares of the Company's common stock.

In March 2020, March 2021, and March 2022, certain executives of the Company were granted 0.5 million PSUs (the "2020 PSUs"), 0.3 million PSUs (the "2021 PSUs"), and 0.1 million PSUs (the "2022 PSUs"), respectively. The 2020, 2021 and 2022 PSUs are eligible to vest and be settled into shares of common stock in an amount between 0% and 200% of a target award based on achievement of total shareholder return performance vesting criteria over a period of three years beginning March 1, 2020, 2021 and 2022, respectively, with one-third of the units also eligible to vest based on performance through March 1, 2021, 2022 and 2023, respectively.

*Share-Based Award Activities*

The following table summarizes the Company's share-based awards:

| Share-based Awards | Shares (or Units) (in thousands) | Weighted-Average Grant Date Fair Value, per Share (or Unit) |
|---|---|---|
| Share-based awards outstanding as of December 31, 2022 | 2,348 | 25.91 |
| Granted | 1,319 | 41.08 |
| Vested | (1,426) | 15.89 |
| Forfeited | (128) | 40.95 |
| Share-based awards outstanding as of December 31, 2022 | 2,113 | 41.73 |

The Company recorded $28, $29 and $29 of expenses related to share-based awards during the years ended December 31, 2023, 2022 and 2021, respectively. As of December 31, 2023, unrecognized compensation expense totaled $48 related to non-vested stock award payments that are expected to be recognized over a weighted average period of 1.0 years.

The Company is eligible to receive a tax benefit when the vesting date fair value of an award exceeds the value used to recognize compensation expense at the date of grant. The excess tax benefit resulting from tax deductions in excess of the compensation cost recognized by the Company was $12, $11 and $9 for the years ended December 31, 2023, 2022 and 2021, respectively.

*Employee Benefit Plans*

The Company sponsors a defined contribution plan (401(k) plan) that covers all full-time employees. The Company matches 100% of participant contributions up to 2% of their total eligible annual base compensation and matches 50% of contributions for the next 4% of each participant's total eligible annual base compensation. Matching contributions by the Company totaled $11 and $18 for the years ended December 31, 2023 and 2022, respectively.

## 16. Earnings per Share

The Company computes earnings per share using the two-class method, which is an earnings allocation formula that determines earnings per share for common stock and any participating securities according to dividends declared (whether paid or unpaid) and participation rights in undistributed earnings. The Series A Preferred Stock is considered participating securities because it has dividend rights determined on an as-converted basis in the event of Company's declaration of a dividend or distribution for common shares. In 2021, the Company repurchased a total of 14.8 million shares of its common stock from affiliates of Kohlberg Kravis Roberts & Co. L.P., ("KKR") a related party of the Company. In addition, in August 2021, the Company repurchased 1.0 million shares of its Series A Preferred Stock from affiliates of KKR. After giving effect to the transaction, KKR no longer held any equity interests in the Company.

The following table sets forth the computation of basic and diluted net income (loss) per common share (amounts in millions, except per share amounts):

| Computation of Earnings Per Share | 2023 | 2022 | 2021 |
|---|---|---|---|
| Net income from continuing operations | $ 500 | $ 923 | $ 1,466 |
| Less: Undistributed earnings from continuing operations attributable to participating stockholders | — | — | 8 |
| Less: Premium on redemption of preferred stock | — | — | 28 |
| Less: Premium on continuing operations attributable to Mr. Cooper common stockholders | $ 500 | $ 923 | $ 1,430 |
| Net loss from discontinued operations | $ — | $ — | $ (12) |
| Less: Undistributed earnings from discontinued operations attributable to participating stockholders | — | — | — |
| Net loss from discontinued operations attributable to Mr. Cooper common stockholders | $ — | $ — | $ (12) |
| Net income | $ 500 | $ 923 | $ 1,454 |
| Less: Undistributed earnings attributable to participating stockholders | — | — | 8 |
| Less: Premium on redemption of preferred stock | — | — | 28 |
| Net income attributable to common stockholders | $ 500 | $ 923 | $ 1,418 |
| Earnings from continuing operations per common share attributable to Mr. Cooper: | | | |
| Basic | $ 7.46 | $ 12.84 | $ 17.39 |
| Diluted | $ 7.30 | $ 12.50 | $ 16.67 |
| Earnings from discontinued operations per common share attributable to Mr. Cooper: | | | |
| Basic | $ — | $ — | $ (0.15) |
| Diluted | $ — | $ — | $ (0.14) |
| Earnings per common share attributable to Mr. Cooper: | | | |
| Basic | $ 7.46 | $ 12.84 | $ 17.24 |
| Diluted | $ 7.30 | $ 12.50 | $ 16.53 |
| Weighted average shares of common stock outstanding (in thousands): | | | |
| Basic | 67,070 | 71,885 | 82,247 |
| Dilutive effect of stock awards | 1,479 | 1,933 | 3,067 |
| Dilutive effect of participating securities | — | — | 492 |
| Diluted | 68,549 | 73,818 | 85,806 |

Apx. 116

## 17. Income Taxes

The components of income tax expense for continuing operations were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| Total Income Tax Expense on continuing operations | 2023 | 2022 | 2021[1] |
| **Current Income Taxes** | | | |
| Federal | $ 3 | $ (6) | $ 7 |
| State | 16 | 8 | 113 |
| **Total current income taxes** | 19 | 2 | 120 |
| **Deferred Income Taxes** | | | |
| Federal | 110 | 245 | 376 |
| State | 25 | 44 | (25) |
| **Total deferred income taxes** | 135 | 289 | 351 |
| **Total income tax expense** | $ 154 | $ 291 | $ 471 |

[1]   The provision for income taxes for 2021 does not reflect the tax effects of the sale of the Company's reverse servicing portfolio reported as discontinued operations.

The following table presents a reconciliation of the income tax provision computed at the U.S. federal statutory tax rate to the actual effective tax rate:

| | Year Ended December 31, | | |
|---|---|---|---|
| Reconciliation of the Income Tax Provision | 2023 | 2022 | 2021 |
| **Tax Expense at Federal Statutory Rate** | $ 137 | $ 255 | $ 407 |
| Effect of: | | | |
| State taxes, net of federal benefit | 32 | 39 | 70 |
| Bargain purchase gain[1] | (20) | — | — |
| Nondeductible executive compensation | 11 | 8 | 9 |
| Share based compensation | (9) | (9) | (8) |
| Other, net | 3 | (2) | (7) |
| **Total income tax expense** | $ 154 | $ 291 | $ 471 |

[1]   Amount is related to preliminary bargain purchase gain recorded in connection with the Home Point Acquisition. Refer to *Note 3, Acquisitions,* for further details.

Temporary differences and carryforwards that give rise to deferred tax assets and liabilities are comprised of the following:

| Deferred Tax Assets and Liabilities | December 31, 2023 | December 31, 2022 |
|---|---|---|
| **Deferred Tax Assets** | | |
| Effect of: | | |
| Goodwill and intangible assets | $ 585 | $ 827 |
| Loss reserves | 101 | 84 |
| Loss carryforwards (federal, state & capital) | 85 | 104 |
| Lease liability | 22 | 28 |
| Accruals | 20 | 11 |
| Depreciation and amortization, net | 8 | — |
| Other, net | 12 | 19 |
| **Total deferred tax assets** | 833 | 1,073 |
| **Deferred Tax Liabilities** | | |
| MSR amortization and mark-to-market, net | (282) | (269) |
| Other investment assets | (53) | (67) |
| Right-of-use assets | (18) | (24) |
| Depreciation and amortization, net | — | (2) |
| Prepaid assets | (1) | (1) |
| **Total deferred tax liabilities** | (354) | (363) |
| Valuation Allowance | (7) | (7) |
| **Deferred tax assets, net[1]** | $ 472 | $ 703 |

[1]   The Company elected to account for the Global Intangible Low-Taxed Income ("GILTI") tax expense in the period in which it is incurred. As a result, no deferred tax impact of GILTI has been provided in the consolidated financial statements.

The Company has federal NOL carryforwards (pre-tax) of $354 and $484 as of December 31, 2023 and 2022, respectively. The Company believes it is more likely than not that its deferred tax assets will be realized except for certain federal Code Section 382 limited NOLs that begin to expire with the 2026 tax year, if unused, and immaterial state NOL carryforwards that begin to expire with the 2023 tax year, if unused. Accordingly, the Company has recorded a federal valuation allowance of $7 as of December 31, 2023 and 2022 related to these NOL carryforwards. The state valuation allowance was immaterial as of December 31, 2023 and 2022. The Company does not expect any future tax loss limitations under Sections 382 and 384 that would impact its utilization of remaining federal NOL carryforwards.

The Company files income tax returns in the U.S. federal jurisdiction and numerous U.S. state jurisdictions. As of December 31, 2023, the Company is currently under examination by the Internal Revenue Service for tax years 2018, 2019, and 2020. The years open to examination by federal, state and local government authorities vary by jurisdiction.

Below is a reconciliation of the changes in the federal and state uncertain tax position balances, exclusive of interest and penalties, for the year ended December 31, 2023.

| Unrecognized Tax Benefits (exclusive of interest and penalties) | December 31, 2023 |
|---|---|
| **Balance – beginning of year** | $ — |
| Additions for tax positions taken in prior years | 6 |
| **Balance - end of year** | $ 6 |

Index to Consolidated Financial Statements

The total amount of uncertain tax positions that, if recognized, would impact the effective income tax rate were $7 as of December 31, 2023 and zero as of December 31, 2022 and 2021. The Company recognizes interest and penalties related to uncertain tax positions as a component of income tax expense in the accompanying consolidated statement of operations. As of December 31, 2023, the Company recorded $7 of unrecognized tax benefits related to uncertain tax positions, including $1 in interest and penalties. The Company does not anticipate that any adjustments relating to federal or state tax examinations will result in material changes to the financial statements. As of December 31, 2022 and 2021, the Company had no unrecognized tax benefits related to uncertain tax positions.

## 18. Fair Value Measurements

Fair value is a market-based measurement, not an entity-specific measurement, and should be determined based on the assumptions that market participants would use in pricing the asset or liability. As a basis for considering market participant assumptions in fair value measurements, a three-tiered fair value hierarchy has been established based on the level of observable inputs used in the measurement of fair value (e.g., Level 1 representing quoted prices for identical assets or liabilities in an active market; Level 2 representing values using observable inputs other than quoted prices included within Level 1; and Level 3 representing estimated values based on significant unobservable inputs).

The following describes the methods and assumptions used by the Company in estimating fair values:

**Cash and Cash Equivalents, Restricted Cash (Level 1)** — The carrying amount reported in the consolidated balance sheets approximates fair value.

**Mortgage Loans Held for Sale (Level 2 and Level 3)** — The Company originates mortgage loans in the U.S. that it intends to sell into Fannie Mae, Freddie Mac, and Ginnie Mae (collectively, the "Agencies") MBS. Additionally, the Company holds mortgage loans that it intends to sell into the secondary markets via whole loan sales or securitizations. The Company measures newly originated prime residential mortgage loans held for sale at fair value.

Newly originated mortgage loans held for sale are generally pooled together and sold into certain exit markets, depending upon underlying attributes of the loan, such as agency eligibility, product type, interest rate, and credit quality. Those loans are valued on a recurring basis using a market approach by utilizing either: (i) the fair value of securities backed by similar mortgage loans, adjusted for certain factors to approximate the fair value of a whole mortgage loan, including the value attributable to mortgage servicing and credit risk, (ii) current commitments to purchase loans or (iii) recent observable market trades for similar loans, adjusted for credit risk and other individual loan characteristics. As these prices are primarily derived from observable inputs, the Company classifies these valuations as Level 2 in the fair value disclosures.

The Company may also purchase loans out of a Ginnie Mae securitization pool if that loan meets certain criteria, including being delinquent greater than 90 days. The Company has elected to carry these loans at fair value on a recurring basis. These loans are valued on a recurring basis using a market approach similar to newly originated loans as mentioned above, with adjustments for assumptions including fair rate, partial claim rate and modification status. As these prices are primarily derived from observable inputs, the Company classifies these valuations as Level 3 in the fair value disclosures.

The Company may also repurchase loans that are unable to be securitized and sold, and fair value is based upon recent market trades for similar loans adjusted for delinquency rates or broker pricing. These loans are valued on a recurring basis and as the prices used are not primarily derived from market observable inputs, the Company classifies these valuations as Level 3 in the fair value disclosures.

From time to time, the Company may acquire mortgage loans held for sale from various securitization trusts for which it acts as servicer through the exercise of various clean-up call options as permitted through the respective pooling and servicing agreements. The Company has elected to account for these loans at fair value on a recurring basis and classifies these valuations as Level 3 in the fair value disclosures.

See *Note 7, Mortgage Loans Held for Sale,* for more information.

**Mortgage Servicing Rights – Fair Value (Level 3)** — The Company estimates the fair value of its MSRs on a recurring basis using a process that combines the use of a discounted cash flow model and analysis of current market data to arrive at an estimate of fair value. Beginning in the second quarter of 2023, the Company valued MSRs using a stochastic option adjusted spread (OAS) instead of a static discount rate. OAS is the incremental spread added to the risk-free rate to reflect embedded (prepayment) optionality and other risk inherent in the MSRs to discount cash flows. The cash flow assumptions used in the discounted cash flow model incorporate prepayment speeds, OAS, costs to service, delinquencies, ancillary revenues, recapture rates and other assumptions, with the key assumptions being mortgage prepayment speeds, OAS, and cost to service. The cash flow assumptions are generated and applied based on collateral stratifications including product type, remittance type, geography, delinquency and coupon dispersion. These assumptions require the use of judgment by the Company and can have a significant impact on the fair value of the MSRs. Quarterly, management obtains third-party valuations to assess the reasonableness of the fair value calculations provided by the internal cash flow model. Because of the nature of the valuation inputs, the Company classifies these valuations as Level 3 in the fair value disclosures. See *Note 5, Mortgage Servicing Rights and Related Liabilities,* for more information.

**Advances and Other Receivables, Net (Level 3)** — Advances and other receivables, net are valued at their net realizable value after taking into consideration the reserves. Advances have no stated maturity. Their net realizable value approximates fair value as the net present value based on discounted cash flow is not materially different from the net realizable value. See *Note 6, Advances and Other Receivables,* for more information.

**Equity Investments (Level 1 and Level 3)** — The fair value of the common stock received from the previous sale of the title and field services businesses is measured quarterly based on the common stock's fair value, which was established at the time of the transaction, and observable market indicators. Because of the nature of the unobservable inputs, the Company classifies these securities as Level 3 in the fair value disclosures.

The fair value of the common stock received from the previous sale of the valuation business is measured using the closing price reported on an active market in which the securities are traded. As the fair value is based on market observable inputs, the Company classifies these securities as Level 1 in the fair value disclosures.

