1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

RICARDO SALOM, CATHERINE
PALAZZO as assignee for Ruben Palazzo, and
PETER HACKINEN, *on their own behalf and
on behalf of other similarly situated persons,*

Plaintiffs,

vs.

NATIONSTAR MORTGAGE LLC, *et al.*,

Defendants.

Case No. 2:24-cv-00444-MJP

**PLAINTIFFS' CONTINUED
APPENDIX OF EXHIBITS**

PLAINTIFFS' CONTINUED
APPENDIX OF EXHIBITS- 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**TABLE OF CONTENTS**
(Exhibits are bookmarked in Adobe as well)

| Exhibit No. | Description | Appendix Pages |
|---|---|---|
| 13 | Snapshot of Nationstar Website | 163 |
| 14 | Christinia Henry Declaration | 164 – 169 |
| 15 | Freddie Mac Corp. Designee Dep. (3/9/2012 from *Schneck v. SunTrust*) | 170 – 179 |
| 16 | Fannie Mae Corp. Dep. (1/22/2021 from *White v. NewRez LLC and Fannie Mae*) (PR needs to verify authenticity) | 180 – 206 |
| 17 | Nationstar Corp. Dep. (5/7/2015 from *May v. Nationstar*) | 207 – 220 |
| 18 | Declaration of Catherine Palazzo | 221 – 224 |
| 19 | Declaration of Ricardo Salom | 225 – 229 |
| 20 | Declaration of Peter Hackinen | 230 – 234 |
| 21 | Declaration of Phillip Robinson | 235 – 250 |
| 22 | CFPB, FDCPA Advisory Opinion, Pay-to-Pay Fees | 251 – 260 |
| 23 | 10 Biggest Cash-Out Refinance Lenders Helping Homeowners Tap Record Home Equity (mortgageresearch.com) | 261 – 273 |
| 24 | Nationstar Corp. Dep. (12/5/2023 in *Parker v. NewRez*) | 274 – 277 |

PLAINTIFFS' CONTINUED
APPENDIX OF EXHIBITS- 2

SEATTLE CONSUMER JUSTICE P.S.
10728 16th Avenue SW
Seattle, WA  98146
206.330.0595

Rates        Apply        Help        🔍        Sign In

⊕ *Help Center*  ⌄*Payments & Payoffs*  ⌄Requesting a Payoff Quote

# Requesting a Payoff Quote

## Who Can Request

Only Mr. Cooper customers and authorized third parties may request a payoff quote.

- You can **authorize a third party** to request a payoff quote on your behalf online.

## How to Request Online

**Mr. Cooper Customers:**

You can request a payoff quote through **your online account**.

- Depending on your loan, you may be eligible for an instant payoff quote.
- Otherwise, we will send your payoff quote by the delivery method you select within the timeframe provided.

**Third Parties Acting on Behalf of a Mr. Cooper Customer:**

If the customer has already **authorized you** (either online or by completing our **Third Party Authorization Form**), you can **request a third-party quote**.

## How to Request by Phone or Mail

- Phone: Call us at 833-685-2567.
- Mail: Send us a short letter stating that you'd like a payoff quote.
  Be sure to include:
  - your loan number;
  - the address of the property; and
  - all of your most up-to-date contact information.
        Send it to:
        Mr. Cooper
        Attn: Payoff Department
        800 State Highway 121 Bypass
        Lewisville, TX 75067

## Fees

A preparation fee of up to $25 may apply to each payoff quote statement we generate.

- Additional expedited delivery fees of up to $25 may apply to each payoff quote sent via web.

Feel free to **contact us** for clarification of applicable fees before requesting your quote.

The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON - SEATTLE

| | |
|---|---|
| RICARDO SALOM, CATHERINE PALAZZO as assignee for Ruben Palazzo, and PETER HACKINEN, *on their own behalf and on behalf of other similarly situated persons,* | Case No. 2:24-cv-00444-BJR |
| Plaintiffs, | **DECLARATION OF CHRISTINA L. HENRY IN SUPPORT OF CLASS CERTIFICATION** |
| vs. | |
| NATIONSTAR MORTGAGE LLC | |
| And | |
| FEDERAL HOME LOAN MORTGAGE CORPORATION, *on its own behalf and on behalf of similarly situated persons* | |
| Defendants. | |

CHRISTINA HENRY, being first duly sworn on oath, declares and states as follows:

DECLARATION OF CHRISTINA L. HENRY IN
SUPPORT OF CLASS CERTIFICATION - 1

SEATTLE CONSUMER JUSTICE P.S.
10728 16th Avenue SW
Seattle, WA  98146
206.330.0595

1

2  1.  I am one of the attorneys for Ricardo Salom, Catherine Palazzo as assignee for

3  Ruben Palazzo, and Peter Hackinen, *on their own behalf and on behalf of other similarly*

4  *situated persons* ("Plaintiffs"), and I have personal knowledge of the facts set forth herein.

5  2.  I submit this Declaration in support of the Plaintiffs' Motion to Certify a Class

6  against Nationstar pursuant to FED. R. CIV. P. 23.

7  3.  I am an attorney first licensed to practice law in 2001. I am currently admitted to

8  practice before all courts in the State of Washington.

9  4.  I am currently in private practice in Seattle, WA with Seattle Consumer Justice,

10  P.S., fka Henry & DeGraaff, P.S.

11  5.  I earned a Bachelor of Arts degree in Asian Studies at Dartmouth College in

12  Hanover, New Hampshire, and my juris doctorate from Boston College Law School in the

13  year 2000.

14  6.  In the two years after graduation, I clerked for the Honorable Whitney Rimel for

15  the U.S. Bankruptcy Court for the Eastern District of California, passed the Washington State

16  Bar Examination in 2001, and began practicing as an attorney in Washington State in the fall

17  of 2002 after finishing the clerkship.

18  7.  My practice includes representing consumer clients in litigation matters in state

19  and federal courts and bankruptcy debtors in Washington and elsewhere.

20  8.  My practice focuses on representing consumers in both bankruptcy and

21  consumer protection contexts. Though sometimes these areas of law overlap, for purposes of

22  this Declaration, the consumer protection area of my practice involves claims related to

23  mortgage loan servicing, Washington Consumer Protection Act and Fair Debt Collection

24

25

26

DECLARATION OF CHRISTINA L. HENRY IN
SUPPORT OF CLASS CERTIFICATION - 2

SEATTLE CONSUMER JUSTICE P.S.
10728 16th Avenue SW
Seattle, WA 98146
206.330.0595

Practices Act matters, and, on occasion, discrimination cases brought under the Americans with Disabilities Act.

9.     I have been the lead or co-counsel in approximately 48 federal district court cases, 10 court of appeals cases of significance, 1 bankruptcy appellate panel case, over 600 consumer bankruptcy cases, and approximately 20 state court cases. Some cases of note that I successfully litigated to favorable conclusions include:

*Hoover v. Quality Loan Svcs Corp. of WA,* 646 B.R. 488,(Bankr W.D. Wash. 2021), *aff'd,* 645 B.R. 656 (W.D. Wash. 2022), *aff'd in part, vacated in part, remanded,* No. 22-35814, 2023 WL 5814810 (9th Cir. Sept. 8, 2023), and *aff'd in part, appeal dismissed in part,* No. C21-5154RSL, 2023 WL 7920436 (W.D. Wash. Nov. 16, 2023). A foreclosure of a debtor's residence after the filing of her bankruptcy led to a ruling by the bankruptcy court that a willful violation of the stay occurred, and that the property was part of the bankruptcy estate. The ruling on the nature of the bankruptcy estate's interest in the property was affirmed on appeal. The ruling regarding the willful stay violation was not addressed as unripe for appeal and not a final                                                                          order.

*Flores v. Wells Fargo Bank, N.A.,* 623 F. Supp. 3d 1142 (W.D. Wash. 2022). Litigation regarding the proper record and reporting of payments to a mortgage loan while a debtor was in a Chapter 13 bankruptcy.

*Grande v. U.S. Bank, N.A.,* 2020 WL 832307, No. C19-333-MJP (W.D. Wash. February 20, 2020). An order granting a motion to compel against a mortgage servicer and beneficiary in a case where over the existence of a contract for a loan modification, for unfair and deceptive misrepresentations and for credit discrimination.

*National Collegiate Student Loan Trust 2007-2 v. Osure Brown and Tommy Brown*, Case No. 19-2-09402-8-KNT, King County Superior Court for the State of Washington, December 27, 2019. A case regarding student loans in state court that was dismissed on summary judgment with prejudice for lack of standing.

*In re Gray*, 567 B.R. 841, 843 (Bankr. W.D. Wash. 2017), litigated a case over violations of the automatic stay. Their car lender sued them in state court for failing to keep up payments on a stipulated repayment plan to avoid garnishment, obtained a bench warrant and arrested the borrowers, who were in bankruptcy.

DECLARATION OF CHRISTINA L. HENRY IN
SUPPORT OF CLASS CERTIFICATION - 3

SEATTLE CONSUMER JUSTICE P.S.
10728 16th Avenue SW
Seattle, WA  98146
206.330.0595

*Goudelock v. Sixty-01 Association of Apartment Owners,* 895 F.3d 633 (9th Cir. 2018). A case to the Ninth Circuit regarding the dischargeability of homeowner's dues in bankruptcy. Writ of Certiorari by the U.S. Supreme Court Denied.

*In re Snowden*, 769 F.3d 651 (9th Cir. 2014). Ninth Circuit affirmed $12,000 emotional distress and $12,000 punitive damages award for a payday loan of $550, presented in violation of the bankruptcy automatic stay.

10.    After graduating from law school, I served a clerkship from 2000 to 2002 and I have been in active private practice since June 21, 2001.

11.    My co-counsel and I have and will devote the resources necessary to pursue the claims in this action.

12.    My co-counsel in this case is Phillip Robinson, an experienced trial lawyer practicing in Maryland since 2000 and who has been actively involved in the litigation of claims relating to representing consumers in financial transactions, concentrating in debt collection and mortgage servicing practices.

13.    I have also prosecuted court trials as well as numerous appeals to the Ninth Circuit Court of Appeals, a few to the Washington State Court of Appeals, and one to the Washington State Supreme Court.

14.    I have not previously been appointed as class counsel but believe my education and litigation experience qualifies me to be appointed as co-class counsel in this action.

15.    Neither I, nor my co-counsel, have any interests that would adversely affect any of us from acting as class counsel in this action.

DECLARATION OF CHRISTINA L. HENRY IN
SUPPORT OF CLASS CERTIFICATION - 4

SEATTLE CONSUMER JUSTICE P.S.
10728 16th Avenue SW
Seattle, WA  98146
206.330.0595

16.     Attached as Exhibit 13 to Plaintiffs' Continued Appendix of Exhibits is a publicly available document .pdf printing from Nationstar's own website at: **Requesting a Payoff Quote (mrcooper.com),**

17.     Attached as Exhibit 17 to Plaintiffs' Continued Appendix of Exhibits is a portion of a transcript of Nationstar's Corporate Designee taken in the matter of May v. Nationstar in the United States District Court for the Eastern District of Missouri dated May 7, 2015.

18,     Based on my more than twenty years experience in bankruptcy matters, it is possible to identify from a simple search of PACER individuals who have filed for Chapter 7 or 13 bankruptcy. The PACER system tracks filing and discharge dates that can be applied to Nationstar's records and exclude persons who are not eligible to join the putative Plaintiffs' Class and subclasses.

1       I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE

2 AND CORRECT UNDER THE LAWS OF THE UNITED STATES OF AMERICA AN THE

3 STATE OF WASHINGTON.

4       Executed on July 17, 2022 at Bothell, Washington.

5

6                    */s/ Christina Henry*

7                    Christina L Henry, WSBA# 31273

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF CHRISTINA L. HENRY IN
SUPPORT OF CLASS CERTIFICATION - 6

SEATTLE CONSUMER JUSTICE P.S.
10728 16th Avenue SW
Seattle, WA  98146
206.330.0595

Brandveen, Donna                                           March 9, 2012

                                                              Page 1

                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MARYLAND

                   (Northern Division Baltimore)


     ---------------------------------------+
     BRIAN SCHNECK, RONA SCHNECK,            :
                    Plaintiffs,              :
                                             :
                                             :
     vs.                                     :CASE NUMBER
                                             :11-CV-01878-CCB
     SUNTRUST MORTGAGE, INC.,                :
                    Defendant.               :
     ---------------------------------------+

                               March 9, 2012


             PURSUANT TO NOTICE, the following deposition

     of DONNA BRANDVEEN, was taken before me, Janie Arriaga,

     Notary Public, in and for the Commonwealth of Virginia,

     at 8200 Jones Branch Drive, McLean, Virginia 22102,

     commencing at approximately 2:10 p.m., when were present

     on behalf of the respective parties:


**Elite Reporting Company, Inc.**                    **800-734-3337**
67 Saint Andrews Road              Severna Park,      Maryland 21146

Brandveen, Donna                                    **March 9, 2012**

                                                    2 (Pages 2 to 5)

| Page 2 |
| --- |

```
 1              * * * *
 2  Appearances,
 3        PHILLIP ROBINSON, ESQUIRE
 4        Civil Justice Inc.
 5        520 West Fayette Street, Suite 410
 6        Baltimore, Maryland 21202
 7            On Behalf of the Plaintiff
 8
 9        TODD M. REINECKER, ESQUIRE
10        Miles and Stockbridge P.C.
11        10 Light Street
12        Baltimore, Maryland 21202-1487
13            On Behalf of the Defendant
14
15        TIFFANY JOSEPH, ESQUIRE
16        Federal Home Loan Mortgage Corporation
17        8200 Jones Branch Drive
18        McLean, Virginia 22102
19            On Behalf of the Witness
20
21
```

| Page 3 |
| --- |

```
 1              I N D E X
 2  WITNESS                    PAGE
 3  DONNA BRANDVEEN
 4  Examination by Mr. Robinson       4
 5  Examination by Mr. Reinecker     111
 6
 7
 8              E X H I B I T S
 9  Number 18   Subpoena              9
10  Number 19   Corporate documents      18
11  Number 20   December 6 letter from SunTrust  102
12  Number 21   October 1 letter from SunTrust  103
13
14              (NOT ATTACHED)
15
16
17
18
19
20
21
```

| Page 4 |
| --- |

```
 1  Whereupon,
 2            DONNA BRANDVEEN,
 3  was called as a witness by counsel for the Plaintiffs,
 4  Brian and Rona Schneck, and after having first been duly
 5  sworn by the Notary Reporter, was examined and
 6  testified, as follows:
 7            EXAMINATION
 8  BY MR. ROBINSON:
 9      Q   Can you please state your name and business
10  address for the record, please?
11      A   Sure.  My name is Donna Brandveen, B-r-a-n-d,
12  "v" like Vickie, e-e-n.
13      Q   And your business address?
14      A   8000 Jones Branch Drive, McLean, Virginia.
15      Q   Ms. Brandveen, my name is Phil Robinson.  I am
16  counsel for Rona and Brian Schneck in the matter of
17  Schneck vs. SunTrust Mortgage, Inc. pending in the
18  United States District Court for Maryland.
19           We are here today for a corporate designee
20  deposition of the witness -- well, it's Freddie Mac.
21           Are you here today to testify on behalf of
```

| Page 5 |
| --- |

```
 1  Freddie Mac, which is also known as the Federal Home
 2  Loan Mortgage Corporation?
 3      A   Yes.
 4      Q   And instead of saying Federal Home Loan
 5  Mortgage Corporation today, I'm just going to say,
 6  Freddie Mac.  And you understand that to mean the same;
 7  is that right?
 8      A   Yes.
 9      Q   Have you had your deposition taken before?
10      A   Yes.
11      Q   How many times --
12      A   Five.
13      Q   -- to the best of your ability?
14      A   Five.
15      Q   Five times.  Are you employed by Freddie Mac?
16      A   Yes, I am.
17      Q   And were those depositions on behalf of
18  Freddie Mac?
19      A   Yes, they were.
20      Q   What is your job title here at Freddie Mac?
21      A   Director of loss mitigation.
```

**Brandveen, Donna**                                    **March 9, 2012**

7 (Pages 22 to 25)

| Page 22 |
|---|
| 1    Q  By "these two documents," do you mean the |
| 2   ones, just for the record, tabbed at tab 10 and 11? |
| 3    A  Yes. |
| 4    Q  Which are FRE23 and FRE25? |
| 5    A  Yes. |
| 6    Q  But you believe you reviewed all of the other |
| 7   records that are here? |
| 8    A  Yes. |
| 9    Q  In all of the other records that you reviewed, |
| 10  did you see any responses from Freddie Mac to the |
| 11  inquiries made by Mr. or Mrs. Schneck on October 13th |
| 12  2010 or October 29, 2010? |
| 13   A  No. |
| 14   Q  If you wanted to find out if there was a |
| 15  written response by Freddie Mac to Mr. and Mrs. Schneck |
| 16  to either of those inquiries, where would you go to find |
| 17  out if there was a written response? |
| 18   A  I would probably go to Pamela Barrow, the |
| 19  director of that group. |
| 20   Q  Earlier you testified generically about three |
| 21  different databases that Freddie Mac has.  Do you recall |

| Page 24 |
|---|
| 1    Q  Okay.  By "loan," you mean mortgage loan; is |
| 2   that right? |
| 3    A  Correct. |
| 4    Q  Freddie Mac doesn't buy any other kind of |
| 5   loan; does it? |
| 6    A  No. |
| 7    Q  Just residential loans; right? |
| 8    A  Residential and multi-family. |
| 9    Q  Multi-family loans, too.  But in this case, |
| 10  it's a residential mortgage loan? |
| 11   A  That's correct. |
| 12   Q  And do you know how Freddie Mac acquired the |
| 13  loan? |
| 14   A  Freddie Mac purchased the loan interest from a |
| 15  mortgage company. |
| 16   Q  Okay.  Is it your understanding that that |
| 17  mortgage company is SunTrust Mortgage, Inc.? |
| 18   A  Yes. |
| 19   Q  What is your understanding of the relationship |
| 20  of Mr. and Mrs. Schneck's loan now owned by Freddie Mac |
| 21  and SunTrust Mortgage, Inc.? |

| Page 23 |
|---|
| 1   that? |
| 2    A  Yes. |
| 3    Q  Would Freddie Mac's responses, if they |
| 4   existed, be in any of those three databases? |
| 5    A  No. |
| 6    Q  Is there any other database that you didn't |
| 7   testify about that there might be a record of any |
| 8   response from Freddie Mac to Mr. or Mrs. Schneck? |
| 9    A  No. |
| 10   Q  Is there any other database that you know of |
| 11  managed by the customer service team that might track |
| 12  that information? |
| 13   A  I don't know. |
| 14   Q  In your preparation for the deposition today, |
| 15  did you review any other documents or communications |
| 16  whatsoever between Mr. and Mrs. Schneck and Freddie Mac? |
| 17   A  I did not see any communications. |
| 18   Q  What is your understanding of the relationship |
| 19  between Mr. and Mrs. Schneck with Freddie Mac? |
| 20   A  They are a borrower on a loan where Freddie |
| 21  Mac owns. |

| Page 25 |
|---|
| 1    A  Can you repeat that? |
| 2    Q  What is your understanding of the relationship |
| 3   of – I'm going to say SunTrust today, I mean, SunTrust |
| 4   Mortgage, Inc., not to be confusing, just to narrow it |
| 5   down. |
| 6        What is your understanding of the relationship |
| 7   between SunTrust and Mr. and Mrs. Schneck? |
| 8    A  SunTrust is the mortgage company that owns the |
| 9   servicing rights. |
| 10   Q  Servicing rights to Mr. and Mrs. Schneck's |
| 11  loan? |
| 12   A  Yes. |
| 13   Q  And what does that mean or what is your |
| 14  understanding of what that means, that they own the |
| 15  servicing rights? |
| 16   A  That means the mortgage company manages their |
| 17  residential mortgage on a monthly basis.  They collect |
| 18  their monthly mortgage payments and they submit their |
| 19  required portions to the investor, which would be |
| 20  Freddie Mac. |
| 21   Q  Okay.  And I should have said this at the |

Brandveen, Donna                                    March 9, 2012

9 (Pages 30 to 33)

Page 30

1   here; is that correct?
2       A   That is correct.
3       Q   And those guidelines change over time; is that
4   right?
5       A   Yes.
6       Q   Especially in the last five years,
7   unfortunately for all of us?
8       A   Yes.
9       Q   Does Freddie Mac also expect that SunTrust
10  will comply with all federal and state laws related to
11  mortgage servicing?
12      A   That is correct.
13      Q   What is Freddie Mac's policies and procedures
14  when it receives a complaint that a servicer has not
15  complied with federal and state laws?
16      MS. JOSEPH:  I'm going to object.  I think
17  this is getting outside the scope of the subpoena as we
18  discussed and agreed.
19      MR. REINECKER:  I'm going to object as well
20  for the same reasons.  I'm also going to object because
21  I think the question, at least in my view, assumes facts

Page 31

1   not in evidence.
2       MR. ROBINSON:  I'll back up and narrow it to
3   the Schnecks.
4   BY MR. ROBINSON:
5       Q   What was your understanding as to Mr. and
6   Mrs. Schneck's inquiry at tab 10 and 11, FRE23 and
7   FRE25?
8       A   I understood they inquired or they called
9   Freddie Mac to state that they had been denied for HAMP
10  and they thought that they should have been included in
11  the program and wanted to file a complaint.
12      Q   And nothing else; right?
13      A   They're saying that -- the consumer, which is
14  the homeowner, stated that SunTrust told her Freddie Mac
15  denied her, not SunTrust.
16      MR. REINECKER:  For the record, which document
17  are we looking at?  Is it tab --
18      MS. JOSEPH:  Tab 10.
19      THE WITNESS:  Tab 10.
20  BY MR. ROBINSON:
21      Q   FRE23?

