# EXHIBIT 6

JS 44 (Rev. 12/12)

Case 2:24-cv-00444-BJR   Document 51-6   Filed 08/06/24   Page 2 of 66
Case 2:16-cv-00302-MCE-JDP   Document 1-1   Filed 02/12/16   Page 1 of 2

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

EUGENIO AND ROSA CONTRERAS, WILLIAM AND MELVA PHILLIPS, TERESA BARNEY, KEITH AND TERESA MARCEL, SHERLIE CHARLOT, COLLEEN ANN O'HALLORAN, JENNIE MILLER, AND EDWARD YAGER, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED

## DEFENDANTS

NATIONSTAR LLC, A DELAWARE LIMITED LIABILITY COMPANY; SOLUTIONSTAR, LLC, A DELAWARE LIMITED LIABILITY COMPANY; AND DOES 1 THROUGH 1000

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Dean Kawamoto (#232032)     Tom Loeser (#202724)
KELLER ROHRBACK L.L.P.   HAGENS BERMAN SOBOL SHAPIRO L.L.P.
1201 Third Avenue, Suite 3200    1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101-3052   Seattle, Washington 98101
(206) 623-1900      (206) 623-7292

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL INJURY** ☐ 365 Personal Injury - Product Liability ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability ☐ 368 Asbestos Personal Injury Product Liability | ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark | ☐ 450 Commerce ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 480 Consumer Credit |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 891 Agricultural Acts |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | ☐ 893 Environmental Matters ☐ 895 Freedom of Information Act |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | ☐ 896 Arbitration ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Or. Rev. Stat. §§ 646.605; CAL. BUS. & PROF. CODE § 17200; ARIZ. REV. STAT. § 44-1522 ET SEQ.; M.G.L.A. 93A § 1, ET SEQ.); FLA. STAT. §§ 501.201, ET SEQ.; ILLINOIS' CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILL. COMP STAT. ANN. 505/2, ET SEQ.)

Brief description of cause:
Complaint alleges that a mortgage loan servicer charged borrowers unreasonable, unnecessary and unfair fees in connection with the servicing of distressed mortgages.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.   DEMAND $ TBD   CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE _____ DOCKET NUMBER _____

DATE
February 12, 2016

SIGNATURE OF ATTORNEY OF RECORD
/s/ Dean Kawamoto

JS 44 Reverse  (Rev. 12/12)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I. (a)  Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

 **(b)  County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

 **(c)  Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.  Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.  Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.  Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.  Origin.**  Place an "X" in one of the six boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

**VI.  Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.  Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

Dean Kawamoto (#232032)
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
(206) 623-1900, Fax (206) 623-3384

Tom Loeser (#202724)
**HAGENS BERMAN SOBOL SHAPIRO L.L.P.**
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292, Fax (206) 623-0594

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| EUGENIO AND ROSA CONTRERAS, WILLIAM AND MELVA PHILLIPS, TERESA BARNEY, KEITH AND TERESA MARCEL, SHERLIE CHARLOT, COLLEEN ANN O'HALLORAN, JENNIE MILLER, AND EDWARD YAGER, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>      Plaintiffs,<br><br>v.<br><br>NATIONSTAR LLC, A DELAWARE LIMITED LIABILITY COMPANY; SOLUTIONSTAR, LLC, A DELAWARE LIMITED LIABILITY COMPANY; AND DOES 1 THROUGH 1000,<br><br>      Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**(BREACH OF CONTRACT; UNJUST ENRICHMENT; VIOLATION OF OR. REV. STAT. §§ 646.605, ET SEQ.; VIOLATION OF CAL. BUS. & PROF. CODE § 17200; VIOLATION OF ARIZ. REV. STAT. § 44-1522 ET SEQ.; VIOLATION OF M.G.L.A. 93A § 1, ET SEQ.); VIOLATION OF FLA. STAT. §§ 501.201, ET SEQ.; VIOLATION OF ILLINOIS' CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILL. COMP STAT. ANN. 505/2, ET SEQ.)**<br><br>**DEMAND FOR A JURY TRIAL** |

I.      INTRODUCTION ............................................................................1

II.     THE INSPECTION FEE SCHEME .................................................3

III.    THE PAY-TO-PAY FEE SCHEME .................................................6

IV.     JURISDICTION AND VENUE .......................................................8

V.      PARTIES...........................................................................................9

VI.     FACTS ............................................................................................10

        A.    Predatory Practices by Nationstar and Solutionstar Have Made
              the American Dream of Home Ownership a Dangerous Pitfall
              to Financial Ruin..................................................................10

        B.    Mortgages Contain Largely Uniform Obligations and
              Requirements for Loan Servicers .........................................11

        C.    Effect of a Borrower's Default on the Loan Servicer .........13

        D.    Property Inspections on Defaulted Loans ............................17

              1.    Fannie Mae/Freddie Mac Guidelines Control Appropriate
                    Loan Servicing Activities.........................................17

              2.    Mortgage Contracts Establish the Legal Limits of a Loan
                    Servicer's Powers. ...................................................20

              3.    Laws and Regulations Govern Loan Servicing.......22

              4.    Nationstar's Property Inspections Process Ignores the
                    Applicable Guidelines, Mortgage Contracts, and
                    Regulations. ............................................................23

        E.    Nationstar Charged Plaintiffs Unfair Property Inspection Fees .......25

              1.    Eugenio and Rosa Diaz Contreras.........................25

              2.    William and Melva Phillips .....................................26

              3.    Teresa Barney ..........................................................26

              4.    Keith and Teresa Marcel .........................................28

              5.    Sherlie Charlot.........................................................28

6.    Colleen Ann O'Halloran ...................................................... 30

F.    Nationstar Charged Plaintiffs Unfair 'Pay-to-Pay' Fees ................. 31

1.    Jennie Miller ....................................................................... 31

2.    Edward Yager ..................................................................... 32

VII.   TOLLING OF THE STATUTE OF LIMITATIONS ........................... 33

VIII.  CLASS ALLEGATIONS ......................................................... 34

A.    The Classes ............................................................... 34

1.    Numerosity. ......................................................... 37

2.    Commonality. ....................................................... 37

3.    Typicality. ............................................................ 38

4.    Adequacy. ............................................................ 39

5.    The prerequisites to maintaining a class action for
      injunctive relief pursuant to Rule 23(b)(2) are readily
      apparent. .............................................................. 39

6.    Common questions predominate, and the class action
      device is superior, making certification appropriate under
      Rule 23(b)(3). ....................................................... 39

IX. CLAIMS FOR RELIEF ............................................................. 40

COUNT I - BREACH OF CONTRACT (ON BEHALF OF PLAINTIFFS,
    THE NATIONAL DISTRESSED MORTGAGE FEES CLASS AND
    THE NATIONAL PAY-TO-PAY CLASS AGAINST
    NATIONSTAR) ..................................................................... 40

COUNT II - BREACH OF CONTRACT - IMPLIED COVENANT OF
    GOOD FAITH AND FAIR DEALING (ON BEHALF OF
    PLAINTIFFS, THE NATIONAL DISTRESSED MORTGAGE FEE
    CLASS AND THE NATIONAL PAY-TO-PAY FEE CLASS
    AGAINST NATIONSTAR) ...................................................... 41

COUNT III - UNJUST ENRICHMENT (ON BEHALF OF PLAINTIFFS
    AND THE NATIONAL DISTRESSED MORTGAGE FEES CLASS

AND THE NATIONAL PAY-TO-PAY CLASS AND AGAINST
ALL DEFENDANTS) ................................................................43

COUNT IV - VIOLATIONS OF OREGON'S UNLAWFUL TRADE
PRACTICES ACT (OR. REV. STAT. §§ 646.605, *ET SEQ.*) (ON
BEHALF OF PLAINTIFF TERESA BARNEY AND THE OREGON
DISTRESSED MORTGAGE FEES CLASS AGAINST ALL
DEFENDANTS)................................................................44

COUNT V - VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION
LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) (ON
BEHALF OF PLAINTIFFS CONTRERAS, YAGER, THE
CALIFORNIA DISTRESSED MORTGAGE FEES CLASS AND
THE CALIFORNIA PAY-TO-PAY CLASS AGAINST ALL
DEFENDANTS)................................................................46

COUNT VI - VIOLATION OF THE ROSENTHAL FAIR DEBT
COLLECTION PRACTICES ACT (RFDCPA) (CAL. CIV. CODE
§§ 1788, *ET SEQ.*) (ON BEHALF OF PLAINTIFFS CONTRERAS,
YAGER, THE CALIFORNIA DISTRESSED MORTGAGE FEES
CLASS AND THE CALIFORNIA PAY-TO-PAY CLASS AGAINST
NATIONSTAR) ................................................................48

COUNT VII - VIOLATIONS OF THE ARIZONA CONSUMER FRAUD
ACT (ARIZ. REV. STAT. § 44-1522 *ET SEQ.*)(ON BEHALF OF
PLAINTIFF PHILLIPS AND THE ARIZONA DISTRESSED
MORTGAGE FEES CLASS AGAINST ALL DEFENDANTS)..............50

COUNT VIII - VIOLATIONS OF THE MASSACHUSETTS
REGULATION OF BUSINESS PRACTICE AND CONSUMER
PROTECTION ACT (MASS. GEN. LAWS ANN. CH. 93A § 1 *ET
SEQ.*)(ON BEHALF OF PLAINTIFF O'HALLORAN AND THE
MASSACHUSETTS DISTRESSED MORTGAGE FEES CLASS
AGAINST ALL DEFENDANTS) ............................................51

COUNT IX - VIOLATIONS OF FLORIDA'S UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT (FLA. STAT. §§ 501.201, *ET SEQ.*) (ON
BEHALF OF PLAINTIFF CHARLOT AND THE FLORIDA
DISTRESSED MORTGAGE FEES CLASS AGAINST ALL
DEFENDANTS)................................................................52

COUNT X - VIOLATIONS OF ILLINOIS' CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT (815 ILL. COMP.
STAT. ANN. 505/2, *ET SEQ.*) (ON BEHALF OF PLAINTIFF

iv

JENNIE MILLER AND THE ILLINOIS PAY-TO-PAY CLASS
AGAINST ALL DEFENDANTS) ..............................................................54

X.   PRAYER FOR RELIEF.................................................................56

XI.  DEMAND FOR JURY TRIAL...................................................57

# I.  INTRODUCTION

1.    For most Americans, home ownership—and the mortgage relationship that allows it—is the single most important transaction in their lifetime. For this reason, it is critically important that lenders and loan servicers act with integrity and treat borrowers fairly, even when borrowers are behind on mortgage payments.  But Defendant Nationstar and its affiliate Defendant Solutionstar do not act with integrity and do not treat borrowers fairly.  Instead, Nationstar and Solutionstar use an automated default servicing platform to illegally, unfairly, and fraudulently charge defaulted borrowers for multiple and repetitive "property inspections" that are not required by lenders, not permitted by lender guidelines, and in many cases not allowed under state and federal regulations and guidelines.

2.    Through this lawsuit, Plaintiffs seek to hold Nationstar and Solutionstar to the applicable legal standards and stop the practice of automatically ordering and assessing unfair and excessive fees for property inspections.

3.    Nationstar is the fifth largest loan servicer in the United States and is the second largest loan servicer that is not also a bank.[1]  Nationstar is the principal servicing subsidiary of Nationstar Mortgage Holdings, Inc., a publicly traded holding company that is "engaged primarily in the servicing of residential mortgage loans for others, [and] the origination of, selling or securitization of single-family conforming mortgage loans to GSEs or other third-party investors in the secondary market…."[2]  Nationstar Mortgage Holdings, Inc., in turn, is about 75% owned by FIF HE Holdings, Inc., which is an indirect subsidiary of Fortress Investment Group, a private equity firm.

---

[1] *See* Nationstar Mortgage Holdings, Inc., Form 10-Q (Q3, 2014), p.51, available at http://www.sec.gov/Archives/edgar/data/1520566/000152056614000080/nsmhinc093020 1410-q.htm.

[2] *See* Nationstar Mortgage Holdings, Inc., Form 10-K ("2013 Annual Report"), p.8, available at http://investors.nationstarholdings.com/Cache/23214130.PDF?Y=&O=PDF&D=&FID=2 3214130&T=&OSID=9&IID.

4.     To describe the role of a loan servicer, Nationstar has itself used the following diagram:[3]



5.     As the diagram shows, Nationstar is not the owner of a mortgage note (the owner is also known as the "investor" when the note is held by a mortgage-backed security), that is entitled to the interest and principal payments.  Rather Nationstar is a service provider which, pursuant to the lender/investor's instructions and guidelines, interacts with the borrower during the term of the mortgage loan.  To a borrower, Nationstar is thus the face of the lender.

