# EXHIBIT 1

The Honorable Barbara J. Rothstein

1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON - SEATTLE

11
12

RICARDO SALOM, CATHERINE
PALAZZO as assignee for Ruben Palazzo,
and PETER HACKINEN, *on their own
behalf and on behalf of other similarly
situated persons,*

Plaintiffs,

vs.

NATIONSTAR MORTGAGE LLC

Defendant.

Case No. 2:24-cv-00444-BJR

**DECLARATION OF CRISTI RICHEY,
AS AUTHORIZED CORPORATE
REPRESENTATIVE FOR FEDERAL
NATIONAL MORTGAGE
ASSOCIATION**

13
14
15
16
17
18
19
20
21
22
23
24
25
26

I, Cristi Richey, pursuant to 28 U.S.C. § 1746 and as the authorized corporate representative for Federal National Mortgage Association ("Fannie Mae") for the purpose of providing the testimony contained in this declaration, state and declare the following:

CONFIDENTIAL

1. I am a competent person over eighteen years of age and I am providing this declaration on Fannie Mae's behalf and with its express authorization as its Rule 30(b)(6) corporate representative.

2. The Plaintiffs served a deposition subpoena upon Fannie Mae on January 15, 2025 for oral testimony in this matter.  In lieu of appearing for a deposition for oral testimony and to address certain objections Fannie Mae raised in response to that subpoena, Fannie Mae has agreed to provide this declaration instead.

3. The testimony contained in this declaration is based upon the knowledge of Fannie Mae and its corporate records which are maintained in the normal course of business.

4. As described more fully in our 2023 Form 10K, Fannie Mae is a leading source of financing for residential mortgages in the United States.  Fannie Mae is a government-sponsored enterprise, stockholder-owned corporation, chartered by an act of Congress to provide liquidity and stability to the United States housing market and to promote access to mortgage credit. Since 2008, Fannie Mae has been under the federal conservatorship of the Federal Housing Finance Agency, where it remains today.

5. Fannie Mae primarily does its work by buying residential mortgage loans that are originated by various lenders.  Fannie Mae then places those loans into trusts and issues guaranteed mortgage-backed securities ("MBS") that global investors buy from Fannie Mae.  Fannie Mae does not originate loans or lend money directly to borrowers.

6. Fannie Mae establishes originating and underwriting guidelines which describe generally the requirements for a lender to sell loans to Fannie Mae on the secondary mortgage

market and issues a *Selling Guide* for single- family loans which it amends or supplements from time to time.  The Fannie Mae *Selling Guide* is publicly available at https://selling -guide.fanniemae.com.

7.  Fannie Mae also establishes loan servicing guidelines for the servicing of Fannie Mae loans and issues a *Servicing Guide* for single- family loans which it amends or supplements from time to time.  The Fannie Mae *Servicing Guide* is publicly available at https://servicing-guide.fanniemae.com.    In some instances, the *Servicing Guide* specifically incorporates certain provisions of the *Selling Guide*.

8.  Fannie Mae and the Federal Home Loan Mortgage Corporation ("Freddie Mac") jointly maintain and publish legal documents known as the Uniform Instruments for use in residential real estate financing transactions.  The Uniform Instruments include Notes and Security Instruments such as the Deed of Trust for Plaintiff Ricardo Salom in this case (Maryland Form 3021).  The current versions of the Uniform Instruments are published by Fannie Mae on its website at https://singlefamily.fanniemae.com/fannie-mae-legal-documents.

9.  If called to testify in this action, Fannie Mae would testify to the authenticity of the Fannie Mae *Selling Guide*, *Servicing Guide*, and Uniform Instruments published on its website.

10. Fannie Mae has reviewed the loan instruments of the Named Plaintiff Ricardo Salom in this action (which are referenced hereinafter by exhibit number).  From that review and its business records kept in the normal counsel of its business, Fannie Mae can confirm:

CONFIDENTIAL

a.  The Salom Note utilized a Fannie Mae/Freddie Mac Uniform Instrument available at the time of the transaction. *See* **Exhibit 1** (Salom Note).

b.  The Salom Deed of Trust utilized a Fannie Mae/Freddie Mac Uniform Instrument available at the time of the transaction. *See* **Exhibit 2** (Salom Deed of Trust).

c.  Fannie Mae was, when the loan was paid off and satisfied by Plaintiff Salom in July 2022, the owner of the Salom Loan memorialized by **Exhibit 1** (Salom Note) and **Exhibit 2** (Salom Deed of Trust).

d.  The Salom Deed of Trust provides in part:

   **14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

   **16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

   **(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

11. The Salom Note and Deed of Trust were also modified twice before when JPMorgan Chase Bank, NA (Ex. 3) and Seterus Inc. (Ex. 4) acted as Fannie Mae's assigned servicer for the loan. Neither of those modifications changed the terms agreed to in the Salom Deed of Trust quoted above.

