# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

RICHARDO SALOM, CATHERINE
PALAZZO as assignee for Ruben Palazzo, and
PETER HACKINEN, *on their own behalf and
on behalf of other similarly situated persons,*

               Plaintiffs,

      vs.

NATIONSTAR MORTGAGE LLC
and

FEDERAL HOME LOAN MORTGAGE
ASSOCIATION, *on its own behalf and on
behalf of similarly situated persons*,

            Defendants.

Case No. 2:24-cv-00444-BJR

**EXPERT REPORT OF MARCEL BRYAR**

I.    **Introduction**

1.    I have been retained as an expert witness by Troutman Pepper Locke LLP ("Troutman"), counsel for one of the defendants in the above-captioned matter, Nationstar Mortgage LLC ("Nationstar").

2.    Nationstar was the servicer of residential mortgage loans made to the plaintiffs in this case, Richard Salom, Catherine Palazzo and Peter Hackinen.[1]  The loans of Mr. Salom and Ms. Palazzo were secured by their respective homes in the State of Maryland and Mr. Hackinen's loan was secured by his home in the State of Washington.[2]

3.    Between 2022 and 2024, Messrs. Salom and Hackinen paid off their loans.[3]  The loan to Ms. Palazzo is still outstanding.[4]

4.    This case relates to payoff statements requested by each plaintiff from Nationstar.   A payoff statement shows how much cash a borrower needs by a certain date to pay off the borrower's loan, including accrued interest and any outstanding fees and expenses incurred by the borrower in connection with the loan.

5.    Servicers are generally required by federal law to provide a borrower with a payoff statement by mail at no charge within seven business days of a borrower's request.[5]  Each

---

[1]    Amended Complaint, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (May 30, 2024) ("Amended Complaint"), ¶¶ 24-26.

[2]    Amended Complaint, ¶¶ 24-26.

[3]    Amended Complaint, ¶¶ 87 & 122.

[4]    *See* MDLANDREC, *available at* mdlandrec.net (last visited on March 13, 2024).

[5]    *See* 15 U.S.C. 1639g.

plaintiff requested expedited delivery of their payoff statements, however, and Nationstar charged each of them $25 for the expedited service.[6]

6.    On June 29, 2022, expedited delivery of Mr. Salom's payoff statement was requested on Nationstar's web site.[7]  The site includes a link to Nationstar's expedited delivery service and a written disclosure that informs borrowers that the service costs at least $25.[8]  Mr. Salom's payoff statement was faxed to him.[9]  Mr. Salom paid his expedited-delivery fee when his loan was paid off on July 12, 2022.[10]

7.    On September 11, 2023, Ms. Palazzo ordered expedited delivery of a payoff statement for her loan on Nationstar's web site and the site generated the statement for her.[11]  Ms. Palazzo paid the fee for the expedited delivery with her next loan payment.[12]

8.    Expedited delivery of payoff statements for Mr. Hackinen was ordered four separate times.[13]  Three of the orders, on July 5, 2023, July 21, 2023, and March 11, 2024, were made by means of interactive voice response, or IVR.[14]  In IVR, a borrower communicates, by phone, with an automated phone system that allows the borrower to receive and communicate information.  Nationstar's IVR discloses that there is a fee for

---

[6]    Amended Complaint, ¶¶ 120-122.

[7]    NSM_SALOM 019224.

[8]    *See* NSM_SALOM 020061.

[9]    NSM_SALOM 019224; NSM_SALOM 009958.

The next day, on June 30, 2022, Nationstar sent an amended version of the payoff statement.  NSM_SALOM 009953.  Mr. Salom was not charged a fee for the delivery of the amended version.  Amended Complaint, ¶ 84.

[10]    Amended Complaint, ¶ 84.

[11]    NSM_SALOM 005876-5877; Amended Complaint, ¶ 101; Videotaped Zoom Deposition of Catherine Palazzo, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 12, 2025) ("Palazzo Depo."), at 27-28.

[12]    Palazzo Depo., at 29.

[13]    Amended Complaint, ¶¶ 120-122.

[14]    NSM_SALOM 002548-2553; NSM_SALOM 020017-20018.

expedited delivery of a payoff statement and requires a borrower to consent to the fee before the system will authorize expedited delivery.[15]  Nationstar received the fourth order, on October 5, 2023, from a title company.[16]  Mr. Hackinen had authorized the title company to communicate with Nationstar on behalf of Mr. Hackinen to expedite a refinance of Mr. Hackinen's loan and the title company requested expedited delivery of a payoff statement from Nationstar.[17]

9.    Mr. Salom ordered his payoff statement in connection with the sale of the property that secured his loan.[18]  Mr. Hackinen used his payoff statements to facilitate a refinance of his loan, taking out a new mortgage loan to pay off the one serviced by Nationstar.[19]

10.    I have reviewed the Amended Complaint in this case and it is my understanding that plaintiffs claim that Nationstar's fee for the expedited service was not expressly authorized by their loan agreements or permitted by law.

11.    Troutman has asked me to opine, based on my expertise in mortgage industry standards, on two questions.

    i.    Was the expedited-service fee charged by Nationstar permitted by mortgage industry standards, including standards established by federal government agencies?

    ii.    Are Nationstar's policies and procedures for payoff statements designed to comply with industry standards and applicable laws?

---

[15]    *See* NSM_SALOM 020056.

[16]    NSM_SALOM 002552.

[17]    NSM_SALOM 002551; NSM_SALOM 001492-1494; NSM_SALOM 000038-40.

[18]    Amended Complaint, ¶ 84.

[19]    Amended Complaint, ¶ 122.

12.     Plaintiffs have produced in this case reports by four people:  (i) Andrew G. Pizor; (ii)

         David L. Friend (the "Friend Report"); (iii) Bernard Jay Patterson; and (iv) Thomas A.

         Tarter (the "Tarter Report").[20]

13.     All of the opinions expressed in this report are my own.  My opinions are based on,

         among other things, my review of the materials listed in Appendix A attached hereto and

         my knowledge, skill, experience, training and education in mortgage servicing industry

         norms and standards, including the norms and standards that govern servicing fees,

         including the expedited-service fee at issue in this case.

14.     The opinions presented in this report are mine and mine alone.  My compensation in this

         case is at a rate of $850 per hour.  My compensation is in no way contingent on my

         findings or on the outcome of this or any other matter.

15.     I may supplement this report and expand or modify the opinions stated herein based on

         my review of additional material as it becomes available through discovery, through any

         additional work I perform, or through review of additional work performed by others.

**II.     Executive Summary**

16.     Based on my review of the materials set forth in Appendix A and my experience in the

         mortgage industry, I have developed the following regarding the questions posed to me

         by Troutman.

---

[20]     Preliminary Report of Andrew G. Pizor, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 7, 2025); Preliminary Expert Witness Report of David L. Friend, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 7, 2025); Expert Witness Report of Bernard Jay Patterson, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 7, 2025); Expert Report of Thomas A. Tarter, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 10, 2025).