**Derivative Financial Instruments (Level 2 and Level 3)** — The Company enters into a variety of derivative financial instruments as part of its hedging strategy and measures these instruments at fair value on a recurring basis in the consolidated balance sheets. These derivatives are exchange-traded or traded within highly active dealer markets. In order to determine the fair value of these instruments, the Company utilizes the exchange price or dealer market price for the particular derivative contract; therefore, these contracts are classified as Level 2. In addition, the Company enters into IRLCs and LPCs with prospective borrowers and other loan originators. IRLCs and LPCs are carried at fair value primarily based on secondary market prices for underlying mortgage loans, which is observable data, with adjustments made to such observable data for the inherent value of servicing, which is an unobservable value. The fair value is also subject to adjustments for the estimated pull-through rate. The impact of the unobservable input to the overall valuation of IRLCs and LPCs is significant and results in a classification of Level 3 in the fair value hierarchy. The Company adjusts the outstanding IRLCs with prospective borrowers based on an expectation that it will be exercised, and the loan will be funded. The Company has entered into Treasury futures and swap futures contracts as part of its hedging strategy. The futures contracts are measured at fair value on a recurring basis. These contracts are classified as Level 2 in the fair value disclosures as the valuation is based on market observable data. Derivative financial instruments are recorded in "other assets" and "payables and other liabilities" within the consolidated balance sheets. See *Note 12, Derivative Financial Instruments,* for more information.

**Loans Subject to Repurchase from Ginnie Mae (Level 2)** — As the Company has the unilateral right to repurchase these loans at the unpaid principal balance, the carrying amount, which is based on the unpaid principal balance, approximates fair value. See *Note 10, Loans Subject to Repurchase from Ginnie Mae,* for more information.

**Advance Facilities and Warehouse Facilities (Level 2)** — As the underlying warehouse and advance finance facilities bear interest at a rate that is periodically adjusted based on a market index, the carrying amount reported on the consolidated balance sheets approximates fair value. See *Note 13, Indebtedness,* for more information.

**Unsecured Senior Notes (Level 2)** — The fair value of unsecured senior notes, which are carried at amortized cost, is based on quoted market prices in a market with limited trading activity. See *Note 13, Indebtedness,* for more information.

Apx. 117

**Excess Spread Financing (Level 3) –** The Company estimates fair value on a recurring basis based on the present value of future expected discounted cash flows with the discount rate approximating current market value for similar financial instruments. Beginning in the second quarter of 2023, the Company valued excess spread financing using a stochastic OAS instead of a static discount rate. The cash flow assumptions used in the model are based on various factors, with the key assumptions being mortgage prepayment speeds and OAS. Quarterly, management obtains a third-party valuation to assess the reasonableness of the fair value calculations provided by the internal cash flow model. As these prices are derived from a combination of internally developed valuation models and quoted market prices based on the value of the underlying MSRs, the Company classifies these valuations as Level 3 in the fair value disclosures. Excess spread financing is recorded in MSR related liabilities within the consolidated balance sheets. See *Note 5, Mortgage Servicing Rights and Related Liabilities*, for more information.

**Mortgage Servicing Rights Financing Liability (Level 3) -** The Company estimates fair value on a recurring basis based on the present value of future expected discounted cash flows with the discount rate approximating current market value for similar financial instruments. The cash flow assumptions and prepayment assumptions used in the model are based on various factors, with the key assumptions being advance financing rates and annual advance recovery rates. As these assumptions are derived from internally developed valuation models based on the value of the underlying MSRs, the Company classifies these valuations as Level 3 in the fair value disclosures. Mortgage servicing rights financing liability is recorded in MSR related liabilities on the consolidated balance sheets. See *Note 5, Mortgage Servicing Rights and Related Liabilities*, for more information.

The following table presents the estimated carrying amount and fair value of the Company's financial instruments and other assets and liabilities measured at fair value on a recurring basis:

| | | December 31, 2023 | | |
|---|---|---|---|---|
| | | | Recurring Fair Value Measurements | |
| Fair Value - Recurring Basis | Total Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| Mortgage loans held for sale | $ 927 | $ — | $ 846 | $ 81 |
| Mortgage servicing rights | 9,090 | — | — | 9,090 |
| Equity investments | 9 | 1 | — | 8 |
| Derivative financial instruments: | | | | |
| Treasury futures | 113 | — | 113 | — |
| Forward MBS trades | 22 | — | 22 | — |
| IRLCs | 21 | — | — | 21 |
| LPCs | 3 | — | — | 3 |
| **Liabilities** | | | | |
| Derivative financial instruments: | | | | |
| Forward MBS trades | 9 | — | 9 | — |
| Mortgage servicing rights financing | 29 | — | — | 29 |
| Excess spread financing | 437 | — | — | 437 |

The tables below present a reconciliation for all of the Company's Level 3 assets and liabilities measured at fair value on a recurring basis:

| | Assets | | | | Liabilities | |
|---|---|---|---|---|---|---|
| | | | Year Ended December 31, 2023 | | | |
| Fair Value - Level 3 Assets and Liabilities | Mortgage servicing rights | Mortgage loans held for sale | Equity investments | IRLCs | Excess spread financing | Mortgage servicing rights financing |
| Balance - beginning of year | $ 6,654 | $ 74 | $ 45 | $ 22 | $ 509 | $ 19 |
| Changes in fair value included in earnings | (483) | 18 | (37) | (1) | 8 | 10 |
| Purchases/additions[1] | 3,189 | 180 | — | — | — | — |
| Issuances | 273 | — | — | — | — | — |
| Sales/dispositions[1] | (573) | (189) | — | — | — | — |
| Repayments | — | (6) | — | — | (9) | — |
| Settlements | — | — | — | — | (71) | — |
| Other changes | 30 | 4 | — | — | — | — |
| Balance - end of year | $ 9,090 | $ 81 | $ 8 | $ 21 | $ 437 | $ 29 |

---

| | | December 31, 2022 | | |
|---|---|---|---|---|
| | | | Recurring Fair Value Measurements | |
| Fair Value - Recurring Basis | Total Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| Mortgage loans held for sale | $ 893 | $ — | $ 819 | $ 74 |
| Mortgage servicing rights | 6,654 | — | — | 6,654 |
| Equity investments | 47 | 2 | — | 45 |
| Derivative financial instruments: | | | | |
| Forward MBS trades | 8 | — | 8 | — |
| IRLCs | 22 | — | — | 22 |
| LPCs | 1 | — | — | 1 |
| **Liabilities** | | | | |
| Derivative financial instruments: | | | | |
| Forward MBS trades | 9 | — | 9 | — |
| LPCs | 1 | — | — | 1 |
| Treasury futures | 14 | — | 14 | — |
| Mortgage servicing rights financing | 19 | — | — | 19 |
| Excess spread financing | 509 | — | — | 509 |

The tables below present a reconciliation for all of the Company's Level 3 assets and liabilities measured at fair value on a recurring basis:

| | Assets | | | | Liabilities | |
|---|---|---|---|---|---|---|
| | | | Year Ended December 31, 2022 | | | |
| Fair Value - Level 3 Assets and Liabilities | Mortgage servicing rights | Mortgage loans held for sale | Equity investments | IRLCs | Excess spread financing | Mortgage servicing rights financing |
| Balance - beginning of year | $ 4,223 | $ 76 | $ 54 | $ 134 | $ 768 | $ 10 |
| Changes in fair value included in earnings | 549 | (3) | (9) | (112) | 133 | 9 |
| Purchases/additions[1] | 1,595 | 130 | — | — | — | — |
| Issuances | 554 | — | — | — | — | — |
| Sales/dispositions[1] | (294) | (124) | — | — | — | — |
| Repayments | — | (2) | — | — | (293) | — |
| Settlements | — | — | — | — | (99) | — |
| Other changes | 27 | (3) | — | — | — | — |
| Balance - end of year | $ 6,654 | $ 74 | $ 45 | $ 22 | $ 509 | $ 19 |

[1] Additions for mortgage loans held for sale include loans that are purchased or transferred. Dispositions for mortgage loans held for sales include loans that are sold or transferred out.

The Company had immaterial LPCs assets and liabilities as of December 31, 2023 and 2022. No transfers were made in or out of Level 3 fair value assets for the Company during the years ended December 31, 2023 and 2022.

---

The tables below present the quantitative information for significant unobservable inputs used in the fair value measurement of Level 3 assets and liabilities:

| | December 31, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | Range | | | Range | | |
| Level 3 Inputs | Min | Max | Weighted Average | Min | Max | Weighted Average |
| **MSR[1]** | | | | | | |
| Option adjusted spread[2] | 6.9 % | 12.3 % | 8.0 % | N/A | N/A | N/A |
| Discount rate | N/A | N/A | N/A | 10.4 % | 13.7 % | 11.4 % |
| Prepayment speed | 6.8 % | 9.3 % | 7.5 % | 6.3 % | 12.2 % | 7.2 % |
| Cost to service per loan[3] | $ 56 | $ 100 | $ 80 | $ 54 | $ 155 | $ 80 |
| Average life[4] | | | 7.9 years | | | 8.1 years |
| **Mortgage loans held for sale** | | | | | | |
| Market pricing | 45.0 % | 103.4 % | 81.1 % | 37.3 % | 114.7 % | 77.4 % |
| **IRLCs** | | | | | | |
| Value of servicing (reflected as a percentage of loan commitment) | 1.1 % | 3.5 % | 1.9 % | (0.6)% | 3.9 % | 2.3 % |
| **Excess spread financing** | | | | | | |
| Option adjusted spread[2] | 7.0 % | 12.3 % | 8.8 % | N/A | N/A | N/A |
| Discount rate | N/A | N/A | N/A | 10.0 % | 13.8 % | 11.3 % |
| Prepayment speed | 7.7 % | 9.1 % | 8.4 % | 6.9 % | 13.3 % | 9.2 % |
| Average life[4] | | | 6.7 years | | | 6.6 years |
| **Mortgage servicing rights financing** | | | | | | |
| Advance financing and counterparty fee rates | 6.6 % | 7.6 % | 7.6 % | 5.2 % | 8.6 % | 7.1 % |
| Annual advance recovery rates | 12.2 % | 14.8 % | 13.0 % | 15.9 % | 20.6 % | 17.3 % |

[1] The inputs are weighted by investor.
[2] OAS represents incremental spread above a risk-free rate (one-month SOFR), which is an observable input. See Discussion on methodology.
[3] Presented in whole dollar amounts.
[4] Average life is included for informational purposes.

Apx. 118

The tables below present a summary of the carrying amount and estimated fair value of the Company's financial instruments not carried at fair value:

| | December 31, 2023 | | | | |
|---|---|---|---|---|---|
| | Carrying | | Fair Value | | |
| Financial Instruments | Amount | | Level 1 | Level 2 | Level 3 |
| **Financial assets** | | | | | |
| Cash and cash equivalents | $ | 571 | $ 571 | $ — | $ — |
| Restricted cash | | 169 | 169 | — | — |
| Advances and other receivables, net | | 966 | — | — | 966 |
| Loans subject to repurchase from Ginnie Mae | | 966 | — | 966 | — |
| **Financial liabilities** | | | | | |
| Unsecured senior notes, net | | 3,151 | — | 3,056 | — |
| Advance, warehouse and MSR facilities, net | | 4,302 | — | 4,318 | — |
| Liability for loans subject to repurchase from Ginnie Mae | | 966 | — | 966 | — |

| | December 31, 2022 | | | | |
|---|---|---|---|---|---|
| | Carrying | | Fair Value | | |
| Financial Instruments | Amount | | Level 1 | Level 2 | Level 3 |
| **Financial assets** | | | | | |
| Cash and cash equivalents | $ | 527 | $ 527 | $ — | $ — |
| Restricted cash | | 175 | 175 | — | — |
| Advances and other receivables, net | | 1,019 | — | — | 1,019 |
| Loans subject to repurchase from Ginnie Mae | | 1,865 | — | 1,865 | — |
| **Financial liabilities** | | | | | |
| Unsecured senior notes, net | | 2,673 | — | 2,209 | — |
| Advance, warehouse and MSR facilities, net | | 2,885 | — | 2,896 | — |
| Liability for loans subject to repurchase from Ginnie Mae | | 1,865 | — | 1,865 | — |

### 19. Capital Requirements

Fannie Mae, Freddie Mac, Ginnie Mae and certain private label mortgage investors require the Company to maintain minimum net worth ("capital") requirements, as specified in the respective selling and servicing agreements. In addition, these investors may require capital ratios in excess of the stated requirements to approve large servicing transfers. To the extent that these requirements are not met, the Company's secondary market investors may utilize a range of remedies ranging from sanctions, suspension or ultimately termination of the Company's selling and servicing agreements, which would prohibit the Company from further originating or securitizing those specific types of mortgage loans or being an approved servicer. The Company's various capital requirements related to its outstanding selling and servicing agreements are measured based on the Company's operating subsidiary, Nationstar Mortgage LLC, as well as Rushmore Loan Management Services, LLC, which was acquired during the third quarter of 2023 in connection with the Roosevelt Transaction. As of December 31, 2023, the Company was in compliance with its selling and servicing capital requirements.

### 20. Commitments and Contingencies

*Litigation and Regulatory*

The Company and its subsidiaries are routinely and currently involved in a significant number of legal proceedings, including, but not limited to, judicial, arbitration, regulatory and governmental proceedings related to matters that arise in connection with the conduct of the Company's business. The legal proceedings are at varying stages of adjudication, arbitration or investigation and are generally based on alleged violations of consumer protection, securities, employment, contract, tort, common law fraud and other numerous laws, including, without limitation, the Equal Credit Opportunity Act, Fair Debt Collection Practices Act, Fair Credit Reporting Act, Real Estate Settlement Procedures Act, National Housing Act, Homeowners Protection Act, Service Member's Civil Relief Act, Telephone Consumer Protection Act, Truth in Lending Act, Financial Institutions Reform, Recovery, and Enforcement Act of 1989, unfair, deceptive or abusive acts or practices in violation of the Dodd-Frank Act, the Securities Act of 1933, the Securities Exchange Act of 1934, the Home Mortgage Disclosure Act, Title 11 of the United States Code (aka the "Bankruptcy Code"), False Claims Act, the CARES Act and Making Home Affordable loan modification programs.

In addition, along with others in its industry, the Company is subject to repurchase and indemnification claims and may continue to receive claims in the future, regarding alleged breaches of representations and warranties relating to the sale of mortgage loans, the placement of mortgage loans into securitization trusts or the servicing of mortgage loans securitizations. The Company is also subject to legal actions or proceedings related to loss sharing and indemnification provisions of its various acquisitions. Certain of the pending or threatened legal proceedings include claims for substantial compensatory, punitive and or statutory damages or claims for an indeterminate amount of damages.