Page 32

1       A   Yes.
2       Q   Does Freddie Mac approve or deny borrowers for
3   loss mitigation?
4       A   Yes.
5       Q   Does Freddie Mac delegate responsibility to
6   mortgage servicers, like SunTrust, to approve or deny
7   borrowers for loss mitigation?
8       A   Yes.
9       Q   In this instance, were there any other records
10  that you reviewed in preparation for your deposition
11  today that Freddie Mac had denied Mr. and Mrs. Schneck
12  for loss mitigation?
13      A   I did not see that.
14      Q   If you wanted to know if Freddie Mac had
15  actually denied Mr. and Mrs. Schneck for loss
16  mitigation, where would you go to find that information?
17      A   The loss mitigation work station.
18      Q   Those documents, I believe, were produced in
19  Exhibit 19; is that correct?
20      A   Correct.
21      Q   Do you know what tab those are at?

Page 33

1       A   That would be tab 4.
2       Q   Is there any information on what is at tab 4,
3   FRE7, to indicate that Freddie Mac had actually denied
4   Mr. and Mrs. Schneck for loss mitigation?
5       A   There's nothing here that indicated that we
6   reviewed or denied it.  And I'm focusing in on the
7   section on the bottom, which is workout history.
8       Q   And that information is all blank?
9       A   That's correct.
10      Q   That's where you would see if there had been a
11  Freddie Mac denial?
12      A   That's correct.
13      Q   I don't want to put words in your mouth, but I
14  understand the process a little bit.  So if it got
15  escalated, someone wanted to complain that they
16  shouldn't have been denied by their servicer and they
17  appealed to Freddie Mac directly, and Freddie Mac
18  denied, is that where it would show up?  Is that how it
19  happens in most instances?
20      A   Yes.
21      Q   Because primarily Freddie Mac expects SunTrust

Elite Reporting Company, Inc.                    800-734-3337
67 Saint Andrews Road        Severna Park,        Maryland 21146

**Brandveen, Donna**                                              **March 9, 2012**

12 (Pages 42 to 45)

**Page 42**

1  just don't charge a fee.
2      Q   So do you see any payments here where Mr. and
3  Mrs. Schneck were charged a fee because of a payment
4  made after the grace period?
5      A   Our systems don't capture that data.
6      Q   And then turn back to FRE20, cut off on the
7  right-hand margin in the middle of the page for two
8  entries, for October 15th, 2011 and September 15th,
9  2011, there's some reference. I'm not really sure what
10  it is.
11      A   Yes.
12      Q   Do you know what that is?
13      A   Yes.
14      Q   What are those?
15      A   They're exception codes that were reported to
16  us by SunTrust. There was an inactivation of the loan
17  because it appears to be delinquent, and then
18  reinstate -- it appears to be delinquent as of the --
19  starting with the May 15th accounting cycle. And it was
20  reinstated. They reported the reinstatement in
21  February, which meant they brought the account more

**Page 43**

1  current, but it still looks like they were behind.
2      Q   You said February. Did you mean September?
3      A   I'm sorry, September. Yes, 9, 9/2011, the
4  account was -- an inactivation code was reported.
5      Q   Does Freddie Mac -- on Mr. and Mrs. Schneck's
6  loan only -- a narrow question, I'm not asking about
7  other borrowers. Does Freddie Mac expect SunTrust to
8  post the account when it receives the payment?
9          MR. REINECKER: Objection.
10      A   They're expected to post the payment to their
11  account.
12  BY MR. ROBINSON:
13      Q   Are they expected to hold the payment for 15
14  days?
15          MR. REINECKER: Objection.
16      A   I don't understand the question.
17  BY MR. ROBINSON:
18      Q   Does Freddie Mac expect SunTrust to hold the
19  payment for 15 days before posting it to the account?
20          MR. REINECKER: Objection to the foundation of
21  the question.

**Page 44**

1      A   I'm not understanding what you're meaning.
2  BY MR. ROBINSON:
3      Q   SunTrust receives a payment on behalf of
4  Mr. and Mrs. Schneck. Does Freddie Mac expect SunTrust
5  to post it to the account when it receives it?
6          MS. JOSEPH: Objection; asked and answered.
7      A   When it's -- within a reasonable amount of
8  time of receiving it, so yes.
9  BY MR. ROBINSON:
10      Q   What is a reasonable amount of time that
11  Freddie Mac expects SunTrust to post it to the account
12  from receipt?
13      A   Reasonable. Within 24 hours of receipt.
14      Q   Would it be unreasonable to post 15 days late
15  after receipt?
16          MR. REINECKER: Objection; foundation.
17      A   I would say yes.
18  BY MR. ROBINSON:
19      Q   You identified in your testimony a default
20  which occurred, I believe your testimony was, as of May
21  15th. And it appears to you -- I believe your testimony

**Page 45**

1  was that the loan was then reinstated sometime in the
2  fall; maybe October?
3      A   That's correct.
4      Q   Are there any other times in this loan history
5  that you see Mr. and Mrs. Schneck were in default on
6  their loan?
7      A   It appears one other time.
8      Q   Where are you looking?
9      A   I'm on page 21. I'm looking at November 2010.
10  It looks like there's a payment that was missing there,
11  so they --
12      Q   Any others?
13      A   No.
14      Q   Okay. But it would be your understanding,
15  from looking at this report, that they were in default
16  in November of 2010?
17      A   It would be delinquent. I wouldn't say
18  default.
19      Q   What is your understanding of the difference
20  between delinquent and default on Mr. and Mrs. Schneck's
21  loan?

Brandveen, Donna                                    **March 9, 2012**

16 (Pages 58 to 61)

---

**Page 58**

1  specific guidelines on that issue?

2      A  I can't recall the number of days, if any,

3  other than a timely response.

4      Q  Okay. Is it Freddie Mac's position that a

5  timely response would come within a month before October

6  2012?

7          MR. REINECKER: Objection; form and

8  foundation. And I believe it mischaracterizes the prior

9  testimony.

10     A  Can you restate your question?

11 BY MR. ROBINSON:

12     Q  Well, I think your testimony is, if I

13 understand it correctly, that Freddie Mac expected,

14 before this new regulation that was effective October

15 2012, the expectation that Freddie Mac had for its

16 servicers, including specifically in this instance

17 SunTrust with Mr. and Mrs. Schneck, that they would

18 receive a timely response?

19     A  That's correct.

20     Q  So I'm trying to get at, I suppose, at what

21 point in time does it become untimely?

---

**Page 59**

1      A  We had not stated those numbers.

2      Q  Okay. Did Freddie Mac expect that SunTrust,

3  before October of 2012, would, in fact, respond to

4  Mr. and Mrs. Schneck's request for loss mitigation?

5      A  We would expect that they would respond,

6  that's correct.

7      Q  And if there was a denial, that Freddie Mac

8  have -- I'm going to ask the same time frame, so let me

9  ask it generically so that we're on the same page and

10 then I'll narrow it for form purposes because it may

11 have changed over time.

12     A  Okay.

13     Q  Did Freddie Mac have an expectation when a

14 borrower was denied loss mitigation how the servicer

15 would inform the borrower and what information the

16 servicer would give to the borrower? That's the generic

17 question. And then I'll relate it to Mr. and Mrs.

18 Schneck's loan in July of 2010, did Freddie Mac have

19 that expectation?

20         MS. JOSEPH: I'm going to object to form. If

21 you understand the question, you can answer.

---

**Page 60**

1          MR. REINECKER: I'm going to object for the

2  same reason. I think the question is actually multiple

3  questions.

4      A  You said July of 2010?

5  BY MR. ROBINSON:

6      Q  Correct.

7      A  I can't say for sure.

8      Q  Let's back up to sort of help out and make

9  sure the record is clear.

10         Let's ask for Mr. and Mrs. Schneck's loan

11 today, so we'll start with today as the benchmark.

12     A  Sure.

13     Q  If SunTrust denied Mr. and Mrs. Schneck a loan

14 modification today, would Freddie Mac expect SunTrust to

15 provide Mr. and Mrs. Schneck a reason for the denial?

16     A  Yes.

17     Q  Would that be a written or an oral or both?

18     A  The requirement is written.

19     Q  Does the written requirement have to give --

20 what kind of information is required in a written

21 denial?

---

**Page 61**

1      A  They would need to state why they were denied

2  for the loan modification.

3      Q  Okay. And this is all in the context of

4  hypothetically today. I want to back up, same question,

5  and we'll go backwards.

6          How about in March of 2011? Same answer?

7      A  Same answer.

8      Q  January of 2011?

9      A  Same answer.

10     Q  October of 2010?

11     A  I'm not sure.

12     Q  July of 2010?

13     A  I'm not sure.

14     Q  Where would you go to find out the answer

15 related specifically to October and July 2010?

16     A  I would go to the guide chapters that we had

17 in place at that time.

18     Q  Okay. Is it your understanding that if a

19 borrower -- and I'll do this an easier way so it's

20 easier to follow. Hypothetically, today, if Mr. and

21 Mrs. Schneck were current on the mortgage loan -- tab 9,

---

**Brandveen, Donna**                                        **March 9, 2012**

17 (Pages 62 to 65)

| Page 62 |
|---|

1  FRE20, would you agree with me this seems to indicate
2  that Mr. and Mrs. Schneck are presently current on their
3  mortgage loan?
4      MR. REINECKER: Objection.
5      A  It appears to be current as reported to us by
6  SunTrust.
7  BY MR. ROBINSON:
8      Q  As of today, would Mr. and Mrs. Schneck be
9  eligible for loss mitigation on their mortgage loan?
10     A  I can't tell just based on –
11     Q  Just in terms of the qualification of current.
12 Is there any disqualification today to be ineligible for
13 loss mitigation because they happen to be current on
14 their loan?
15     MS. JOSEPH: Objection to the form.
16     MR. REINECKER: I'm objecting to form and
17 foundation.
18     MS. JOSEPH: If you understand the question,
19 you can answer.
20     A  Yes. They would not be denied loss mitigation
21 strictly based on their loan status.

| Page 63 |
|---|

1  BY MR. ROBINSON:
2      Q  Being current on the loan?
3      A  Being current on the loan.
4      Q  So the converse is true, you don't have to be
5  in default to be eligible for loss mitigation; is that
6  right?
7      MR. REINECKER: Objection to the form and the
8  foundation to the question.
9      A  You do not have to be in default or
10 delinquent.
11 BY MR. ROBINSON:
12     Q  Let me go backwards again, so same time frame
13 in case things changed, to the best you know.
14     In March of 2011, did you have to be
15 delinquent to be eligible for loss mitigation?
16     A  No.
17     Q  Let me ask that again. Did Mr. and
18 Mrs. Schneck have to be in default in March of 2011 to
19 be eligible for loss mitigation?
20     MR. REINECKER: I'm going to object to the
21 form and the foundation. And I think, actually, we're

| Page 64 |
|---|

1  going beyond the pale, because as the witness testified
2  earlier, there are circumstances beyond the default and
3  not in default.
4      MR. ROBINSON: That is a speaking objection,
5  Counsel. And if you'd like to make a speaking
6  objection, we can go off the record.
7      MR. REINECKER: Why don't we do this. Let's
8  stay on the record. With Ms. Joseph's permission, I
9  would ask that the witness step out briefly just so I
10 can articulate my concerns outside the presence of the
11 witness.
12     MS. JOSEPH: If that's what you guys want.
13     MR. ROBINSON: Well, we're not going to stay
14 on the record. If you want to make a speaking
15 objection, we can talk off the record and then you can
16 make whatever statement you want. I'd like to go
17 forward with my questions.
18     MR. REINECKER: I understand that.
19     MR. ROBINSON: You can make your objection.
20     MR. REINECKER: I'd like to make it on the
21 record, but I don't want to do it in front of the

| Page 65 |
|---|

1  witness. As you pointed out, I don't want to make a
2  speaking objection.
3      MR. ROBINSON: Sorry. We are going to do
4  lawyerly stuff, and I'd ask you to leave the room.
5  Don't step too far away.
6      (Thereupon, the witness exits the
7      deposition room.)
8      MR. REINECKER: The objection that I have is
9  as I articulated to the form and foundation. I think
10 the line of questions are actually unfair because they
11 actually suggest circumstances that not only conflict
12 with the witness' testimony, but they create a
13 hypothetical situation that is both completely divorced
14 from Freddie Mac's guidelines for evaluating loss
15 mitigation. It is –
16     MR. ROBINSON: We haven't even gotten to that
17 testimony yet.
18     MR. REINECKER: I know.
19     MR. ROBINSON: So you're presupposing that it
20 is divorced from the guidelines, and that's improper.
21 And it's improper for you to say all that in front of

Brandveen, Donna                                    **March 9, 2012**

                                        21 (Pages 78 to 81)

| Page 78 |
| --- |

1  been SunTrust.
2      Q   Okay. Anything else that you recall?
3      A   No.
4      Q   In October of 2010, if a borrower was denied
5  for a HAMP modification, was it Freddie Mac's policies
6  that they be offered some alternative loss mitigation if
7  eligible?
8      A   If eligible.
9      Q   Was it Freddie Mac's policies and procedures
10  that they be considered for any other loss mitigation if
11  eligible?
12      A   Yes.
13      Q   Ms. and Mrs. Schneck, if they weren't eligible
14  for HAMP in October of 2010, do you know what other
15  loss -- depending on the particular circumstances, do
16  you know what other loss mitigation options would have
17  been available to them on their loan?
18      MS. JOSEPH:  Objection; calls for speculation.
19  You can answer, if you can.
20      MR. REINECKER:  Same objection.
21      A   So generically speaking, they would go

| Page 79 |
| --- |

1  through -- if they were denied for HAMP, they would be
2  evaluated for either a classic modification or a short
3  sale.
4  BY MR. ROBINSON:
5      Q   What is your understanding of a classic
6  modification?
7      A   It was what we called a Freddie Mac in-house
8  modification.
9      Q   Can you describe for me what that modification
10  might have provided Mr. and Mrs. Schneck if they
11  qualified for it?
12      A   A modification generically would modify either
13  term, rate, and/or balance, unpaid principal balance.
14      Q   Like a principal reduction?
15      A   If wouldn't be a principal reduction. It
16  would be adding --
17      Q   A loan --
18      A   -- increasing the principal balance.
19      Q   Take the past due amounts and add it to the
20  balance?
21      A   Exactly.

| Page 80 |
| --- |

1      Q   Did Freddie Mac have an expectation that
2  SunTrust would consider a borrower not eligible, like
3  Mr. and Mrs. Schneck, for HAMP, as SunTrust believed,
4  for other options?
5      MR. REINECKER:  If eligible?
6      MR. ROBINSON:  If eligible.
7      A   Yes.
8  BY MR. ROBINSON:
9      Q   For these other options, would Freddie Mac
10  have an expectation that if they were not available to
11  Mr. and Mrs. Schneck, that SunTrust would provide
12  Mr. and Mrs. Schneck with an explanation of why they
13  were not?
14      MR. REINECKER:  Objection.
15      A   Yes.
16  BY MR. ROBINSON:
17      Q   And would that explanation be in writing or
18  orally or both?
19      MR. REINECKER:  Objection.
20      A   I'm not sure specifically about the
21  guidelines.

| Page 81 |
| --- |

1  BY MR. ROBINSON:
2      Q   Not sure at the time --
3      A   At the time, yes.
4      Q   Okay. I'm sorry to be repetitive, but just to
5  make it clear because the guidelines have changed.
6      A   Yes.
7      Q   In June or July of 2010?
8      A   I don't think that we were specific in our
9  guidelines about how the communication would be handled.
10      Q   Just that the communication occurred?
11      A   Yes.
12      Q   Same question for October of 2010?
13      A   Yes.
14      MR. REINECKER:  Yes, what?
15  BY MR. ROBINSON:
16      Q   You have to be clear.
17      A   Yes, the expectation is the same in October of
18  2010.
19      Q   That a response be made, but --
20      A   Yes. We were specific in that it had to be
21  oral or it had to be written.

**Elite Reporting Company, Inc.**                   **800-734-3337**
67 Saint Andrews Road              Severna Park,    **Maryland 21146**

**Brandveen, Donna**                                      **March 9, 2012**

30 (Pages 114 to 117)

Page 114

1  mortgage to get a response to a HAMP application?
2      A  That is correct.
3      Q  Part of the reason for that greater sense of
4  urgency is because if there is a default, that triggers
5  certain other potential issues, such as foreclosure?
6      A  That is correct.
7      Q  Aside from a HAMP application, there are other
8  loss mitigation scenarios that may be available to a
9  buyer; correct?
10     A  That's correct.
11     Q  You mentioned one of those is a classic
12  modification; correct?
13     A  That's correct.
14     Q  What exactly is a classic modification?
15     A  Classic modification is a modification that
16  we've had in place for almost forever, since the
17  mid-'90s that kind of predated HAMP.  That, again,
18  allowed Freddie Mac to help bring a borrower current by
19  the waterfall terms that Freddie Mac policy defined
20  instead of what was defined by U.S. Treasury, which is
21  the HAMP.

Page 116

1  curtailment of income, death of one of the borrowers.
2          THE WITNESS:  Let me get this.  I had another
3  appointment at 4:30.
4          (Brief interruption.)
5  BY MR. ROBINSON:
6      Q  Are the hardships for the classic set forth in
7  a written guideline?
8      A  Yes, they were set forth in our seller
9  servicer guide.
10     Q  And, in fact, all of the criteria for
11  qualifying for a classic loan modification are set forth
12  in the seller servicer guide?  If you don't know,
13  that's --
14     A  No, it wasn't all in the guide.  It was -- we
15  provided some basic eligibility and submission
16  requirements in the guide because servicers in total did
17  not have complete decision-making for classic
18  modifications.  It was not fully delegated like the HAMP
19  program.
20     Q  In October 2010, the classic modification was
21  not fully delegated like the HAMP?

Page 115

1      Q  Now, is the classic loan modification, is that
2  presently referred to as the standard modification?
3      A  Well, classic was in essence retired, and then
4  a loan new modification option is now available, and we
5  call that standard.
6      Q  But in the time period, at least October
7  2010, it was a classic loan modification?
8      A  That's true.
9      Q  What are the requirements for a borrower to
10  qualify for a classic loan modification?
11         THE WITNESS:  I have another 4:30 appointment.
12     A  They would have had to have had a hardship
13  that was within not -- it was outside of their control,
14  and some other kind of characteristics as well.
15  BY MR. REINECKER:
16     Q  Okay.  When you say "hardship," are there a
17  specific set of hardships set forth for the classic
18  modification or were set forth?
19     A  Yes.
20     Q  What are those hardships?
21     A  Unemployment, medical, under employment,

Page 117

1      A  That's correct.
2      Q  I think given sort of the open issues -- let
3  me ask one more question.
4          To the extent your testimony today conflicts
5  with any of the guidances or guidelines provided by
6  counsel in response to the subpoena, you would agree
7  that the priority would be given to the written
8  guidelines?
9          MR. ROBINSON:  Objection.
10     A  I would, yes.
11         MR. REINECKER:  Ms. Brandveen, I thank you.  I
12  think that I may be okay for now.
13         But Tiffany, you and I will talk.  I know you
14  have other commitments.  You've got other commitments
15  I'm happy to accommodate those even though I only got
16  about four or five minutes.  But to the extent issues
17  come up, I would ask that we have a little latitude to
18  reconvene.  I understand this is not what you do on a
19  daily basis.  You have other work to do.  But I've got
20  to leave it open.
21         MS. JOSEPH:  We will talk about it.

**Brandveen, Donna**                                    **March 9, 2012**

Page 119

### CERTIFICATE OF NOTARY PUBLIC

I, Janie G. Arriaga, Court Reporter, before whom the foregoing Deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing Deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically, and that I thereafter reduced it to typewriting; that said Deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this Deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto; nor financially or otherwise interested  in the outcome of the action.