6.     In exchange for performing the servicing role, Nationstar collects a fee from the lender/investor based upon the size of its servicing portfolio for that lender, and it is entitled to keep servicing fees it assesses (like late fees and the inspection fees at issue here).  Nationstar also can recoup advances from the lender/investor for payments it makes to cover third party costs associated with a loan.

7.     The bifurcation of the loan into "Servicing Rights" and ownership creates a disparate interest between a loan servicer like Nationstar, and the loan investor/owner such as FNMA ("FannieMae").  The investor/owner has great interest in the loan remaining a performing asset—that is, not being in default—because only a performing

---

[3] *See* Nationstar Mortgage LLC, Nationstar Capital Corporation Prospectus, p.2, available at
http://www.sec.gov/Archives/edgar/data/1507951/000119312512161857/d317546d424
b3.htm.

loan provides it with a regular stream of principal and interest payments due. Furthermore, foreclosure auctions, net of associated costs, usually result in a return that does not cover the balance due on the loan, resulting in a loss to the mortgage investor/owner.

8.      In stark contrast to how an investor/owner earns profits, the loan servicer makes just a small fraction of its profits from its cut of performing loan payments of principal and interest, but can make tremendous profits from a loan in default where it can assess substantial late fees, inspection fees, default fees, and fees related to the foreclosure process.  Fees and expenses the loan servicer charges to a defaulted loan, even if not paid by the borrower, are paid by the investor/owner through the foreclosure process. In this manner, it is actually in the interest of the loan servicer to put as many loans as possible into default, regardless of whether ultimate foreclosure may reduce the size of its servicing portfolio.

9.      In an attempt to control the perverse incentive of the loan servicer to drive serviced loans into default in order to profit from exorbitant default servicing fees, investor/owners build limitations on what loan servicers can do—called covenants—into the mortgage notes/deeds of trust that form the contract for each loan and publish guidelines that regulate the scope of permitted servicer conduct.  In addition, regulators have issued rules to prevent loan servicers from exploiting vulnerable borrowers who are in, or on the verge of default on their mortgages.

## II. THE INSPECTION FEE SCHEME

10.     This action arises from a scheme ("The Inspection Scheme" or "Scheme") undertaken by Nationstar and Solutionstar to profit from: (1) ordering unfair and excessive property inspections which are charged to defaulted borrowers accounts; (2) collecting fees on each inspection so ordered; and (3) collecting additional late fees and default-related fees based upon the increase in monthly costs to borrowers as a result of the unnecessary inspection fees first added.

11.     The Inspection Scheme works as follows.

i.     Nationstar is one of the largest loan servicers in the United States for home loans. It has an automated and computerized loan servicing platform that is programed to automatically and systematically take specific steps in response to various triggers that may occur in the loan servicing process.

ii.     When a borrower misses a loan payment, or a loan otherwise becomes in default, Nationstar's loan servicing platform automatically, and without regard to owner/investor guidelines and/or actual need, orders property inspections that are excessive in frequency and price, or otherwise unfair.

iii.     Nationstar orders the property inspections through its affiliate Defendant Solutionstar, in order for Solutionstar to reap otherwise unavailable mark-ups and profits on the inspections. Solutionstar, in turn, automatically generates orders for inspections that are sent to third parties, who complete purported inspections, but in reality merely drive by the property and check for signs of residency ("drive-by inspections"), if that. In some instances, the "inspection" is illusory or fabricated, because it is impossible even to do a drive-by inspection on the property because of, *e.g.*, gated communities ("fabricated inspections").

iv.     Nationstar pays its affiliate Solutionstar, then charges borrowers' accounts for the inspections. If borrowers (who are already in default) fail to pay timely for the dubious inspections, Nationstar adds additional late fees and associated charges.

v.     All Defendants profit: (1) Nationstar profits through fees at the expense of borrowers who try to come current on their loans and either pay the fees or incur increased debt obligations for those fees; (2) Solutionstar profits by adding service/referral charges to the amounts actually paid to the third party "inspectors"; and (3) the inspectors themselves profit from completing dubious and unnecessary drive-by or fabricated inspections, for which Solutionstar pays them.

12.     Due to the high volume of loans Nationstar services, tens of thousands of borrowers have been victims of this Scheme.

13.     The Inspection Scheme works because:  (1) Nationstar uses its affiliate Solutionstar as a go-between for drive-by and fabricated inspections; (2) Nationstar systematically and automatically causes the inspections to be ordered, whether they are needed, permitted, or lawful, or not; and (3) loan owner/investors rely on Nationstar to follow their guidelines and government regulations, and cannot or do not police Defendants' activities for compliance.

14.     Plaintiffs and Class members are harmed by the Inspection Scheme: (1) because they are charged for multiple, unnecessary, unreasonable, or otherwise unlawful drive-by inspections, which are marked up by Solutionstar; and (2) because Nationstar counts on the bogus inspection charges going unpaid due to the borrower's default status, and as a result tacks on additional late fees, thus causing a debt spiral, rendering it difficult, if not impossible for the defaulted borrower to come current.

15.     Participation by Solutionstar allows the Inspection Scheme to function more effectively, because it allows the normal checks and balances within the loan servicing process to be eliminated. The price Nationstar charged borrowers for property inspections increased at the same time that Nationstar began sending inspection orders through Solutionstar. On information and belief, Nationstar increased the frequency—up to three or more inspections in a 30-day period and sometimes multiple inspections in a single day—only after Solutionstar began providing the inspection "services." Nationstar colluded with Solutionstar to drive up the fee income that Solutionstar received by increasing both the pricing and frequency of property inspection orders.

16.     Defendants are linked through contractual relationships, agreements, access to the Nationstar "Servicing System," financial ties, and coordination of activities between Defendants and the third-party appraisers/inspectors. Nationstar's Servicing System is a common communication network by which Defendants communicate and share information. The Servicing System enables Defendants to charge Plaintiffs and the Class improper fees, to collect and record the payments of these fees, and to share the resulting profits.

17.     Defendants control and operate the Inspection Scheme as follows: (a) Nationstar uses an automated program in its loan servicing platform to order multiple and serial property inspections merely because a borrower is behind in payments and without regard to whether an inspection is actually warranted under the circumstances, called for under the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") which govern servicers of Fannie Mae or Freddie Mac loans, or permitted by the mortgage contracts or applicable law; (b) the inspection order is automatically sent to Solutionstar for fulfilment; (c) Solutionstar runs the order through its systems and delegates the actual "inspection" to a complicit third party to complete; (d) the third party appraiser/inspector completes, if anything, a cursory "drive-by" inspection of the subject property and submits an inspection report (where not even a "drive-by" inspection is possible, the inspection is simply fabricated); (e) the inspection report is returned to Solutionstar, which provides it to Nationstar; (f) Solutionstar pays the third-party appraiser/inspector and submits a marked-up bill to Nationstar; and (g) Nationstar charges the Class member the marked-up, unfair, and unnecessary property inspection fees.

18.     As a result of the Inspection Scheme, Defendants have obtained Plaintiffs' and the Class' money and damaged their property, as well as increased their debt obligations without justification and contrary to applicable law.

### III.     THE PAY-TO-PAY FEE SCHEME

19.     This action further arises from a scheme ("The Pay-to-Pay Scheme") undertaken by Nationstar to profit from ordering unfair and excessive fees charged to certain borrowers to make a payment on their online accounts.  Defaulting borrowers, or those who may merely inquire about payment options, are literally charged to pay their mortgage payments.

20.     The way the Pay-to-Pay Scheme is works as follows.  When a borrower misses a loan payment, or otherwise appears to be in risk of default, for example, by inquiring about a mortgage modification, or informing Nationstar of a hardship such as losing a job or a spouse, Nationstar's loan servicing platform begins to charge borrowers

an additional fee of approximately $9.95 to make payments to their online Nationstar account. This fee is not charged to other borrowers, is not charged to provide defaulting borrowers with any additional service or benefit, and is not a "late fee"—because late fees are separately charged.

21.   Moreover, as representative customer comments indicate, borrowers are not notified when the Pay-to-Pay requirement has been implemented with respect to their accounts and, as a result, automatic monthly payments by borrowers are often rejected, causing them to incur further fees and risk default.





22.     As a result of the Pay-to-Pay Scheme, Defendants have obtained Plaintiffs'
and the Class' money and damaged their property, as well as increased their debt
obligations without justification and contrary to applicable law.

## IV.   JURISDICTION AND VENUE

23.     With respect to Plaintiffs' claims under state law, Plaintiffs invoke the
jurisdiction of this Court pursuant to 28 U.S.C. § 1332(d) because various members of
the Class are citizens of a state different from Defendants' states and the aggregate
amount in controversy exceeds five million dollars.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because
Plaintiffs Eugenio Contreras and Rosa Diaz Contreras reside in this district, the properties
underlying their mortgage loans are in this judicial district, and because Defendants
regularly conduct business in interstate trade and commerce in this District.

25.     Defendants' activities described herein were in the flow of interstate
commerce and had a substantial effect on interstate commerce.

8

## V. PARTIES

26.     Eugenio and Rosa Dias Contreras (the "Contreras") are married residents of the State of California. On or about April 1, 2008, Contreras executed a Note and Deed of Trust secured by real property located in San Joaquin County California, Tracy California, their primary residence.   Nationstar is the current servicer of their mortgage loan.

27.     Plaintiffs William Phillips and Melva Phillips (the "Phillips") are married residents of the State of Arizona.   On or about April 30, 2010, Phillips executed a Note and Deed of Trust secured by real property located in Gila County Arizona, Globe Arizona, their primary residence. Nationstar LLC is the current servicer of their mortgage loan.

28.     Plaintiff Teresa Barney ("Barney") is a resident and citizen of Oregon. On or about November 2, 2005, Barney executed a Note and Mortgage encumbering a certain piece of real property located in Corbett, Oregon, 97019, her primary residence Nationstar LLC is the current servicer of her mortgage loan.

29.     Keith and Teresa Marcel ("the Marcels") are residents and citizens of Louisiana. On or about August 12, 2003, the Marcels executed a Note and Deed of Trust encumbering a certain piece of real property located in Mahdeville, LA, their primary residence.  Nationstar LLC is the current servicer of their mortgage loan.

30.     Plaintiff Sherlie Charlot ("Charlot") is a resident and citizen of Florida. On or about March 22, 2010, Charlot executed a Note and Mortgage encumbering a certain piece of real property located in Lake Worth, Florida, her primary residence. Nationstar LLC is the current servicer of her mortgage loan.

31.     Plaintiff Colleen Ann O'Halloran ("O'Halloran") is a resident and citizen of Massachusetts. O'Halloran executed a Promissory Note and Deed of Trust encumbering a certain piece of real property located in Sherborn, Massachusetts, her primary residence. Nationstar LLC is the current servicer of her mortgage loan.

32.     Defendant Nationstar is a Delaware limited liability company. Nationstar's principal place of business in Lewisville, Texas. Defendant Nationstar is a subsidiary of Nationstar Mortgage Holdings, Inc., which is a publicly traded holding company. Nationstar Mortgage Holdings, Inc., in turn, is approximately 75% owned by FIF HE Holdings, Inc., which is an indirect subsidiary of Fortress Investment Group, a private equity firm.

33.     Defendant Solutionstar is also a Delaware limited liability company.  Its principal place of business is also Lewisville, Texas. Solutionstar is a wholly owned subsidiary of Nationstar Mortgage Holdings, Inc., and an affiliate of Defendant Nationstar. The required Nationstar Mortgage Holdings, Inc., financial filings state: "Solutionstar provides technology and data enhanced solutions to home buyers, home sellers, real estate agents, and companies engaged in the origination and/or servicing of mortgage loans."[4]

34.     On its website, Solutionstar touts its "national network of certified appraisers delivering a competitive suite of full and limited valuation products."[5] These products include: "Drive-bys," "Evaluations," and "Re-inspection/ Recertifications."[6]  Solutionstar has been providing services to Nationstar, including services provided through the Inspection Scheme, since at least April 2012.

## VI.    FACTS

**A.     Predatory Practices by Nationstar and Solutionstar Have Made the American Dream of Home Ownership a Dangerous Pitfall to Financial Ruin**

35.     Homeownership remains the best path to building financial assets and attaining wealth for most Americans.  With assets, families can more easily pay for a child's education, start a small business, prepare for retirement, or help to build wealth and a brighter future for their children and grandchildren.