CONFIDENTIAL

12. The Fannie Mae *Guides* provide in part:

    a.  The Servicing Guide at § A2-1-01 generally describes servicer duties and responsibilities and states in part that "[i]n performing the services and duties incident to the servicing of mortgage loans, the servicer must take whatever action necessary to protect the beneficial interest of Fannie Mae and an MBS trust in the security property as long as it is authorized to do so by the terms of the mortgage loan. Among other things, this generally includes, but is not limited to: complying with laws (see *Selling Guide,* A3-2-01, Compliance With Laws)."

    b.  The Selling Guide at § A3-2-01 provides in part that all lenders and servicers must "comply with, all federal, state, and local laws (e.g., statutes, regulations, ordinances, directives, codes, administrative rules and orders that have the effect of law, and judicial rulings and opinions) that apply to: any of its origination, selling, or servicing practices, including laws and regulations on consumer credit, equal credit opportunity and truth-in-lending, and borrower privacy."

13. To the extent the fees at issue in this lawsuit are unlawful under federal, state or local law, as defined above in paragraph 12.b., Fannie Mae states that such fees are not allowed to be charged by its servicers to Fannie Mae borrowers including Ricardo Salom.

14. Fannie Mae has not directly or indirectly authorized Nationstar to violate any applicable laws governing the fee subject to this action in relation to any borrower.

CONFIDENTIAL

15. Borrowers are not parties to the Fannie Mae *Selling Guide* or *Servicing Guide*.

16. Fannie Mae has designated the testimony herein as confidential pursuant to the

Confidentiality Order entered in this action, but not the exhibits to this declaration.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on this <u>Fourteenth</u> day of February, 2025.

DocuSigned by:

*Cristi Richey*

A7E8F72F5A8A470...

Cristi Richey
Vice President
Business Account Management Solutions
Federal National Mortgage Association

# EXHIBIT 1



# NOTE



June    23  2003              ROCKVILLE                    MARYLAND
    [Date]                       [City]                         [State]

**14608 QUINCE ORCHARD ROAD**          **GAITHERSBURG, MD  20878**
                                       [Property Address]

**1.   BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $  **286,500.00**      (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is   **WACHOVIA MORTGAGE CORPORATION**

    I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of    **5.750**        %.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section
6(B) of this Note.

**3.   PAYMENTS**
    (A) Time and Place of Payments
    I will pay principal and interest by making a payment every month.
    I will make my monthly payment on the  **1st** day of each month beginning on  **August     1    2003**          .
I will make these payments every month until I have paid all of the principal and interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied
to interest before Principal. If, on  **July      1    2033**    , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at    **1100 CORPORATE CENTER DRIVE**
**RALEIGH, NC  27607-5066**           or at a different place if required by the Note Holder.

    (B) Amount of Monthly Payments
    My monthly payment will be in the amount of U.S. $    **1671.94**        .

**4.   BORROWER'S RIGHT TO PREPAY**
    I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.
    I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01
241430 (25/pkg rev03) (01/01) [14301]                    Page 1 of 3                                          **GBB**

_RS._



**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of principal and interest **or $2.00, whichever is greater.**

I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

241430 (1/each rev03) (01/01) [14302]                    Page 2 of 3

Form 3200 1/01
**GBB**

AS.

NSM_SALOM 005879



**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
**RICARDO A SALOM**                  -Borrower                                           -Borrower

_____ (Seal)        _____ (Seal)
                                     -Borrower                                           -Borrower

_____ (Seal)        _____ (Seal)
                                     -Borrower                                           -Borrower

_____ (Seal)        _____ (Seal)
                                     -Borrower                                           -Borrower

*[Sign Original Only]*

**GBB**

Form 3200 1/01

241430 (1/each rev03) (01/01) [14303]                    Page 3 of 3

NSM_SALOM 005880

PAY TO THE ORDER OF

WITHOUT RECOURSE
WACHOVIA MORTGAGE CORPORATION

BY:

Assistant Vice President
KAREN DAVIS

# EXHIBIT 2

24388    113    SALE: CHAS113003
SVC#: 1948562836
6888952-SALOM

Return To:

Return To:    03-2760C
Robert W. Moses Title, Inc.
11400 Rockville Pike, Suite 112
Rockville, MD 20852

MONTGOMERY COUNTY, MD
APPROVED BY _____

JUN 28 2003

$N/A RECORDATION TAX PAID
$N/A TRANSFER TAX PAID

Prepared By:

**GERRI BUTLER**
**WACHOVIA MORTGAGE CORPORATION**

[Space Above This Line For Recording Data]
**PURCHASE MONEY**

# DEED OF TRUST

MIN   100013700068889524

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   June    23    2003    , together with all Riders to this document.

(B) "Borrower" is
**RICARDO A SALOM**

**PATRICIA SALOM**            **JOINT TENANTS WITH RIGHT OF SURVIVORSHIP**

Borrower is the trustor under this Security Instrument.