17.    The expedited delivery fees charged by Nationstar are permitted by industry standards. Nationstar's servicing of plaintiffs' loans are governed by standards established by Fannie Mae and Freddie Mac, known collectively as the government sponsored enterprises, or GSEs, and by the federal regulator and conservator of the GSEs, the Federal Housing Finance Agency, or FHFA.  The GSEs and FHFA have made it clear that a servicer may charge a fee for the expedited delivery of a payoff statement.  Moreover, other federal agencies that insure or guarantee residential mortgage loans, including the Federal Housing Administration and the Department of Veterans Affairs, have indicated that a servicer is authorized to charge the fees.

18.    The fees are part of a compensation structure for servicers that the GSEs and FHFA have designed to make loans affordable to borrowers while at the same time ensuring that servicing is profitable.  The GSEs need servicers – such as Nationstar – to service their loans and servicing needs to be profitable for servicers to make the investments necessary to service loans in accordance with GSE servicing guidelines.  A portion of a servicer's compensation comes from servicing fees, which are paid out of borrowers' interest payments.  However, the GSEs and FHFA limit servicing fees and, therefore, the interest rate a borrower must pay for a loan by permitting servicers to have other sources of revenue, such as the expedited delivery service fees at issue in this case.  Moreover, the expedited delivery service fees are charged only to borrowers who affirmatively consent to pay them and, therefore, can presumably afford to pay them.

19.    Finally, it is clear that Nationstar's policies and procedures are designed to ensure Nationstar charges expedited delivery fees in accordance with industry standards and applicable law.  Nationstar's counsel review the policies and procedures to ensure that

they comply with the standards, and Nationstar has invested – and continues to invest – millions of dollars in the systems that Nationstar uses to process and respond to requests for expedited delivery of payoff statements.

**III.    Qualifications**

20.    I graduated from Yale College in 1987 and Yale Law School in 1993.  I have worked in the mortgage industry full time since 2000.

21.    I am currently a founder and Managing Director of Mortgage Policy Advisors LLC ("MPA").  MPA was formed in April 2020 and took over the business of Bryar & Wollner LLC ("B&W"), a firm I had founded in September 2014.  MPA advises and provides consulting services to, among others, mortgage originators, servicers, technology companies and service providers on matters concerning the mortgage and real estate industries, including compliance with mortgage industry regulations and standards and the management of the requirements of mortgage investors, guarantors (*e.g.*, Fannie Mae and Freddie Mac, the government sponsored enterprises, or GSEs)) and insurers (*e.g.*, the Federal Housing Administration, or FHA, and the U.S. Department of Veterans Affairs, or VA).  As a Managing Director for MPA (and during my time with B&W), I have worked on numerous projects relating to the servicing of loans and servicer compensation.

22.    Prior to founding B&W, I was employed for over 14 years by two of the largest financial firms in the mortgage industry.  I worked at Fannie Mae from 2000 to 2012.  Fannie Mae guarantees against default residential mortgage loans that meet its origination and underwriting criteria and are pooled into Fannie Mae residential mortgage-backed securities, or RMBS.  From 2012 to 2014, I worked for JPMorgan Chase Bank, N.A. ("Chase"), in its mortgage bank as a Senior Vice President for operations.

23.    From 2000 to 2004, I was an Associate General Counsel at Fannie Mae.  My responsibilities included providing legal advice and negotiating complex transactions with Fannie Mae vendors and business partners in connection with Fannie Mae's development and implementation of technology tools designed to facilitate the origination, processing, closing, recordation, servicing and securitization of mortgage loans, including the creation of promissory notes and mortgages and the delivery of collateral documents to custodians.  I also worked on contracts for Fannie Mae's custodial, securitization and servicer oversight operations.

24.    In 2005, I worked on the implementation of regulatory agreements between Fannie Mae and its safety and soundness regulator, known at the time as the Office of Federal Housing Enterprise Oversight ("OFHEO").[21]  The regulatory agreements required Fannie Mae to, among other things, change its risk-management practices, including practices related to credit, interest, portfolio and counterparty risk.  Fannie Mae's counterparties include mortgage servicers.  I also worked on the development of Fannie Mae's program for compliance with the Sarbanes-Oxley Act.[22]

25.    In 2006, I was appointed Director, Policies & Programs, at Fannie Mae.  In that capacity, among other things, I developed, implemented and managed Fannie Mae's framework governing all of its policies and procedures, including policies and procedures related to risk management, collateral documents, mortgage loan securitization and master servicing.

---

[21]    The agency was abolished in 2008 and replaced by the Federal Housing Finance Agency.  *See* Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289 (July 30, 2008).

[22]    The Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204 (July 30, 2002).

26.     In 2006, I was assigned responsibility for managing Fannie Mae's compliance with a Consent Order entered into between Fannie Mae and OFHEO. I oversaw Fannie Mae's implementation of the Consent Order's requirements and reported on Fannie Mae's compliance status to OFHEO. The Consent Order required Fannie Mae to develop and implement, among other things, enhancements to its governance of credit, market and portfolio risks.

27.     In 2007, I was appointed the head of Fannie Mae's regulatory team, with responsibility for managing Fannie Mae's relationship with OFHEO and its housing goals regulator at the time, the U.S. Department of Housing and Urban Development.[23] Under my supervision, the team worked on regulatory exams, commented on proposed regulations and performed regulatory reporting.

28.     In 2008, the Federal Housing Finance Agency ("FHFA") was established and was made responsible for the effective supervision, regulation and housing mission oversight of Fannie Mae and Freddie Mac.[24]

29.     In or about June 2009, I became responsible for managing the Fannie Mae team charged with the administration of the Making Home Affordable ("MHA") program. President Obama launched MHA under the Troubled Asset Relief Program. MHA consisted of a number of foreclosure prevention programs, including programs to modify delinquent loans and to allow short sales, in which a delinquent borrower sells their home for less than the borrower owes on his or her loan. President Obama announced MHA on

---

[23]  HUD's housing goal responsibilities were transferred to FHFA in connection with the formation of FHFA in 2008. *See* Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289 (July 30, 2008).

[24]  Federal Housing Finance Agency, "FHFA At-A-Glance," *available at* https://www.fhfa.gov/About.

February 18, 2009, and the U.S. Department of the Treasury ("Treasury") contracted with Fannie Mae the same day to serve as the program's administrator.[25]

30.    In my capacity as leader of Fannie Mae's program administration team, I directed all of Fannie Mae's work on behalf of Treasury, including the development and drafting of program guidelines and the oversight of mortgage loan servicers.  MHA applied to all GSE and government-insured loans (including loans insured by FHA and VA), and to servicers covering nearly 90% of all other outstanding loans in the United States (*i.e.*, non-GSE and non-government-insured loans).[26]

31.    In the spring of 2011, I led the Fannie Mae team responsible for working with Freddie Mac and FHFA on FHFA's servicing alignment initiative.  FHFA launched the initiative for Fannie Mae and Freddie Mac to develop uniform guidelines for servicing delinquent mortgages.  In particular, FHFA directed the GSEs to agree on standards for borrower contact, delinquency management practices, loan modifications and foreclosure timelines.  FHFA also instructed the GSEs to specify uniform servicer incentives and penalties, based on the servicers' performance against those standards.  As part of this initiative, the GSEs worked together to adopt uniform, state-specific foreclosure timelines applicable to GSE mortgage loans.[27]  I was responsible for working with master servicing and credit policy teams from both GSEs.