On November 3, 2023, a putative class action lawsuit was filed against the Company, captioned Cabezas v. Mr. Cooper Group, Inc., No. 23-cv-02453 ("Cabezas"), in the United States District Court for the Northern District of Texas, by plaintiff Jennifer Cabezas purportedly on behalf of a class consisting of those persons impacted by the cybersecurity incident that occurred on October 31, 2023. The class action complaint alleges claims for negligence, negligence per se, breach of express contract, breach of implied contract, invasion of privacy, unjust enrichment, breach of confidence, and breach of fiduciary duty based upon allegations that the Company did not employ reasonable and adequate security measures to protect customer personal information accessed in the cybersecurity incident. The Cabezas complaint seeks damages, declaratory and injunctive relief, and an award of costs, attorney fees and expenses, among other relief. Between November 2023 and January 9, 2024, 19 additional putative class actions have been filed against the Company asserting substantially similar claims and allegations as those asserted in the Cabezas action. On January 9, 2024, the Cabezas Court ordered that all 19 then-pending actions be consolidated with the Cabezas action. Following the issuance of the consolidation order, six additional, related putative class actions were filed in the Northern District of Texas, which we expect will also be consolidated with the Cabezas action.

The Company operates within highly regulated industries on a federal, state and local level. In the normal and ordinary course of its business, the Company is routinely subject to extensive examinations, investigations, subpoenas, inquiries and reviews by various federal, state and local governmental, regulatory and enforcement agencies, including the Consumer Financial Protection Bureau, the Securities and Exchange Commission, the Department of Justice, the Office of the Special Inspector General for the Troubled Asset Relief Program, the U.S. Department of Housing and Urban Development, various State mortgage banking regulators and various State Attorneys General. Any pending or potential future investigations, subpoenas, examinations or inquiries may lead to administrative, civil or criminal proceedings or settlements, and possibly result in remedies including fines, penalties, restitution, or alterations in the Company's business practices, and additional expenses and collateral costs. The Company is cooperating fully in those matters. Responding to these matters requires the Company to devote substantial resources, resulting in higher costs and fewer such cases. Adverse results in any of these matters could further increase the Company's operating expenses and reduce its revenues, require it to change business practices and limit its ability to grow and otherwise materially and adversely affect its business, reputation, financial condition and results of operation.

The Company seeks to resolve all legal proceedings and other matters in the manner management believes is in the best interest of the Company and contests liability, allegations of wrongdoing, and where applicable, the amount of damages or scope of any penalties or other relief sought as appropriate in each pending matter. The Company has entered into agreements with a number of entities and regulatory agencies that will applicable limitations periods with respect to their claims.

On at least a quarterly basis, the Company assesses its liabilities and contingencies in connection with outstanding legal and regulatory and governmental proceedings utilizing the latest information available. Where available information indicates that it is probable a liability has been incurred, and the Company can reasonably estimate the amount of the loss, an accrued liability is established. The actual costs of resolving these proceedings may be substantially higher or lower than the amounts accrued.

Index to Consolidated Financial Statements

As a legal matter develops, the Company, in conjunction with any outside counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is both probable and estimable. If, at the time of evaluation, the loss contingency is not both probable and reasonably estimable, the matter will continue to be monitored for further developments that would make such loss contingency both probable and reasonably estimable. Once the matter is deemed to be both probable and reasonably estimable, the Company will establish an accrued liability and record a corresponding amount to legal-related expense. The Company will continue to monitor the matter for further developments that could affect the amount of the accrued liability that has been previously established. The Company incurred legal-related expense, which includes legal settlements and the fees paid to external legal service providers, of $39 and $23 for the years ended December 31, 2023 and 2022, respectively, and was included in "expenses - general and administrative" on the consolidated statements of operations.

For matters for which a loss is probable or reasonably estimable in future periods, whether in excess of a related accrued liability or where there is no accrued liability, the Company may be able to estimate a range of possible loss. In determining whether it is possible to provide an estimate of loss or range of possible loss, the Company reviews and evaluates its material legal matters on an ongoing basis, in conjunction with any outside counsel handling the matter. Management currently believes the aggregate range of reasonably possible loss is $1 to $3 in excess of the accrued liability (if any) related to those matters as of December 31, 2023. This estimated range of possible loss is based upon currently available information and is subject to significant judgment, numerous assumptions and known and unknown uncertainties. The matters underlying the estimated range will change from time to time, and actual results may vary substantially from the current estimate. Those matters for which an estimate is not possible are not included within the estimated range. Therefore, this estimated range of possible loss represents what management believes to be an estimate of possible loss only for certain matters meeting these criteria. It does not represent the Company's maximum loss exposure and the Company cannot provide assurance that its litigations reserves will not need to be adjusted in the future. Thus, the Company's exposure and ultimate losses may be higher, possibly significantly so, than the amounts accrued on the aggregate amount.

In the Company's experience, legal proceedings are inherently unpredictable. One or more of the following factors frequently contribute to this inherent unpredictability: the proceeding is in its early stages; the damages sought are unspecified, unsupported or uncertain; it is unclear whether a case brought as a class action will be allowed to proceed on that basis or, if permitted to proceed as a class action, how the class will be defined; the other party is seeking relief other than or in addition to compensatory damages (including, in the case of regulatory and governmental investigations and inquiries, the possibility of fines and penalties); the matter presents meaningful legal uncertainties, including novel issues of law; the Company has not engaged in meaningful settlement discussions; discovery has not started or is not complete; there are significant facts in dispute; predicting possible outcomes depends on making assumptions about future decisions of courts or governmental or regulatory bodies or the behavior of other parties; and there are a large number of parties named as defendants (including where it is uncertain how damages or liability, if any, will be shared among multiple defendants). Generally, the less progress that has been made in the proceedings or the broader the range of potential results, the harder it is for the Company to estimate losses or ranges of losses that is reasonably possible the Company could incur.

Based on current knowledge and, after consultation with counsel, management believes that the current legal accrued liability within payables and accrued liabilities, is appropriate, and the amount of any incremental liability arising from these matters is not expected to have a material adverse effect on the consolidated financial condition of the Company, although the outcome of such proceedings could be material to the Company's operating results and cash flows for a particular period depending, on among other things, the level of the Company's revenues or income for such period. However, in the event of significant developments on existing cases, it is possible that the ultimate resolution, if unfavorable, may be material to the Company's consolidated financial statements.

*Other Loss Contingencies*

As part of the Company's ongoing operations, it acquires servicing rights of mortgage loans that are subject to indemnification based on the representations and warranties of the seller. From time to time, the Company will seek recovery under these representations and warranties for incurred costs. The Company believes all balances sought from sellers recorded in "advances and other receivables, net" represent valid claims. However, the Company acknowledges that the claims process can be prolonged due to the required time to perfect claims at the loan level. Because of the required time to perfect or remediate these claims, management relies on the sufficiency of documentation supporting the claims, current negotiations with the counterparty and other evidence to evaluate whether a reserve is required for non-recoverable balances. In the absence of successful negotiations with the seller, all amounts claimed may not be recovered. Balances may be written-off and charged against earnings when management identifies amounts where recoverability from the seller is not likely. As of December 31, 2023, the Company believes all recorded balances for which recovery is sought from the seller are valid claims, and no evidence suggests additional reserves are warranted.

Index to Consolidated Financial Statements

As a seller of mortgage loans to Agencies and other third parties, the Company may be required to indemnify or repurchase mortgage loans that fail to meet certain customary representations and warranties made in conjunction with sales of mortgage loans. The repurchase reserve liability related to such customary representations and warranties was $79 and $22 as of December 31, 2023 and 2022, respectively, which are included in "payables and other liabilities" within the consolidated balance sheets. The repurchase reserve liability increased during the third quarter of 2023 due to the assumption of repurchase risk for any mortgages previously sold by Home Point in connection with the Home Point Acquisition. Refer to Note 3, Acquisitions, for discussion of the Home Point Acquisition.

*Loan and Other Commitments*

The Company enters into IRLCs with prospective borrowers whereby the Company commits to lend a certain loan amount under specific terms and interest rates to the borrower. The Company also enters into LPCs with prospective sellers. These loan commitments are treated as derivatives and are carried at fair value. See Note 12, Derivative Financial Instruments, for more information.

### 21. Segment Information

The Company's segments reflect the internal reporting we use to evaluate operating performance and are based upon the Company's organizational structure, which focuses primarily on the services offered. A brief description of our current business segments is as follows:

*Servicing:* This segment performs operational activities on behalf of investors or owners of the underlying mortgages and mortgage servicing rights, including collecting and disbursing borrower payments, investor reporting, customer service, modifying loans where appropriate to help borrowers stay current, and when necessary performing collections, foreclosures, and the sale of REO. In 2023, we expanded our special servicing product offering with the acquisition of Rushmore Loan Management Services.

During the third quarter of 2023, the Company collapsed a securitization with a bond balance of $82, secured by mortgage loans with an approximate UPB of $207. The loans were sold to a third party. A net gain on sale of $67 was recorded on the transaction, which was included in "net gain on mortgage loans held for sale" within the consolidated statements of operations and reported under Servicing.

*Originations:* This segment originates residential mortgage loans through our direct-to-consumer channel, which provides refinance options for our existing customers, and through our correspondent channel, which purchases or originates loans from mortgage bankers.

*Corporate/Other:* Functional expenses are allocated to individual segments based on the actual cost of services performed, direct resource utilization, or headcount percentage for shared services. During the fourth quarter of 2022, the Company began allocating shared services based on headcount instead of estimate of percentage use as it changed its segment measures provided to and used by the chief operating decision maker. As a result, all costs for shared services are allocated to individual segments based on headcount. The Company restated segment information for the historical periods presented herein to reflect the allocation method change and to conform to the current presentation. The change affects total expenses for Servicing and Originations segments and Corporate/Other but had no effect on consolidated statements of operations. Facility costs are allocated to individual segments based on cost per headcount for specific facilities utilized. Group insurance costs are allocated to individual segments based on global cost per headcount. Non-allocated corporate expenses include the administrative costs of executive management and other corporate functions that are not directly attributable to the Company's operating segments. Revenues generated on inter-segment services performed are valued based on similar services provided to external parties. Eliminations are included in Corporate/Other.

Apx. 119

The following tables present financial information by segment:

| Financial Information by Segment | Servicing | Originations | Corporate/Other | Consolidated |
|---|---|---|---|---|
| **Year Ended December 31, 2023** | | | | |
| Revenues | | | | |
| Service related, net | $ 1,295 | $ 61 | $ 84 | $ 1,440 |
| Net gain (loss) on mortgage loans held for sale | 84 | 271 | (1) | 354 |
| Total revenues | 1,379 | 332 | 83 | 1,794 |
| Total expenses | 664 | 232 | 276 | 1,172 |
| Interest income | 491 | 36 | 1 | 528 |
| Interest expense | (324) | (37) | (176) | (537) |
| Other income, net | — | — | 41 | 41 |
| Total other income (expenses), net | 167 | (1) | (134) | 32 |
| Income (loss) from continuing operations before income tax expense (benefit) | $ 882 | $ 99 | $ (327) | $ 654 |
| Depreciation and amortization for property and equipment and intangible assets from continuing operations | $ 12 | $ 16 | $ 3 | $ 38 |
| Total assets | $ 11,740 | $ 782 | $ 1,674 | $ 14,196 |

| Financial Information by Segment | Servicing | Originations | Corporate/Other | Consolidated |
|---|---|---|---|---|
| **Year Ended December 31, 2022** | | | | |
| Revenues | | | | |
| Service related, net | $ 1,691 | $ 98 | $ 76 | $ 1,865 |
| Net gain on mortgage loans held for sale | (33) | 632 | — | 599 |
| Total revenues | 1,658 | 730 | 76 | 2,464 |
| Total expenses | 559 | 491 | 224 | 1,274 |
| Interest income | 208 | 53 | — | 261 |
| Interest expense | (221) | (43) | (160) | (424) |
| Other income, net | — | — | 187 | 187 |
| Total other (expenses) income, net | (13) | 10 | 27 | 24 |
| Income (loss) from continuing operations before income tax expense (benefit) | $ 1,086 | $ 249 | $ (121) | $ 1,214 |
| Depreciation and amortization for property and equipment and intangible assets from continuing operations | $ 18 | $ 16 | $ 3 | $ 37 |
| Total assets | $ 10,152 | $ 749 | $ 1,875 | $ 12,776 |

| Financial Information by Segment | Servicing | Originations | Corporate/Other | Consolidated |
|---|---|---|---|---|
| **Year Ended December 31, 2021** | | | | |
| Revenues | | | | |
| Service related, net | $ 705 | $ 176 | $ 186 | $ 1,067 |
| Net gain on mortgage loans held for sale | 568 | 1,683 | — | 2,251 |
| Total revenues | 1,273 | 1,859 | 186 | 3,318 |
| Total expenses | 502 | 849 | 311 | 1,662 |
| Interest income | 129 | 102 | — | 231 |
| Interest expense | (262) | (88) | (128) | (478) |
| Other income, net | — | — | 528 | 528 |
| Total other (expenses) income, net | (133) | 14 | 400 | 281 |
| Income from continuing operations before income tax expense | $ 638 | $ 1,024 | $ 275 | $ 1,937 |
| Depreciation and amortization for property and equipment and intangible assets from continuing operations | $ 32 | $ 24 | $ 1 | $ 57 |
| Total assets | $ 8,733 | $ 3,143 | $ 2,328 | $ 14,204 |

**22. Subsequent Events**

On February 1, 2024, the Company completed an offering by Nationstar Mortgage Holdings Inc., a direct wholly-owned subsidiary of the Company ("Nationstar"), of $1,000 7.125% unsecured senior notes due 2032 (the "Notes"). The Notes will bear interest at 7.125% per annum and will mature on February 1, 2032. Interest on the Notes will be payable semi-annually on February 1 and August 1 of each year, beginning on August 1, 2024. The net proceeds of the offering were used to repay a portion of the amounts outstanding under the Company's MSR facilities.

---

Table of Contents

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended ("Exchange Act"), as of December 31, 2023.

Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2023, our disclosure controls and procedures are effective. Disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined by Rule 13a-15(f) and Rule 15d-15(f) under the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with GAAP. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2023. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organization of the Treadway Commission ("COSO") in Internal Control-Integrated 2013 Framework. A control system, no matter how well conceived, implemented and operated, can provide only reasonable, not absolute, assurance that the objectives of the internal control system are met. Because of such inherent limitations, no evaluation of controls can provide absolute assurance that all control issues, if any, within a company have been detected.

Based on our assessment and those criteria, our management concluded that our internal control over financial reporting was effective as of December 31, 2023.