*Janie G. Arriaga /s/*

JANIE G. ARRIAGA,

Notary Public

My commission expires:  July 31, 2014

Registration Number 7039792

**Elite Reporting Company, Inc.**          **800-734-3337**
67 Saint Andrews Road          Severna Park,          Maryland 21146

Ludwig, Erich                                    January 22, 2021

Page 1

IN THE CIRCUIT COURT

FOR ANNE ARUNDEL COUNTY, MARYLAND


- - - - - - - - - - - - - - x
                                    :
MARCELINE WHITE                     :
   On behalf of herself             :
   individually and similarly       :
   situated persons                 :
          Plaintiff                 :
      v.                            : Case No.
NEWREZ LLC d/b/a SHELLPOINT         : C-02-CV-001060
MORTGAGE SERVICING                  :
&                                   :
FEDERAL NATIONAL MORTGAGE           :
ASSOCIATION                         :
          Defendants                :
                                    :
- - - - - - - - - - - - - - x  January 22, 2021


**Elite Reporting Company, Inc.**      **710 Americana Drive, A-1**
**800-734-3337**                       **Annapolis, Maryland 21403**

**Ludwig, Erich**                                    **January 22, 2021**

 1              PURSUANT TO NOTICE, the following video

 2      deposition of ERICH LUDWIG was taken before me,

 3      Kathleen S. Wilson, Notary Public, in and for the

 4      State of Maryland, via Zoom, commencing at 10:04

 5      a.m. when were present on behalf of the respective

 6      parties:

 7

 8      APPEARANCES

 9

10          PHILLIP ROBINSON, ESQUIRE

11          Consumer Law Center, LLC

12          8737 Colesville Road

13          Suite 308

14          Silver Spring, Maryland 20910

15          (301) 448-1304

16

17              On Behalf Of The Plaintiff

18

19

20

21

**Elite Reporting Company, Inc.        710 Americana Drive, A-1**
**800-734-3337                        Annapolis, Maryland 21403**

**Ludwig, Erich**                                    **January 22, 2021**

Page 3

1          THOMAS J. MINTON, ESQUIRE

2          Goldman & Minton, P.C.

3          3600 Clipper Mill Road - Suite 201

4          Baltimore, Maryland 21211

5          (410) 783-7575

6

7               On Behalf of the Plaintiff and

8                   Putative Class Members

9

10

11         ANDREW NAROD, ESQUIRE

12         Bradley Arant Boult Cummings LLP

13         1615 L Street, N.W. - Suite 1350

14         Washington, D.C. 20036

15         (202) 719-8214

16

17              On Behalf of the Defendants

18

19

20

21

**Elite Reporting Company, Inc.        710 Americana Drive, A-1**
**800-734-3337                          Annapolis, Maryland 21403**

**Ludwig, Erich**                                    **January 22, 2021**

                                                        Page 4

1                          I-N-D-E-X

2

3    WITNESS

4    ERICH LUDWIG

5    Examination by Mr. Robinson                    Page  10

6    Examination by Mr. Narod                       Page 178

7    Examination Resumed by Mr. Robinson            Page 194

8

9                          E-X-H-I-B-I-T-S

10   No. 1      NewRez Corporate Designee Depo          Page 9

11              Notice Shellpoint.pdf

12   No. 2      NewRez Responses to Plaintiff's         Page 9

13              Interrogatories.pdf

14   No. 3      NewRez Amended Responses to             Page 9

15              Plaintiff's Interrogatories.pdf

16   No. 4      Excerpt of Exhibit A to NewRez          Page 9

17              Amended Responses to Plaintiff's

18              Interrogatories (Confidential).pdf

19   No. 5      Shellpoint White Responses to           Page 9

20              Requests for Admissions.pdf

21

**Elite Reporting Company, Inc.**      **710 Americana Drive, A-1**
**800-734-3337**                        **Annapolis, Maryland 21403**

Ludwig, Erich                                    January 22, 2021

                                                      Page 5

 1                      E-X-H-I-B-I-T-S

 2                         (Continued)

 3

 4   No. 6     Shellpoint -- Responses to              Page 9

 5             Plaintiff's Second RFAs.pdf

 6   No. 7     White - Amended Responses to            Page 9

 7             Plaintiff's First RFA - Final.pdf

 8   No. 8     White - Amended Responses to            Page 9

 9             Plaintiff's Second RFAs - Final.pdf

10   No. 9     FM Servicing Guide (First Page).pdf     Page 9

11   No. 10    FM Servicing Guide (Portion 1).pdf      Page 9

12   No. 11    FM Servicing Guide (Portion 2).pdf      Page 9

13   No. 12    FM Servicing Guide (Portion 3).pdf      Page 9

14   No. 13    FM Servicing Guide (Portion 4).pdf      Page 9

15   No. 14    FM Servicing Guide (Portion 5).pdf      Page 9

16   No. 15    FM Servicing Guide (Portion 6).pdf      Page 9

17   No. 16    FM Servicing Guide (Portion 7).pdf      Page 9

18   No. 17    White DOT.pdf                           Page 9

19   No. 18    White Note.pdf                          Page 9

20   No. 19    Shellpoint Loan History                 Page 9

21             Statement.pdf

Ludwig, Erich                                    January 22, 2021

                                                        Page 6

 1                       E-X-H-I-B-I-T-S

 2                          (Continued)

 3

 4    No. 20      DiTech Statements.pdf                 Page 9

 5    No. 21      Safeguard Statement.pdf               Page 9

 6    No. 22      NewRez Hello Letter                   Page 9

 7                (Representation).pdf

 8    No. 23      NewRez 1_18_2020 Statement.pdf        Page 9

 9    No. 24      NewRez 2_16_2020 Statement.pdf        Page 9

10    No. 25      NewRez 3_18_2020 Statement.pdf        Page 9

11    No. 26      NewRez 8_19_2020 Statement.pdf        Page 9

12    No. 27      White Letter to NewRez.pdf            Page 9

13    No. 28      NewRez 4_9_2020 Letter to White       Page 9

14                (Representation).pdf

15    No. 29      NewRez 4_27_2020 Letter to White      Page 9

16                (Representation).pdf

17    No. 30      FM Screen Shots.pdf                   Page 9

18    No. 31      Default Letter to White from          Page 9

19                NR.pdf

20    No. 32      Payoff Quote from NewRez.pdf          Page 9

21    No. 33      NewRez Screenshot.pdf                 Page 9

Ludwig, Erich                                    January 22, 2021

                                                          Page 7

 1                          E-X-H-I-B-I-T-S

 2                            (Continued)

 3

 4    No. 34    Payoff Quote from NewRez II.pdf          Page 9

 5    No. 35    NewRez Screenshot II.pdf                 Page 9

 6    No. 36    Defendants' Answer.pdf                   Page 9

 7    No. 37    CFPB Notice.pdf                          Page 9

 8    No. 38    NewRez Request for Production            Page 9

 9              Responses.pdf

10    No. 39    Organizational Charts.pdf                Page 9

11    No. 40    CFR Papers.pdf                           Page 9

12    No. 41    NewRez Fee Schedule Disclosed to         Page 9

13              CFR.pdf

14    No. 42    NewRez Bonds.pdf                         Page 9

15    No. 43    NewRez 5_19_2020 Statement.pdf           Page 9

16    No. 44    Corporate Designee Depo Notice           Page 9

17              Fannie Mae FINAL.pdf

18    No. 45    White - Fannie Mae Responses to          Page 9

19              Plaintiff's First ROGs.pdf

20    No. 46    White - Fannie Mae Responses to          Page 9

21              Plaintiff's First RFA's.pdf

Ludwig, Erich                                    January 22, 2021

                                                        Page 8

1                      E-X-H-I-B-I-T-S

2                        (Continued)

3

4    No. 47    White - Fannie Mae Responses to      Page 9

5              Plaintiff's First RFPs.pdf

6    No. 48    FM-NewRez Contract.pdf               Page 9

7    No. 49    FM Letter to NR.pdf                  Page 9

8    No. 50    Ludwig Deposition.pdf                Page 9

9    No. 51    2020-05-11 Amended Complaint             Page

10             FINAL.pdf

11                    (Retained by Counsel)

12

13

14

15

16

17

18

19

20

21

Elite Reporting Company, Inc.      710 Americana Drive, A-1
800-734-3337                       Annapolis, Maryland 21403

**Ludwig, Erich**                                    **January 22, 2021**

                                                    Page 9

 1   Whereupon,

 2                        ERICH LUDWIG,

 3   was called as a witness by counsel for the

 4   Plaintiff, Marceline White, and after having first

 5   been duly sworn by the Notary Reporter, was

 6   examined and testified as follows:

 7             (Whereupon, Deposition Exhibits Number

 8   One through 50 were premarked for identification.)

 9             THE REPORTER:  Okay.  We're on the

10   record.  And, Mr. Ludwig, would you raise your

11   right hand, please?

12             (Whereupon, the witness was duly sworn.)

13             THE REPORTER:  Would you state your full

14   name and address for the record?  And you can give

15   me your work address.

16             THE WITNESS:  Erich Stephon Ludwig.

17             THE REPORTER:  Could you spell Stephan

18   for me, please?

19             THE WITNESS:  S-t-e-p-h-a-n.

20             THE REPORTER:  And your address?

21             (Whereupon, there was a discussion off

**Ludwig, Erich**                              **January 22, 2021**

Page 10

1    the record.)

2            THE REPORTER:  Okay.  Your witness.

3                    EXAMINATION

4            BY MR. ROBINSON:

5        Q.   All right.  Mr. Ludwig, good morning.

6    How are you?

7        A.   Very well, thank you.

8        Q.   Okay.  My name is Phillip Robinson and I

9    represent Marceline White in the matter of White

10   versus NewRez LLC and Federal National Mortgage

11   Association, pending in the Circuit Court for Anne

12   Arundel County.  And it's my understanding that

13   you have been designated on behalf of the Federal

14   National Mortgage Association as its corporate

15   designee for today;  is that correct?

16       A.   That is correct.

17       Q.   All right.  And I believe you have

18   testified in other matters before;  is that

19   correct?

20       A.   That is correct.

21       Q.   Orally and I think also in written

Ludwig, Erich                                   January 22, 2021

Page 11

1   affidavit form;  is that correct?

2           A.    That is correct.

3           Q.    So you probably have some familiarity

4   with sort of how this works and I don't know if

5   you've done it by Zoom.  But first let me sort of

6   go over some ground rules so you and I are on the

7   same page today.  Is that okay with you?

8           A.    Works for me.

9           Q.    So thanks for calling in separately.

10  That's a good thing to do because, as you may

11  know, sometimes on Zoom the video may freeze or we

12  may get kicked off if there is a storm that comes

13  through, wherever one of us is located, because we

14  are all in different locations.  So if something

15  strange happens, you can't hear the entire

16  question, and you don't hear it because something

17  checks out or the screen freezes, wave your hands

18  and let us know if, for whatever reason, you get

19  kicked off the internet, or one of us gets kicked

20  off the internet.  We should just stop and wait

21  for everybody to log back in.  Do you sort of

**Ludwig, Erich**                                   **January 22, 2021**

Page 12

1   understand that general problem?

2        A.   Yes.

3        Q.   All right.  And then I'm going to -- as

4   you know, I'm going to ask a series of questions

5   today.  Even though the court reporter is

6   recording it via Zoom and she is going to

7   transcribe the words that are spoken, and it's

8   important that you not just answer with a nod of

9   the head, or using expressions like "uh-huh" or

10  "uhm" and also say yes or no, or whatever the

11  appropriate response is.  Do you understand that?

12       A.   Yes.

13       Q.   If I ask a question and you don't

14  understand it, I would ask that you let me know

15  that you don't understand it.  Is that fair?

16       A.   Yes.

17       Q.   If you answer the question, I'll assume

18  you understood it.  Is that fair?

19       A.   Yes.

20       Q.   And the -- sometimes the -- we're going

21  to use the share feature today, so I'm going to

**Ludwig, Erich**                                    **January 22, 2021**

Page 13

1    share some of the exhibits up on the screen.  So,

2    do you have an adequate setup so that you can see

3    documents shared on the screen?

4         A.   I do.

5         Q.   Okay.  And if there's a problem on that,

6    again, on a technology thing, let me know.

7              Kathy, I do hear clicking now.

8              THE REPORTER:  Uh-huh.

9              (Noise interruption.)

10             MR. ROBINSON:  Do you want to go off the

11   record?

12             THE REPORTER:  Going off the record.

13             (Whereupon, there was a discussion off

14   the record.)

15             THE REPORTER:  Okay.  We are back on the

16   record.

17             BY MR. ROBINSON:

18        Q.   All right.  So, Mr. Ludwig, the -- are

19   you currently employed by Fannie Mae?

20        A.   Yes.

21        Q.   And for the purposes of today's

**Ludwig, Erich**                                    **January 22, 2021**

 1  deposition do you agree with me that Fannie Mae's

 2  formal legal name is Federal National Mortgage

 3  Association?

 4      A.   Yes.

 5      Q.   All right.  So I'll just refer to Fannie

 6  Mae and it means the same entity today.  Do you

 7  agree with that?

 8      A.   Yes.

 9      Q.   And since you've been designated on

10  behalf of Fannie Mae as its corporate witness

11  today, I may use the pronoun "you" today from time

12  to time.  Unless I qualify that pronoun with like

13  "you, personally," I intend that to mean Fannie

14  Mae.  If I say "you" without the qualification, I

15  mean Fannie Mae.  Do you agree with that?

16      A.   Yes.

17      Q.   And if you're confused and you're not

18  sure if I mean you, personally, or Fannie Mae,

19  just -- feel free to ask me.  Is that okay?

20      A.   Yes.

21      Q.   All right.  And then, the defendant --

Ludwig, Erich                                    January 22, 2021

Page 28

1        Q.   Does Fannie Mae expect NewRez to

2   interpret and understand the guidelines it

3   provides it?

4             MR. NAROD:  Objection.  Scope.

5             THE WITNESS:  Servicers are required to

6   adhere to the guidelines outlined in the servicing

7   guide.

8             BY MR. ROBINSON:

9        Q.   Okay.  And are servicers required to

10  adhere to the mortgage note between the borrower

11  and Fannie Mae?

12            MR. NAROD:  Objection.  Scope.

13            THE WITNESS:  Servicers are required to

14  adhere to the note, yes.

15            BY MR. ROBINSON:

16       Q.   And are the servicers -- is NewRez

17  required to adhere to the note between Fannie Mae

18  and Ms. White?

19       A.   Yes.

20       Q.   And are servicers required to adhere to

21  the terms of a deed of trust between a borrower

Elite Reporting Company, Inc.        710 Americana Drive, A-1
800-734-3337                         Annapolis, Maryland 21403

Ludwig, Erich                                          January 22, 2021

                                                              Page 29

1    and Fannie Mae?

2              MR. NAROD:  Objection.  Scope.

3              THE WITNESS:  Servicers are required to

4    adhere to the deed of trust.

5              BY MR. ROBINSON:

6         Q.   And is NewRez required to adhere to the

7    deed of trust between Ms. White and Fannie Mae?

8         A.   Yes.

9         Q.   And Fannie Mae is the owner of Ms.

10   White's mortgage note;  correct?

11        A.   Yes.

12        Q.   And Fannie Mae is the beneficiary and

13   owner of -- of the secured instrument, the deed of

14   trust, between Fannie Mae and Ms. White;  correct?

15        A.   Yes.

16        Q.   And Fannie Mae retained NewRez to act as

17   its servicer in relation to Ms. White's mortgage

18   note and mortgage, and deed of trust;  correct?

19        A.   Yes.

20        Q.   Ms. White did not retain NewRez in that

21   capacity, did she?

Elite Reporting Company, Inc.        710 Americana Drive, A-1
800-734-3337                         Annapolis, Maryland 21403

Ludwig, Erich                                    January 22, 2021

1    do not have access to that.

2         Q.   All right.  So you mentioned earlier that

3    one of your new responsibilities, I think, is the

4    borrower interfacing team?

5         A.   Yes.

6         Q.   And what is your -- what's Fannie Mae's

7    borrower interfacing team?  What does it do?

8         A.   We manage calls and emails that come from

9    borrowers looking for assistance on their Fannie

10   Mae loans.

11        Q.   And in managing calls and emails from

12   borrowers, does it -- does it confirm that the

13   borrower actually has a loan owned by Fannie Mae?

14             MR. NAROD:  Objection.  Scope.

15             THE WITNESS:  Yes.

16             BY MR. ROBINSON:

17        Q.   How does it do that?

18             MR. NAROD:  Objection.  Scope.

19             THE WITNESS:  Fannie Mae has a lookup

20   tool, using property information to identify

21   Fannie Mae loans.

Ludwig, Erich                                    January 22, 2021

Page 50

1            BY MR. ROBINSON:

2        Q.    So, would that -- what information does

3    it need on the lookup tool to identify if a loan

4    is owned by Fannie Mae?

5        A.    Property address.

6        Q.    Anything else?

7        A.    That's it.

8        Q.    If the borrower provided the borrower

9    interfacing team with his or her Social Security

10   number, would that be -- help in assisting to

11   determine if it was Fannie Mae owned?

12       A.    No.  We do not collect -- the role of our

13   team is not to collect the Social Security number

14   related to the idea I am a security risk

15   associated.  It is not necessary to determine

16   Fannie Mae loan status with a Social Security

17   number.

18       Q.    Does Ms. White's loan -- if you wanted to

19   -- if you were at your office and you wanted to

20   look up information on Ms. White's loan, is there

21   a system you could do to do that on at Fannie Mae?

Ludwig, Erich                           January 22, 2021

Page 82

1        A.    Yes.

2        Q.    So the particulars of the borrower's name

3    and address, and maybe the dates, and the name of

4    the particular lender might change on different

5    documents, but otherwise the other terms and

6    conditions are pretty uniform and standard for

7    Fannie Mae deeds of trust;  right?

8        A.    Yes.

9        Q.    All right.  So the first page deals with

10   definitions.

11           And if we go to the second page of

12   Exhibit 17, there's a definition for applicable

13   law.  I'll make it a little bigger for you.

14           Do you want to read that paragraph (J)

15   and let me know when you're ready?

16       A.    (Perusing document.)

17           I'm ready.

18       Q.    Is it your understanding that paragraph

19   (J) describes that the deed of trust -- well,

20   describes the term "applicable law" would mean all

21   state, federal, local statutes, regulations,

Page 83

1  ordinances, administrative rules, and orders that

2  have the effect of law in any final non-appealable

3  judicial decisions?

4          MR. NAROD:  Objection.  Scope.

5          THE WITNESS:  (No response.)

6          BY MR. ROBINSON:

7      Q.  Was that term or definition there

8  something written by Ms. White on this instrument,

9  or is that something written by the lender, as

10  approved by Fannie Mae?

11     A.  Yeah.  That would be standard verbiage on

12  this document, as approved by Fannie Mae.

13     Q.  All right.  So, Fannie Mae would not

14  acquire a loan that didn't have that definition

15  there;  correct?

16     A.  I -- I can't speak to that.  I -- I don't

17  -- I can't say 100 percent sure yes, but I would -

18  - I would think that this would be standard

19  verbiage for all Fannie Mae loans.

20     Q.  Okay.  So, we'll go to paragraph 14.

21  This paragraph is titled "Loan Charges."  Do you

Ludwig, Erich                                    January 22, 2021

Page 86

1    down here at the end that you -- you testified

2    about you can't really speak to.  "Lender may not

3    charge fees that are expressly prohibited by this

4    security instrument or by applicable law";  right?

5        A.    Correct.

6        Q.    Who determines what -- in the

7    relationship between Fannie Mae and NewRez, doing

8    business as Shellpoint, who determines what fees

9    are allowed under applicable law, pursuant to

10   paragraph 14 of the deed of trust?

11           MR. NAROD:  Objection to scope.

12           THE WITNESS:  It is my understanding that

13   servicers are required to vet and understanding

14   any applicable law, whether it be federal, state,

15   or local and to abide by those.

16           BY MR. ROBINSON:

17       Q.    And it's your understanding that Fannie

18   Mae requires them to do that;  correct?

19           MR. NAROD:  Objection to scope.

20           THE WITNESS:  Correct.

21           BY MR. ROBINSON:

Ludwig, Erich                                    January 22, 2021

1              MR. NAROD:  Objection.  Scope.

2              THE WITNESS:  I have no record of that.

3      No.

4              BY MR. ROBINSON:

5          Q.   Okay.  And just so we're on the same page

6      about definitions, the same question as to NewRez,

7      doing business as Shellpoint?

8          A.   Outside of what's specifically in the

9      servicing guide, that's the requirement for the

10     servicers, whether it be NewRez, doing business as

11     Shellpoint, or DiTech.

12         Q.   All right.  And your testimony earlier,

13     the servicing guide is subject to applicable law,

14     whether they can do that or not;  correct?