---

[4] Form 10Q, *supra*, n. 1, at 52.

[5] *See* http:///www.solutionstar.com/pages/valuationservices.

[6] *Id.*

36.     Yet this vision is frustrated when borrowers who enter into real estate transactions run by sophisticated professionals are exploited by the very companies that are counted on to provide fair and reasonable customer service in connection with loan servicing.  Borrowers are perilously vulnerable to short term economic distress that may result from job loss or medical problems.  When these borrowers are unable to make their payments on time, perhaps just for a short time between jobs, unreasonable and unfair practices such as those of Nationstar and Solutionstar described in this complaint, create a debt spiral that prolongs borrower default, and thereby increases revenue to the loan servicer and its affiliates. In consequence, borrowers run high risks of foreclosure and/or bankruptcy, and often lose any accumulated savings that were used to fund the purchase price or transaction costs for their home.

**B.     Mortgages Contain Largely Uniform Obligations and Requirements for Loan Servicers**

37.     Virtually all mortgage loans originated in the United States use either the standardized Fannie Mae/Freddie Mac Security Instrument (the "Fannie/Freddie Mortgage") or the Federal Housing Authority ("FHA") Deed of Trust (the "FHA Mortgage"). This is because at origination, the originating bank/lender must use these forms in order to have the possibility of selling the mortgage to Fannie/Freddie, which are the largest holders of mortgages in the United States.  If the standardized forms are not used, Fannie/Freddie will not purchase the loan from the originator.  Plaintiffs Contreras, Phillips, Barney, Charlot, and O'Halloran all have Deeds of Trust utilizing the standard Fannie/Freddie Mortgage.

38.     While the Fannie/Freddie forms are not identical for each state, they contain sections which are uniform and do not change from state to state.  Importantly, the sections of Fannie/Freddie mortgages at issue in this case are the sections that are uniform on a nationwide basis. *C.f.,* Exhibit 1, Exhibit 2 (Exhibit 1 is the form for California and Exhibit 2 is the form for Arizona, yet they contain identical language relevant to this case).

11

39.     Likewise, the FHA Mortgage forms have sections that can vary based on the state in which the property is located, but the sections at issue in this case are the same in every state. Plaintiffs Charlot and Miller have a Deed of Trust utilizing the standard FHA Mortgage.

40.     When the mortgage loan is sold in the secondary market, for example to Fannie/Freddie, or to private investors through a Mortgage Backed Security ("MBS"), the Servicing Rights are separated from the principal and interest income stream rights, and the Servicing Rights are either retained by the originating lender or acquired by a loan servicer such as Defendant Nationstar.

41.     The Fannie Mortgage clarifies the distinction between the "Lender" and the "Loan Servicer." The "Lender" is the originating Lender who provides the funds to the Borrower in return for repayment plus interest, i.e., the owner of the note. *See* Fannie/Freddie Mortgage, "Definitions" ¶ (D). *See also* Exhibit 1, ¶ (D); Exhibit 2, ¶ (D).

42.     The Fannie Mortgage specifically contemplates that the owner of the note, the "Lender," may change, and recognizes the distinction between the "Loan Servicer" and the note owner:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.[7]

43.     Thus, under the Fannie Mortgage, when the Lender's interest in the Note is transferred—*i.e.*, when the right to receive principal and interest payments due under the note is sold to another entity—the "Lender" becomes the seller of the Note and Security Instrument.

---

[7] Fannie Mortgage, ¶ 20. *See* Exhibit 1, Contreras Note. ¶ 20; Exhibit 2, Phillips Note, ¶ 20.

44.    Importantly, the Fannie Mortgage draws an additional sharp distinction between the "Lender" and the "Loan Servicer." Specifically, the "Lender" funds the loan and is entitled to repayment of principal and interest. The "Loan Servicer" "collects Periodic Payments due under the Note and … Security Instrument and performs other mortgage loan servicing obligations …" *See* Fannie/Freddie Mortgage, ¶ 20; Exhibit 1, ¶ 20; Exhibit 2, ¶ 20.

45.    The Loan Servicer's duties and obligations are clearly filled in and defined by the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") when the loan is sold to those entities.

## C.    Effect of a Borrower's Default on the Loan Servicer

46.     As explained more fully below, loan servicers have an economic incentive to push borrowers into default, an interest that is misaligned with borrowers and lenders.

47.    In the event of a default by the Borrower, the GSE/Mortgage-owner (i.e., the Lender) suffers the principal loss. *See* 2013 10-K, p.10 ("Loan servicers service on behalf of the owners of the loans, and servicers are therefore exposed to minimal credit risk.").

48.    If the Loan Servicer advanced payments on taxes, insurance premiums or other default/foreclosure related costs (including, without limitation, property inspections), the Loan Servicer does not suffer a loss of those advances in the event of foreclosure. Rather, the Lender reimburses the Loan Servicer for the outstanding amount. *See, e.g.*, 2013 10-K, p.3 ("[Servicing] advances can include … fees to preserve and protect the property and legal fees to foreclose on the property. Serving advances are reimbursed to the servicer if and when the borrower makes a payment on the underlying mortgage loan at the time the loan is modified or upon liquidation of the underlying mortgage loan.").

49.    The Loan Servicer's risk of loss in the event of a Borrower's default and foreclosure is limited to a loss of the right to receive future servicing fees on the loan. In the event of default and foreclosure, Loan Servicers also stand to collect additional fee income including late fees, attorney fees, foreclosure fees, etc., that exceed the value of the

servicing fees paid to Loan Servicers by Lenders. If the Loan Servicer manages to work with the borrower to modify or refinance the delinquent loan, the Loan Servicer typically receives a fee in connection with that outcome as well. *See* 2013 10-K, p.10 ("We also generate incentive fees from owners of the loans that we service for meeting certain delinquency and loss goals and for arranging successful loss mitigation programs. Moreover, we earn incentive fees from the U.S. Treasury for loans that we successfully modify within the parameters of HAMP and other assistance programs it sponsors.").

50. The potential loss of base servicing fees can pale in comparison to the ancillary fee compensation received by the Loan Servicer in connection with default servicing activities. Indeed, where the compensation received in connection with default servicing activities is greater than the present value of servicing fees—as is often the case— the Loan Servicer has a greater interest in forcing borrowers into (and ensuring they stay in) default than it has in granting a modification or restoring the account to a fully performing loan.

51. Moreover, the average duration of mortgage loans in the United States is seven years. In fact, in valuing its mortgage servicing rights ("MSRs"), Nationstar estimates that the loans in its servicing portfolio will only endure, on average, for 4.63 or 7.88 years. Thus, on average, the Loan Servicer anticipates receiving far fewer than thirty (30) years of loan servicing fees making the expected value of the Servicing Rights at closing (or at any other time during the life of a loan) to a Loan Servicer, significantly less than the present value of 30 years of servicing fees.

52. Nationstar earns revenue from mortgage loan servicing in three principal ways. First, Nationstar receives a fixed fee for each loan which is determined by the servicing agreements between Nationstar and the investors or note holders. *See* 2013 10-K, p.97 ("Nationstar receives a base servicing fee ranging from 0.25% to 0.50% annually on the remaining outstanding principal balances of the loans. The servicing fees are collected from investors.").

53.    Second, Nationstar earns "float" income from accrued interest between when consumers pay and when those funds are remitted to Lenders, investors, taxing authorities, insurers and other relevant parties. *See* 2013 10-K, p.10 ("[Nationstar] earn[s] interest income on amounts deposited in collection accounts and amounts held in escrow to pay property taxes and insurance, which we refer to as float income.").

54.    Third, Nationstar receives ancillary fee income that includes, without limitation, late charges paid by borrowers, workout and modification incentive fees, and other delinquency-related fee income including, for example, the property inspection or "home preservation" fees at issue here.

55.    Two important sources of ancillary fee income for Defendants are property inspection fees and late fees. As described more fully herein, each time Nationstar inspects the property and assesses a property inspection fee on a borrower, the borrower must pay an additional $15 (the amount Nationstar presently charges) to become current. If the borrower fails to become current, Nationstar imposes late fees on the borrower.

56.    This practice makes it more difficult for distressed borrowers to become current and leads many borrowers into foreclosure proceedings and/or to modify their loan. As explained above, this serves Nationstar's interests. Because Loan Servicers like Nationstar generate revenue from loan servicing activities and fees, and do not profit directly from principal and interest payments made by borrowers, Loan Servicers have a vested interest in generating revenue through so-called default servicing activities and corresponding ancillary fees.

57.    Some of these fees, such as late fees, are pure profit for the Loan Servicer. Other fees permit the Loan Servicer to generate additional income by delegating the task to an affiliated entity or entity that returns a profit to the Loan Servicer.

58.    Furthermore, because Nationstar is able to generate more loan servicing income through default servicing activities as compared to ensuring that borrowers make timely payments on the mortgage to the benefit of the owner/investor of the loan, Nationstar is incentivized to keep borrowers in default, which is contrary to the interests of

both borrowers and the Lenders. Indeed, according to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [of the loan] money, but [it] may actually earn money for the servicer in the form of fees."[8]

59.     Therefore, it is important to note that Loan Servicers, including Nationstar, and Lenders have a conflict of interest. Even though the loan servicing and default servicing tasks performed by Nationstar are purportedly to protect the Lender, such tasks and associated charges must be critically evaluated.

60.     One template for determining the reasonableness of the tasks and charges undertaken by the Loan Servicer are the guidelines, rules and/or regulations issued by the Lender that set forth the Loan Servicer's obligations with respect to the specific tasks at issue. None of these documents suggest that it is appropriate to inspect a property more than once during a 30-day period, if at all, or after the borrower has come current. Rather, it is Nationstar's unilateral and self-serving determination *en masse* that conducting these excessive property inspections is "appropriate" regardless of the borrowers' underlying circumstances or any objective criterion related to the circumstances surrounding particular loans.

61.     Defendants' Scheme takes advantage of the current structure of the mortgage industry and Nationstar's role, in nearly all cases, as merely the Loan Servicer, and not the "Lender." While the mortgage documents and Lender guidelines permit and in some circumstances require the Loan Servicer to conduct certain property inspections, Nationstar's scheme ignores these guidelines and imposes, without limitation: (a) unfair and excessive property inspections that are not permitted by mortgage documents; (b) more property inspections than are required or requested by the Lenders; (c) more property inspections than are permitted by federal regulations and state laws; (d) more property inspections than are warranted by the circumstances of any actual loan—*i.e.*, without any regard for whether the borrowers occupy the property or any other factor that would make

---

[8] Governor Sarah Bloom Raskin, "Problems in the Mortgage Servicing Industry," Board of Governors of the Federal Reserve System (Nov. 12, 2010), available: http://www.federalreserve.gov/newsevents/speech/raskin20101112a.htm.

inspections unwarranted; and (e) charges for property inspections that are inflated by amounts that Solutionstar retains for its role in the scheme. Nationstar engages in this scheme with minimal risk because Lenders are required to reimburse Nationstar for the property inspection charges in the event that the borrower does not pay them.

**D.    Property Inspections on Defaulted Loans**

62.    Loan Servicers perform "servicing" tasks on behalf of the Lender that holds the loan. These tasks include collecting monthly payments, monitoring insurance coverages, and ensuring that taxes are paid. Loan Servicers are also responsible for taking action to protect the properties securing loans when certain triggering circumstances arise, *e.g.*, obtaining lender-placed insurance when the Loan Servicer determines that the property is uninsured and/or securing a property that has been abandoned to avoid damage.

**1.    Fannie Mae/Freddie Mac Guidelines Control Appropriate Loan Servicing Activities.**

63.    The tasks Loan Servicers perform and the standards Loan Servicers are supposed to adhere to in performing these tasks are determined by owner/investor guidelines. For example, Fannie Mae and Freddie Mac each issue written servicing guides that delineate the tasks that Loan Servicers must perform and standards applied in evaluating Loan Servicer performance. Failure to comply with these guidelines is probative of a failure on the part of the servicer to comply with state consumer protection laws. Loan Servicers are also bound by the terms of the mortgage contracts and applicable laws and regulations.

64.    The provisions of the Fannie Mae and Freddie Mac Guidelines referencing property inspections do not require or suggest that Loan Servicers order property inspections more frequently than once every 30 days, nor do they authorize inspections after the borrower has remedied their default/come current on their loan.