(C) "Lender" is   **WACHOVIA MORTGAGE CORPORATION**

Lender is a   **CORPORATION**
organized and existing under the laws of     **NORTH CAROLINA**

MARYLAND-Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3021 1/01

241448 (rev04 01/01) [14481]               Page 1 of 16

**GBB**

NSM_SALOM 005882

6888952
SALOM

24388    114

Lender's address is     **1100 CORPORATE CENTER DRIVE
RALEIGH, NC 27607-5066**
(D) "Trustee" is     **TRSTE, INC.**

(E) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) **"Note"** means the promissory note signed by Borrower and dated **June      23    2003**    .
The Note states that Borrower owes Lender     **Two Hundred Eighty Six Thousand Five Hundred and no/100**                                                                                    Dollars
(U.S. $     **286,500.00**     plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July       1     2033**

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

241448  (rev04  01/01)  [14482]                    Page 2 of 16                    Form 3021 1/01

GBB

6888952
SALOM

24388    115

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

**COUNTY**                    of              **MONTGOMERY**                    :
[Type of Recording Jurisdiction]                      [Name of Recording Jurisdiction]

**All or part of the purchase price of the property is paid for with the money loaned.**
Parcel ID Number:                                which currently has the address of
**14608 QUINCE ORCHARD ROAD**                                              [Street]
**GAITHERSBURG**                      [City], Maryland   **20878**    [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

241448 (rev04 01/01) [14483]              Page 3 of 16                    Form 3021 1/01

GBB

AS /BS.

NSM_SALOM 005884

24388   116                                                    6888952
                                                               SALOM

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's

GBB



6888952
SALOM

24388    1:17

obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

241448 (rev04 01/01) [14485]          Page 5 of 16                    Form 3021 1/01

GBB



NSM_SALOM 005886

24388    118

6888952
SALOM

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the

241448 (rev04 01/01) [14486]              Page 6 of 16              Form 3021 1/01

**GBB**



NSM_SALOM 005887

6888952
SALOM

24388   119

excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

241448  (rev04 01/01) [14487]                    Page 7 of 16                    Form 3021 1/01

GBB



6888952
SALOM

'24388    120

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until the Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as ) a portion of Borrower's payments for Mortgage Insurance, in

241448  (rev04  01/01)  [14488]            Page 8 of 16                          Form 3021 1/01

GBB



6888952
SALOM

24388 ' 12ı

exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes

GBB



6888952
SALOM

24388 '  122

Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal

GBB



24388    123

6888952
SALOM

owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time

GBB



24388    124

6888952
SALOM

prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

   **20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

   Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

   **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response

241448  (rev04  01/01)  [144812]                     Page 12 of 16                              Form 3021 1/01

GBB

24388 '125

6888952
SALOM

action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale, assent to decree, and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail a notice of sale to Borrower in the manner prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement and by such other means as required by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale and by notice to any other persons as required by Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in

GBB



24388    1.26

6888952
SALOM

the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of **5.00** % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Borrower, in accordance with Title 14, Chapter 200 of the Maryland Rules of Procedure, does hereby declare and assent to the passage of a decree to sell the Property in one or more parcels by the equity court having jurisdiction for the sale of the Property, and consents to the granting to any trustee appointed by the assent to decree of all the rights, powers and remedies granted to the Trustee in this Security Instrument together with any and all rights, powers and remedies granted by the decree. Neither the assent to decree nor the power of sale granted in this Section 22 shall be exhausted in the event the proceeding is dismissed before the payment in full of all sums secured by this Security Instrument.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee, shall release this Security Instrument and mark the Note "paid" and return the Note to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the city or county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Possession of the Property.** Borrower shall have possession of the Property until Lender has given Borrower notice of default pursuant to Section 22 of this Security Instrument.

241448 (rev04 01/01) [144814]          Page 14 of 16          Form 3021 1/01

GBB



24388. 127

6888952
SALOM

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____
P. Case Aiken II

_____ (Seal)
RICARDO A SALOM                    -Borrower

_____     _____ (Seal)
                                                           -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower                              -Borrower

_____ (Seal)     _____ (Seal)
PATRICIA SALOM           -Borrower                              -Borrower

_____ (Seal)     _____ (Seal)
P. Case              Witness   -Borrower                              -Borrower
Aiken II

241448  (rev04 01/01) [144815]          Page 15 of 16          Form 3021 1/01

GBB



NSM_SALOM 005896

24388    1.28

6888952
SALOM

**STATE OF MARYLAND,**          Montgomery          County ss:
I Hereby Certify, That on this 23 rd day of May, 2003          before me, the subscriber, a
Notary Public of the State of Maryland, in and for the
personally appeared

Ricardo A. Salom

Patricia Salom

known to me or satisfactorily proven to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledge that he/she/they executed the same for the purposes therein contained.
AS WITNESS: my hand and notarial seal.
My Commission Expires:                                             Notary Public