---

[25]    Financial Agency Agreement for a Homeownership Preservation Program under the Emergency Economic Stabilization Act of 2008, effective as February 18, 2009, by and between the U.S. Department of the Treasury and Fannie Mae.

[26]    Congressional Oversight Panel, "December Oversight Report: A Review of Treasury's Foreclosure Prevention Programs," December 14, 2010, at 40.

[27]    For information concerning the alignment initiative, *see* Federal Housing Finance Agency, "Servicing Alignment Initiative Frequently Asked Questions," *available at* https://www.fhfa.gov/faqs/servicing-alignment-initiative.

32.     In or about June 2011, I became responsible for overseeing all of the vendors that worked with servicers of Fannie Mae loans to mitigate losses from loan delinquencies.  In this role, I worked as part of Fannie Mae's master servicing team (*i.e.*, the Fannie Mae team responsible for performing servicer oversight), and I managed numerous loss-mitigation services, including property preservation, lender placed insurance, mortgage insurance and foreclosure notices.  I also managed a team that reviewed expenses incurred by servicers in connection with the servicing of Fannie Mae loans, including legal, property preservation and valuation expenses.  Finally, I participated in the negotiation with servicers of compensatory fee and mortgage insurance compensation claims.

33.     From 2009 to 2011, I also worked with teams responsible for making repurchase demands.  Fannie Mae has required lenders to repurchase a substantial number of loans that, according to Fannie Mae, were not originated in accordance with Fannie Mae's underwriting criteria.  In addition, Fannie Mae demanded, in its capacity as an investor in non-GSE and non-government insured loans, compensation for losses Fannie Mae incurred as a result of its investments in non-GSE RMBS.

34.     In 2012, I left Fannie Mae and began work at Chase.  My responsibilities included but were not limited to: (i) implementing for Chase the provisions of the 2012 National Mortgage Settlement with Chase and other mortgage loan servicers governing the servicing of performing and non-performing loans, (ii) remediating MHA issues and (iii) managing credit reporting, loan boarding and loan transfer operations.  During my time at Chase, I managed a large mortgage loan servicing transfer to Chase, and I also managed the transfers of loans from Chase to other servicers.  In addition, I was responsible for the boarding of new loans to Chase's servicing operation.  I also participated in the process

of preparing Chase's annual servicing Regulation AB reports and attestation reports.[28] Finally, I negotiated disputes with the GSEs regarding compensatory fees and investor claims.

35. I have worked on a number of engagements in my capacity as a Managing Director at MPA (and, before that, B&W). Among other things, I worked on a project to restructure Freddie Mac's trustee function for Freddie Mac RMBS. This project required me to define and document the roles and responsibilities of the various teams within Freddie Mac with responsibility for issuing and managing Freddie Mac's RMBS. I also worked with various mortgage servicers and originators, the GSEs and government mortgage insurers (*e.g.*, FHA) on projects to address federal and state regulatory issues and mortgage program matters arising out of the COVID-19 pandemic. Finally, I have worked on various complex projects regarding foreclosures, the conveyance of GSE and FHA properties, investor claims and the preservation of properties that secure delinquent mortgage loans. My clients have included FICO, National General Lender Services, Inc. (a lender-placed insurance company), and GLS Solutions LLC, a mortgage servicer.

36. In sum, I have extensive experience working on mortgage operations and business models – including the people, processes and tools necessary to originate, service and securitize mortgage loans – and working with industry stakeholders and regulators. My work in the mortgage industry has involved me on a regular basis in determining servicer compensation and the standards that govern the servicing of loans. I am also fully familiar with notes and security instruments for mortgage loans.

---

[28] Asset-Backed Securities (Regulation AB), 17 C.F.R. §§ 229.1100 – 229.1125.

37.    A copy of my curriculum vitae is attached to this report as Appendix B.  A list of cases and proceedings in which I have provided expert testimony in the past four years is attached to this report as Appendix C.

## IV.    Background

### A.    Mortgage Loans

38.    A mortgage loan is a loan secured by a security interest in a real estate property.

39.    A borrower signs two documents to obtain a mortgage loan:  a promissory note (or, simply, a "note") and a security instrument.  A note is a borrower's promise to pay back the loan and a security instrument authorizes the lender – and any subsequent owner of the loan – to foreclose on the property securing the loan if the borrower defaults on the note.

40.    Any borrower may pay off a residential mortgage loan early, either by selling the property securing the loan or by refinancing the loan.  Early payoffs are common.  As explained above, Mr. Salom requested a payoff statement in connection with the sale of his home and Mr. Hackinen requested his payoff statements in connection with a refinance of his loan.

### B.    RMBS

41.    After their origination, the vast majority of mortgage loans are sold into RMBS.  RMBS are created to facilitate investments in mortgage loans.  To create an RMBS, loans are pooled by a seller and conveyed to an RMBS trust.  Beneficial ownership of certificates for a trust is sold to investors and the certificates entitle the investors to a share of the cash flow generated by the loans in the trust.

42.    Currently, most mortgage loans are in RMBS created by Fannie Mae and Freddie Mac, two government sponsored enterprises, or GSEs, or by issuers approved by Ginnie Mae, a government agency.  RMBS created by the GSEs or by issuers approved by Ginnie Mae are known as agency RMBS.  The loans in Ginnie Mae RMBS are loans insured by government agencies, including the Federal Housing Administration, or FHA.  The GSEs, Ginnie Mae and government insurers of mortgage loans are commonly referred to as the agencies.  The loans of Mr. Salom and Ms. Palazzo serviced by Nationstar were in GSE RMBS.[29]

43.    Some RMBS were created by private issuers.  RMBS created by private issuers are commonly referred to as private label security RMBS, or PLS RMBS.  Mr. Hackinen's loan was in a PLS RMBS.[30]

44.    As of the third quarter of 2024, the outstanding balance of mortgage loans in agency RMBS was equal to approximately $9.3 trillion.[31]  By comparison, the balance for PLS RMBS was $500 billion.[32]

### C.    GSEs

45.    The GSEs are chartered by the U.S. Congress.  Congress passed statutes that created each GSE and some provisions of those charters supersede state and local laws.  For example, under the charters, the GSEs are not liable for state or local taxes.[33]

---

[29]    Amended Complaint, ¶¶ 76 & 94.

[30]    Amended Complaint, ¶ 114.

[31]    Housing Finance Policy Center, *Housing Finance at a Glance:  A Monthly Chartbook* (January 2025) ("January 2025 Monthly Chartbook"), at 6.

[32]    January 2025 Monthly Chartbook, at 6.

[33]    Federal National Mortgage Association Charter Act, Title III of the National Housing Act, 12 U.S.C. 1716 et seq. (As amended through July 25, 2019), § 309(c)(2); Federal Home Loan Mortgage Corporation Act, Public Law No. 91-351, 84 Stat. 450 (Approved July 24, 1970, As amended through January 3, 2023), § 303(e).

46.     The GSEs have been in conservatorship since September 2008.  The GSEs were

originally created as private entities that managed their own businesses.  During the

financial crisis, however, the safety and soundness regulator of the GSEs, the Federal

Housing Finance Agency, or FHFA, placed the GSEs in conservatorship because the

GSEs were at risk of failing.  Under the conservatorships, "FHFA has the powers of the

management, boards, and shareholders" of the GSEs.[34]  FHFA is a federal regulator with

power to issue regulations that govern the businesses of the GSEs.