Our independent registered public accounting firm has audited the effectiveness of our internal control over financial reporting as of December 31, 2023 as stated in their report, dated February 28, 2024, which appears herein.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the fourth quarter ended December 31, 2023 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Limitations on Effectiveness of Controls and Procedures**

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

---

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Mr. Cooper Group Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Mr. Cooper Group Inc.'s internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Mr. Cooper Group Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2023, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the accompanying consolidated balance sheets of the Company as of December 31, 2023 and 2022, the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2023 and the related notes and our report dated February 28, 2024 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Dallas, Texas
February 28, 2024

Apx. 120

**Item 9B.** ***Other Information***

None.

**Item 9C.** ***Disclosure Regarding Foreign Jurisdictions that Prevent Inspections***

Not applicable.

**PART III.**

**Item 10.** ***Directors, Executive Officers and Corporate Governance***

Information required by this item will be incorporated by reference from the Company's definitive proxy statement for the 2024 Annual Meeting of Stockholders, which will be filed with the SEC within 120 days of the Company's fiscal year-end (the "2024 Proxy Statement").

**Item 11.** ***Executive Compensation***

Information required by this item will be incorporated by reference from the 2024 Proxy Statement.

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.***

Information required by this item will be incorporated by reference from the 2024 Proxy Statement.

**Item 13.** ***Certain Relationships and Related Transactions, and Director Independence.***

Information required by this item will be incorporated by reference from the 2024 Proxy Statement.

**Item 14.** ***Principal Accountant Fees and Services.***

Information required by this item will be incorporated by reference from the 2024 Proxy Statement.

**Item 15.** ***Exhibits and Financial Statement Schedules***

Documents filed as part of this Annual Report on Form 10-K:

1. Financial Statements:

   Our consolidated financial statements as of December 31, 2023 and 2022 and for the years ended December 31, 2023, 2022 and 2021, and the notes thereto, together with the report of the independent registered public accounting firm on those consolidated financial statements are filed within Item 8 in Part II as part of this Annual Report on Form 10-K.

2. Financial Statement Schedules:

   No financial statement schedules are presented since the required information is not present or not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements and accompanying notes.

3. Exhibits:

   The exhibits to this report are listed in the index to exhibits below.

Table of Contents

**INDEX TO EXHIBITS**

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 2.1+ | Stock Purchase Agreement, dated as of March 12, 2021, by and among Title365 Holding Co., Xome Holdings LLC, Blend Labs, Inc. and solely for the purposes set forth therein, the Company | 8-K | 001-14667 | 2.1 | 03/15/2021 | |
| 2.2+ | Contribution Agreement, dated as of February 10, 2022, by and among Nationstar Mortgage LLC, Sagent M&C, LLC and solely for the purposes set forth therein, Mr. Cooper Group Inc. | 8-K | 001-14667 | 2.1 | 02/11/2022 | |
| 2.2+ | Agreement and Plan of Merger, dated as of May 10, 2023, by and among Mr. Cooper Group Inc., Home Point Capital Inc. and Heisman Merger Sub, Inc. | 8-K | 001-14667 | 2.1 | 05/11/2023 | |
| 3.1 | Amended and Restated Certificate of Incorporation of the Company, as amended. | 8-K | 001-14667 | 3.1 | 10/10/2018 | |
| 3.2 | Amended and Restated Bylaws of the Company | 10-Q | 001-14667 | 3.2 | 11/09/2018 | |
| 4.1 | Form of Stock Certificate | 10-Q | 001-14667 | 4.1 | 11/01/2019 | |
| 4.2 | Description of Common Stock | | | | | X |
| 4.3 | Indenture, dated as of January 16, 2020, among Nationstar Mortgage Holdings Inc. as Issuer, the Company as Parent Guarantor, the guarantors thereto and Wells Fargo Bank, National Association as Trustee | 10-K | 001-14667 | 4.14 | 02/28/2020 | |
| 4.4 | First Supplemental Indenture, dated as of August 1, 2023 to Indenture dated January 16, 2020, among Nationstar Mortgage Holdings Inc. as issuer, the Company, as Parent Guarantor, the guarantors thereto and Computershare Trust Company, N.A. (f/k/a Wells Fargo Bank, National Association), as trustee | 8-K | 001-14667 | 4.3 | 08/01/2023 | |
| 4.5 | Indenture, dated as of August 6, 2020, among Nationstar Mortgage Holdings Inc. as Issuer, the Company as Parent Guarantor, the guarantors thereto and Wells Fargo Bank, National Association as Trustee | 8-K | 001-14667 | 4.1 | 08/06/2020 | |
| 4.6 | First Supplemental Indenture, dated as of August 1, 2023 to Indenture dated August 6, 2020, among Nationstar Mortgage Holdings Inc. as issuer, the Company, as Parent Guarantor, the guarantors thereto and Computershare Trust Company, N.A. (f/k/a Wells Fargo Bank, National Association), as trustee | 8-K | 001-14667 | 4.4 | 08/01/2023 | |
| 4.7 | Indenture, dated as of December 4, 2020, among Nationstar Mortgage Holdings Inc. as Issuer, the Company as Parent Guarantor, the guarantors thereto and Wells Fargo Bank, National Association as Trustee | 8-K | 001-14667 | 4.1 | 12/04/2020 | |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 4.8 | First Supplemental Indenture, dated as of August 1, 2023 to Indenture dated December 4, 2020, among Nationstar Mortgage Holdings Inc. as issuer, the Company, as Parent Guarantor, the guarantors thereto and Computershare Trust Company, N.A. (f/k/a Wells Fargo Bank, National Association), as trustee | 8-K | 001-14667 | 4.5 | 08/01/2023 | |
| 4.9 | Indenture, dated as of January 19, 2021, among Nationstar Mortgage Holdings Inc. (as successor-in-interest to Home Point Capital Inc.), the guarantors party thereto and U.S. Bank Trust Company, National Association (as successor-in-interest to U.S. Bank National Association), as trustee | 8-K | 001-14667 | 4.1 | 08/01/2023 | |
| 4.10 | First Supplemental Indenture, dated August 1, 2023 to Indenture dated January 19, 2021, among Nationstar Mortgage Holdings Inc. (as successor-in-interest to Home Point Capital Inc.), the guarantors party thereto and U.S. Bank Trust Company, National Association (as successor-in-interest to U.S. Bank National Association), as trustee | 8-K | 001-14667 | 4.2 | 08/01/2023 | |
| 4.11 | Indenture, dated as of November 4, 2021, among Nationstar Mortgage Holdings Inc. as Issuer, the Company as Parent Guarantor, the guarantors thereto and Computershare Trust Company, N.A. as Trustee | 8-K | 001-14667 | 4.1 | 11/04/2021 | |
| 4.12 | First Supplemental Indenture, dated as of August 1, 2023 to Indenture dated November 4, 2021, among Nationstar Mortgage Holdings Inc. as issuer, the Company, as Parent Guarantor, the guarantors thereto and Computershare Trust Company, N.A. (f/k/a Wells Fargo Bank, National Association), as trustee | 8-K | 001-14667 | 4.6 | 08/01/2023 | |
| 4.13 | Indenture, dated as of February 1, 2024 among Nationstar Mortgage Holdings Inc. as Issuer, the Company as Parent Guarantor, the guarantors thereto and Computershare Trust Company, N.A. as Trustee | 8-K | 001-14667 | 4.1 | 02/01/2024 | |
| 10.1 | Mortgage Loan Participation Purchase and Sale Agreement, dated March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-K | 001-35449 | 10.18 | 03/15/2013 | |
| 10.2 | Amendment Number One, dated February 29, 2012, to the Mortgage Loan Participation Purchase and Sale Agreement, dated March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-K | 001-35449 | 10.19 | 03/15/2013 | |
| 10.3 | Amendment Number Two, dated August 28, 2012, to the Mortgage Loan Participation Purchase and Sale Agreement, dated March 25, 2011, among Barclays Bank PLC and Nationstar Mortgage LLC | 10-K | 001-35449 | 10.20 | 03/15/2013 | |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.4 | Amendment Number Three, dated December 24, 2012, to the Mortgage Loan Participation Purchase and Sale Agreement, dated March 25, 2012, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-K | 001-35449 | 10.21 | 03/15/2013 | |
| 10.5 | Amendment Number Four, dated July 18, 2013, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-Q | 001-35449 | 10.11 | 11/14/2013 | |
| 10.6 | Amendment Number Five, dated July 24, 2013, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-Q | 001-35449 | 10.12 | 11/14/2013 | |
| 10.7 | Amendment Number Six, dated September 20, 2013, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-Q | 001-35449 | 10.13 | 11/14/2013 | |
| 10.8 | Amendment Number Seven, dated August 21, 2014, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011 between Barclays Bank PLC and Nationstar Mortgage LLC | 10-Q | 001-35449 | 10.3 | 11/07/2014 | |
| 10.9 | Amendment Number Eight, dated October 20, 2014, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-Q | 001-35449 | 10.4 | 11/07/2014 | |
| 10.10 | Amendment Number Nine, dated October 19, 2015, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-K | 001-35449 | 10.28 | 03/01/2016 | |
| 10.11 | Amendment Number Ten, dated October 17, 2016, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-K | 001-35449 | 10.17 | 03/09/2017 | |
| 10.12 | Amendment Number Eleven, dated October 31, 2016, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-K | 001-35449 | 10.18 | 03/09/2017 | |
| 10.13 | Amendment Number Twelve, dated October 30, 2017, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-K | 001-35449 | 10.18 | 03/02/2018 | |
| 10.14 | Amendment Number Thirteen, dated March 22, 2018, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-Q | 001-35449 | 10.1 | 05/10/2018 | |
| 10.15 | Amendment Number Fourteen, dated October 24, 2018, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-K | 001-14667 | 10.17 | 03/11/2019 | |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.16 | Amendment Number Fifteen, dated November 20, 2018, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC, and Nationstar Mortgage LLC | 10-K | 001-14667 | 10.18 | 03/11/2019 | |
| 10.17 | Amendment Number Sixteen, dated January 29, 2019, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC, and Nationstar Mortgage LLC | 10-Q | 001-14667 | 10.1 | 05/08/2019 | |
| 10.18 | Amendment Number Seventeen, dated March 29, 2019, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC, and Nationstar Mortgage LLC | 10-Q | 001-14667 | 10.2 | 05/08/2019 | |
| 10.19 | Amendment Number Eighteen, dated April 3, 2019, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC and Nationstar Mortgage LLC | 10-Q | 001-14667 | 10.1 | 08/02/2019 | |
| 10.20 | Amendment Number Nineteen, dated March 30, 2020, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC, as agent and Nationstar Mortgage LLC, as seller | 10-K | 001-14667 | 10.22 | 02/23/2021 | |
| 10.21 | Amendment Number Twenty, dated September 11, 2020, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC, as Agent and Nationstar Mortgage LLC, as Seller | 10-Q | 001-14667 | 10.2 | 10/29/2020 | |
| 10.22 | Amendment Number Twenty-One, dated December 18, 2020, to the Mortgage Loan Participation Purchase and Sale Agreement, dated as of March 25, 2011, between Barclays Bank PLC, as Agent and Nationstar Mortgage LLC, as Seller | 10-K | 001-14667 | 10.24 | 02/23/2021 | |
| 10.23 | Amended and Restated Receivables Pooling Agreement, dated January 31, 2013, between Nationstar Agency Advance Funding LLC (depositor) and Nationstar Agency Advance Funding Trust (issuer) | 8-K | 001-35449 | 10.5 | 02/06/2013 | |
| 10.24 | Amended and Restated Receivables Sale Agreement, dated January 31, 2013, between Nationstar Mortgage LLC (receivables seller and servicer) and Nationstar Agency Advance Funding LLC (depositor) | 8-K | 001-35449 | 10.6 | 02/06/2013 | |
| 10.25 | Second Amended and Restated Master Repurchase Agreement, dated January 29, 2016, between Barclays Bank PLC, as purchaser and agent, Sutton Funding LLC, as purchaser and agent, and Nationstar Mortgage LLC, as seller | 10-K | 001-35449 | 10.1 | 05/05/2016 | |
| 10.26 | Amendment Number One dated as of June 24, 2016 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, Sutton Funding LLC, as a purchaser, and Nationstar Mortgage LLC, as seller | 10-Q | 001-35449 | 10.2 | 08/09/2016 | |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.27 | Amendment Number Two dated as of October 17, 2016 to the Second Amended and Restated Master Repurchase Agreement, dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, Sutton Funding LLC, as a purchaser, and Nationstar Mortgage LLC, as seller | 10-K | 001-35449 | 10.21 | 03/09/2017 | |
| 10.28 | Amendment Number Three dated as of October 31, 2016 to the Second Amended and Restated Master Repurchase Agreement, dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, Sutton Funding LLC, as a purchaser, and Nationstar Mortgage LLC, as seller | 10-K | 001-35449 | 10.22 | 03/09/2017 | |
| 10.29 | Amendment Number Four dated as of October 30, 2017 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, Sutton Funding LLC, as a purchaser, and Nationstar Mortgage LLC, as seller | 10-K | 001-35449 | 10.23 | 03/02/2018 | |
| 10.30 | Amendment Number Five dated as of March 22, 2018 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, Sutton Funding LLC, as a purchaser, and Nationstar Mortgage LLC, as seller | 10-Q | 001-35449 | 10.2 | 05/10/2018 | |
| 10.31 | Amendment Number Six dated as of May 29, 2018 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, and Nationstar Mortgage LLC, as seller | 10-Q | 001-35449 | 10.1 | 08/03/2018 | |
| 10.32 | Amendment Number Seven dated as of October 24, 2018 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, and Nationstar Mortgage LLC, as seller | 10-K | 001-14667 | 10.26 | 03/11/2019 | |
| 10.33 | Amendment Number Eight dated as of November 20, 2018 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, and Nationstar Mortgage LLC, as seller | 10-K | 001-14667 | 10.27 | 03/11/2019 | |
| 10.34 | Amendment Number Nine dated as of January 28, 2019 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.3 | 05/08/2019 | |
| 10.35 | Amendment Number Ten dated as of March 29, 2019 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent, and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.4 | 05/08/2019 | |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.36 | Amendment Number Eleven, dated as of April 3, 2019 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016, among Barclays Bank PLC, as purchaser and agent, and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.2 | 08/02/2019 | |
| 10.37 | Amendment Number Twelve dated as of October 25, 2019 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 between Barclays Bank PLC, as purchaser and agent, and Nationstar Mortgage LLC, as seller | 10-K | 001-14667 | 10.34 | 02/28/2020 | |
| 10.38 | Amendment Number Thirteen dated March 30, 2020 to the Second Amended and Restated Master Repurchase Agreement dated as of January 29, 2016 between Barclays Bank PLC, as agent and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.3 | 04/30/2020 | |
| 10.39 | Amendment Number Fourteen dated September 11, 2020 to the Second Amended and Restated Master Repurchase Agreement dated as of January 29, 2016 between Barclays Bank PLC, as agent and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.1 | 10/29/2020 | |
| 10.40 | Amendment Number Fifteen dated October 26, 2020 to the Second Amended and Restated Master Repurchase Agreement dated as of January 29, 2016 between Barclays Bank PLC, as agent and Nationstar Mortgage LLC, as seller | 10-K | 001-14667 | 10.40 | 02/23/2021 | |
| 10.41 | Amendment Number Sixteen dated October 18, 2020 to the Second Amended and Restated Master Repurchase Agreement dated as of January 29, 2016 between Barclays Bank PLC, as agent and Nationstar Mortgage LLC, as seller | 10-K | 001-14667 | 10.41 | 02/23/2021 | |
| 10.42 | Amendment Number Seventeen dated July 9, 2021 to the Second Amended and Restated Master Repurchase Agreement dated as of January 29, 2016 between Barclays Bank PLC, as agent and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.1 | 10/28/2021 | |
| 10.43 | Amendment Number Eighteen dated September 30, 2021 to the Second Amended and Restated Master Repurchase Agreement dated as of January 29, 2016 between Barclays Bank PLC, as agent and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.2 | 10/28/2021 | |
| 10.44 | Amendment Number Nineteen dated June 3, 2022 to the Second Amended and Restated Master Repurchase Agreement dated as of January 29, 2016 between Barclays Bank PLC, as agent and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.7 | 07/27/2022 | |
| 10.45 | Amendment Number Twenty dated September 30, 2022 to the Second Amended and Restated Master Repurchase Agreement dated as of January 29, 2016 between Barclays Bank PLC, as agent and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.1 | 10/26/2022 | |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.46 | Amendment Number Twenty-One dated October 6, 2023 to the Second Amended and Restated Master Repurchase Agreement dated January 29, 2016 among Barclays Bank PLC, as purchaser and agent and Nationstar Mortgage LLC, as seller | | | | | X |
| 10.47 | Mortgage Loan Participation Sale Agreement dated as of August 30, 2016 between JPMorgan Chase Bank, National Association, as buyer and Nationstar Mortgage LLC, as seller, conformed through Amendment No. 1 | 10-Q | 001-14667 | 10.1 | 07/27/2022 | |
| 10.48 | Omnibus Amendment, Consent and Acknowledgment Agreement, effective as of February 1, 2019 to Mortgage Loan Participation Sale Agreement dated as of August 30, 2016 and between JPMorgan Chase Bank, National Association, as Purchaser and Nationstar Mortgage LLC (successor by merger to Pacific Union Financial, LLC), as seller | 10-Q | 001-14667 | 10.2 | 07/27/2022 | |
| 10.49 | Amendment Number 8, dated June 6, 2023 to Mortgage Loan Participation Sale Agreement dated as of August 30, 2016 between JPMorgan Chase Bank, National Association, as purchaser and Nationstar Mortgage LLC, as seller | 10-Q | 001-14667 | 10.6 | 07/26/2023 | |
| 10.50 | Master Repurchase Agreement dated as of May 17, 2019 among Nationstar Sub 11 LLC and Nationstar REO Sub 11 LLC, as seller parties, Nationstar Mortgage LLC, as guarantor and JPMorgan Chase Bank, National Association, as buyer, conformed through Amendment No. 9 | 10-Q | 001-14667 | 10.3 | 07/27/2022 | |
| 10.51 | Amendment No. 10, dated as of June 12, 2023 to Master Repurchase Agreement dated as of May 17, 2019 among Nationstar Sub 11 LLC and Nationstar REO Sub 11 LLC, as seller parties, Nationstar Mortgage LLC, as guarantor and JPMorgan Chase Bank, National Association, as buyer | 10-Q | 001-14667 | 10.7 | 07/26/2023 | |
| 10.52 | Loan and Security Agreement dated as of August 20, 2020 among Nationstar Mortgage LLC, as borrower, Morgan Stanley Bank, N.A., as initial lender and Morgan Stanley Mortgage Capital Holdings LLC, as administrative agent | 10-Q | 001-14667 | 10.4 | 07/27/2022 | |
| 10.53 | Amendment No. 1, dated as of September 17, 2021 to Loan and Security Agreement dated as of August 20, 2020 among Nationstar Mortgage LLC, as borrower, Morgan Stanley Bank, N.A., as initial lender and Morgan Stanley Mortgage Capital Holdings LLC, as administrative agent | 10-Q | 001-14667 | 10.5 | 07/27/2022 | |
| 10.54 | Amendment No. 7, dated as of August 3, 2022 to Loan and Security Agreement dated as of August 20, 2020 among Nationstar Mortgage LLC, as borrower, Morgan Stanley Bank, N.A., as lender and Morgan Stanley Mortgage Capital Holdings LLC, as administrative agent | 10-Q | 001-14667 | 10.2 | 10/26/2023 | |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.55 | Amendment No. 3 dated as of March 30, 2023 to Loan and Security Agreement dated as of August 20, 2020 among Nationstar Mortgage LLC, as borrower, Morgan Stanley Mortgage Capital Holdings LLC, as administrative agent | 10-Q | 001-14667 | 10.6 | 04/26/2023 | |
| 10.56 | Third Amended and Restated Master Repurchase Agreement, entered into as of August 31, 2020 by and between Bank of America, N.A., as buyer and Nationstar Participation Sub 1HM LLC, as seller, and acknowledged, guaranteed and agreed to by Nationstar Mortgage LLC, as guarantor or pledgor | 10-Q | 001-14667 | 10.6 | 07/27/2022 | |
| 10.57 | Conformed Amendments through Amendment Number 1, dated August 12, 2022, to Third Amended and Restated Master Repurchase Agreement, entered into as of August 31, 2020 by and between Bank of America, N.A., as buyer and Nationstar Participation Sub 1HM LLC, as seller, and acknowledged, guaranteed and agreed to by Nationstar Mortgage LLC, as guarantor or pledgor | 10-Q | 001-14667 | 10.3 | 10/26/2022 | |
| 10.54 | Amendment Number 4, dated October 21, 2022, to Third Amended and Restated Master Repurchase Agreement, entered into as of August 31, 2020 by and between Bank of America, N.A., as buyer and Nationstar Participation Sub 1HM LLC, as seller, and acknowledged, guaranteed and agreed to by Nationstar Mortgage LLC, as guarantor or pledgor | 10-K | 001-14667 | 10.54 | 02/16/2023 | |
| 10.55 | Amendment Number 5, dated October 20, 2023, to Third Amended and Restated Master Repurchase Agreement, entered into as of August 31, 2020 by and between Bank of America, N.A., as buyer and Nationstar Participation Sub 1HM LLC, as seller, and acknowledged, guaranteed and agreed to by Nationstar Mortgage LLC, as guarantor or pledgor | | | | | X |
| 10.56 | Amended and Restated Loan and Security Agreement, dated as of April 3, 2023, between Nationstar Mortgage LLC, as borrower and Barclays Bank PLC, as lender | 10-Q | 001-14667 | 10.1 | 07/26/2023 | |
| 10.57 | Amendment Number One, dated as of May 11, 2023 to the Amended and Restated Loan and Security Agreement, dated as of April 3, 2023, between Nationstar Mortgage LLC, as borrower and Barclays Bank PLC, as lender | 10-Q | 001-14667 | 10.2 | 07/26/2023 | |
| 10.58 | Amendment Number Two, dated as of June 23, 2023 to the Amended and Restated Loan and Security Agreement, dated as of April 3, 2023, between Nationstar Mortgage LLC, as borrower and Barclays Bank PLC, as lender | 10-Q | 001-14667 | 10.3 | 07/26/2023 | |