15         A.   Correct.

16         Q.   Earlier, when we were talking about

17     servicing, you stated that servicing included the

18     collection of payments;  correct?

19         A.   Yes.

20         Q.   And the collection of payments is done by

21     the servicer on Fannie Mae's behalf;  correct?

Elite Reporting Company, Inc.       710 Americana Drive, A-1
800-734-3337                        Annapolis, Maryland 21403

Ludwig, Erich                                    January 22, 2021

Page 98

1        A.    Yes.

2                MR. NAROD:  Objection.

3                BY MR. ROBINSON:

4        Q.    And Ms. White has made payments to

5    NewRez, doing business as Shellpoint;  correct?

6        A.    Yes.

7        Q.    And NewRez, doing business as Shellpoint,

8    has collected those payments on Fannie Mae's

9    behalf?

10               MR. NAROD:  Objection to scope.

11               MR. ROBINSON:  Is that right?

12               THE WITNESS:  Yes.

13               BY MR. ROBINSON:

14       Q.    And, if you know, what has NewRez, doing

15   business as Shellpoint, done with those payments

16   that it's collected from Ms. White?

17       A.    Those payments are passed through to

18   Fannie Mae.  The interest and principal portion

19   after the servicing fee is retained by the

20   servicer.

21       Q.    And that's the same for every other

1    borrower in the state of Maryland that NewRez,

2    doing business as Shellpoint, collects on behalf

3    of Fannie Mae;  right?

4              MR. NAROD:  Objection to scope.

5              THE WITNESS:  Yes.

6              BY MR. ROBINSON:

7         Q.   It's not any different with the other

8    people, as compared to what happens with Ms.

9    White?

10             MR. NAROD:  Objection to form and scope.

11             THE WITNESS:  There is no differentiation

12   between borrowers, in terms of the collection.

13             BY MR. ROBINSON:

14        Q.   All right.  So, if I understand -- what

15   I'm understanding and hearing from you is that

16   Fannie Mae collects indirectly, through NewRez,

17   doing business as Shellpoint, from Ms. White?

18             MR. NAROD:  Objection to scope.

19             BY MR. ROBINSON:

20        Q.   Is that correct?

21        A.   Yeah.  Fannie -- Yeah.  Fannie Mae is not

Ludwig, Erich                                    January 22, 2021

Page 100

1    a -- not a debt collector.

2          Q.    I didn't ask if they were a debt

3    collector.  I understand where you want to go, but

4    that wasn't my question.

5                So my question was, and I think I

6    understood your testimony, is that NewRez, doing

7    business as Shellpoint, collects payments from Ms.

8    White;  correct?

9          A.    Correct.

10         Q.    And it does that on behalf of Fannie Mae;

11   correct?

12               MR. NAROD:  Objection to scope.

13               THE WITNESS:  Correct.

14               BY MR. ROBINSON:

15         Q.    And a portion of those payments you

16   testified about is transmitted to Fannie Mae;

17   correct?

18         A.    Correct.

19         Q.    So my question for you is, Fannie Mae is

20   collecting indirectly through NewRez, doing

21   business as Shellpoint;  right?

Elite Reporting Company, Inc.        710 Americana Drive, A-1
800-734-3337                         Annapolis, Maryland 21403

Ludwig, Erich                                    January 22, 2021

Page 101

1              MR. NAROD:  Objection to scope.

2              THE WITNESS:  Yes.

3              BY MR. ROBINSON:

4       Q.    Okay.  And then you mentioned servicing

5    fee retained a moment ago.  What did you mean by

6    that expression?

7       A.    Within every payment, the servicer has

8    the ability to retain a portion of the payment as

9    -- as compensation for the servicing that they are

10   doing.

11      Q.    And is the amount of the servicing fee

12   laid out in the contract between Fannie Mae and

13   New Residential in this case that we went over

14   earlier?

15      A.     I don't know if that's specifically

16   detailed in that contract.

17      Q.    There may be some other agreement

18   somewhere that details that;  correct?

19             MR. NAROD:  Objection.

20             THE WITNESS:  Maybe.

21             BY MR. ROBINSON:

Ludwig, Erich                                    January 22, 2021

Page 205

CERTIFICATE OF NOTARY REPORTER

I, Kathleen S. Wilson, a Notary Reporter, in
and for the State of Maryland, County of Anne
Arundel, do hereby certify that the Witness whose
testimony appears in the foregoing transcript was
first duly sworn by me;  that the testimony of
said witness was taken by me and thereafter
transcribed by me or under my direction;  that
said transcript is a true and accurate record of
the testimony given to the best of my ability;
that I am neither counsel for, related to nor
employed by any of the parties to the action in
which this deposition was taken; and further, that
I am not a relative or employee of any attorney or
counsel employed by the parties hereto, nor
financially or otherwise interested in the outcome
of this action.

_____

Kathleen S. Wilson

Notary Reporter

My Commission Expires March 14, 2022

**Elite Reporting Company, Inc.        710 Americana Drive, A-1**
**800-734-3337                          Annapolis, Maryland 21403**

ANDREW LOLL - 5/7/2015

```
1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
2                          EASTERN DIVISION
3
4
5
6    JEANNIE K. MAY              )
                                 )
7           Plaintiff,           )
                                 )
8    vs.                         ) Case No. 4:14-CV-578-TCM
                                 )
9    NATIONSTAR MORTGAGE, LLC,   ) VOLUME I
                                 )
10          Defendant.           )
11   _____)
12
13
14
15            VIDEOTAPED DEPOSITION OF ANDREW J. LOLL
16
17
18            DATE & TIME:  Thursday, May 7, 2015
                            9:36 a.m. - 4:31 p.m.
19
20            LOCATION:   211 North Broadway
                          St. Louis, Missouri
21
22            REPORTER:   Tami L. Bruder, CCR
                          Certificate No. 1030
23
24
25
                                                        Page 1
```

ANDREW LOLL - 5/7/2015

```
 1                   UNITED STATES DISTRICT COURT

                     EASTERN DISTRICT OF MISSOURI

 2                        EASTERN DIVISION

 3

 4

 5

 6   JEANNIE K. MAY              )

 7                              )

 8        Plaintiff,            )

 9                              )

10   vs.                        ) Case No. 4:14-CV-578-TCM

11                              )

12   NATIONSTAR MORTGAGE, LLC,   ) VOLUME I

13                              )

14        Defendant.            )

15   _____)

16

17   VIDEOTAPED DEPOSITION OF ANDREW J. LOLL, taken on

18   behalf of the Plaintiff on Thursday, May 7, 2015, at Bryan

19   Cave LLP, 211 North Broadway, St. Louis, Missouri 63102-2750,

20   commencing at 9:36 a.m., and concluding at 4:31 p.m., on

21   Thursday, May 7, 2015, pursuant to Notice, before TAMI

22   L. BRUDER, CCR No. 1030, a Certified Court Reporter, in

23   and for the State of Missouri.

24                         ***

25
```

                                                       Page 2

ANDREW LOLL - 5/7/2015

```
 1    APPEARANCES:
 2        For the Plaintiff:
 3                HUMPHREYS WALLACE HUMPHREYS, P.C.
                  Luke J. Wallace, Esquire
 4                David Humphreys, Esquire
                  9202 South Toledo Avenue
 5                Tulsa, Oklahoma 74137
 6        For the Defendant:
 7                BRYAN CAVE LLP
                  Amy E. Breihan, Esquire
 8                211 North Broadway, Suite 3600
                  St. Louis, Missouri 63102-2750
 9
          Also present:
10
                  Ms. Lynn Reina, CLVS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

ANDREW LOLL - 5/7/2015

```
 1              INDEX OF EXHIBITS PREVIOUSLY MARKED
 2    EXHIBIT
      NO.       DESCRIPTION                    PAGE(s)
 3
      1         LSAMS notes                    123, 125,
 4              (collection history log/profile)  143, 145,
                Bates NATIONSTAR00468-504      147, 151,
 5                                             166, 187,
                                               191, 193,
 6                                             194, 207,
                                               212, 218,
 7                                             232, 241,
                                               249, 262,
 8                                             271, 311
 9
      3         payment history               141
10              (Bates MAY00376, MAY00257-260)
11
      5         4/9/13 fax @ 10:00 a.m. to    202, 203
12              Alicia Jackson from Ms. May
                (Bates NATIONSTAR00276-00303)
13
14    8         4/22/13 fax to research from  267
                Ms. May (Bates MAY00010-46)
15
16    11        4/19/13 letter from Ms. Agyeman  251, 274
                to Ms. May
17              (Bates NATIONSTAR00306-309)
18
      14        process management notes dated  155, 157,
19              1/20/11 to 3/7/14             161, 165,
                (Bates NATIONSTAR00437-467)   236, 238
20
21    16        4/18/13 statement            168
                (Bates NATIONSTAR00437-467)
22
23
24
25
                                               Page 4
```

ANDREW LOLL - 5/7/2015

```
 1              INDEX OF EXHIBITS MARKED 5/7/2015
 2      EXHIBIT
        NO.      DESCRIPTION                    PAGE(s)
 3
        18       4/3/15 statement               88, 92,
 4               (Bates MAY00785-790)           109, 185
 5
        19       Amended Notice of Deposition   109
 6
 7      20       2/26/13 statement              117, 118,
                 (Bates NATIONSTAR00636-638)    127
 8
 9      21       1/6/13 bankruptcy discharge    117
                 (Bates MAY00101-104)
10
11      22       motion for relief             132
12
        23       $4,838.30 cashier's check      133
13               (Bates MAY00169)
14
        24       withdrawal of motion for relief  134
15               (Bates MAY00254-255)
16
        25       3/11/13 statement and annual   143, 149,
17               escrow disclosure statement    261, 306
                 (Bates NATIONSTAR00639-643)
18
19      26       Nationstar's Answers and       160, 177
                 Objections to Plf's discovery
20               request dated 2/9/15
21
        27       Nationstar's Answers and       173
22               Objections to Plf's discovery
                 request dated 4/29/14
23
24      28       written communication from     210
                 Ms. May to Fred Williams
25               dated 4/10/13 (Bates MAY00256)
```

Page 5

Maxene Weinberg Agency
(800) 640-1949

ANDREW LOLL - 5/7/2015

```
 1          INDEX OF EXHIBITS MARKED 5/7/2015 CONTINUED
 2     EXHIBIT
       NO.        DESCRIPTION                    PAGE(s)
 3
       29        4/15/13 fax from Ms. May to     235, 242,
 4               Valicia Jackson                 249
                 (Bates NATIONSTAR00665-666)
 5
 6     30        5/2/13 letter from Nationstar   269
                 to Ms. May (Bates MAY00232)
 7
 8     31        5/2/13 letter to Ms. May from   272
                 Nationstar - new SPOC
 9               (Bates NATIONSTAR00314)
10
       32        5/8/13 letter from Nationstar   274, 287
11               to Ms. May
                 (Bates MAY00275-278)
12
13     33        5/8/13 letter from Ms. Ramirez  294
                 to Ms. May (Bates MAY00050-51)
14
15     34        5/13/13 letter from Nationstar  302, 304
                 to Ms. May - new SPOC
16               (Bates NATIONSTAR00315)
17
       35        bank record of 6/14/13 payment  306
18               of $999.45 to Nationstar
                 (Bates MAY00284)
19
20     36        6/14/13 printout of loan        307
                 summary online
21               (Bates MAY00282-283)
22
       37        6/16/13 printout of online      310
23               account information
                 (Bates MAY00286-287)
24
25
                                                 Page 6
```

ANDREW LOLL - 5/7/2015

```
 1              ST. LOUIS, MISSOURI; THURSDAY, MAY 7, 2015

 2                         9:36 A.M.

 3              THE VIDEOGRAPHER:  This is the video

 4    deposition of A.J. Loll taken on behalf of the Plaintiff

 5    in the matter of Jeannie K. May, Plaintiff, versus

 6    Nationstar Mortgage, LLC, Defendant, Case No.

 7    4:14-CV-578-TCM, in the United States District Court for

 8    the Eastern District of Missouri.  The deposition is

 9    being held on May 7th, 2015, beginning at 9:36 a.m.

10         My name is Lynn Reina, Certified Legal Video

11    Specialist.  The court reporter is Tami Bruder.  And we

12    are here on behalf of Maxene Weinberg Agency in Mission

13    Viejo, California.

14         The deposition is being held in the offices of

15    Bryan Cave, One Metropolitan Square, 211 North Broadway,

16    Suite 3600, in St. Louis, Missouri 63102.

17         Would counsel please introduce themselves and the

18    parties they represent, beginning with the party

19    noticing this proceeding?

20              MR. WALLACE:  Yes.  This is Luke Wallace.

21    Sitting next to me is my partner, David Humphreys.  We

22    represent the Plaintiff Jeannie K. May.

23              MS. BREIHAN:  Amy Breihan.  I represent

24    Nationstar Mortgage, LLC.

25              THE VIDEOGRAPHER:  Would the court reporter
```

Page 7

ANDREW LOLL - 5/7/2015

```
 1    please administer the oath to the witness.

 2                 ANDREW J. LOLL,

 3          called as a witness by and on behalf of the

 4          Plaintiff, being first duly sworn, was examined

 5          and testified as follows:

 6                      EXAMINATION

 7    BY MR. WALLACE:

 8          Q.    Good morning.

 9          A.    Good morning.

10          Q.    My name is Luke Wallace.  Would you tell us

11    your name?

12          A.    A.J. Loll as it relates to corporate

13    resolution for Nationstar Mortgage.  Legal name Andrew

14    J. Loll.  Last name is L-o-l-l.

15          Q.    You say corporate resolution?

16          A.    Yeah.  I sign documents for the company as

17    an officer.  I sign it A.J. Loll.

18          Q.    Okay.  Mr. Loll, how -- how many times have

19    you done what we're doing here, which is sitting down to

20    offer testimony on behalf of a corporation?

21          A.    Many times.  Well over 100.

22          Q.    Okay.  When did you first start?

23                MS. BREIHAN:  Objection, vague.

24          A.    Probably about maybe six years ago, in that

25    ball park.
```

Page 8

ANDREW LOLL - 5/7/2015

```
 1    BY MR. WALLACE:

 2          Q.    And is that when you joined Nationstar?

 3          A.    No, sir.  I joined Nationstar in January of

 4    2002.

 5          Q.    And how did you hire in, what -- what

 6    position in January of 2002?

 7          A.    I was recruited from Citigroup Mortgage.  I

 8    was hired in as a vice-president in their collections

 9    area.

10          Q.    So you're collecting on delinquent

11    mortgages or overseeing the group that collects on

12    delinquent mortgages?

13          A.    That was my title, but I was utilized to

14    spend time in each department for Nationstar, but my

15    official title hired in was vice-president collections.

16          Q.    How long did you do that, where you were

17    utilized in each of the departments?

18          A.    I can -- maybe I can answer this way.

19          Q.    Rough.  Rough.

20          A.    I've been with the company since 2002.

21    During that period of time, I've been the vice-president

22    of post-foreclosure/REO, vice-president of foreclosure,

23    vice-president of underwriting, vice-president of

24    bankruptcy, vice-president of auditing/quality control,

25    vice-president of loss mitigation, vice-president of 60
```

Page 9

ANDREW LOLL - 5/7/2015

```
 1   to 89 day delinquency, vice-president of our national

 2   mediation program, and currently I am vice-president of

 3   our litigation support, which entails litigation such as

 4   this and preparing corporate witnesses for pretty much

 5   all areas of the mortgage servicing area from

 6   origination through liquidation and all our vendors in

 7   between.  I have 30 -- approximately 30 years in the

 8   financial industry.

 9           Q.    What is Nationstar?

10           A.    Nationstar Mortgage is a combination of a

11   mortgage servicer.  It is a -- also a mortgage

12   originator, and it also has an entity called

13   Solutionstar that is our technologies area, and it -- as

14   it relates to Nationstar, it handles our servicing side

15   as it relates to products.  Example would be BPOs,

16   appraisals, title work, closing, recovery services.

17           Q.    What are the recovery services?

18           A.    For different investors, Nationstar doesn't

19   own most of our loans, so we collect post-foreclosure on

20   a recovery basis through Solutionstar's recovery entity.

21           Q.    All right.  And when you say mortgage

22   servicing, can you tell us what that means?

23           A.    Mortgage servicing is everything

24   post-origination, once your first payment is due, your

25   escrow analysis, your -- applying your payments to your
```

Page 10

ANDREW LOLL - 5/7/2015

```
 1    amortization, overseeing homeowner's insurance, tax

 2    assessment changes for your escrow, year end 1098 for

 3    tax reporting, bankruptcy monitoring.

 4          If -- if the loan is in default, we have to

 5    follow procedures for the investor as well as CFPB.  We

 6    also handle the foreclosure, and if we're still the

 7    investor -- I mean, excuse me -- we're still the

 8    servicer post-foreclosure, if the investor would like us

 9    to, we also handle the liquidation of that account and

10    also the tax reporting on those assets.

11          So it's basically cradle to grave once your

12    mortgage is originated and it's funded and the first

13    payment is due.  And also the custodian of records that

14    are associated with the -- with the origination.

18          So the investor in -- in Mrs. May's account is

19    Fannie Mae; is that correct?

20          A.    That's correct.

21          Q.    And when we say investor, that means what

22    in your industry?

23          A.    Investor is the owner of the -- of the

24    loan.  In the case of Jeannie May, the -- the

25    underwriting and the ownership side is Fannie Mae.
```

Page 11

Case: 4:14-cv-00578-TCM   Doc. #:  144-5   Filed: 11/19/15   Page: 204 of 224 PageID #:
2991

ANDREW LOLL - 5/7/2015



So did -- has anyone at Nationstar told the

20    investor, the owner of this loan, how you serviced this

21    account for Mrs. May, now that you know the details?

22    Anybody told your -- the owner of the loan?

23          A.    The investor is aware of any Fannie Mae

24    loan that's in litigation or delinquent, and we have to

25    update them on a monthly basis of what's going on with

Page 284

ANDREW LOLL - 5/7/2015



1    the status.  Fannie Mae contractually that we are -- if

2    it's our error, then we are responsible for that error,

3    and that's what we're contracted to do.

4            Q.    Have you --

5            A.    So Fannie Mae is aware.  Fannie Mae doesn't

6    service the loan.  They own the loan.  They want us to

7    -- if we erred, to fix it.

8            Q.    Have they -- have you told them that you

9    erred?

10           A.    They're aware that it's in litigation and

11   that it's in the status that it's in.

Page 285

Maxene Weinberg Agency
(800) 640-1949

ANDREW LOLL - 5/7/2015