65.    For example, in Section 303 of the 2015 Fannie Mae Servicing Guidelines, Fannie states:

> Generally, the servicer does not have to inspect a property that secures a delinquent mortgage loan if it has established [Quality Right Party Contact ("QRPC")] with the borrower and is working with the borrower to resolve the delinquency … or a full payment has been received within the last 30 days.
>
> The servicer must order the property inspection by the 45th day of delinquency and complete the property inspection no later than the 60th day of delinquency if QRPC has not been achieved or a full payment has not been received within the last 30 days. The servicer must continue to obtain property inspections every 30 days until it establishes QRPC as long as the mortgage loan remains 45 days or more delinquent.

66.     This provision is necessary to ensure the property is occupied when the Loan Servicer has been *unable to establish contact with the borrower* and loan payments have not been received. Plainly, the provision does not authorize or permit inspections when the Loan Servicer is in contact with the borrower and knows the property to be inhabited, or after the borrower has come current.

67.     As detailed above, Plaintiffs had either been in contact with Nationstar, achieved QRPC under the Fannie Mae Servicing Guidelines, and/or become current on their loans and were no longer in default. Yet, Defendants continued ordering property inspections *well after* they knew that a QRPC with each Plaintiff was made.

68.     If the Loan Servicer first identifies a circumstance at the property that warrants additional inspections, the Guidelines make exceptions to the 30-day inspection rule. But there must be an identified need for the additional inspection. For example, Section 303.01 of the Fannie Mae Guidelines, which addresses property inspections for borrowers who are delinquent on a previously negotiated repayment plan, states:

> A servicer must inspect a property as soon as it becomes aware of a borrower's delinquency under a repayment plan, and continue inspecting the property at 30 day intervals. If an inspection reveals evidence of vandalism or major damage to the property (or vandalism in the vicinity of the property), the servicer should schedule the property inspections at more frequent intervals. The inspections should continue to be made until such time as the mortgage is brought current or, if the servicer decides to initiate foreclosure proceedings or accept a deed-in-lieu, until the date that the servicer makes the required comprehensive property inspection prior to the foreclosure sale or the date the deed-in-lieu is executed.

69.     If the Loan Servicer becomes aware of the possibility that the borrower *abandoned* the property or the property is *vacant or tenant-occupied*, Section 302 of the Fannie Mae Guidelines discusses and permits additional property inspections.

70.     But these provisions do not authorize or require inspections more frequently than once every 30 days even where the Loan Servicer is unable to establish a QRPC, and they certainly do not allow the Loan Servicer to continue to order and charge for inspections after the borrower has cured any default.

71.     Fannie Mae and Freddie Mac have not taken action to prevent Defendants' violations of the guidelines because they rely on Loan Servicers to police themselves. As explained by the Federal Housing Finance Agency ("FHFA"), the conservator of Fannie Mae and Freddie Mac:

> [Fannie Mae and Freddie Mac] use a delegated business model to buy and service mortgage loans. In this model, they contract with third-party mortgage loan sellers and/or servicers (e.g., counterparties, such as banks) that are relied on to comply with their requirements for ... servicing the ... loans [purchased or guaranteed by Fannie Mae or Freddie Mac] (e.g., collecting payments); and [] reporting data about the loans. As a result of relying on the counterparties for compliance and reporting, [Fannie Mae and Freddie Mac] run the risk of their counterparties failing to meet their respective ... servicing guidelines.[9]

72.     The Office of Inspector General for the FHFA then wrote:

> In the mid-1990s, one of the Enterprises required an independent, third-party assurance of counterparties' compliance with some elements of its guidelines, but this requirement was replaced by *reliance on counterparties' self-representations of their compliance.* Further, the Enterprises have risk-based, internal oversight of their counterparties'

---

[9] Letter from Russell A. Rau, Deputy Inspector General for Audits of the FHFA, to Nina Nichols, Deputy Director for Enterprise Regulation, *Audit of FHFA's Oversight of Risks Associated with the Enterprises Relying on Counterparties to Comply with Selling and Servicing Guidelines* (Sept. 26, 2014) ("Counterparty Risk Letter"), at 1, *available at* http://fhfaoig.gov/Content/Files/AUD-2014-018.pdf (last visited Jan. 20, 2015).

compliance with selling and servicing guidelines but *most receive no onsite review.*[10]

73.    The OIG of the FHFA has also previously found that Fannie Mae and Freddie Mac "do not ensure counterparties' business practices follow all federal and state laws and regulations designed to protect consumers from unlawful activities...."[11] "In addition, OIG identified that [Fannie Mae and Freddie Mac] do not have a formal monitoring program in place to review their counterparties' compliance with the federal and state laws that govern ... servicing mortgage loans. Instead, [Fannie Mae and Freddie Mac] rely primarily on counterparty self-certifications of contractual compliance along with federal regulators' supervisory and enforcement activities."[12]

### 2.    Mortgage Contracts Establish the Legal Limits of a Loan Servicer's Powers.

74.    Mortgage loan contracts establish the parameters of the relationship between and among a borrower, the Lender, and Loan Servicer.  The mortgage contracts have provisions that govern when a Loan Servicer can order property inspections and charge a borrower for the cost of such inspections.

75.    In Paragraph 7 of the standard Fannie/Freddie Mortgage, the Lender or its agent "may make reasonable entries upon and inspections of the Property." *See, e.g.,*

---

[10] Counterparty Risk Letter (emphasis added), at 1.

[11] Counterparty Risk Letter, at 11.

[12] *Id. See also* FHFA OIG, *FHFA Should Develop and Implement a Risk-Based Plan to Monitor Oversight of Their Counterparties Compliance with Contractual Requirements Including Consumer Protection Laws* (Mar. 26, 2013), *available at* http://www.fhfaoig.gov/Content/Files/AUD-2013-008_0.pdf; Letter from Steve A. Linick, Inspector General of FHFA to Edward J. DeMarco, Director, Systemic Implication Report: Enterprise Oversight of Property Preservation Inspections (Nov. 26, 2012), *available at* http://fhfaoig.gov/Content/Files/SIR%20FINAL%20Enterprise%20Oversight%20of%20Property%20Preservation_0.pdf (uncovering fraud by property inspection vendor and questioning whether Fannie Mae and Freddie Mac had sufficient protections in place to detect fraud).

Exhibit 1, Exhibit 2, each at ¶ 7. The Fannie/Freddie Mortgage further provides that if the "Borrower fails to perform the covenants and agreements contained in [the mortgage agreement] ... or Borrower has abandoned the Property, then Lender may do and pay for whatever is *reasonable or appropriate* to protect Lender's interest in the Property and rights under [the mortgage agreement] including protecting and/or assessing the value of the Property...." *See, e.g., id.*, ¶ 9 (emphasis added). The form mortgage provides that any amount disbursed by the Lender for taking action under paragraph 9 becomes additional debt of the Borrower.

76.    Loan Servicers of loans owned or guaranteed by Fannie Mae or Freddie Mac must follow the standards and procedures of the Fannie Mae and Freddie Mac Servicing Guidelines. Thus, these Guidelines clarify what is "reasonable or appropriate" under Paragraphs 7 and 9 of the Fannie Mortgage.

77.    The standard FHA Mortgage states at Paragraph 5:

> Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property.

78.    Paragraph 7 of the standard FHA Mortgage provides:

> Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.[13]

> Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

---

[13] Paragraph 2 of the FHA Mortgage concerns "Monthly Payment of Taxes, Insurance and Other Charges." It does not discuss or reference property inspections.

21

79.   However, federal regulations, discussed below, make clear that borrowers cannot be charged for property inspections unless the Lender – or Loan Servicer – has reason to believe the property is vacant.

**3.   Laws and Regulations Govern Loan Servicing.**

80.   Certain federal regulations and state laws govern whether Loan Servicers—including Nationstar—may order a property inspection and charge the inspection to a borrower.

81.   For example, the United States Department of Housing and Urban Development imposes a limitation on Loan Servicers' ability to order property inspections and charge them to borrowers. Specifically, 24 C.F.R. § 203.377, which provides, in pertinent part:

> The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, and efforts to reach the mortgagor by telephone within that period have been unsuccessful, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, if such action does not constitute an illegal trespass. "Reasonable action" includes the commencement of foreclosure within the time required by § 203.355(b) of this part.

82.   A bankruptcy court in the Eastern District of Pennsylvania recently ruled that Section 203.377 of the federal regulations trumps any provision to the contrary in FHA Mortgages. *See In re Ruiz*, 501 B.R. 76 (Bkrtcy. E.D. Pa. 2013). In *Ruiz*, the court ruled that notwithstanding the Loan Servicer's argument that the mortgage permitted inspections solely on the basis of default, the federal regulation controlled.

### 4.   Nationstar's Property Inspections Process Ignores the Applicable Guidelines, Mortgage Contracts, and Regulations.

83.    Nationstar monitors its mortgage servicing portfolio using an automated computer system known as Loan Servicing and Accounting Management System ("LSAMS"). LSAMS is a customizable loan servicing software platform sold by ISGN.[14]

84.    Nationstar began using LSAMS as its servicing system of record in May 2011 to document and monitor all servicing functions performed by Nationstar. Nationstar has integrated LSAMS with other systems, databases and modules such as LenStar,[15] Remedy, RemedySTAR,[16] FORTRACS[17] and others.[18] Nationstar's Servicing System is programmed to account for and apply Lenders' minimum guidelines and required tasks, but Nationstar has further customized its Servicing System to take other actions for its own purposes and profit. The ordering of multiple property inspections within a single 30-day period is one example of exceeding the Lender guidelines for Defendants' benefit.

85.    Nationstar's Servicing System will automatically order a property inspection and charge the borrower's account for the inspection if a borrower is late making a payment. The only criteria for the inspection to be ordered and charged is that the loan has been in default for a certain number of days. The inspection is ordered and charged regardless of whether there is a lawful and reasonable basis for ordering the inspection or whether the borrower may be legally charged for the inspection.

86.    The Servicing System is fully automated. It generates work orders for property inspections without human intervention.  On information and belief, Nationstar

---

[14] *See* http://www.isgn.com/technology/servicing/ (last visited Jan. 20, 2015).

[15] LenStar is a default management communications software that provides bi-directional integration with attorney case management systems for mortgage banking organizations and attorneys involved in the servicing of loans in foreclosure, bankruptcy and eviction.

[16] Remedy and RemedySTAR are Nationstar's loan modification systems of record.

[17] FORTRACS is a software system that navigates the mortgage servicer user through default processes such as loss mitigation, foreclosure processing and bankruptcy processing.

[18] These secondary systems and databases perform and track automated functions of Nationstar's servicing system.

does not assign any employee the task of determining whether each property inspection is reasonable, necessary and/or appropriate to protect the Lender's interest in the property.

87.     Once the automated trigger for an inspection occurs, the property inspection work order is automatically sent, via Solutionstar, to either a third-party vendor or affiliate of Nationstar.

88.     Once the vendor/affiliate receives the computer-generated property inspection work order, the inspection is performed and the cost is automatically charged to the borrower's account. The property inspection report is uploaded to the Servicing System.

89.     After the first inspection is ordered, the Servicing System continuously orders additional inspections without regard to the existence of any condition warranting additional inspections and even after the borrower becomes current. Even if a borrower misses only one monthly payment, but continues to make additional monthly payments, the borrower is in default and property inspections are repeatedly ordered.

90.     The Inspection Scheme ignores whether borrowers, including Plaintiffs, are obviously living in their homes at the time of the inspections. Specifically, Nationstar programmed its automated loan servicing system to ignore the occupancy of the home or any other relevant consideration into account before ordering property inspections. Furthermore, as was the case with a number of Plaintiffs, the system continued to order and charge for inspections, even after the borrower had cured their delinquency and come current on their loan.

91.     The Guidelines, the mortgage contracts, and the applicable regulations support at least three separate and independent reasons why Nationstar's conduct is not appropriate: (a) it is not reasonable to order multiple property inspections in a single 30-day period, or order inspections after a borrower has come current; (b) it is not reasonable for Nationstar to impose charges on borrowers for visual property inspections or fabricated property inspections; and (c) it is not reasonable for Nationstar to engage in self-dealing with Solutionstar and profit from inspections at borrowers' expense.

92.     Furthermore, it is improper for Nationstar to program its automated and computerized loan servicing system to automatically order property inspections and assess the "costs" of those inspections to borrowers without accounting for: (a) whether the inspections may be legally charged to borrowers; (b) whether Nationstar has reason to believe the property is abandoned; and (c) whether the frequency of the property inspections exceed the standards of reasonableness and appropriateness.