MY
COMMISSION
EXPIRES
11/1/06

**STATE OF**  MARYL          Montgomery County          County ss:
I Hereby Certify, That on this 23 rd day of May, 2007 before me, the subscriber,
a Notary Public of the State of MARYLAN and for the Montgomery Coun ,
personally appeared

Robert Moses

the agent of the party secured by the foregoing Deed of Trust, and made oath in due form of law that the
consideration recited in said Deed of Trust is true and bona fide as therein set forth and that the actual sum
of money advanced at the closing transaction by the secured party was paid over and disbursed by the party
or parties secured by the Deed of Trust to the Borrower or to the person responsible for disbursement of
funds in the closing transaction or their respective agent at a time not later than the execution and delivery
by the Borrower of this Deed of Trust; and also made oath that he is the agent of the party or parties
secured and is duly authorized to make this affidavit.
AS WITNESS: my hand and notarial seal.
My Commission Expires:                                             Notary Public

MY
COMMISSION
EXPIRES
11/1/06

This is to certify that the within instrument was prepared by a party to the instrument.

_Gerri Butler_          (signature)
, Authorized Agent
**GERRI BUTLER**
**WACHOVIA MORTGAGE CORPORATION**

241448 (rev04 01/01) [144816]          Page 16 of 16          **CLOSER**          Form 3021 1/01

GBB

NSM_SALOM 005897

24388    129

EXHIBIT A

Lot numbered Sixteen (16) in Block lettered "C" in the subdivision known as "MILLS FARM",
as per plat thereof recorded in Plat Book 118 at Plat 13960, among the Land Record of
Montgomery County, Maryland.  Subject to and together with a common access easement as
shown on the recorded subdivision plat.  By acceptance of the within Deed, Grantee agrees to be
responsible for one-fourth of the act of maintenance, repair and for snow removal on said
easement.

Address of Property: 14608 Quince Orchard Road, Gaithersburg, MD 20878
Address of Borowers: 14608 Quince Orchard Road, Gaithersburg, MD 20878
Address of Trustee: same as lender
Tax ID#:6-25-2236465
Title Insurer: Security Title-(Homeowners Policy)

RETURN TO: Robert W. Moses
            11400 Rockville Pike, Suite 112
            Rockville, Maryland 20852

     File: **03-2760C**

NSM_SALOM 005898

# EXHIBIT 3

Loan Number 36

# HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I"):[1] **RICARDO A SALOM**
Lender or Servicer ("Lender"): **JPMORGAN CHASE BANK, N.A.**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): **JUNE 23, 2003**
Loan Number: **1948562836**
Property Address ("Property"): **14608 QUINCE ORCHARD RD, GAITHERSBURG, MARYLAND 20878**

If my representations and covenants in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.    **My Representations and Covenants**. I certify, represent to Lender, covenant and agree:

    A.    I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.    The Property has not been condemned;

    C.    There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

    D.    I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification Program ("Program"));

    E.    Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

    F.    If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

    G.    I have made or will make all payments required under a trial period plan.

---

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

**JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 02_04_2013_11_08_17    OP362/Form 3157 3/09 (rev. 7/12)(CHF rev. 07/12)**

*(page 1 of 8 pages)*



NSM_SALOM 005899

Loan Number 36

H.  If I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

2.  **Acknowledgements and Preconditions to Modification.**  I understand and acknowledge that:

A.  If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate.  In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

B.  I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.  **The Modification.**  If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **MARCH 01, 2013** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived.  I understand that if I have failed to make any payments as a precondition to this modification under a trial period plan, this modification will not take effect.  The first modified payment will be due on **MARCH 01, 2013**.

A.  The Maturity Date will be: **JULY 01, 2033.**

B.  The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan.  The new principal balance of my Note will be **$250,986.39** (the "New Principal Balance").  I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.  Interest at the rate of **2.375%** will begin to accrue on the New Principal Balance as of **FEBRUARY 01, 2013** and the first new monthly payment on the New Principal Balance will be due on **MARCH 01, 2013**.  My payment schedule for the modified loan is as follows:

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 02_04_2013_11_08_17    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 2 of 8 pages)*



Loan Number ▮▮▮▮36

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins on | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-5 | 2.375% | 02/01/2013 | $1,293.79 | $451.89 May adjust periodically | $1,745.68 May adjust periodically | 03/01/2013 | 60 |
| 6 | 3.375% | 02/01/2018 | $1,389.91 | May adjust periodically | May adjust periodically | 03/01/2018 | 12 |
| 7-20 | 3.500% | 02/01/2019 | $1,401.49 | May adjust periodically | May adjust periodically | 03/01/2019 | 173 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step, or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest being added to the outstanding principal balance.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.  If I make a partial prepayment of Principal, the Lender may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

4.  **Additional Agreements**. I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT   ver. 02_04_2013_11_08_17   OP362/Form 3157 3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 3 of 8 pages)*





borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.  That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Lender.