        **D.**      **Servicing**

47.     The agencies do not service the loans in their RMBS.  Instead, they delegate that work to

mortgage servicers – such as Nationstar.  Servicers perform numerous tasks in connection

with loans, including sending out monthly statements to borrowers, collecting borrower

payments and forwarding them for remittance to investors, making property tax and

hazard insurance payments for borrowers with escrow account and releasing a borrower

from his or her mortgage after the loan is paid off or refinanced.  When a borrower

defaults, the servicer attempts to resolve the delinquency.

48.     The agencies issue extensive guidelines regarding the servicing of their loans and they

update their guidelines on a regular basis.  Since the GSEs were placed in

conservatorship, FHFA has been responsible for approving all GSE servicing guidelines.

The agencies require servicers to abide by agency servicing guidelines, and, if the

agencies authorize a servicing practice, that practice is permitted under industry standards

unless expressly prohibited by law.

        **E.**      **Economics of Servicing**

---

[34]     https://www.fhfa.gov/conservatorship.

49.    Servicers are paid a servicing fee.  The fee is paid by each borrower.  A borrower pays off his or her loan in monthly installments, with a portion of each monthly payment paying down the loan's principal balance and the rest of the payment applied to interest on the unpaid portion of that balance.  The servicing fee, in turn, represents a portion of the interest paid by the borrower.  The servicing fee for GSE loans is generally equal to the product of a quarter of percentage point (*i.e.*, 0.25%) and a loan's unpaid principal balance.  For example, if a GSE loan has an interest rate of 6% and, as of a particular month, the unpaid principal balance of the loan is equal to $100,000, the interest paid on that balance is equal to $6,000 (6% times $100,000) and the servicing fee is equal to $500 of the $6,000 (0.5% times $100,000).  As a result, of the interest paid by the borrower, $5,500 goes to investors in the borrower's loan and $500 goes to the servicer of the borrower's loan.

50.    Servicers also make money by providing ancillary services to borrowers for a fee.  An ancillary service is a service provided to a borrower in connection with the borrower's mortgage loan.  For example, facilitating the assumption by a new borrower of an old borrower's loan, canceling a mortgage or recasting the repayment term of a mortgage. The expedited delivery of payoff statements – the service at issue in this case – is an ancillary service.

### F.    Payoff Statements

51.    Producing a payoff statement is not a simple or otherwise clerical task.  To prepare one, a servicer needs to account for not only a loan's outstanding balance but also the interest accrued on the loan since the borrower's last payment, any fees the borrower owes in connection with the loan and any refunds due to the borrower.  In addition, each borrower's circumstances are different, adding additional complexity to the preparation

of payoff statements.  For example, while one borrower may need only to pay a loan's unpaid principal balance and accrued interest, another borrower may owe fees to the servicer and have insurance proceeds in escrow with the servicer that were paid in connection with a hazard insurance claim arising out of damage to the borrower's home, and a third borrower may owe fees and costs incurred by the lender in connection with a borrower's delinquency.  To produce payoff statements, servicers must design their systems and processes to account for all of these scenarios.

## V.    Analysis and Opinions

### A.    The Expedited-Service Fee Is Consistent with Industry Standards – Including Standards Established by the Government Agencies that Oversee Servicing

52.    The mortgage industry standards that govern the servicing of residential mortgage loans authorize servicers to charge fees for ancillary services provided to borrowers – including fees for expediting the delivery of payoff statements.  The fees help make mortgage loans more affordable to all mortgage borrowers while, at the same time, providing servicers with sufficient revenue to justify the investments servicers make to service those loans in accordance with industry standards.

53.    As acknowledged by Messrs. Friend and Tarter in their reports for plaintiffs, the servicing of the At-Issue Loans was governed by mortgage industry standards.  The standards that govern ancillary services are set forth in the servicing guidelines of the GSEs because, as noted above, the lenders that made the At-Issue Loans required plaintiffs to sign the GSE form of note and security instrument.

54.    The servicing guide for one of the GSEs, Fannie Mae, makes clear that the "other fees" referenced in the GSE form of security instrument includes fees for expedited services.

Section A2-3-05 of the Fannie Mae servicing guide provides that servicers are allowed to charge borrowers fees for providing ancillary services, including, but not limited to, expedited services – such as the expedited payoff statements provided to plaintiffs – because a servicer's servicing fee "is not intended to encompass certain additional work that the servicer performs at the borrower's request or on the borrower's behalf."[35]

55.    In addition, the government agency responsible for managing the GSEs while they are in conservatorship, FHFA, has made it clear that servicers are authorized to charge borrowers for expedited delivery of payoff statements.  A September 27, 2011, discussion paper on servicer compensation compiled by FHFA, stated that "[s]ervicers are also entitled to certain ancillary fees under the Servicing Guidelines [of the GSEs], which include, among other things, late fees assessed on delinquent payments, *charges for issuing payoff statements*, fax charges, biweekly payment fees, and advertising supplement fees."[36]

56.    The FHFA and GSE approach to servicer compensation is followed by government insurers of mortgage loans, such as the FHA.  The September 27, 2011, discussion paper on servicer compensation mentioned above was a product of a joint effort by FHFA, Ginnie Mae and FHA.[37]  In addition, the servicing guide published by FHA makes clear that a servicer is permitted to charge fees for expedited delivery of a payoff statement.[38]

---

[35]    Fannie Mae, *Servicing Guide*, § A2-3-05, Fees for Certain Servicing Activities (11/08/2017).

[36]    Alternative Mortgage Servicing Compensation Discussion Paper (September 27, 2011) ("September 27 Compensation Paper"), at 6 (emphasis added).

FHFA and the GSEs also recognize that some ancillary fees may be prohibited by laws that are not superseded by FHFA's regulatory authority or the charters of the GSEs.  This does not change the fact that, to the extent ancillary fees are not prohibited by such laws, the GSEs permit the fees.

[37]    September 27 Compensation Paper, at 2.

[38]    Federal Housing Administration, FHA Single Family Housing Policy Handbook 4000.1 (January 10, 2025), § III.A.1.f.ii.A., at 1172 & Appendix 3.0.

57. Other regulators also recognize that services are entitled to charge fees for ancillary services and that such fees are common practice within the industry. For example, the Office of the Comptroller of the Currency has indicated that depository institutions are permitted to charge fees for expedited delivery of payoff statements.[39] In addition, in a 2016 survey, the Department of Veterans Affairs ("VA") determined that servicers charge up to $30 for processing payoff statements.[40] Moreover, VA's regulations authorize the department to charge its borrowers up to $30 to process a payoff statement.[41]

58. Finally, the GSE form of security instrument authorizes a servicer – such as Nationstar – to "charge Borrower fees for services performed in connection with Borrower's default, for purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees."[42] The form also provides that, "[i]n regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee."[43] The security instruments for plaintiffs' loans include these provisions.[44]

---

[39]  Comptroller of the Currency, *Interpretive Letter #1069* (August 21, 2006).