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.59 | Amendment Number Three, dated October 6, 2023 to Second Amended and Restated Loan and Security Agreement, dated as of April 3, 2023, between Nationstar Mortgage LLC, as borrower and Barclays Bank PLC, as lender | | | | | X |
| 10.60 | Second Amended and Restated Loan and Security Agreement, dated as of April 3, 2023, between Nationstar Mortgage LLC, as borrower and Citibank, N.A., as lender | 10-Q | 001-14667 | 10.4 | 07/26/2023 | |
| 10.61 | Amendment Number One, dated June 23, 2023 to Second Amended and Restated Loan and Security Agreement, dated as of April 3, 2023, between Nationstar Mortgage LLC, as borrower and Citibank, N.A., as lender | 10-Q | 001-14667 | 10.5 | 07/26/2023 | |
| 10.62 | Amendment Number Two, dated August 11, 2023 to Second Amended and Restated Loan and Security Agreement, dated as of April 3, 2023, between Nationstar Mortgage LLC, as borrower and Citibank, N.A., as lender | 10-Q | 001-14667 | 10.1 | 10/25/2023 | |
| 10.63** | Offer Letter, dated as of December 11, 2018 by and between the Company and Christopher Marshall | 8-K | 001-14667 | 10.1 | 12/12/2018 | |
| 10.64** | Offer Letter and Acceptance, dated January 15, 2020, between the Company and Mike Rawls | 10-K | 001-14667 | 10.3 | 10/20/2020 | |
| 10.65** | Offer Letter and Acceptance, dated February 12, 2021, between the Company and Kurt Johnson | 10-K | 001-14667 | 10.57 | 02/16/2023 | |
| 10.66** | Offer Letter and Acceptance, dated January 9, 2022, by and between the Company and Carlos Pelayo | 10-Q | 001-14667 | 10.2 | 04/26/2023 | |
| 10.67** | Transition and Separation Agreement, dated March 6, 2023, between the Company and Jaime Gow | 8-K | 001-14667 | 10.1 | 03/06/2023 | |
| 10.68** | Employment and Transition Agreement, effective as of October 24, 2023, by and between the Company and Christopher Marshall | 10-Q | 001-14667 | 10.2 | 10/25/2023 | |
| 10.69** | Employment and Retention Agreement, effective as of October 24, 2023, by and between the Company and Jesse K. Bray | 10-Q | 001-14667 | 10.3 | 10/25/2023 | |
| 10.70** | Employment Agreement, dated December 7, 2023, between the Company and Michael Weinbach | 8-K | 001-14667 | 10.1 | 01/09/2024 | |
| 10.71** | Amendment to the Nationstar Mortgage Holdings Inc. Second Amended and Restated 2012 Incentive Compensation Plan | 8-K | 001-35449 | 10.1 | 05/12/2016 | |
| 10.72** | Nationstar Mortgage Holdings Inc. Second Amended and Restated 2012 Incentive Compensation Plan | 10-K | 001-14667 | 10.2 | 08/01/2018 | |
| 10.73** | Form of Restricted Stock Unit Agreement for Employees under the Amended and Restated 2012 Incentive Compensation Plan | 10-Q | 001-35449 | 10.5 | 05/07/2015 | |
| 10.74** | Mr. Cooper Group Inc. 2019 Omnibus Incentive Plan | S-8 | 333-231552 | 99.1 | 05/16/2019 | |
| 10.75** | Form of Grant Notice and Restricted Stock Unit Award Agreement-Employees | 8-K | 001-14667 | 10.1 | 05/17/2019 | |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.76* | Form of 2024 Performance Stock Unit Agreement | | | | | X |
| 10.77** | Form of 2021 Performance Stock Unit Agreement | 10-Q | 001-14667 | 10.3 | 04/26/2023 | |
| 10.78** | Form of 2022 Grant Notice and Restricted Stock Unit Award Agreement-Employee (No Retirement Provision) | 10-Q | 001-14667 | 10.1 | 04/28/2022 | |
| 10.79** | Form of 2022 Performance Stock Unit Agreement – Employee (Standard Retirement Provision) | 10-Q | 001-14667 | 10.2 | 04/28/2022 | |
| 10.80** | Form of 2022 Performance Stock Unit Agreement – Employee (Special Retirement Provision) | 10-Q | 001-14667 | 10.3 | 04/28/2022 | |
| 10.81** | Form of Grant Notice and Restricted Stock Unit Award Agreement-Non-Employee Directors | 8-K | 001-14667 | 10.1 | 05/17/2019 | |
| 10.82** | Form of 2021 Performance Stock Unit Agreement – Employee | 10-Q | 001-14667 | 10.1 | 04/29/2021 | |
| 10.83** | Form of 2021 Performance Stock Unit Agreement – Employee | 10-Q | 001-14667 | 10.2 | 04/29/2021 | |
| 10.84** | Form of Value-Driver Retention and Performance Award Agreement and Grant Notice (Bray) | 10-Q | 001-14667 | 10.4 | 10/25/2023 | |
| 10.85** | Form of Indemnification Agreement with directors and officers | 8-K | 001-14667 | 10.1 | 05/13/2015 | |
| 21.1 | Subsidiaries of the Registrant | | | | | X |
| 23.1 | Consent of Ernst & Young LLP | | | | | X |
| 31.1 | Certification by Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 and Section 302 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 31.2 | Certification by Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 and Section 302 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 32.1 | Certification by Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 32.2 | Certification by Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 97 | Incentive Compensation Clawback Policy (Policy Relating to Recovery of Erroneously Awarded Compensation), adopted October 24, 2023 | | | | | X |
| 101.INS | Inline XBRL Instance Document – the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | | | | | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | | | | | X |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | | | X |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | | | | | X |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | | | | | X |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | | | X |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibits 101.) | | | | | X |

\*   The schedules and other attachments referenced in this exhibit have been omitted in accordance with Item 601(b)(2) of Regulation S-K. A copy of any omitted schedule or attachment will be furnished supplementary to the Securities and Exchange Commission upon request.

\*\*   Management contract, compensatory plan or arrangement.

The agreements and other documents filed as exhibits to this report are not intended to provide factual information or other disclosure other than the terms of the agreements or other documents themselves, and you should not rely on them for that purpose. In particular, any representations and warranties made by the Company in these agreements or other documents were made solely within the specific context of the relevant agreement or document and may not describe the actual state of affairs at the date they were made or at any other time.

## Item 16. Form 10-K Summary

None.

Apx. 123

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Mr. Cooper Group Inc.

By: /s/ Jay Bray
Jay Bray
Chief Executive Officer

February 28, 2024

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| | |
|---|---|
| /s/ Jay Bray | February 28, 2024 |
| Jay Bray, Chief Executive Officer and Director (Principal Executive Officer) | |
| /s/ Kurt Johnson | February 28, 2024 |
| Kurt Johnson, Executive Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) | |
| /s/ Elizabeth Burr | February 28, 2024 |
| Elizabeth Burr, Director | |
| /s/ Roy A. Guthrie | February 28, 2024 |
| Roy A. Guthrie, Director | |
| /s/ Daniela Jorge | February 28, 2024 |
| Daniela Jorge, Director | |
| /s/ Michael D. Malone | February 28, 2024 |
| Michael D. Malone, Director | |
| /s/ Shveta Mujumdar | February 28, 2024 |
| Shveta Mujumdar, Director | |
| /s/ Tagar C. Olson | February 28, 2024 |
| Tagar C. Olson, Director | |
| /s/ Steven D. Scheiwe | February 28, 2024 |
| Steven D. Scheiwe, Director | |

Apx. 124

**No. 21-55459**

----

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

----

Amy Thomas-Lawson; Brenda Boley; Miguel Padilla;
William Green, on behalf of themselves and all those
similarly situated,

Plaintiffs-Appellants,

*v.*

Carrington Mortgage Services, LLC,

Defendant-Appellee.