```
 1                    NOTARIAL CERTIFICATE
 2   STATE OF MISSOURI    )
                          )
 3   COUNTY OF ST. LOUIS  )
 4            I, TAMI L. BRUDER, a Registered Professional
     Reporter, Certified Court Reporter, and a duly
 5   commissioned Notary Public within and for the State of
     Missouri, do hereby certify that on May 7, 2015, there
 6   came before me at the law firm of Bryan Cave LLP, 211
     North Broadway, Suite 3600, St. Louis, Missouri
 7   63102-2750,
 8                    ANDREW J. LOLL,
 9   who was by me first duly sworn to testify to the truth
     and nothing but the truth of all knowledge touching and
10   concerning the matters in controversy in this cause;
     that the witness was there upon carefully examined under
11   oath and said examination was reduced to writing by me;
     and that the signature of the witness is reserved by
12   agreement of all parties, and that this deposition is a
     true and correct record of the testimony given by the
13   witness.
14            I further certify that I am neither attorney
     nor counsel for nor related nor employed by any of the
15   parties to the action in which this deposition is taken;
     further, that I am not a relative or employee of any
16   attorney or counsel employed by the parties hereto or
     financially interested in this action.
17
18            IN WITNESS WHEREOF, I have hereunto set my
     hand and seal on this 11th day of May, 2015.
19            My commission expires June 27, 2015.
20
21                         NOTARY PUBLIC
                       Tami L. Bruder, C.C.R. No. 1030
22
23
24
25
                                                   Page 317
```

1
2
3
4
5
6

The Honorable Barbara J. Rothstein

7          UNITED STATES DISTRICT COURT
8          WESTERN DISTRICT OF WASHINGTON

9   RICARDO SALOM, CATHERINE
10  PALAZZO as assignee for Ruben Palazzo, and
    PETER HACKINEN, *on their own behalf and*
11  *on behalf of other similarly situated persons,*

                                            Case No. 2:24-cv-00444-BJR

12                  Plaintiffs,

13          vs.                             **AFFIDAVIT OF**
                                            **CATHERINE PALAZO**
14
    NATIONSTAR MORTGAGE LLC,
15
16                  Defendant.

17          I, CATHERINE PALAZZO, proposed Plaintiff and Class Representative, being of
18  lawful age, deposes and states the following:

19      1.  I am over 18 and competent to testify to the following facts.  I have personal knowledge
20          of the facts set forth herein.

21      2.  I submit this affidavit in support of my Motion to Certify a Plaintiffs' Class in this
22          action against Nationstar Mortgage LLC.

23      3.  I reside in Pittsville, Wicomico County, Maryland, where I own a home with my
            husband at 34811 Old Ocean City Road.

24      4.  My home is subject to a mortgage loan and is secured by a Deed of Trust in which I am
25          identified as a borrower.  My husband Ruben Palazzo and I agreed to the terms of the
26          loan for our personal, family use of the family home.

Seattle Consumer Justice P.S.
10728 16th Avenue SW
Seattle, WA  98146
206.330.0595

5. After we took out the mortgage loan to our home, it was assigned and sold to Freddie Mac, which engaged a series of collectors to act as the mortgage servicer of the loan on its behalf thereafter.

6. Nationstar d/b/a RightPath became the servicer of our loan in 2022 but it did not disclose its role as the service of the loan until more than eight months after the fact and only in response to a dispute we sent to it. In that same correspondence dated February 24, 2023, Nationstar stated in writing that its "records indicate that the Federal Home Loan Mortgage Corporation (Freddie Mac) as owner" our loan.

7. I am in charge of managing our household finances and all mail related to the mortgage is reviewed by me.

8. Nationstar at no time has sent me (or my husband) correspondence indicating the ownership of our mortgage loan has transferred from Freddie Mac to Nationstar (or anyone else) as required by 15 U.S.C.A. § 1641(g) or 12 C.F.R. § 1026.39(b).

9. Due in part to Nationstar's irregularities related to my loan, I requested Nationstar to send me a payoff quote on or about September 11, 2023. As a result of that request for an accurate payoff statement, Nationstar imposed and collected from us fees of at least $25 related to the request for a mortgage payoff.

10. This action is to hold Nationstar liable for imposing fees for borrowers like me to obtain accurate payoff statements of our mortgage loans. It is my understanding that these fees are illegal under Federal and State law.

11. My rights asserted in this action include those of my husband Ruben as well since he has assigned his rights to me via power of attorney.

12. I understand that I will serve as a class representative to fairly and adequately protect the interests of others throughout the country and in Maryland.

13. I do not have any interests that are antagonistic to the proposed class. My claims are the same as the claims of all class members and I have the same interests, to hold Nationstar and its clients accountable for the claims asserted against them in this action.

14. I am prepared to participate in the discovery needed for this lawsuit, including sitting for a deposition. I am ready and willing to continue to do what may be necessary to pursue the claims in this case on behalf of the proposed class of persons and come to trial if necessary and appropriate.

Seattle Consumer Justice P.S.
10728 16th Avenue SW
Seattle, WA 98146
206.330.0595

15. I have retained counsel—Mr. Phillip Robinson and Ms. Christina Henry—to represent my interests and the interests of others like me who paid fees to obtain accurate payoff statements of their mortgage loans. Nationstar collected fees from us for those statements even though none of our agreements or laws expressly permitted them to do so.

I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

_____                    Dated _Jul 23, 2024_
Catherine Palazzo

## CERTIFICATE OF SERVICE

I hereby certify that I caused this Affidavit of Catherine Palazzo to be served on the following named person(s) on the date indicated below by notice of electronic filing using the CM/ECF system:

I hereby certify that a copy of the foregoing and related other filings referenced herein, and proposed order was provided to counsel to record for Defendant Nationstar at the time of filing through the Court's CM/ECF system.

In addition, I also hereby certify that a paper copy of the same was sent by pre-paid U.S. Mail to Freddie Mac's General Counsel at:

Heidi Mason
Executive VP & General Counsel
Freddie Mac
8200 Jones Brach Drive
McLean, VA 22102

EXECUTED THIS 23rd of July 2024          _s/ Christina L. Henry_
                                          Christina L Henry

AFFIDAVIT OF CATHERINE PALAZZO  - 3

# Palazzo_Affidavit - final

Final Audit Report                                                                    2024-07-23

| | |
|---|---|
| Created: | 2024-07-23 |
| By: | Christina Henry (mainline@hdm-legal.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAEm5VG3MlmZYkZMDr6HCXWXHfySBjVOqv |

## "Palazzo_Affidavit - final" History

Document created by Christina Henry (mainline@hdm-legal.com)
2024-07-23 - 11:32:10 PM GMT

Document emailed to Catherine Palazzo (cathypalazzo@live.com) for signature
2024-07-23 - 11:32:14 PM GMT

Email viewed by Catherine Palazzo (cathypalazzo@live.com)
2024-07-23 - 11:32:55 PM GMT

Document e-signed by Catherine Palazzo (cathypalazzo@live.com)
Signature Date: 2024-07-23 - 11:33:19 PM GMT - Time Source: server

Agreement completed.
2024-07-23 - 11:33:19 PM GMT

**Adobe Acrobat Sign**

1

2

3

4

5

6

The Honorable Barbara J. Rothstein

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9

10

11

RICARDO SALOM, CATHERINE
PALAZZO as assignee for Ruben Palazzo, and
PETER HACKINEN, *on their own behalf and
on behalf of other similarly situated persons,*

Plaintiffs,

vs.

NATIONSTAR MORTGAGE LLC, *et al.*

Defendants.

Case No. 2:24-cv-00444-BJR

**AFFIDAVIT OF RICARDO SALOM**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

I, RICARDO SALOM, solemnly affirm under the penalties of perjury and upon

personal knowledge that the contents of the foregoing paper are true.:

1.  I am over 18 and competent to testify to the following facts.  I have personal knowledge
    of the facts set forth herein.

2.  I submit this affidavit in support of the Motion to Certify a Class in this action against
    Nationstar Mortgage LLC ("Nationstar").

Seattle Consumer Justice P.S.
10728 16th Avenue SW
Seattle, WA  98146
206.330.0595

3. I previously resided in Gaithersburg, Montgomery County, Maryland, where I owned a home at 14608 Quince Orchard Road until I sold it and moved to the State of Washington.

4. My former home was subject to a mortgage I agreed to for my personal use. After I took out my former loan subject to this action, it was assigned and sold to Fannie Mae.  In 2016, I completed a loan modification with Seterus, Inc., the previous servicer, when it worked on behalf of Fannie Mae.

5. Since 2019, until I paid off the loan in 2022, my mortgage was serviced by Nationstar after it merged with Seterus Inc.

6. In 2022, to prepare to sell my former home in Maryland, I requested, through my agent, that Nationstar provide to me an accurate payoff statement of the loan which I received on or about June 29, 2022.

7. When I sold my home in Maryland and the sale proceeds paid off my former Nationstar mortgage loan, Nationstar imposed and collected from him fees of at least $25 for the payoff statement.

8. In late 2022 or in early 2023, I requested Nationstar send me a copy of certain records related to my former loan from Seterus and from Nationstar itself. In response to that request, Nationstar provided me with voluminous records. However, Nationstar at no time has ever sent me correspondence indicating the ownership of my former mortgage loan transferred from Fannie Mae to Nationstar (or anyone else) as required by 15 U.S.C.A. § 1641(g) or 12 C.F.R. § 1026.39(b).

AFFIDAVIT OF RICARDO SALOM  - 2

9. This action is to hold Nationstar liable for imposing fees for borrowers like me to obtain accurate payoff statements of our mortgage loans. It is my understanding that these fees are illegal under Federal and State law.

10. I understand that I will serve as a class representative to fairly and adequately protect the interests of others throughout the country and in my former home state of Maryland.

11. I do not have any interests that are antagonistic to the proposed class. My claims are the same as the claims of all class members and I have the same interests, to hold Nationstar and its clients, if necessary, accountable for the claims asserted against them in this action.

12. I am prepared to participate in the discovery including sitting for a deposition. I am ready and willing to continue to do what may be necessary to pursue the claims in this case on behalf of the proposed class of persons and come to trial if necessary and appropriate.

13. I have retained counsel—Mr. Phillip Robinson and Ms. Christina Henry—to represent my interests and the interests of others like me, we paid fees to obtain accurate payoff statements of their mortgage loans and Nationstar collected fees from us for those statements even though none of our agreements or laws expressly permitted them to do so.

I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

_____                    Dated  Jul 23, 2024  _____
Ricardo Salom

AFFIDAVIT OF RICARDO SALOM  - 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I hereby certify that I caused the Affidavit of Ricardo Salom to be served on the following named person(s) on the date indicated below by notice of electronic filing using the CM/ECF system:

I hereby certify that a copy of the foregoing and related other filings referenced herein, and proposed order was provided to counsel to record for Defendant Nationstar at the time of filing through the Court's CM/ECF system.

In addition, I also hereby certify that a paper copy of the same was sent by pre-paid U.S. Mail to Freddie Mac's General Counsel at:


Heidi Mason
Executive VP & General Counsel
Freddie Mac
8200 Jones Brach Drive
McLean, VA 22102


EXECUTED THIS 23rd of July 2024

/s/ Christina L. Henry
Christina L Henry

AFFIDAVIT OF RICARDO SALOM  - 4

# Salom_Affidavit - final

Final Audit Report                                                              2024-07-24

| | |
|---|---|
| Created: | 2024-07-23 |
| By: | Christina Henry (mainline@hdm-legal.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAZTGcH_FutgFoy4uPc8f8Vyylsv0SBLCc |

## "Salom_Affidavit - final" History

- Document created by Christina Henry (mainline@hdm-legal.com)
  2024-07-23 - 11:00:32 PM GMT

- Document emailed to Ricardo Salom (rsalom3022@aol.com) for signature
  2024-07-23 - 11:00:36 PM GMT

- Email viewed by Ricardo Salom (rsalom3022@aol.com)
  2024-07-24 - 5:16:51 AM GMT

- Document e-signed by Ricardo Salom (rsalom3022@aol.com)
  Signature Date: 2024-07-24 - 5:18:12 AM GMT - Time Source: server

- Agreement completed.
  2024-07-24 - 5:18:12 AM GMT

**Adobe Acrobat Sign**

1

2

3

4

5

6

The Honorable Barbara J. Rothstein

7    UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

8

9  RICARDO SALOM, CATHERINE                    Case No. 2:24-cv-00444-BJR
10  PALAZZO as assignee for Ruben Palazzo, and
PETER HACKINEN, *on their own behalf and*
11  *on behalf of other similarly situated persons,*

12              Plaintiffs,                     **AFFIDAVIT OF**
**PETER HACKINEN**
13      vs.

14
NATIONSTAR MORTGAGE LLC,
15
             Defendant.
16

17      I, PETER HACKINEN, solemnly affirm under the penalties of perjury and upon

18
personal knowledge that the contents of the foregoing paper are true:
19
20      1.  I am over 18 and competent to testify to the following facts.  I have personal knowledge

21          of the facts set forth herein.

22      2.  I submit this affidavit in support of the Motion to Certify a Class in this action against

23          Nationstar Mortgage LLC ("Nationstar").

24      3.  I reside in Seattle, Washington, where I own a home at 624 North 138th Street.

25

26

AFFIDAVIT OF PETER HACKINEN  - 1

Seattle Consumer Justice P.S.
10728 16th Avenue SW
Seattle, WA  98146
206.330.0595

4.  My home was subject to a prior mortgage subject to this action which I agreed to for my personal use.

5.  Since 2013, my mortgage was serviced by Nationstar when it became the collector on the loan (which was in default due my missed payments) on behalf of the entity owned it—i.e. Bank of New York Mellon f/k/a The Bank of New York as Trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates Series FHAMS 2007-FA1.

6.  Because I needed to refinance my mortgage loan, in 2023, I requested Nationstar to send me accurate payoff statements so I knew what sum would be needed to satisfy the mortgage.

7.  In response, I received written payoff quotes from Nationstar on multiple dates, including July 21, 2023, October 5, 2023, and March 11, 2024. On each of those quotes, Nationstar imposed fees for the payoff statements of at least $25 in each instance onto my mortgage account.

8.  I finally completed the refinance of my mortgage in late March 2024.

9.  Before and after paying off my former mortgage, at no time did Nationstar send me correspondence indicating the ownership of our mortgage loan has transferred from Bank of New York Mellon f/k/a The Bank of New York as Trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates Series FHAMS 2007-FA1 to Nationstar (or anyone else) as required by 15 U.S.C.A. § 1641(g) or 12 C.F.R. § 1026.39(b).

Seattle Consumer Justice P.S.
10728 16th Avenue SW
Seattle, WA  98146
206.330.0595

10. This action is to hold Nationstar liable for imposing fees for borrowers like me to obtain accurate payoff statements of our mortgage loans. It is my understanding that these fees are illegal under Federal and State law.

11. I understand that I will serve as a class representative to fairly and adequately protect the interests of others throughout the country and in Washington State.

12. I do not have any interests that are antagonistic to the proposed class. My claims are the same as the claims of all class members and I have the same interests, to hold Nationstar and its clients, if necessary, accountable for the claims asserted against them in this action.

13. I am prepared to participate in the discovery for this lawsuit, including sitting for a deposition. I am ready and willing to continue to do what may be necessary to pursue the claims in this case on behalf of the proposed class of persons and come to trial if necessary and appropriate.

14. I have retained counsel—Mr. Phillip Robinson and Ms. Christina Henry—to represent my interests and the interests of others like me who paid fees to obtain accurate payoff statements of their mortgage loans. Nationstar collected fees from us for those statements even though none of our agreements or laws expressly permitted them to do so.

I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.


_Peter Hackinen_
Peter Hackinen (Jul 23, 2024 11:55 PDT)
Peter Hackinen

Dated  Jul 23, 2024

AFFIDAVIT OF PETER HACKINEN - 3

Seattle Consumer Justice P.S.
10728 16th Avenue SW
Seattle, WA 98146
206.330.0595

1

## CERTIFICATE OF SERVICE

2      I hereby certify that I caused the Affidavit of Peter Hackinen to be served on the

3   following named person(s) on the date indicated below by notice of electronic filing using the

4   CM/ECF system:

5      I hereby certify that a copy of the foregoing and related other filings referenced herein,

6

7   and proposed order was provided to counsel to record for Defendant Nationstar at the time of

8   filing through the Court's CM/ECF system.

9

10      In addition, I also hereby certify that a paper copy of the same was sent by pre-paid U.S.

11   Mail to Freddie Mac's General Counsel at:

12

13

14   Heidi Mason
    Executive VP & General Counsel
15   Freddie Mac
    8200 Jones Brach Drive
16   McLean, VA 22102

17

18   EXECUTED THIS 23rd of July 2024

19

20                    /s/ Christina L. Henry
                    Christina L Henry

21

22

23

24

25

26

AFFIDAVIT OF PETER HACKINEN  - 4

# Hackinen_Affidavit -final (again)

Final Audit Report                                                                2024-07-23

| | |
|---|---|
| Created: | 2024-07-23 |
| By: | Christina Henry (mainline@hdm-legal.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAbV_F0tpxZj70Ecd6MmipP1OR1f1iTVz- |

## "Hackinen_Affidavit -final (again)" History

🗎 Document created by Christina Henry (mainline@hdm-legal.com)
2024-07-23 - 10:01:03 PM GMT

📧 Document emailed to Peter Hackinen (therecoup624@gmail.com) for signature
2024-07-23 - 10:01:08 PM GMT

🗎 Email viewed by Peter Hackinen (therecoup624@gmail.com)
2024-07-23 - 10:02:35 PM GMT

✒ Document e-signed by Peter Hackinen (therecoup624@gmail.com)
Signature Date: 2024-07-23 - 10:03:10 PM GMT - Time Source: server

✔ Agreement completed.
2024-07-23 - 10:03:10 PM GMT

**Adobe Acrobat Sign**

The Honorable Barbara J. Rothstein

1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON - SEATTLE

12

| | |
|---|---|
| RICARDO SALOM, CATHERINE PALAZZO as assignee for Ruben Palazzo, and PETER HACKINEN, *on their own behalf and on behalf of other similarly situated persons,*<br><br>    Plaintiffs,<br><br>    vs.<br><br>NATIONSTAR MORTGAGE LLC<br><br>And<br><br>FEDERAL HOME LOAN MORTGAGE CORPORATION, *on its own behalf and on behalf of similarly situated persons*<br><br>    Defendants. | Case No. 2:24-cv-00444-BJR<br><br><br><br>**DECLARATION OF PHILLIP ROBINSON IN SUPPORT OF CLASS CERTIFICATION** |

13

14

15

16

17

18

19

20

21

22

23

24

Phillip Robinson, being of lawful age, declares:

25

26

1. I have personal knowledge of the facts set forth herein.

2. I submit this declaration in support of the Plaintiffs' Motion to for Class Certification Pursuant to FED. R. CIV. P. 23.

3. I am an attorney first licensed to practice law in 2000. I am currently admitted to practice before the Maryland Court of Appeals, and various federal courts including the United States District Court for the District of Maryland, United States District Court for the District of Columbia, and the United States Court of Appeals for the Third Circuit, the United States Court of Appeals for the Fourth Circuit, and the United States Court of Appeals for the Ninth Circuit. I was also admitted to appear in this action *pro hac vice*.

4. I am also currently a member of Consumer Law Center, LLC.

5. My practice includes representing consumers in financial transactions, concentrating in debt collection and mortgage servicing practices. I have represented consumers in cases involving federal and state consumer protection laws for approximately 19 years. I have been counsel in over a hundred cases involving consumer protection claims before this and other courts throughout the country.

6. In addition to my current practice, I previously was Of Counsel to the Legg Law Firm LLC and a past Executive Director and Attorney for Civil Justice Inc., a private not-for-profit legal services program that concentrates on legal representation in the area of predatory consumer practices.

7. I have devoted the resources necessary to pursue the claims in this action and advanced time and costs to the benefit of the class members and Plaintiffs (as well as administration of the case on behalf of the Class), and engaged qualified co-counsel to undertake this action with me on behalf of the class, including all the appellate work. I and my co-counsel Christina

Henry spent substantial time investigating the factual and legal basis of the matters set forth in the Amended Complaint.  This includes researching the Plaintiffs' claims and records, reviewing information about the fees charged by the Defendants.  We have also extensively researched the Defendants' prior judicial admissions and testimony and related laws which significantly narrows the issues fundamentally at issue in this action.  We are also ready, able, and willing, if necessary, to pursue this case through trial.

8. I have testified by invitation and otherwise before the Maryland General Assembly and Congressional committees relating to consumer protection laws. I have also participated in drafting these laws.  In addition, I have also served as a presenter before numerous state and national conferences concerning consumer protection and foreclosure issues, including the Judicial Institute of Maryland.

9. In the community, I have also served in a variety of appointed positions including:

- Appointed Member of the <u>Maryland State Bar Association's Laws Committee</u> (2019 to present)
- Appointed Recipient of the Consumer Advocate of the Year Award, <u>National Association of Consumer Advocates</u> (2016)
- Appointed Member, <u>Montgomery County, Maryland Advisory Committee on Consumer Affairs</u> (2007 to 2011, 2021 to the Present)
- Appointed Member, <u>Maryland Consumer Rights Coalition</u> Board of Directors (2010-2011)
- Recipient of the Denis J. Murphy Consumer Advocate of the Year, <u>Maryland Consumer Rights Coalition</u> (2008)
- Appointed Member, <u>Governor O'Malley's Homeownership Preservation Task Force</u> (2007)

10. I have been appointed as class counsel in various actions before Federal and State Courts including:

- *Keneipp v. Fountainhead et al.* (USDC of MD, Civ. No. 03-cv-02813-WMN)*;*

- *Johnson v. Fountainhead* (USDC of MD, Civ. No. 03-cv-03106-WMN);

- *Greer v. Crown Title Corp.,* Cir. Ct. Balt. City, MD; Case No. 24-C-02001227 (September 2005);

- *Robinson v. Fountainhead Title Group Corp.*, 447 F.Supp.2d 478 (D.Md. 2006); 252 F.R.D. 275 (D.Md. 2008);

- *Benway v. Resource Real Estate Services*, 239 F.R.D. 419, (D.Md. 2006);

- *Taylor v. Savings First et al.*.Cir. Ct. Balt. City, MD; Case No. 24-C-02001635 (January 2008);

- *Proctor v. Metropolitan Money Store Corp.*, 645 F.Supp.2d 464, 483 (D.Md.2009);

- *Winston v. Regional Title & Escrow LLC*, (USDC of MD, Civ. No. 08-2633-RWT) (2009);

- *Hauk v. LVNV Funding, LLC*, 749 F. Supp. 2d 358 (D. Md. 2010);

- *Johnson v. Midland Funding, LLC*, USDC of MD, Case No.: 1:09-cv-02391-RDB (2010);

- *Bradshaw v. Hilco Receivables, LLC*, 725 F. Supp. 2d 532 (D. Md. 2010), 765 F. Supp. 2d 719 (D. Md. 2011);

- *Winemiller v. Worldwide Asset Purchasing, LLC*, USDC of MD, Civ. No. 1:09-CV-02487, 2011 WL 1457749 (2011);

- *Gardner v. Montgomery County Teachers Fed. Credit Union,* USDC of MD, Civ. No. 1:10-CV-02781-JKB, 2012 WL 1994602 (June 4, 2012);

- *Castillo v. Nagle & Zaller, PC,* USDC of MD, Civ. No. 12-cv-2338 (2013);

- *Rand v. Main Street Acquisition Corporation*,  Cir. Ct.for Balt, MD; Case No.24-O-13-004864 (2015);

- *Turner v. Asset Acquisition Group, LLC*, Cir. Ct.for Balt., MD; Case No. 24-C-13-004861 (2015);

- *Baumgardner v. Blatt*, Cir. Ct. for Anne Arundel County, MD; Case No. C-02-CV-14-000785(2015);

- *Martinez v. Grand Bel Manor Condominium, et al*. Cir. Ct. for Montgomery County, MD, Case No. 410129-V (2016);

- *Barbely v. Dyck O'Neal Inc*., Cir. Ct. for Anne Arundel County, MD, Case No. 02-C-14-190995 (2016);

- *Devan v. Wilcox; Wilcox v. Wilmington Savings Fund Society FSB, as Trustee for the Primestar-H Fund I Trust*, Cir. Ct. for Anne Arundel County, MD, Case No. C-02-cv-14-000099 (2016);

- *Hansford v. Erin Capital Management*, Cir. Ct. for Baltimore City, MD, Case No. 24-C—13-004860 (2016);