**E.     Nationstar Charged Plaintiffs Unfair Property Inspection Fees**

**1.     Eugenio and Rosa Diaz Contreras**

93.     Plaintiffs Eugenio Contreras and Rosa Diaz Contreras (the "Contreras") are married residents of the State of California.  On April 11, 2008, the Contreras executed a Promissory Note in favor of Suntrust Mortgage, Inc. The Note was secured by a standard Fannie Mae/Freddie Mac Uniform Security Instrument deed of trust on the Contreras' primary residence located in Tracy, California. *See* Ex. 1 ("Contreras Deed of Trust").

94.     The Contreras' mortgage is currently serviced by Nationstar and owned and/or guaranteed by Fannie Mae.  On or about November 1, 2012, the Contreras became delinquent in their mortgage payments.  The Contreras have, however, continuously lived in their home despite the fact that they fell behind in payments.

95.     The Contreras have been in consistent and regular contact with Nationstar either on their own or through counsel.  Through that contact, the Contreras have informed Nationstar, and Nationstar is well-aware, that they continue to live in the property.

96.     On or about August 1, 2014, the Contreras resolved the delinquency on their loan and have been current on their mortgage payments. Nonetheless, the Contreras continue to be charged inspections fee by Nationstar which is indicated on their mortgage statements.

### 2.      William and Melva Phillips

97.      Plaintiffs William Phillips and Melva Phillips (the "Phillips") are married residents of the State of Arizona.  On February 18, 2009, the Phillips executed a Promissory Note in favor of Nationstar Mortgage, LLC, which is also their servicer. The Note was secured by a standard Fannie Mae/Freddie Mac Uniform Security Instrument encumbering the Phillips' primary residence located in Globe, Arizona. *See* Ex. 2 ("Phillips Deed of Trust").

98.      The Phillips mortgage is currently serviced by Nationstar and owned and/or guaranteed by Fannie Mae.  On or about July 1, 2013, the Phillips fell behind in their mortgage payments.  The Phillips have, however, continuously lived in their home despite the late status of their payments.  The Phillips have been in consistent contact with Nationstar either on their own or through counsel.  Through that contact, the Phillips have informed Nationstar, and Nationstar well knows, that they continue to live in the property.  The Phillips have been attempting and continue to attempt to resolve their loan delinquency including by submitting an application to modify their mortgage terms. Nonetheless, the Phillips continue to be charged inspections fee by Nationstar which are indicated on their mortgage statements.

### 3.      Teresa Barney

99.      Plaintiff Teresa Barney ("Barney") is a resident and citizen of Oregon. On or about November 2, 2005, Barney executed a Promissory Note in favor of GN Mortgage, LLC.

100.      The Note is secured by a standard Fannie Mae / Freddie Mac Uniform Security Instrument encumbering a certain piece of real property located in Corbett, Oregon, (the "Gordon Creek Property"). *See* Ex. 3 ("Barney Deed of Trust"). Barney's mortgage was initially serviced by Aurora Loan Services, LLC.  It is currently serviced by Nationstar.

101.   On or before June 25, 2010, Barney lost her job, and qualified for a modification of her mortgage terms pursuant to the federal government's Home Affordable Modification Program ("HAMP"). *See* Ex. 4 ("HAMP Approval"). She also qualified for the Oregon Homeownership Stabilization Initiative, which permitted her to forego mortgage payments for a year, and qualified her for a number of other protections. *See* Ex. 5 ("OSHI Authorization Form").

102.   On or about June 15, 2012, Nationstar bought the servicing rights to Barney's mortgage and Nationstar is the current servicer of her loan. *See* Ex. 6 ("Barney Letter Confirming Sale of Servicing Rights").

103.   Barney has continuously resided at the Gordon Creek Property at all times relevant to the present suit and has been in consistent and regular contact with Nationstar, so as to put them on notice that the property was inhabited. Nevertheless, Nationstar charged Barney over $120 in fees for Properties Inspections intended to ensure that the property had not been abandoned or vandalized.

104.   Moreover, a number of the Property Inspections occurred within 30 days of one another. *See* Ex. 7 ("Barney Payment History Transaction Report"); Ex. 8 ("Barney Property Inspection Invoices").

105.   Further, Barney has never missed a mortgage payment and foreclosure has not been initiated against her property. Nevertheless, Nationstar charged Barney a number of "Distressed Mortgage Fees," including Corporate Advances, for services intended to facilitate foreclosure that Barney never received and/or were never explained to her. *See* Ex.  7 (indicating Corporate Advances on 11/28/14 4/24/15, 5/22/15, 6/16/15).

106.   When Barney transmits her monthly mortgage payments to Nationstar, the payment is first applied to her fees, which causes her to fall behind on her mortgage payments and incur additional late payment fees. Nevertheless, Barney continues to pay all fees incurred in order to remain current on her account.

#### 4.    Keith and Teresa Marcel

107.    Keith and Teresa Marcel ("the Marcels") are residents and citizens of Louisiana.

108.    On or about August 12, 2003, the Marcels executed a Note and Deed of Trust encumbering a certain piece of real property located in Mahdeville, LA ("Longwood Property").  *See* Ex. 9 ("Marcel Note"); Ex. 10 ("Marcel Deed of Trust").

109.    The Marcels' loan is serviced by Nationstar.

110.    The Marcels have continuously resided at the Longwood Property at all times relevant to the present suit and has been in consistent and regular contact with Nationstar, so as to put them on notice that the property is inhabited, including sending written requests to Nationstar. *See* Ex. 11 ("Marcel Correspondence").

111.    Nevertheless, as of December 22, 2014, Nationstar charged the Marcels $57.00 for property inspections, services designed to ensure that the property has not been abandoned. *See* Ex. 12 ("Marcel 12/22/14 Statement").

112.    Moreover, the Marcels were issued property inspection fees for inspections that appear to have never occurred. The Marcels live in a gated community which restricts the access of non-residents, including Nationstar or Solutionstar representatives. As such, Defendants could not have gained access to the Marcels' home to conduct an inspection of any kind, even for a "drive-by" inspection.

113.    Further, Nationstar charged the Marcels a number of other unexplained "Distressed Mortgage Fees" including a number of Corporate Advances for services the Marcels never received and/or were never explained to them. *See* Ex. 13 ("Marcel Transaction History") (indicating Corporate Advances on 12/31/14, 12/16/14, 6/19/14, 5/22/14, 2/3/14, 1/3/14).

#### 5.    Sherlie Charlot

114.    Plaintiff Sherlie Charlot ("Charlot") is a resident and citizen of Florida.

115.    On or about March 22, 2010, Charlot executed a Promissory Note and a standardized FHA Mortgage in favor of America Home Key, Inc. encumbering a certain piece of real property located in Lake Worth, Florida (the "Lake Worth Property"). *See* Ex. 14 ("Charlot Mortgage").

116.    Charlot's Mortgage was initially serviced by Bank of America.

117.    On or about June 10, 2013, Charlot's Mortgage was transferred to Nationstar Mortgage, LLC, and Nationstar is the present servicer of Charlot's Mortgage. *See* Ex. 15 ("Assignment of Mortgage").

118.    After Charlot's Mortgage was transferred, Nationstar claimed that she was in default and applied a $4,000.00 fee to her account, which Charlot paid to bring her account current.

119.     Charlot has continuously resided at the Lake Worth Property at all times relevant to the present suit and has been in consistent and regular contact with Nationstar, so as to put them on notice that the property is inhabited.

120.    Nevertheless, Nationstar charged Charlot $30.00 for Property Inspections, a service designed to ensure the property has not been abandoned or vandalized. *See* Ex. 16 ("Charlot 2/15 Statement") (also indicated $2,632.34 in Legal Fees").

121.    Moreover, no foreclosure action has been initiated against Charlot's property. But, as of May 22, 2015, Nationstar charged Charlot $2,418.34 in foreclosure fees, title examination fees, posting costs, publication fees, and recording fees, services designed for facilitate the foreclosure process. *See* Ex. 17 ("Charlot 4/25 Statement).

122.    Further, Nationstar charged Charlot a number of other unexplained "Distressed Mortgage Fees" including a number of Corporate Advances for services Charlot never received and were never explained to her. *See* Ex. 18 ("Charlot Transaction History") (indicating Corporate Advances on 11/28/14 4/24/15, 5/22/15, 6/16/15).

123.    Charlot paid each of the fees charged by Nationstar, and transmitted payment to Nationstar in the amount of $9,980.42, the amount necessary to cure the

default and bring her account current. But Nationstar misapplied or failed to apply the payment and, as a result, she remains in default.

### 6.    Colleen Ann O'Halloran

124.    Plaintiff Colleen Ann O'Halloran  ("O'Halloran") is a resident and citizen of the State of Massachusetts.

125.    O'Halloran executed a Promissory Note and Deed of Trust encumbering a certain piece of real property located in Sherborn, Massachusetts (the "Sherborn Property"). *See* Ex. 19 ("O'Halloran Deed of Trust"); Ex. 20 ("O'Halloran Note").

126.    On or about May 21, 2013, Nationstar bought the servicing rights to O'Halloran's mortgage and Nationstar is the current servicer of her loan. *See* Ex. 21 ("O'Halloran Account Summary").

127.    O'Halloran has continuously resided at the Sherborn Property at all times relevant to the present suit and has been in consistent and regular contact with Nationstar, so as to put them on notice that the property was inhabited. *See* Ex. 22 ("O'Halloran 08/15 Correspondence"); Ex. 23 ("O'Halloran 03/15 Correspondence"). Nevertheless, Nationstar charged O'Halloran over $260.00 in fees for Properties Inspections intended to ensure that the property had not been abandoned or vandalized. *See* Ex. 24 ("O'Halloran 7/20 Statement").

128.    Moreover, O'Halloran was charged for property inspections that appear to never have occurred. Due to the layout of O'Halloran's building and community, her property cannot be observed from the street, which would prevent Defendants from conducting an inspection without her permission.

129.    Further, Nationstar charged O'Halloran a number of other unexplained "Distressed Mortgage Fees" including a number of Corporate Advances for services Charlot never received and were never explained to her. *See* Ex. 25 (indicating Corporate Advances on 15/5/15, 4/2/15, 2/4/15, 1/6/15, 12/12/14, 11/4/14, 10/17/14, 9/30/14, 7/28/14, 4/30/14, 4/24/14, 1/22/14, 12/23/13, 12/18/13, 5/23/13).

**F.      Nationstar Charged Plaintiffs Unfair 'Pay-to-Pay' Fees**

**1.      Jennie Miller**

130.    Plaintiff Jennie Miller ("Miller") is a resident and citizen of the State of Illinois.

131.    Miller executed a Promissory Note and Deed of Trust encumbering a certain piece of real property located in Wauconda, IL (the "Cattail Property"). *See* Ex. 26 ("Miller Deed of Trust"); Ex. 27 ("Miller Note").

132.    On or about June 4, 2013, Nationstar bought the servicing rights to Miller's mortgage and Nationstar is the current servicer of her loan. *See* Ex. 28 ("Miller Servicing Transfer Notice").

133.    As early as August 9, 2013, Nationstar began to charge Miller a $9.95 fee for making or scheduling online payments, totaling more than $129.00, all of which she paid. *See* Ex. 29 ("Miller Transaction History").

134.    Miller was not made aware of the fact that she was being charged an additional fee for online payment.

135.    Indeed, following the application of the 'pay-to-pay' scheme to her account, Miller no longer received paper statements from Nationstar that might have indicated her total amount owed, or any fees that she had been charged.

136.    Moreover, as a result of the 'pay-to-pay' scheme, payments that Miller made towards her principal loan balance were misapplied, as detailed below.

137.    In addition to her minimum monthly payment, Miller generally makes an additional monthly payment towards her principal loan balance. As indicated in the below screen capture, Nationstar's online payment form permits additional payments to be made directly to the principal. Despite Miller's use of the online form to indicate that her payment be made to her principal balance, Nationstar applied a portion of her additional payment to satisfy 'pay-to-pay' fees. Miller never received verbal or written notification that fees would be taken out of her additional monthly principal payments.

31

As indicated in the below screen capture, the Nationstar monthly payment screen does not indicate any outstanding fees or indicate that additional monthly principal payments would be applied towards outstanding fees.



## 2.   Edward Yager

138.   Plaintiff Edward Yager ("Yager") is a resident and citizen of the State of California.

139.   On or about July 27, 2012, Nationstar bought the servicing rights to Yager's mortgage and Nationstar is the current servicer of his loan. *See* Ex. 30 ("Yager Servicing Transfer Notice").

140.   As early as January 15, 2013, Nationstar began to charge Yager a $9.95 fee for making debit card payments over the phone ("Pay-to-Pay" Fees).