C.  To comply, except to the extent that they are modified by this Agreement or by the United States Bankruptcy Code, with all covenants, agreements, and requirements of  Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.  That, if I am in bankruptcy upon execution of this document, I will cooperate fully with Lender in obtaining any required bankruptcy court and trustee approvals in accordance with local court rules and procedures. I understand that if such approvals are not received, then the terms of this Agreement will be null and void. If this Agreement becomes null and void, the terms of the original Loan Documents shall continue in full force and effect and such terms shall not be modified by this Agreement.

E.  Intentionally Deleted.

F.  That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms.

G.  That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement or by the United States Bankruptcy Code, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.



H.  That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

I.  That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT   ver. 02_04_2013_11_08_17   OP362/Form 3157 3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 4 of 8 pages)*



 **Loan Number** ██████ 36

assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

J. That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

K. That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

L. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective document, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

M. Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

N. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

O. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to

**JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT ver. 02_04_2013_11_08_17 OP362/Form 3157 3/09 (rev. 7/12)(CHF rev. 07/12)**

*(page 5 of 8 pages)*



NSM_SALOM 005903

Loan Number  36

execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.O. shall be referred to as "Documents."    I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

P.    That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

Q.    If my Loan Documents govern a home equity loan or line of credit, then I agree that as of the Modification Effective Date, I am terminating my right to borrow new funds under my home equity loan or line of credit.    This means that I cannot obtain additional advances, and must make payments according to this Agreement.   (Lender may have previously terminated or suspended my right to obtain additional advances under my home equity loan or line of credit, and if so, I confirm and acknowledge that no additional advances may be obtained.)

(SIGNATURES CONTINUE ON FOLLOWING PAGES)

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac   UNIFORM INSTRUMENT    ver. 02_04_2013_11_08_17    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 6 of 8 pages)*



NSM_SALOM 005904

Loan Number  36

### TO BE SIGNED BY BORROWER ONLY

**BORROWER** SIGNATURE PAGE TO HOME AFFORDABLE MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, N.A. And RICARDO A SALOM, LOAN NUMBER 1948562836 WITH A MODIFICATION EFFECTIVE DATE OF March 01, 2013

In Witness Whereof, the Borrower(s) have executed this agreement.

Date: 2 / 15 / 13

Borrower - RICARDO A SALOM

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac   UNIFORM INSTRUMENT    ver. 02_04_2013_11_08_17    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 7 of 8 pages)*



Loan Number ███36

TO BE SIGNED BY LENDER ONLY

LENDER SIGNATURE PAGE TO HOME AFFORDABLE MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, N.A. And RICARDO A SALOM, LOAN NUMBER 1948562836 WITH A MODIFICATION EFFECTIVE DATE OF March 01, 2013

In Witness Whereof, the Lender has executed this Agreement.

Lender

**JPMORGAN CHASE BANK, N.A.**

By: _____

Printed Name:
  Brenda Nevarez-Quiroga
  Vice President

Date: _____

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac   UNIFORM INSTRUMENT    ver. 02_04_2013_11_08_17    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 8 of 8 pages)*



# EXHIBIT 4

BOOK: 53169 PAGE: 122

MONTGOMERY COUNTY, MD

APPROVED BY _____ *AQT* _____

OCT 2 0 2016

$ *24. 15* RECORDATION TAX PAID
$ *MM* TRANSFER TAX PAID

————————————————————— [Space Above This Line For Recording Data] ——————————————————

L790AC.1

Loan number:
Investor loan number:

## LOAN MODIFICATION AGREEMENT
### (Providing for Fixed Interest Rate)
*Principal Residence*

This Loan Modification Agreement ("Agreement"), made this 9th day of May, 2016, between SALOM, RICARDO A ("Borrower") and Seterus, Inc. ("Servicer") Loan Servicer for Federal National Mortgage Association ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment Rewards Rider, if any, dated June 23, 2003 and recorded in Book or Liber 24388, at page(s) 113, Instrument Number N/A, of the Montgomery Records of MD and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property," located at

14608 QUINCE ORCHARD RD, NORTH POTOMAC MD 20878-3311,

the real property described being set forth as follows:
Property Legal Description - See Attached Exhibit A

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

SALOM, RICARDO A
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179  1.01 (rev. 06.12)    Page 1 of 8



NSM_SALOM 005920

**BOOK: 53169 PAGE: 123**

1. As of June 01, 2016, the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. $227,091.60, consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2. Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be charged on the Unpaid Principal Balance at the yearly rate of 4.000%, from May 01, 2016. Borrower promises to make monthly payments of principal and interest of U.S. $949.10, beginning on the 1st day of June, 2016, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. The yearly rate of 4.000% will remain in effect until principal and interest are paid in full. If on May 01, 2056 (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