[40]  81 Fed. Reg. 74382, 74385.

[41]  38 CFR 36, §36.4529(5).

[42]  *See, e.g.*, WASHINGTON--Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT, Form 3048 07/2021 (rev. 09/22), § 15(b); MARYLAND--Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT, Form 3021 07/2021, § 15(b).

[43]  *See, e.g.*, WASHINGTON--Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT, Form 3048 07/2021 (rev. 09/22), § 15(c); MARYLAND--Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT, Form 3021 07/2021, § 15(c).

[44]  Hackinen Security Instrument, § 14, NSM_SALOM 00005-000019, at 000014; Palazzo Security Instrument, § 14, NSM_SALOM 002562-2575, at 002571; Salom Security Instrument, § 14, NSM_SALOM 005882-5898, at 005891.

59.     In his report, Mr. Friend claims that the GSE form of security instrument does not

"expressly authorize" a servicer to charge a fee for the expedited delivery of a payoff

statement.[45]  There are at least three problems with this claim.

60.     First, the GSE form of security instrument clearly states that servicers may charge fees

for ancillary services, which include expedited delivery of payoff statements.  Mr. Friend

does not explain what he means by the term "expressly authorize" as used in his report.

But if Mr. Friend is asserting that the form does not authorize the charging of expedited-

delivery fees for payoff statements because the form does not refer specifically to

expedited-delivery fees for payoff statements, then he is missing the forest for the trees.

In their forms and servicing guidelines, the GSEs regularly authorize or prohibit multiple

different types of servicer actions without identifying each authorization or prohibition

specifically.  For example, the GSE servicing guides regularly prohibit servicers from

violating "applicable law" without advising servicers of which laws are applicable to

servicing work.[46]

61.     Second, both Fannie Mae and the conservator of the GSEs, FHFA, make clear that the

fees authorized by the form of security instrument include expedited-delivery fees.  Mr.

Friend acknowledges in his report that, among other things, the "requirements of Fannie

Mae, Freddie Mac … establish much of the customary and usual servicing practices

expected to be adhered to by servicers …"[47]  But Mr. Friend makes no reference to the

---

[45]   Friend Report, at 2.

[46]   *See, e.g.*, Fannie Mae, *Servicing Guide*, F-1-17, Processing a Transfer of Ownership (11/13/2024) ("Once
Fannie Mae returns the executed assignment of mortgage to the servicer, the servicer is authorized to execute
the assumption or assumption and release agreement, as applicable, must record the agreement if required by
*applicable law*, and must send a copy of the executed agreement (original recorded, if applicable) to its
document custodian.") (emphasis added).

[47]   Friend Report, at 4.

fact that, in its servicing guide, Fannie Mae states clearly that a servicer may charge fees for expedited delivery of payoff statements and, in its public statements, FHFA makes clear that a servicer may charge fees in connection with payoff statements.

62.    Third, I have worked extensively on servicing compensation issues with FHFA and both GSEs, including during the 12 years I worked as an attorney and business executive at Fannie Mae, and, in my experience, it is generally accepted by officials at those agencies that servicers may elect to charge ancillary fees, including fees for the expedited delivery of payoff statements.  FHFA and the GSEs spend a considerable amount of time discussing the appropriate level of compensation for servicers.  In all of the FHFA and GSE discussions I have participated in regarding servicer compensation, I have never heard anyone suggest, much less propose, that the GSEs should prohibit servicers from charging fees for ancillary services.  Instead, I have heard officials from FHFA and both GSE discuss the fact that servicers charge fees for ancillary services and also indicate that those fees are consistent with industry standards.

63.    In the Amended Complaint, plaintiffs claim that the expedited-service fees at issue in this case "are nothing more than junk fees added unfairly or deceptively to the accounts of mortgage borrowers and thousands of other consumers by Nationstar."[48]  That is not how such fees are treated by FHFA or the GSEs.  As noted above, the GSEs depend on servicers to manage GSE loans.  As a result, the GSEs run the risk that, if servicer compensation is inadequate, servicers will not make the investments necessary to properly service GSE loans or, if servicer compensation is too high, loans will not be affordable for borrowers.  In February 2011, FHFA published a paper in coordination

---

[48]    Amended Complaint, ¶ 5.

with Ginnie Mae and FHA that describes this balancing act.[49]  The paper notes that the goal of FHFA and GSE work on servicing compensation is, among other things, to provide borrowers with "[a]ccess to a competitive, inexpensive mortgage market" while at the same time ensuring that servicing is "profitable."[50]

64.  Ancillary service fees help FHFA and the GSEs strike a balance between servicer profitability and affordability for borrowers.  In the September 27, 2011, FHFA discussion paper on servicer compensation mentioned above, FHFA publicly stated that ancillary fees support a goal that benefits the GSEs and borrowers:  encouraging servicers to keep borrowers current on their loans.  After listing various types of servicer compensation, including ancillary fees, the paper notes that "[a]s a result of the compensation structure described above, a servicer is incented to keep loans current, or to restore loans to a performing status, in order to maintain their servicing fee cash flows."[51]  At the same time, the fees make loans affordable for mortgage borrowers.  As explained above, servicers earn servicing fees and ancillary fees.  Without the ancillary fees, FHFA and the GSEs would have to increase the servicing fee for loans.  That increase would, in turn, increase the cost of loans for every borrower since, as explained above, the servicing fee is paid out of a loan's interest income, which is paid by all borrowers.  With the ancillary fees, on the other hand, the only borrowers who pay them are borrowers who elect, voluntarily, to use ancillary services.  At the same time, all borrowers – including the ones who elect to use ancillary services – pay lower interest rates.

---

[49]  *Servicing Compensation Initiative pursuant to FHFA Directive in Coordination with HUD:  Background and Issues for Consideration* (February 2011) ("Servicing Compensation Initiative White Paper").

[50]  Servicing Compensation Initiative White Paper, at 4.

[51]  September 27 Compensation Paper, at 7.

65.     The balancing act managed by FHFA and the GSEs is based on a practical reality.
Managing the economics of servicing is like shaping a water balloon, where the water in
the balloon represents the revenue necessary to ensure loans are affordable to borrowers
and, at the same time, to make servicing profitable for servicers.  Squeezing one part of
the balloon – such as fees for ancillary services – may shrink that part of the balloon.  But
it will also, at the same time, increase the size of another part of the balloon – servicing
fees.

66.     While FHFA and the GSEs authorize fees for ancillary services, they are at the same time
careful to prohibit fees that may impair a borrower's ability to afford their loans.  For
example, Freddie Mac prohibits servicers from charging borrowers "any processing fee
or other administrative fee in connection with the processing of a loan modification"
because loan modifications are designed to make a delinquent borrower's loan affordable
to the borrower.[52]  In addition, the GSEs require servicers to waive fees they could
otherwise charge if the waiver helps modify a delinquent loan.  For example, Fannie Mae
requires servicers "waive all late charges, penalties, stop payment fees, or similar charges
upon the borrower's conversion to a permanent mortgage loan modification."[53]

67.     The plaintiffs benefited from the FHFA and GSE approach to servicing economics.  The
fees they paid supported lower interest rates on the loans they paid off as well as on the
new loans that replaced the paid off loans.  Moreover, I have not seen any evidence that
the plaintiffs were harmed by the fees.  They were able to pay the fees and the fees did
not keep the plaintiffs from qualifying for new loans.