----

On Appeal from the United States District Court
for the Central District of California

Case No. 20-cv-7301

Hon. Otis D. Wright, II

----

**Brief of *Amicus Curiae*
Consumer Financial Protection Bureau
in Support of Plaintiffs-Appellants**

----

Stephen Van Meter
  *Acting General Counsel*
Steven Y. Bressler
  *Acting Deputy General Counsel*
Kristin Bateman
  *Acting Assistant General Counsel*
Joseph Frisone
  *Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-9287 (telephone)
(202) 435-7024 (facsimile)
Joseph.Frisone@cfpb.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................ii

INTEREST OF AMICUS CURIAE..................................................1

STATEMENT ....................................................................................1

     A.   Statutory and Regulatory Background................................1

     B.   Pay-to-Pay Fees ................................................................4

     C.   Facts and Procedural History............................................6

SUMMARY OF ARGUMENT.........................................................8

ARGUMENT ..................................................................................12

I.   Pay-to-pay fees are not "permitted by law" unless a law expressly
    authorizes such fees.................................................................12

     A.   Interpreting "permitted by law" to mean "permitted by any valid
        contract" is inconsistent with the text of Section 1692f(1)............14

     B.   An "amount" is "permitted by law" under Section 1692f(1) only
        if a law expressly authorizes it......................................17

     C.   Allowing debt collectors to charge pay-to-pay fees absent express
        authorization is inconsistent with the FDCPA's purposes. ............19

II.   An "amount" does not need to be "incidental to the principal
    obligation" to be covered under Section 1692f(1). ...............24

III.  The Bureau's interpretation of Section 1692f(1) warrants
    *Skidmore* deference. ...............................................................27

CONCLUSION ...............................................................................29

i

Apx. 126

## TABLE OF AUTHORITIES

**Cases**                                                                                           Page(s)

*Ali v. Fed. Bur. of Prisons*,
    552 U.S. 214 (2008) ........................................................................25

*Arizona State Bd. For Charter Schools v. Dep't. of Educ.*,
    464 F.3d 1003 (9th Cir. 2006) .......................................................25

*Artichoke Joe's Cal. Grand Casino v. Norton*,
    353 F.3d 712 (9th Cir. 2003) .....................................................17, 18

*Bank of Am. v. City & Cnty. of San Francisco*,
    309 F.3d 551 (9th Cir. 2002) ........................................................27

*Boise Cascade Corp. v. EPA*,
    942 F.2d 1427 (9th Cir. 1991) .....................................................15

*De Dios v. International Realty & Investments*,
    641 F.3d 1071 (9th Cir. 2011) .......................................................3

*Diaz v. Kubler Corp.*,
    785 F.3d 1326 (9th Cir. 2015) .......................................................3

*Fed. Express Corp. v. Holowecki*,
    552 U.S. 389 (2008) ........................................................................29

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
    314 U.S. 95 (1941) ..........................................................................25

*Hernandez v. Williams, Zinman & Parham PC*,
    829 F.3d 1068 (9th Cir. 2016) .....................................................18

*Johnson v. Riddle*,
    305 F.3d 1107 (10th Cir. 2002) ................................................14, 16

*Rico v. Ducart*,
    980 F.3d 1292 (9th Cir. 2020) .......................................................6

*Rumsey Indian Rancheria of Wintun Indians v. Wilson*,
    64 F.3d 1250 (9th Cir. 1994) .......................................................17

*Seeger v. AFNI, Inc.*,
    548 F.3d 1107 (7th Cir. 2008) .............................................................18

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)..............................................................................28

*Torliatt v. Ocwen Loan Servicing, LLC*,
    No. 19-cv-04303, 2020 WL 1904596 (N.D. Cal. Apr. 17, 2020).......26

*Tuttle v. Equifax Check*,
    190 F.3d 9 (2d Cir. 1999).....................................................................19

*United States v. Gonzales*,
    520 U.S. 1 (1997)..................................................................................25

*United States v. Launder*,
    743 F.2d 686 (9th Cir. 1984) ...............................................................17

*United Transp. Union v. BNSF Ry. Co.*,
    710 F.3d 915 (9th Cir. 2013) ...............................................................14

*Van Asdale v. Int'l Game, Tech.*,
    763 F.3d 1089 (9th Cir. 2014) .............................................................27

**Statutes**

12 U.S.C. § 5491(a)..................................................................................1

12 U.S.C. § 5512(b)(4)(B)......................................................................28

15 U.S.C. § 1692(a)................................................................................20

15 U.S.C. § 1692(b)......................................................................18, 22, 23

15 U.S.C. § 1692(e)............................................................................2, 20

15 U.S.C. § 1692f...............................................................................2, 27

15 U.S.C. § 1692f(1) ......................................................................*passim*

15 U.S.C. § 1692k(a)................................................................................2

15 U.S.C. § 1692k(d)................................................................................2

iii

Apx. 128

15 U.S.C. § 1692k(e) ................................................................28

15 U.S.C. § 1692*l* ......................................................................2

15 U.S.C. § 1692*l*(a) ...........................................................2, 19

15 U.S.C. § 1692*l*(b)(6) ...................................................1, 3, 28

15 U.S.C. § 1692*l*(d) .......................................................1, 2, 28

Pub. L. No. 95-109, § 802(e), 91 Stat. 874, 874 ........................2

Pub. L. No. 111-203, 124 Stat. 1376, 1964, 2093 ....................1, 3

**Rules**

Fed. R. App. P. 29(a)(2) ............................................................1

**Other Authorities**

Association for Finance Professionals, *Payments Cost Benchmarking Survey*,
 https://www.afponline.org/docs/default-source/default-document-
 library/pub/2015-payments-cost-benchmarking-report ....................5, 6

Black's Law Dictionary (11th ed. 2019) ................................25

CFPB Compliance Bulletin 2017-01,
 82 Fed. Reg. 35936 (2017) ............................................3, 27

CFPB: Fall 2014 Supervisory Highlights,
 https://files.consumerfinance.gov/f/201410_cfpb_supervisory-
 highlights_fall-2014.pdf ................................................4, 28

CFPB: Fall 2015 Supervisory Highlights,
 https://files.consumerfinance.gov/f/201510_cfpb_supervisory-
 highlights.pdf ..............................................................4, 28

Collins English Dictionary (12th ed. 2014) ............................25

Restatement (Second) of Contracts § 4 (1981) ........................15

Staff Commentary On the Fair Debt Collection Practices Act,
 53 Fed. Reg. 50097 (Dec. 13, 1988) ............................3, 19, 29

iv

Apx. 129

S. Rep. No. 95-382 (1977) ...............................................................................*passim*

Webster's Third New International Dictionary (1976) .....................................17, 24

v

## INTEREST OF AMICUS CURIAE

The Consumer Financial Protection Bureau, an independent agency of the United States, files this brief pursuant to Fed. R. App. P. 29(a)(2).

In 2010, Congress established the Bureau and vested it with authority to promulgate rules under the Fair Debt Collection Practices Act (FDCPA) as well as to enforce compliance with the Act's requirements. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 1964, 2093 (2010) (codified at 12 U.S.C. § 5491(a) and 15 U.S.C. § 1692*l*(b)(6), (d)). This case concerns a provision of the FDCPA, 15 U.S.C. § 1692f(1), that prohibits debt collectors from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt," including "collect[ing] … any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." Given its authority over the FDCPA, the Bureau has a substantial interest in this Court's interpretation of this provision.

## STATEMENT

### A. Statutory and Regulatory Background

1. Congress enacted the FDCPA in 1977 to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively

1

Apx. 131

disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." Pub. L. No. 95-109, § 802(e), 91 Stat. 874, 874 (codified at 15 U.S.C. § 1692(e)). To achieve those ends, the FDCPA imposes various restrictions on debt collectors' debt collection activity. Relevant here is Section 1692f, which provides that a "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The provision then states that "[w]ithout limiting the general application of the foregoing, the following conduct is a violation of this section" and enumerates eight specifically prohibited practices, including the "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id*. § 1692f(1).

To ensure compliance with these and the FDCPA's other requirements, Congress provided a private right of action, *id.* § 1692k(a), (d), and authorized enforcement by a number of federal agencies, including the Bureau, *id.* § 1692*l*.

2. From the time of the FDCPA's enactment until Congress created the Bureau in 2010, the Federal Trade Commission (FTC) was the agency that administered, and had primary responsibility for enforcing, the FDCPA. *See* 15 U.S.C. § 1692*l*(a) (2010). The FTC did not have general rulemaking authority under the Act, *see id*. § 1692*l*(d) (2010), but its staff issued Commentary that set

2

Apx. 132

forth "staff interpretations" of the FDCPA. *See* Staff Commentary On the Fair

Debt Collection Practices Act, 53 Fed. Reg. 50097, 50101 (Dec. 13, 1988).

Although the Staff Commentary is "not binding on the Commission or the public,"

courts have looked to it for guidance, including the Ninth Circuit. *See*, *e.g.*, *Diaz v.*

*Kubler Corp.*, 785 F.3d 1326, 1328 (9th Cir. 2015); *De Dios v. International*

*Realty & Investments*, 641 F.3d 1071, 1075 n.3 (9th Cir. 2011). As relevant here,

FTC staff stated that, under Section 1692f(1), a "debt collector may attempt to

collect a fee or charge in addition to the debt if . . . the contract [creating the debt]

is silent but the charge is otherwise expressly permitted by state law." 53 Fed. Reg.

at 50108.  Conversely, FTC staff stated that "a debt collector may not collect an

additional amount if . . . the contract does not provide for collection of the amount

and state law is silent." *Id*.

     3. The Bureau now administers the FDCPA. In 2010, Congress passed the

Dodd-Frank Wall Street Reform and Consumer Protection Act, which created the

Bureau and granted it authority to enforce the FDCPA. Pub. L. No. 111-203, §

1089, 124 Stat. 1376, 2093 (codified at 15 U.S.C. § 1692*l*(b)(6)). In 2017, the

Bureau issued a compliance bulletin that "provides guidance to debt collectors

about compliance with the [FDCPA] when assessing phone pay fees," like the

phone pay fee at issue here. CFPB Compliance Bulletin 2017-01, 82 Fed. Reg.

35936, 35936 (2017). The Bulletin summarizes the findings of Bureau staff that

3

Apx. 133

under Section 1692f(1), debt collectors may collect such pay-to-pay fees only if the

underlying contract or state law expressly authorizes those fees. In particular, the

Bulletin states that in at least one supervisory exam, Bureau examiners found that a

debt collector "violated [Section 1692f(1)] when they charged fees for taking

mortgage payments over the phone" where the underlying contracts creating the

debt did not expressly authorize collecting such fees and where the relevant state

law did not "expressly permit collecting such fees." *Id*. at 35938 (explaining that

the Bureau examiners had instructed the company to collect pay-by-phone fees

only "where expressly authorized by contract or state law"); *see also* CFPB: Fall

2014 Supervisory Highlights, at 7, *available at*

https://files.consumerfinance.gov/f/201410_cfpb_supervisory-highlights_fall-

2014.pdf (similar); CFPB: Fall 2015 Supervisory Highlights, at 20-21, *available at*

https://files.consumerfinance.gov/f/201510_cfpb_supervisory-highlights.pdf

(similar).

## B. Pay-to-Pay Fees

So-called "convenience" fees, or pay-to-pay fees, are fees imposed on

consumers to make payments through a particular channel. For instance, while

companies may allow consumers to make payments in person or by mail for free,

they may charge consumers a fee to make payments over the phone or online.

4

According to the Bureau's market understanding, most third-party debt collectors allow consumers to repay their debts over the phone or online, and the majority of those collectors do not impose any additional fees for such payments. This may be in part because the phone and online payment methods that are marketed as convenient for consumers are also more cost-effective for the debt collectors. That is, it is generally cheaper and less time-consuming for debt collectors to process phone and online payments than it is to process paper-check payments delivered by mail or in person.

Still, some collectors impose fees on consumers repaying their debts over the phone or online, often relying on independent third-party payment processors to process those payments. Frequently, these debt collectors will charge consumers a fee for phone and online payments that is substantially higher than the price debt collectors pay to third parties to process such payments. According to the Bureau's market understanding, while debt collectors typically charge consumers pay-to-pay fees of between $4 and $12, debt collectors typically pay third-party processors only $0.50 or less per transaction.[1] By contrast, these same collectors do not charge

---

[1] This estimate of the debt collectors' costs in initiating and receiving ACH (Automated Clearing House) transfers—the most common type of payment made by phone or online—is consistent with estimates from industry professionals. *See*, *e.g.*, Association for Finance Professionals, *Payments Cost Benchmarking Survey*, at 8 (2015) (finding the median cost range for sending and receiving ACH payments is between $0.37 and $0.75), *available at*

5

consumers extra to pay by check even though processing paper checks can cost

debt collectors between $1 and $4 per check, depending on the size of the

company.[2]

### C. Facts and Procedural History

Defendant Carrington Mortgage Services collected on mortgage payments

owed by Plaintiffs Amy Thomas-Lawson, William Green, Brenda Boley, and

Miguel Padilla.[3] Excerpts of Record (ER) 219. Carrington provides several

methods for consumers to make mortgage payments—including paying online, for

which Carrington charges an additional $5 fee, and paying by phone, for which it

charges an additional $10 or $20 fee. ER-223. These online and phone payments

are processed by Speedpay, a third-party mortgage payment processing service. *Id.*

In December 2019, Plaintiffs Thomas-Lawson, Green, and Boley filed a

putative class action against Carrington alleging that in charging these pay-to-pay

---

https://www.afponline.org/docs/default-source/default-document-library/pub/2015-payments-cost-benchmarking-report. An ACH transfer is an electronic fund transfer made between accounts at banks or credit unions across the Automated Clearing House network.

[2] *See* Association for Finance Professionals, *Payments Cost Benchmarking Survey*, at 7 ("The median cost range to receive checks is $1.01 to $2.00[, and s]maller organizations with annual revenues of less than $1 billion report . . . a median range of $2.01 to $4.00.").

[3] The facts are drawn from plaintiffs' complaint, as this is an appeal from the district court's grant of a motion to dismiss. *See Rico v. Ducart*, 980 F.3d 1292, 1295 n.4 (9th Cir. 2020).

fees, Carrington violated Section 1692f(1)'s prohibition on debt collectors collecting "any amount" that is not "expressly authorized by the agreement creating the debt or permitted by law," as well as various state laws. ER-217, 234. Carrington moved to dismiss on the grounds that it was not a debt collector; that the pay-to-pay fees were not "incidental to the principal obligation" and therefore not subject to Section 1692f(1); and that the fees were "permitted by law" in any event. ER-9.