- *Jason v. National Loan Recoveries, LLC*, Cir. Ct. for Baltimore City, MD, Case No. 24-C-13-004862 (2017);

- *Hyatt v. Swann; Swann v. Pontus Capital Management, LLC*, Cir. Ct. for Anne Arundel County, MD, Case No. C-02-cv-15-2117 (2017);

- *Jernigan et al.  v. Protas, Spivok & Collins, LLC,* (USDC of MD, Civ. No. 1:16-cv-03058-ELH) (2017);

- *Payne et al. v. Marriot Employees Federal Credit Union*, (USDC for the E.D. of Pa., Civ. Act. No. 2:18-cv-04009-WB) (2019);

- *Grayson v. Freedom Mortgage Corporation*, Cir. Ct. for Montgomery County, MD, Case No. 444996-V (2019);

- *Graham v. Servis One, Inc.*, (USDC for the E.D. of Pa., Civ. Act. No. 2:18-cv-04377-WB) (2020);

- *White v. NewRez LLC d/b/a Shellpoint Mortgage Servicing & Federal National Mortgage Association*, (Cir. Ct. for Anne Arundel County, MD, Case No. C-02-cv-001060 (2021);

- *Cilano v. Shea*, USDC of MD, Case No.: 8:19-cv-0827-PWG (2021);

- *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370 (4th Cir. 2022);

- *Finch v. LVNV*, Cir. Ct. for Baltimore City, MD, Case No. 24-C-11-007101 (2015 & 2023);

- *Baxter v. Lakeview Loan Servicing & Nationstar Mortgage LLC*, Cir. Ct. for Anne Arundel County, MD, Case No. C-02-cv-22-654 (2023);

- *Baxter v. AmeriHome Mortg. Co., LLC*, 617 F. Supp. 3d 346 (D. Md. 2022); and

- *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 258 A.3d 296 (2021).

11. I also have been involved in numerous other impact cases than those identified in the previous paragraph which are identified on Exhibit A hereto.

12. Additionally, I regularly provide training for other attorneys, housing counselors, other professionals, and the public in Maryland and around the country. A sample of this work is attached as Exhibit B hereto.

13. In the Fall of 2023, I served as an Adjunct Professor of Consumer Law at both the University of Maryland School of Law and the Delaware School of Law at Widener University.

14. I am not aware of any pending similar litigation against the Defendants concerning the specific fees at issue in this action related to borrowers' requests for payoff statements.

15. Neither I nor the Plaintiffs have any interests that are antagonistic to the class and subclasses or that would adversely affect any of us from acting as class counsel for named representatives in this action. Each of the Plaintiffs and my co-counsel Christina Henry have been involved in all pre- and post-litigation activities in this action and are prepared to continue to litigate the actual issues in dispute (if Nationstar has any good faith basis to do so in light of it prior sworn statements and admissions and also those of its clients for whom it collects) on behalf of the class and subclass members. The Plaintiffs are also available and willing to appear at trial if necessary and answer all discovery.

16. Attached as Exhibit 15 to Plaintiffs' Continued Appendix of Exhibits is a publicly available document from PACER of a portion of a transcript of Defendant Freddie Mac taken in the matter of *Schneck v. SunTrust* in the United States District Court for the District of Maryland dated March 9, 2011.

17. Attached as Exhibit 16 to Plaintiffs' Continued Appendix of Exhibits is a portion of a transcript of Fannie Mae's Corporate Designee taken in the matter of *White v. New Rez and Fannie Mae* in the Circuit Court for Anne Arundel County, Maryland dated January 22, 2021.

18. Attached as Exhibit 24 to Plaintiffs' Continued Appendix of Exhibits is a publicly available document from PACER of a portion of a transcript of Defendant Nationstar taken in the matter of *Parker v. NewRez* in the United States District Court for the District of Maryland dated December 5, 2023.

I swear under penalty of perjury and upon personal knowledge that the foregoing is true and correct to the best of my knowledge.

Executed on July 15, 2024

_____

Phillip Robinson

# Exhibit A:

## PHILLIP ROBINSON

### INDIVIDUAL IMPACT CASES

*Wells Fargo Home Mortg., Inc. v. Neal,* 398 Md. 705, 922 A.2d 538 (Md.,2007)
- Co-counsel for the *amici curiae*.

*Delph v. AllState Home Mortgage*, Mont. Cty. Cir Ct. Case No. 278020V (July 2008)
- First judgment in Maryland to find a payment-option-arm mortgage loan to be unfair and deceptive pursuant to the state UDAP statute; successful remand motion reported at 478 F. Supp. 2d 852 (D. Md. 2008).

*Griffin v. Bierman,* 403 Md. 186 (2008)
- Served as trial and appellate co-counsel for homeowner challenging the constitutionality of Maryland foreclosure notice requirements; the Court of Appeals denied the challenge but the published decision aided the legislative reforms enacted a month later and has tipped the deference to homeowners in Maryland's foreclosure proceedings.

*New Towne Properties LLC v. Boyd,* Md. Court of Special Appeals (Case No. 2058) (unpublished) (10/17/2008)
- Served as co-counsel at the trial level and counsel at the appellate level for homeowners victimized by a foreclosure rescue scheme. In this first impression case, the appellate court upheld the lower court ruling in favor of homeowners and the protections of a new state law to protect vulnerable homeowners.

*Massey v. Lewis,* CIV. AMD 08-261, 2009 WL 6885028 (D. Md. Feb. 24, 2009)
- Served as counsel at the trial level for victim of wide ranging bankruptcy and mortgage fraud scheme which resulted in criminal and civil judgments. Through this representation, Ms. Massey received title to her home back as well as a judgment for damages and attorney fees in the amount of $670,000.

*Harmon v. BankUnited*, CIV. WDQ-08-3456, 2009 WL 3487808 (D. Md. Oct. 22, 2009)
- Served as counsel in surviving a motion to dismiss a consumer protection act claim involving a payment option mortgage.

*Addison v. Lochearn Nursing Home, LLC,* 411 Md. 251, 983 A.2d 138 (2009)
- Served as trial and appellate co-counsel in opposing motion to compel arbitration; established that denials of motions to compel arbitration cannot be appealed in Maryland until a final order is entered in the trial court.

*Julian v. Buonassissi,* 414 Md. 641 (2010)
- Served as trial and appellant counsel for successful appeal concerning the rights of mortgage backed security to property acquired by massive foreclosure rescue fraud in favor of client and victim.

*Boyd v. New Towne Properties LLC*, US Bank. Ct., for Md. Case No. 08-00357, Final Judgment (June 2010).
- Obtained final judgment of $104,000 for victims of foreclosure rescue scheme; achieved previous settlements for clients which reformed mortgage to loan amount at the time of the scam resulting in a return of $150,000 in equity**.**

*Hollidayoake v. JBL Mortgage Network, LLC*, et al, Anne Arundel Cir. Ct. Civ No. 02-C10-155944 (2012)
- Served as lead counsel for all pre-trial and trial purposes; presented plaintiff's Real Estate Settlement Procedures Act and state unfair and deceptive practice claims against mortgage defendants in six-day jury trial concerning the arrangement of payment option mortgages for a 72 year old consumer.

*In re Bolthouse, Case no. 10-17021 (Bolthouse v. PHH Mortgage Corporation (U.S.B.C. Md.)(July 22, 2013)*
- Obtained $175,000 non-confidential settlement for homeowners seeking judgment for botched modification attempts under federal and state law.

*Schneck v. SunTrust Mortgage, Inc.*, Case No. Case No.: 11-1878—CCB (D. Md. 2013)
- Obtained $175,000 judgment for homeowners seeking judgment for botched modification attempts under federal and state law.

*Hastings v. Ocwen Loan Servicing, LLC*, No. CIV.A. GLR-14-2244, 2014 WL 7188784, at *1 (D. Md. Dec. 16, 2014)
- Serving as counsel in breach of a loan modification agreement and settlement agreement case brought under federal and state law.

*Rizwan v. Lender Servs. Inc.*, 176 F. Supp. 3d 513 (D. Md. 2016)
- Successfully obtained remand of improperly removed counterclaims filed in a foreclosure case.

*Ceccone v. Carroll Home Servs., LLC*, 454 Md. 680, 165 A.3d 475 (2017)
- Counsel for *Amici Curiae* in precedent case establishing limits on a business' attempting to contract away its liability for consumer protection claims.

*Hackett v. Bayview Loan Servicing, LLC*, No. 8:18-CV-01286-PX, 2019 WL 1934672, at *1 (D. Md. Apr. 30, 2019)
- Successfully obtained remand of improperly removed class action case.

*Gillis v. Household Fin. Corp. III*, No. GJH-18-3923, 2019 WL 3412621 (D. Md. July 29, 2019)
- Successfully defended motion to dismiss in mortgage servicing abuse case

*Banks v. Rushmore Loan Services*, Montgomery Cir. Ct., Maryland Civ No. 444995-V
- Successfully defended motion to dismiss in mortgage servicing abuse case and obtained summary judgment as to liability against mortgage servicer.

*Andrews & Lawrence Pro. Servs., LLC v. Mills*, 467 Md. 126, 223 A.3d 947 (2020)
- Counsel for *Amici Curiae* in precedent case establishing the Maryland Consumer Protection Act applies to debt collection attorneys.

*Harris v. Nationstar Mortg. LLC*, No. CV CCB-19-3251, 2020 WL 4698062 (D. Md. Aug. 13, 2020)
- Successfully survived motion to dismiss federal and state law claims in a mortgage servicing abuse case where the mortgage servicer imposed fees and charges not owed as a matter of law and also failed to conduct any reasonable investigation.

*Wheeling v. Selene Fin. LP*, 473 Md. 356, 250 A.3d 197 (2021)
- Successfully appealed and defended remedial statute passed to protect protected tenants and former owners in possession of their former properties from unlawful threats of eviction by mortgage servicer.

*Cain v. Midland Funding, LLC*, 475 Md. 4, 256 A.3d 765 (2021)
- Successfully appealed individual questions of unlawful debt collection challenging predatory debt collection practices.

*Newsom v. Brock & Scott, PLLC*, 253 Md. App. 181, 264 A.3d 283 (2021)
- Successful appeal against directed verdict at trial in favor of debt collection law firm, interpreting mortgage fraud statute, and state debt collection statute; holding affirmed state debt collection statute governs foreclosure activities in contrast with FDCPA.

*Simmons v. Maryland Mgmt. Co.*, 253 Md. App. 655, 269 A.3d 369, 664, <u>cert. denied,</u> 276 A.3d 615 (Md. 2022)
- Successful appeal of debt collection claims against collectors and their clients based on time barred debts.

*Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180 (4th Cir. 2022)
- Successful appeal defending Dodd-Frank's ban on arbitration.

*Morgan v. Caliber Home Loans, Inc.*, 26 F.4th 643 (4th Cir. 2022)
- Successful appeal on the scope of the Real Estate Settlement Procedures Act after Dodd-Frank related to the Second Circuit's decision in *Naimoli v. Ocwen Loan Servicing, LLC*, 22 F.4th 376 (2d Cir. 2022).

*Brown v. Transworld Sys., Inc.*, 73 F.4th 1030 (9th Cir. July 14, 2023)
- Successful appeal reversing the dismissal of FDCPA claims based upon the statute of limitations for unfair litigation conduct that occurred less than one year before the commencement of the action.

# Exhibit B:

## PHILLIP ROBINSON

### CONFERENCE PRESENTATIONS & SPEAKING ENGAGEMENTS

**2023**

- Consumer Rights Litigation Conference in Chicago, IL
      Title: Advances RESPA Litigation Issues
      Title: Homeownership Roundtable: Zombie Seconds

- Mortgage Training Conference in Philadelphia, PA

    Title: Mortgage Servicing Litigation Post-Covid

- National Association of Consumer Advocates and National Consumer Law Center Spring Training in New Orleans, LA

    Title: eDiscovery and How Debt Collectors Manage Their Data: How to get the

    discovery you need from electronically stored information.

**2022**

- Consumer Rights Litigation Conference in Seattle, WA

    Title: Fighting Court Secrecy in Civil Litigation

- Preventing Home Foreclosures in Oregon in Portland, OR

    Sponsor: Oregon State Bar

- Mortgage Training Conference in St. Louis, MO

    Title: Litigation: RESPA Updates

- Defending Zombie Second Liens in Baltimore, MD

    Sponsor: Pro Bono Resource Center of Maryland

**2021**

- Make the Right Mortgage Decision for You (virtual)

    Sponsor: Montgomery County Office of Consumer Protection

- Mortgage Training Conference (virtual)

Title: Litigation: Taking the Deposition of the QWR Rep

- Dealing with Mortgages and COCs During COVID-19 (virtual)
  Sponsor: City of Takoma Park & Civil Justice Inc.
- Consumer Rights Litigation Conference (virtual)
  Title: Using Violations of Mortgage Servicing Rules without Private Rights of
  Action as Predicates for FDCPA and UDAP Claims
- Understanding the Maryland Homeowner Assistance Fund, Moderator (virtual)
  Sponsor: Montgomery County Office of Consumer Protection

**2019**

- Consumer Rights Litigation Conference in Boston, MA
  Newcomers Breakfast Host

**2018**

- Practicing Law Institute in San Francisco, CA
  Title: Representing the Pro Bono Client: Consumer Law Basics 2018

- NAACP, Prince George's County Chapter
  Title: Foreclosure Defense Workshops

- Consumer Rights Litigation Conference in Denver, CO
  Title: FDCPA Claims and Mortgage Foreclosures

**2017**

- Fair Debt Collections Conference in New Orleans, LA
  Title: FDCPA Claims Related to Mortgage Servicing
- Mortgage Training Conference in Philadelphia, PA
  Title: Dealing with Distressed Mortgage Purchasers
- Consumer Rights Litigation Conference in Washington, DC
  Title: Discovery Issues in Mortgage Servicing and Foreclosure Litigation

**2016**

- Mortgage Training Conference in Boston, MA
  Title: Litigating Mortgage Cases Parts 1, 2, and 3

- Consumer Rights Litigation Conference in Anaheim, CA

   Title: Litigating Servicing Cases: Preparing and Presenting Mortgage

   Misconduct at Trial

**2015**

- Mortgage Training Conference in Washington, DC

   Title: Discovery: Getting the Information You Need

- Maryland State Bar Association Solo Day

   Title: Doing Well by Doing Good: How to Spot a Good Consumer Case

**2011**

- Judicial Institute of Maryland

   Title: Consumer Protection Law

- Homeowner Retention Workshop

   Sponsor: Maryland Department of Housing & Community Development

**2010**

- Maryland Department of Housing and Community Development and Civil Justice Inc.
   Title: New Foreclosure Prevention 101-A Beginner's Guide

**2009**

- Consumer Rights Litigation Conference in Philadelphia, PA

   Title: Foreclosure Consultant and Loan Modification Scams

- Homeowner Retention Workshop

   Sponsor: Congresswoman: Donna Edwards

- Homeowner Retention Workshop

   Sponsor: Congressmen: Steny Hoyer

**2008**

  - Maryland Cash Campaign

     Title: Money Power Day

  - Homeowner Retention Workshop

Sponsor: Congressman Elijah Cummings

- Consumer Rights Litigation Conference in Portland, OR

  Title: Foreclosure

- Maryland Institute for Continuing Professional Education of Lawyers, Inc.

  Title: Advanced Real Property Institute

BILLING CODE: 480-AM-P

**BUREAU OF CONSUMER FINANCIAL PROTECTION**

**12 CFR Part 1006**

**Debt Collection Practices (Regulation F); Pay-to-Pay Fees**

**AGENCY:**  Bureau of Consumer Financial Protection.

**ACTION:**  Advisory opinion.

**SUMMARY:**  Section 808(1) of the Fair Debt Collection Practices Act (FDCPA or Act) prohibits debt collectors from collecting "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  The Consumer Financial Protection Bureau (CFPB) issues this advisory opinion to affirm that this provision prohibits debt collectors from collecting pay-to-pay or "convenience" fees, such as fees imposed for making a payment online or by phone, when those fees are not expressly authorized by the agreement creating the debt or expressly authorized by law.  This advisory opinion also clarifies that a debt collector may also violate section 808(1) when the debt collector collects pay-to-pay fees through a third-party payment processor.

**DATES:**  This advisory opinion is effective on [INSERT DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

**FOR FURTHER INFORMATION CONTACT:**  Sonya Pass, Senior Legal Counsel and Chief of Staff, Legal Division, (202) 435-7700.  If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Advisory Opinion

### A. Background

Congress enacted the FDCPA in 1977 to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."[1]  The statute was a response to "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors," which Congress attributed to the "inadequacy" of "existing laws and procedures," including State laws.[2]  To remedy this, the FDCPA imposes various requirements and restrictions on debt collectors' debt collection activity.  Relevant here is section 808, which provides that a "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."[3]  Section 808 then states that "[w]ithout limiting the general application of the foregoing, the following conduct is a violation of this section" and enumerates eight specifically prohibited practices, including the "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."[4]

At the time of the FDCPA's enactment, the Federal Trade Commission (FTC) was the agency that administered, and had primary responsibility for enforcing, the FDCPA.[5]  Then, in 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, which

---

[1] Pub. L. No. 95-109, sec. 802(e), 91 Stat. 874, 874 (codified at 15 U.S.C. 1692(e)).
[2] 15 U.S.C. 1692(a), (b).  *See also* S. Rep. No. 95-382, at 2 (1977) (stating that "debt collection abuse by third party debt collectors [was] a widespread and serious national problem," which Congress largely attributed to a "lack of meaningful legislation on the State level").
[3] 15 U.S.C. 1692f.
[4] 15 U.S.C. 1692f(1).
[5] *See* 15 U.S.C. 1692*l*(a) (2010).

created the CFPB and granted it authority to administer, implement, and enforce the FDCPA.[6]

Congress also provided the CFPB authority to prescribe rules under the FDCPA.[7]  Pursuant to

that authority, in 2020, the CFPB issued Regulation F, which implements the FDCPA, to

prescribe rules governing the activities of debt collectors.[8]  The CFPB implemented FDCPA

section 808(1) at 12 CFR 1006.22(b) by "generally mirror[ing] the statute, with minor wording

and organizational changes for clarity."[9]  In particular, the CFPB stated that the "term 'any

amount' includes any interest, fee, charge, or expense incidental to the principal obligation."[10]

In 2013, the CFPB launched its supervisory program over certain larger participants in

the consumer debt collection market.  Through these examinations, the CFPB ascertains

compliance with the FDCPA, and now Regulation F, as well as other Federal consumer financial

laws.  The CFPB also periodically publishes *Supervisory Highlights* with anonymized findings

and analysis from these supervisory examinations, as well as compliance bulletins to provide

entities with guidance on complying with certain legal requirements.

For example, in 2017, the CFPB issued a compliance bulletin (Bulletin) that "provides

guidance to debt collectors about compliance with the [FDCPA] when assessing phone pay

fees," a type of pay-to-pay fee.[11]  The Bulletin summarizes CFPB staff's conclusion that, under

section 808(1), debt collectors may collect such pay-to-pay fees only if the underlying contract

or state law expressly authorizes those fees.[12]  In particular, the Bulletin states that in at least one

supervisory exam, CFPB examiners found that a debt collector "violated [section 808(1)] when

---

[6] Pub. L. No. 111-203, sec. 1089, 124 Stat. 1376, 2093 (codified at 15 U.S.C. 1692*l*(b)(6)).
[7] 15 U.S.C. 1691*l*(d).
[8] *See* Debt Collection Practices (Regulation F), 85 FR 76734 (Nov. 30, 2020); Debt Collection Practices (Regulation F), 86 FR 5766 (Jan. 19, 2021).
[9] 85 FR 76734, 76833.
[10] *Id*. at 76833, 76892.
[11] CFPB Compliance Bulletin 2017-01, 82 FR 35936, 35936 (Aug. 2, 2017).
[12] *Id*. at 35938.

3

they charged fees for taking mortgage payments over the phone" where the underlying contracts creating the debt did not expressly authorize collecting such fees and where the relevant State law did not "expressly permit collecting such fees."[13]

## B.  Coverage

This advisory opinion applies to debt collectors as defined in section 803(6) of the FDCPA and implemented in Regulation F, 12 CFR 1006.2(i).  As used in this advisory opinion, pay-to-pay fees—sometimes called convenience fees—refers to fees incurred by consumers to make debt collection payments through a particular channel, such as over the telephone or online.

## C.  Legal Analysis

### 1.  Any Amount

Section 808(1) of the FDCPA prohibits debt collectors, in relevant part, from "collect[ing] . . . *any* amount (*including* any interest, fee, charge, or expense incidental to the principal obligation)."[14]  As the Supreme Court has explained, the "word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"[15]  In addition, under its ordinary meaning, the term "including" typically indicates a partial list.[16]  The CFPB interprets

---

[13] *Id*. (explaining that the CFPB examiners had instructed the company to collect pay-by-phone fees only "where expressly authorized by contract or state law"); *see also* CFPB: Fall 2014 Supervisory Highlights, at 7, *available at* https://files.consumerfinance.gov/f/201410_cfpb_supervisory-highlights_fall-2014.pdf (similar); CFPB: Fall 2015 Supervisory Highlights, at 20-21, *available at* https://files.consumerfinance.gov/f/201510_cfpb_supervisory-highlights.pdf (similar).

[14] 15 U.S.C. 1692f(1) (emphasis added).  *See also* 12 CFR 1006.22(b).

[15] *Ali v. Fed. Bur. of Prisons*, 552 U.S. 214, 219 (2008) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997), in turn quoting Webster's Third New International Dictionary 97 (1976)).

[16] *Include*, Black's Law Dictionary (11th ed. 2019).  Additionally, as the Supreme Court has stated, "including" is "not [a term] of all-embracing definition, but connotes simply an illustrative application of the general principle." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941); *see also Arizona State Bd. For Charter Schools v. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006) ("[T]he word 'including' is ordinarily defined as a term of illustration, signifying that what follows is an example of the preceding principle."); *United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019) (explaining that "including" "is an introductory term for an incomplete list of examples").

the words "any" and "including" as used in section 808(1) consistent with their ordinary meanings. Accordingly, the CFPB clarifies that FDCPA section 808(1) and Regulation F, 12 CFR 1006.22(b), apply to any amount collected by a debt collector in connection with the collection of a debt,[17] including, *but not limited to*, any interest, fee, charge, or expense that is incidental to the principal obligation.

Consistent with this interpretation, the CFPB further clarifies that pay-to-pay fees charged to consumers for accepting a consumer's payment on a debt through a particular payment channel are an "amount" within the meaning of FDCPA section 808(1) and Regulation F, 12 CFR 1006.22(b). The CFPB acknowledges that some courts have held otherwise, finding that pay-to-pay fees do not violate FDCPA section 808(1) because such fees are not "incidental to the principal obligation."[18] But, as explained, the CFPB interprets section 808(1) to apply to "any amount," even if such amount is not "incidental to" the principal obligation.[19]

2. *Permitted by Law*

Section 808(1) of the FDCPA prohibits, in relevant part, the collection of any amount "unless such amount is expressly authorized by the agreement creating the debt or *permitted by*

---

[17] The CFPB notes that, if a debt collector is engaged in a truly separate transaction and is not collecting or attempting to collect a debt covered by the FDCPA, section 808(1) does not apply.

[18] *See, e.g., Flores v. Collection Consultants of Cal.*, No. SA CV 14-0771-DOC, 2015 WL 4254032, at 10 (C.D. Cal. Mar. 20, 2015); *Shula v. Lawent*, 359 F.3d 489, 492-93 (7th Cir. 2004). In *Shula*, it does not appear that that court was presented with the question whether "any amount" included more than "fees . . . incidental to the principal obligation"; nor did that court analyze the issue. For the reasons stated above, the CFPB disagrees with that decision to the extent it suggested that section 808(1) applies only to amounts that are incidental to the principal obligation.

[19] Section 808(1) of the FDCPA and Regulation F, 12 CFR 1006.22(b), also covers pay-to-pay fees for the separate reason that such fees are "incidental to" the principal obligation. While the FDCPA does not define "incidental," it is ordinarily understood as "related to," *see* Collins English Dictionary (12th ed. 2014), or "[s]ubordinate to something of greater importance," *see* Black's Law Dictionary (11th ed. 2019). Pay-to-pay fees meet these definitions: They are "related to" the principal obligation because they are fees charged for paying the principal obligation. Indeed, if the principal obligation did not exist, then neither would the pay-to-pay fee. These fees are also generally minor in comparison to the outstanding debt and are therefore "subordinate to" the principal obligation.

*law*."[20]  The word "permit" is susceptible to multiple meanings, but it tends to refer to "affirmative authorization," and the CFPB reads section 808(1) to use the word in that sense. Dictionaries provide that "permit" can mean either "to consent to expressly or formally," suggesting affirmative authorization, or to "allow" or "to acquiesce, by failure to prevent," suggesting that the lack of a prohibition is sufficient.[21]  However, "allow and permit have an important connotative difference.  Allow . . . suggests merely the absence of opposition, or refraining from a proscription.  In contrast, permit suggests affirmative sanction or approval."[22] Use of the word "permit," rather than "allow," therefore suggests that affirmative authorization, rather than a mere lack of a prohibition, is required.  Furthermore, as the Supreme Court has instructed, "words of a statute must be read in their context,"[23] and here, "permit" is used not in isolation but as part of the phrase "permitted by law."  While in some contexts one may "permit" something by failing to prevent it, it is far less natural to understand "permitted by law" to mean "permitted by the absence of any law prohibiting it."