141.   Yager was charged "Pay-to-Pay" fees in an amount totaling more than $19.90, all of which he paid, before he began to send all payments to Nationstar via certified mail. *See* Ex. 31 ("Yager Transaction History").

142.   Yager was not made aware of the fact that he would was going to be charged an additional fee for online payment.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

143.   Plaintiffs' claims are subject to equitable tolling, stemming from Plaintiffs' inability to obtain vital information underlying their claims.  Any applicable statutes of limitation are properly tolled because Plaintiffs did not know and could not have learned the true facts underlying their claims until shortly before filing their Complaint.

144.   Plaintiffs and members of the Classes were or have been unable to obtain vital information bearing on their claims absent any fault or lack of diligence on their part.  As further set forth below, Plaintiffs were not on inquiry notice of Defendants' wrongdoing and had no duty to initiate an investigation of any nature because the charges for property inspection and payment appeared to be legitimate.  Plaintiffs did not and could not have known of Defendants' violations of applicable consumer law, breaches of their contracts or unjust enrichment.

145.   Plaintiffs were relieved of any duty to investigate because they reasonably and justifiably relied on Defendants to comply with applicable consumer law and contractual obligations.  Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiffs had attempted to investigate, such investigation would have been futile because it would not have uncovered the true, unlawful nature of Defendants' activities.

146.   Plaintiffs and members of the Class did not discover and could not have discovered, despite all due diligence, that the property inspection and payment fees charged to their accounts were unfair and excessive.  Plaintiffs and members of the Class did not discover and could not have discovered, despite all due diligence, the two Schemes alleged herein.  Plaintiffs' claims were thus equitably tolled until they discovered the true facts underlying their claims shortly before the filing of the Complaint.

147.    Moreover, Defendants knowingly and intentionally engaged in conduct solely calculated to induce Plaintiffs to refrain from or postpone the commencement of an action.

148.    Further Plaintiffs claims are subject to the continual accrual and/or continuous violation doctrines. Defendants engaged in continuous and repetitive violations of applicable consumer law and breaches of contract and, as such, the limitations period for Plaintiffs' claims accrue only upon the last of the Defendants' unfair and/or illegal acts.

## VIII.  CLASS ALLEGATIONS

**A.    The Classes**

149.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

150.    This class action is brought by the individually named Plaintiffs on behalf of themselves and the following class (the "National Distressed Mortgage Fees Class"):

> All persons in the United States or any United States Territory who were charged one or more property inspection fees through Nationstar's automated loan servicing platform, when they inhabited the property to be inspected and were in contact with Nationstar so as to put them on notice of the fact that the property was inhabited.

151.    This class action is brought by the individually named Plaintiffs on behalf of themselves and the following class (the "Fannie/Freddie National Distressed Mortgage Fees Class"):

> All persons in the United States or any United States Territory whose mortgage contracts use the standard Fannie Mae/Freddie Mac Uniform Security Instrument and were charged one or more property inspection fees through Nationstar's automated loan servicing platform, when they inhabited the property to be inspected and were in contact with Nationstar so as to put them on notice of the fact that the property was inhabited.

152.    This class action is brought by the individually named Plaintiffs on behalf of themselves and the following class (the "FHA Distressed Mortgage Fees Class"):

> All persons in the United States or any United States Territory whose mortgage contracts use the standard Federal Housing Administration Security Instrument and were charged one or more property inspection fees through Nationstar's automated loan servicing platform, when they inhabited the property to be inspected and were in contact with Nationstar so as to put them on notice of the fact that the property was inhabited.

153.    This class action is also brought under California law by the Contreras on behalf of themselves and the following class (the "California Distressed Mortgage Fees Class"):

> All members of National Distressed Mortgage Fees Classes whose properties securing their loan serviced by Nationstar are located in California.

154.    This class action is also brought under Arizona law by the Phillips on behalf of themselves and the following class (the "Arizona Distressed Mortgage Fees Class"):

> All members of the National Distressed Mortgage Fees Classes whose properties securing their loan serviced by Nationstar are located in Arizona.

155.    This class action is also brought under Oregon law by Plaintiff Barney on behalf of herself and the following class (the "Oregon Distressed Mortgage Fees Class"):

> All members of the National Distressed Mortgage Fees Classes whose properties securing their loan serviced by Nationstar are located in Oregon.

156.    This class action is also brought under Louisiana law by Plaintiffs Keith and Teresa Marcel on behalf of themselves and the following class (the "Louisiana Distressed Mortgage Fees Class"):

35

> All members of the National Distressed Mortgage Fees Classes whose properties securing their loan serviced by Nationstar are located in Louisiana.

157.   This class action is also brought under Florida law by Plaintiff Charlot on behalf of herself and the following class (the "Florida Distressed Mortgage Fees Class"):

> All members of the National Distressed Mortgage Fees Classes whose properties securing their loan serviced by Nationstar are located in Florida.

158.   This class action is also brought under Massachusetts law by Plaintiff O'Halloran on behalf of herself and the following class (the "Massachusetts Distressed Mortgage Fees Class"):

> All members of the National Distressed Mortgage Fees Classes whose properties securing their loan serviced by Nationstar are located in Massachusetts.

159.   This class action is brought by the individually named Plaintiffs on behalf of themselves and the following class (the "National Pay-to-Pay Class"):

> All persons in the United States or any United States Territory whose were charged one or more fees in order to make a payment online payment to their Nationstar account.

160.   This class action is also brought under Illinois law by Plaintiff Miller on behalf of herself and the following class (the "Illinois Pay-to-Pay Class"):

> All members of National Pay-to-Pay Class whose properties securing their loan serviced by Nationstar are located in Illinois.

161.   This class action is also brought under California law by Plaintiff Yager on behalf of himself and the following class (the "California Pay-to-Pay Class"):

> All members of National Pay-to-Pay Class whose properties securing their loan serviced by Nationstar are located in California.

162.   Plaintiffs sue on their own behalf and on behalf of the Classes under Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

## 1.   Numerosity.

163.   Plaintiffs do not know the exact size or identities of the proposed Class, since such information is in the exclusive control of the Defendants.  Nationstar is the second largest non-bank loan servicer in the United States.  Its servicing portfolio contains millions of loans. As of year end 2013, Nationstar stated that it had 2.3 million loan servicing customers, 15% of whom "are facing difficult situations in life that make paying their mortgage challenging"[19], and 11.8% of whose 1.98 million loans (234,000) are 60+ days delinquent.[20] Thus, Nationstar admits at least 230,000 defaulting customers as of 2013, and it has substantially grown its loan portfolio in the ensuing two years.  On this basis, Plaintiffs believe that the Class encompasses tens if not hundreds of thousands of individuals.  California, Arizona, Oregon, Florida, Massachusetts, Illinois and Louisiana are highly populated states where Nationstar has significant operations and a large loan servicing portfolio. Therefore, the proposed Classes are so numerous that joinder of all members is impracticable.

## 2.   Commonality.

164.   All members of the Class have been subject to and affected by Defendants' practices detailed herein.  There are questions of law and fact that are common to the Class,

---

[19] 2013 Annual Report, p. 2.
[20] *Id.* at 45.

and predominate over any questions affecting only individual members of the Class.  These questions include, but are not limited to, the following:

     a.     Whether Defendants created and implemented the Inspection Scheme and the Pay-to-Pay Scheme;

     b.     Whether Defendants violated state law;

     c.     Whether the statute of limitations for Plaintiffs' claims should be properly tolled;

     d.     Whether Nationstar had a policy and practice of charging persons in arrears unlawful and unreasonable inspection and/or pay-to-pay fees;

     e.     Whether Nationstar had a policy and practice of charging persons inspection fees after borrowers had cured their arrearages;

     f.     Whether and to what extent Nationstar's automated servicing platform improperly ordered and charged inspection fees to Class members;

     g.     Whether and the extent to which Nationstar's pay-to-pay fees improperly charged fees to Class members;

     h.     Whether the Court can enter declaratory and injunctive relief; and

     i.     The proper measure of disgorgement and/or actual and/or punitive damages and/or restitution, as well as other recovery to the class, including fees and costs.

**3.**    **Typicality**.

165.   The claims of the individually named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class, in that Plaintiffs and the other members of the Class were subjected to the same uniform abusive practices of the Defendants.

4.      **Adequacy**.

166.    The individually named Plaintiffs will fairly and adequately represent the interests of the Class.  They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions—in particular, consumer protection and predatory lending actions.

5.      **The prerequisites to maintaining a class action for injunctive relief pursuant to Rule 23(b)(2) are readily apparent.**

167.    The prerequisites to maintaining a class action for injunctive relief exist:

a.      If injunctive relief is not granted, great harm and irreparable injury to Plaintiffs and the members of the Class will continue; and

b.      Plaintiffs and the members of the Class have no adequate remedy at law for the injuries which are threatened to recur, in that, absent action from this Court, Defendants will continue to violate state law, and cause damage to Plaintiffs.

168.    Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.

6.      **Common questions predominate, and the class action device is superior, making certification appropriate under Rule 23(b)(3).**

169.    The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.  The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  Plaintiffs' counsel, highly experienced in class actions, foresee little difficulty in the management of this case as a class action.

# IX. CLAIMS FOR RELIEF

## COUNT I - BREACH OF CONTRACT (ON BEHALF OF PLAINTIFFS, THE NATIONAL DISTRESSED MORTGAGE FEES CLASS AND THE NATIONAL PAY-TO-PAY CLASS AGAINST NATIONSTAR)

170.   Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

171.   Plaintiffs' mortgage loans are owned and/or guaranteed by Fannie Mae or Freddie Mac.

172.   The Fannie/Freddie National Distressed Mortgage Fees Class Plaintiffs' ("Fannie/Freddie Plaintiffs") mortgage contracts use the standard Fannie Mae/Freddie Mac Uniform Security Instrument with language substantially similar to the language identified herein.

173.   Pursuant to the Fannie/Freddie Plaintiffs' mortgage contracts, where the Loan Servicer or Lender acts to protect the property, the Loan Servicer and/or Lender are obligated to do so only in a manner that is "reasonable and appropriate."

174.   The FHA Distressed Mortgage Fees Class Plaintiffs' ("FHA Plaintiffs") mortgage contracts use the standard FHA Deed of Trust with language substantially similar to the language identified herein.

175.   Pursuant to the FHA Plaintiffs' mortgage contracts, where the Loan Servicer or Lender acts to protect the property, the Loan Servicer and/or Lender are obligated to do so only in a manner that is "necessary to protect the value of the Property and Lender's rights in the property."

176.   Plaintiffs' mortgage loans are serviced by Defendant Nationstar.

177.   As the Loan Servicer, Nationstar acquired and/or retains certain contractual rights and obligations including compliance with the terms of Paragraphs 7 and 9 of the mortgage contracts.

178.   Nationstar, as described herein, ordered numerous drive-by or fabricated property inspections at a rate in excess of once every 30 days. Nationstar charged Plaintiffs for each of these inspections.

179.   The frequency of these inspections was excessive and neither reasonable nor appropriate. Nationstar knew at the time the inspections were ordered that Plaintiffs inhabited their homes which secured the mortgages. Thus, Nationstar ordered property inspections that were too frequent and were otherwise unfair or excessive.

180.   Nationstar charged Plaintiffs for these excessive and unfair property inspections.

181.   Nationstar breached Plaintiffs' mortgage contracts by charging Plaintiffs for property inspections that Plaintiffs were not required to pay for by the terms of their mortgage contracts.  These charges were not "reasonable and appropriate" with regard to the Fannie/Freddie Plaintiffs, and were not necessary with regard to the FHA Plaintiffs.

182.   Nationstar breached Plaintiffs' mortgage contracts by charging Plaintiffs inflated property inspections fees due to the portion of the charge that was retained by Nationstar and/or its affiliate Solutionstar.

183.   Moreover, Nationstar breached Plaintiffs' mortgage contracts by charging Plaintiffs for fees to make online payments ("Pay-to-Pay" fees) that Plaintiffs were not required to pay for by the terms of their mortgage contracts.

184.   As the direct, proximate and legal result of these breaches of the express terms of the contract, Plaintiffs and members of the Classes have suffered damages and are entitled to the relief sought herein for such breaches.