3. In addition to the regularly scheduled payments that Borrower is required to pay under the Modification Agreement, Borrower agrees to pay Servicer an escrow payment in the amount of $536.94 for deposit into an escrow account for necessary payments to be made by Servicer, including but not limited to, payments for property taxes and insurance. As permitted by the Real Estate Settlement Procedures Act and other applicable law, Servicer may adjust the amount of the Escrow Payment. After notice of such adjustment, Borrower shall pay the adjusted Escrow Payment.
   (a) Each Escrow Payment shall be due on the same day(s) of the month as the regularly scheduled payments due under the Modification, commencing June 01, 2016.
   (b) In the event Escrow Payments are not made and Servicer advances its own funds to make payments that should have been paid from Borrower's escrow account, such amounts will be added to Borrower's loan obligation under the Note.
   (c) Any failure to make an Escrow Payment when due shall be deemed to be a default under the Note and Modification Agreement and upon Borrower's failure to pay the Escrow Payment, Servicer may exercise its rights under the Note and Modification Agreement.
   (d) Unless an agreement is made in writing or applicable law requires interest to be paid on the escrow account payments held by Servicer, Servicer shall not be required to pay any interest or earnings on the payments held.

4. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay

SALOM, RICARDO A
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179  1.01 (rev. 06.12)    Page 2 of 8

NSM_SALOM 005921

BOOK: 53169 PAGE: 124

these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

5. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

   (a) all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note, including, where applicable, the Timely Payment Rewards rate reduction, as described in paragraph 1 of the Timely Payment Rewards Addendum to Note and paragraph A.1. of the Timely Payment Rewards Rider. By executing this Agreement, Borrower waives any Timely Payment Rewards rate reduction to which Borrower may have otherwise been entitled; and

   (b) all terms and provisions of any adjustable rate rider, or Timely Payment Rewards Rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

6. Borrower understands and agrees that:

   (a) If Borrower has failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will be null and void.

   (b) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

   (c) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

   (d) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

   (e) All administration and processing costs incurred by Servicer in connection with this Agreement, such as required notary fees, recordation fees, title costs and property valuation fees, shall be paid by the Servicer, unless otherwise stipulated.

SALOM, RICARDO A
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179  1.01 (rev. 06.12)    Page 3 of 8

NSM_SALOM 005922

BOOK: 53169 PAGE: 125

(f) Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

(g) To execute other documents as may be reasonably necessary to correct an error (including but not limited to any inaccuracy, mistake or omission) if an error is detected after execution of this Agreement. In the event an error is detected, a corrected Agreement will be provided to Borrower, and this Agreement will be void and of no legal effect upon notice of such error. If Borrower elects not to sign any such corrected Agreement, the terms of the original Note and Security Instrument shall continue in full force and effect and such terms will not be modified by this Agreement.

7. Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a Lender can require under RESPA.

NSM_SALOM 005923

BOOK: 53169 PAGE: 126

Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

8.  Any and all attorneys fees and legal costs incurred by Borrower or its representatives, with respect to this loan, will be the sole responsibility of the Borrower.

9.  In the event of future default, Borrower authorizes Lender and Lender's successors and assigns, to share certain Borrower public and non-public personal information including, but not limited to (i) name, address, telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, and (v) payment history and information about Borrower's account balances and activity, with an authorized third party, which may include, but is not limited to, a counseling agency, state or local Housing Finance Agency, or similar entity that is assisting Borrower in connection with obtaining a foreclosure prevention alternative, including the Trial Period Plan to modify Borrower's loan ("Authorized Third Party").

Borrower understands and consents to Lender or Authorized Third Party, as well as Fannie Mae (the owner of Borrower's loan), disclosing such personal information and the terms of any relief

SALOM, RICARDO A
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179  1.01 (rev. 06.12)    Page 5 of 8

NSM_SALOM 005924

**BOOK: 53169 PAGE: 127**

or foreclosure prevention alternative, including the terms of the Trial Period Plan to modify Borrower's loan, to any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with the loan or any other mortgage loan secured by the Property on which Borrower is obligated.

Borrower consents to being contacted by Fannie Mae, Lender, or Authorized Third Party concerning mortgage assistance relating to Borrower's loan including the Trial Period Plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Authorized Third Party.

By checking this box, Borrower also consents to being contacted by text messaging. ☐

In Witness Whereof, the Servicer and I have executed this Agreement.

Scott Burich

_____          MAY 3 1 2016
Seterus, Inc.  Authorized Signer                Date

_____          05-28-2016.
SALOM, RICARDO A                          Date


_____ [Space Below This Line For Acknowledgments] _____

State of **MARYLAND**, Montgomery County (or Baltimore City), to wit:

On this 28 day of MAY, 2016, before me, the undersigned officer, personally appeared **SALOM, RICARDO A**, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes therein contained.
In witness hereof I hereunto set my hand and official seal.

_____
Notary Public

Print Name: SAMSON DURAND.