---

[52]   Freddie Mac, Seller/Servicer Guide, 9206.15, Expenses, delinquent amounts, capitalization rules and expense reimbursement for modifications (Effective 02/12/2025).

[53]   Fannie Mae, Servicing Guide, D2-3.2-06, Fannie Mae Flex Modification (11/13/2024).

### B.    Nationstar's Payoff-Statement Policies and Procedures are Designed to Comply with Industry Standards and Applicable Law

68.    As explained above, I have been responsible for servicer oversight and legal compliance work throughout my career – including my leadership of MHA, which oversaw the servicing of more than 90% of all mortgage loans in the U.S.  Based on my experience, it is my opinion that the policies and procedures Nationstar follows in connection with the expedited production and delivery of payoff statements are designed to comply with industry standards and applicable law.

69.    Under those policies and procedures, Nationstar provides borrowers in Maryland and Washington with payoff statements by mail at no charge.[54]  Nationstar sends statements within three business days of a borrower's request even though, under federal law, Nationstar has, in general, seven business days to send statements.[55]  Moreover, a borrower may request multiple payoff statements by mail at no charge even though, under GSE guidelines, Nationstar is authorized to charge for "more than one payoff statement in a short period of time."[56]

70.    A borrower may request expedited delivery of a payoff statement by Nationstar. Nationstar charges for expedited delivery but only after taking steps to ensure the borrower consents to the charge.  A borrower may elect to order expedited delivery only after they are informed of the fee for the service and they affirmatively consent to the

---

[54]    Revised Declaration of Courtney Ehinger, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (November 2024) ("Ehinger Declaration"), ¶ 8.

[55]    Ehinger Declaration, ¶ 8; NSM_SALOM 020023.

[56]    NSM_SALOM 019943-19944; Fannie Mae, *Servicing Guide*, § A2-3-05, Fees for Certain Servicing Activities (11/08/2017).

fee.[57]  For example, before Ms. Palazzo could order expedited delivery of her payoff

statement on Nationstar's web site, she had to read a disclosure that there was a fee for

expedited delivery and she had to affirmatively consent to paying the fee.

71.    Nationstar's payoff-statement policies and procedures account for state restrictions on

fees for expedited deliveries of payoff statements.  In Maryland and Washington,

Nationstar charges $25 for expedited delivery.  In states that cap the amount Nationstar

can charge, however, Nationstar charges only the amount allowed by the state.  For

example, Georgia allows servicers to charge a maximum of $10 for expedited delivery

and, therefore, Nationstar charges that amount for Georgia loans.[58]  In addition,

Nationstar does not charge any fee for expedited delivery in those states that prohibit the

fees, including Alabama, Indiana and Iowa.[59]  In Maryland and Washington, the states for

plaintiffs' loans, the states do not restrict expedited-delivery fees.

72.    Nationstar's policies and procedures also account for the fact that some government

insurers of mortgage loans limit the amounts a servicer can charge for expedited delivery

of a payoff statement.  For example, as explained above, while FHA allows servicers to

charge a fee for expedited delivery, FHA also caps the fee at $5.[60]  To manage this

limitation, Nationstar determines whether a loan is insured by FHA before charging a fee

for expedited delivery and, if the loan is an FHA loan, Nationstar only charges $5.[61]

---

[57]    Ehinger Declaration, ¶¶ 17-18.

[58]    NSM_SALOM 019943.

[59]    NSM_SALOM 019942-19943.

[60]    Federal Housing Administration, FHA Single Family Housing Policy Handbook 4000.1 (January 10, 2025), § III.A.1.f.ii.A., at 1172 & Appendix 3.0.

[61]    Ehinger Declaration, ¶ 10.

73.    All of Nationstar's payoff-statement policies and procedures are reviewed by Nationstar's counsel for compliance with industry standards and applicable laws.[62]  In addition, Nationstar has invested millions of dollars in software and hardware to ensure that, when its systems provides a payoff statement pursuant to a request for expedited delivery of a payoff statement, the statement is accurate and complete and any fees Nationstar charges comply with industry standards and applicable law.[63]  The industry standards and laws that govern the expedited production of payoff statements are coded into the systems.

74.    In the report he submitted for plaintiffs, Mr. Tarter claims that, at Nationstar, "internal systems and processes (guard rails) may have been specifically designed to not detect" allegedly unauthorized charges of expedited-service fees to borrowers.[64]  But Mr. Tarter does not substantiate this claim.  He does not identify a single Nationstar policy, procedure or practice that "was specifically designed to not detect" any breach of borrower contracts or violations of law.

75.    Moreover, the Nationstar policies and procedures Mr. Tarter does cite support a completely different conclusion.  Among other things, Mr. Tarter makes the following observations regarding Nationstar's compliance with borrower contracts and the law.[65]

    i.    "Nationstar and every major loan servicer I know has a Compliance Department as well as internal external auditors, extensive policies and procedures and internal controls and systems for the loans they service."

    ii.    Nationstar's Code of Business Conduct and Ethics is "relatively similar to other financial institutions that engage in loan servicing

---

[62]    Ehinger Declaration, ¶ 9.

[63]    Ehinger Declaration, ¶ 15.

[64]    Tarter Report, at 13.

[65]    Tarter Report, at 11, 13 & 14.

including the requirement to comply with the laws and regulations
that apply to their business."

76.    Finally, I have not seen any evidence in the materials I reviewed for this case regarding

Nationstar's policies, procedures and practices that Nationstar is ignoring its compliance

obligations.  Instead, as explained above, I have observed the exact opposite.

77.    In sum, Mr. Tarter's claim that Nationstar "may have" have had policies and procedures

"specifically designed to not detect" breaches of borrower contracts and violations of law

is based entirely on baseless speculation.

**VI.    Conclusion**

78.    It is well established under industry standards that servicers are permitted to charge a fee

for expediting the delivery of payoff statements, and Nationstar's policies and procedures

are designed to comply with those standards and applicable law.


Respectfully submitted,


Marcel Bryar

**Appendix A**

Materials Produced in this Case

NSM_SALOM 000001-020055

Pleadings

Amended Complaint, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (May 30, 2024)

Depositions

Deposition of Nationstar Mortgage LLC Corp Rep, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (March 11, 2025) and exhibits thereto

Videotaped Zoom Deposition of Peter Hackinen, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 12, 2025) and exhibits thereto

Oral and Videotaped Deposition of Courtney Ehinger, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (January 14, 2025) and exhibits thereto

Zoom Deposition of Ricardo Salom, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 10, 2025) and exhibits thereto

Videotaped Zoom Deposition of Catherine Palazzo, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 12, 2025) and exhibits thereto

Declarations

Revised Declaration of Courtney Ehinger, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (November 2024)

Declaration of Richard St. Onge, as Authorized Corporate Designee for the Washington State Department of Financial Institutions, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 13, 2025)

Declaration of Kathleen Hyland, as Authorized Corporate Designee for the Office of Financial Regulation in the Maryland Department of Labor, *Salom et al. v. Nationstar Mortgage LLC et*