The district court first held that Plaintiffs had sufficiently alleged that their debts were in default at the time Carrington began servicing them, and that Carrington therefore qualified as a "debt collector" under the FDCPA. ER-11. Next, the district court held that whether the pay-to-pay fees were "incidental" to the underlying mortgage obligations was irrelevant to whether the fees were prohibited by Section 1692f(1). ER-13. Acknowledging a split in authority among district courts in the Ninth Circuit on that issue, the court found that it was "clear from the statute's plain language that an 'amount' collected does not need to be 'incidental to the principal obligation' to violate [Section] 1692f(1)." *Id*. The court thus stated that it did not need to determine "whether Carrington's . . . fees are incidental to Plaintiffs' mortgage debts, as such a determination would not dispose of Plaintiffs' claims in any event." *Id*.

7

Finally, the district court held that Carrington nonetheless did not violate

Section 1692f(1) because the pay-to-pay fees were "permitted by law." ER-13-14.

In so holding, the district court did not identify a specific "law" that "permitted"

the fees. *See id*. Rather, the court found it "persuasive" that the fees were

potentially the "subject of valid, separate agreements into which Plaintiffs freely

and lawfully entered." ER-13 (stating that it would not "go[] so far as to conclude

that Plaintiffs entered into contracts not described in the Complaint"). The district

court then stated, without explanation, that nothing in the FDCPA prohibited such

separate agreements. ER-14. As a result, the district court held that Section

1692f(1) did not prohibit Carrington from collecting pay-to-pay fees and granted

Carrington's motion to dismiss Plaintiffs' FDCPA claims. *Id*.

## SUMMARY OF ARGUMENT

The Fair Debt Collection Practices Act (FDCPA) prohibits debt collectors

from "collect[ing] . . . any amount (including any interest, fee, charge, or expense

incidental to the principal obligation) unless such amount is expressly authorized

by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

Relevant here are two aspects of the district court's decision interpreting this

provision. First, the district court erred in holding that fees charged to consumers

repaying their debts over the phone or online were "permitted by law" where no

law expressly or affirmatively authorized such fees. Second, the court correctly

held that a fee does not need to be "incidental to the principal obligation" in order to be a covered "amount[]."

1. Under Section 1692f(1), debt collectors may obtain money from consumers in the course of collecting a debt in only two circumstances: (1) when the agreement creating the debt expressly authorizes it and (2) when the amount is "permitted by law." The district court held that pay-to-pay fees were "permitted by law" under Section 1692f(1)'s second prong, despite not identifying any law that expressly permitted these fees. Instead, the court appears to have held that the collection of such fees was "permitted by" general principles of contract law. That interpretation of "permitted by law" is inconsistent with Section 1692f(1)'s text and purpose.

Understanding Section 1692f(1) to allow debt collectors to collect fees whenever authorized by an agreement that is valid under general principles of contract law would nullify Section 1692f(1)'s careful delineation of the first category of collectible fees—those "*expressly* authorized by *the agreement creating the debt*." After all, the "agreement creating the debt" is, by definition, a valid agreement under state contract law. Thus, reading Section 1692f(1) to allow debt collectors to collect amounts authorized (implicitly or expressly) by *other* agreements would disregard Congress's deliberate choice. Further, the district court's interpretation ignores Section 1692f(1)'s focus on "amounts" being

9

"permitted by law." Under Section 1692f(1), it is not enough for the agreement to be "permitted by law"; rather, the "amount" itself must be, and general principles of state contract law standing alone do not provide for the collection of any specific amounts.

Given this statutory context, "permitted by law" under Section 1692f(1) can only refer to amounts that are expressly or affirmatively authorized by law. That, of course, is consistent with a common meaning of "permit." And while "permit" can in some contexts also mean to allow something by not preventing it, that meaning does not make sense in the context of Section 1692f(1). That provision authorizes debt collectors to collect amounts "permitted *by law*," and it is hardly natural to read that phrase to mean "not prohibited by law."

Understanding Section 1692f(1)'s "permitted by law" prong to require affirmative authorization is also most consistent with Section 1692f(1)'s purpose. The FDCPA was designed to rein in unethical debt collectors, and Section 1692f(1) specifically was designed to limit the amounts that debt collectors could try to collect from consumers. But under the district court's interpretation, debt collectors can collect additional fees, like the pay-to-pay fees at issue here, whenever no other law specifically prohibits them—leaving debt collectors with the power and discretion to try to collect additional fees during the collection process. This is particularly problematic given that consumers have no ability to

10

shop around for a better deal. And it's not as if these pay-to-pay fees are necessary for debt collectors to offer phone or online payment options that consumers might want, as it is generally cheaper for collectors to accept payment by phone or online than to accept payment by mail (which is typically the fee-free option). Pay-to-pay fees are thus most often just a way for debt collectors to take advantage of consumers by trying to extract more money than they originally bargained for or reasonably expected to pay.

2. Separately, the district court held that whether the pay-to-pay fees are "incidental to the principal obligation" is irrelevant in determining whether such fees are covered by Section 1692f(1). That holding was correct. The statute by its terms covers the collection of "*any* amount[s]"—an all-encompassing term. (Emphasis added.) And the provision specifies that those amounts "*includ[e]*" fees "incidental to the principal obligations." (Emphasis added.) The word "including" is a term of illustration, signifying that what follows is an example of the preceding principle, not an all-embracing definition. Thus, "fee[s] . . . incidental to the principal obligation" are an example of a covered amount, not the only amounts that are covered. Pay-to-pay fees are therefore covered by Section 1692f(1) regardless of whether they are considered "incidental to the principal obligation."

In any event, even if Section 1692f(1) covered only those fees that are "incidental to the principal obligation," pay-to-pay fees would still be covered

11

because they are "incidental to the principal obligation." Indeed, if the principal

obligation—the underlying mortgage debt—did not exist, then neither would the

pay-to-pay fee.

3. Finally, to the extent that the Court is left with any doubt over the

meaning of Section 1692f(1) after consulting the statute's text and purpose, it

should defer to the views of the Bureau, which is charged with implementing and

enforcing the FDCPA. In particular, given the Bureau's authority over the FDCPA,

its previous statements from 2014, 2015, and 2017 on the scope of Section

1692f(1), and the reasoning set forth in this brief, the Bureau's interpretation of

Section 1692f(1) is entitled to *Skidmore* deference.

## ARGUMENT

**I.    Pay-to-pay fees are not "permitted by law" unless a law expressly authorizes such fees.**

The Fair Debt Collection Practices Act (FDCPA) prohibits debt collectors

from "us[ing] unfair or unconscionable means to collect or attempt to collect any

debt," including "collect[ing] . . . any amount (including any interest, fee, charge,

or expense incidental to the principal obligation) unless such amount is expressly

authorized by the agreement creating the debt or permitted by law." 15 U.S.C.

§ 1692f(1). By the provision's own terms, there are two acceptable bases for debt

collectors to obtain money from a consumer in the course of collecting a debt.

First, debt collectors can collect amounts that are "expressly authorized by the

12

agreement creating the debt." Second, collectors can collect amounts when they are "permitted by law." The opinion below would establish a third category of collectible amounts: those that are authorized (expressly or impliedly) by an otherwise lawful agreement other than the one that created the debt.

This Court should reject the district court's interpretation of section1692f(1) for three related reasons. First, it is inconsistent with the FDCPA's text. The district court's approach implicitly relies on the view that general principles of contract law are the "law" that "permitted" Carrington to charge the fees in this case. But this view would negate Congress's deliberate choice to permit fees that are "*expressly* authorized by the *agreement creating the debt*" as opposed to fees that consumers might agree to in any way in any agreement. Second, because any other reading would negate that choice by Congress, the better view of Section 1692f(1)'s "permitted by law" prong, and the one that courts and regulators have long endorsed, is that an amount is permitted by law only when a law expressly or affirmatively authorizes it. Finally, the district court's interpretation is inconsistent with the FDCPA's purposes. Section 1692f(1) is designed to protect consumers by limiting the amounts that debt collectors can try to collect from consumers. But the district court's interpretation allows debt collectors to take advantage of consumers by tacking on additional fees during the collection process and extract more money than consumers originally bargained for or expected to pay.

13

### A. Interpreting "permitted by law" to mean "permitted by any valid contract" is inconsistent with the text of Section 1692f(1).

To "evaluate whether [an amount] was 'permitted by law,' it is necessary to determine which 'law' [the amount is] 'permitted by.'" *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002). The district court, however, did not identify any "law" that "permitted" the collection of the pay-to-pay fees at issue here. Rather, the court appears to have held that the collection of such fees was "permitted by" general principles of contract law. This interpretation is inconsistent with Section 1692f(1)'s text in two ways. First, interpreting amounts "permitted by law" to include amounts permitted by any agreement that would be valid under state contract law renders superfluous Section 1692f(1)'s other prong allowing debt collectors to collect amounts "expressly" authorized by an "agreement creating the debt." Second, the district court's interpretation ignores Section 1692f(1)'s focus on the "*amount*" being "permitted by law." That is, Section 1692f(1) asks whether an "amount" is "permitted by law" and not, as the district court intimated, whether an agreement is permitted by law.

1. As this Court has previously recognized, "[u]nder accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *United Transp. Union v. BNSF Ry. Co*., 710 F.3d 915, 928 (9th Cir. 2013) (quoting

14

Apx. 144

*Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991)). The district

court's interpretation runs afoul of this well-established canon in at least two ways.

First, interpreting "permitted by law" to include amounts authorized by *any*

agreement that is valid under state contract law would render the "agreement

creating the debt" clause superfluous, because an "agreement creating the debt" is,

by definition, an agreement valid under state contract law. Thus, under the district

court's interpretation, Section 1692f(1)'s "permitted by law" prong would already

encompass amounts authorized by the "agreement creating the debt"—rendering

that prong unnecessary.

Second, the district court's interpretation would render superfluous Section

1692f(1)'s requirement that amounts agreed to in the underlying contract be

"expressly" authorized. After all, general principles of state contract law allow

parties to agree to express or implied terms as part of any agreement. *See*

Restatement (Second) of Contracts § 4 cmt. a (1981). So if general principles of

contract law counted as a "law" that "permitted" the collection of amounts, debt

collectors would be free to collect not only those amounts authorized by separate

agreements, but also to collect amounts that are only implicitly authorized by the

agreement creating the debt—rendering Section 1692f(1)'s "express" requirement

meaningless.

15

Apx. 145

Thus, the clause permitting debt collectors to collect amounts "expressly authorized by the agreement creating the debt" has independent effect only if "permitted by law" means affirmatively permitted by a particular law (whether state or federal), not just permitted under an agreement that is valid under state contract law.

2. Separately, the district court's interpretation ignores Section 1692f(1)'s focus on the "amount" being "permitted by law." *See Riddle*, 305 F.3d at 1118 ("The statute does not ask whether [the debt collector's] actions were permitted by law . . ., it asks whether the *amount* he sought to collect was permitted by law." (emphasis in original)). Here, the district court appears to have found Carrington's collection of pay-to-pay fees permissible because (1) they were authorized by a separate agreement between Carrington and the consumers and (2) those separate agreements were permitted by general principles of contract law. But, under Section 1692f(1), it is not enough for the agreement to be "permitted by law"; rather, the "amount" itself must be. Contract law standing alone does not provide for the collection of any specific amounts—and no principle of contract law says debt collectors may collect pay-to-pay fees. Thus, while it may have been permissible under contract law for Carrington to enter into separate agreements with consumers, contract law did not permit the "amount" at issue here. *Cf. Riddle*, 305 F.3d at 1118 (concluding that just because Rule 11 would authorize someone

16

Apx. 146

to file suit to collect a statutory shoplifting fee on a dishonored check does not mean that collecting that fee was "permitted by law"). And, under the terms of Section 1692f(1), it is the "amount" that must be "permitted by law."

### B. An "amount" is "permitted by law" under Section 1692f(1) only if a law expressly authorizes it.

For these reasons, the district court's view that general principles of contract law satisfy Section 1692f(1)'s "permitted by law" prong is untenable. It is no surprise then that courts and regulators have long understood section 1692f(1)'s use of the phrase "permitted by law" to refer to amounts that a particular law affirmatively authorizes. This understanding of "permitted by law" allows that prong to sensibly coexist with the statute's reference to amounts that are "expressly authorized by the agreement creating the debt."

This understanding also accords with a common meaning of "permit"—"to consent to expressly or formally." Webster's Third New International Dictionary 1683 (1976). To be sure, the word "permit," when read in "isolation," may be "susceptible to more than one interpretation." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 722 (9th Cir. 2003). The word "permit" can also mean "to acquiesce, by failure to prevent." *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1257 (9th Cir. 1994) (citing *United States v. Launder*, 743 F.2d 686, 689 (9th Cir. 1984)) (internal quotations omitted). But in "deciphering the meaning of a statute, [courts] do not look at its words in isolation"; rather, it is

17

necessary to look at the "specific context in which [those words are] used."

*Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1073 (9th Cir.

2016); *accord Artichoke Joe's*, 353 F.3d at 724 (looking to statutory context to

interpret provision addressing whether a state "permits [certain] gaming"). Here,

"permit" is used not in isolation but as part of the phrase "permitted by law." And

while in some contexts one may "permit" something by failing to prevent it, it is

far less natural to understand "permitted *by law*" to mean "permitted by the

absence of any law prohibiting it." The better reading is that "permitted by law"

means the law must affirmatively authorize the amount that the collector seeks to

collect.[4]

Indeed, this is how courts and regulators alike have traditionally understood

Section 1692f(1)'s "permitted by law" prong. For example, the Seventh and

Second Circuits have read that prong to refer to a law expressly or affirmatively

permitting a charge. *See*, *e.g.*, *Seeger v. AFNI, Inc.*, 548 F.3d 1107, 1111, 1112

(7th Cir. 2008) ("In order to be entitled to collect a fee, AFNI must show that the

---

[4] The alternative interpretation—that "permitted by law" means not prohibited by law—is inconsistent with the FDCPA's purposes. Congress passed the FDCPA in part because of the "lack of meaningful legislation on the State level." S. Rep. No. 95-382 at 2; *see also* 15 U.S.C. § 1692(b) ("[e]xisting laws and procedures . . . [were] inadequate to protect consumers"). Given the concern about the lack of existing protections, it is decidedly unlikely that Congress meant to allow debt collectors to collect any amounts not expressly authorized in the agreement creating the debt whenever state law simply did not prohibit the collection of those amounts.