The CFPB therefore interprets FDCPA section 808(1) to prohibit a debt collector from collecting any amount unless such amount either is expressly authorized by the agreement creating the debt (and is not prohibited by law) or is expressly permitted by law.  That is, the CFPB interprets FDCPA section 808(1) to permit collection of an amount only if: (1) the agreement creating the debt expressly permits the charge and some law does not prohibit it; or (2) some law expressly permits the charge, even if the agreement creating the debt is silent.  The

---

[20] 15 U.S.C. 1692f(1) (emphasis added).  *See also* 12 CFR 1006.22(b).
[21] *Permit*, Webster's Third New International Dictionary 1683 (1976); *see also Permit*, Black's Law Dictionary (5th ed. 1979) (defining "permit" as "[t]o suffer, allow, consent, let; to give leave or license; to acquiesce, by failure to prevent, or to expressly assent or agree to the doing of an act").
[22] Garner's Dictionary of Legal Usage 46 (3d ed. 2011); *see also Alexander v. Carrington Mortgage Services*, 23 F.4th 370, 377 (4th Cir. 2022) (holding "permitted by law" requires affirmative authorization).
[23] *King v. Burwell*, 576 U.S. 473, 492 (2015).

CFPB's interpretation of the phrase "permitted by law" applies to any "amount" covered under section 808(1), including pay-to-pay fees.[24]

Under the CFPB's interpretation, an amount is impermissible if both the agreement creating the debt and other law are silent. For example, under the CFPB's interpretation, amounts, including pay-to-pay fees, that are neither expressly authorized by the agreement creating the debt nor expressly authorized by law are impermissible under FDCPA section 808(1) and Regulation F, 12 CFR 1006.22(b), even if such amounts are the subject of a separate, valid agreement under State contract law.[25] Although some courts have adopted this "separate agreement" interpretation to permit debt collectors to collect, for example, certain pay-to-pay fees, the CFPB declines to do so. Such a reading would render the part of section 808(1) that refers to amounts "expressly authorized by the agreement creating the debt" superfluous[26] because a lawful agreement creating the debt is, by definition, an agreement valid under State contract law.[27] In addition, the separate agreement interpretation ignores section 808(1)'s focus on the "amount" being "expressly authorized by the agreement creating the debt" or "permitted

---

[24] Note that, even if pay-to-pay fees are expressly authorized in the underlying agreement or permitted by State law, debt collectors must still take care to comply with other laws, including other provisions of the FDCPA and the Consumer Financial Protection Act's prohibition on unfair, deceptive, or abusive acts or practices, when assessing pay-to-pay fees.

[25] The CFPB acknowledges that some district courts have held otherwise. *See, e.g.*, *Thomas-Lawson v. Carrington Mortg. Servs., LLC*, No. 2:20-cv-07301-ODW, 2021 WL 1253578 (C.D. Cal. Apr. 5, 2021), *appeal pending*, No. 21-55459 (9th Cir.).

[26] *See Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019) (refusing to interpret the FDCPA in a way that would render a provision "superfluous").

[27] *Accord Alexander*, 23 F.4th at 379 (rejecting the separate agreement interpretation in part because it would render section 808(1)'s other prong superfluous). The separate agreement interpretation also would conflict with the FDCPA's use of the phrase "expressly authorized," since general principles of State contract law allow parties to agree to express or implied terms as part of any agreement. *See* Restatement (Second) of Contracts § 4 cmt. a (1981). If general principles of contract law counted as a "law" that "permitted" the collection of amounts, debt collectors would be free to collect not only those amounts authorized by separate agreements, but also to collect amounts that are only implicitly authorized by the agreement creating the debt—further rendering section 808(1)'s "express" requirement meaningless.

7

by law."[28]   Under section 808(1), it is not enough for the agreement to be "permitted by law";
rather, the "amount" itself must be.  Contract law standing alone does not provide for the
collection of any specific amounts—and no principle of contract law says debt collectors may
collect pay-to-pay fees.[29]  Thus, while it may have been permissible under contract law for a debt
collector to enter into separate agreements with consumers, contract law does not permit the
"amount" at issue, i.e., the pay-to-pay fees.

The CFPB's interpretation of "permitted by law" in FDCPA section 808(1) is consistent
with the previous interpretation in a CFPB compliance bulletin as discussed in part I.A., as well
as with the prior interpretation of FTC staff and the holdings of the majority of courts to address
the issue.[30]  In particular, in 1988, FTC staff issued Commentary that set forth "staff
interpretations" of the FDCPA.[31]  As relevant here, FTC staff stated that, under section 808(1), a
"debt collector may attempt to collect a fee or charge in addition to the debt if . . . the contract
[creating the debt] is silent but the charge is otherwise expressly permitted by state law."[32]
Conversely, FTC staff stated that "a debt collector may not collect an additional amount if . . .
the contract does not provide for collection of the amount and state law is silent."[33]

---

[28] *See Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002) ("The statute does not ask whether [the debt collector's] actions were permitted by law . . ., it asks whether the *amount* he sought to collect was permitted by law." (emphasis in original)).

[29] While a *contract* might, consistent with contract law, permit an amount, section 808(1) only permits collecting amounts authorized *by contract* when the amount is expressly authorized by the contract "creating the debt."

[30] *See, e.g., Alexander*, 23 F.4th at 376-77 (holding, in a case regarding pay-to-pay fees, that "'permitted by law' requires affirmative sanction or approval"); *Seeger v. AFNI, Inc.*, 548 F.3d 1107, 1111, 1112 (7th Cir. 2008) (finding that, to be entitled to collect a fee, debt collectors "must show that the fee is either authorized by the governing contract or that it is permitted by Wisconsin law" and that, in that case, that neither an agreement nor a law expressly permitting a collection fee existed); *Tuttle v. Equifax Check*, 190 F.3d 9, 13 (2d Cir. 1999) (explaining that if "state law neither affirmatively permits nor expressly prohibits service charges, a service charge can be imposed only if the customer expressly agrees to it in the [underlying] contract").

[31] *See* Staff Commentary on the Fair Debt Collection Practices Act, 53 FR 50097, 50101 (Dec. 13, 1988).

[32] *Id.* at 50108.

[33] *Id.*

The CFPB's interpretation is also consistent with the FDCPA's statutory purposes. As noted in part I.A, Congress passed the FDCPA because it found that existing laws and procedures, including at the state level, were inadequate to protect consumers. Given this concern, it would be particularly unnatural to understand "permitted by law" to mean "permitted because no law prohibits it." Accordingly, the CFPB interprets FDCPA section 808(1) and Regulation F, 12 CFR 1006.22(b), to prohibit debt collectors from collecting any amount, including any pay-to-pay fee, not expressly authorized in the agreement creating the debt unless there is some law that affirmatively authorizes the collection of that amount.

### 3. Payment Processors

Debt collectors may violate FDCPA section 808(1) and Regulation F, 12 CFR 1006.22(b), when using payment processors who charge consumers pay-to-pay fees. For instance, a debt collector collects an amount under section 808(1) at a minimum when a third-party payment processor collects a pay-to-pay fee from a consumer and remits to the debt collector any amount in connection with that fee, whether in installments or in a lump sum.[34]

## II. Regulatory Matters

This is an advisory opinion issued under the CFPB's authority to interpret the FDCPA, including under section 1022(b)(1) of the Consumer Financial Protection Act, which authorizes guidance as may be necessary or appropriate to enable the CFPB to administer and carry out the purposes and objectives of Federal consumer financial laws, such as the FDCPA.[35]

An advisory opinion is a type of interpretive rule. As an interpretive rule, this advisory opinion is exempt from the notice-and-comment rulemaking requirements of the Administrative

---

[34] *See, e.g.,* Ballentine's Law Dictionary (3d ed. 2010) (defining "collect" as "to receive payment"); *cf.* 15 U.S.C. 1692a(6) (defining debt collector to include persons who "directly or indirectly" collect debts).
[35] 12 U.S.C. 5512(b)(1); 5481(14); 5481(12)(H).

Procedure Act.[36]  Because no notice of proposed rulemaking is required, the Regulatory

Flexibility Act does not require an initial or final regulatory flexibility analysis.[37]  The CFPB has

also determined that this advisory opinion does not impose any new or revise any existing

recordkeeping, reporting, or disclosure requirements on covered entities or members of the

public that would be collections of information requiring approval by the Office of Management

and Budget under the Paperwork Reduction Act.[38]

Pursuant to the Congressional Review Act,[39] the CFPB will submit a report containing

this advisory opinion and other required information to the United States Senate, the United

States House of Representatives, and the Comptroller General of the United States prior to the

opinion's published effective date.  The Office of Information and Regulatory Affairs has

designated this advisory opinion as not a "major rule" as defined by 5 U.S.C. 804(2).


/s/ Rohit Chopra

_____

**Rohit Chopra**,

*Director, Consumer Financial Protection Bureau.*

---

[36] 5 U.S.C. 553(b).
[37] 5 U.S.C. 603(a), 604(a).
[38] 44 U.S.C. 3501-3521.
[39] 5 U.S.C. 801 *et seq*.

Mortgage Research Center, LLC - NMLS #1907. Not available in NY.

 MORTGAGE RESEARCH CENTER

**Home Loans  Rates  Credit  Real Estate  Calculators**

**Home Loans**

**Rates**

**Credit**

**Economy**

**Calculators**

/  Home Loans

# 10 Biggest Cash-Out Refinance Lenders Helping Homeowners Tap Record Home Equity

by **Jonathan Davis** in **Home Loans**

MAY 13, 2024, 4:50 PM UTC    🕐  9 MIN



**See how much home you can afford**    |  Find Out Now  |

A cash-out refinance can convert your home equity to cash. And it could be a fantastic time to do just that. ICE Mortgage Technology estimates that homeowners with mortgages are sitting on an average of $206,000 in tappable equity. That could translate to a college education, a home addition, accessory dwelling unit construction, or another financial goal.

But who are the best cash-out lenders? Not all providers are the same – some are more likely to offer great rates, a painless application process, and top-notch customer service.

In some mortgage shoppers' books, bigger is better. That's why we've compiled a list of the ten biggest cash-out refinance lenders by the number of loans originated in 2023.

**Check your cash-out eligibility with a lender. Start here.**

# Biggest Cash-Out Refinance Lenders

The ten biggest cash-out refinance lenders for owner-occupied homes accounted for nearly 47% of all cash-out refinances last year. These mortgage companies may not provide the lowest quotes in every situation, but they've certainly established themselves as the largest cash-out refinance lenders for a reason.

| Rank | Lender | Cash-Out Refinances in 2023 | Market Share |
|------|--------|------------------------------|--------------|
| 1 | Rocket Mortgage | 130,547 | 22.34% |
| 2 | United Wholesale Mortgage | 35,992 | 6.16% |

See how much home you can afford    Find Out Now

| 3 | Nationstar Mortgage | 22,006 | 3.77% |
| 4 | PennyMac | 17,219 | 2.95% |
| 5 | LoanDepot | 17,074 | 2.92% |
| 6 | Freedom Mortgage | 12,952 | 2.22% |
| 7 | Flagstar Bank | 10,103 | 1.73% |
| 8 | Newrez | 9,244 | 1.58% |
| 9 | AmeriSave | 9,123 | 1.56% |
| 10 | Huntington National Bank | 8,940 | 1.53% |

*Home Mortgage Disclosure Act (HMDA) data from the Consumer Finance Protection Bureau (CFPB), accessed via PolygonResearch.com HMDAVision, May 13, 2024.*

# 1. Rocket Mortgage

Rocket Mortgage is the nation's biggest cash-out refinance lender, leading the pack by a considerable margin. Their 2023 originations accounted for a whopping 22% of the total cash-out refinance market, with over three-and-a-half times more loans issued than the second-largest lender.

Their secret? It may be the company's position at the forefront of mortgage tech. Their

**See how much home you can afford** | Find Out Now

of proprietary data to streamline the cash-out refinance process; the system has reportedly helped Rocket Mortgage reduce closing times by 25% since 2022.

## 2. United Wholesale Mortgage

Ranking second with about 6% of all cash-out refinances, United Wholesale Mortgage (UWM) is a major wholesale lender with a nationwide network of independent mortgage brokers. Unlike most other lenders on our list, they don't deal directly with consumers.

While UWM may be second in the number of cash-out refinances, with 35,992, the company ranked first in total mortgages originated. According to their website, United Wholesale Mortgage offers conventional cash-out refinances with a credit score as low as 620 through their mortgage broker partners.

**Mortgage Rates for July 16, 2024**

**Home Purchase** in **21842**
$400,000 with 20% Down Payment. 740-759 Credit Score

**CHANGE SEARCH OPTIONS**

## 3. Nationstar Mortgage

Nationstar Mortgage ranked third in 2023 with a total of 22,006 cash-out refinances originated. While the company primarily operates under the relatively new Mr. Cooper brand name, Nationstar has been in the mortgage market for over 25 years. Over that time, they've served more than 4.1 million homeowners, according to their website.

Cash-out refinances were Nationstar Mortgage's primary focus in 2023, comprising nearly 78% of their total (28,244) issued loans.

## 4. PennyMac

See how much home you can afford    Find Out Now

Since its founding in 2008, PennyMac boasts having worked with more than one million homeowners. When it comes to cash-out refinances, the company comes in fourth, with 2.95% of the market last year.

PennyMac was ranked 20th in total mortgage originations in 2023; however, they saw the fifth-largest year-over-year decline on that list. This was especially true for their "rate and term" no-cash refis, which dropped 79% from 2022.

**Find your cash-out refinance lender here.**

## 5. LoanDepot

LoanDepot is a direct lender that, according to its website, has funded more than $275 billion in mortgages since 2010. In 2023, it was the fifth largest cash-out provider, originating 17,074 loans.

LoanDepot has implemented its proprietary platform, "mello," which simplifies the cash-out refinance process by directly verifying employment, income, and assets. The company boasts that mello lets borrowers close their mortgages in as few as eight days.

In addition to 5th place for cash-out refinances, LoanDepot ranked 10th biggest mortgage originator and 8th biggest FHA lender for 2023.

## 6. Freedom Mortgage

Freedom Mortgage works directly with consumers, as well as through a nationwide network of affiliated mortgage brokers. Since its inception in 1990, Freedom Mortgage claims to have helped more than 1.9 million borrowers.

On their website, Freedom Mortgage advertises VA and FHA cash-out refinances for homeowners with credit scores as low as 550. Conventional cash-outs are available for

**See how much home you can afford**     Find Out Now

<u>Check Today's Conventional Loan Rates</u>

# 7. Flagstar Bank

Their website portrays Flagstar Bank as a regional financial institution with 419 locations (as of Q1 2024) across nine states. While you can apply for a cash-out refinance with Flagstar online or in your local branch, the company also works with a team of over 3,000 third-party loan-originating brokers.

One unique aspect of Flagstar Bank's home loan program is that they advertise mortgages with a term of up to 40 years.

# 8. Newrez

Founded in 2008 as New Penn Financial, Newrez offers cash-out refinances nationwide through a network of third-party brokers. It also attracts borrowers through its retail locations and website as a <u>direct-to-consumer lender</u>. In 2023, Newrez closed a total of 9,244 cash-outs across all channels.

Newrez has grown in recent years through industry acquisitions like Caliber Home Loans and Computershare Mortgage Services. Earlier this year, Newrez announced its AI initiative, partnered with Microsoft's Azure OpenAI Service, aimed at delivering the "best-in-class mortgage and homeownership experience."

# 9. AmeriSave

Atlanta-based AmeriSave has financed nearly 750,000 mortgages, totaling $130 billion in home loans, since its founding in 2002, according to the company's website.

AmeriSave offers loans in every state except New York and boasts an average closing time of 31 days on cash-out refinances. Conventional cash-out refinances are advertised

**See how much home you can afford**    Find Out Now

for credit scores of 620 and above, while FHA and VA cash-out refinances only require a score of 600.

## 10. Huntington National Bank

Huntington National Bank has retail locations across 11 states, with the most robust presence throughout the Midwest. According to their website, Huntington has over 1,000 local branches and a reported $194 billion in total assets.

In addition to rounding out the top 10 biggest cash-out refinance lenders, Huntington National Bank ranked 16th for total mortgages originated in 2023.

## Get Pre-Approved Today!



I want to **Buy** a home



I want to **Refinance** my home

Provided by



NMLS ID 1907. Equal Housing Lender. Not a government agency. No endorsement is made of any third-party product, service, or website.
Advertising Disclosure

## Why Use a Cash-Out Refinance?

A cash-out refinance allows you to replace your existing mortgage with a larger one and

See how much home you can afford     Find Out Now

The most common reason borrowers opt for a cash-out refinance is to <u>fund home repairs or improvements</u>, but you can also use your built-up equity to:

- <u>Consolidate high-interest credit cards</u>

- <u>Purchase a second home</u> or investment property

- <u>Pay off an auto loan</u>

- Wrap in a second loan or <u>HELOC balance</u>

- <u>Eliminate student loan debt</u> (you may even qualify for lower rates)

# Cash-Out Refinance Programs

Most large lenders offer an assortment of <u>cash-out refinance programs</u> designed to fit different types of homeowners. The three most common that you'll encounter are:

**Conventional Cash-Out Refinances**

Conventional cash-out refinances follow the <u>guidelines established by Fannie Mae and Freddie Mac</u>. Borrowers will need a credit score of at least 620 to qualify. However, the cost for homeowners on the lower end of the credit spectrum will likely be higher than with other cash-out refinance programs. Conventional cash-outs let you tap up to 80% of your home's equity.

<u>See if You Qualify for a 2024 Conventional Loan</u>

**FHA Cash-Out Refinances**

Designed for homeowners with less-than-perfect credit, FHA cash-out guidelines allow

See how much home you can afford    Find Out Now

higher minimums. As with conventional loans, an FHA cash-out refinance lets you borrow up to 80% of your property's current appraised value. So if your home is worth more than just a few years ago, you may be eligible for a substantial amount of cash.

<u>2024 FHA Loan Eligibility</u>
**VA Cash-Out Refinances**

VA cash-out refinances are available to current and former U.S. military members with eligible service history. VA guidelines set no minimum credit score, although most lenders will have score requirements ranging from 580 to 620. With a <u>VA cash-out refinance</u>, you can withdraw up to 100% of your home's current value, although many lenders opt to cap loans at 90%.

# Is Now a Good Time to Consider Cash-Out?

The best time to do a cash-out refinance is when you can simultaneously lower the interest rate on your loan. But most homeowners have interest rates much lower than what's available today.

However, if you need to access a large amount of funds, it may still be worth <u>taking a higher rate on a cash-out refinance</u>.

As mentioned, homeowners have access to over $200,000 in home equity on average. It could be wise to use a fixed-rate cash-out refinance rather than an <u>adjustable HELOC</u>.

Rates are down from their 2023 peaks. If you've <u>purchased your home since mid-2022</u>, you may be able to qualify for a cash-out refinance at a rate comparable to or lower than what you currently have. This is especially true for homeowners who have since significantly improved their credit score or built considerable equity in their property.

# Find the Best Cash-Out Refinance Lender

**See how much home you can afford**    Find Out Now

We've covered the ten biggest cash-out refinance lenders by loan volume, but even though they account for almost 47% of all cash-out refis, there are plenty of other great mortgage providers out there. The best cash-out refinance lender for you may even be a lower-volume originator.

If you're ready to explore your cash-out options, check today's refi rates and apply for quotes from a few of the top cash-out refinance lenders.

**See if you're eligible for a cash-out refinance.**

**Mortgage Rates for July 16, 2024**

**Home Purchase** in **21842**
$400,000 with 20% Down Payment. 740-759 Credit Score

CHANGE SEARCH OPTIONS

**About The Author:**

Jonathan Davis is a Florida-based writer with over a decade of experience helping consumers understand complex mortgage, real estate, and personal finance topics. Jonathan has previously worked in the real estate industry and holds a bachelor's degree in finance from the University of Central Florida.

SHARE   

## YOU MAY LIKE

Should You Choose a Closed-End Second Mortgage (CES) or a HELOC? 

**See how much home you can afford**    Find Out Now

Can You Buy A Foreclosure With A USDA Loan? 

Freddie Mac Home Possible® 2024: A Flexible, 3% Down Mortgage 

« *Back to News*

## RECOMMENDED ARTICLES

### 7 Steps: Cash-Out Refinance To Buy an Investment Property 2024

Getting a cash-out refinance to buy an investment property is often a good idea. Discover how to make sure the costs pencil out in your favor.



by **TIM LUCAS** in **HOME LOANS**

6 HOURS AGO    🕐 8 MIN

### Freddie Mac BorrowSmart Income Limits & Eligibility

Homebuyers can receive up to $3,000 in down payment assistance with Freddie Mac BorrowSmart or BorrowSmart Access.



by **TIM LUCAS** in **HOME LOANS**

7 HOURS AGO    🕐 3 MIN

## RECOMMENDED GUIDES

### Comprehensive Guide to the USDA Home Loan

Government-backed USDA loans make rural and low-income home ownership



**See how much home you can afford**    | Find Out Now |

*Read Guide Now »*

---

### Tips and Tricks for Selling Your Home



Here's what you need to know when it's time to move on to a new home.

*Read Guide Now »*

# Get Pre-Approved Today!



I want to **Buy** a home



I want to **Refinance** my home

**Provided by**

**MRC** MORTGAGE RESEARCH CENTER

NMLS ID 1907. Equal Housing Lender. Not a government agency. No endorsement is made of any third-party product, service, or website.

Advertising Disclosure

MORTGAGE
RESEARCH
CENTER

Mortgage Research Center, LLC. NMLS #1907
(**www.nmlsconsumeraccess.org**)

Equal Housing Opportunity.

1400 Forum Blvd. Ste. 18
Columbia, MO 65203

**See how much home you can afford**     **Find Out Now**

**GUIDES**

FHA Loans: The Comprehensive Guide

How to Refinance Your Home

Comprehensive Guide to the USDA Home Loan

Tips and Tricks for Selling Your Home

**TOOLS**

Conventional Loan Calculator

VA Loan Calculator

FHA Loan Calculator

USDA Loan Calculator

**FOR BUSINESSES**

Advertise With Us

**ABOUT MRC**

About

Contributors

Contact

**Licenses    Terms    Privacy    Accessibility    Site Map**

Copyright © 2024. Mortgage Research Center, LLC. All rights reserved.

**See how much home you can afford**    **Find Out Now**

In the Matter Of:

MICHAEL AND PATRICE PARKER

vs

GOLDMAN SACHS MORTGAGE

**EDWARD HYNE**

*December 05, 2023*

---

MICHAEL AND PATRICE PARKER vs GOLDMAN SACHS MORTGAGE

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                        FOR THE
 3                 DISTRICT OF MARYLAND
 4    _____
 5    MICHAEL AND PATRICE PARKER,
 6          Plaintiff,
 7      v.                              Case No.
 8    GOLDMAN SACHS MORTGAGE            8:20-CV-03581-ADC
 9    COMPANY, LP, AND NEWREZ LLC
10    D/B/A SHELLPOINT MORTGAGE
11          Defendant.
12    _____
13          AUDIOVISUAL DEPOSITION OF EDWARD HYNE
14    DATE:        December 5, 2023
15    TIME:        10:39 Eastern Time
16    LOCATION:    Zoom
17    REPORTED BY: Colleen Callahan, Remote Notary Public
18    JOB No.:     12986
19
20
21
22
23
24
25
```