COUNT II - BREACH OF CONTRACT - IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (ON BEHALF OF PLAINTIFFS, THE NATIONAL DISTRESSED MORTGAGE FEE CLASS AND THE NATIONAL PAY-TO-PAY FEE CLASS AGAINST NATIONSTAR)

185.   Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

186.   Every contract contains an implied covenant of good faith and fair dealing.

187.   In all of their actions described herein, Nationstar acted on its own behalf.

188.   The mortgage contracts of Plaintiffs and the Classes contained an implied covenant of good faith and fair dealing, pursuant to which Nationstar was bound to exercise

41

the discretion afforded it under the mortgage contract in good faith and to deal fairly with Plaintiffs and the Classes.

189.   Nationstar's duty of good faith and fair dealing prevents it from evading the spirit of the mortgage contract by exercising discretion afforded it to order unnecessary property inspections and charge borrowers excessive fees for property inspections.

190.   Any discretionary authority granted to Nationstar under the terms of the mortgage contracts was subject to Nationstar's implied duty of good faith and fair dealing. To the extent that the Classes' mortgage contracts permitted Nationstar to order property inspections and charge the cost of those inspections to the borrowers, Nationstar was obligated to exercise that discretion in good faith and not for its own financial gain at borrowers' expense.

191.   Nationstar breached its duty of good faith and fair dealing in at least the following respects, among others:

> a.   ordering property inspections more frequently than requested or required by the Lender in order to perpetuate Class member's loan delinquency;
>
> b.   ordering property inspections through its affiliate, Solutionstar, that retained a portion of the property inspection charge as profit;
>
> c.   imposing charges for property inspections on the Classes that are not permitted by applicable law or regulation and/or in violation of the applicable mortgage provisions;
>
> d.   imposing charges for property inspections on the Classes that are not permitted or requested by the Lender; and
>
> e.   imposing charges to make an online or phone payment that are not permitted by applicable law or regulation and/or are in violation of the applicable mortgage provisions.

192.   By ordering unnecessary property inspections that were not required to protect the Lender and by doing so in a manner to maximize its profits and/or the profits of its

affiliate, Solutionstar, Nationstar has breached the implied covenant of good faith and fair dealing.

193.    Moreover, by ordering online "Pay-to-Pay" fees that were not required to protect the Lender, did not provide any benefit to the consumer, and issued only at the discretion of Nationstar towards debtors that were most likely to into default as a result, Nationstar exercised breach its duty to exercise its discretion in good faith and not for its own financial gain at borrowers' expense.

194.    As the direct, proximate and legal result of these breaches of the implied covenant of good faith and fair dealing, Plaintiffs and members of the Class have suffered damages and are entitled to the relief sought herein for such breaches.

### COUNT III - UNJUST ENRICHMENT (ON BEHALF OF PLAINTIFFS AND THE NATIONAL DISTRESSED MORTGAGE FEES CLASS AND THE NATIONAL PAY-TO-PAY CLASS AND AGAINST ALL DEFENDANTS)

195.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

196.    As a result of the Inspection Scheme, Nationstar, Solutionstar and Defendants improperly charged unnecessary property inspection fees to Plaintiffs and Class members at an inflated price, and earned money and fees that were unreasonable.

197.    As a result of the Pay-to-Pay Scheme, Nationstar improperly charged unnecessary payment fees to Plaintiffs and Class members, and earned money and fees that were unreasonable.

198.    Nationstar, Solutionstar and Defendants are aware of the receipt of the above-described benefits.

199.    Nationstar, Solutionstar and Defendants received the above-described benefits to the detriment of Plaintiffs and each Class member.

200.    Nationstar, Solutionstar and Defendants continue to retain the above-described benefits to the detriment of Plaintiffs and the Class.

201.   As a result of Nationstar, Solutionstar and Defendants' unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Nationstar, Solutionstar and Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

202.   Moreover, Nationstar and Defendants improperly charged unnecessary "Pay-to-Pay" fees to Plaintiffs and Class members, and earned money and fees that were unreasonable.

203.   Further, Plaintiffs and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Nationstar, Solutionstar and Defendants as a result of their unfair, unlawful and/or deceptive practices.

COUNT IV - VIOLATIONS OF OREGON'S UNLAWFUL TRADE PRACTICES ACT (OR. REV. STAT. §§ 646.605, *ET SEQ.*) (ON BEHALF OF PLAINTIFF TERESA BARNEY AND THE OREGON DISTRESSED MORTGAGE FEES CLASS AGAINST ALL DEFENDANTS)

204.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

205.   Plaintiff Teresa Barney brings this cause of action on behalf of herself and the members of the Oregon Distressed Mortgage Fees Class.

206.   Oregon's Unlawful Trade Practices Act (Or. Rev. Stat. §§ 646.605, *et seq.*) enumerates a number of unlawful practices, including general prohibitions of unconscionable tactics and unfair or deceptive conduct in the course of a person's business, vocation or occupation.

207.   A person engages in an "unlawful practice" within the meaning of Oregon's Unlawful Trade Practice Act if, in the course of the person's business, vocation or occupation, the person "[e]ngages in any . . . unfair or deceptive conduct in trade or commerce." O.R.S. § 646.608.

208.   A person engages in "unconscionable tactics" within the meaning of Oregon's Unlawful Trade Practices Act if that person: "Knowingly permits a customer to enter into a transaction from which the customer will derive no material benefit; [and/or] Permits a customer to enter into a transaction with knowledge that there is no reasonable probability of payment of the attendant financial obligation in full by the customer when due." O.R.S. § 646.605.

209.   In the course and conduct of Nationstar's loan servicing and collection and in violation of Oregon's Unlawful Trade Practices Act, Defendants used false, deceptive and misleading statements, and omitted material facts, concerning the propriety of certain fees and services that were automatically ordered and charged to Class members. Specifically, Defendants led consumers to believe that certain fees  including but not limited to, fees for property inspections, broker price opinions, property appraisals, foreclosure auction services, title examinations and other services  ("Distressed Mortgage Fees") were authorized by their Lender and appropriately priced when, in reality, the fees were for services that were inflated, unauthorized, duplicative, and/or never performed.

210.   In the course and conduct of Nationstar's loan servicing and collection and in violation of Oregon's Unlawful Trade Practices Act, Defendants knowingly permitted their customers to enter into transactions from which they would derive no material benefit. Specifically, Defendants charged consumers certain "Distressed Mortgage Fees," as defined above, that were unauthorized, unnecessary, provided no value or benefit to their customers and, in some cases, were duplicative and/or never performed.

211.   In the course and conduct of Nationstar's loan servicing and collection and in violation of Oregon's Unlawful Trade Practices Act, Defendants knowing permitted their customers to enter into transactions with knowledge that there was no reasonable probability of payment of the attendant financial obligation in full by the customer when due. Specifically, Defendants charged consumers unauthorized and/or illegal "Distressed Mortgage Fees," intended to prevent borrowers from modifying their existing mortgage to

have more favorable terms or otherwise bring their loans out of default so as to permit them to repay their loans or the fees charged by Defendants.

212. As a direct and proximate result of Nationstar and Defendants' violations of Oregon's Unlawful Trade Practices Act (Or. Rev. Stat. §§ 646.605, *et seq.*) Plaintiff Barney and each member of the Oregon Distressed Mortgage Fees Class have suffered damages and substantial injury to a number of legally protected interests, including injury to their business and/or property.

213. As provided under Or. Rev. Stat. Ann. § 646.638, Nationstar and Defendants are liable to Plaintiff Barney and each member of the Oregon Distressed Mortgage Fees Class for the greater of $200 in statutory damages and/or actual damages, together with all costs of this action, plus reasonable attorney's fees.

214. Due to Nationstar and Defendants' willful and knowing violations of Oregon's Unlawful Trade Practices Act, Plaintiffs Barney and each member of the Oregon Distressed Mortgage Fees Class also seek an award of punitive damages in an amount that the court deems appropriate, as authorized under Or. Rev. Stat. Ann. § 646.638.

215. Pursuant to Or. Rev. Stat. Ann. § 646.638, Plaintiffs Barney and each member of the Oregon Distressed Mortgage Fees Class also seek an order of this court declaring Nationstar and Defendants' acts and practices to be unlawful and enjoining Nationstar and Defendants from continuing their unfair, unlawful, and/or deceptive business acts and/or practices in the State of Oregon and elsewhere, as well as any other injunctive or declaratory relief as the court deems appropriate.

COUNT V - VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) (ON BEHALF OF PLAINTIFFS CONTRERAS, YAGER, THE CALIFORNIA DISTRESSED MORTGAGE FEES CLASS AND THE CALIFORNIA PAY-TO-PAY CLASS AGAINST ALL DEFENDANTS)

216. Plaintiffs reallege and incorporate by reference the preceding allegations.

217. Through the Inspection Scheme and the Pay to Pay Scheme, Defendants have (1) directly and indirectly employed a scheme, device and artifice to defraud and mislead

borrowers and defraud any person; (2) directly and indirectly engaged in an unfair and deceptive act toward a person; (3) directly and indirectly obtained property by fraud and misrepresentation; and (4) knowingly made published and disseminated false, deceptive and misleading information.

218.   California law applies to the claims of Plaintiffs Yager, Contreras and members of the California Classes.

219.   Defendants have engaged and continue to engage in the two Schemes alleged herein.   Nationstar and Solutionstar's acts and practices as described herein constitute unlawful, fraudulent and/or unfair business acts and practices.  As such, its conduct violates Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL").

220.   Defendants' conduct described herein constitutes an unlawful business practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*, in that the conduct violates California law and the common law of unjust enrichment.  Specifically, as alleged herein, Defendants have violated 24 C.F.R. § 203.377 by ordering and charging for unnecessary inspections and charging fees to make payments.

221.   Defendants' conduct as described herein violates not only the unlawful prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong, independent of the other causes of action asserted herein.  Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers. Any justification for Defendants' practices is outweighed by the consequences and harm to Plaintiffs and the Class.

222.   Defendants' conduct as described herein also violates the "deceptive" prong of the UCL, independent of the other causes of action asserted herein.  Defendants acted deceptively by charging Plaintiffs and members of the Class fees for unfair and excessive pay-to-pay fees and property inspections.

223.   Plaintiffs and the Class have suffered injury-in-fact and have lost money or property as a result of Defendants' unlawful, unfair and/or deceptive business practices. Each of Defendant's omissions was material to Plaintiffs and the Class in entering into the

transaction with Defendants and Plaintiffs and the Class relied on Defendants' false and misleading misrepresentations in entering into the transactions at issue.

224.   The above-described unlawful, unfair and/or deceptive business practices present an ongoing threat of continuing injury to Plaintiffs, the Class and the general public. Among other things, Plaintiffs, the Class and the general public continue to be financially disadvantaged by such conduct.   Such wrongful conduct is continuing and, unless Defendants are restrained, it will continue to engage in such conduct.

225.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Class, individually and on behalf of the public, seek an order of this Court enjoining Defendants from continuing their unfair, unlawful, and/or deceptive business acts or practices in the State of California and elsewhere.   The public, Plaintiffs and the Class will be irreparably harmed if such an order is not granted.

226.   Further, Plaintiffs and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

COUNT VI - VIOLATION OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT (RFDCPA) (CAL. CIV. CODE §§ 1788, *ET SEQ.*) (ON BEHALF OF PLAINTIFFS CONTRERAS, YAGER, THE CALIFORNIA DISTRESSED MORTGAGE FEES CLASS AND THE CALIFORNIA PAY-TO-PAY CLASS AGAINST NATIONSTAR)

227.   Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs.

228.   Plaintiffs bring this cause of action on behalf of themselves and the members of the California Distressed Mortgage Fees Class and the California Pay-to-Pay Class.

229.   As alleged above, Nationstar committed violations of the Rosenthal Fair Debt Collection Practices Act, California Civil Code §§ 1788, *et seq.* ("RFDCPA").

230.   Nationstar is a "debt collector" within the meaning of California Civil Code §§ 1788.2(c) because Nationstar sent mortgage bills to Plaintiffs and members of the

48

California Distressed Mortgage Fees Class and the California Pay-to-Pay Class, Plaintiffs and members of the California Distressed Mortgage Fees Class and the California Pay-to-Pay Class made their mortgage payments to Nationstar, Nationstar accepted those payments, and Nationstar made demands for payment which included payments for overcharged Distressed Mortgage fees, Property Inspection fees and Pay-to-Pay fees. Nationstar made demands for such payment by sending letters, making telephone calls, and through other attempts to collect mortgage payment and fees.