My Commission Expires on: Feb 05. 2020

SALOM, RICARDO A
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT ... 2)      Page 6 of 8

BOOK: 53169 PAGE: 128

State of Oregon

County of Washington

On _____, before me, _____ _____, personally appeared _____,
**Authorized Signer of Seterus, Inc.,** who proved to me on the basis of satisfactory evidence to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public
State of Oregon

My commission expires on:

Commission No.

SALOM, RICARDO A
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179  1.01 (rev. 06.12)    Page 7 of 8

NSM_SALOM 005926

BOOK: 53169 PAGE: 129

**Exhibit A**

Lot numbered Sixteen (16) in Block lettered ?C? in the subdivision known as ?MILLS FARM?, as per plat thereof recorded in Plat Book 118 at Plat 13960, among the Land Record of Montgomery County, Maryland. Subject to and together with a common access easement as shown on the recorded subdivision plat. By acceptance of the within Deed, Grantee agrees to be responsible for one-fourth of the act of maintenance, repair and for snow removal on said easement. Address of Property: 14608 Quince Orchard Road, Gaithersburg, MD 20878 Address of Borowers: 14608 Quince Orchard Road, Gaithersburg, MD 20878 Address of Trustee: same as lender Tax ID#:6-25-2236465 Title Insurer: Security Title-(Homeowners Policy)
Also Known As: 14608 QUINCE ORCHARD RD, NORTH POTOMAC, MD 20878-3311

SALOM, RICARDO A .
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT      Form 3179  1.01 (rev. 06.12)      Page 8 of 8

NSM_SALOM 005927

BOOK: 53169 PAGE: 130

State of Oregon

County of Washington

On **05/31/2016**, before me, **Bethany Ann Boerste**, personally appeared **Scott Burich, Authorized Signer of Seterus, Inc.,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Bethany Ann Boerste, Notary Public
State of Oregon

My commission expires on: October 21, 2017

Commission No. 920379

OFFICIAL STAMP
BETHANY ANN BOERSTE
NOTARY PUBLIC - OREGON
COMMISSION NO. 920379
MY COMMISSION EXPIRES OCTOBER 21, 2017

NSM_SALOM 005928

BOOK: 53169  PAGE: 131

## AFFIDAVIT OF UNPAID PRINCIPAL BALANCE

STATE OF OREGON

COUNTY OF WASHINGTON, to-wit:

I hereby certify on this __15TH__ day of July, 2016 before me, the subscriber, a notary public in and for the county/city and state aforesaid, personally appeared Kim Nguyen authorized agent, for SETERUS, INC, who solemnly declares and affirms under penalties of perjury and in due form of law that:

the original loan amount was $286,500.00

the unpaid principal balance prior to loan modification was $223,650.60

the new loan amount is $227,091.60

Affiant: Kim Nguyen
Title: Title Services Specialist

Sworn and affirmed before me, the undersigned notary public, by Kim Nguyen, its Title Services Specialist, on behalf of SETERUS, INC., this 15th day of July, 2016

Notary Public
My commission expires: 03-30-2019
Notary Registration Number: 936592

OFFICIAL STAMP
LISA D BURKS
NOTARY PUBLIC - OREGON
COMMISSION NO. 936592
MY COMMISSION EXPIRES MARCH 30, 2019

**BOOK: 53169  PAGE: 132**

I hereby certify that the preceding instrument was prepared by Seterus, Inc. a party to the instrument.

Kim Nguyen

Title Services Specialist

Seterus, Inc.

NSM_SALOM 005930

**BOOK: 53169 PAGE: 133**

## State of Maryland Land Instrument Intake Sheet
☐ Baltimore City  ☑ County: Montgomery

*Information provided is for the use of the Clerk's Office, State Department of Assessments and Taxation, and County Finance Office Only.*
**(Type or Print in Black Ink Only—All Copies Must Be Legible)**

**1. Type(s) of Instruments** ( ☐ Check Box if addendum Intake Form is Attached.)

| Deed | Mortgage | X Other Loan Mod | Other |
|---|---|---|---|
| Deed of Trust | Lease | | |

**2. Conveyance Type Check Box**

| Improved Sale Arms-Length [1] | Unimproved Sale Arms-Length [2] | ☑ Multiple Accounts Arms-Length [3] | Not an Arms-Length Sale [9] |
|---|---|---|---|

**3. Tax Exemptions (if applicable) Cite or Explain Authority**

| Recordation | |
| State Transfer | |
| County Transfer | |

**4. Consideration and Tax Calculations**

| Consideration Amount | | Finance Office Use Only Transfer and Recordation Tax Consideration | |
|---|---|---|---|
| Purchase Price/Consideration | $ 0.00 | Transfer Tax Consideration | $ |
| Any New Mortgage | $ 227,091.60 | X ( )% | $ |
| Balance of Existing Mortgage | $ 223,650.60 | Less Exemption Amount | – $ |
| Other: | $ | Total Transfer Tax | = $ |
| Other: | $ | Recordation Tax Consideration | $ |
| | | X ( ) per $500 | = $ |
| Full Cash Value: | $ | TOTAL DUE | $ |