1

*al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 14, 2025)

Declaration of Cristi Richey, as Authorized Corporate Representative for Federal National Mortgage Association, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 14, 2025)

Declaration of Dean Meyer, as Authorized Corporate Designee for Federal Home Loan Mortgage Corporation, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 25, 2025)

<u>Expert Reports Produced by Plaintiffs</u>

Preliminary Report of Andrew G. Pizor, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 7, 2025)

Preliminary Expert Witness Report of David L. Friend, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 7, 2025)

Expert Witness Report of Bernard Jay Patterson, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 7, 2025)

Expert Report of Thomas A. Tarter, *Salom et al. v. Nationstar Mortgage LLC et al.*, United States District Court for the Western District of Washington, Case No. 2:24-cv-00444-BJR (February 10, 2025)

<u>Publications</u>

Housing Finance Policy Center, *Housing Finance at a Glance:  A Monthly Chartbook* (January 2025)

<u>GSE and FHA Guidance and Forms</u>

Fannie Mae, *Servicing Guide*, § A2-3-05, Fees for Certain Servicing Activities (11/08/2017)

Federal Housing Administration, FHA Single Family Housing Policy Handbook 4000.1 (January 10, 2025)

WASHINGTON--Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT, Form 3048  07/2021 (rev. 09/22), § 15(b)

MARYLAND--Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT, Form 3021 07/2021, § 15(b)

Fannie Mae, *Servicing Guide*, F-1-17, Processing a Transfer of Ownership (11/13/2024)

Freddie Mac, Seller/Servicer Guide, 9206.15, Expenses, delinquent amounts, capitalization rules and expense reimbursement for modifications (Effective 02/12/2025)

Fannie Mae, Servicing Guide, D2-3.2-06, Fannie Mae Flex Modification (11/13/2024)

Fannie Mae, *Servicing Guide*, § A2-3-05, Fees for Certain Servicing Activities (11/08/2017)

<u>Government Records</u>

MDLANDREC, *available at* mdlandrec.net

Financial Agency Agreement for a Homeownership Preservation Program under the Emergency Economic Stabilization Act of 2008, effective as February 18, 2009, by and between the U.S. Department of the Treasury and Fannie Mae

<u>Government Reports</u>

"FHFA At-A-Glance," *available at* https://www.fhfa.gov/About

Congressional Oversight Panel, "December Oversight Report: A Review of Treasury's Foreclosure Prevention Programs," December 14, 2010

Federal Housing Finance Agency, "Servicing Alignment Initiative Frequently Asked Questions," *available at* https://www.fhfa.gov/faqs/servicing-alignment-initiative

https://www.fhfa.gov/conservatorship

Alternative Mortgage Servicing Compensation Discussion Paper (September 27, 2011)

*Servicing Compensation Initiative pursuant to FHFA Directive in Coordination with HUD: Background and Issues for Consideration* (February 2011)

<u>Laws and Regulations</u>

15 U.S.C. 1639g

Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289 (July 30, 2008)

The Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204 (July 30, 2002)

Asset-Backed Securities (Regulation AB), 17 C.F.R. §§ 229.1100 – 229.1125

Federal National Mortgage Association Charter Act, Title III of the National Housing Act, 12 U.S.C. 1716 et seq. (As amended through July 25, 2019), § 309(c)(2);

Federal Home Loan Mortgage Corporation Act, Public Law No. 91-351, 84 Stat. 450 (Approved July 24, 1970, As amended through January 3, 2023), § 303(e)

Comptroller of the Currency, *Interpretive Letter #1069* (August 21, 2006).

81 Fed. Reg. 74382

38 CFR 36

**Appendix B**

**Curriculum Vitae**

**Marcel Augusto Bryar**

*Work Addresses:*

Mortgage Policy Advisors LLC
One Thomas Circle NW
Suite 700
Washington, DC  20005

Housing Gears LLC
7405 Brunswick Circle
Boynton Beach, FL  33472

Horizon Legal PLLC
One Thomas Circle NW
Suite 700
Washington, DC  20005

*Telephone Numbers:*

Office:  202-960-1602

Mobile:  202-746-4450

*E-mails:*

Mortgage Policy Advisors:  mbryar@mpadvisorsgroup.com

Housing Gears:  marcel.bryar.td.87@aya.yale.edu

Horizon Legal:  mbryar@horizonlegaladvisors.com

*Education:*

Yale College, Bachelor of Arts, 1987 – *summa cum laude*; Honors in History; Phi Beta Kappa.

Yale Law School, Juris Doctor, 1993.

*Bar Admissions:*

District of Columbia

Commonwealth of Massachusetts (inactive)

*Subject Matter Expertise:*

**Mortgage industry compliance**, including compliance with fair lending, servicing and origination rules.

**Mortgage loan origination standards and practices**, including underwriting standards, origination practices and loan processing and closing operations.

**Mortgage servicing standards and practices**, including GSE, FHA, VA, USDA, PLS and non-QM standards, delinquent loan servicing operations, property inspection and preservation practices, marketing and sale of REO, servicing accounting and the role of servicers, subservicers and master servicers.

**Mortgage securitization standards and practices**, including GSE, Ginnie Mae and PLS securitization operations and investor remittances and reporting.

**Economics of mortgage business**, including servicing compensation, advances and incentives.

**Mortgage technology**, including servicing systems, default management systems and loan origination systems.

**Market for residential real estate**, including real estate agent practices and property valuation standards.

*Employment:*

| 2023 – Present | Founder, Horizon Legal PLLC (licensed in the District of Columbia) |
|---|---|
| 2020 – Present | Co-Founder, Managing Director, Mortgage Policy Advisors LLC |
| 2017 – Present | Founder, Managing Director, Housing Gears LLC |
| 2014 – 2022 | Co-Founder, Managing Director, Bryar & Wollner LLC |
| 2012 – 2014 | Senior Vice President, Mortgage Bank Operations Executive, JP Morgan Chase & Co., Inc. |
| 2011 – 2012 | Vice President, Credit Loss Vendor Management, Fannie Mae |
| 2009 – 2011 | Vice President, Making Home Affordable Program, Fannie Mae |
| 2009 | Vice President & Deputy General Counsel, Government Initiatives, Fannie Mae |
| 2007 – 2009 | Vice President & Deputy General Counsel, Procurement, Fannie Mae |
| 2006 – 2007 | Director, Policies & Programs, Fannie Mae |
| 2005 | Associate General Counsel, Restatement & Regulatory Agreements, Fannie Mae |
| 2000 – 2004 | Associate General Counsel, eSolutions & Technology, Fannie Mae |
| 1999 – 2000 | Telecommunications Act Counsel, Verizon Communications Inc. |
| 1996 – 1998 | Venture Company Associate, Foley Hoag, LLP |
| 1995 – 1996 | Litigation Associate, Foley Hoag, LLP |
| 1993 – 1994 | Trial Attorney, U.S. Department of Justice, Civil Rights Division, Voting Section |
| 1988 – 1990 | Editor & Research Assistant, Honorable Joseph A. Califano, Jr. |
| 1987 | Carnegie Intern, Carnegie Endowment for International Peace |

***Representative Experiences in the Mortgage Industry:***

**Consulted with mortgage banks** regarding origination practices, including marketing, solicitation, underwriting, processing and closing.