18

Apx. 148

fee is either authorized by the governing contract or that it is permitted by Wisconsin law. . . . Neither a *law expressly permitting* a collection fee . . . nor an agreement . . . exists here." (emphasis added)); *Tuttle v. Equifax Check*, 190 F.3d 9, 13 (2d Cir. 1999) ("If state law neither *affirmatively permits* nor expressly prohibits service charges, a service charge can be imposed only if the customer expressly agrees to it in the [underlying] contract." (emphasis added)). Likewise, in 1988, the FTC, which had primary enforcement authority over the FDCPA before the creation of the Bureau, *see* 15 U.S.C. § 1692*l*(a) (2010), issued non-binding staff commentary stating the same. *See* Staff Commentary On the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097, 50108 (Dec. 13, 1988) (stating that a "debt collector may attempt to collect a fee or charge in addition to the debt if . . . the contract [creating the debt] is silent but the charge is otherwise expressly permitted by state law"; and, conversely, that "a debt collector may not collect an additional amount if . . . the contract does not provide for collection of the amount and state law is silent.").

## C. Allowing debt collectors to charge pay-to-pay fees absent express authorization is inconsistent with the FDCPA's purposes.

Understanding Section 1692f(1)'s "permitted by law" prong to require affirmative authorization is also more consistent with the FDCPA's purposes. Congress passed the FDCPA after finding that "debt collection abuse by third party debt collectors [was] a widespread and serious national problem," which it largely

19

Apx. 149

attributed to a "lack of meaningful legislation on the State level." S. Rep. No. 95-382, at 2 (1977). The FDCPA was thus intended to rein in unethical debt collectors who had been "us[ing] . . . abusive, deceptive, and unfair debt collection practices." 15 U.S.C. § 1692(a), (e). Section 1692f(1), in particular, was designed to limit the amounts that debt collectors could try to collect from consumers—by ensuring that collectors would collect only those amounts that consumers had agreed to upfront, unless some law permitted them to impose additional charges later. By allowing debt collectors to collect pay-to-pay fees not expressly authorized by the agreement creating the debt or expressly authorized by law, the district court's interpretation runs afoul of the FDCPA's purposes in at least two ways.

    1. First, the district court's interpretation would permit debt collectors to take advantage of consumers in debt by increasing consumers' costs beyond what they initially agreed to and expected to pay. When a consumer incurs a debt, she does not expect to have to pay a fee to make a payment by convenient method, unless, of course, the contract authorizes that fee or some other law expressly authorizes it. However, under the district court's interpretation, debt collectors can tack on these additional fees during the debt collection process and extract more money than consumers originally bargained to pay, at a point when consumers have no ability to shop around for a better deal.

20

While consumers may in some sense have a choice whether to pay these added "convenience fees," that choice may often be illusory. Consumers faced with debts in collection may feel compelled to choose the payment option that most quickly and reliably pays down their debts in order to avoid the myriad adverse consequences that can result from a delayed payment—such as accruing interest and late fees, continued adverse credit-reporting, or a potential lawsuit. As Congress recognized, consumers subject to debt collection are usually already facing "an unforeseen event such as unemployment, overextension, serious illness, or marital difficulties or divorce." S. Rep. No. 95-382, at 3. These consumers, already under stress, may not want to compound that stress and may want the peace of mind of using a payment method that they can immediately confirm went through—i.e., via a representative over the phone or a confirmation note online. Consumers may not want to chance paying by mail, which could get lost and would take more time to reach the debt collector. Thus, consumers may feel pressured to pay by means that are the fastest and most reliable—which come with a fee attached. This is particularly problematic because consumers cannot shop around for their debt collector, and therefore have no ability to choose a collector who offers convenient payment methods at lower or no cost.

Debt collectors, moreover, cannot defend pay-to-pay fees as charges necessary to enable them to offer convenient payment methods that consumers

21

want. The whole point of debt collection activity is to get consumers to pay debts. It is therefore in debt collectors' own interest to provide convenient methods for consumers to pay. Additionally, it is generally *cheaper* for collectors to accept payment by phone or online than to accept payment by mail (which is typically the fee-free option).[5] According to the Bureau's market understanding, whereas these pay-to-pay fees typically cost consumers between $4 and $12, debt collectors typically pay between $0.20 and $0.50 to process an online or phone payment. Plaintiffs' allegations here reflect that reality: Plaintiffs allege that Carrington charges its consumers $5 for online payments and $10 or $20 for payments over the phone, but that each such payment costs Carrington only $0.50.

By permitting pay-to-pay fees where neither the agreement creating the debt nor any law affirmatively authorizes such fees, the district court's interpretation would enable debt collectors to extract more money than consumers (who cannot choose their debt collector) originally bargained, or reasonably expected, to pay—contrary to Congress's goal of preventing debt collectors from taking advantage of consumers.

2. The district court's interpretation also removes an important check that Congress imposed on debt collectors' power and discretion: legislative

---

[5] This is one reason why it is unlikely that debt collectors would cease making online and phone payment options available if they could not charge extra for those payments.

22

authorization. Congress passed the FDCPA because "[e]xisting laws and procedures . . . [were] inadequate to protect consumers." 15 U.S.C. § 1692(b). Prior to the FDCPA, due to the lack of existing laws and procedures, including the "lack of meaningful legislation on the State level," S. Rep. No. 95-382 at 2, unethical debt collectors tried to collect whatever fees they saw fit to impose. Section 1692f(1) was designed to address that by limiting the collection of fees that consumers did not originally bargain for (i.e., in the agreement creating the debt) to situations where the fees are "permitted by law." In other words, Congress protected consumers by limiting the fees that debt collectors could choose on their own to try to collect: If a debt collector wants to collect an amount that the consumer did not agree to pay upfront, then some other law must affirmatively allow it.

Under the district court's interpretation, however, debt collectors and consumers revert to the power dynamic that existed before the FDCPA. In the absence of a law expressly authorizing additional fees or expressly prohibiting them, debt collectors get to choose which fees to try to collect and under what conditions. But it was this discretion and power that Congress sought to limit with Section 1692f(1).

23

II.   An "amount" does not need to be "incidental to the principal obligation" to be covered under Section 1692f(1).

The district court correctly held that whether the pay-to-pay fees are "incidental to the principal obligation" is irrelevant in determining whether such fees are covered by Section 1692f(1). That provision prohibits debt collectors from "collect[ing] . . . any amount (including any interest, fee, charge, or expense incidental to the principal obligation)" unless one of the two exceptions discussed above applies. Carrington argued below that its pay-to-pay fees did not violate Section 1692f(1) because the fees were not "incidental to the principal obligation"—i.e., the consumers' mortgages. Carrington is doubly mistaken. As the district court correctly held, Section 1692f(1)'s prohibition applies to any "amount," regardless of whether it is "incidental to the principal obligation." And, besides, pay-to-pay fees are "incidental to" the principal obligation.[6]

Section 1692f(1) prohibits the collection of "*any* amount" other than those expressly authorized by the underlying agreement or permitted by law—not just amounts that are "incidental to the principal obligation." (Emphasis added.) The "word 'any' has an expansive meaning, that is, 'one or some indiscriminately of

---

[6] Carrington also argued below that its pay-to-pay fees are not "debts" under the FDCPA. ER-102. But whether they are "debts" is irrelevant. Section 1692f(1) prohibits collectors from collecting unauthorized "amounts," not unauthorized "debts." Pay-to-pay fees are plainly "amounts" and therefore covered by Section 1692f(1).

24

whatever kind.'" *Ali v. Fed. Bur. of Prisons*, 552 U.S. 214, 219 (2008) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997), in turn quoting Webster's Third New International Dictionary 97 (1976)). Thus, Congress's "use of 'any' to modify" the term amount "is most naturally read to mean [amounts] of whatever kind." *Id.* at 220.

Beyond that, Section 1692f(1) explicitly states that the "amounts" covered by the provision "*includ[e]* any interest, fee, charge, or expense incidental to the principal obligation." (Emphasis added.) As this Court has explained, "the word 'including' is ordinarily defined as a term of illustration, signifying that what follows is an example of the preceding principle." *Arizona State Bd. For Charter Schools v. Dep't. of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006) (stating that this is the definition in "both legal and common usage") (citing *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)). In other words, the term "including" does not signal an "all-embracing definition." *Bismarck Lumber*, 314 U.S. at 100. Here, that means that "interest, fee, charge or expense incidental to the principal obligation" are examples of "amount[s]," and not the *only* amounts that are covered. Pay-to-pay fees are therefore covered by Section 1692f(1) regardless of whether they are considered "incidental to the principal obligation."

In any event, even if Section 1692f(1) covered only those fees that are incidental to the principal obligation, pay-to-pay fees would be covered because

25

Apx. 155

they are "incidental to" the relevant principal obligation. While the FDCPA does not define "incidental," it is ordinarily understood as "related to," Collins English Dictionary (12th ed. 2014), or "[s]ubordinate to something of greater importance," Black's Law Dictionary (11th ed. 2019). Pay-to-pay fees meet those definitions: They are "related to" the principal obligation because they are fees charged for paying the principal obligation. Indeed, if the principal obligation did not exist, then neither would the pay-to-pay fee. These fees are also generally minor in comparison to the outstanding debt and are therefore "subordinate to" the principal obligation.

A minority of courts have incorrectly held that pay-to-pay fees are not "incidental" to the principal obligation because such fees are optional. *See Torliatt v. Ocwen Loan Servicing, LLC*, No. 19-cv-04303, 2020 WL 1904596, at *2 (N.D. Cal. Apr. 17, 2020) (stating that "most courts have rejected" the conclusion that Section 1692f(1) requires the fees at issue to be incidental to the principal obligation). But the statute does not make an exception for optional amounts, and regardless, pay-to-pay fees are still "related" and "subordinate" to the underlying mortgage debt, and thus "incidental" to the principal obligation.

Perhaps courts have read "incidental" narrowly out of a concern that Section 1692f(1) would otherwise reach debt collectors attempting to collect amounts wholly unrelated to the underlying debt and thereby prevent debt collectors from

26

Apx. 156

engaging with consumers in truly separate transactions. But that is not the case, and courts do not need to avoid Section 1692f(1)'s plain meaning to find a limiting principle. Section 1692f(1) is an example of an "unfair or unconscionable *means to collect or attempt to collect a[] debt*." 15 U.S.C. § 1692f (emphasis added). Thus, if a debt collector is not trying to collect a debt covered by the FDCPA, Section 1692f(1)'s prohibition does not apply.

## III.    The Bureau's interpretation of Section 1692f(1) warrants *Skidmore* deference.

For the reasons set forth above, the text and purpose of Section 1692f(1) demonstrate that the provision's "permitted by law" prong is satisfied only where a law expressly or affirmatively authorizes the fee at issue. Similarly, the provision's text shows that a fee does not need to be "incidental to the principal obligation" to be a covered "amount." To the extent that the Court is left with any doubt, however, it should defer to the views of the Bureau, which is charged with implementing and enforcing the FDCPA. *See Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 563, 563 n.7 (9th Cir. 2002) (giving "great weight to any reasonable construction of a regulatory statute adopted by the agency charged with its enforcement," including where that interpretation is conveyed in an amicus brief).

In particular, the Bureau's position is entitled to *Skidmore* deference. *Van Asdale v. Int'l Game Tech.*, 763 F.3d 1089, 1092-93 (9th Cir. 2014) (applying

27

Apx. 157

*Skidmore* deference to the agency's interpretation of statute expressed in amicus brief). Under *Skidmore*, courts should give "weight" to an agency's interpretation commensurate with "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Congress vested authority for administering the FDCPA in the CFPB, which is empowered not only to enforce the Act, but also to promulgate regulations and to issue advisory opinions. 15 U.S.C. §§ 1692k(e), 1692*l*(b)(6), (d); *see also* 12 U.S.C. § 5512(b)(4)(B) (addressing deference due to CFPB interpretations of federal consumer financial law). With respect to Section 1692f(1), the Bureau has previously publicly summarized its staff's findings that the provision's "permitted by law" prong requires express authorization, first in 2014, then in 2015, and again in 2017. *See* CFPB: Fall 2014 Supervisory Highlights, at 7 (noting that Bureau examiners found that a debt collector violated Section 1692f(1) by imposing pay-to-pay fees "where the law was silent regarding the collection of fees"); CFPB: Fall 2015 Supervisory Highlights, at 20-21 (similar); 82 Fed. Reg. at 35938 (explaining that Bureau examiners had advised collectors that it would violate Section 1692f(1) to collect pay-by-phone fees unless "*expressly* authorized by contract or state law" (emphasis added)). This is consistent with the views

28

Apx. 158

expressed in the FTC's staff commentary on the FDCPA, issued more than 30 years ago. *See* 53 Fed. Reg. at 50108 (stating that a "debt collector may attempt to collect a fee or charge in addition to the debt if . . . the contract [creating the debt] is silent but the charge is otherwise expressly permitted by state law"; and, conversely, that "a debt collector may not collect an additional amount if . . . the contract does not provide for collection of the amount and state law is silent.").

Given these previous statements, as well as the Bureau's authority over the FDCPA and the reasoning set forth in this brief, the Bureau's interpretations of Section 1692f(1)'s "permitted by law" and "amount" are entitled to *Skidmore* deference. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399, 401–02 (2008) (affording *Skidmore* deference to the EEOC's interpretative position, which had been "embodied in its compliance manual and internal directives" for "at least five years").

## CONCLUSION

For the foregoing reasons, the Court should hold that an amount is "permitted by law" for purposes of Section 1692f(1) only if a law expressly or affirmatively authorizes debt collectors to collect that amount. Further, the Court should hold that Section 1692f(1) prohibits collection of "any amount" not authorized by the

29

Apx. 159

underlying agreement or permitted by law, regardless of whether that amount is "incidental to the principal obligation."

Respectfully submitted,

October 21, 2021                    s/ Joseph Frisone

Stephen Van Meter
   *Acting General Counsel*
Steven Y. Bressler
   *Acting Deputy General Counsel*
Kristin Bateman
   *Acting Assistant General Counsel*
Joseph Frisone
   *Counsel*
Consumer Financial Protection
Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-9287 (telephone)
(202) 435-7024 (facsimile)
Joseph.Frisone@cfpb.gov

Apx. 160

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P.

Rule 32(f), this brief contains 6863 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has

been prepared in a proportionally spaced typeface using Microsoft Word 2010 and

14-point Times New Roman font.


October 21, 2021                    s/ Joseph Frisone

                                    Joseph Frisone
                                    Counsel
                                    Consumer Financial Protection Bureau
                                    1700 G Street, NW
                                    Washington, D.C. 20552
                                    (202) 435-9287 (telephone)
                                    Joseph.Frisone@cfpb.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2021, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the

Ninth Circuit by using the appellate CM/ECF system. The participants in the case

are registered CM/ECF users and service will be accomplished by the appellate

CM/ECF system.


October 21, 2021                    s/ Joseph Frisone

                              Joseph Frisone
                              Counsel
                              Consumer Financial Protection Bureau
                              1700 G Street, NW
                              Washington, D.C. 20552
                              (202) 435-9287 (telephone)
                              Joseph.Frisone@cfpb.gov