---

MICHAEL AND PATRICE PARKER vs GOLDMAN SACHS MORTGAGE
HYNE, EDWARD on 12/05/2023                                      Page 2

```
 1            A P P E A R A N C E S
 2
 3    ON BEHALF OF PLAINTIFFS:
 4       PHILLIP R. ROBINSON, ESQUIRE
 5       Consumer Law Center, LLC
 6       10125 Colesville Road, Suite 378
 7       Silver Spring, Maryland 20901
 8       info@marylandconsumer.com
 9       (301) 448-1304
10
11    ON BEHALF OF PLAINTIFFS:
12       THOMAS JOSEPH MINTON, ESQUIRE
13       Goldman & Minton, P.C.
14       3600 Clipper Mill Road, Suite 201
15       Baltimore, Maryland 21211
16       tminton@charmcitylegal.com
17       (410) 783-7575
18
19    ON BEHALF OF DEFENDANTS:
20       BRIAN E. PUMPHREY, ESQUIRE
21       McGuireWoods, LLC
22       800 East Canal Street
23       Richmond, Virginia 23219
24       bpumphrey@mcguirewoods.com
25
```

---

MICHAEL AND PATRICE PARKER vs GOLDMAN SACHS MORTGAGE
HYNE, EDWARD on 12/05/2023                                      Page 3

```
 1         A P P E A R A N C E S   C O N ' T
 2
 3    ON BEHALF OF DEFENDANTS:
 4       NICHOLAS B. JORDAN, ESQUIRE
 5       McGuireWoods, LLC
 6       800 East Canal Street
 7       Richmond, Virginia 23219
 8       njordan@mcguirewoods.com
 9
10    ON BEHALF OF THIRD-PARTY DEFENDANT AND EDWARD HYNE
11       JOSEPH F. YENOUSKAS, ESQUIRE
12       Goodwin Proctor
13       1900 N Street NW
14       Washington, D.C. 20036
15       jyenouskas@goodwinlaw.com
16       (202) 346-4143
17
18
19
20
21
22
23
24
25
```

Apx.  197

MICHAEL AND PATRICE PARKER vs GOLDMAN SACHS MORTGAGE
HYNE, EDWARD on 12/05/2023

Page 5

```
 1              I N D E X
 2  EXAMINATION:                          PAGE
 3     By Mr. Robinson                    7, 63
 4     By Mr. Pumphrey                    50, 69
 5
 6
 7           E X H I B I T S
 8  PLAINTIFF
 9  NO.         DESCRIPTION               PAGE
10  Exhibit 1    Nationstar Subpoena        9
11  Exhibit 2    Nationstar Response Email #1  13
12  Exhibit 3    Nationstar Response Email #2  13
13  Exhibit 4    Nationstar Response Email #3  14
14  Exhibit 5    Note                      17
15  Exhibit 6    Deed of Trust             17
16  Exhibit 7    Prelim. Loss Mitigation Affidavit  18
17  Exhibit 8    Notice of Intent          19
18  Exhibit 9    Notice of Sale of Loan    20
19  Exhibit 10   Communications Log        22
20  Exhibit 11   Shellpoint BPO            31
21  Exhibit 12   Mortgage Loan Statements  34
22  Exhibit 13   Nationstar Assurance      36
23  Exhibit 14   Memorandum of Understanding  37
24  Exhibit 15   CONFIDENTIAL Referral to Alba Law  38
25  Exhibit 16   Redacted Excel Spreadsheet  40
```

MICHAEL AND PATRICE PARKER vs GOLDMAN SACHS MORTGAGE
HYNE, EDWARD on 12/05/2023

Page 5

```
 1        E X H I B I T S   C O N ' T
 2  PLAINTIFF
 3  NO.          DESCRIPTION              PAGE
 4  Exhibit 17   Transaction Summary       47
 5  Exhibit 18   QWR Response June 2020    48
 6
 7  DEFENDANT
 8  NO.          DESCRIPTION              PAGE
 9  Exhibit 19   9/25/19 Packet of Information  51
10  Exhibit 20   Goodbye Letter            54
11  Exhibit 21   Redacted Excel Spreadsheet  55
12
13              (*Exhibits attached.)
14
15
16
17
18
19
20
21
22
23
24
25
```

MICHAEL AND PATRICE PARKER vs GOLDMAN SACHS MORTGAGE
HYNE, EDWARD on 12/05/2023

Page 6

```
 1              P R O C E E D I N G
 2        THE REPORTER:  Good morning.  My name is
 3  Colleen Callahan.  I am the officer of this deposition
 4  representing DepoDirect, Inc., 251 Little Falls Drive,
 5  Wilmington, Delaware, and we are now on the record.
 6  Today's date is December 5th, 2023, and the time is
 7  10:39 a.m. Eastern.
 8        This deposition is taking place remotely in
 9  the matter of Michael and Patrice Parker versus
10  Goldman Sachs Mortgage Company, LP, and NewRez, LLC,
11  d/b/a Shellpoint Mortgage.  The case number is 8:20-
12  cv-03581-ADC, and this is the audiovisual recorded
13  deposition of Edward Hyne, taken on behalf of the
14  plaintiff in the United States District Court for the
15  District of Maryland.
16        Absent any objection, all parties agree that
17  we may place this witness under oath and record this
18  proceeding remotely via audiovisual method.
19        At this time, will everyone appearing
20  remotely please identify yourself, starting with the
21  noticing.
22        MR. ROBINSON:  Phillip Robinson, Consumer
23  Law Center, on behalf of the plaintiffs, Michael and
24  Patrice Parker.
25        MR. MINTON:  This is Thomas Minton.  I'm
```

MICHAEL AND PATRICE PARKER vs GOLDMAN SACHS MORTGAGE
HYNE, EDWARD on 12/05/2023

Page 7

```
 1  also here for the plaintiff.  I'm going to be on mute.
 2        MR. PUMPHREY:  Brian E. Pumphrey,
 3  MaguireWoods LLP, on behalf of the defendant,
 4  Shellpoint.
 5        MR. JORDAN:  Nick Jordan, also with
 6  MaguireWoods LLP, and also on behalf of the
 7  defendants.
 8        MR. YENOUSKAS:  Joseph Yenouskas.  I'm with
 9  Goodwin Proctor in Washington, D.C., on behalf of
10  Third-party Nationstar and the witness, Mr. Edward
11  Hyne.
12        THE REPORTER:  Okay.  Mr. Hyne, could you
13  please raise your right hand?
14  WHEREUPON,
15              EDWARD HYNE,
16  called as a witness, and having been first duly sworn
17  to tell the truth, the whole truth and nothing but the
18  truth, was examined and testified as follows:
19        THE REPORTER:  Okay.  Please begin.
20              EXAMINATION
21  BY MR. ROBINSON:
22     Q    Good morning, Mr. Hyne.  As you heard
23  earlier, my name is Phillip Robinson.  I represent the
24  plaintiffs.  My understanding is you've been
25  designated by the non-party, Nationstar Mortgage, LLC,
```

Apx.  198

Page 17

```
 1   today, did you also review Nationstar's system of
 2   record?
 3      A    Yes.
 4      Q    And what is the name of Nationstar's system
 5   of record?
 6      A    It's called LSAMS, which is L-S-A-M-S.
 7      Q    And do you recall specifically what you
 8   reviewed on LSAMS?
 9      A    The status of the account as it stands
10   today, the transaction history, the communication
11   history profile.  I think that's about it.
12      Q    And does Nationstar have a relationship with
13   the account today?
14      A    No.
15      Q    I'm sorry, Mr. Hyne, I didn't hear you.
16      A    No.
17      Q    And when you say "account," in your answer
18   there, did you mean the loan related to Mr. and Ms.
19   Parker --
20      A    Yes.
21      Q    -- the subject of this litigation?
22      A    Yes.
23      Q    All right.  I'm going to scroll through what
24   I'll mark as -- I think I'm on 5.
25           MR. ROBINSON:  Is that right, Madam Court
```

*DepoDirect Inc.*
*833.913.3376*

Page 17

```
 1   Reporter?
 2           THE REPORTER:  Yes.
 3           (Exhibit 5 was marked for identification.)
 4   BY MR. ROBINSON:
 5      Q    Mr. Hyne, I'll scroll through Exhibit 5.
 6   Did you review Exhibit 5 as part of your preparation
 7   for today's deposition?
 8      A    Yes.
 9      Q    And can you identify that for me generally,
10   what your understanding of it is?
11      A    It's a copy of the note for the residential
12   mortgage loan to the Parkers.
13      Q    Okay.  And I'll mark this Exhibit 6.
14           (Exhibit 6 was marked for identification.)
15   BY MR. ROBINSON:
16      Q    Okay.  And in preparation for the
17   deposition, did you review what I marked as Exhibit 6?
18      A    Not this version.  This looks like it's a
19   copy -- a certified copy pulled from the county of the
20   recorded Deed of Trust.
21      Q    Okay.  But you may have reviewed another
22   version of the Deed of Trust?
23      A    Yes.
24      Q    Okay.  And was that version signed by Mr.
25   and Ms. Parker?
```

*DepoDirect Inc.*
*833.913.3376*

```
 1      A    Yes.
 2      Q    Okay.  And the Exhibit 5, the note, and
 3   Exhibit 6, the Deed of Trust, would you agree with me
 4   those are generally -- go together, and they're
 5   referred to as the Parker Loan?
 6      A    Yes.
 7      Q    Was there a time that Nationstar had a
 8   relationship with the Parker Loan memorialized by
 9   Exhibits 5 and 6?
10      A    Yes.
11      Q    And could you describe for me what
12   Nationstar's role was with the Parker loan?
13      A    We were the servicer of the loan from 2009
14   to 2019.
15      Q    And what do you mean by servicer of the
16   loan?
17      A    We were the entity that accepted and
18   processed mortgage payments, paid escrow items,
19   assisted the Parkers in the day-to-day operations of
20   their mortgage, especially in times of when they were
21   in default.
22      Q    And did Nationstar own the loan at that
23   time, or did someone else own the loan?
24      A    No, it was owned by another party.  We don't
25   own our loans.
```

*DepoDirect Inc.*
*833.913.3376*

```
 1      Q    Okay.  And do you know who the party was
 2   that owned the loan at the time Nationstar was the
 3   servicer?
 4      A    I don't recall.
 5      Q    Okay.  Let me see if I can help refresh your
 6   memory a little.
 7           MR. ROBINSON:  I'm sorry, Madam Court
 8   Reporter, what number am I on?
 9           THE REPORTER:  Number 7.
10   BY MR. ROBINSON:
11      Q    Mr. Hyne, I'm showing you what I marked as
12   Exhibit 7.  I'll scroll through it slowly.
13           (Exhibit 7 was marked for identification.)
14   BY MR. ROBINSON:
15      Q    I'm also going to show you what I'll mark as
16   Exhibit 8.
17           (Exhibit 8 was marked for identification.)
18           MR. YENOUSKAS:  Can you finish going back
19   through 7, though, Phil, first?  I didn't really -- I
20   personally didn't get a chance to get a good look --
21           MR. ROBINSON:  Sure.
22           MR. YENOUSKAS:  -- at 7.  Thank you.
23           MR. ROBINSON:  Let me go ahead and mark --
24           MR. YENOUSKAS:  Okay.
25           MR. ROBINSON:  -- three of them, Joe, and
```

*DepoDirect Inc.*
*833.913.3376*

Apx. 201

```
 1

 2                 CERTIFICATE OF NOTARY PUBLIC

 3          I, Colleen Callahan, a Remote Online Notary

 4   of the State of Massachusetts, duly authorized to

 5   administer oaths, do hereby certify:

 6          That I am a disinterested person herein;

 7   that the witness, Edward Hyne named in the foregoing

 8   deposition, was by me duly sworn to testify the truth,

 9   the whole truth, and nothing but the truth; that the

10   deposition was reported by me, Colleen Callahan, and

11   is a true and correct record of the testimony so

12   given.

13          IN WITNESS WHEREOF, I hereby certify this

14   transcript at my office in the County of Middlesex,

15   State of Massachusetts, this 7th day of December,

16   2023.

17

18

19                    COLLEEN CALLAHAN

20          Remote Online Notary Public in and for the

21                       State of Massachusetts

22

23

24

25
```

Apx. 215