231. The RFDCPA, which incorporates the provisions of the FDCPA, prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

232. The overcharged Distressed Mortgage fees, Property Inspection fees and Pay-to-Pay fees purportedly owed by Plaintiffs and the members of the members of the California Distressed Mortgage Fees Class and the California Pay-to-Pay Class are a "debt" within the meaning of California Civil Code § 1788.2(d) because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

233. As more fully set forth above, Nationstar knowingly, affirmatively, and actively misrepresented material facts by charging Plaintiffs and Class Members and demanding payment for property inspections and pay-to-pay fees that were not authorized by stature or by their lender at rates that were up-charged, above-cost, and above market rates.

234. Pursuant to California Civil Code § 1788.17 and 1788.30, Plaintiffs and members of the California Distressed Mortgage Fees Class and California Pay-to-Pay Class are entitled to recover actual damages sustained as a result of Nationstar's violations of the RFDCPA. Such damages include, without limitation, monetary losses and damages. Additionally, because Nationstar's violations of the RFDCPA were committed willingly and knowingly, Plaintiffs and members of the Classes are entitled to recover penalties of

up to $1,000 per violation as provided for in the RFDCPA, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

## COUNT VII - VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT (ARIZ. REV. STAT. § 44-1522 *ET SEQ*.)(ON BEHALF OF PLAINTIFF PHILLIPS AND THE ARIZONA DISTRESSED MORTGAGE FEES CLASS AGAINST ALL DEFENDANTS)

235.   Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs.

236.   Nationstar made use of deception, false promises, misrepresentations and material omissions in connection with its services, in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A).

237.   Nationstar's false, deceptive and misleading statements, and/or omissions of material facts, were made with the intent that consumers rely on such concealment, suppression or omission, in connection with the sale and advertisement of merchandise and services.

238.   Nationstar used false, deceptive and misleading statements, and omitted material facts, concerning the propriety of the property inspections that it was automatically ordering and charging to Class members when Class members fell behind on their mortgage payments.  Nationstar led consumers to believe that the property inspection fees were required by the Lender and appropriately priced, when in reality Nationstar was charging inflated fees for unnecessary property inspections that were not required by the Lender or permitted by law.

COUNT VIII - VIOLATIONS OF THE MASSACHUSETTS REGULATION OF BUSINESS PRACTICE AND CONSUMER PROTECTION ACT (MASS. GEN. LAWS ANN. CH. 93A § 1 *ET SEQ*.)(ON BEHALF OF PLAINTIFF O'HALLORAN AND THE MASSACHUSETTS DISTRESSED MORTGAGE FEES CLASS AGAINST ALL DEFENDANTS)

239.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

240.   Plaintiff Coleen Ann O'Halloran brings this cause of action on behalf of herself and the members of the Massachusetts Distressed Mortgage Fees Class.

241.   Massachusetts Regulation of Business Practice and Consumer Protection Act (Mass. Gen. Laws Ch. 93A §§ 1, *et seq*.) prohibits unfair methods of competition and unfair or deceptive acts or practices.

242.   In the course and conduct of Nationstar's loan servicing and collection and in violation of Massachusetts' Regulation of Business Practice and Consumer Protection Act, Defendants used false, deceptive and misleading statements, and omitted material facts, concerning the propriety of certain fees and services that were automatically ordered and charged to Class members. Specifically, Defendants led consumers to believe that certain Distressed Mortgage Fees, were authorized by their Lender and appropriately priced when, in reality, the fees were for services that were excessive, unauthorized, duplicative, and/or never performed.

243.   As a direct and proximate result of Nationstar and Defendants' violations of Massachusetts' Regulation of Business Practice and Consumer Protection Act, Plaintiff O'Halloran and each member of the Massachusetts Distressed Mortgage Fees Class have suffered damages and substantial injury to a number of legally protected interests, including injury to their business and/or property.

244.   As provided under Mass. Gen. Laws Ch. 93A §§ 11, Nationstar and Defendants are liable to Plaintiff O'Halloran and each member of the Massachusetts Distressed Mortgage Fees Class for actual damages, double, and/or treble damages,

together with all costs of this action, plus reasonable attorney's fees, for their willful and knowing violation of the Act.

245.   Also pursuant to Mass. Gen. Laws Ch. 93A §§ 11, Plaintiff O'Halloran and each member of the Massachusetts Distressed Mortgage Fees Class seek an order of this court declaring Nationstar and Defendants' acts and practices to be unlawful and enjoining Nationstar and Defendants from continuing their unfair, unlawful, and/or deceptive business acts and/or practices in the State of Massachusetts and elsewhere, as well as any other injunctive or declaratory relief as the court deems appropriate.

## COUNT IX - VIOLATIONS OF FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. §§ 501.201, *ET SEQ.*) (ON BEHALF OF PLAINTIFF CHARLOT AND THE FLORIDA DISTRESSED MORTGAGE FEES CLASS AGAINST ALL DEFENDANTS)

246.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

247.   Plaintiff Sherlie Charlot brings this cause of action on behalf of herself and the members of the Florida Distressed Mortgage Fees Class.

248.   Florida's Unfair and Deceptive Trade Practices Act (Fla. Stat. §§ 501.201, *et seq.*) prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

249.   A practice is "deceptive" within the meaning of Florida's Unfair and Deceptive Trade Practices Act if it is likely to mislead consumers.

250.   A practice is "unfair" within the meaning of Florida's Unfair and Deceptive Trade Practices Act if it offends public policy and/or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

251.   The issuance of fees for unauthorized services in connection with loan servicing constitutes an unfair and deceptive practice within the meaning of Florida's Unfair and Deceptive Trade Practices Act.

252.   In the course and conduct of Nationstar's loan servicing and collection and in violation of Florida's Unfair and Deceptive Trade Practices Act and federal law, Defendants used false, deceptive, confusing and misleading statements, and failed to disclose and/or omitted material facts, concerning the propriety of certain fees and services that were automatically ordered and charged to Class members as well as the fraudulent and self-dealing nature of Nationstar's business relationship with Solutionstar, and Defendants.

253.   Specifically, Nationstar and Defendants led consumers to believe that certain "Distressed Mortgage Fees" including but not limited to, corporate advances, fees for property inspections, broker price opinions, property appraisals and other services, were authorized by their Lender and appropriately priced when, in reality, the fees were inflated due to Nationstar's self-dealing business relationship with Solutionstar and Defendants and were for services that were unauthorized, duplicative, provided no benefit to the consumer, and/or were never performed.

254.   Nationstar and Defendants' false, deceptive, confusing and misleading statements and omissions are likely to mislead consumers into believing that Nationstar's "Distressed Mortgage Fees" are appropriately priced and/or authorized by their lender when, in fact, they are not.

255.   Nationstar and Defendants' false, deceptive, confusing and misleading statements and omissions are significantly injurious to the public and are against public policy. As detailed above, Nationstar and Defendants' practices are contrary to the general public interest in home ownership as they make it less likely that borrowers will become current on their mortgage and more likely that they will default on those mortgages and face foreclosure.

256.   As a direct and proximate result of Nationstar and Defendants' violations of the Florida's Unfair and Deceptive Trade Practices Act (Fla. Stat. §§ 501.201, *et seq.*) Plaintiff Charlot and each member of the Florida Distressed Mortgage Fees Class have

suffered damages and substantial injury to a number of legally protected interests, including injury to their business and/or property.

257.    Nationstar and Defendants are liable to Plaintiff Charlot and each member of the Florida Distressed Mortgage Fees Class for damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Fla. Stat. Ann. § 501.211, and § 501.2105.

258.    Further, pursuant to Fla. Stat. Ann. § 501.211, Plaintiff Charlot and each member of the Florida Distressed Mortgage Fees Class seek and order of this court declaring Nationstar and Defendants' acts and practices to be unlawful and enjoining Nationstar and Defendants from continuing their unfair, unlawful, and/or deceptive business acts and/or practices in the State of Florida and elsewhere, as well as any other injunctive or declaratory relief as the court deems appropriate.

COUNT X - VIOLATIONS OF ILLINOIS' CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILL. COMP. STAT. ANN. 505/2, *ET SEQ*.) (ON BEHALF OF PLAINTIFF JENNIE MILLER AND THE ILLINOIS PAY-TO-PAY CLASS AGAINST ALL DEFENDANTS)

259.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

260.    Plaintiff Jennie Miller brings this cause of action on behalf of herself and the members of the Illinois Pay-to-Pay Class.

261.    Illinois' Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. 505/2, *et seq*.) prohibits "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices". . . in the conduct of any trade or commerce."

262.    In determining whether particular conduct is unfair, the Act asks whether the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.

263.    Conduct is immoral, unethical, oppressive, or unscrupulous within the meaning of the Act if consumers have little alternative but to submit to it.

264.    Conduct causes substantial injury within the meaning of the Act if the injury is (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) one that consumers themselves could not reasonably have avoided.

265.    Nationstar's Pay-to-Pay Scheme constitutes an unfair or deceptive practice within the meaning of Illinois' Consumer Fraud and Deceptive Business Practices Act.

266.    Consumers are not made aware that they will or have been charged a Pay-to-Pay fee, they are not made aware of what will incur such a fee as it is imposed purely at the discretion of Nationstar, and consumers are not able to choose their servicer or select a servicer that does not issue such a fee. As such, they cannot reasonably avoid the practice.

267.    Nationstar's Pay-to-Pay fee provides no value to consumers, does not compensate them for any service, and does not benefit competition amongst servicers. It is merely an effort to collect additional fees-as-profit from the most vulnerable defaulting borrowers.

268.    Moreover, Nationstar's Pay-to-Pay fee is misleading and deceptive. As noted above, it is disclosed to customers alternatively as a late payment fee and/or a fee to make online payments when, in reality, it is triggered at Nationstar's discretion.

269.    Finally, Nationstar's false, deceptive, confusing and misleading statements and omissions are significantly injurious to the public and are against public policy. As detailed above, Nationstar and Defendants' practices are contrary to the general public interest in home ownership as they make it less likely that borrowers will become current

on their mortgage and more likely that they will default on those mortgages and face foreclosure.

270.   As a direct and proximate result of Nationstar's violations of the Illinois' Consumer Fraud and Deceptive Business Practices Act Plaintiff Miller and each member of the Illinois Pay-to-Pay Class have suffered damages and substantial injury to a number of legally protected interests, including injury to their business and/or property.

271.   Nationstar and Defendants are liable to Plaintiffs Miller and each member of the Illinois Pay-to-Pay Class for damages, together with all costs of this action, plus reasonable attorney's fees, as provided under 815 Ill. Comp. Stat. Ann. 505/10a(c)

272.   Further, pursuant to 815 Ill. Comp. Stat. Ann. 505/10a(c), Plaintiff Miller and each member of the Illinois Pay-to-Pay Class seek and order of this court declaring Nationstar and Defendants' acts and practices to be unlawful and enjoining Nationstar and Defendants from continuing their unfair, unlawful, and/or deceptive business acts and/or practices in the State of Illinois and elsewhere, as well as any other injunctive or declaratory relief as the court deems appropriate.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   For an order declaring that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure Rule 23, and for an order certifying this case as a class action and appointing Plaintiffs as representatives of the Class;

B.   For an order awarding compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

C.   For judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair or deceptive practices; along with exemplary damages to each Class member for each violation;

D.     For an order enjoining Nationstar and Defendants from continuing their unfair, unlawful, and/or deceptive practices, and any other injunctive relief as may appear necessary and appropriate;

E.     For judgment for Plaintiffs and the Class on their federal and state law claims, in an amount to be proven at trial;

F.     For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and members of the Class;

G.     For an accounting of all credits, disbursements and charges and other benefits associated with Plaintiffs' and Class members' real estate transactions;

H.     For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

I.     For an order awarding Plaintiffs and the Class their attorneys' fees and costs; and

J.     Such other and further relief as may appear necessary and appropriate.

## XI.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

DATED this 12th day of February, 2016.

**KELLER ROHRBACK L.L.P.**


By  */s/ Dean Kawamoto*
    Dean Kawamoto, Bar No. 232032
    Derek Loeser, *pro hac vice forthcoming*
    Gretchen Obrist , *pro hac vice forthcoming*
    1201 Third Avenue, Suite 3200
    Seattle, Washington 98101-3052
    (206) 623-1900, Fax (206) 623-3384
    Email: dkawamoto@kellerrohrback.com
    dloeser@kellerrohrback.com
    gobrist@kellerrohrback.com

**HAGENS BERMAN SOBOL SHAPIRO L.L.P.**


By  */s/ Tom Loeser*
    Thomas Eric Loeser, Bar No. 202724
    1918 Eighth Avenue, Suite 3300
    Seattle, Washington 98101
    (206) 623-7292, Fax (206) 623-0594

    Email: toml@hbsslaw.com