**5. Fees**

| Amount of Fees | Doc. 1 | Doc. 2 | |
|---|---|---|---|
| Recording Charge | $ 20.00 | $ | Agent: |
| Surcharge | $ 40.00 | $ | |
| State Recordation Tax | $ 24.15 | $ | Tax Bill: |
| State Transfer Tax | $ 0.00 | $ | |
| County Transfer Tax | $ 0.00 | $ | C.B. Credit: |
| Other | $ 0.00 | $ | |
| Other | $ 0.00 | $ | Ag. Tax/Other: |

**6. Description of Property** SDAT requires submission of all applicable information. A maximum of 40 characters will be indexed in accordance with the priority cited in Real Property Article Section 3-104(g)(3)(i).

| District | Property Tax ID No. (1) | Grantor Liber/Folio | Map | Parcel No. | Var. LOG |
|---|---|---|---|---|---|
| 06 | 02236465 | | | | (S) |
| Subdivision Name | | Lot (3a) | Block (3b) | Sect/AR (3c) | Plat Ref. | SqFt/Acreage (4) |

Location/Address of Property Being Conveyed (2)
14608 Quince Orchard Road, North Polomac, MD 20878

Other Property Identifiers (if applicable) | Water Meter Account No.

Residential ☑ or Non-Residential ☐   Fee Simple ☑ or Ground Rent ☐   Amount:
Partial Conveyance? ☐ Yes ☐ No   Description/Amt. of SqFt/Acreage Transferred:

If Partial Conveyance, List Improvements Conveyed:

**7. Transferred From**

| Doc. 1 – Grantor(s) Name(s) | Doc. 2 – Grantor(s) Name(s) |
|---|---|
| Ricardo A. Salom | |
| Doc. 1 – Owner(s) of Record, if Different from Grantor(s) | Doc. 2 – Owner(s) of Record, if Different from Grantor(s) |

**8. Transferred To**

| Doc. 1 – Grantee(s) Name(s) | Doc. 2 – Grantee(s) Name(s) |
|---|---|
| Seterus, Inc. | |
| New Owner's (Grantee) Mailing Address | |
| 14608 Quince Orchard Road, North Polomac, MD 20878 | |

**9. Other Names to Be Indexed**

| Doc. 1 – Additional Names to be Indexed (Optional) | Doc. 2 – Additional Names to be Indexed (Optional) |
|---|---|

**10. Contact/Mail Information**

Instrument Submitted By or Contact Person
Name: Diane Romoth
Firm: SAMUEL I. WHITE, P.C.
Address: 611 ROCKVILLE PIKE, SUITE 100
ROCKVILLE, MD 20852   Phone: (301) 804-3400

☑ Return to Contact Person
☐ Hold for Pickup
☐ Return Address Provided

**11. Assessment Information**
IMPORTANT: *BOTH the ORIGINAL DEED AND A PHOTCOPY MUST ACCOMPANY EACH TRANSFER*

☑ Yes ☐ No   Will the property being conveyed be the grantee's principal residence?
☐ Yes ☑ No   Does transfer include personal property? If yes, identify:
☐ Yes ☑ No   Was property surveyed? If yes, attach copy of survey (if recorded, no copy required).

**Assessment Use Only – Do Not Write Below This Line**

| Terminal Verification | Agricultural Verification | Whole | Part | Tran. Process Verification |
|---|---|---|---|---|
| Transfer Number | Date Received: | Deed Reference: | | Assigned Property No. |
| Year | 20 | 20 | Geo. | Map | Sub | Block |
| Land | | | Zoning | Grid | Plat | Lot |
| Buildings | | | Use | Parcel | Section | Occ. Cd. |
| Total | | | Town Cd. | Ex. St. | Ex. Cd. | |

REMARKS:

Distribution: White – Clerk's Office     Canary – SDAT     AOC-CC-300 (5/2007)
Pink – Office of Finance     Goldenrod – Preparer

NSM_SALOM 005931

**BOOK: 53169 PAGE: 134**

```
LR - Agreement
Recording Fee      20.00
Name: Salom
Ref:
LR - Agreement
Surcharge          40.00
=======================
SubTotal:          60.00
=======================
Total:             60.00
11/10/2016  08:49
                   CC15-NE
#7264290 CC0602 -
Montgomery
County/CC06.02.04 -
Register 04
```



## DOCUMENT VALIDATION PAGE
FOR CLERK'S USE ONLY
(EXCLUDED FROM PAGE COUNT FOR CERTIFIED COPY)

### BARBARA H. MEIKLEJOHN
Clerk of the Circuit Court for Montgomery County
50 Maryland Avenue
Rockville, Maryland 20850
Recording and Licensing
(240) 777-9470