**Worked with property inspection and preservation companies** on their operations and technology.

**Developed data and workflow systems** for the origination, processing, closing and servicing of mortgage loans.

**Worked on regulatory and agency guidance** regarding the origination and servicing of mortgage loans.

**Consulted with insurance companies** regarding lender placed insurance.

**Advised mortgage banks** regarding compliance with Making Home Affordable program guidelines and origination and servicing law and regulations.

**Led mortgage bank teams responsible** for loan boarding, loan transfers and credit bureau reporting.

**Developed and implemented data quality management plan** for new loans originated through mortgage bank's origination channels.

**Re-engineered loan boarding operations** that had failed three internal audits.

**Led team of 25 staff responsible** for reviewing servicing expenses incurred by mortgage servicers.

**Saved $177M** by re-negotiating relationships with mortgage insurance companies.

**Developed new nationwide marketplace** for lender-placed insurance premiums.

**Led team of 600 staff responsible** for developing and implementing MHA.

**Coordinated MHA teams**, including policy, legal, communications, reporting, finance, planning, and analysis, technology, and operations functions.

**Worked closely with government officials** at the U.S. Department of the Treasury, the National Economic Council, the U.S. Department of Housing and Urban Development and the Federal Housing Finance Agency on mortgage industry standards.

**Re-engineered program management office** to establish a formal governance structure for implementation of MHA.

**Led development of common Government Sponsored Enterprise loan modification programs**, persuading each GSE to resolve differences in their approaches and FHFA to mandate unified approach.

**Served as General Counsel for Fannie Mae's Troubled Assets Relief Program**, counseling TARP team regarding development and implementation of the program.

**Developed and implemented multiple listing service data program and short-sale operation**, working with real estate agents across the United States.

**Structured and negotiated service, technology and data contracts to support Fannie Mae business operations**, including underwriting, securitization, servicer oversight and portfolio acquisitions and management.

**Founded and organized compliance and ethics team** for Fannie Mae.

**Oversaw implementation of regulatory agreements between** Fannie Mae and its safety and soundness regulator at the time, the Office of Federal Housing Enterprise Oversight, governing Fannie Mae's risk management practices.

**Provided regulatory and joint venture advice** to Fannie Mae business team developing ecommerce platform for originating, underwriting, processing and closing mortgage loans.

**Served as legal counsel for credit policy team** in connection with the development of mortgage loan products and origination standards.

**Litigated accounting malpractice cases** involving mortgage banks.

**Researched and wrote papers** on founding of GSEs and securitization of mortgage loans.

Appendix C

**Expert Deposition Testimony of Marcel Bryar in the Past Four Years (as of November 7, 2024)**

| No. | Case | Deposition Testimony |
|---|---|---|
| 1 | *County of Cook v. Bank of America Corporation, Bank of America, N.A., Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB, Countrywide Warehouse Lending, LLC, BAC Home Loans Servicing, LP, Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Capital Inc., and Merrill Lynch Mortgage Lending, Inc.*, United States District Court for the Northern District of Illinois, Case No. 1-14-cv-2280. | 2021 |
| 2 | *Samuel Voss v. Quicken Loans, LLC and Mortgage Electronic Registration Systems, Inc.,* United States District Court for the Southern District of Ohio, Case No. 1:20-cv-00756. | 2021 |
| 3 | *In re the Matter of the Rehabilitation of: PMI Mortgage Insurance Co., an Arizona corporation; Ocwen Loan Servicing, LLC, et al. v. Evan G. Daniels, Director of the Arizona Department of Insurance and as Receiver, of PMI Mortgage Insurance Co., et al.*, Superior Court for the State of Arizona in and for the County of Maricopa, Case No. CV 2011-018944. | 2021 |
| 4 | *Ambac Assurance Corporation v. U.S. Bank National Association,* United States District for the Southern District of New York, Case No. 17-cv-2614. | 2021 |
| 5 | *National Credit Union Administration Board et al. v. Deutsche Bank National Trust Co.*, United States District Court for the Southern District of New York, Case No. 14-cv-8919. | 2021 |
| 6 | *National Fair Housing Alliance et al. v. Bank of America, National Association et al.*, United States District Court for the District of Maryland, Case No. 1:18-cv-1919. | 2022 |
| 7 | *U.S. Mortgage Finance, LLC et al. v. BAC Florida Bank,* Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 2020-009959-CA-01. | 2022 |
| 8 | *HSBC Bank USA, N.A. v. PHH Mortgage Corporation*, Supreme Court of the State of New York, County of New York, Index No. 655868/2020. | 2022 |
| 9 | *National Fair Housing Alliance, et al. v. Deutsche Bank National Trust, et al.*, United States District Court for the Northern District of Illinois, Case No. 18-cv-839. | 2023 |
| 10 | *Donna Kemp v. Seterus, Inc. and Federal National Mortgage Association*, United States District Court for the District of Maryland, Case No. 8:18-cv-00472. | 2023 |
| 11 | *Freedom Mortgage Corporation v. LoanCare, LLC*, United States District Court for the District of New Jersey, Case No. 1:16-cv-02569. | 2023 |

| 12 | *PRCM Advisers LLC, Pine River Capital Management L.P., and Pine River Domestic Management L.P. vs. Two Harbors Investment Corp.*, United States District Court for the Southern District of New York, Case No. 1:20-cv-05649. | 2023 |
|----|---|------|
| 13 | *LoanCare, LLC, v. DIMONT & Associates, LLC, & Investor Claim Solutions, LLC*, United States District Court for the Southern District of New York, Case No. 1:22-cv-09286. | 2024 |
| 14 | *Federal Deposit Insurance Corporation as Receive for Washington Mutual Bank v. Ark-La-Tex Financial Services, LLC, d/b/a Benchmark Mortgage*, United States District Court for the Central District of California, Case No. 8:22-cv-01491. | 2024 |
| 15 | *Commerzbank AG v. Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas*, United States District Court for the Southern District of New York, Case No. 15-cv-10031-JGK. | 2024 |
| 16 | *IKB International, S.A., et al. v. The Bank of New York et al.*, Supreme Court of the State of New York, County of New York, Index No. 654438/2015, IAS Part 60 (Crane, J.). | 2024 |
| 17 | *IKB International, S.A., et al. v. U.S. Bank National Association*, Supreme Court of the State of New York, County of New York, Index No. 654442/2015, IAS Part 60 (Crane, J.). | 2024 |
| 18 | *IKB International, S.A., et al. v. Deutsche Bank National Trust Company, et al.*, Supreme Court of the State of New York, County of New York, Index No. 654439/2015, IAS Part 60 (Crane, J.). | 2024 |
| 19 | *loanDepot.com, LLC v. CrossCountry Mortgage, LLC et al.*, JAMS Alternative Dispute Resolution, JAMS Case NO. 5240000056. | 2024 |
| 20 | *National Credit Union Administrative Board, as liquidating agent of U.S. Central Federal Credit Union, Western Corporate Federal Credit Union, and Southwest Corporate Federal Union, against U.S. Bank National Association*, United States District Court for the Southern District of New York, Case No. 18-cv-11366-LLS. | 2024 |